No. 24-1193

*In the*

# United States Court of Appeals
*for the*
## District of Columbia Circuit

———————————————

CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA, *et al.*,

*Petitioners*,

– v. –

ENVIRONMENTAL PROTECTION AGENCY *and*
MICHAEL S. REGAN, *in his official capacity as EPA Administrator*

*Respondents*,

*&*

CLEAN CAPE FEAR, ET AL.,

*Intervenors for Respondent.*

———————————————

On Petition for Review of a Final Rule of the Environmental Protection
Agency, 89 Fed. Reg. 39,124 (May 8, 2024)

———————————————

**BRIEF OF THE NATIONAL ASSOCIATION OF MANUFACTURERS AND
PRINTING UNITED ALLIANCE AS *AMICI CURIAE*
IN SUPPORT OF PETITIONERS AND VACATUR**

———————————————

ERICA T. KLENICKI
MICHAEL A. TILGHMAN II
*NAM Legal Center*
*733 10th Street NW*
*Washington, DC 20001*
*(202) 637-3000*

*Counsel for the National*
*Association of Manufacturers*

MICHAEL B. KIMBERLY
*Winston & Strawn LLP*
*1901 L Street, N.W.*
*Washington, DC 20036*
*(202) 282-5000*

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

In accordance with D.C. Circuit Rule 28(a)(1), *amici* state:

**1.      Parties, intervenors, and *amici*:** Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in the opening brief of petitioners, at page i.

*Amici* supporting petitioners are the National Association of Manufacturers and PRINTING United Alliance.

**2.      Rulings under review:** References to the rulings at issue appear in the petitioners' opening brief, at page ii.

**3.      Related cases:** This case was not previously before this or any other Court.

## CORPORATE DISCLOSURE

Pursuant to Rules 26.1 and 29(a)(4)(A), *amici curiae* disclose that:

The National Association of Manufacturers is a nonprofit, tax-exempt organization located in the District of Columbia. It has no parent corporation, and no publicly held company has 10% or greater ownership in it.

PRINTING United Alliance is a nonprofit, tax-exempt organization located in Virginia. It has no parent corporation, and no publicly held company has 10% or greater ownership in it.

# TABLE OF CONTENTS

**Page**

Table of Authorities ...........................................................................iii

Glossary of Abbreviations............................................................. v

Introduction and the Interest of the *Amici Curiae* ........................................ 1

Argument ............................................................................... 5

    A.  EPA violated the APA by failing to allow public comment on its cost-benefit analysis........................................................................ 6

    B.  If given an opportunity to comment on EPA's cost-benefit analysis, amici and their members would have cast doubt on it .........13

Conclusion ............................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AFL-CIO v. Chao,*
496 F. Supp. 2d 76 (D.D.C. 2007) ..................................................... 14, 15

*Allina Health Services v. Sebelius,*
746 F.3d 1102 (D.C. Cir. 2014) .............................................................. 14

*American Public Gas Assoc. v. U.S. Department of Energy,*
22 F.4th 1018 (D.C. Cir. 2022)................................................................. 9

*American Public Gas Association v. U.S. Department of Energy,*
72 F.4th 1324 (D.C. Cir. 2023)................................................... 9, 10, 12

*American Radio Relay League, Inc. v. FCC,*
524 F.3d 227 (D.C. Cir. 2008)..................................................... 8, 13, 14

*Arizona Public Service Co. v. EPA,*
211 F.3d 1280 (D.C. Cir. 2000) .............................................................. 10

*AT&T Services v. FCC,*
21 F.4th 841 (D.C. Cir. 2021) ................................................................ 18

*Building Industry Association of Superior California v. Norton,*
247 F.3d 1241 (D.C. Cir. 2001)............................................................. 8, 9

*Chamber of Commerce v. SEC,*
443 F.3d 890 (D.C. Cir. 2006) ............................... 8, 9, 12, 13, 14, 15, 19

*Community Nutrition Inst. v. Block,*
749 F.2d 50 (D.C. Cir. 1984)................................................................... 9

*Connecticut Light & Power Co. v. Nuclear Regulatory Commission,*
673 F.2d 525 (D.C. Cir. 1982) ................................................................. 8

*Environmental Integrity Project v. EPA,*
425 F.3d 992 (D.C. Cir. 2005) ........................................................... 7, 10

*Gerber v. Norton,*
294 F.3d 173 (D.C. Cir. 2002) ............................................................... 14

*International Fabricare v. EPA,*
972 F.2d 384 (D.C. Cir. 1992)........................................................... 7, 12

**Cases—continued**

*International Union, United Mine Workers of America v. Mine*
   *Safety & Health Administration,*
   407 F.3d 1250 (D.C. Cir. 2005) ........................................ 6, 10

*Mingo Logan Coal Co. v. EPA,*
   829 F.3d 710 (D.C. Cir. 2016) ............................................. 18

*Sherley v. Sebelius,*
   689 F.3d 776 (D.C. Cir. 2012) ............................................. 18

*Solite Corp. v. EPA,*
   952 F.2d 473 (D.C. Cir. 1991) ............................................... 9

*Sugar Cane Growers Co-op of Fla. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002) .............................................. 14

*Texas Association of Manufacturers v. U.S. Consumer Product*
   *Safety Commission,*
   989 F.3d 368 (5th Cir. 2021) ...........................................7, 11

**Statutes**

5 U.S.C.
   § 553 .............................................................................. 4
   § 553(b)(3) ....................................................................... 6
   § 553(c) ........................................................................... 6
   § 706 .............................................................................. 14

42 U.S.C.
   § 9602 ............................................................................. 5
   § 9602(a) .......................................................................... 1
   § 9604 ............................................................................ 16
   § 9606 ............................................................................ 16

**Other Authorities**

87 Fed. Reg. 54,415 (Sep. 6, 2022) ............................. 3, 5, 10, 12

89 Fed. Reg. 39,124 (May 8, 2024) ................... 1, 4, 5, 10, 11, 12, 16, 17, 18

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| EA | Economic Analysis |
| EPA (the agency) | Environmental Protection Agency |
| NAM | National Association of Manufacturers |
| NPL | National Priorities List |
| PFAS | per- and polyfluoroalkyl substances |
| PFOA | perfluorooctanoic acid |
| PFOS | perfluorooctanesulfonic acid |
| RIA | Regulatory Impact Analysis |

## INTRODUCTION AND THE INTEREST OF THE *AMICI CURIAE*[1]

This case concerns the Environmental Protection Agency's (EPA) final rule designating two poly- and perfluoroalkyl substances (PFAS)—perfluorooctanoic acid (PFOA) and perfluorooctanesulfonic acid (PFOS)—hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). *See* 89 Fed. Reg. 39,124 (May 8, 2024) (the Rule). The Rule marks the first time in CERCLA's 44-year history that EPA has exercised authority to designate a hazardous substance under § 102(a)—a sort of residual clause. *See* 42 U.S.C. § 9602(a). CERCLA designation is a powerful regulatory tool, arming EPA with authority to saddle nearly every manufacturing sector with enormous costs.

The National Association of Manufacturers (NAM) is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs nearly 13 million people in the United States, contributes approximately $2.91 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for over half of all private-sector research

---

[1]    All parties consent to the filing of this brief. The brief was not authored by any party's counsel, in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of the brief; and no person, other than the *amici curiae*, its members, or its counsel, contributed money intended to fund the preparation or submission of the brief.

and development in the Nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

PRINTING United Alliance is the most comprehensive member-based printing and graphic arts association in North America. The Alliance proudly represents the diverse and widespread printing industry, a subsector of the manufacturing sector that employs nearly one million Americans and adds more than $375 billion to the United States economy. The Alliance is the voice of print communities and advocates for a pro-print legislative and regulatory agenda that allows the printing industry to thrive and paves the way for new print market opportunities throughout the United States.

The Rule directly affects *amici*'s members. Several have manufactured PFAS for use in their operations and products. Many more have used or relied on PFAS in their supply chains. PFAS have played a critical role in developing the products that have sustained modern America, such as medical technologies, semiconductors, batteries, phones, cars, and airplanes. For many manufacturing sectors, PFAS have been indispensable. Indeed, there are no viable alternatives to PFAS for many critical applications across a variety of manufacturing sectors.

*Amici's* members are committed to serving their communities, including by protecting their health, safety, and vibrancy. American manufacturers have

2

become leaders in environmental stewardship while continuing to drive economic growth and prosperity. To that end, *amici* recognize that there is a need to address PFAS through regulation. But such regulation must be pragmatic, logical, and based in science; otherwise, there is a risk of reactionary overcorrection, to broader social and economic detriment. Collaboration with industry during the rulemaking process is critical to striking the right balance.

That engagement was missing here. Despite threatening the manufacturing industry with substantial economic and logistical burdens, the agency deprived the public, including not just the parties to this case but also *amici* and their members, any opportunity to meaningfully comment on the costs and benefits of the Rule. Having (wrongly) concluded that CERCLA § 102(a) precluded it from considering costs when deciding whether to designate a substance as hazardous, EPA's rulemaking notice offered only the most cursory economic analysis for the proposed rule. It quantified only the direct costs associated with CERCLA's notification requirements, while offering a brief, "qualitative discussion" of other indirect costs, benefits, and purported cost transfers. *See* EA 39-56 (JA138-155). This, despite the U.S. Office of Management and Budget designating the action "economically significant," triggering specific requirements to assess and quantify a rule's costs and benefits under Executive Order 12866. *See* 87 Fed. Reg. 54,415, 54,439 (Sep. 6, 2022).

*Amici* told EPA that its cursory analysis and lack of relevant data precluded meaningful commentary. In response to these comments, EPA ultimately provided a more voluminous Regulatory Impact Analysis (RIA), which involved quantifying myriad direct and indirect costs, as well as potential health benefits—but it gave the public no opportunity to comment on its substance. The RIA is over *three times* longer than the economic assessment (EA) EPA released with the proposed rule. From this new data, EPA set aside the question whether CERCLA § 102(a) permits cost-benefit analysis and instead concluded that, under the totality of the circumstances, the Rule's benefits would justify its costs. 89 Fed. Reg. at 39,126, 39,131.

The agency did not offer the public any opportunity to review and comment upon the RIA—or its supporting data—before it finalized the Rule. Its failure to do so flouted the APA's notice-and-comment requirements. *See* 5 U.S.C. § 553. And as we demonstrate below, *amici* and their members, like petitioners, would have submitted highly pertinent comments casting doubt on the outcome. Because EPA committed serious procedural error by denying interested parties the opportunity to comment on the RIA, it must be set aside.[2]

---

[2] *Amici* note their strong agreement with the other grounds petitioners offer for vacating the Rule, including that EPA misinterpreted CERCLA § 102(a) and that key elements of the Rule are arbitrary and capricious.

# ARGUMENT

As the petitioners' brief explains, CERCLA § 102(a), codified at 42 U.S.C. § 9602, requires EPA to consider costs before designating a substance as hazardous. Petitioners' Br. 41-44. EPA took the opposite view in its notice of proposed rulemaking, "propos[ing] to interpret the language of CERCLA section 102(a) as *precluding* the Agency from taking cost in to account in designating hazardous substances." 87 Fed. Reg. at 54,421 (emphasis added). For all the reasons that petitioners give, that was wrong.

Perhaps recognizing its unsustainability, EPA did not ultimately hang its hat on that interpretation. In the final Rule, it did "not determine whether section 102(a) precludes consideration of costs and benefits" because it believed "designation [was] warranted when considering benefits and costs as part of the totality of the circumstances analysis." 89 Fed. Reg. at 39,165. To support that view, it published a lengthy RIA quantifying health benefits (RIA 129-143 (JA510-524)), direct costs of compliance (*id.* at 144-184 (JA525-565)), indirect costs stemming from enforcement actions (*id.* at 159-165 (JA540-546)), purported transfers from the government's Superfund to the private sector (*id.* at 170-187 (JA551-568)), and more. But EPA did not publish this analysis before finalizing the Rule or open a new notice-and-comment period. For the reasons the petitioners explained in their opening brief (at 44-51), and for the additional reasons we offer below, that was unlawful.

### A.    EPA violated the APA by failing to allow public comment on its cost-benefit analysis

Notice and comment is an integral part of the rulemaking process. The APA requires an agency to publish a notice of a proposed rule including "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). After providing notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). These procedures "ensure that agency regulations are tested via exposure to diverse public comment," "ensure fairness to affected parties," and "give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *International Union, United Mine Workers of America v. Mine Safety & Health Administration*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

Two interrelated principles safeguard the process: first, the logical-outgrowth doctrine; and second, the requirement that agencies disclose the underlying data supporting a rule. These principles ensure that agencies afford interested parties a *meaningful* opportunity to participate in the rulemaking process by prohibiting unfair surprise and ensuring access to the information necessary to persuasively criticize a rule. EPA's error, which implicates both,

6

unlawfully deprived *amici* and their members, like petitioners, of a meaningful opportunity to comment on the Rule.

**1.** Without additional notice and comment, "an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." *Environmental Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). The logical-outgrowth doctrine prevents agencies from "pull[ing] a surprise switcheroo on regulated entities." *Id.* A classic logical-outgrowth problem arises when an agency changes a rule in a way "interested parties [could not] have anticipated . . . was possible," and thus "would have had to divine the agency's unspoken thoughts" to comment upon the rule. *Id.* (quotations omitted) (cleaned up).

The doctrine also applies when an agency switches the *justification* for a final rule, even if the rule's text remains unchanged. *See Texas Association of Manufacturers v. U.S. Consumer Product Safety Commission*, 989 F.3d 368, 382-383 (5th Cir. 2021) (an agency "violate[s] the APA's notice-and-comment procedures by not adequately allowing for comment after it changed its primary justification for the rule but before adopting the final rule"). The core question is whether interested parties "had fair notice of, and full opportunity to comment on, the issue actually decided by" the agency (*International Fabricare v. EPA*, 972 F.2d 384, 399 (D.C. Cir. 1992)), or whether the agency

7

"changed the rule's reasoning," (*Building Industry Association of Superior California v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001)).

The principle that an agency cannot alter the technical foundation for a final rule without supplemental notice and comment complements the general requirement that an agency must divulge "the 'technical studies and data' upon which [it] relies" for "public evaluation." *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (quoting *Chamber of Commerce v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006)). Such disclosures are essential to "allow for useful criticism" of the agency's "decisions to propose particular rules." *Id.* (quoting *Connecticut Light & Power Co. v. Nuclear Regulatory Commission*, 673 F.2d 525, 530 (D.C. Cir. 1982)). An agency thus "commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Connecticut Light & Power Co.*, 673 F.2d at 530-531.

An agency must reopen a rule's comment period if it plans to rely on previously undisclosed data as "primary, rather than supplementary, evidence" in support of the rule. *Chamber of Commerce*, 443 F.3d at 903. Information is "supplementary" only if it "clarif[ies], expand[s], or amend[s] other data that has been offered for comment." *Id.* But "such 'supplementary' information . . . is distinct from 'provid[ing] entirely new information critical to

8

the [agency]'s determination.'" *Id.* at 900 (quoting *Community Nutrition Inst. v. Block*, 749 F.2d 50, 57-58 (D.C. Cir. 1984)).

This Court's decision in *American Public Gas Association v. U.S. Department of Energy* demonstrates the distinction between primary and supplementary evidence. 72 F.4th 1324, 1338 (D.C. Cir. 2023) (*APGA II*). There, the Court had remanded a final rule to the Department of Energy, concluding it was unreasonable for the agency to adopt the rule it had "[w]ithout a cogent and reasoned response to the substantial concerns the petitioners [had] raised about [a] crucial part of its analysis." *American Public Gas Assoc. v. U.S. Department of Energy*, 22 F.4th 1018, 1028 (D.C. Cir. 2022) (*APGA I*). On remand, the agency supplemented the final rule, relying on "new studies and documentation," including new "datasets," to support its methodology in response to the petitioners' concerns. *APGA II*, 72 F.4th at 1337. It published the supplement without notice and comment.

The Court held that the Department of Energy had violated the APA's notice-and-comment requirement and vacated the rule. It recognized that an agency does not run afoul of the APA merely by "rel[ying] on data submitted during the comment period" (*id.* at 1337 (quoting *Building Industry Assoc.*, 247 F.3d at 1246)) to "address alleged deficiencies in any pre-existing data," (*id.* (quoting *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991)). In that case, however, the new data was not "additional support" for the same

9

"hypothesis," but rather "entirely new information" that was "necessary to respond to [the Court's] order and justify a key [aspect of the agency's] analysis." *Id.* at 1337-38.

In short, an agency commits procedural error when its technical justification for a final rule departs from whatever it provided in its notice without offering the public an opportunity to comment on the new reasoning or the data supporting it. That is precisely EPA's error here.

**2.** Here, the APA required EPA to provide the public with an opportunity to comment on its significant changes to the final rule. Its failure to do so was serious procedural error.

Between the proposed and final rule, EPA unlawfully "pull[ed] a surprise switcheroo" regarding its legal and technical basis for designating PFOA and PFOS hazardous substances under CERCLA. *Environmental Integrity Project*, 425 F.3d at 996. It decided designation was warranted because, under a totality-of-the-circumstances approach, "the advantages of designation outweigh the disadvantages" (89 Fed. Reg. at 39,126), "including both quantified and unquantified costs" (*id.* at 39,131). This determination is "'surprisingly distant' from the proposed rule," which expressly refused to take any account of costs or benefits whatsoever. *United Mine Workers of America*, 407 F.3d at 1260 (quoting *Arizona Public Service Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000)); *see* 87 Fed. Reg. at 54,420-54,423.

10

EPA supported this determination with a brand-new RIA, chock full of technical data and analysis the public had no opportunity to review before the Rule was finalized—and that they were told the agency did not believe it could consider. The RIA included quantified health benefits (RIA 129-143 (JA510-524)), direct costs of compliance (*id.* at 144-184 (JA525-565)), indirect costs stemming from enforcement actions (*id.* at 159-165 (JA540-546)), costs that would purportedly be transferred from the government's Superfund to the private sector (*id.* at 170-187 (JA551-568)), and more. EPA quantified these estimates using data and methodologies entirely absent from the proposed rule or corresponding draft economic assessment. The economic assessment, in fact, contained almost no data or quantitative analysis at all.[3]

This is precisely the sort of change that requires an additional round of notice and comment. For one, the Rule itself is manifestly different; EPA shifted the Rule's "primary justification." *Texas Association of Manufacturers*, 989 F.3d at 383. The core determination that the Rule's advantages outweigh its disadvantages, including costs, (89 Fed. Reg. at 39,131), is not the logical outgrowth of the proposed rule's far more limited finding—that

---

[3]   The lone exception, EPA calculated direct costs associated with statutorily mandated notification activity. EA 39-42 (JA138-141). Although it estimated $0-$370,000 annually in notification costs, information EPA obtained from comments raised that projection nearly five-fold, to $0-$1,630,000 annually. *See* RIA 147-148 (JA528-529); 89 Fed. Reg. at 39,179.

PFOA/PFOS "may present substantial danger to the public health or welfare or the environment," *without* considering costs, (87 Fed. Reg. at 54,420).

And the RIA, along with its underlying data, is "primary, rather than supplementary, evidence" supporting the Rule. *Chamber of Commerce*, 443 F.3d at 903. It does not "clarify, expand, or amend other data that has been offered for comment"—there was *no* data offered for comment at all. *Id.* And this "entirely new information" was no doubt "necessary to . . . justify a key [aspect of EPA's] analysis." *APGA II*, 72 F.4th at 1337-38. EPA ultimately decided "not [to] determine whether section 102(a) precludes consideration of costs and benefits because designation is warranted *either* by examining the health- and environmental-based criteria alone *or* by examining these criteria along with the broader totality of the circumstances." 89 Fed. Reg. at 39,165 (emphasis added). EPA's cost-benefit determination was thus an independent basis for the Rule, without which the agency would have had to resolve the statutory question it expressly passed on.

At bottom, the public lacked "fair notice of, and full opportunity to comment on, the issue actually decided by" the agency: that the Rule's benefits outweighed its costs. *See International Fabricare Institute*, 972 F.2d at 399. That was unlawful.

To be sure, EPA requested comment on whether and how the agency should assess costs. *See* 87 Fed. Reg. at 54,423. But that does not excuse its

failure to allow comment on the material it ultimately relied on. The data and methodologies EPA used to assemble the RIA did not come from public comments, but rather its own analyses from other rulemakings (*see, e.g.*, RIA 129 n.187 (JA510)), EPA's PFAS Analytic Tool (*id.* at 137 (JA518)), various studies (*see, e.g.*, *id.* at 137-140 (JA518-521)), and more—none of which EPA previously signaled it would rely on. Even where the agency incorporated analyses from previous rulemakings, it crafted new methodologies to approximate costs and benefits for *this* Rule. *See, e.g.*, RIA 140-141 (JA521-522). EPA's "bare request for information on costs" in the proposed rule did not remotely provide the sort of notice the APA requires. *See Chamber of Commerce*, 443 F.3d at 904-905 ("The Commission's bare request for information on costs . . . did not place interested parties on notice that, in the absence of receiving reliable cost data during the comment period, the Commission would base its cost estimates on an extra-record summary of extra-record survey data[.]").

### B.    If given an opportunity to comment on EPA's cost-benefit analysis, *amici* and their members would have cast doubt on it

Without question, EPA's notice-and-comment violation prejudiced not just the petitioners here, but also *amici* and their members—any other interested party positioned to bear the Rule's costs.

"The failure to disclose for public comment is [generally] subject . . . to 'the rule of prejudicial error'" (*American Radio Relay League*, 524 F.3d at 237

(quoting 5 U.S.C. § 706)), meaning a challenger must show it "suffered prejudice from the agency's failure to provide an opportunity for public comment" (*id.* (quoting *Gerber v. Norton*, 294 F.3d 173, 182 (D.C. Cir. 2002)). This showing is not onerous. A challenger "need not prove that its comments would have persuaded [the agency] to reach a different outcome," only that it "has something useful to say about . . . critical data." *Chamber of Commerce*, 443 F.3d at 905.

But this Court has been particularly "[in]hospitable to government claims of harmless error in cases" involving total failures of notice and comment—like this one. *Allina Health Services v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014). An agency's "utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Sugar Cane Growers Co-op of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002). Indeed, in such cases, the agency's "utter failure . . . lessens if not altogether eliminates a challenging party's burden, for there will rarely if ever be no 'uncertainty' as to the error's effect, and the party is not even required to identify 'additional considerations [it] would have raised in a comment procedure.'" *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 89 (D.D.C. 2007) (quoting *Sugar Cane Growers*, 289 F.3d at 96)).

EPA's "utter failure" to provide *any* notice or opportunity for comment on its totality-of-the circumstances approach or cost-benefit analysis is self-

evidently prejudicial. But even without this "relaxed standard," (*see AFL-CIO*, 496 F. Supp. 2d at 89), *amici* and their members, like the petitioners, would have "had something useful to say about this critical data." *Chamber of Commerce*, 443 F.3d at 905.

For one, *amici* expressly sought information about the Rule's costs, benefits, and transfers and made quite clear they would have commented if given the chance. As the NAM explained on page 2 of its comment letter:

> A full economic analysis is essential for agency staff, the public and regulated communities to understand the scope of this possible designation and related impacts on remediation timelines, supply chains, potential litigation and other relevant information. Unfortunately, the agency has failed to do this, . . . thereby making it impossible for stakeholders to have either notice of these actions or to comment meaningfully.

NAM Comment Letter at 2, EPA-HQ-OLEM-2019-0341 (Nov. 7, 2022); *See also* 3M Comment Letter at 17, EPA-HQ-OLEM-2019-0341 (Nov. 9, 2022) ("EPA's decision to ignore some obvious costs . . . fails to give the regulated community adequate notice of the costs associated with this action, and prevents meaningful participation in the rulemaking process."); Chamber Coalition Comment Letter at 45, EPA-HQ-OLEM-2019-0341 (Nov. 10, 2022) ("[EPA] should develop a complete RIA that is sufficient to show how the benefits of this rule outweigh the significant costs. This analysis should be released for public comment, along with a revised proposal that takes its findings into account.") (JA361).

*Amici* further have serious concerns about the data EPA provided. *Amici* agree with petitioners that EPA's cost assessment was fundamentally arbitrary and capricious for the glaring errors, oversights, and omissions that petitioners ably identify. *See* Petitioners' Br. at 55-69. To name just a few, EPA underestimates the "cost premium" to clean up PFOA and PFOS at sites containing other contaminants (*id.* at 55-56); grossly underestimates the costs parties would incur from response actions at non-NPL sites by severely restricting the number of sites potentially requiring clean-up (*id.* 57-59); and overstates the Rule's benefits (*id.* at 68-69). These significant defects in EPA's analysis, all of which commenters would have been positioned to identify if given the chance, lay plain the prejudice of the agency's notice-and-comment violation.

Even taking EPA's own assessment at face value, it is still far from clear that the Rule's benefits will justify its costs, as the agency concluded. EPA emphasizes that designating PFOA and PFOS hazardous substances "makes available CERCLA enforcement authority that EPA can use to compel [potentially responsible parties] to pay for or conduct CERCLA response actions, rather than EPA using the Fund to clean up." 89 Fed. Reg. at 39,139; *see* 42 U.S.C. §§ 9604, 9606. But EPA's data shows that the costs private parties will bear to treat PFOA and PFOS will likely outweigh the benefits.

EPA anticipates using CERCLA enforcement authority to compel parties to conduct response actions for PFOA and PFOS, such as investigations, site characterizations, and clean-up—including at sites not listed on the National Priorities List (NPL).[4] *See* RIA 26-27, 159 (JA407-408, JA540). The agency estimates that the total present value of costs for these enforcement actions will fall anywhere from $13 million to *$721 million*. RIA 165 (JA546). Yet the quantified benefits for addressing PFOA and PFOS contamination at such sites is magnitudes lower—ranging from $359,000 to $31.1 million. RIA 199 (JA580). The estimated costs EPA would purportedly transfer to private parties to remove PFOA and PFOS from NPL sites tell the same story. Even assuming EPA appropriately treats these expenses as "transfers" at all,[5] EPA anticipates passing as much as $2.06 billion in costs onto private parties while

---

[4] "The NPL is the list of sites of national priority among the known releases or threatened releases of hazardous substances, pollutants, or contaminants throughout the United States and its territories." 89 Fed. Reg. at 39,128. It principally "guide[s] EPA in determining which sites warrant further investigation." *Id.*

[5] *Amici* agree that EPA was wrong to treat these expenses as "transfers" instead of costs to private parties that will ultimately be responsible for clean-up. As petitioners rightly identify (at 53-54), EPA does not remotely support its claim that it has, will, or even *can* use Superfund resources to clean up PFOA and PFOS as "pollutants or contaminants" under CERCLA § 104(a). More, summarily concluding that response actions at NPL sites would constitute "transferred" costs begs the question—for EPA to clean up PFOA and PFOS itself without the Rule, it *still* must be cost-effective to do so. *See* Petitioners' Br. at 54.

expecting, at most, half that in benefits. *See* RIA 143, 184-185 (JA524, JA565-566).

EPA does not grapple with the reality of these figures, as it would have been required to do in response to meaningful comments on the issue. *AT&T Services v. FCC*, 21 F.4th 841, 853 (D.C. Cir. 2021) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public." (quoting *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012)). It asserts that "these cleanup costs" will "provid[e] significant health benefits . . . that justify the costs" without explaining why that is so given its own data suggesting otherwise. *See* 89 Fed. Reg. at 39,164. As *amici* and their members would have made clear in comments, a rational explanation for the Rule would have at least required EPA to explain *how* it would ensure the Rule's benefits would justify its costs.

It is surely no answer that the substantial costs private parties stand to incur are actually "benefits" of designation—as EPA wrongly insists. *See* 89 Fed. Reg. at 39,164 (noting EPA "acknowledges that the costs parties expend to clean up PFOA and PFOS is a burden for them," but that it "views the cleanup monies spent by PRPs as an *advantage* of the rule."). Regardless of who pays, costs are still costs. And to be reasonable—at least without requiring *significant* explanation EPA has not provided here—costs must be justified by the Rule's benefits. *See Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 733

(D.C. Cir. 2016) ("[C]ommon administrative practice and common sense require an agency to consider the costs and benefits of its proposed actions, and to reasonably decide and explain whether the benefits outweigh the costs."). EPA's apparent belief otherwise turns the whole point of a cost-benefit analysis on its head.

In short, like petitioners, *amici* and their members would have "ha[d] something useful to say" about EPA's cost-benefit analysis. *See Chamber of Commerce*, 443 F.3d at 905. The strength of those comments shows why it is so essential for agencies to adhere to their notice and comment obligations.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Rule.

December 5, 2025                    Respectfully submitted,

/s/ *Michael B. Kimberly*

MICHAEL B. KIMBERLY
   *Winston & Strawn LLP*
   *1901 L Street, N.W.*
   *Washington, DC 20036*
   *(202) 282-5000*

*Counsel for Amici Curiae*

ERICA T. KLENICKI
MICHAEL A. TILGHMAN II
   *NAM Legal Center*
   *733 10th Street NW*
   *Washington, DC 20001*
   *(202) 637-3000*

*Counsel for the National*
*Association of Manufacturers*

20

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(G) and 32(g)(1), I certify that this brief:

(i)    complies with the type-volume limitation of Rule 29(a)(5) because it contains 4,355 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it is typeset in Century Supra A font in 14-point or larger.

Dated: December 5, 2025                    */s/ Michael B. Kimberly*

**CERTIFICATE OF SERVICE**

I hereby certify that that, on December 5, 2025, I electronically filed the foregoing brief with the Clerk of Court using the appellate CM/ECF system, which served copies of the brief on all ECF-registered counsel.

Dated: December 5, 2025                    */s/ Michael B. Kimberly*