SCHEDULED FOR ORAL ARGUMENT JANUARY 20, 2026

No. 24-1193
(consolidated with Nos. 24-1261, 24-1266, 24-1271, and 24-1272)

———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

———————————————

On Petition for Review of Final Action by the
U.S. Environmental Protection Agency

———————————————

**STATUTORY, REGULATORY, AND LEGISLATIVE HISTORY
ADDENUDUM TO FINAL BRIEF FOR U.S. ENVIRONMENTAL
PROTECTION AGENCY**

———————————————

Of Counsel:

ELIZABETH G. BERG
NOEL M. JOHNSON
JEFFREY MANSBACH
Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, D.C. 20460

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

JIN HYUNG LEE
RILEY W. WALTERS
United States Department of Justice
Environmental Defense Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044

(202) 598-7264 (Lee)
(202) 718-3109 (Walters)
jin.hyung.lee@usdoj.gov
riley.walters@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on January 7, 2026, I filed the foregoing with the Court's

CM/ECF system, which served copies of the brief on all ECF-registered counsel.


Dated: January 7, 2026                          /s/ *Jin Hyung Lee*
                                                JIN HYUNG LEE

                                                Counsel for Respondents

# TABLE OF CONTENTS

## STATUTES

5 U.S.C. § 553 ................................................................................ADD1

5 U.S.C. § 605 ................................................................................ADD3

5 U.S.C. § 611 ................................................................................ADD4

5 U.S.C. § 706 ................................................................................ADD6

42 U.S.C. § 9601 ............................................................................ADD7

42 U.S.C. § 9603 ..........................................................................ADD26

42 U.S.C. § 9604 ..........................................................................ADD30

42 U.S.C. § 9605 ..........................................................................ADD58

42 U.S.C. § 9606 ..........................................................................ADD64

42 U.S.C. § 9607 ..........................................................................ADD66

42 U.S.C. § 9611 ..........................................................................ADD86

42 U.S.C. § 9613 ..........................................................................ADD94

42 U.S.C. § 9615 ........................................................................ADD101

42 U.S.C. § 9620 ........................................................................ADD110

42 U.S.C. § 9622 ........................................................................ADD121

42 U.S.C. § 9656 ........................................................................ADD134

42 U.S.C. § 11004 ......................................................................ADD135

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 300.400 ................................................................................ADD139

40 C.F.R. § 300.405 ................................................................................ADD145

40 C.F.R. § 300.410 ................................................................................ADD147

40 C.F.R. § 300.415 ................................................................................ADD149

40 C.F.R. § 300.420 ................................................................................ADD156

40 C.F.R. § 300.425 ................................................................................ADD160

40 C.F.R. § 300.430 ................................................................................ADD163

40 C.F.R. § 300.435 ................................................................................ADD179

**FEDERAL REGISTER**

48 Fed. Reg. 23602 (May 25, 1983) ..........................................................ADD183

52 Fed. Reg. 2923 (Jan. 29, 1987) (Exec. Order No. 12580) .......................ADD187

**LEGISLATIVE HISTORY**

S. Rep. No. 96-848 (1980) .........................................................................ADD194

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 5. Administrative Procedure (Refs & Annos)
        Subchapter II. Administrative Procedure (Refs & Annos)

5 U.S.C.A. § 553

§ 553. Rule making

Currentness

**(a)** This section applies, according to the provisions thereof, except to the extent that there is involved--

**(1)** a military or foreign affairs function of the United States; or

**(2)** a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

**(b)** General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--

**(1)** a statement of the time, place, and nature of public rule making proceedings;

**(2)** reference to the legal authority under which the rule is proposed;

**(3)** either the terms or substance of the proposed rule or a description of the subjects and issues involved; and

**(4)** the Internet address of a summary of not more than 100 words in length of the proposed rule, in plain language, that shall be posted on the Internet website under section 206(d) of the E-Government Act of 2002 (44 U.S.C. 3501 note) (commonly known as regulations.gov).

Except when notice or hearing is required by statute, this subsection does not apply--

**(A)** to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

**(B)** when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

ADD1

**(c)** After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

**(d)** The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except--

   **(1)** a substantive rule which grants or recognizes an exemption or relieves a restriction;

   **(2)** interpretative rules and statements of policy; or

   **(3)** as otherwise provided by the agency for good cause found and published with the rule.

**(e)** Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

**CREDIT(S)**

   (Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 383; Pub.L. 118-9, § 2, July 25, 2023, 137 Stat. 55.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 12044**

Ex. Ord. No. 12044, Mar. 23, 1978, 43 F.R. 12661, as amended by Ex. Ord. No. 12221, June 27, 1980, 45 F.R. 44249, which related to the improvement of Federal regulations, was revoked by Ex. Ord. No. 12291, Feb. 17, 1981, 46 F.R. 13193, formerly set out as a note under section 601 of this title.

Notes of Decisions (1595)

5 U.S.C.A. § 553, 5 USCA § 553
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD2

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> United States Code Annotated
>   Title 5. Government Organization and Employees (Refs & Annos)
>     Part I. The Agencies Generally
>       Chapter 6. The Analysis of Regulatory Functions (Refs & Annos)

5 U.S.C.A. § 605

§ 605. Avoidance of duplicative or unnecessary analyses

Currentness

**(a)** Any Federal agency may perform the analyses required by sections 602, 603, and 604 of this title in conjunction with or as a part of any other agenda or analysis required by any other law if such other analysis satisfies the provisions of such sections.

**(b)** Sections 603 and 604 of this title shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. If the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a statement providing the factual basis for such certification. The agency shall provide such certification and statement to the Chief Counsel for Advocacy of the Small Business Administration.

**(c)** In order to avoid duplicative action, an agency may consider a series of closely related rules as one rule for the purposes of sections 602, 603, 604 and 610 of this title.

**CREDIT(S)**

(Added Pub.L. 96-354, § 3(a), Sept. 19, 1980, 94 Stat. 1167; amended Pub.L. 104-121, Title II, § 243(a), Mar. 29, 1996, 110 Stat. 866.)

Notes of Decisions (18)

5 U.S.C.A. § 605, 5 USCA § 605
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 5. Government Organization and Employees (Refs & Annos)
        Part I. The Agencies Generally
            Chapter 6. The Analysis of Regulatory Functions (Refs & Annos)

5 U.S.C.A. § 611

§ 611. Judicial review

Currentness

**(a)(1)** For any rule subject to this chapter, a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610 in accordance with chapter 7. Agency compliance with sections 607 and 609(a) shall be judicially reviewable in connection with judicial review of section 604.

**(2)** Each court having jurisdiction to review such rule for compliance with section 553, or under any other provision of law, shall have jurisdiction to review any claims of noncompliance with sections 601, 604, 605(b), 608(b), and 610 in accordance with chapter 7. Agency compliance with sections 607 and 609(a) shall be judicially reviewable in connection with judicial review of section 604.

**(3)(A)** A small entity may seek such review during the period beginning on the date of final agency action and ending one year later, except that where a provision of law requires that an action challenging a final agency action be commenced before the expiration of one year, such lesser period shall apply to an action for judicial review under this section.

**(B)** In the case where an agency delays the issuance of a final regulatory flexibility analysis pursuant to section 608(b) of this chapter, an action for judicial review under this section shall be filed not later than--

  **(i)** one year after the date the analysis is made available to the public, or

  **(ii)** where a provision of law requires that an action challenging a final agency regulation be commenced before the expiration of the 1-year period, the number of days specified in such provision of law that is after the date the analysis is made available to the public.

**(4)** In granting any relief in an action under this section, the court shall order the agency to take corrective action consistent with this chapter and chapter 7, including, but not limited to--

  **(A)** remanding the rule to the agency, and

**(B)** deferring the enforcement of the rule against small entities unless the court finds that continued enforcement of the rule is in the public interest.

**(5)** Nothing in this subsection shall be construed to limit the authority of any court to stay the effective date of any rule or provision thereof under any other provision of law or to grant any other relief in addition to the requirements of this section.

**(b)** In an action for the judicial review of a rule, the regulatory flexibility analysis for such rule, including an analysis prepared or corrected pursuant to paragraph (a)(4), shall constitute part of the entire record of agency action in connection with such review.

**(c)** Compliance or noncompliance by an agency with the provisions of this chapter shall be subject to judicial review only in accordance with this section.

**(d)** Nothing in this section bars judicial review of any other impact statement or similar analysis required by any other law if judicial review of such statement or analysis is otherwise permitted by law.

## CREDIT(S)

(Added Pub.L. 96-354, § 3(a), Sept. 19, 1980, 94 Stat. 1169; amended Pub.L. 104-121, Title II, § 242, Mar. 29, 1996, 110 Stat. 865.)

Notes of Decisions (22)

5 U.S.C.A. § 611, 5 USCA § 611
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD5

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or Preempted  Limitation Recognized by  Krafsur v. Davenport,  6th Cir.(Tenn.),  Dec. 04, 2013

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 5. Government Organization and Employees (Refs & Annos)
        Part I. The Agencies Generally
            Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

  **(1)** compel agency action unlawfully withheld or unreasonably delayed; and

  **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)** contrary to constitutional right, power, privilege, or immunity;

    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    **(D)** without observance of procedure required by law;

    **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

ADD6

🏴 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
   Title 42. The Public Health and Welfare
      Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
         Subchapter I. Hazardous Substances Releases, Liability, Compensation (Refs & Annos)

42 U.S.C.A. § 9601

§ 9601. Definitions

Currentness

For purpose of this subchapter--

**(1)** The term "act of God" means an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight.

**(2)** The term "Administrator" means the Administrator of the United States Environmental Protection Agency.

**(3)** The term "barrel" means forty-two United States gallons at sixty degrees Fahrenheit.

**(4)** The term "claim" means a demand in writing for a sum certain.

**(5)** The term "claimant" means any person who presents a claim for compensation under this chapter.

**(6)** The term "damages" means damages for injury or loss of natural resources as set forth in section 9607(a) or 9611(b) of this title.

**(7)** The term "drinking water supply" means any raw or finished water source that is or may be used by a public water system (as defined in the Safe Drinking Water Act) or as drinking water by one or more individuals.

**(8)** The term "environment" means (A) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Magnuson-Stevens Fishery Conservation and Management Act, and (B) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States.

**(9)** The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    1

vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

**(10)** The term "federally permitted release" means (A) discharges in compliance with a permit under section 402 of the Federal Water Pollution Control Act, (B) discharges resulting from circumstances identified and reviewed and made part of the public record with respect to a permit issued or modified under section 402 of the Federal Water Pollution Control Act and subject to a condition of such permit, (C) continuous or anticipated intermittent discharges from a point source, identified in a permit or permit application under section 402 of the Federal Water Pollution Control Act, which are caused by events occurring within the scope of relevant operating or treatment systems, (D) discharges in compliance with a legally enforceable permit under section 404 of the Federal Water Pollution Control Act, (E) releases in compliance with a legally enforceable final permit issued pursuant to section 3005(a) through (d) of the Solid Waste Disposal Act from a hazardous waste treatment, storage, or disposal facility when such permit specifically identifies the hazardous substances and makes such substances subject to a standard of practice, control procedure or bioassay limitation or condition, or other control on the hazardous substances in such releases, (F) any release in compliance with a legally enforceable permit issued under section 1412 of Title 33 of[1] section 1413 of Title 33, (G) any injection of fluids authorized under Federal underground injection control programs or State programs submitted for Federal approval (and not disapproved by the Administrator of the Environmental Protection Agency) pursuant to part C of the Safe Drinking Water Act, (H) any emission into the air subject to a permit or control regulation under section 111, section 112, title I part C, title I part D, or State implementation plans submitted in accordance with section 110 of the Clean Air Act (and not disapproved by the Administrator of the Environmental Protection Agency), including any schedule or waiver granted, promulgated, or approved under these sections, (I) any injection of fluids or other materials authorized under applicable State law (i) for the purpose of stimulating or treating wells for the production of crude oil, natural gas, or water, (ii) for the purpose of secondary, tertiary, or other enhanced recovery of crude oil or natural gas, or (iii) which are brought to the surface in conjunction with the production of crude oil or natural gas and which are reinjected, (J) the introduction of any pollutant into a publicly owned treatment works when such pollutant is specified in and in compliance with applicable pretreatment standards of section 307(b) or (c) of the Clean Water Act and enforceable requirements in a pretreatment program submitted by a State or municipality for Federal approval under section 402 of such Act, and (K) any release of source, special nuclear, or byproduct material, as those terms are defined in the Atomic Energy Act of 1954, in compliance with a legally enforceable license, permit, regulation, or order issued pursuant to the Atomic Energy Act of 1954.

**(11)** The term "Fund" or "Trust Fund" means the Hazardous Substance Superfund established by section 9507 of Title 26.

**(12)** The term "ground water" means water in a saturated zone or stratum beneath the surface of land or water.

**(13)** The term "guarantor" means any person, other than the owner or operator, who provides evidence of financial responsibility for an owner or operator under this chapter.

**(14)** The term "hazardous substance" means (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph,

ADD8

and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

**(15)** The term "navigable waters" or "navigable waters of the United States" means the waters of the United States, including the territorial seas.

**(16)** The term "natural resources" means land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act), any State or local government, any foreign government, any Indian tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe.

**(17)** The term "offshore facility" means any facility of any kind located in, on, or under, any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a vessel or a public vessel.

**(18)** The term "onshore facility" means any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land or nonnavigable waters within the United States.

**(19)** The term "otherwise subject to the jurisdiction of the United States" means subject to the jurisdiction of the United States by virtue of United States citizenship, United States vessel documentation or numbering, or as provided by international agreement to which the United States is a party.

**(20)(A)** The term "owner or operator" means (i) in the case of a vessel, any person owning, operating, or chartering by demise, such vessel, (ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility, and (iii) in the case of any facility, title or control of which was conveyed due to bankruptcy, foreclosure, tax delinquency, abandonment, or similar means to a unit of State or local government, any person who owned, operated, or otherwise controlled activities at such facility immediately beforehand. Such term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility.

**(B)** In the case of a hazardous substance which has been accepted for transportation by a common or contract carrier and except as provided in section 9607(a)(3) or (4) of this title, (i) the term "owner or operator" shall mean such common carrier or other bona fide for hire carrier acting as an independent contractor during such transportation, (ii) the shipper of such hazardous substance shall not be considered to have caused or contributed to any release during such transportation which resulted solely from circumstances or conditions beyond his control.

**(C)** In the case of a hazardous substance which has been delivered by a common or contract carrier to a disposal or treatment facility and except as provided in section 9607(a)(3) or (4) of this title, (i) the term "owner or operator" shall not include such common or contract carrier, and (ii) such common or contract carrier shall not be considered to have caused or contributed to any release at such disposal or treatment facility resulting from circumstances or conditions beyond its control.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    3

**(D)** The term "owner or operator" does not include a unit of State or local government which acquired ownership or control through seizure or otherwise in connection with law enforcement activity, or through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government acquires title by virtue of its function as sovereign. The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a State or local government shall be subject to the provisions of this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.

**(E) Exclusion of certain Alaska Native villages and Native Corporations**

**(i) In general**

The term "owner or operator" does not include, with respect to a facility conveyed to a Native village or Native Corporation (as those terms are defined in section 3 of the Alaska Native Claims Settlement Act) under the Alaska Native Claims Settlement Act--

**(I)** the Native village or Native Corporation that received the facility from the United States Government; or

**(II)** a successor in interest to which the facility was conveyed under section 14(c) of such Act.

**(ii) Limitation**

The exclusion provided under this subparagraph shall not apply to any entity described in clause (i) that causes or contributes to a release or threatened release of a hazardous substance from the facility conveyed as described in such clause.

**(F) Exclusion of lenders not participants in management**

**(i) Indicia of ownership to protect security**

The term "owner or operator" does not include a person that is a lender that, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect the security interest of the person in the vessel or facility.

**(ii) Foreclosure**

The term "owner or operator" does not include a person that is a lender that did not participate in management of a vessel or facility prior to foreclosure, notwithstanding that the person--

**(I)** forecloses on the vessel or facility; and

ADD10

**(II)** after foreclosure, sells, re-leases (in the case of a lease finance transaction), or liquidates the vessel or facility, maintains business activities, winds up operations, undertakes a response action under section 9607(d)(1) of this title or under the direction of an on-scene coordinator appointed under the National Contingency Plan, with respect to the vessel or facility, or takes any other measure to preserve, protect, or prepare the vessel or facility prior to sale or disposition,

if the person seeks to sell, re-lease (in the case of a lease finance transaction), or otherwise divest the person of the vessel or facility at the earliest practicable, commercially reasonable time, on commercially reasonable terms, taking into account market conditions and legal and regulatory requirements.

**(G) Participation in management**

For purposes of subparagraph (F)--

**(i)** the term "participate in management"--

**(I)** means actually participating in the management or operational affairs of a vessel or facility; and

**(II)** does not include merely having the capacity to influence, or the unexercised right to control, vessel or facility operations;

**(ii)** a person that is a lender and that holds indicia of ownership primarily to protect a security interest in a vessel or facility shall be considered to participate in management only if, while the borrower is still in possession of the vessel or facility encumbered by the security interest, the person--

**(I)** exercises decisionmaking control over the environmental compliance related to the vessel or facility, such that the person has undertaken responsibility for the hazardous substance handling or disposal practices related to the vessel or facility; or

**(II)** exercises control at a level comparable to that of a manager of the vessel or facility, such that the person has assumed or manifested responsibility--

**(aa)** for the overall management of the vessel or facility encompassing day-to-day decisionmaking with respect to environmental compliance; or

**(bb)** over all or substantially all of the operational functions (as distinguished from financial or administrative functions) of the vessel or facility other than the function of environmental compliance;

**(iii)** the term "participate in management" does not include performing an act or failing to act prior to the time at which a security interest is created in a vessel or facility; and

**(iv)** the term "participate in management" does not include--

ADD11

**(I)** holding a security interest or abandoning or releasing a security interest;

**(II)** including in the terms of an extension of credit, or in a contract or security agreement relating to the extension, a covenant, warranty, or other term or condition that relates to environmental compliance;

**(III)** monitoring or enforcing the terms and conditions of the extension of credit or security interest;

**(IV)** monitoring or undertaking 1 or more inspections of the vessel or facility;

**(V)** requiring a response action or other lawful means of addressing the release or threatened release of a hazardous substance in connection with the vessel or facility prior to, during, or on the expiration of the term of the extension of credit;

**(VI)** providing financial or other advice or counseling in an effort to mitigate, prevent, or cure default or diminution in the value of the vessel or facility;

**(VII)** restructuring, renegotiating, or otherwise agreeing to alter the terms and conditions of the extension of credit or security interest, exercising forbearance;

**(VIII)** exercising other remedies that may be available under applicable law for the breach of a term or condition of the extension of credit or security agreement; or

**(IX)** conducting a response action under section 9607(d) of this title or under the direction of an on-scene coordinator appointed under the National Contingency Plan,

if the actions do not rise to the level of participating in management (within the meaning of clauses (i) and (ii)).

**(H) Other terms**

As used in this chapter:

**(i) Extension of credit**

The term "extension of credit" includes a lease finance transaction--

**(I)** in which the lessor does not initially select the leased vessel or facility and does not during the lease term control the daily operations or maintenance of the vessel or facility; or

ADD12

**(II)** that conforms with regulations issued by the appropriate Federal banking agency or the appropriate State bank supervisor (as those terms are defined in section 1813 of Title 12) or with regulations issued by the National Credit Union Administration Board, as appropriate.

**(ii) Financial or administrative function**

The term "financial or administrative function" includes a function such as that of a credit manager, accounts payable officer, accounts receivable officer, personnel manager, comptroller, or chief financial officer, or a similar function.

**(iii) Foreclosure; foreclose**

The terms "foreclosure" and "foreclose" mean, respectively, acquiring, and to acquire, a vessel or facility through--

**(I)(aa)** purchase at sale under a judgment or decree, power of sale, or nonjudicial foreclosure sale;

**(bb)** a deed in lieu of foreclosure, or similar conveyance from a trustee; or

**(cc)** repossession,

if the vessel or facility was security for an extension of credit previously contracted;

**(II)** conveyance pursuant to an extension of credit previously contracted, including the termination of a lease agreement; or

**(III)** any other formal or informal manner by which the person acquires, for subsequent disposition, title to or possession of a vessel or facility in order to protect the security interest of the person.

**(iv) Lender**

The term "lender" means--

**(I)** an insured depository institution (as defined in section 1813 of Title 12);

**(II)** an insured credit union (as defined in section 1752 of Title 12);

**(III)** a bank or association chartered under the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.);

**(IV)** a leasing or trust company that is an affiliate of an insured depository institution;

ADD13

**(V)** any person (including a successor or assignee of any such person) that makes a bona fide extension of credit to or takes or acquires a security interest from a nonaffiliated person;

**(VI)** the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Federal Agricultural Mortgage Corporation, or any other entity that in a bona fide manner buys or sells loans or interests in loans;

**(VII)** a person that insures or guarantees against a default in the repayment of an extension of credit, or acts as a surety with respect to an extension of credit, to a nonaffiliated person; and

**(VIII)** a person that provides title insurance and that acquires a vessel or facility as a result of assignment or conveyance in the course of underwriting claims and claims settlement.

### (v) Operational function

The term "operational function" includes a function such as that of a facility or plant manager, operations manager, chief operating officer, or chief executive officer.

### (vi) Security interest

The term "security interest" includes a right under a mortgage, deed of trust, assignment, judgment lien, pledge, security agreement, factoring agreement, or lease and any other right accruing to a person to secure the repayment of money, the performance of a duty, or any other obligation by a nonaffiliated person.

**(21)** The term "person" means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body.

**(22)** The term "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine, (C) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954, if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act, or, for the purposes of section 9604 of this title or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 7912(a)(1) or 7942(a) of this title, and (D) the normal application of fertilizer.

**(23)** The terms "remove" or "removal" means [2] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous

substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act.

**(24)** The terms "remedy" or "remedial action" means [2] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

**(25)** The terms "respond" or "response" means [2] remove, removal, remedy, and remedial action;, [3] all such terms (including the terms "removal" and "remedial action") include enforcement activities related thereto.

**(26)** The terms "transport" or "transportation" means [2] the movement of a hazardous substance by any mode, including a hazardous liquid pipeline facility (as defined in section 60101(a) of Title 49), and in the case of a hazardous substance which has been accepted for transportation by a common or contract carrier, the term "transport" or "transportation" shall include any stoppage in transit which is temporary, incidental to the transportation movement, and at the ordinary operating convenience of a common or contract carrier, and any such stoppage shall be considered as a continuity of movement and not as the storage of a hazardous substance.

**(27)** The terms "United States" and "State" include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction.

**(28)** The term "vessel" means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

**(29)** The terms "disposal", "hazardous waste", and "treatment" shall have the meaning provided in section 1004 of the Solid Waste Disposal Act.

ADD15

**(30)** The terms "territorial sea" and "contiguous zone" shall have the meaning provided in section 502 of the Federal Water Pollution Control Act.

**(31)** The term "national contingency plan" means the national contingency plan published under section 311(c) of the Federal Water Pollution Control Act or revised pursuant to section 9605 of this title.

**(32)** The terms "liable" or "liability" under this subchapter shall be construed to be the standard of liability which obtains under section 311 of the Federal Water Pollution Control Act.

**(33)** The term "pollutant or contaminant" shall include, but not be limited to, any element, substance, compound, or mixture, including disease-causing agents, which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring; except that the term "pollutant or contaminant" shall not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of paragraph (14) and shall not include natural gas, liquefied natural gas, or synthetic gas of pipeline quality (or mixtures of natural gas and such synthetic gas).

**(34)** The term "alternative water supplies" includes, but is not limited to, drinking water and household water supplies.

**(35)(A)** The term "contractual relationship", for the purpose of section 9607(b)(3) of this title, includes, but is not limited to, land contracts, deeds, easements, leases, or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:

**(i)** At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.

**(ii)** The defendant is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, or through the exercise of eminent domain authority by purchase or condemnation.

**(iii)** The defendant acquired the facility by inheritance or bequest.

In addition to establishing the foregoing, the defendant must establish that the defendant has satisfied the requirements of section 9607(b)(3)(a) and (b) of this title, provides full cooperation, assistance, and facility access to the persons that are authorized to conduct response actions at the facility (including the cooperation and access necessary for the installation, integrity, operation, and maintenance of any complete or partial response action at the facility), is in compliance with any land use restrictions established or relied on in connection with the response action at a facility, and does not impede the effectiveness or integrity of any institutional control employed at the facility in connection with a response action.

ADD16

**(B) Reason to know**

**(i) All appropriate inquiries**

To establish that the defendant had no reason to know of the matter described in subparagraph (A)(i), the defendant must demonstrate to a court that--

**(I)** on or before the date on which the defendant acquired the facility, the defendant carried out all appropriate inquiries, as provided in clauses (ii) and (iv), into the previous ownership and uses of the facility in accordance with generally accepted good commercial and customary standards and practices; and

**(II)** the defendant took reasonable steps to--

**(aa)** stop any continuing release;

**(bb)** prevent any threatened future release; and

**(cc)** prevent or limit any human, environmental, or natural resource exposure to any previously released hazardous substance.

**(ii) Standards and practices**

Not later than 2 years after January 11, 2002, the Administrator shall by regulation establish standards and practices for the purpose of satisfying the requirement to carry out all appropriate inquiries under clause (i).

**(iii) Criteria**

In promulgating regulations that establish the standards and practices referred to in clause (ii), the Administrator shall include each of the following:

**(I)** The results of an inquiry by an environmental professional.

**(II)** Interviews with past and present owners, operators, and occupants of the facility for the purpose of gathering information regarding the potential for contamination at the facility.

**(III)** Reviews of historical sources, such as chain of title documents, aerial photographs, building department records, and land use records, to determine previous uses and occupancies of the real property since the property was first developed.

ADD17

**(IV)** Searches for recorded environmental cleanup liens against the facility that are filed under Federal, State, or local law.

**(V)** Reviews of Federal, State, and local government records, waste disposal records, underground storage tank records, and hazardous waste handling, generation, treatment, disposal, and spill records, concerning contamination at or near the facility.

**(VI)** Visual inspections of the facility and of adjoining properties.

**(VII)** Specialized knowledge or experience on the part of the defendant.

**(VIII)** The relationship of the purchase price to the value of the property, if the property was not contaminated.

**(IX)** Commonly known or reasonably ascertainable information about the property.

**(X)** The degree of obviousness of the presence or likely presence of contamination at the property, and the ability to detect the contamination by appropriate investigation.

**(iv) Interim standards and practices**

**(I) Property purchased before May 31, 1997**

With respect to property purchased before May 31, 1997, in making a determination with respect to a defendant described in clause (i), a court shall take into account--

**(aa)** any specialized knowledge or experience on the part of the defendant;

**(bb)** the relationship of the purchase price to the value of the property, if the property was not contaminated;

**(cc)** commonly known or reasonably ascertainable information about the property;

**(dd)** the obviousness of the presence or likely presence of contamination at the property; and

**(ee)** the ability of the defendant to detect the contamination by appropriate inspection.

**(II) Property purchased on or after May 31, 1997**

ADD18

With respect to property purchased on or after May 31, 1997, and until the Administrator promulgates the regulations described in clause (ii), the procedures of the American Society for Testing and Materials, including the document known as "Standard E1527-97", entitled "Standard Practice for Environmental Site Assessment: Phase 1 Environmental Site Assessment Process", shall satisfy the requirements in clause (i).

**(v) Site inspection and title search**

In the case of property for residential use or other similar use purchased by a nongovernmental or noncommercial entity, a facility inspection and title search that reveal no basis for further investigation shall be considered to satisfy the requirements of this subparagraph.

**(C)** Nothing in this paragraph or in section 9607(b)(3) of this title shall diminish the liability of any previous owner or operator of such facility who would otherwise be liable under this chapter. Notwithstanding this paragraph, if the defendant obtained actual knowledge of the release or threatened release of a hazardous substance at such facility when the defendant owned the real property and then subsequently transferred ownership of the property to another person without disclosing such knowledge, such defendant shall be treated as liable under section 9607(a)(1) of this title and no defense under section 9607(b)(3) of this title shall be available to such defendant.

**(D)** Nothing in this paragraph shall affect the liability under this chapter of a defendant who, by any act or omission, caused or contributed to the release or threatened release of a hazardous substance which is the subject of the action relating to the facility.

**(36)** The term "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village but not including any Alaska Native regional or village corporation, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

**(37)(A)** The term "service station dealer" means any person--

**(i)** who owns or operates a motor vehicle service station, filling station, garage, or similar retail establishment engaged in the business of selling, repairing, or servicing motor vehicles, where a significant percentage of the gross revenue of the establishment is derived from the fueling, repairing, or servicing of motor vehicles, and

**(ii)** who accepts for collection, accumulation, and delivery to an oil recycling facility, recycled oil that (I) has been removed from the engine of a light duty motor vehicle or household appliances by the owner of such vehicle or appliances, and (II) is presented, by such owner, to such person for collection, accumulation, and delivery to an oil recycling facility.

**(B)** For purposes of section 9614(c) of this title, the term "service station dealer" shall, notwithstanding the provisions of subparagraph (A), include any government agency that establishes a facility solely for the purpose of accepting recycled oil that satisfies the criteria set forth in subclauses (I) and (II) of subparagraph (A)(ii), and, with respect to recycled oil that satisfies the criteria set forth in subclauses (I) and (II), owners or operators of refuse collection services who are compelled by State law to collect, accumulate, and deliver such oil to an oil recycling facility.

ADD19

**(C)** The President shall promulgate regulations regarding the determination of what constitutes a significant percentage of the gross revenues of an establishment for purposes of this paragraph.

**(38)** The term "incineration vessel" means any vessel which carries hazardous substances for the purpose of incineration of such substances, so long as such substances or residues of such substances are on board.

**(39) Brownfield site**

**(A) In general**

The term "brownfield site" means real property, the expansion, redevelopment, or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant.

**(B) Exclusions**

The term "brownfield site" does not include--

**(i)** a facility that is the subject of a planned or ongoing removal action under this subchapter;

**(ii)** a facility that is listed on the National Priorities List or is proposed for listing;

**(iii)** a facility that is the subject of a unilateral administrative order, a court order, an administrative order on consent or judicial consent decree that has been issued to or entered into by the parties under this chapter;

**(iv)** a facility that is the subject of a unilateral administrative order, a court order, an administrative order on consent or judicial consent decree that has been issued to or entered into by the parties, or a facility to which a permit has been issued by the United States or an authorized State under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. 1321), the Toxic Substances Control Act (15 U.S.C. 2601 et seq.), or the Safe Drinking Water Act (42 U.S.C. 300f et seq.);

**(v)** a facility that--

**(I)** is subject to corrective action under section 3004(u) or 3008(h) of the Solid Waste Disposal Act (42 U.S.C. 6924(u), 6928(h)); and

**(II)** to which a corrective action permit or order has been issued or modified to require the implementation of corrective measures;

**(vi)** a land disposal unit with respect to which--

ADD20

**(I)** a closure notification under subtitle C of the Solid Waste Disposal Act (42 U.S.C. 6921 et seq.) has been submitted; and

**(II)** closure requirements have been specified in a closure plan or permit;

**(vii)** a facility that is subject to the jurisdiction, custody, or control of a department, agency, or instrumentality of the United States, except for land held in trust by the United States for an Indian tribe;

**(viii)** a portion of a facility--

**(I)** at which there has been a release of polychlorinated biphenyls; and

**(II)** that is subject to remediation under the Toxic Substances Control Act (15 U.S.C. 2601 et seq.); or

**(ix)** a portion of a facility, for which portion, assistance for response activity has been obtained under subtitle I of the Solid Waste Disposal Act (42 U.S.C. 6991 et seq.) from the Leaking Underground Storage Tank Trust Fund established under section 9508 of Title 26.

**(C) Site-by-site determinations**

Notwithstanding subparagraph (B) and on a site-by-site basis, the President may authorize financial assistance under section 9604(k) of this title to an eligible entity at a site included in clause (i), (iv), (v), (vi), (viii), or (ix) of subparagraph (B) if the President finds that financial assistance will protect human health and the environment, and either promote economic development or enable the creation of, preservation of, or addition to parks, greenways, undeveloped property, other recreational property, or other property used for nonprofit purposes.

**(D) Additional areas**

For the purposes of section 9604(k) of this title, the term "brownfield site" includes a site that--

**(i)** meets the definition of "brownfield site" under subparagraphs (A) through (C); and

**(ii)(I)** is contaminated by a controlled substance (as defined in section 802 of Title 21);

**(II)(aa)** is contaminated by petroleum or a petroleum product excluded from the definition of "hazardous substance" under this section; and

**(bb)** is a site for which there is no viable responsible party and that is determined by the Administrator or the State, as appropriate, to be a site that will be assessed, investigated, or cleaned up by a person that is not potentially liable for cleaning up the site under this chapter or any other law pertaining to the cleanup of petroleum products; and

ADD21

**(cc)** is not subject to any order issued under section 9003(h) of the Solid Waste Disposal Act (42 U.S.C. 6991b(h)); or

**(III)** is mine-scarred land.

**(40) Bona fide prospective purchaser**

**(A) In general**

The term "bona fide prospective purchaser" means, with respect to a facility--

**(i)** a person who--

**(I)** acquires ownership of the facility after January 11, 2002; and

**(II)** establishes by a preponderance of the evidence each of the criteria described in clauses (i) through (viii) of subparagraph (B); and

**(ii)** a person--

**(I)** who acquires a leasehold interest in the facility after January 11, 2002;

**(II)** who establishes by a preponderance of the evidence that the leasehold interest is not designed to avoid liability under this chapter by any person; and

**(III)** with respect to whom any of the following conditions apply:

**(aa)** The owner of the facility that is subject to the leasehold interest is a person described in clause (i).

**(bb)(AA)** The owner of the facility that is subject to the leasehold interest was a person described in clause (i) at the time the leasehold interest was acquired, but can no longer establish by a preponderance of the evidence each of the criteria described in clauses (i) through (viii) of subparagraph (B) due to circumstances unrelated to any action of the person who holds the leasehold interest; and

**(BB)** the person who holds the leasehold interest establishes by a preponderance of the evidence each of the criteria described in clauses (i), (iii), (iv), (v), (vi), (vii), and (viii) of subparagraph (B).

ADD22

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(cc)** The person who holds the leasehold interest establishes by a preponderance of the evidence each of the criteria described in clauses (i) through (viii) of subparagraph (B).

**(B) Criteria**

The criteria described in this subparagraph are as follows:

**(i) Disposal prior to acquisition**

All disposal of hazardous substances at the facility occurred before the person acquired the facility.

**(ii) Inquiries**

**(I) In general**

The person made all appropriate inquiries into the previous ownership and uses of the facility in accordance with generally accepted good commercial and customary standards and practices in accordance with subclauses (II) and (III).

**(II) Standards and practices**

The standards and practices referred to in clauses (ii) and (iv) of paragraph (35)(B) shall be considered to satisfy the requirements of this clause.

**(III) Residential use**

In the case of property in residential or other similar use at the time of purchase by a nongovernmental or noncommercial entity, a facility inspection and title search that reveal no basis for further investigation shall be considered to satisfy the requirements of this clause.

**(iii) Notices**

The person provides all legally required notices with respect to the discovery or release of any hazardous substances at the facility.

**(iv) Care**

The person exercises appropriate care with respect to hazardous substances found at the facility by taking reasonable steps to--

**(I)** stop any continuing release;

ADD23

**(II)** prevent any threatened future release; and

**(III)** prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substance.

**(v) Cooperation, assistance, and access**

The person provides full cooperation, assistance, and access to persons that are authorized to conduct response actions or natural resource restoration at a vessel or facility (including the cooperation and access necessary for the installation, integrity, operation, and maintenance of any complete or partial response actions or natural resource restoration at the vessel or facility).

**(vi) Institutional control**

The person--

**(I)** is in compliance with any land use restrictions established or relied on in connection with the response action at a vessel or facility; and

**(II)** does not impede the effectiveness or integrity of any institutional control employed at the vessel or facility in connection with a response action.

**(vii) Requests; subpoenas**

The person complies with any request for information or administrative subpoena issued by the President under this chapter.

**(viii) No affiliation**

The person is not--

**(I)** potentially liable, or affiliated with any other person that is potentially liable, for response costs at a facility through--

**(aa)** any direct or indirect familial relationship; or

**(bb)** any contractual, corporate, or financial relationship (other than a contractual, corporate, or financial relationship that is created by the instruments by which title to the facility is conveyed or financed, by a tenancy, by the instruments by which a leasehold interest in the facility is created, or by a contract for the sale of goods or services); or

ADD24

**(II)** the result of a reorganization of a business entity that was potentially liable.

**(41) Eligible response site**

**(A) In general**

The term "eligible response site" means a site that meets the definition of a brownfield site in subparagraphs (A) and (B) of paragraph (39), as modified by subparagraphs (B) and (C) of this paragraph.

**(B) Inclusions**

The term "eligible response site" includes--

**(i)** notwithstanding paragraph (39)(B)(ix), a portion of a facility, for which portion assistance for response activity has been obtained under subtitle I of the Solid Waste Disposal Act (42 U.S.C. 6991 et seq.) from the Leaking Underground Storage Tank Trust Fund established under section 9508 of Title 26; or

**(ii)** a site for which, notwithstanding the exclusions provided in subparagraph (C) or paragraph (39)(B), the President determines, on a site-by-site basis and after consultation with the State, that limitations on enforcement under section 9628 of this title at sites specified in clause (iv), (v), (vi) or (viii) of paragraph (39)(B) would be appropriate and will--

**(I)** protect human health and the environment; and

**(II)** promote economic development or facilitate the creation of, preservation of, or addition to a park, a greenway, undeveloped property, recreational property, or other property used for nonprofit purposes.

**(C) Exclusions**

The term "eligible response site" does not include--

**(i)** a facility for which the President--

**(I)** conducts or has conducted a preliminary assessment or site inspection; and

**(II)** after consultation with the State, determines or has determined that the site obtains a preliminary score sufficient for possible listing on the National Priorities List, or that the site otherwise qualifies for listing on the National Priorities List; unless the President has made a determination that no further Federal action will be taken; or

**(ii)** facilities that the President determines warrant particular consideration as identified by regulation, such as sites posing a threat to a sole-source drinking water aquifer or a sensitive ecosystem.

ADD25

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
      Subchapter I. Hazardous Substances Releases, Liability, Compensation (Refs & Annos)

42 U.S.C.A. § 9603

§ 9603. Notification requirements respecting released substances

Currentness

**(a) Notice to National Response Center upon release from vessel or offshore or onshore facility by person in charge; conveyance of notice by Center**

Any person in charge of a vessel or an offshore or an onshore facility shall, as soon as he has knowledge of any release (other than a federally permitted release) of a hazardous substance from such vessel or facility in quantities equal to or greater than those determined pursuant to section 9602 of this title, immediately notify the National Response Center established under the Clean Water Act of such release. The National Response Center shall convey the notification expeditiously to all appropriate Government agencies, including the Governor of any affected State.

**(b) Penalties for failure to notify; use of notice or information pursuant to notice in criminal case**

Any person--

  **(1)** in charge of a vessel from which a hazardous substance is released, other than a federally permitted release, into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or

  **(2)** in charge of a vessel from which a hazardous substance is released, other than a federally permitted release, which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson-Stevens Fishery Conservation and Management Act), and who is otherwise subject to the jurisdiction of the United States at the time of the release, or

  **(3)** in charge of a facility from which a hazardous substance is released, other than a federally permitted release,

in a quantity equal to or greater than that determined pursuant to section 9602 of this title who fails to notify immediately the appropriate agency of the United States Government as soon as he has knowledge of such release or who submits in such a notification any information which he knows to be false or misleading shall, upon conviction, be fined in accordance with the applicable provisions of Title 18 or imprisoned for not more than 3 years (or not more than 5 years in the case of a second or subsequent conviction), or both. Notification received pursuant to this subsection or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

**(c) Notice to Administrator of EPA of existence of storage, etc., facility by owner or operator; exception; time, manner, and form of notice; penalties for failure to notify; use of notice or information pursuant to notice in criminal case**

ADD26

Within one hundred and eighty days after December 11, 1980, any person who owns or operates or who at the time of disposal owned or operated, or who accepted hazardous substances for transport and selected, a facility at which hazardous substances (as defined in section 9601(14)(C) of this title) are or have been stored, treated, or disposed of shall, unless such facility has a permit issued under, or has been accorded interim status under, subtitle C of the Solid Waste Disposal Act, notify the Administrator of the Environmental Protection Agency of the existence of such facility, specifying the amount and type of any hazardous substance to be found there, and any known, suspected, or likely releases of such substances from such facility. The Administrator may prescribe in greater detail the manner and form of the notice and the information included. The Administrator shall notify the affected State agency, or any department designated by the Governor to receive such notice, of the existence of such facility. Any person who knowingly fails to notify the Administrator of the existence of any such facility shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. In addition, any such person who knowingly fails to provide the notice required by this subsection shall not be entitled to any limitation of liability or to any defenses to liability set out in section 9607 of this title: *Provided, however*, That notification under this subsection is not required for any facility which would be reportable hereunder solely as a result of any stoppage in transit which is temporary, incidental to the transportation movement, or at the ordinary operating convenience of a common or contract carrier, and such stoppage shall be considered as a continuity of movement and not as the storage of a hazardous substance. Notification received pursuant to this subsection or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

**(d) Recordkeeping requirements; promulgation of rules and regulations by Administrator of EPA; penalties for violations; waiver of retention requirements**

**(1)** The Administrator of the Environmental Protection Agency is authorized to promulgate rules and regulations specifying, with respect to--

**(A)** the location, title, or condition of a facility, and

**(B)** the identity, characteristics, quantity, origin, or condition (including containerization and previous treatment) of any hazardous substances contained or deposited in a facility;

the records which shall be retained by any person required to provide the notification of a facility set out in subsection (c) of this section. Such specification shall be in accordance with the provisions of this subsection.

**(2)** Beginning with December 11, 1980, for fifty years thereafter or for fifty years after the date of establishment of a record (whichever is later), or at any such earlier time as a waiver if obtained under paragraph (3) of this subsection, it shall be unlawful for any such person knowingly to destroy, mutilate, erase, dispose of, conceal, or otherwise render unavailable or unreadable or falsify any records identified in paragraph (1) of this subsection. Any person who violates this paragraph shall, upon conviction, be fined in accordance with the applicable provisions of Title 18 or imprisoned for not more than 3 years (or not more than 5 years in the case of a second or subsequent conviction), or both.

**(3)** At any time prior to the date which occurs fifty years after December 11, 1980, any person identified under paragraph (1) of this subsection may apply to the Administrator of the Environmental Protection Agency for a waiver of the provisions of the first sentence of paragraph (2) of this subsection. The Administrator is authorized to grant such waiver if, in his discretion, such waiver would not unreasonably interfere with the attainment of the purposes and provisions of this chapter. The Administrator

ADD27

shall promulgate rules and regulations regarding such a waiver so as to inform parties of the proper application procedure and conditions for approval of such a waiver.

**(4)** Notwithstanding the provisions of this subsection, the Administrator of the Environmental Protection Agency may in his discretion require any such person to retain any record identified pursuant to paragraph (1) of this subsection for such a time period in excess of the period specified in paragraph (2) of this subsection as the Administrator determines to be necessary to protect the public health or welfare.

**(e) Applicability to registered pesticide products and air emissions from animal waste at farms**

**(1) In general**

This section shall not apply to--

**(A)** the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136 et seq.) or the handling and storage of such a pesticide product by an agricultural producer; or

**(B)** air emissions from animal waste (including decomposing animal waste) at a farm.

**(2) Definitions**

In this subsection:

**(A) Animal waste**

**(i) In general**

The term "animal waste" means feces, urine, or other excrement, digestive emission, urea, or similar substances emitted by animals (including any form of livestock, poultry, or fish).

**(ii) Inclusions**

The term "animal waste" includes animal waste that is mixed or commingled with bedding, compost, feed, soil, or any other material typically found with such waste.

**(B) Farm**

The term "farm" means a site or area (including associated structures) that--

**(i)** is used for--

ADD28

**(I)** the production of a crop; or

**(II)** the raising or selling of animals (including any form of livestock, poultry, or fish); and

**(ii)** under normal conditions, produces during a farm year any agricultural products with a total value equal to not less than $1,000.

**(f) Exemptions from notice and penalty provisions for substances reported under other Federal law or is in continuous release, etc.**

No notification shall be required under subsection (a) or (b) of this section for any release of a hazardous substance--

**(1)** which is required to be reported (or specifically exempted from a requirement for reporting) under subtitle C of the Solid Waste Disposal Act or regulations thereunder and which has been reported to the National Response Center, or

**(2)** which is a continuous release, stable in quantity and rate, and is--

**(A)** from a facility for which notification has been given under subsection (c) of this section, or

**(B)** a release of which notification has been given under subsections (a) and (b) of this section for a period sufficient to establish the continuity, quantity, and regularity of such release:

*Provided*, That notification in accordance with subsections (a) and (b) of this paragraph shall be given for releases subject to this paragraph annually, or at such time as there is any statistically significant increase in the quantity of any hazardous substance or constituent thereof released, above that previously reported or occurring.

### CREDIT(S)

(Pub.L. 96-510, Title I, § 103, Dec. 11, 1980, 94 Stat. 2772; Pub.L. 96-561, Title II, § 238(b), Dec. 22, 1980, 94 Stat. 3300; Pub.L. 99-499, Title I, §§ 103, 109(a)(1), (2), Oct. 17, 1986, 100 Stat. 1617, 1632, 1633; Pub.L. 104-208, Div. A, Title I, § 101(a) [Title II, § 211(b)], Sept. 30, 1996, 110 Stat. 3009, 3009-41; Pub.L. 115-141, Div. S, Title XI, § 1102, Mar. 23, 2018, 132 Stat. 1147.)

Notes of Decisions (41)

42 U.S.C.A. § 9603, 42 USCA § 9603
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> United States Code Annotated
>   Title 42. The Public Health and Welfare
>     Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
>       Subchapter I. Hazardous Substances Releases, Liability, Compensation (Refs & Annos)

42 U.S.C.A. § 9604

§ 9604. Response authorities

*Currentness*

**(a) Removal and other remedial action by President; applicability of national contingency plan; response by potentially responsible parties; public health threats; limitations on response; exception**

**(1)** Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health and welfare or the environment. When the President determines that such action will be done properly and promptly by the owner or operator of the facility or vessel or by any other responsible party, the President may allow such person to carry out the action, conduct the remedial investigation, or conduct the feasibility study in accordance with section 9622 of this title. No remedial investigation or feasibility study (RI/FS) shall be authorized except on a determination by the President that the party is qualified to conduct the RI/FS and only if the President contracts with or arranges for a qualified person to assist the President in overseeing and reviewing the conduct of such RI/FS and if the responsible party agrees to reimburse the Fund for any cost incurred by the President under, or in connection with, the oversight contract or arrangement. In no event shall a potentially responsible party be subject to a lesser standard of liability, receive preferential treatment, or in any other way, whether direct or indirect, benefit from any such arrangements as a response action contractor, or as a person hired or retained by such a response action contractor, with respect to the release or facility in question. The President shall give primary attention to those releases which the President deems may present a public health threat.

**(2) Removal action**

Any removal action undertaken by the President under this subsection (or by any other person referred to in section 9622 of this title) should, to the extent the President deems practicable, contribute to the efficient performance of any long term remedial action with respect to the release or threatened release concerned.

**(3) Limitations on response**

The President shall not provide for a removal or remedial action under this section in response to a release or threat of release--

**(A)** of a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found;

**(B)** from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures; or

**(C)** into public or private drinking water supplies due to deterioration of the system through ordinary use.

**(4) Exception to limitations**

Notwithstanding paragraph (3) of this subsection, to the extent authorized by this section, the President may respond to any release or threat of release if in the President's discretion, it constitutes a public health or environmental emergency and no other person with the authority and capability to respond to the emergency will do so in a timely manner.

**(b) Investigations, monitoring, coordination, etc., by President**

**(1) Information; studies and investigations**

Whenever the President is authorized to act pursuant to subsection (a) of this section, or whenever the President has reason to believe that a release has occurred or is about to occur, or that illness, disease, or complaints thereof may be attributable to exposure to a hazardous substance, pollutant, or contaminant and that a release may have occurred or be occurring, he may undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of danger to the public health or welfare or to the environment. In addition, the President may undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.

**(2) Coordination of investigations**

The President shall promptly notify the appropriate Federal and State natural resource trustees of potential damages to natural resources resulting from releases under investigation pursuant to this section and shall seek to coordinate the assessments, investigations, and planning under this section with such Federal and State trustees.

**(c) Criteria for continuance of obligations from Fund over specified amount for response actions; consultation by President with affected States; contracts or cooperative agreements by States with President prior to remedial actions; cost-sharing agreements; selection by President of remedial actions; State credits: granting of credit, expenses before listing or agreement, response actions between 1978 and 1980, State expenses after December 11, 1980, in excess of 10 percent of costs, item-by-item approval, use of credits; operation and maintenance; limitation on source of funds for O&M; recontracting; siting**

**(1)** Unless (A) the President finds that (i) continued response actions are immediately required to prevent, limit, or mitigate an emergency, (ii) there is an immediate risk to public health or welfare or the environment, and (iii) such assistance will

ADD31

not otherwise be provided on a timely basis, or (B) the President has determined the appropriate remedial actions pursuant to paragraph (2) of this subsection and the State or States in which the source of the release is located have complied with the requirements of paragraph (3) of this subsection, or (C) continued response action is otherwise appropriate and consistent with the remedial action to be taken [1] obligations from the Fund, other than those authorized by subsection (b) of this section, shall not continue after $2,000,000 has been obligated for response actions or 12 months has elapsed from the date of initial response to a release or threatened release of hazardous substances.

**(2)** The President shall consult with the affected State or States before determining any appropriate remedial action to be taken pursuant to the authority granted under subsection (a) of this section.

**(3)** The President shall not provide any remedial actions pursuant to this section unless the State in which the release occurs first enters into a contract or cooperative agreement with the President providing assurances deemed adequate by the President that (A) the State will assure all future maintenance of the removal and remedial actions provided for the expected life of such actions as determined by the President; (B) the State will assure the availability of a hazardous waste disposal facility acceptable to the President and in compliance with the requirements of subtitle C of the Solid Waste Disposal Act for any necessary offsite storage, destruction, treatment, or secure disposition of the hazardous substances; and (C) the State will pay or assure payment of (i) 10 per centum of the costs of the remedial action, including all future maintenance, or (ii) 50 percent (or such greater amount as the President may determine appropriate, taking into account the degree of responsibility of the State or political subdivision for the release) of any sums expended in response to a release at a facility, that was operated by the State or a political subdivision thereof, either directly or through a contractual relationship or otherwise, at the time of any disposal of hazardous substances therein. For the purpose of clause (ii) of this subparagraph, the term "facility" does not include navigable waters or the beds underlying those waters. In the case of remedial action to be taken on land or water held by an Indian tribe, held by the United States in trust for Indians, held by a member of an Indian tribe (if such land or water is subject to a trust restriction on alienation), or otherwise within the borders of an Indian reservation, the requirements of this paragraph for assurances regarding future maintenance and cost-sharing shall not apply, and the President shall provide the assurance required by this paragraph regarding the availability of a hazardous waste disposal facility.

**(4) Selection of remedial action**

The President shall select remedial actions to carry out this section in accordance with section 9621 of this title (relating to cleanup standards).

**(5) State credits**

**(A) Granting of credit**

The President shall grant a State a credit against the share of the costs, for which it is responsible under paragraph (3) with respect to a facility listed on the National Priorities List under the National Contingency Plan, for amounts expended by a State for remedial action at such facility pursuant to a contract or cooperative agreement with the President. The credit under this paragraph shall be limited to those State expenses which the President determines to be reasonable, documented, direct out-of-pocket expenditures of non-Federal funds.

**(B) Expenses before listing or agreement**

ADD32

The credit under this paragraph shall include expenses for remedial action at a facility incurred before the listing of the facility on the National Priorities List or before a contract or cooperative agreement is entered into under subsection (d) for the facility if--

(i) after such expenses are incurred the facility is listed on such list and a contract or cooperative agreement is entered into for the facility, and

(ii) the President determines that such expenses would have been credited to the State under subparagraph (A) had the expenditures been made after listing of the facility on such list and after the date on which such contract or cooperative agreement is entered into.

**(C) Response actions between 1978 and 1980**

The credit under this paragraph shall include funds expended or obligated by the State or a political subdivision thereof after January 1, 1978, and before December 11, 1980, for cost-eligible response actions and claims for damages compensable under section 9611 of this title.

**(D) State expenses after December 11, 1980, in excess of 10 percent of costs**

The credit under this paragraph shall include 90 percent of State expenses incurred at a facility owned, but not operated, by such State or by a political subdivision thereof. Such credit applies only to expenses incurred pursuant to a contract or cooperative agreement under subsection (d) and only to expenses incurred after December 11, 1980, but before October 17, 1986.

**(E) Item-by-item approval**

In the case of expenditures made after October 17, 1986, the President may require prior approval of each item of expenditure as a condition of granting a credit under this paragraph.

**(F) Use of credits**

Credits granted under this paragraph for funds expended with respect to a facility may be used by the State to reduce all or part of the share of costs otherwise required to be paid by the State under paragraph (3) in connection with remedial actions at such facility. If the amount of funds for which credit is allowed under this paragraph exceeds such share of costs for such facility, the State may use the amount of such excess to reduce all or part of the share of such costs at other facilities in that State. A credit shall not entitle the State to any direct payment.

**(6) Operation and maintenance**

For the purposes of paragraph (3) of this subsection, in the case of ground or surface water contamination, completed remedial action includes the completion of treatment or other measures, whether taken onsite or offsite, necessary to restore ground and surface water quality to a level that assures protection of human health and the environment. With respect to such measures, the operation of such measures for a period of up to 10 years after the construction or installation and commencement of operation

ADD33

shall be considered remedial action. Activities required to maintain the effectiveness of such measures following such period or the completion of remedial action, whichever is earlier, shall be considered operation or maintenance.

**(7) Limitation on source of funds for O&M**

During any period after the availability of funds received by the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26 from tax revenues or appropriations from general revenues, the Federal share of the payment of the cost of operation or maintenance pursuant to paragraph (3)(C)(i) or paragraph (6) of this subsection (relating to operation and maintenance) shall be from funds received by the Hazardous Substance Superfund from amounts recovered on behalf of such fund under this chapter.

**(8) Recontracting**

The President is authorized to undertake or continue whatever interim remedial actions the President determines to be appropriate to reduce risks to public health or the environment where the performance of a complete remedial action requires recontracting because of the discovery of sources, types, or quantities of hazardous substances not known at the time of entry into the original contract. The total cost of interim actions undertaken at a facility pursuant to this paragraph shall not exceed $2,000,000.

**(9) Siting**

Effective 3 years after October 17, 1986, the President shall not provide any remedial actions pursuant to this section unless the State in which the release occurs first enters into a contract or cooperative agreement with the President providing assurances deemed adequate by the President that the State will assure the availability of hazardous waste treatment or disposal facilities which--

**(A)** have adequate capacity for the destruction, treatment, or secure disposition of all hazardous wastes that are reasonably expected to be generated within the State during the 20-year period following the date of such contract or cooperative agreement and to be disposed of, treated, or destroyed,

**(B)** are within the State or outside the State in accordance with an interstate agreement or regional agreement or authority,

**(C)** are acceptable to the President, and

**(D)** are in compliance with the requirements of subtitle C of the Solid Waste Disposal Act.

**(d) Contracts or cooperative agreements by President with States or political subdivisions or Indian tribes; State applications, terms and conditions; reimbursements; cost-sharing provisions; enforcement requirements and procedures**

**(1) Cooperative agreements**

**(A) State applications**

ADD34

A State or political subdivision thereof or Indian tribe may apply to the President to carry out actions authorized in this section. If the President determines that the State or political subdivision or Indian tribe has the capability to carry out any or all of such actions in accordance with the criteria and priorities established pursuant to section 9605(a)(8) of this title and to carry out related enforcement actions, the President may enter into a contract or cooperative agreement with the State or political subdivision or Indian tribe to carry out such actions. The President shall make a determination regarding such an application within 90 days after the President receives the application.

**(B) Terms and conditions**

A contract or cooperative agreement under this paragraph shall be subject to such terms and conditions as the President may prescribe. The contract or cooperative agreement may cover a specific facility or specific facilities.

**(C) Reimbursements**

Any State which expended funds during the period beginning September 30, 1985, and ending on October 17, 1986, for response actions at any site included on the National Priorities List and subject to a cooperative agreement under this chapter shall be reimbursed for the share of costs of such actions for which the Federal Government is responsible under this chapter.

**(2)** If the President enters into a cost-sharing agreement pursuant to subsection (c) of this section or a contract or cooperative agreement pursuant to this subsection, and the State or political subdivision thereof fails to comply with any requirements of the contract, the President may, after providing sixty days notice, seek in the appropriate Federal district court to enforce the contract or to recover any funds advanced or any costs incurred because of the breach of the contract by the State or political subdivision.

**(3)** Where a State or a political subdivision thereof is acting in behalf of the President, the President is authorized to provide technical and legal assistance in the administration and enforcement of any contract or subcontract in connection with response actions assisted under this subchapter, and to intervene in any civil action involving the enforcement of such contract or subcontract.

**(4)** Where two or more noncontiguous facilities are reasonably related on the basis of geography, or on the basis of the threat, or potential threat to the public health or welfare or the environment, the President may, in his discretion, treat these related facilities as one for purposes of this section.

**(e) Information gathering and access**

**(1) Action authorized**

Any officer, employee, or representative of the President, duly designated by the President, is authorized to take action under paragraph (2), (3), or (4) (or any combination thereof) at a vessel, facility, establishment, place, property, or location or, in the case of paragraph (3) or (4), at any vessel, facility, establishment, place, property, or location which is adjacent to the vessel, facility, establishment, place, property, or location referred to in such paragraph (3) or (4). Any duly designated officer, employee, or representative of a State or political subdivision under a contract or cooperative agreement under subsection (d) (1) is also authorized to take such action. The authority of paragraphs (3) and (4) may be exercised only if there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant. The authority

ADD35

of this subsection may be exercised only for the purposes of determining the need for response, or choosing or taking any response action under this subchapter, or otherwise enforcing the provisions of this subchapter.

**(2) Access to information**

Any officer, employee, or representative described in paragraph (1) may require any person who has or may have information relevant to any of the following to furnish, upon reasonable notice, information or documents relating to such matter:

**(A)** The identification, nature, and quantity of materials which have been or are generated, treated, stored, or disposed of at a vessel or facility or transported to a vessel or facility.

**(B)** The nature or extent of a release or threatened release of a hazardous substance or pollutant or contaminant at or from a vessel or facility.

**(C)** Information relating to the ability of a person to pay for or to perform a cleanup.

In addition, upon reasonable notice, such person either (i) shall grant any such officer, employee, or representative access at all reasonable times to any vessel, facility, establishment, place, property, or location to inspect and copy all documents or records relating to such matters or (ii) shall copy and furnish to the officer, employee, or representative all such documents or records, at the option and expense of such person.

**(3) Entry**

Any officer, employee, or representative described in paragraph (1) is authorized to enter at reasonable times any of the following:

**(A)** Any vessel, facility, establishment, or other place or property where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed of, or transported from.

**(B)** Any vessel, facility, establishment, or other place or property from which or to which a hazardous substance or pollutant or contaminant has been or may have been released.

**(C)** Any vessel, facility, establishment, or other place or property where such release is or may be threatened.

**(D)** Any vessel, facility, establishment, or other place or property where entry is needed to determine the need for response or the appropriate response or to effectuate a response action under this subchapter.

**(4) Inspection and samples**

**(A) Authority**

ADD36

Any officer, employee or representative described in paragraph (1) is authorized to inspect and obtain samples from any vessel, facility, establishment, or other place or property referred to in paragraph (3) or from any location of any suspected hazardous substance or pollutant or contaminant. Any such officer, employee, or representative is authorized to inspect and obtain samples of any containers or labeling for suspected hazardous substances or pollutants or contaminants. Each such inspection shall be completed with reasonable promptness.

**(B) Samples**

If the officer, employee, or representative obtains any samples, before leaving the premises he shall give to the owner, operator, tenant, or other person in charge of the place from which the samples were obtained a receipt describing the sample obtained and, if requested, a portion of each such sample. A copy of the results of any analysis made of such samples shall be furnished promptly to the owner, operator, tenant, or other person in charge, if such person can be located.

**(5) Compliance orders**

**(A) Issuance**

If consent is not granted regarding any request made by an officer, employee, or representative under paragraph (2), (3), or (4), the President may issue an order directing compliance with the request. The order may be issued after such notice and opportunity for consultation as is reasonably appropriate under the circumstances.

**(B) Compliance**

The President may ask the Attorney General to commence a civil action to compel compliance with a request or order referred to in subparagraph (A). Where there is a reasonable basis to believe there may be a release or threat of a release of a hazardous substance or pollutant or contaminant, the court shall take the following actions:

**(i)** In the case of interference with entry or inspection, the court shall enjoin such interference or direct compliance with orders to prohibit interference with entry or inspection unless under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

**(ii)** In the case of information or document requests or orders, the court shall enjoin interference with such information or document requests or orders or direct compliance with the requests or orders to provide such information or documents unless under the circumstances of the case the demand for information or documents is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

The court may assess a civil penalty not to exceed $25,000 for each day of noncompliance against any person who unreasonably fails to comply with the provisions of paragraph (2), (3), or (4) or an order issued pursuant to subparagraph (A) of this paragraph.

**(6) Other authority**

Nothing in this subsection shall preclude the President from securing access or obtaining information in any other lawful manner.

ADD37

**(7) Confidentiality of information**

**(A)** Any records, reports, or information obtained from any person under this section (including records, reports, or information obtained by representatives of the President) shall be available to the public, except that upon a showing satisfactory to the President (or the State, as the case may be) by any person that records, reports, or information, or particular part thereof (other than health or safety effects data), to which the President (or the State, as the case may be) or any officer, employee, or representative has access under this section if made public would divulge information entitled to protection under section 1905 of Title 18, such information or particular portion thereof shall be considered confidential in accordance with the purposes of that section, except that such record, report, document or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, or when relevant in any proceeding under this chapter.

**(B)** Any person not subject to the provisions of section 1905 of Title 18 who knowingly and willfully divulges or discloses any information entitled to protection under this subsection shall, upon conviction, be subject to a fine of not more than $5,000 or to imprisonment not to exceed one year, or both.

**(C)** In submitting data under this chapter, a person required to provide such data may (i) designate the data which such person believes is entitled to protection under this subsection and (ii) submit such designated data separately from other data submitted under this chapter. A designation under this paragraph shall be made in writing and in such manner as the President may prescribe by regulation.

**(D)** Notwithstanding any limitation contained in this section or any other provision of law, all information reported to or otherwise obtained by the President (or any representative of the President) under this chapter shall be made available, upon written request of any duly authorized committee of the Congress, to such committee.

**(E)** No person required to provide information under this chapter may claim that the information is entitled to protection under this paragraph unless such person shows each of the following:

**(i)** Such person has not disclosed the information to any other person, other than a member of a local emergency planning committee established under title III of the Amendments and Reauthorization Act of 1986, an officer or employee of the United States or a State or local government, an employee of such person, or a person who is bound by a confidentiality agreement, and such person has taken reasonable measures to protect the confidentiality of such information and intends to continue to take such measures.

**(ii)** The information is not required to be disclosed, or otherwise made available, to the public under any other Federal or State law.

**(iii)** Disclosure of the information is likely to cause substantial harm to the competitive position of such person.

**(iv)** The specific chemical identity, if sought to be protected, is not readily discoverable through reverse engineering.

ADD38

USCA Case #24-1193    Document #2153240    Filed: 01/07/2026    Page 44 of 204

**(F)** The following information with respect to any hazardous substance at the facility or vessel shall not be entitled to protection under this paragraph:

**(i)** The trade name, common name, or generic class or category of the hazardous substance.

**(ii)** The physical properties of the substance, including its boiling point, melting point, flash point, specific gravity, vapor density, solubility in water, and vapor pressure at 20 degrees celsius.

**(iii)** The hazards to health and the environment posed by the substance, including physical hazards (such as explosion) and potential acute and chronic health hazards.

**(iv)** The potential routes of human exposure to the substance at the facility, establishment, place, or property being investigated, entered, or inspected under this subsection.

**(v)** The location of disposal of any waste stream.

**(vi)** Any monitoring data or analysis of monitoring data pertaining to disposal activities.

**(vii)** Any hydrogeologic or geologic data.

**(viii)** Any groundwater monitoring data.

**(f) Contracts for response actions; compliance with Federal health and safety standards**

In awarding contracts to any person engaged in response actions, the President or the State, in any case where it is awarding contracts pursuant to a contract entered into under subsection (d) of this section, shall require compliance with Federal health and safety standards established under section 9651(f) of this title by contractors and subcontractors as a condition of such contracts.

**(g) Rates for wages and labor standards applicable to covered work**

**(1)** All laborers and mechanics employed by contractors or subcontractors in the performance of construction, repair, or alteration work funded in whole or in part under this section or section 9628(a)(1)(B)(ii)(III) of this title shall be paid wages at rates not less than those prevailing on projects of a character similar in the locality as determined by the Secretary of Labor in accordance with sections 3141-3144, 3146, and 3147 of Title 40. The President shall not approve any such funding without first obtaining adequate assurance that required labor standards will be maintained upon the construction work.

**(2)** The Secretary of Labor shall have, with respect to the labor standards specified in paragraph (1), the authority and functions set forth in Reorganization Plan Numbered 14 of 1950 (15 F.R. 3176; 64 Stat. 1267) and section 3145 of Title 40.

ADD39

**(h) Emergency procurement powers; exercise by President**

Notwithstanding any other provision of law, subject to the provisions of section 9611 of this title, the President may authorize the use of such emergency procurement powers as he deems necessary to effect the purpose of this chapter. Upon determination that such procedures are necessary, the President shall promulgate regulations prescribing the circumstances under which such authority shall be used and the procedures governing the use of such authority.

**(i) Agency for Toxic Substances and Disease Registry; establishment, functions, etc.**

**(1)** There is hereby established within the Public Health Service an agency, to be known as the Agency for Toxic Substances and Disease Registry, which shall report directly to the Surgeon General of the United States. The Administrator of said Agency shall, with the cooperation of the Administrator of the Environmental Protection Agency, the Commissioner of the Food and Drug Administration, the Directors of the National Institute of Medicine, National Institute of Environmental Health Sciences, National Institute of Occupational Safety and Health, Centers for Disease Control and Prevention, the Administrator of the Occupational Safety and Health Administration, the Administrator of the Social Security Administration, the Secretary of Transportation, and appropriate State and local health officials, effectuate and implement the health related authorities of this chapter. In addition, said Administrator shall--

**(A)** in cooperation with the States, establish and maintain a national registry of serious diseases and illnesses and a national registry of persons exposed to toxic substances;

**(B)** establish and maintain inventory of literature, research, and studies on the health effects of toxic substances;

**(C)** in cooperation with the States, and other agencies of the Federal Government, establish and maintain a complete listing of areas closed to the public or otherwise restricted in use because of toxic substance contamination;

**(D)** in cases of public health emergencies caused or believed to be caused by exposure to toxic substances, provide medical care and testing to exposed individuals, including but not limited to tissue sampling, chromosomal testing where appropriate, epidemiological studies, or any other assistance appropriate under the circumstances; and

**(E)** either independently or as part of other health status survey, conduct periodic survey and screening programs to determine relationships between exposure to toxic substances and illness. In cases of public health emergencies, exposed persons shall be eligible for admission to hospitals and other facilities and services operated or provided by the Public Health Service.

**(2)(A)** Within 6 months after October 17, 1986, the Administrator of the Agency for Toxic Substances and Disease Registry (ATSDR) and the Administrator of the Environmental Protection Agency (EPA) shall prepare a list, in order of priority, of at least 100 hazardous substances which are most commonly found at facilities on the National Priorities List and which, in their sole discretion, they determine are posing the most significant potential threat to human health due to their known or suspected toxicity to humans and the potential for human exposure to such substances at facilities on the National Priorities List or at facilities to which a response to a release or a threatened release under this section is under consideration.

ADD40

**(B)** Within 24 months after October 17, 1986, the Administrator of ATSDR and the Administrator of EPA shall revise the list prepared under subparagraph (A). Such revision shall include, in order of priority, the addition of 100 or more such hazardous substances. In each of the 3 consecutive 12-month periods that follow, the Administrator of ATSDR and the Administrator of EPA shall revise, in the same manner as provided in the 2 preceding sentences, such list to include not fewer than 25 additional hazardous substances per revision. The Administrator of ATSDR and the Administrator of EPA shall not less often than once every year thereafter revise such list to include additional hazardous substances in accordance with the criteria in subparagraph (A).

**(3)** Based on all available information, including information maintained under paragraph (1)(B) and data developed and collected on the health effects of hazardous substances under this paragraph, the Administrator of ATSDR shall prepare toxicological profiles of each of the substances listed pursuant to paragraph (2). The toxicological profiles shall be prepared in accordance with guidelines developed by the Administrator of ATSDR and the Administrator of EPA. Such profiles shall include, but not be limited to each of the following:

**(A)** An examination, summary, and interpretation of available toxicological information and epidemiologic evaluations on a hazardous substance in order to ascertain the levels of significant human exposure for the substance and the associated acute, subacute, and chronic health effects.

**(B)** A determination of whether adequate information on the health effects of each substance is available or in the process of development to determine levels of exposure which present a significant risk to human health of acute, subacute, and chronic health effects.

**(C)** Where appropriate, an identification of toxicological testing needed to identify the types or levels of exposure that may present significant risk of adverse health effects in humans.

Any toxicological profile or revision thereof shall reflect the Administrator of ATSDR's assessment of all relevant toxicological testing which has been peer reviewed. The profiles required to be prepared under this paragraph for those hazardous substances listed under subparagraph (A) of paragraph (2) shall be completed, at a rate of no fewer than 25 per year, within 4 years after October 17, 1986. A profile required on a substance listed pursuant to subparagraph (B) of paragraph (2) shall be completed within 3 years after addition to the list. The profiles prepared under this paragraph shall be of those substances highest on the list of priorities under paragraph (2) for which profiles have not previously been prepared. Profiles required under this paragraph shall be revised and republished as necessary, but no less often than once every 3 years. Such profiles shall be provided to the States and made available to other interested parties.

**(4)** The Administrator of the ATSDR shall provide consultations upon request on health issues relating to exposure to hazardous or toxic substances, on the basis of available information, to the Administrator of EPA, State officials, and local officials. Such consultations to individuals may be provided by States under cooperative agreements established under this chapter.

**(5)(A)** For each hazardous substance listed pursuant to paragraph (2), the Administrator of ATSDR (in consultation with the Administrator of EPA and other agencies and programs of the Public Health Service) shall assess whether adequate information on the health effects of such substance is available. For any such substance for which adequate information is not available (or under development), the Administrator of ATSDR, in cooperation with the Director of the National Toxicology Program, shall assure the initiation of a program of research designed to determine the health effects (and techniques for development of methods to determine such health effects) of such substance. Where feasible, such program shall seek to develop methods to

ADD41

determine the health effects of such substance in combination with other substances with which it is commonly found. Before assuring the initiation of such program, the Administrator of ATSDR shall consider recommendations of the Interagency Testing Committee established under section 4(e) of the Toxic Substances Control Act on the types of research that should be done. Such program shall include, to the extent necessary to supplement existing information, but shall not be limited to--

**(i)** laboratory and other studies to determine short, intermediate, and long-term health effects;

**(ii)** laboratory and other studies to determine organ-specific, site-specific, and system-specific acute and chronic toxicity;

**(iii)** laboratory and other studies to determine the manner in which such substances are metabolized or to otherwise develop an understanding of the biokinetics of such substances; and

**(iv)** where there is a possibility of obtaining human data, the collection of such information.

**(B)** In assessing the need to perform laboratory and other studies, as required by subparagraph (A), the Administrator of ATSDR shall consider--

**(i)** the availability and quality of existing test data concerning the substance on the suspected health effect in question;

**(ii)** the extent to which testing already in progress will, in a timely fashion, provide data that will be adequate to support the preparation of toxicological profiles as required by paragraph (3); and

**(iii)** such other scientific and technical factors as the Administrator of ATSDR may determine are necessary for the effective implementation of this subsection.

**(C)** In the development and implementation of any research program under this paragraph, the Administrator of ATSDR and the Administrator of EPA shall coordinate such research program implemented under this paragraph with the National Toxicology Program and with programs of toxicological testing established under the Toxic Substances Control Act and the Federal Insecticide, Fungicide and Rodenticide Act. The purpose of such coordination shall be to avoid duplication of effort and to assure that the hazardous substances listed pursuant to this subsection are tested thoroughly at the earliest practicable date. Where appropriate, consistent with such purpose, a research program under this paragraph may be carried out using such programs of toxicological testing.

**(D)** It is the sense of the Congress that the costs of research programs under this paragraph be borne by the manufacturers and processors of the hazardous substance in question, as required in programs of toxicological testing under the Toxic Substances Control Act. Within 1 year after October 17, 1986, the Administrator of EPA shall promulgate regulations which provide, where appropriate, for payment of such costs by manufacturers and processors under the Toxic Substances Control Act, and registrants under the Federal Insecticide, Fungicide, and Rodenticide Act, and recovery of such costs from responsible parties under this chapter.

ADD42

**(6)(A)** The Administrator of ATSDR shall perform a health assessment for each facility on the National Priorities List established under section 9605 of this title. Such health assessment shall be completed not later than December 10, 1988, for each facility proposed for inclusion on such list prior to October 17, 1986, or not later than one year after the date of proposal for inclusion on such list for each facility proposed for inclusion on such list after October 17, 1986.

**(B)** The Administrator of ATSDR may perform health assessments for releases or facilities where individual persons or licensed physicians provide information that individuals have been exposed to a hazardous substance, for which the probable source of such exposure is a release. In addition to other methods (formal or informal) of providing such information, such individual persons or licensed physicians may submit a petition to the Administrator of ATSDR providing such information and requesting a health assessment. If such a petition is submitted and the Administrator of ATSDR does not initiate a health assessment, the Administrator of ATSDR shall provide a written explanation of why a health assessment is not appropriate.

**(C)** In determining the priority in which to conduct health assessments under this subsection, the Administrator of ATSDR, in consultation with the Administrator of EPA, shall give priority to those facilities at which there is documented evidence of the release of hazardous substances, at which the potential risk to human health appears highest, and for which in the judgment of the Administrator of ATSDR existing health assessment data are inadequate to assess the potential risk to human health as provided in subparagraph (F). In determining the priorities for conducting health assessments under this subsection, the Administrator of ATSDR shall consider the National Priorities List schedules and the needs of the Environmental Protection Agency and other Federal agencies pursuant to schedules for remedial investigation and feasibility studies.

**(D)** Where a health assessment is done at a site on the National Priorities List, the Administrator of ATSDR shall complete such assessment promptly and, to the maximum extent practicable, before the completion of the remedial investigation and feasibility study at the facility concerned.

**(E)** Any State or political subdivision carrying out a health assessment for a facility shall report the results of the assessment to the Administrator of ATSDR and the Administrator of EPA and shall include recommendations with respect to further activities which need to be carried out under this section. The Administrator of ATSDR shall state such recommendation in any report on the results of any assessment carried out directly by the Administrator of ATSDR for such facility and shall issue periodic reports which include the results of all the assessments carried out under this subsection.

**(F)** For the purposes of this subsection and section 9611(c)(4) of this title, the term "health assessments" shall include preliminary assessments of the potential risk to human health posed by individual sites and facilities, based on such factors as the nature and extent of contamination, the existence of potential pathways of human exposure (including ground or surface water contamination, air emissions, and food chain contamination), the size and potential susceptibility of the community within the likely pathways of exposure, the comparison of expected human exposure levels to the short-term and long-term health effects associated with identified hazardous substances and any available recommended exposure or tolerance limits for such hazardous substances, and the comparison of existing morbidity and mortality data on diseases that may be associated with the observed levels of exposure. The Administrator of ATSDR shall use appropriate data, risk assessments, risk evaluations and studies available from the Administrator of EPA.

**(G)** The purpose of health assessments under this subsection shall be to assist in determining whether actions under paragraph (11) of this subsection should be taken to reduce human exposure to hazardous substances from a facility and whether additional information on human exposure and associated health risks is needed and should be acquired by conducting epidemiological studies under paragraph (7), establishing a registry under paragraph (8), establishing a health surveillance program under

ADD43

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    14

paragraph (9), or through other means. In using the results of health assessments for determining additional actions to be taken under this section, the Administrator of ATSDR may consider additional information on the risks to the potentially affected population from all sources of such hazardous substances including known point or nonpoint sources other than those from the facility in question.

**(H)** At the completion of each health assessment, the Administrator of ATSDR shall provide the Administrator of EPA and each affected State with the results of such assessment, together with any recommendations for further actions under this subsection or otherwise under this chapter. In addition, if the health assessment indicates that the release or threatened release concerned may pose a serious threat to human health or the environment, the Administrator of ATSDR shall so notify the Administrator of EPA who shall promptly evaluate such release or threatened release in accordance with the hazard ranking system referred to in section 9605(a)(8)(A) of this title to determine whether the site shall be placed on the National Priorities List or, if the site is already on the list, the Administrator of ATSDR may recommend to the Administrator of EPA that the site be accorded a higher priority.

**(7)(A)** Whenever in the judgment of the Administrator of ATSDR it is appropriate on the basis of the results of a health assessment, the Administrator of ATSDR shall conduct a pilot study of health effects for selected groups of exposed individuals in order to determine the desirability of conducting full scale epidemiological or other health studies of the entire exposed population.

**(B)** Whenever in the judgment of the Administrator of ATSDR it is appropriate on the basis of the results of such pilot study or other study or health assessment, the Administrator of ATSDR shall conduct such full scale epidemiological or other health studies as may be necessary to determine the health effects on the population exposed to hazardous substances from a release or threatened release. If a significant excess of disease in a population is identified, the letter of transmittal of such study shall include an assessment of other risk factors, other than a release, that may, in the judgment of the peer review group, be associated with such disease, if such risk factors were not taken into account in the design or conduct of the study.

**(8)** In any case in which the results of a health assessment indicate a potential significant risk to human health, the Administrator of ATSDR shall consider whether the establishment of a registry of exposed persons would contribute to accomplishing the purposes of this subsection, taking into account circumstances bearing on the usefulness of such a registry, including the seriousness or unique character of identified diseases or the likelihood of population migration from the affected area.

**(9)** Where the Administrator of ATSDR has determined that there is a significant increased risk of adverse health effects in humans from exposure to hazardous substances based on the results of a health assessment conducted under paragraph (6), an epidemiologic study conducted under paragraph (7), or an exposure registry that has been established under paragraph (8), and the Administrator of ATSDR has determined that such exposure is the result of a release from a facility, the Administrator of ATSDR shall initiate a health surveillance program for such population. This program shall include but not be limited to--

**(A)** periodic medical testing where appropriate of population subgroups to screen for diseases for which the population or subgroup is at significant increased risk; and

**(B)** a mechanism to refer for treatment those individuals within such population who are screened positive for such diseases.

ADD44

**(10)** Two years after October 17, 1986, and every 2 years thereafter, the Administrator of ATSDR shall prepare and submit to the Administrator of EPA and to the Congress a report on the results of the activities of ATSDR regarding--

**(A)** health assessments and pilot health effects studies conducted;

**(B)** epidemiologic studies conducted;

**(C)** hazardous substances which have been listed under paragraph (2), toxicological profiles which have been developed, and toxicologic testing which has been conducted or which is being conducted under this subsection;

**(D)** registries established under paragraph (8); and

**(E)** an overall assessment, based on the results of activities conducted by the Administrator of ATSDR, of the linkage between human exposure to individual or combinations of hazardous substances due to releases from facilities covered by this chapter or the Solid Waste Disposal Act and any increased incidence or prevalence of adverse health effects in humans.

**(11)** If a health assessment or other study carried out under this subsection contains a finding that the exposure concerned presents a significant risk to human health, the President shall take such steps as may be necessary to reduce such exposure and eliminate or substantially mitigate the significant risk to human health. Such steps may include the use of any authority under this chapter, including, but not limited to--

**(A)** provision of alternative water supplies, and

**(B)** permanent or temporary relocation of individuals.

In any case in which information is insufficient, in the judgment of the Administrator of ATSDR or the President to determine a significant human exposure level with respect to a hazardous substance, the President may take such steps as may be necessary to reduce the exposure of any person to such hazardous substance to such level as the President deems necessary to protect human health.

**(12)** In any case which is the subject of a petition, a health assessment or study, or a research program under this subsection, nothing in this subsection shall be construed to delay or otherwise affect or impair the authority of the President, the Administrator of ATSDR, or the Administrator of EPA to exercise any authority vested in the President, the Administrator of ATSDR or the Administrator of EPA under any other provision of law (including, but not limited to, the imminent hazard authority of section 7003 of the Solid Waste Disposal Act) or the response and abatement authorities of this chapter.

**(13)** All studies and results of research conducted under this subsection (other than health assessments) shall be reported or adopted only after appropriate peer review. Such peer review shall be completed, to the maximum extent practicable, within a period of 60 days. In the case of research conducted under the National Toxicology Program, such peer review may be conducted by the Board of Scientific Counselors. In the case of other research, such peer review shall be conducted by panels consisting of no less than three nor more than seven members, who shall be disinterested scientific experts selected for such purpose by the

ADD45

Administrator of ATSDR or the Administrator of EPA, as appropriate, on the basis of their reputation for scientific objectivity and the lack of institutional ties with any person involved in the conduct of the study or research under review. Support services for such panels shall be provided by the Agency for Toxic Substances and Disease Registry, or by the Environmental Protection Agency, as appropriate.

**(14)** In the implementation of this subsection and other health-related authorities of this chapter, the Administrator of ATSDR shall assemble, develop as necessary, and distribute to the States, and upon request to medical colleges, physicians, and other health professionals, appropriate educational materials (including short courses) on the medical surveillance, screening, and methods of diagnosis and treatment of injury or disease related to exposure to hazardous substances (giving priority to those listed in paragraph (2)), through such means as the Administrator of ATSDR deems appropriate.

**(15)** The activities of the Administrator of ATSDR described in this subsection and section 9611(c)(4) of this title shall be carried out by the Administrator of ATSDR, either directly or through cooperative agreements with States (or political subdivisions thereof) which the Administrator of ATSDR determines are capable of carrying out such activities. Such activities shall include provision of consultations on health information, the conduct of health assessments, including those required under section 3019(b) of the Solid Waste Disposal Act, health studies, registries, and health surveillance.

**(16)** The President shall provide adequate personnel for ATSDR, which shall not be fewer than 100 employees. For purposes of determining the number of employees under this subsection, an employee employed by ATSDR on a part-time career employment basis shall be counted as a fraction which is determined by dividing 40 hours into the average number of hours of such employee's regularly scheduled workweek.

**(17)** In accordance with section 9620 of this title (relating to Federal facilities), the Administrator of ATSDR shall have the same authorities under this section with respect to facilities owned or operated by a department, agency, or instrumentality of the United States as the Administrator of ATSDR has with respect to any nongovernmental entity.

**(18)** If the Administrator of ATSDR determines that it is appropriate for purposes of this section to treat a pollutant or contaminant as a hazardous substance, such pollutant or contaminant shall be treated as a hazardous substance for such purpose.

**(j) Acquisition of property**

**(1) Authority**

The President is authorized to acquire, by purchase, lease, condemnation, donation, or otherwise, any real property or any interest in real property that the President in his discretion determines is needed to conduct a remedial action under this chapter. There shall be no cause of action to compel the President to acquire any interest in real property under this chapter.

**(2) State assurance**

The President may use the authority of paragraph (1) for a remedial action only if, before an interest in real estate is acquired under this subsection, the State in which the interest to be acquired is located assures the President, through a contract or cooperative agreement or otherwise, that the State will accept transfer of the interest following completion of the remedial action.

ADD46

USCA Case #24-1193    Document #2153240       Filed: 01/07/2026      Page 52 of 204

**(3) Exemption**

No Federal, State, or local government agency shall be liable under this chapter solely as a result of acquiring an interest in real estate under this subsection.

**(k) Brownfields revitalization funding**

**(1) Definition of eligible entity**

In this subsection, the term "eligible entity" means--

**(A)** a general purpose unit of local government;

**(B)** a land clearance authority or other quasi-governmental entity that operates under the supervision and control of or as an agent of a general purpose unit of local government;

**(C)** a government entity created by a State legislature;

**(D)** a regional council or group of general purpose units of local government;

**(E)** a redevelopment agency that is chartered or otherwise sanctioned by a State;

**(F)** a State;

**(G)** an Indian Tribe other than in Alaska;

**(H)** an Alaska Native Regional Corporation and an Alaska Native Village Corporation as those terms are defined in the Alaska Native Claims Settlement Act (43 U.S.C. 1601 and following) and the Metlakatla Indian community;

**(I)** an organization described in section 501(c)(3) of Title 26 and exempt from taxation under section 501(a) of that Title;

**(J)** a limited liability corporation in which all managing members are organizations described in subparagraph (I) or limited liability corporations whose sole members are organizations described in subparagraph (I);

**(K)** a limited partnership in which all general partners are organizations described in subparagraph (I) or limited liability corporations whose sole members are organizations described in subparagraph (I); or

ADD47

**(L)** a qualified community development entity (as defined in section 45D(c)(1) of Title 26).

**(2) Brownfield site characterization and assessment grant program**

**(A) Establishment of program**

The Administrator shall establish a program to--

**(i)** provide grants to inventory, characterize, assess, and conduct planning related to brownfield sites under subparagraph (B); and

**(ii)** perform targeted site assessments at brownfield sites.

**(B) Assistance for site characterization and assessment**

**(i) In general**

On approval of an application made by an eligible entity, the Administrator may make a grant to the eligible entity to be used for programs to inventory, characterize, assess, and conduct planning related to one or more brownfield sites.

**(ii) Site characterization and assessment**

A site characterization and assessment carried out with the use of a grant under clause (i) shall be performed in accordance with section 9601(35)(B) of this title.

**(C) Exemption for certain publicly owned brownfield sites**

Notwithstanding paragraph (5)(B)(iii), an eligible entity described in any of subparagraphs (A) through (H) of paragraph (1) may receive a grant under this paragraph for property acquired by that eligible entity prior to January 11, 2002, even if the eligible entity does not qualify as a bona fide prospective purchaser, so long as the eligible entity has not caused or contributed to a release or threatened release of a hazardous substance at the property.

**(3) Grants and loans for brownfield remediation**

**(A) Grants provided by the President**

Subject to paragraphs (5) and (6), the President shall establish a program to provide grants to--

**(i)** eligible entities, to be used for capitalization of revolving loan funds; and

ADD48

(ii) eligible entities or nonprofit organizations, where warranted, as determined by the President based on considerations under subparagraph (C), to be used directly for remediation of one or more brownfield sites owned by the entity or organization that receives the grant and in amounts not to exceed $500,000 for each site to be remediated, which limit may be waived by the Administrator, but not to exceed a total of $650,000 for each site, based on the anticipated level of contamination, size, or ownership status of the site.

**(B) Loans and grants provided by eligible entities**

An eligible entity that receives a grant under subparagraph (A)(i) shall use the grant funds to provide assistance for the remediation of brownfield sites in the form of--

(i) one or more loans to an eligible entity, a site owner, a site developer, or another person; or

(ii) one or more grants to an eligible entity or other nonprofit organization, where warranted, as determined by the eligible entity that is providing the assistance, based on considerations under subparagraph (C), to remediate sites owned by the eligible entity or nonprofit organization that receives the grant.

**(C) Considerations**

In determining whether a grant under subparagraph (A)(ii) or (B)(ii) is warranted, the President or the eligible entity, as the case may be, shall take into consideration--

(i) the extent to which a grant will facilitate the creation of, preservation of, or addition to a park, a greenway, undeveloped property, recreational property, or other property used for nonprofit purposes;

(ii) the extent to which a grant will meet the needs of a community that has an inability to draw on other sources of funding for environmental remediation and subsequent redevelopment of the area in which a brownfield site is located because of the small population or low income of the community;

(iii) the extent to which a grant will facilitate the use or reuse of existing infrastructure;

(iv) the benefit of promoting the long-term availability of funds from a revolving loan fund for brownfield remediation; and

(v) such other similar factors as the Administrator considers appropriate to consider for the purposes of this subsection.

**(D) Transition**

Revolving loan funds that have been established before January 11, 2002, may be used in accordance with this paragraph.

**(E) Exemption for certain publicly owned brownfield sites**

ADD49

Notwithstanding paragraph (5)(B)(iii), an eligible entity described in any of subparagraphs (A) through (H) of paragraph (1) may receive a grant or loan under this paragraph for property acquired by that eligible entity prior to January 11, 2002, even if the eligible entity does not qualify as a bona fide prospective purchaser, so long as the eligible entity has not caused or contributed to a release or threatened release of a hazardous substance at the property.

**(4) Multipurpose brownfields grants**

**(A) In general**

Subject to subparagraph (D) and paragraphs (5) and (6), the Administrator shall establish a program to provide multipurpose grants to an eligible entity based on the criteria under subparagraph (C) and the considerations under paragraph (3)(C), to carry out inventory, characterization, assessment, planning, or remediation activities at 1 or more brownfield sites in an area proposed by the eligible entity.

**(B) Grant amounts**

**(i) Individual grant amounts**

Each grant awarded under this paragraph shall not exceed $1,000,000.

**(ii) Cumulative grant amounts**

The total amount of grants awarded for each fiscal year under this paragraph may not exceed 15 percent of the funds made available for the fiscal year to carry out this subsection.

**(C) Criteria**

In awarding a grant under this paragraph, the Administrator shall consider the extent to which the eligible entity is able--

**(i)** to provide an overall plan for revitalization of the 1 or more brownfield sites in the proposed area in which the multipurpose grant will be used;

**(ii)** to demonstrate a capacity to conduct the range of eligible activities that will be funded by the multipurpose grant; and

**(iii)** to demonstrate that a multipurpose grant will meet the needs of the 1 or more brownfield sites in the proposed area.

**(D) Condition**

As a condition of receiving a grant under this paragraph, each eligible entity shall expend the full amount of the grant by not later than the date that is 5 years after the date on which the grant is awarded to the eligible entity, unless the Administrator provides an extension.

ADD50

**(E) Ownership**

An eligible entity that receives a grant under this paragraph may not expend any of the grant funds for the remediation of a brownfield site unless the eligible entity owns the brownfield site.

**(5) General provisions**

**(A) Maximum grant amount**

**(i) Brownfield site characterization and assessment**

**(I) In general**

A grant under paragraph (2) may be awarded to an eligible entity on a community-wide or site-by-site basis, and shall not exceed, for any individual brownfield site covered by the grant, $200,000.

**(II) Waiver**

The Administrator may waive the $200,000 limitation under subclause (I) to permit the brownfield site to receive a grant of not to exceed $350,000, based on the anticipated level of contamination, size, or status of ownership of the site.

**(ii) Brownfield remediation**

A grant under paragraph (3)(A)(i) may be awarded to an eligible entity on a community-wide or site-by-site basis, not to exceed $1,000,000 per eligible entity. The Administrator may make an additional grant to an eligible entity described in the previous sentence for any year after the year for which the initial grant is made, taking into consideration--

**(I)** the number of sites and number of communities that are addressed by the revolving loan fund;

**(II)** the demand for funding by eligible entities that have not previously received a grant under this subsection;

**(III)** the demonstrated ability of the eligible entity to use the revolving loan fund to enhance remediation and provide funds on a continuing basis; and

**(IV)** such other similar factors as the Administrator considers appropriate to carry out this subsection.

**(B) Prohibition**

No part of a grant or loan under this subsection may be used for the payment of--

ADD51

**(i)** a penalty or fine;

**(ii)** a Federal cost-share requirement;

**(iii)** a response cost at a brownfield site for which the recipient of the grant or loan is potentially liable under section 9607 of this title; or

**(iv)** a cost of compliance with any Federal law (including a Federal law specified in section 9601(39)(B) of this title), excluding the cost of compliance with laws applicable to the cleanup.

**(C) Assistance for development of local government site remediation programs**

A local government that receives a grant under this subsection may use not to exceed 10 percent of the grant funds to develop and implement a brownfields program that may include--

**(i)** monitoring the health of populations exposed to one or more hazardous substances from a brownfield site; and

**(ii)** monitoring and enforcement of any institutional control used to prevent human exposure to any hazardous substance from a brownfield site.

**(D) Insurance**

A recipient of a grant or loan awarded under paragraph (2), (3), or (4) that performs a characterization, assessment, or remediation of a brownfield site may use a portion of the grant or loan to purchase insurance for the characterization, assessment, or remediation of that site.

**(E) Administrative costs**

**(i) In general**

An eligible entity may use up to 5 percent of the amounts made available under a grant or loan under this subsection for administrative costs.

**(ii) Restriction**

For purposes of clause (i), the term "administrative costs" does not include--

**(I)** investigation and identification of the extent of contamination of a brownfield site;

**(II)** design and performance of a response action; or

**(III)** monitoring of a natural resource.

**(6) Grant applications**

**(A) Submission**

**(i) In general**

**(I) Application**

An eligible entity may submit to the Administrator, through a regional office of the Environmental Protection Agency and in such form as the Administrator may require, an application for a grant under this subsection for one or more brownfield sites (including information on the criteria used by the Administrator to rank applications under subparagraph (C), to the extent that the information is available).

**(II) NCP requirements**

The Administrator may include in any requirement for submission of an application under subclause (I) a requirement of the National Contingency Plan only to the extent that the requirement is relevant and appropriate to the program under this subsection.

**(ii) Coordination**

The Administrator shall coordinate with other Federal agencies to assist in making eligible entities aware of other available Federal resources.

**(iii) Guidance**

The Administrator shall publish guidance to assist eligible entities in applying for grants under this subsection.

**(B) Approval**

The Administrator shall--

**(i)** at least annually, complete a review of applications for grants that are received from eligible entities under this subsection; and

**(ii)** award grants under this subsection to eligible entities that the Administrator determines have the highest rankings under the ranking criteria established under subparagraph (C).

ADD53

**(C) Ranking criteria**

The Administrator shall establish a system for ranking grant applications received under this paragraph that includes the following criteria:

**(i)** The extent to which a grant will stimulate the availability of other funds for environmental assessment or remediation, and subsequent reuse, of an area in which one or more brownfield sites are located.

**(ii)** The potential of the proposed project or the development plan for an area in which one or more brownfield sites are located to stimulate economic development of the area on completion of the cleanup.

**(iii)** The extent to which a grant would address or facilitate the identification and reduction of threats to human health and the environment, including threats in areas in which there is a greater-than-normal incidence of diseases or conditions (including cancer, asthma, or birth defects) that may be associated with exposure to hazardous substances, pollutants, or contaminants.

**(iv)** The extent to which a grant would facilitate the use or reuse of existing infrastructure.

**(v)** The extent to which a grant would facilitate the creation of, preservation of, or addition to a park, a greenway, undeveloped property, recreational property, or other property used for nonprofit purposes.

**(vi)** The extent to which a grant would meet the needs of a community that has an inability to draw on other sources of funding for environmental remediation and subsequent redevelopment of the area in which a brownfield site is located because of the small population or low income of the community.

**(vii)** The extent to which the applicant is eligible for funding from other sources.

**(viii)** The extent to which a grant will further the fair distribution of funding between urban and nonurban areas.

**(ix)** The extent to which the grant provides for involvement of the local community in the process of making decisions relating to cleanup and future use of a brownfield site.

**(x)** The extent to which a grant would address or facilitate the identification and reduction of threats to the health or welfare of children, pregnant women, minority or low-income communities, or other sensitive populations.

**(xi)** The extent to which a grant would address a site adjacent to a body of water or a federally designated flood plain.

**(xii)** The extent to which a grant would facilitate--

ADD54

**(I)** the location at a brownfield site of a facility that generates renewable electricity from wind, solar, or geothermal energy; or

**(II)** any energy efficiency improvement project at a brownfield site, including a project for a combined heat and power system or a district energy system.

**(D) Report on ranking criteria**

Not later than September 30, 2022, the Administrator shall submit to Congress a report regarding the Administrator's use of the ranking criteria described in subparagraph (C) in awarding grants under this subsection.

**(7) Implementation of brownfields programs**

**(A) Establishment of program**

The Administrator may provide, or fund eligible entities or nonprofit organizations to provide, training, research, and technical assistance to individuals and organizations, as appropriate, to facilitate the inventory of brownfield sites, site assessments, remediation of brownfield sites, community involvement, or site preparation.

**(B) Funding restrictions**

The total Federal funds to be expended by the Administrator under this paragraph shall not exceed 15 percent of the total amount appropriated to carry out this subsection in any fiscal year.

**(8) Audits**

**(A) In general**

The Inspector General of the Environmental Protection Agency shall conduct such reviews or audits of grants and loans under this subsection as the Inspector General considers necessary to carry out this subsection.

**(B) Procedure**

An audit under this subparagraph shall be conducted in accordance with the auditing procedures of the Government Accountability Office, including chapter 75 of Title 31.

**(C) Violations**

If the Administrator determines that a person that receives a grant or loan under this subsection has violated or is in violation of a condition of the grant, loan, or applicable Federal law, the Administrator may--

ADD55

**(i)** terminate the grant or loan;

**(ii)** require the person to repay any funds received; and

**(iii)** seek any other legal remedies available to the Administrator.

**(D) Report to Congress**

Not later than September 30, 2022, the Inspector General of the Environmental Protection Agency shall submit to Congress a report that provides a description of the management of the program (including a description of the allocation of funds under this subsection).

**(9) Leveraging**

An eligible entity that receives a grant under this subsection may use the grant funds for a portion of a project at a brownfield site for which funding is received from other sources if the grant funds are used only for the purposes described in paragraph (2), (3), or (4).

**(10) Agreements**

Each grant or loan made under this subsection shall--

**(A)** include a requirement of the National Contingency Plan only to the extent that the requirement is relevant and appropriate to the program under this subsection, as determined by the Administrator; and

**(B)** be subject to an agreement that--

**(i)** requires the recipient to--

**(I)** comply with all applicable Federal and State laws; and

**(II)** ensure that the cleanup protects human health and the environment;

**(ii)** requires that the recipient use the grant or loan exclusively for purposes specified in paragraph (2), (3), or (4), as applicable;

**(iii)** in the case of an application by an eligible entity under paragraph (3)(A), requires the eligible entity to pay a matching share (which may be in the form of a contribution of labor, material, or services) of at least 20 percent, from non-Federal sources of funding, unless the Administrator determines that the matching share would place an undue hardship on the eligible entity; and

ADD56

**(iv)** contains such other terms and conditions as the Administrator determines to be necessary to carry out this subsection.

**(11) Facility other than brownfield site**

The fact that a facility may not be a brownfield site within the meaning of section 9601(39)(A) of this title has no effect on the eligibility of the facility for assistance under any other provision of Federal law.

**(12) Effect on Federal laws**

Nothing in this subsection affects any liability or response authority under any Federal law, including--

**(A)** this chapter (including the last sentence of section 9601(14) of this title);

**(B)** the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.);

**(C)** the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.);

**(D)** the Toxic Substances Control Act (15 U.S.C. 2601 et seq.); and

**(E)** the Safe Drinking Water Act (42 U.S.C. 300f et seq.).

**(13) Authorization of appropriations**

There is authorized to be appropriated to carry out this subsection $200,000,000 for each of fiscal years 2019 through 2023.

**CREDIT(S)**

(Pub.L. 96-510, Title I, § 104, Dec. 11, 1980, 94 Stat. 2774; Pub.L. 99-499, Title I, §§ 104, 110, Title II, § 207(b), Oct. 17, 1986, 100 Stat. 1617, 1636, 1705; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 102-531, Title III, § 312(h), Oct. 27, 1992, 106 Stat. 3506; Pub.L. 107-118, Title II, § 211(b), Jan. 11, 2002, 115 Stat. 2362; Pub.L. 108-271, § 8(b), July 7, 2004, 118 Stat. 814; Pub.L. 109-59, Title I, § 1956, Aug. 10, 2005, 119 Stat. 1515; Pub.L. 115-141, Div. N, §§ 6 to 13, 14(b), Mar. 23, 2018, 132 Stat. 1054, 1058.)

Notes of Decisions (117)

**Footnotes**

ADD57

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
      Subchapter I. Hazardous Substances Releases, Liability, Compensation (Refs & Annos)

42 U.S.C.A. § 9605

§ 9605. National contingency plan

Currentness

**(a) Revision and republication**

Within one hundred and eighty days after December 11, 1980, the President shall, after notice and opportunity for public comments, revise and republish the national contingency plan for the removal of oil and hazardous substances, originally prepared and published pursuant to section 1321 of Title 33, to reflect and effectuate the responsibilities and powers created by this chapter, in addition to those matters specified in section 1321(c)(2) of Title 33. Such revision shall include a section of the plan to be known as the national hazardous substance response plan which shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants, which shall include at a minimum:

**(1)** methods for discovering and investigating facilities at which hazardous substances have been disposed of or otherwise come to be located;

**(2)** methods for evaluating, including analyses of relative cost, and remedying any releases or threats of releases from facilities which pose substantial danger to the public health or the environment;

**(3)** methods and criteria for determining the appropriate extent of removal, remedy, and other measures authorized by this chapter;

**(4)** appropriate roles and responsibilities for the Federal, State, and local governments and for interstate and nongovernmental entities in effectuating the plan;

**(5)** provision for identification, procurement, maintenance, and storage of response equipment and supplies;

**(6)** a method for and assignment of responsibility for reporting the existence of such facilities which may be located on federally owned or controlled properties and any releases of hazardous substances from such facilities;

**(7)** means of assuring that remedial action measures are cost-effective over the period of potential exposure to the hazardous substances or contaminated materials;

ADD58

**(8)(A)** criteria for determining priorities among releases or threatened releases throughout the United States for the purpose of taking remedial action and, to the extent practicable taking into account the potential urgency of such action, for the purpose of taking removal action. Criteria and priorities under this paragraph shall be based upon relative risk or danger to public health or welfare or the environment, in the judgment of the President, taking into account to the extent possible the population at risk, the hazard potential of the hazardous substances at such facilities, the potential for contamination of drinking water supplies, the potential for direct human contact, the potential for destruction of sensitive ecosystems, the damage to natural resources which may affect the human food chain and which is associated with any release or threatened release, the contamination or potential contamination of the ambient air which is associated with the release or threatened release, State preparedness to assume State costs and responsibilities, and other appropriate factors;

**(B)** based upon the criteria set forth in subparagraph (A) of this paragraph, the President shall list as part of the plan national priorities among the known releases or threatened releases throughout the United States and shall revise the list no less often than annually. Within one year after December 11, 1980, and annually thereafter, each State shall establish and submit for consideration by the President priorities for remedial action among known releases and potential releases in that State based upon the criteria set forth in subparagraph (A) of this paragraph. In assembling or revising the national list, the President shall consider any priorities established by the States. To the extent practicable, the highest priority facilities shall be designated individually and shall be referred to as the "top priority among known response targets", and, to the extent practicable, shall include among the one hundred highest priority facilities one such facility from each State which shall be the facility designated by the State as presenting the greatest danger to public health or welfare or the environment among the known facilities in such State. A State shall be allowed to designate its highest priority facility only once. Other priority facilities or incidents may be listed singly or grouped for response priority purposes;

**(9)** specified roles for private organizations and entities in preparation for response and in responding to releases of hazardous substances, including identification of appropriate qualifications and capacity therefor and including consideration of minority firms in accordance with subsection (f); and

**(10)** standards and testing procedures by which alternative or innovative treatment technologies can be determined to be appropriate for utilization in response actions authorized by this chapter.

The plan shall specify procedures, techniques, materials, equipment, and methods to be employed in identifying, removing, or remedying releases of hazardous substances comparable to those required under section 1321(c)(2)(F) and (G) and (j)(1) of Title 33. Following publication of the revised national contingency plan, the response to and actions to minimize damage from hazardous substances releases shall, to the greatest extent possible, be in accordance with the provisions of the plan. The President may, from time to time, revise and republish the national contingency plan.

**(b) Revision of plan**

Not later than 18 months after the enactment of the Superfund Amendments and Reauthorization Act of 1986, the President shall revise the National Contingency Plan to reflect the requirements of such amendments. The portion of such Plan known as "the National Hazardous Substance Response Plan" shall be revised to provide procedures and standards for remedial actions undertaken pursuant to this chapter which are consistent with amendments made by the Superfund Amendments and Reauthorization Act of 1986 relating to the selection of remedial action.

**(c) Hazard ranking system**

ADD59

**(1) Revision**

Not later than 18 months after October 17, 1986, and after publication of notice and opportunity for submission of comments in accordance with section 553 of Title 5, the President shall by rule promulgate amendments to the hazard ranking system in effect on September 1, 1984. Such amendments shall assure, to the maximum extent feasible, that the hazard ranking system accurately assesses the relative degree of risk to human health and the environment posed by sites and facilities subject to review. The President shall establish an effective date for the amended hazard ranking system which is not later than 24 months after October 17, 1986. Such amended hazard ranking system shall be applied to any site or facility to be newly listed on the National Priorities List after the effective date established by the President. Until such effective date of the regulations, the hazard ranking system in effect on September 1, 1984, shall continue in full force and effect.

**(2) Health assessment of water contamination risks**

In carrying out this subsection, the President shall ensure that the human health risks associated with the contamination or potential contamination (either directly or as a result of the runoff of any hazardous substance or pollutant or contaminant from sites or facilities) of surface water are appropriately assessed where such surface water is, or can be, used for recreation or potable water consumption. In making the assessment required pursuant to the preceding sentence, the President shall take into account the potential migration of any hazardous substance or pollutant or contaminant through such surface water to downstream sources of drinking water.

**(3) Reevaluation not required**

The President shall not be required to reevaluate, after October 17, 1986, the hazard ranking of any facility which was evaluated in accordance with the criteria under this section before the effective date of the amendments to the hazard ranking system under this subsection and which was assigned a national priority under the National Contingency Plan.

**(4) New information**

Nothing in paragraph (3) shall preclude the President from taking new information into account in undertaking response actions under this chapter.

**(d) Petition for assessment of release**

Any person who is, or may be, affected by a release or threatened release of a hazardous substance or pollutant or contaminant, may petition the President to conduct a preliminary assessment of the hazards to public health and the environment which are associated with such release or threatened release. If the President has not previously conducted a preliminary assessment of such release, the President shall, within 12 months after the receipt of any such petition, complete such assessment or provide an explanation of why the assessment is not appropriate. If the preliminary assessment indicates that the release or threatened release concerned may pose a threat to human health or the environment, the President shall promptly evaluate such release or threatened release in accordance with the hazard ranking system referred to in paragraph (8)(A) of subsection (a) to determine the national priority of such release or threatened release.

**(e) Releases from earlier sites**

ADD60

USCA Case #24-1193     Document #2153240          Filed: 01/07/2026     Page 66 of 204

Whenever there has been, after January 1, 1985, a significant release of hazardous substances or pollutants or contaminants from a site which is listed by the President as a "Site Cleaned Up To Date" on the National Priorities List (revised edition, December 1984) the site shall be restored to the National Priorities List, without application of the hazard ranking system.

**(f) Minority contractors**

In awarding contracts under this chapter, the President shall consider the availability of qualified minority firms. The President shall describe, as part of any annual report submitted to the Congress under this chapter, the participation of minority firms in contracts carried out under this chapter. Such report shall contain a brief description of the contracts which have been awarded to minority firms under this chapter and of the efforts made by the President to encourage the participation of such firms in programs carried out under this chapter.

**(g) Special study wastes**

**(1) Application**

This subsection applies to facilities--

**(A)** which as of October 17, 1986, were not included on, or proposed for inclusion on, the National Priorities List; and

**(B)** at which special study wastes described in paragraph (2), (3)(A)(ii) or (3)(A)(iii) of section 6921(b) of this title are present in significant quantities, including any such facility from which there has been a release of a special study waste.

**(2) Considerations in adding facilities to NPL**

Pending revision of the hazard ranking system under subsection (c), the President shall consider each of the following factors in adding facilities covered by this section to the National Priorities List:

**(A)** The extent to which hazard ranking system score for the facility is affected by the presence of any special study waste at, or any release from, such facility.

**(B)** Available information as to the quantity, toxicity, and concentration of hazardous substances that are constituents of any special study waste at, or released from such facility, the extent of or potential for release of such hazardous constituents, the exposure or potential exposure to human population and the environment, and the degree of hazard to human health or the environment posed by the release of such hazardous constituents at such facility. This subparagraph refers only to available information on actual concentrations of hazardous substances and not on the total quantity of special study waste at such facility.

**(3) Savings provisions**

Nothing in this subsection shall be construed to limit the authority of the President to remove any facility which as of October 17, 1986, is included on the National Priorities List from such List, or not to list any facility which as of such date is proposed for inclusion on such list.

ADD61

**(4) Information gathering and analysis**

Nothing in this chapter shall be construed to preclude the expenditure of monies from the Fund for gathering and analysis of information which will enable the President to consider the specific factors required by paragraph (2).

**(h) NPL deferral**

**(1) Deferral to State voluntary cleanups**

At the request of a State and subject to paragraphs (2) and (3), the President generally shall defer final listing of an eligible response site on the National Priorities List if the President determines that--

**(A)** the State, or another party under an agreement with or order from the State, is conducting a response action at the eligible response site--

**(i)** in compliance with a State program that specifically governs response actions for the protection of public health and the environment; and

**(ii)** that will provide long-term protection of human health and the environment; or

**(B)** the State is actively pursuing an agreement to perform a response action described in subparagraph (A) at the site with a person that the State has reason to believe is capable of conducting a response action that meets the requirements of subparagraph (A).

**(2) Progress toward cleanup**

If, after the last day of the 1-year period beginning on the date on which the President proposes to list an eligible response site on the National Priorities List, the President determines that the State or other party is not making reasonable progress toward completing a response action at the eligible response site, the President may list the eligible response site on the National Priorities List.

**(3) Cleanup agreements**

With respect to an eligible response site under paragraph (1)(B), if, after the last day of the 1-year period beginning on the date on which the President proposes to list the eligible response site on the National Priorities List, an agreement described in paragraph (1)(B) has not been reached, the President may defer the listing of the eligible response site on the National Priorities List for an additional period of not to exceed 180 days if the President determines deferring the listing would be appropriate based on--

**(A)** the complexity of the site;

ADD62

**(B)** substantial progress made in negotiations; and

**(C)** other appropriate factors, as determined by the President.

**(4) Exceptions**

The President may decline to defer, or elect to discontinue a deferral of, a listing of an eligible response site on the National Priorities List if the President determines that--

**(A)** deferral would not be appropriate because the State, as an owner or operator or a significant contributor of hazardous substances to the facility, is a potentially responsible party;

**(B)** the criteria under the National Contingency Plan for issuance of a health advisory have been met; or

**(C)** the conditions in paragraphs (1) through (3), as applicable, are no longer being met.

**CREDIT(S)**

(Pub.L. 96-510, Title I, § 105, Dec. 11, 1980, 94 Stat. 2779; Pub.L. 99-499, Title I, § 105, Oct. 17, 1986, 100 Stat. 1625; Pub.L. 107-118, Title II, § 232, Jan. 11, 2002, 115 Stat. 2379.)

Notes of Decisions (80)

42 U.S.C.A. § 9605, 42 USCA § 9605
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD63

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
      Subchapter I. Hazardous Substances Releases, Liability, Compensation (Refs & Annos)

42 U.S.C.A. § 9606

§ 9606. Abatement actions

Currentness

**(a) Maintenance, jurisdiction, etc.**

In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

**(b) Fines; reimbursement**

**(1)** Any person who, without sufficient cause, willfully violates, or fails or refuses to comply with, any order of the President under subsection (a) may, in an action brought in the appropriate United States district court to enforce such order, be fined not more than $25,000 for each day in which such violation occurs or such failure to comply continues.

**(2)(A)** Any person who receives and complies with the terms of any order issued under subsection (a) may, within 60 days after completion of the required action, petition the President for reimbursement from the Fund for the reasonable costs of such action, plus interest. Any interest payable under this paragraph shall accrue on the amounts expended from the date of expenditure at the same rate as specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26.

**(B)** If the President refuses to grant all or part of a petition made under this paragraph, the petitioner may within 30 days of receipt of such refusal file an action against the President in the appropriate United States district court seeking reimbursement from the Fund.

**(C)** Except as provided in subparagraph (D), to obtain reimbursement, the petitioner shall establish by a preponderance of the evidence that it is not liable for response costs under section 9607(a) of this title and that costs for which it seeks reimbursement are reasonable in light of the action required by the relevant order.

**(D)** A petitioner who is liable for response costs under section 9607(a) of this title may also recover its reasonable costs of response to the extent that it can demonstrate, on the administrative record, that the President's decision in selecting the response

ADD64

USCA Case #24-1193    Document #2153240    Filed: 01/07/2026    Page 70 of 204

action ordered was arbitrary and capricious or was otherwise not in accordance with law. Reimbursement awarded under this subparagraph shall include all reasonable response costs incurred by the petitioner pursuant to the portions of the order found to be arbitrary and capricious or otherwise not in accordance with law.

**(E)** Reimbursement awarded by a court under subparagraph (C) or (D) may include appropriate costs, fees, and other expenses in accordance with subsections (a) and (d) of section 2412 of Title 28.

**(c) Guidelines for using imminent hazard, enforcement, and emergency response authorities; promulgation by Administrator of EPA, scope, etc.**

Within one hundred and eighty days after December 11, 1980, the Administrator of the Environmental Protection Agency shall, after consultation with the Attorney General, establish and publish guidelines for using the imminent hazard, enforcement, and emergency response authorities of this section and other existing statutes administered by the Administrator of the Environmental Protection Agency to effectuate the responsibilities and powers created by this chapter. Such guidelines shall to the extent practicable be consistent with the national hazardous substance response plan, and shall include, at a minimum, the assignment of responsibility for coordinating response actions with the issuance of administrative orders, enforcement of standards and permits, the gathering of information, and other imminent hazard and emergency powers authorized by (1) sections 1321(c)(2), 1318, 1319, and 1364(a) of Title 33, (2) sections 6927, 6928, 6934, and 6973 of this title, (3) sections 300j-4 and 300i of this title, (4) sections 7413, 7414, and 7603 of this title, and (5) section 2606 of Title 15.

## CREDIT(S)

(Pub.L. 96-510, Title I, § 106, Dec. 11, 1980, 94 Stat. 2780; Pub.L. 99-499, Title I, §§ 106, 109(b), Oct. 17, 1986, 100 Stat. 1628, 1633; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095.)

Notes of Decisions (87)

42 U.S.C.A. § 9606, 42 USCA § 9606
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Held Unconstitutional by   Reardon v. U.S.,   1st Cir.(Mass.),   Oct. 29, 1991

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
      Subchapter I. Hazardous Substances Releases, Liability, Compensation (Refs & Annos)

42 U.S.C.A. § 9607

§ 9607. Liability

Currentness

**(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date**

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--

**(1)** the owner and operator of a vessel or a facility,

**(2)** any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

**(3)** any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

**(4)** any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--

**(A)** all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

**(B)** any other necessary costs of response incurred by any other person consistent with the national contingency plan;

**(C)** damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

**(D)** the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

ADD66

The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26. For purposes of applying such amendments to interest under this subsection, the term "comparable maturity" shall be determined with reference to the date on which interest accruing under this subsection commences.

**(b) Defenses**

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by--

**(1)** an act of God;

**(2)** an act of war;

**(3)** an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

**(4)** any combination of the foregoing paragraphs.

**(c) Determination of amounts**

**(1)** Except as provided in paragraph (2) of this subsection, the liability under this section of an owner or operator or other responsible person for each release of a hazardous substance or incident involving release of a hazardous substance shall not exceed--

**(A)** for any vessel, other than an incineration vessel, which carries any hazardous substance as cargo or residue, $300 per gross ton, or $5,000,000, whichever is greater;

**(B)** for any other vessel, other than an incineration vessel, $300 per gross ton, or $500,000, whichever is greater;

**(C)** for any motor vehicle, aircraft, hazardous liquid pipeline facility (as defined in section 60101(a) of Title 49), or rolling stock, $50,000,000 or such lesser amount as the President shall establish by regulation, but in no event less than $5,000,000 (or, for releases of hazardous substances as defined in section 9601(14)(A) of this title into the navigable waters, $8,000,000).

ADD67

Such regulations shall take into account the size, type, location, storage, and handling capacity and other matters relating to the likelihood of release in each such class and to the economic impact of such limits on each such class; or

**(D)** for any incineration vessel or any facility other than those specified in subparagraph (C) of this paragraph, the total of all costs of response plus $50,000,000 for any damages under this subchapter.

**(2)** Notwithstanding the limitations in paragraph (1) of this subsection, the liability of an owner or operator or other responsible person under this section shall be the full and total costs of response and damages, if (A)(i) the release or threat of release of a hazardous substance was the result of willful misconduct or willful negligence within the privity or knowledge of such person, or (ii) the primary cause of the release was a violation (within the privity or knowledge of such person) of applicable safety, construction, or operating standards or regulations; or (B) such person fails or refuses to provide all reasonable cooperation and assistance requested by a responsible public official in connection with response activities under the national contingency plan with respect to regulated carriers subject to the provisions of Title 49 or vessels subject to the provisions of Title 33 or 46, subparagraph (A)(ii) of this paragraph shall be deemed to refer to Federal standards or regulations.

**(3)** If any person who is liable for a release or threat of release of a hazardous substance fails without sufficient cause to properly provide removal or remedial action upon order of the President pursuant to section 9604 or 9606 of this title, such person may be liable to the United States for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred by the Fund as a result of such failure to take proper action. The President is authorized to commence a civil action against any such person to recover the punitive damages, which shall be in addition to any costs recovered from such person pursuant to section 9612(c) of this title. Any moneys received by the United States pursuant to this subsection shall be deposited in the Fund.

**(d) Rendering care or advice**

**(1) In general**

Except as provided in paragraph (2), no person shall be liable under this subchapter for costs or damages as a result of actions taken or omitted in the course of rendering care, assistance, or advice in accordance with the National Contingency Plan ("NCP") or at the direction of an onscene coordinator appointed under such plan, with respect to an incident creating a danger to public health or welfare or the environment as a result of any releases of a hazardous substance or the threat thereof. This paragraph shall not preclude liability for costs or damages as the result of negligence on the part of such person.

**(2) State and local governments**

No State or local government shall be liable under this subchapter for costs or damages as a result of actions taken in response to an emergency created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person. This paragraph shall not preclude liability for costs or damages as a result of gross negligence or intentional misconduct by the State or local government. For the purpose of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence.

**(3) Savings provision**

ADD68

This subsection shall not alter the liability of any person covered by the provisions of paragraph (1), (2), (3), or (4) of subsection (a) of this section with respect to the release or threatened release concerned.

**(e) Indemnification, hold harmless, etc., agreements or conveyances; subrogation rights**

**(1)** No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

**(2)** Nothing in this subchapter, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

**(f) Natural resources liability; designation of public trustees of natural resources**

**(1) Natural resources liability**

In the case of an injury to, destruction of, or loss of natural resources under subparagraph (C) of subsection (a) liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State and to any Indian tribe for natural resources belonging to, managed by, controlled by, or appertaining to such tribe, or held in trust for the benefit of such tribe, or belonging to a member of such tribe if such resources are subject to a trust restriction on alienation: *Provided, however,* That no liability to the United States or State or Indian tribe shall be imposed under subparagraph (C) of subsection (a), where the party sought to be charged has demonstrated that the damages to natural resources complained of were specifically identified as an irreversible and irretrievable commitment of natural resources in an environmental impact statement, or other comparable environment analysis, and the decision to grant a permit or license authorizes such commitment of natural resources, and the facility or project was otherwise operating within the terms of its permit or license, so long as, in the case of damages to an Indian tribe occurring pursuant to a Federal permit or license, the issuance of that permit or license was not inconsistent with the fiduciary duty of the United States with respect to such Indian tribe. The President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages. Sums recovered by the United States Government as trustee under this subsection shall be retained by the trustee, without further appropriation, for use only to restore, replace, or acquire the equivalent of such natural resources. Sums recovered by a State as trustee under this subsection shall be available for use only to restore, replace, or acquire the equivalent of such natural resources by the State. The measure of damages in any action under subparagraph (C) of subsection (a) shall not be limited by the sums which can be used to restore or replace such resources. There shall be no double recovery under this chapter for natural resource damages, including the costs of damage assessment or restoration, rehabilitation, or acquisition for the same release and natural resource. There shall be no recovery under the authority of subparagraph (C) of subsection (a) where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before December 11, 1980.

**(2) Designation of Federal and State officials**

**(A) Federal**

ADD69

The President shall designate in the National Contingency Plan published under section 9605 of this title the Federal officials who shall act on behalf of the public as trustees for natural resources under this chapter and section 1321 of Title 33. Such officials shall assess damages for injury to, destruction of, or loss of natural resources for purposes of this chapter and such section 1321 of Title 33 for those resources under their trusteeship and may, upon request of and reimbursement from a State and at the Federal officials' discretion, assess damages for those natural resources under the State's trusteeship.

**(B) State**

The Governor of each State shall designate State officials who may act on behalf of the public as trustees for natural resources under this chapter and section 1321 of Title 33 and shall notify the President of such designations. Such State officials shall assess damages to natural resources for the purposes of this chapter and such section 1321 of Title 33 for those natural resources under their trusteeship.

**(C) Rebuttable presumption**

Any determination or assessment of damages to natural resources for the purposes of this chapter and section 1321 of Title 33 made by a Federal or State trustee in accordance with the regulations promulgated under section 9651(c) of this title shall have the force and effect of a rebuttable presumption on behalf of the trustee in any administrative or judicial proceeding under this chapter or section 1321 of Title 33.

**(g) Federal agencies**

For provisions relating to Federal agencies, see section 9620 of this title.

**(h) Owner or operator of vessel**

The owner or operator of a vessel shall be liable in accordance with this section, under maritime tort law, and as provided under section 9614 of this title notwithstanding any provision of the Act of March 3, 1851 (46 U.S.C. 183ff) or the absence of any physical damage to the proprietary interest of the claimant.

**(i) Application of a registered pesticide product**

No person (including the United States or any State or Indian tribe) may recover under the authority of this section for any response costs or damages resulting from the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act. Nothing in this paragraph shall affect or modify in any way the obligations or liability of any person under any other provision of State or Federal law, including common law, for damages, injury, or loss resulting from a release of any hazardous substance or for removal or remedial action or the costs of removal or remedial action of such hazardous substance.

**(j) Obligations or liability pursuant to federally permitted release**

Recovery by any person (including the United States or any State or Indian tribe) for response costs or damages resulting from a federally permitted release shall be pursuant to existing law in lieu of this section. Nothing in this paragraph shall affect or modify in any way the obligations or liability of any person under any other provision of State or Federal law, including common law, for damages, injury, or loss resulting from a release of any hazardous substance or for removal or remedial action

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

or the costs of removal or remedial action of such hazardous substance. In addition, costs of response incurred by the Federal Government in connection with a discharge specified in section 9601(10)(B) or (C) of this title shall be recoverable in an action brought under section 1319(b) of Title 33.

**(k) Transfer to, and assumption by, Post-Closure Liability Fund of liability of owner or operator of hazardous waste disposal facility in receipt of permit under applicable solid waste disposal law; time, criteria applicable, procedures, etc.; monitoring costs; reports**

**(1)** The liability established by this section or any other law for the owner or operator of a hazardous waste disposal facility which has received a permit under subtitle C of the Solid Waste Disposal Act, shall be transferred to and assumed by the Post-closure Liability Fund established by section 9641 of this title when--

**(A)** such facility and the owner and operator thereof has complied with the requirements of subtitle C of the Solid Waste Disposal Act and regulations issued thereunder, which may affect the performance of such facility after closure; and

**(B)** such facility has been closed in accordance with such regulations and the conditions of such permit, and such facility and the surrounding area have been monitored as required by such regulations and permit conditions for a period not to exceed five years after closure to demonstrate that there is no substantial likelihood that any migration offsite or release from confinement of any hazardous substance or other risk to public health or welfare will occur.

**(2)** Such transfer of liability shall be effective ninety days after the owner or operator of such facility notifies the Administrator of the Environmental Protection Agency (and the State where it has an authorized program under section 3006(b) of the Solid Waste Disposal Act) that the conditions imposed by this subsection have been satisfied. If within such ninety-day period the Administrator of the Environmental Protection Agency or such State determines that any such facility has not complied with all the conditions imposed by this subsection or that insufficient information has been provided to demonstrate such compliance, the Administrator or such State shall so notify the owner and operator of such facility and the administrator of the Fund established by section 9641 of this title, and the owner and operator of such facility shall continue to be liable with respect to such facility under this section and other law until such time as the Administrator and such State determines that such facility has complied with all conditions imposed by this subsection. A determination by the Administrator or such State that a facility has not complied with all conditions imposed by this subsection or that insufficient information has been supplied to demonstrate compliance, shall be a final administrative action for purposes of judicial review. A request for additional information shall state in specific terms the data required.

**(3)** In addition to the assumption of liability of owners and operators under paragraph (1) of this subsection, the Post-closure Liability Fund established by section 9641 of this title may be used to pay costs of monitoring and care and maintenance of a site incurred by other persons after the period of monitoring required by regulations under subtitle C of the Solid Waste Disposal Act for hazardous waste disposal facilities meeting the conditions of paragraph (1) of this subsection.

**(4)(A)** Not later than one year after December 11, 1980, the Secretary of the Treasury shall conduct a study and shall submit a report thereon to the Congress on the feasibility of establishing or qualifying an optional system of private insurance for postclosure financial responsibility for hazardous waste disposal facilities to which this subsection applies. Such study shall include a specification of adequate and realistic minimum standards to assure that any such privately placed insurance will carry out the purposes of this subsection in a reliable, enforceable, and practical manner. Such a study shall include an examination of

ADD71

the public and private incentives, programs, and actions necessary to make privately placed insurance a practical and effective option to the financing system for the Post-closure Liability Fund provided in subchapter II of this chapter.

**(B)** Not later than eighteen months after December 11, 1980, and after a public hearing, the President shall by rule determine whether or not it is feasible to establish or qualify an optional system of private insurance for postclosure financial responsibility for hazardous waste disposal facilities to which this subsection applies. If the President determines the establishment or qualification of such a system would be infeasible, he shall promptly publish an explanation of the reasons for such a determination. If the President determines the establishment or qualification of such a system would be feasible, he shall promptly publish notice of such determination. Not later than six months after an affirmative determination under the preceding sentence and after a public hearing, the President shall by rule promulgate adequate and realistic minimum standards which must be met by any such privately placed insurance, taking into account the purposes of this chapter and this subsection. Such rules shall also specify reasonably expeditious procedures by which privately placed insurance plans can qualify as meeting such minimum standards.

**(C)** In the event any privately placed insurance plan qualifies under subparagraph (B), any person enrolled in, and complying with the terms of, such plan shall be excluded from the provisions of paragraphs (1), (2), and (3) of this subsection and exempt from the requirements to pay any tax or fee to the Post-closure Liability Fund under subchapter II of this chapter.

**(D)** The President may issue such rules and take such other actions as are necessary to effectuate the purposes of this paragraph.

**(5) Suspension of liability transfer**

Notwithstanding paragraphs (1), (2), (3), and (4) of this subsection and subsection (j) of section 9611 of this title, no liability shall be transferred to or assumed by the Post-Closure Liability Trust Fund established by section 9641 of this title prior to completion of the study required under paragraph (6) of this subsection, transmission of a report of such study to both Houses of Congress, and authorization of such a transfer or assumption by Act of Congress following receipt of such study and report.

**(6) Study of options for post-closure program**

**(A) Study**

The Comptroller General shall conduct a study of options for a program for the management of the liabilities associated with hazardous waste treatment, storage, and disposal sites after their closure which complements the policies set forth in the Hazardous and Solid Waste Amendments of 1984 and assures the protection of human health and the environment.

**(B) Program elements**

The program referred to in subparagraph (A) shall be designed to assure each of the following:

**(i)** Incentives are created and maintained for the safe management and disposal of hazardous wastes so as to assure protection of human health and the environment.

ADD72

**(ii)** Members of the public will have reasonable confidence that hazardous wastes will be managed and disposed of safely and that resources will be available to address any problems that may arise and to cover costs of long-term monitoring, care, and maintenance of such sites.

**(iii)** Persons who are or seek to become owners and operators of hazardous waste disposal facilities will be able to manage their potential future liabilities and to attract the investment capital necessary to build, operate, and close such facilities in a manner which assures protection of human health and the environment.

**(C) Assessments**

The study under this paragraph shall include assessments of treatment, storage, and disposal facilities which have been or are likely to be issued a permit under section 3005 of the Solid Waste Disposal Act and the likelihood of future insolvency on the part of owners and operators of such facilities. Separate assessments shall be made for different classes of facilities and for different classes of land disposal facilities and shall include but not be limited to--

**(i)** the current and future financial capabilities of facility owners and operators;

**(ii)** the current and future costs associated with facilities, including the costs of routine monitoring and maintenance, compliance monitoring, corrective action, natural resource damages, and liability for damages to third parties; and

**(iii)** the availability of mechanisms by which owners and operators of such facilities can assure that current and future costs, including post-closure costs, will be financed.

**(D) Procedures**

In carrying out the responsibilities of this paragraph, the Comptroller General shall consult with the Administrator, the Secretary of Commerce, the Secretary of the Treasury, and the heads of other appropriate Federal agencies.

**(E) Consideration of options**

In conducting the study under this paragraph, the Comptroller General shall consider various mechanisms and combinations of mechanisms to complement the policies set forth in the Hazardous and Solid Waste Amendments of 1984 to serve the purposes set forth in subparagraph (B) and to assure that the current and future costs associated with hazardous waste facilities, including post-closure costs, will be adequately financed and, to the greatest extent possible, borne by the owners and operators of such facilities. Mechanisms to be considered include, but are not limited to--

**(i)** revisions to closure, post-closure, and financial responsibility requirements under subtitles C and I of the Solid Waste Disposal Act;

**(ii)** voluntary risk pooling by owners and operators;

ADD73

**(iii)** legislation to require risk pooling by owners and operators;

**(iv)** modification of the Post-Closure Liability Trust Fund previously established by section 9641 of this title, and the conditions for transfer of liability under this subsection, including limiting the transfer of some or all liability under this subsection only in the case of insolvency of owners and operators;

**(v)** private insurance;

**(vi)** insurance provided by the Federal Government;

**(vii)** coinsurance, reinsurance, or pooled-risk insurance, whether provided by the private sector or provided or assisted by the Federal Government; and

**(viii)** creation of a new program to be administered by a new or existing Federal agency or by a federally chartered corporation.

**(F) Recommendations**

The Comptroller General shall consider options for funding any program under this section and shall, to the extent necessary, make recommendations to the appropriate committees of Congress for additional authority to implement such program.

**(l) Federal lien**

**(1) In general**

All costs and damages for which a person is liable to the United States under subsection (a) of this section (other than the owner or operator of a vessel under paragraph (1) of subsection (a)) shall constitute a lien in favor of the United States upon all real property and rights to such property which--

**(A)** belong to such person; and

**(B)** are subject to or affected by a removal or remedial action.

**(2) Duration**

The lien imposed by this subsection shall arise at the later of the following:

**(A)** The time costs are first incurred by the United States with respect to a response action under this chapter.

ADD74

**(B)** The time that the person referred to in paragraph (1) is provided (by certified or registered mail) written notice of potential liability.

Such lien shall continue until the liability for the costs (or a judgment against the person arising out of such liability) is satisfied or becomes unenforceable through operation of the statute of limitations provided in section 9613 of this title.

### (3) Notice and validity

The lien imposed by this subsection shall be subject to the rights of any purchaser, holder of a security interest, or judgment lien creditor whose interest is perfected under applicable State law before notice of the lien has been filed in the appropriate office within the State (or county or other governmental subdivision), as designated by State law, in which the real property subject to the lien is located. Any such purchaser, holder of a security interest, or judgment lien creditor shall be afforded the same protections against the lien imposed by this subsection as are afforded under State law against a judgment lien which arises out of an unsecured obligation and which arises as of the time of the filing of the notice of the lien imposed by this subsection. If the State has not by law designated one office for the receipt of such notices of liens, the notice shall be filed in the office of the clerk of the United States district court for the district in which the real property is located. For purposes of this subsection, the terms "purchaser" and "security interest" shall have the definitions provided under section 6323(h) of Title 26.

### (4) Action in rem

The costs constituting the lien may be recovered in an action in rem in the United States district court for the district in which the removal or remedial action is occurring or has occurred. Nothing in this subsection shall affect the right of the United States to bring an action against any person to recover all costs and damages for which such person is liable under subsection (a) of this section.

### (m) Maritime lien

All costs and damages for which the owner or operator of a vessel is liable under subsection (a)(1) with respect to a release or threatened release from such vessel shall constitute a maritime lien in favor of the United States on such vessel. Such costs may be recovered in an action in rem in the district court of the United States for the district in which the vessel may be found. Nothing in this subsection shall affect the right of the United States to bring an action against the owner or operator of such vessel in any court of competent jurisdiction to recover such costs.

### (n) Liability of fiduciaries

#### (1) In general

The liability of a fiduciary under any provision of this chapter for the release or threatened release of a hazardous substance at, from, or in connection with a vessel or facility held in a fiduciary capacity shall not exceed the assets held in the fiduciary capacity.

#### (2) Exclusion

ADD75

Paragraph (1) does not apply to the extent that a person is liable under this chapter independently of the person's ownership of a vessel or facility as a fiduciary or actions taken in a fiduciary capacity.

**(3) Limitation**

Paragraphs (1) and (4) do not limit the liability pertaining to a release or threatened release of a hazardous substance if negligence of a fiduciary causes or contributes to the release or threatened release.

**(4) Safe harbor**

A fiduciary shall not be liable in its personal capacity under this chapter for--

**(A)** undertaking or directing another person to undertake a response action under subsection (d)(1) or under the direction of an on scene coordinator designated under the National Contingency Plan;

**(B)** undertaking or directing another person to undertake any other lawful means of addressing a hazardous substance in connection with the vessel or facility;

**(C)** terminating the fiduciary relationship;

**(D)** including in the terms of the fiduciary agreement a covenant, warranty, or other term or condition that relates to compliance with an environmental law, or monitoring, modifying or enforcing the term or condition;

**(E)** monitoring or undertaking 1 or more inspections of the vessel or facility;

**(F)** providing financial or other advice or counseling to other parties to the fiduciary relationship, including the settlor or beneficiary;

**(G)** restructuring, renegotiating, or otherwise altering the terms and conditions of the fiduciary relationship;

**(H)** administering, as a fiduciary, a vessel or facility that was contaminated before the fiduciary relationship began; or

**(I)** declining to take any of the actions described in subparagraphs (B) through (H).

**(5) Definitions**

As used in this chapter:

**(A) Fiduciary**

ADD76

The term "fiduciary"--

   **(i)** means a person acting for the benefit of another party as a bona fide--

      **(I)** trustee;

      **(II)** executor;

      **(III)** administrator;

      **(IV)** custodian;

      **(V)** guardian of estates or guardian ad litem;

      **(VI)** receiver;

      **(VII)** conservator;

      **(VIII)** committee of estates of incapacitated persons;

      **(IX)** personal representative;

      **(X)** trustee (including a successor to a trustee) under an indenture agreement, trust agreement, lease, or similar financing agreement, for debt securities, certificates of interest or certificates of participation in debt securities, or other forms of indebtedness as to which the trustee is not, in the capacity of trustee, the lender; or

      **(XI)** representative in any other capacity that the Administrator, after providing public notice, determines to be similar to the capacities described in subclauses (I) through (X); and

   **(ii)** does not include--

      **(I)** a person that is acting as a fiduciary with respect to a trust or other fiduciary estate that was organized for the primary purpose of, or is engaged in, actively carrying on a trade or business for profit, unless the trust or other fiduciary estate was created as part of, or to facilitate, 1 or more estate plans or because of the incapacity of a natural person; or

      **(II)** a person that acquires ownership or control of a vessel or facility with the objective purpose of avoiding liability of the person or of any other person.

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                12

**(B) Fiduciary capacity**

The term "fiduciary capacity" means the capacity of a person in holding title to a vessel or facility, or otherwise having control of or an interest in the vessel or facility, pursuant to the exercise of the responsibilities of the person as a fiduciary.

**(6) Savings clause**

Nothing in this subsection--

**(A)** affects the rights or immunities or other defenses that are available under this chapter or other law that is applicable to a person subject to this subsection; or

**(B)** creates any liability for a person or a private right of action against a fiduciary or any other person.

**(7) No effect on certain persons**

Nothing in this subsection applies to a person if the person--

**(A)(i)** acts in a capacity other than that of a fiduciary or in a beneficiary capacity; and

**(ii)** in that capacity, directly or indirectly benefits from a trust or fiduciary relationship; or

**(B)(i)** is a beneficiary and a fiduciary with respect to the same fiduciary estate; and

**(ii)** as a fiduciary, receives benefits that exceed customary or reasonable compensation, and incidental benefits, permitted under other applicable law.

**(8) Limitation**

This subsection does not preclude a claim under this chapter against--

**(A)** the assets of the estate or trust administered by the fiduciary; or

**(B)** a nonemployee agent or independent contractor retained by a fiduciary.

**(o) De micromis exemption**

**(1) In general**

ADD78

Except as provided in paragraph (2), a person shall not be liable, with respect to response costs at a facility on the National Priorities List, under this chapter if liability is based solely on paragraph (3) or (4) of subsection (a), and the person, except as provided in paragraph (4) of this subsection, can demonstrate that--

(A) the total amount of the material containing hazardous substances that the person arranged for disposal or treatment of, arranged with a transporter for transport for disposal or treatment of, or accepted for transport for disposal or treatment, at the facility was less than 110 gallons of liquid materials or less than 200 pounds of solid materials (or such greater or lesser amounts as the Administrator may determine by regulation); and

(B) all or part of the disposal, treatment, or transport concerned occurred before April 1, 2001.

(2) Exceptions

Paragraph (1) shall not apply in a case in which--

(A) the President determines that--

(i) the materials containing hazardous substances referred to in paragraph (1) have contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration with respect to the facility; or

(ii) the person has failed to comply with an information request or administrative subpoena issued by the President under this chapter or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the facility; or

(B) a person has been convicted of a criminal violation for the conduct to which the exemption would apply, and that conviction has not been vitiated on appeal or otherwise.

(3) No judicial review

A determination by the President under paragraph (2)(A) shall not be subject to judicial review.

(4) Nongovernmental third-party contribution actions

In the case of a contribution action, with respect to response costs at a facility on the National Priorities List, brought by a party, other than a Federal, State, or local government, under this chapter, the burden of proof shall be on the party bringing the action to demonstrate that the conditions described in paragraph (1)(A) and (B) of this subsection are not met.

(p) Municipal solid waste exemption

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(1) In general**

Except as provided in paragraph (2) of this subsection, a person shall not be liable, with respect to response costs at a facility on the National Priorities List, under paragraph (3) of subsection (a) for municipal solid waste disposed of at a facility if the person, except as provided in paragraph (5) of this subsection, can demonstrate that the person is--

**(A)** an owner, operator, or lessee of residential property from which all of the person's municipal solid waste was generated with respect to the facility;

**(B)** a business entity (including a parent, subsidiary, or affiliate of the entity) that, during its 3 taxable years preceding the date of transmittal of written notification from the President of its potential liability under this section, employed on average not more than 100 full-time individuals, or the equivalent thereof, and that is a small business concern (within the meaning of the Small Business Act (15 U.S.C. 631 et seq.)) from which was generated all of the municipal solid waste attributable to the entity with respect to the facility; or

**(C)** an organization described in section 501(c)(3) of Title 26 and exempt from tax under section 501(a) of such title that, during its taxable year preceding the date of transmittal of written notification from the President of its potential liability under this section, employed not more than 100 paid individuals at the location from which was generated all of the municipal solid waste attributable to the organization with respect to the facility.

For purposes of this subsection, the term "affiliate" has the meaning of that term provided in the definition of "small business concern" in regulations promulgated by the Small Business Administration in accordance with the Small Business Act (15 U.S.C. 631 et seq.).

**(2) Exception**

Paragraph (1) shall not apply in a case in which the President determines that--

**(A)** the municipal solid waste referred to in paragraph (1) has contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration with respect to the facility;

**(B)** the person has failed to comply with an information request or administrative subpoena issued by the President under this chapter; or

**(C)** the person has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the facility.

**(3) No judicial review**

A determination by the President under paragraph (2) shall not be subject to judicial review.

**(4) Definition of municipal solid waste**

**(A) In general**

For purposes of this subsection, the term "municipal solid waste" means waste material--

**(i)** generated by a household (including a single or multifamily residence); and

**(ii)** generated by a commercial, industrial, or institutional entity, to the extent that the waste material--

**(I)** is essentially the same as waste normally generated by a household;

**(II)** is collected and disposed of with other municipal solid waste as part of normal municipal solid waste collection services; and

**(III)** contains a relative quantity of hazardous substances no greater than the relative quantity of hazardous substances contained in waste material generated by a typical single-family household.

**(B) Examples**

Examples of municipal solid waste under subparagraph (A) include food and yard waste, paper, clothing, appliances, consumer product packaging, disposable diapers, office supplies, cosmetics, glass and metal food containers, elementary or secondary school science laboratory waste, and household hazardous waste.

**(C) Exclusions**

The term "municipal solid waste" does not include--

**(i)** combustion ash generated by resource recovery facilities or municipal incinerators; or

**(ii)** waste material from manufacturing or processing operations (including pollution control operations) that is not essentially the same as waste normally generated by households.

**(5) Burden of proof**

In the case of an action, with respect to response costs at a facility on the National Priorities List, brought under this section or section 9613 of this title by--

**(A)** a party, other than a Federal, State, or local government, with respect to municipal solid waste disposed of on or after April 1, 2001; or

ADD81

**(B)** any party with respect to municipal solid waste disposed of before April 1, 2001, the burden of proof shall be on the party bringing the action to demonstrate that the conditions described in paragraphs (1) and (4) for exemption for entities and organizations described in paragraph (1)(B) and (C) are not met.

**(6) Certain actions not permitted**

No contribution action may be brought by a party, other than a Federal, State, or local government, under this chapter with respect to circumstances described in paragraph (1)(A).

**(7) Costs and fees**

A nongovernmental entity that commences, after January 11, 2002, a contribution action under this chapter shall be liable to the defendant for all reasonable costs of defending the action, including all reasonable attorney's fees and expert witness fees, if the defendant is not liable for contribution based on an exemption under this subsection or subsection (o).

**(q) Contiguous properties**

**(1) Not considered to be an owner or operator**

**(A) In general**

A person that owns real property that is contiguous to or otherwise similarly situated with respect to, and that is or may be contaminated by a release or threatened release of a hazardous substance from, real property that is not owned by that person shall not be considered to be an owner or operator of a vessel or facility under paragraph (1) or (2) of subsection (a) solely by reason of the contamination if--

**(i)** the person did not cause, contribute, or consent to the release or threatened release;

**(ii)** the person is not--

**(I)** potentially liable, or affiliated with any other person that is potentially liable, for response costs at a facility through any direct or indirect familial relationship or any contractual, corporate, or financial relationship (other than a contractual, corporate, or financial relationship that is created by a contract for the sale of goods or services); or

**(II)** the result of a reorganization of a business entity that was potentially liable;

**(iii)** the person takes reasonable steps to--

**(I)** stop any continuing release;

ADD82

**(II)** prevent any threatened future release; and

**(III)** prevent or limit human, environmental, or natural resource exposure to any hazardous substance released on or from property owned by that person;

**(iv)** the person provides full cooperation, assistance, and access to persons that are authorized to conduct response actions or natural resource restoration at the vessel or facility from which there has been a release or threatened release (including the cooperation and access necessary for the installation, integrity, operation, and maintenance of any complete or partial response action or natural resource restoration at the vessel or facility);

**(v)** the person--

**(I)** is in compliance with any land use restrictions established or relied on in connection with the response action at the facility; and

**(II)** does not impede the effectiveness or integrity of any institutional control employed in connection with a response action;

**(vi)** the person is in compliance with any request for information or administrative subpoena issued by the President under this chapter;

**(vii)** the person provides all legally required notices with respect to the discovery or release of any hazardous substances at the facility; and

**(viii)** at the time at which the person acquired the property, the person--

**(I)** conducted all appropriate inquiry within the meaning of section 9601(35)(B) of this title with respect to the property; and

**(II)** did not know or have reason to know that the property was or could be contaminated by a release or threatened release of one or more hazardous substances from other real property not owned or operated by the person.

**(B) Demonstration**

To qualify as a person described in subparagraph (A), a person must establish by a preponderance of the evidence that the conditions in clauses (i) through (viii) of subparagraph (A) have been met.

**(C) Bona fide prospective purchaser**

ADD83

Any person that does not qualify as a person described in this paragraph because the person had, or had reason to have, knowledge specified in subparagraph (A)(viii) at the time of acquisition of the real property may qualify as a bona fide prospective purchaser under section 9601(40) of this title if the person is otherwise described in that section.

**(D) Ground water**

With respect to a hazardous substance from one or more sources that are not on the property of a person that is a contiguous property owner that enters ground water beneath the property of the person solely as a result of subsurface migration in an aquifer, subparagraph (A)(iii) shall not require the person to conduct ground water investigations or to install ground water remediation systems, except in accordance with the policy of the Environmental Protection Agency concerning owners of property containing contaminated aquifers, dated May 24, 1995.

**(2) Effect of law**

With respect to a person described in this subsection, nothing in this subsection--

**(A)** limits any defense to liability that may be available to the person under any other provision of law; or

**(B)** imposes liability on the person that is not otherwise imposed by subsection (a).

**(3) Assurances**

The Administrator may--

**(A)** issue an assurance that no enforcement action under this chapter will be initiated against a person described in paragraph (1); and

**(B)** grant a person described in paragraph (1) protection against a cost recovery or contribution action under section 9613(f) of this title.

**(r) Prospective purchaser and windfall lien**

**(1) Limitation on liability**

Notwithstanding subsection (a)(1), a bona fide prospective purchaser whose potential liability for a release or threatened release is based solely on the bona fide prospective purchaser being considered to be an owner or operator of a facility shall not be liable as long as the bona fide prospective purchaser does not impede the performance of a response action or natural resource restoration.

**(2) Lien**

ADD84

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

If there are unrecovered response costs incurred by the United States at a facility for which an owner of the facility is not liable by reason of paragraph (1), and if each of the conditions described in paragraph (3) is met, the United States shall have a lien on the facility, or may by agreement with the owner, obtain from the owner a lien on any other property or other assurance of payment satisfactory to the Administrator, for the unrecovered response costs.

**(3) Conditions**

The conditions referred to in paragraph (2) are the following:

**(A) Response action**

A response action for which there are unrecovered costs of the United States is carried out at the facility.

**(B) Fair market value**

The response action increases the fair market value of the facility above the fair market value of the facility that existed before the response action was initiated.

**(4) Amount; duration**

A lien under paragraph (2)--

**(A)** shall be in an amount not to exceed the increase in fair market value of the property attributable to the response action at the time of a sale or other disposition of the property;

**(B)** shall arise at the time at which costs are first incurred by the United States with respect to a response action at the facility;

**(C)** shall be subject to the requirements of subsection (l)(3); and

**(D)** shall continue until the earlier of--

**(i)** satisfaction of the lien by sale or other means; or

**(ii)** notwithstanding any statute of limitations under section 9613 of this title, recovery of all response costs incurred at the facility.

## CREDIT(S)

(Pub.L. 96-510, Title I, § 107, Dec. 11, 1980, 94 Stat. 2781; Pub.L. 99-499, Title I, §§ 107(a) to (d)(2), (e), (f), 127(b), (e), Title II, §§ 201, 207(c), Oct. 17, 1986, 100 Stat. 1628 to 1630, 1692, 1693, 1705; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 103-429, § 7(e)(2), Oct. 31, 1994, 108 Stat. 4390; Pub.L. 104-208, Div. A, Title II, § 2502(a), Sept. 30, 1996,

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
      Subchapter I. Hazardous Substances Releases, Liability, Compensation (Refs & Annos)

42 U.S.C.A. § 9611

§ 9611. Uses of Fund

Currentness

**(a) In general**

For the purposes specified in this section there is authorized to be appropriated from the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26 not more than $8,500,000,000 for the 5-year period beginning on October 17, 1986, and not more than $5,100,000,000 for the period commencing October 1, 1991, and ending September 30, 1994, and such sums shall remain available until expended. The preceding sentence constitutes a specific authorization for the funds appropriated under title II of Public Law 99-160 (relating to payment to the Hazardous Substances Trust Fund). The President shall use the money in the Fund for the following purposes:

**(1)** Payment of governmental response costs incurred pursuant to section 9604 of this title, including costs incurred pursuant to the Intervention on the High Seas Act.

**(2)** Payment of any claim for necessary response costs incurred by any other person as a result of carrying out the national contingency plan established under section 1321(c) of Title 33 and amended by section 9605 of this title: *Provided, however,* That such costs must be approved under said plan and certified by the responsible Federal official.

**(3)** Payment of any claim authorized by subsection (b) of this section and finally decided pursuant to section 9612 of this title, including those costs set out in subsection 9612(c)(3) of this title.

**(4)** Payment of costs specified under subsection (c) of this section.

**(5) Grants for technical assistance**

The cost of grants under section 9617(e) of this title (relating to public participation grants for technical assistance).

**(6) Lead contaminated soil**

Payment of not to exceed $15,000,000 for the costs of a pilot program for removal, decontamination, or other action with respect to lead-contaminated soil in one to three different metropolitan areas.

ADD86

The President shall not pay for any administrative costs or expenses out of the Fund unless such costs and expenses are reasonably necessary for and incidental to the implementation of this subchapter.

**(b) Additional authorized purposes**

**(1) In general**

Claims asserted and compensable but unsatisfied under provisions of section 1321 of Title 33, which are modified by section 304 of this Act may be asserted against the Fund under this subchapter; and other claims resulting from a release or threat of release of a hazardous substance from a vessel or a facility may be asserted against the Fund under this subchapter for injury to, or destruction or loss of, natural resources, including cost for damage assessment: *Provided, however,* That any such claim may be asserted only by the President, as trustee, for natural resources over which the United States has sovereign rights, or natural resources within the territory or the fishery conservation zone of the United States to the extent they are managed or protected by the United States, or by any State for natural resources within the boundary of that State belonging to, managed by, controlled by, or appertaining to the State, or by any Indian tribe or by the United States acting on behalf of any Indian tribe for natural resources belonging to, managed by, controlled by, or appertaining to such tribe, or held in trust for the benefit of such tribe, or belonging to a member of such tribe if such resources are subject to a trust restriction on alienation.

**(2) Limitation on payment of natural resource claims**

**(A) General requirements**

No natural resource claim may be paid from the Fund unless the President determines that the claimant has exhausted all administrative and judicial remedies to recover the amount of such claim from persons who may be liable under section 9607 of this title.

**(B) Definition**

As used in this paragraph, the term "natural resource claim" means any claim for injury to, or destruction or loss of, natural resources. The term does not include any claim for the costs of natural resource damage assessment.

**(c) Peripheral matters and limitations**

Uses of the Fund under subsection (a) of this section include--

**(1)** The costs of assessing both short-term and long-term injury to, destruction of, or loss of any natural resources resulting from a release of a hazardous substance.

**(2)** The costs of Federal or State or Indian tribe efforts in the restoration, rehabilitation, or replacement or acquiring the equivalent of any natural resources injured, destroyed, or lost as a result of a release of a hazardous substance.

ADD87

**(3)** Subject to such amounts as are provided in appropriation Acts, the costs of a program to identify, investigate, and take enforcement and abatement action against releases of hazardous substances.

**(4)** Any costs incurred in accordance with subsection (m) of this section (relating to ATSDR) and section 9604(i) of this title, including the costs of epidemiologic and laboratory studies, health assessments, preparation of toxicologic profiles, development and maintenance of a registry of persons exposed to hazardous substances to allow long-term health effect studies, and diagnostic services not otherwise available to determine whether persons in populations exposed to hazardous substances in connection with a release or a suspected release are suffering from long-latency diseases.

**(5)** Subject to such amounts as are provided in appropriation Acts, the costs of providing equipment and similar overhead, related to the purposes of this chapter and section 1321 of Title 33, and needed to supplement equipment and services available through contractors or other non-Federal entities, and of establishing and maintaining damage assessment capability, for any Federal agency involved in strike forces, emergency task forces, or other response teams under the national contingency plan.

**(6)** Subject to such amounts as are provided in appropriation Acts, the costs of a program to protect the health and safety of employees involved in response to hazardous substance releases. Such program shall be developed jointly by the Environmental Protection Agency, the Occupational Safety and Health Administration, and the National Institute for Occupational Safety and Health and shall include, but not be limited to, measures for identifying and assessing hazards to which persons engaged in removal, remedy, or other response to hazardous substances may be exposed, methods to protect workers from such hazards, and necessary regulatory and enforcement measures to assure adequate protection of such employees.

**(7) Evaluation costs under petition provisions of section 9605(d)**

Costs incurred by the President in evaluating facilities pursuant to petitions under section 9605(d) of this title (relating to petitions for assessment of release).

**(8) Contract costs under section 9604(a)(1)**

The costs of contracts or arrangements entered into under section 9604(a)(1) of this title to oversee and review the conduct of remedial investigations and feasibility studies undertaken by persons other than the President and the costs of appropriate Federal and State oversight of remedial activities at National Priorities List sites resulting from consent orders or settlement agreements.

**(9) Acquisition costs under section 9604(j)**

The costs incurred by the President in acquiring real estate or interests in real estate under section 9604(j) of this title (relating to acquisition of property).

**(10) Research, development, and demonstration costs under section 9660**

The cost of carrying out section 9660 of this title (relating to research, development, and demonstration), except that the amounts available for such purposes shall not exceed the amounts specified in subsection (n) of this section.

ADD88

**(11) Local government reimbursement**

Reimbursements to local governments under section 9623 of this title, except that during the 8-fiscal year period beginning October 1, 1986, not more than 0.1 percent of the total amount appropriated from the Fund may be used for such reimbursements.

**(12) Worker training and education grants**

The costs of grants under section 9660a of this title for training and education of workers to the extent that such costs do not exceed $20,000,000 for each of the fiscal years 1987, 1988, 1989, 1990, 1991, 1992, 1993, and 1994.

**(13) Awards under section 9609**

The costs of any awards granted under section 9609(d) of this title.

**(14) Lead poisoning study**

The cost of carrying out the study under subsection (f) of section 118 of the Superfund Amendments and Reauthorization Act of 1986 (relating to lead poisoning in children).

**(d) Additional limitations**

**(1)** No money in the Fund may be used under subsection (c)(1) and (2) of this section, nor for the payment of any claim under subsection (b) of this section, where the injury, destruction, or loss of natural resources and the release of a hazardous substance from which such damages resulted have occurred wholly before December 11, 1980.

**(2)** No money in the Fund may be used for the payment of any claim under subsection (b) of this section where such expenses are associated with injury or loss resulting from long-term exposure to ambient concentrations of air pollutants from multiple or diffuse sources.

**(e) Funding requirements respecting moneys in Fund; limitation on certain claims; Fund use outside Federal property boundaries**

**(1)** Claims against or presented to the Fund shall not be valid or paid in excess of the total money in the Fund at any one time. Such claims become valid only when additional money is collected, appropriated, or otherwise added to the Fund. Should the total claims outstanding at any time exceed the current balance of the Fund, the President shall pay such claims, to the extent authorized under this section, in full in the order in which they were finally determined.

**(2)** In any fiscal year, 85 percent of the money credited to the Fund under subchapter II of this chapter shall be available only for the purposes specified in paragraphs (1), (2), and (4) of subsection (a) of this section. No money in the Fund may be used for the payment of any claim under subsection (a)(3) or subsection (b) of this section in any fiscal year for which the President

ADD89

determines that all of the Fund is needed for response to threats to public health from releases or threatened releases of hazardous substances.

**(3)** No money in the Fund shall be available for remedial action, other than actions specified in subsection (c) of this section, with respect to federally owned facilities; except that money in the Fund shall be available for the provision of alternative water supplies (including the reimbursement of costs incurred by a municipality) in any case involving groundwater contamination outside the boundaries of a federally owned facility in which the federally owned facility is not the only potentially responsible party.

**(4)** Paragraphs (1) and (4) of subsection (a) of this section shall in the aggregate be subject to such amounts as are provided in appropriation Acts.

**(f) Obligation of moneys by Federal officials; obligation of moneys or settlement of claims by State officials or Indian tribe**

The President is authorized to promulgate regulations designating one or more Federal officials who may obligate money in the Fund in accordance with this section or portions thereof. The President is also authorized to delegate authority to obligate money in the Fund or to settle claims to officials of a State or Indian tribe operating under a contract or cooperative agreement with the Federal Government pursuant to section 9604(d) of this title.

**(g) Notice to potential injured parties by owner and operator of vessel or facility causing release of substance; rules and regulations**

The President shall provide for the promulgation of rules and regulations with respect to the notice to be provided to potential injured parties by an owner and operator of any vessel, or facility from which a hazardous substance has been released. Such rules and regulations shall consider the scope and form of the notice which would be appropriate to carry out the purposes of this subchapter. Upon promulgation of such rules and regulations, the owner and operator of any vessel or facility from which a hazardous substance has been released shall provide notice in accordance with such rules and regulations. With respect to releases from public vessels, the President shall provide such notification as is appropriate to potential injured parties. Until the promulgation of such rules and regulations, the owner and operator of any vessel or facility from which a hazardous substance has been released shall provide reasonable notice to potential injured parties by publication in local newspapers serving the affected area.

**(h) Repealed. Pub.L. 99-499, Title I, § 111(c)(2),** Oct. 17, 1986, 100 Stat. 1643

**(i) Restoration, etc., of natural resources**

Except in a situation requiring action to avoid an irreversible loss of natural resources or to prevent or reduce any continuing danger to natural resources or similar need for emergency action, funds may not be used under this chapter for the restoration, rehabilitation, or replacement or acquisition of the equivalent of any natural resources until a plan for the use of such funds for such purposes has been developed and adopted by affected Federal agencies and the Governor or Governors of any State having sustained damage to natural resources within its borders, belonging to, managed by or appertaining to such State, and by the governing body of any Indian tribe having sustained damage to natural resources belonging to, managed by, controlled by, or appertaining to such tribe, or held in trust for the benefit of such tribe, or belonging to a member of such tribe if such resources

ADD90

**WESTLAW** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

are subject to a trust restriction on alienation, after adequate public notice and opportunity for hearing and consideration of all public comment.

**(j) Use of Post-closure Liability Fund**

The President shall use the money in the Post-closure Liability Fund for any of the purposes specified in subsection (a) of this section with respect to a hazardous waste disposal facility for which liability has transferred to such fund under section 9607(k) of this title, and, in addition, for payment of any claim or appropriate request for costs of response, damages, or other compensation for injury or loss under section 9607 of this title or any other State or Federal law, resulting from a release of a hazardous substance from such a facility.

**(k) Inspector General**

In each fiscal year, the Inspector General of each department, agency, or instrumentality of the United States which is carrying out any authority of this chapter shall conduct an annual audit of all payments, obligations, reimbursements, or other uses of the Fund in the prior fiscal year, to assure that the Fund is being properly administered and that claims are being appropriately and expeditiously considered. The audit shall include an examination of a sample of agreements with States (in accordance with the provisions of the Single Audit Act) carrying out response actions under this subchapter and an examination of remedial investigations and feasibility studies prepared for remedial actions. The Inspector General shall submit to the Congress an annual report regarding the audit report required under this subsection. The report shall contain such recommendations as the Inspector General deems appropriate. Each department, agency, or instrumentality of the United States shall cooperate with its inspector general in carrying out this subsection.

**(l) Foreign claimants**

To the extent that the provisions of this chapter permit, a foreign claimant may assert a claim to the same extent that a United States claimant may assert a claim if--

**(1)** the release of a hazardous substance occurred (A) in the navigable waters or (B) in or on the territorial sea or adjacent shoreline of a foreign country of which the claimant is a resident;

**(2)** the claimant is not otherwise compensated for his loss;

**(3)** the hazardous substance was released from a facility or from a vessel located adjacent to or within the navigable waters or was discharged in connection with activities conducted under the Outer Continental Shelf Lands Act, as amended (43 U.S.C. 1331 et seq.) or the Deepwater Port Act of 1974, as amended (33 U.S.C. 1501 et seq.); and

**(4)** recovery is authorized by a treaty or an executive agreement between the United States and foreign country involved, or if the Secretary of State, in consultation with the Attorney General and other appropriate officials, certifies that such country provides a comparable remedy for United States claimants.

**(m) Agency for Toxic Substances and Disease Registry**

ADD91

There shall be directly available to the Agency for Toxic Substances and Disease Registry to be used for the purpose of carrying out activities described in subsection (c)(4) and section 9604(i) of this title not less than $50,000,000 per fiscal year for each of fiscal years 1987 and 1988, not less than $55,000,000 for fiscal year 1989, and not less than $60,000,000 per fiscal year for each of fiscal years 1990, 1991, 1992, 1993, and 1994. Any funds so made available which are not obligated by the end of the fiscal year in which made available shall be returned to the Fund.

**(n) Limitations on research, development, and demonstration program**

**(1) Section 9660(b)**

For each of the fiscal years 1987, 1988, 1989, 1990, 1991, 1992, 1993, and 1994, not more than $20,000,000 of the amounts available in the Fund may be used for the purposes of carrying out the applied research, development, and demonstration program for alternative or innovative technologies and training program authorized under section 9660(b) of this title (relating to research, development, and demonstration) other than basic research. Such amounts shall remain available until expended.

**(2) Section 9660(a)**

From the amounts available in the Fund, not more than the following amounts may be used for the purposes of section 9660(a) of this title (relating to hazardous substance research, demonstration, and training activities):

**(A)** For the fiscal year 1987, $3,000,000.

**(B)** For the fiscal year 1988, $10,000,000.

**(C)** For the fiscal year 1989, $20,000,000.

**(D)** For the fiscal year 1990, $30,000,000.

**(E)** For each of the fiscal years 1991, 1992, 1993, and 1994, $35,000,000.

No more than 10 percent of such amounts shall be used for training under section 9660(a) of this title in any fiscal year.

**(3) Section 9660(d)**

For each of the fiscal years 1987, 1988, 1989, 1990, 1991, 1992, 1993, and 1994, not more than $5,000,000 of the amounts available in the Fund may be used for the purposes of section 9660(d) of this title (relating to university hazardous substance research centers).

**(o) Notification procedures for limitations on certain payments**

Not later than 90 days after October 17, 1986, the President shall develop and implement procedures to adequately notify, as soon as practicable after a site is included on the National Priorities List, concerned local and State officials and other concerned

ADD92

persons of the limitations, set forth in subsection (a)(2) of this section, on the payment of claims for necessary response costs incurred with respect to such site.

**(p) General revenue share of Superfund**

**(1) In general**

The following sums are authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, to the Hazardous Substance Superfund:

**(A)** For fiscal year 1987, $212,500,000.

**(B)** For fiscal year 1988, $212,500,000.

**(C)** For fiscal year 1989, $212,500,000.

**(D)** For fiscal year 1990, $212,500,000.

**(E)** For fiscal year 1991, $212,500,000.

**(F)** For fiscal year 1992, $212,500,000.

**(G)** For fiscal year 1993, $212,500,000.

**(H)** For fiscal year 1994, $212,500,000.

In addition there is authorized to be appropriated to the Hazardous Substance Superfund for each fiscal year an amount equal to so much of the aggregate amount authorized to be appropriated under this subsection (and paragraph (2) of section 9631(b) of this title) as has not been appropriated before the beginning of the fiscal year involved.

**(2) Computation**

The amounts authorized to be appropriated under paragraph (1) of this subsection in a given fiscal year shall be available only to the extent that such amount exceeds the amount determined by the Secretary under section 9507(b)(2) of Title 26 for the prior fiscal year.

**CREDIT(S)**

(Pub.L. 96-510, Title I, § 111, Dec. 11, 1980, 94 Stat. 2788; Pub.L. 99-499, Title I, § 111, Title II, § 207(d), Oct. 17, 1986, 100 Stat. 1642, 1706; Pub.L. 101-144, Title III, Nov. 9, 1989, 103 Stat. 857; Pub.L. 101-508, Title VI, § 6301, Nov. 5, 1990, 104 Stat. 1388-319.)

ADD93

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
      Subchapter I. Hazardous Substances Releases, Liability, Compensation (Refs & Annos)

42 U.S.C.A. § 9613

§ 9613. Civil proceedings

Currentness

**(a) Review of regulations in Circuit Court of Appeals of the United States for the District of Columbia**

Review of any regulation promulgated under this chapter may be had upon application by any interested person only in the Circuit Court of Appeals of the United States for the District of Columbia. Any such application shall be made within ninety days from the date of promulgation of such regulations. Any matter with respect to which review could have been obtained under this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement or to obtain damages or recovery of response costs.

**(b) Jurisdiction; venue**

Except as provided in subsections (a) and (h) of this section, the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy. Venue shall lie in any district in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office. For the purposes of this section, the Fund shall reside in the District of Columbia.

**(c) Controversies or other matters resulting from tax collection or tax regulation review**

The provisions of subsections (a) and (b) of this section shall not apply to any controversy or other matter resulting from the assessment of collection of any tax, as provided by subchapter II of this chapter, or to the review of any regulation promulgated under Title 26.

**(d) Litigation commenced prior to December 11, 1980**

No provision of this chapter shall be deemed or held to moot any litigation concerning any release of any hazardous substance, or any damages associated therewith, commenced prior to December 11, 1980.

**(e) Nationwide service of process**

In any action by the United States under this chapter, process may be served in any district where the defendant is found, resides, transacts business, or has appointed an agent for the service of process.

**(f) Contribution**

ADD94

**(1) Contribution**

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

**(2) Settlement**

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

**(3) Persons not party to settlement**

**(A)** If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability.

**(B)** A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

**(C)** In any action under this paragraph, the rights of any person who has resolved its liability to the United States or a State shall be subordinate to the rights of the United States or the State. Any contribution action brought under this paragraph shall be governed by Federal law.

**(g) Period in which action may be brought**

**(1) Actions for natural resource damages**

Except as provided in paragraphs (3) and (4), no action may be commenced for damages (as defined in section 9601(6) of this title) under this chapter, unless that action is commenced within 3 years after the later of the following:

**(A)** The date of the discovery of the loss and its connection with the release in question.

**(B)** The date on which regulations are promulgated under section 9651(c) of this title.

ADD95

With respect to any facility listed on the National Priorities List (NPL), any Federal facility identified under section 9620 of this title (relating to Federal facilities), or any vessel or facility at which a remedial action under this chapter is otherwise scheduled, an action for damages under this chapter must be commenced within 3 years after the completion of the remedial action (excluding operation and maintenance activities) in lieu of the dates referred to in subparagraph (A) or (B). In no event may an action for damages under this chapter with respect to such a vessel or facility be commenced (i) prior to 60 days after the Federal or State natural resource trustee provides to the President and the potentially responsible party a notice of intent to file suit, or (ii) before selection of the remedial action if the President is diligently proceeding with a remedial investigation and feasibility study under section 9604(b) of this title or section 9620 of this title (relating to Federal facilities). The limitation in the preceding sentence on commencing an action before giving notice or before selection of the remedial action does not apply to actions filed on or before October 17, 1986.

**(2) Actions for recovery of costs**

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced--

**(A)** for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and

**(B)** for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

**(3) Contribution**

No action for contribution for any response costs or damages may be commenced more than 3 years after--

**(A)** the date of judgment in any action under this chapter for recovery of such costs or damages, or

**(B)** the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

**(4) Subrogation**

No action based on rights subrogated pursuant to this section by reason of payment of a claim may be commenced under this subchapter more than 3 years after the date of payment of such claim.

ADD96

**(5) Actions to recover indemnification payments**

Notwithstanding any other provision of this subsection, where a payment pursuant to an indemnification agreement with a response action contractor is made under section 9619 of this title, an action under section 9607 of this title for recovery of such indemnification payment from a potentially responsible party may be brought at any time before the expiration of 3 years from the date on which such payment is made.

**(6) Minors and incompetents**

The time limitations contained herein shall not begin to run--

**(A)** against a minor until the earlier of the date when such minor reaches 18 years of age or the date on which a legal representative is duly appointed for such minor, or

**(B)** against an incompetent person until the earlier of the date on which such incompetent's incompetency ends or the date on which a legal representative is duly appointed for such incompetent.

**(h) Timing of review**

No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:

**(1)** An action under section 9607 of this title to recover response costs or damages or for contribution.

**(2)** An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.

**(3)** An action for reimbursement under section 9606(b)(2) of this title.

**(4)** An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

**(5)** An action under section 9606 of this title in which the United States has moved to compel a remedial action.

**(i) Intervention**

In any action commenced under this chapter or under the Solid Waste Disposal Act in a court of the United States, any person may intervene as a matter of right when such person claims an interest relating to the subject of the action and is so situated that

ADD97

the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest, unless the President or the State shows that the person's interest is adequately represented by existing parties.

**(j) Judicial review**

**(1) Limitation**

In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.

**(2) Standard**

In considering objections raised in any judicial action under this chapter, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.

**(3) Remedy**

If the court finds that the selection of the response action was arbitrary and capricious or otherwise not in accordance with law, the court shall award (A) only the response costs or damages that are not inconsistent with the national contingency plan, and (B) such other relief as is consistent with the National Contingency Plan.

**(4) Procedural errors**

In reviewing alleged procedural errors, the court may disallow costs or damages only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made.

**(k) Administrative record and participation procedures**

**(1) Administrative record**

The President shall establish an administrative record upon which the President shall base the selection of a response action. The administrative record shall be available to the public at or near the facility at issue. The President also may place duplicates of the administrative record at any other location.

**(2) Participation procedures**

**(A) Removal action**

The President shall promulgate regulations in accordance with chapter 5 of Title 5 establishing procedures for the appropriate participation of interested persons in the development of the administrative record on which the President will base the selection of removal actions and on which judicial review of removal actions will be based.

**(B) Remedial action**

The President shall provide for the participation of interested persons, including potentially responsible parties, in the development of the administrative record on which the President will base the selection of remedial actions and on which judicial review of remedial actions will be based. The procedures developed under this subparagraph shall include, at a minimum, each of the following:

**(i)** Notice to potentially affected persons and the public, which shall be accompanied by a brief analysis of the plan and alternative plans that were considered.

**(ii)** A reasonable opportunity to comment and provide information regarding the plan.

**(iii)** An opportunity for a public meeting in the affected area, in accordance with section 9617(a)(2) of this title (relating to public participation).

**(iv)** A response to each of the significant comments, criticisms, and new data submitted in written or oral presentations.

**(v)** A statement of the basis and purpose of the selected action.

For purposes of this subparagraph, the administrative record shall include all items developed and received under this subparagraph and all items described in the second sentence of section 9617(d) of this title. The President shall promulgate regulations in accordance with chapter 5 of Title 5 to carry out the requirements of this subparagraph.

**(C) Interim record**

Until such regulations under subparagraphs (A) and (B) are promulgated, the administrative record shall consist of all items developed and received pursuant to current procedures for selection of the response action, including procedures for the participation of interested parties and the public. The development of an administrative record and the selection of response action under this chapter shall not include an adjudicatory hearing.

**(D) Potentially responsible parties**

The President shall make reasonable efforts to identify and notify potentially responsible parties as early as possible before selection of a response action. Nothing in this paragraph shall be construed to be a defense to liability.

**(l) Notice of actions**

ADD99

Whenever any action is brought under this chapter in a court of the United States by a plaintiff other than the United States, the plaintiff shall provide a copy of the complaint to the Attorney General of the United States and to the Administrator of the Environmental Protection Agency.

### CREDIT(S)

(Pub.L. 96-510, Title I, § 113, Dec. 11, 1980, 94 Stat. 2795; Pub.L. 99-499, Title I, § 113, Oct. 17, 1986, 100 Stat. 1647; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095.)

Notes of Decisions (1032)

42 U.S.C.A. § 9613, 42 USCA § 9613
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

---

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    7

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
Subchapter I. Hazardous Substances Releases, Liability, Compensation (Refs & Annos)

42 U.S.C.A. § 9615

§ 9615. Presidential delegation and assignment of duties or powers and promulgation of regulations

Currentness

The President is authorized to delegate and assign any duties or powers imposed upon or assigned to him and to promulgate any regulations necessary to carry out the provisions of this subchapter.

**CREDIT(S)**

(Pub.L. 96-510, Title I, § 115, Dec. 11, 1980, 94 Stat. 2796.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 12286**

Ex. Ord. No. 12286, Jan. 19, 1981, 46 F.R. 9901, which related to delegation of Presidential functions for responses to environmental damage, was revoked by section 8(g) of Ex. Ord. No. 12316, Mar. 14, 1981, 46 F.R. 42240, formerly set out as a note under this section.

**EXECUTIVE ORDER NO. 12316**

Ex. Ord. No. 12316, Aug. 14, 1981, 46 F.R. 42237, as amended by Ex. Ord. No. 12418, May 5, 1983, 48 F.R. 20891, which related to delegation of Presidential functions for responses to environmental damage, was revoked by section 11(h) of Ex. Ord. No. 12580, Jan. 23, 1987, 52 F.R. 2923, set out as a note under this section.

**EXECUTIVE ORDER NO. 12580**

<Jan. 23, 1987, 52 F.R. 2923, as amended by Ex. Ord. No. 12777, § 1(a), Oct. 18, 1991, 56 F.R. 54757; Ex. Ord. No. 13016, Aug. 28, 1996, 61 F.R. 45871; Ex. Ord. No. 13286, Sec. 43, Feb. 28, 2003, 68 F.R. 10627; Ex. Ord. No. 13308, June 20, 2003, 68 F.R. 37691>

**Superfund Implementation**

By the authority vested in me as President of the United States of America by Section 115 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. 9615 et seq.) ("the Act"), and by Section 301 of Title 3 of the United States Code [section 301 of Title 3, The President], it is hereby ordered as follows:

ADD101

**Section 1. National Contingency Plan. (a)(1)** The National Contingency Plan ("the NCP"), shall provide for a National Response Team ("the NRT") composed of representatives of appropriate Federal departments and agencies for national planning and coordination of preparedness and response actions, and Regional Response Teams as the regional counterparts to the NRT for planning and coordination of regional preparedness and response actions.

**(2)** The following agencies (in addition to other appropriate agencies) shall provide representatives to the National and Regional Response Teams to carry out their responsibilities under the NCP: Department of State, Department of Defense, Department of Justice, Department of the Interior, Department of Agriculture, Department of Commerce, Department of Labor, Department of Health and Human Services, Department of Transportation, Department of Energy, Department of Homeland Security, Environmental Protection Agency, United States Coast Guard, and the Nuclear Regulatory Commission.

**(3)** Except for periods of activation because of response action, the representative of the Environmental Protection Agency ("EPA") shall be the chairman, and the representative of the United States Coast Guard shall be the vice chairman, of the NRT and these agencies' representatives shall be co-chairs of the Regional Response Teams ("the RRTs"). When the NRT or an RRT is activated for a response action, the EPA representative shall be the chairman when the release or threatened release or discharge or threatened discharge occurs in the inland zone, and the United States Coast Guard representative shall be the chairman when the release or threatened release or discharge or threatened discharge occurs in the coastal zone, unless otherwise agreed upon by the EPA and the United States Coast Guard representatives (inland and coastal zones are defined in the NCP).

**(4)** The RRTs may include representatives from State governments, local governments (as agreed upon by the States), and Indian tribal governments. Subject to the functions and authorities delegated to Executive departments and agencies in other sections of this order, the NRT shall provide policy and program direction to the RRTs.

**(b)(1)** The responsibility for the revision of the NCP and all the other functions vested in the President by Sections 105(a), (b), (c), (g) and (h), 125, and 301(f) of the Act [42 U.S.C.A. §§ 9605(a) to (c), (g), 9625, and 9651(f) ], by Section 311(d)(1) of the Federal Water Pollution Control Act [33 U.S.C.A. § 1321(d)(1) ], and by Section 4201(c) of the Oil Pollution Act of 1990 [Pub.L. 101-380, 33 U.S.C.A. § 1321 note] is delegated to the Administrator of the Environmental Protection Agency ("the Administrator").

**(2)** The function vested in the President by Section 118(p) of the Superfund Amendments and Reauthorization Act of 1986 (Pub.L. 99-499) ("SARA") [100 Stat. 1662] is delegated to the Administrator.

**(c)** In accord with Section 107(f)(2)(A) of the Act [42 U.S.C.A. § 9607(f)(2)(A) ], Section 311(f)(5) of the Federal Water Pollution Control Act, as amended (33 U.S.C. 1321(f)(5)), and Section 1006(b)(1) and (2) of the Oil Pollution Act of 1990 [33 U.S.C.A. 2706(b)(1), (2) ], the following shall be among those designated in the NCP as Federal trustees for natural resources:

**(1)** Secretary of Defense;

**(2)** Secretary of the Interior;

**(3)** Secretary of Agriculture;

**(4)** Secretary of Commerce;

**(5)** Secretary of Energy.

In the event of a spill, the above named Federal trustees for natural resources shall designate one trustee to act as Lead Administrative Trustee, the duties of which shall be defined in the regulations promulgated pursuant to Section 1006(e)(1) of OPA [33 U.S.C.A. § 2706(e)(1) ]. If there are natural resource trustees other than those designated above which are acting in

ADD102

the event of a spill, those other trustees may join with the Federal trustees to name a Lead Administrative Trustee which shall exercise the duties defined in the regulations promulgated pursuant to Section 1006(e)(1) of OPA.

**(d)** Revisions to the NCP shall be made in consultation with members of the NRT prior to publication for notice and comment.

**(e)** All revisions to the NCP, whether in proposed or final form, shall subject to review and approval by the Director of the Office of Management and Budget ("OMB").

**Sec. 2. Response and Related Authorities. (a)** The functions vested in the President by the first sentence of Section 104(b)(1) of the Act [42 U.S.C.A. § 9604(b)(1) ] relating to "illness, disease, or complaints thereof" are delegated to the Secretary of Health and Human Services who shall, in accord with Section 104(i) of the Act [42 U.S.C.A. § 9604(i) ], perform those functions through the Public Health Service.

**(b)** The functions vested in the President by Sections 104(e)(7)(C), 113(k)(2), 119(c)(7), and 121(f)(1) of the Act [42 U.S.C.A. § 9604(e)(7)(C), 9613(k)(2), 9619(c)(7), 9621(f)(1) ], relating to promulgation of regulations and guidelines, are delegated to the Administrator, to be exercised in consultation with the NRT.

**(c)(1)** The functions vested in the President by Sections 104(a) [42 U.S.C.A. § 9604(a) ] and the second sentence of 126(b) of the Act [42 U.S.C.A. § 9626(b) ], to the extent they require permanent relocation of residents, businesses, and community facilities or temporary evacuation and housing of threatened individuals not otherwise provided for, are delegated to the Director of the Federal Emergency Management Agency.

**(2)** Subject to subsection (b) of this Section, the functions vested in the President by Sections 117(a) and (c) [42 U.S.C.A. § 9617(a), (c) ], and 119 of the Act [42 U.S.C.A. § 9619], to the extent such authority is needed to carry out the functions delegated under paragraph (1) of this subsection, are delegated to the Director of the Federal Emergency Management Agency.

**(d)** Subject to subsections (a), (b) and (c) of this Section, the functions vested in the President by Sections 104(a), (b) and (c)(4), 113(k), 117(a) and (c), 119, and 121 of the Act [42 U.S.C.A. §§ 9604(a), (b), (c)(4), 9613(k), 9617(a), (c), 9619, 9621] are delegated to the Secretaries of Defense and Energy, with respect to releases or threatened releases where either the release is on or the sole source of the release is from any facility or vessel under the jurisdiction, custody or control of their departments, respectively, including vessels bare-boat chartered and operated. These functions must be exercised consistent with the requirements of Section 120 of the Act [42 U.S.C.A. § 9620].

**(e)(1)** Subject to subsections (a), (b), (c), and (d) of this Section, the functions vested in the President by Sections 104(a), (b), and (c)(4), and 121 of the Act [42 U.S.C.A. §§ 9604(a), (b), (c)(4), 9621] are delegated to the heads of Executive departments and agencies, with respect to remedial actions for releases or threatened releases which are not on the National Priorities List ("the NPL") and removal actions other than emergencies, where either the release is on or the sole source of the release is from any facility or vessel under the jurisdiction, custody or control of those departments and agencies, including vessels bare-boat chartered and operated. The Administrator shall define the term "emergency", solely for the purposes of this subsection, either by regulation or by a memorandum of understanding with the head of an Executive department or agency.

**(2)** Subject to subsections (b), (c), and (d) of this Section, the functions vested in the President by Sections 104(b)(2), 113(k), 117(a) and (c), and 119 of the Act [42 U.S.C.A. §§ 9604(b)(2), 9613(k), 9617(a), (c), and 9619] are delegated to the heads of Executive departments and agencies, with respect to releases or threatened releases where either the release is on or the sole source of the release is from any facility or vessel under the jurisdiction, custody or control of those departments and agencies, including vessels bare-boat chartered and operated.

**(f)** Subject to subsections (a), (b), (c), (d), and (e) of this Section, the functions vested in the President by Sections 104(a), (b) and (c)(4), 113(k), 117(a) and (c), 119, and 121 of the Act [42 U.S.C.A. §§ 9604(a), (b), (c)(4), 9613(k), 9617(a), (c), 9619,

ADD103

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    3

9621] are delegated to the Secretary of the Department in which the Coast Guard is operating ("the Coast Guard"), with respect to any release or threatened release involving the coastal zone, Great Lakes waters, ports, and harbors.

**(g)** Subject to subsections (a), (b), (c), (d), (e), and (f) of this Section, the functions vested in the President by Sections 101(24), 104(a), (b), (c)(4) and (c)(9), 113(k), 117(a) and (c), 119, 121, and 126(b) of the Act [42 U.S.C.A. §§ 9601(24), 9604(a), (b), (c)(4), (9), 9613(k), 9617(a), (c), 9619, 9621, 9626(b) ] are delegated to the Administrator. The Administrator's authority under Section 119 of the Act [42 U.S.C.A. § 9619] is retroactive to the date of enactment of SARA [enacted Oct. 17, 1986].

**(h)** The functions vested in the President by Section 104(c)(3) of the Act [42 U.S.C.A. § 9604(c)(3) ] are delegated to the Administrator, with respect to providing assurances for Indian tribes, to be exercised in consultation with the Secretary of the Interior.

**(i)** Subject to subsections (d), (e), (f), (g) and (h) of this Section, the functions vested in the President by Section 104(c) and (d) of the Act [42 U.S.C.A. § 9604(c), (d) ] are delegated to the Coast Guard, the Secretary of Health and Human Services, the Director of the Federal Emergency Management Agency, and the Administrator in order to carry out the functions delegated to them by this Section.

**(j)(1)** The functions vested in the President by Section 104(e)(5)(A) [42 U.S.C.A. § 9604(e)(5)(A) ] are delegated to the heads of Executive departments and agencies, with respect to releases or threatened releases where either the release is on or the sole source of the release is from any facility or vessel under the jurisdiction, custody or control of those departments and agencies, to be exercised with the concurrence of the Attorney General.

**(2)** Subject to subsection (b) of this Section and paragraph (1) of this subsection, the functions vested in the President by Section 104(e) [42 U.S.C.A. § 9604(e) ] are delegated to the heads of Executive departments and agencies in order to carry out their functions under this Order or the Act.

**(k)** The functions vested in the President by Section 104(f), (g), (h), (i)(11), and (j) of the Act [42 U.S.C.A. § 9604(f) to (h), (i)(11), (j) ] are delegated to the heads of Executive departments and agencies in order to carry out the functions delegated to them by this Section. The exercise of authority under Section 104(h) of the Act [42 U.S.C.A. § 9604(h) ] shall be subject to the approval of the Administrator of the Office of Federal Procurement Policy.

**Sec. 3. Cleanup Schedules. (a)** The functions vested in the President by Sections 116(a) and the first two sentences of 105(d) of the Act [42 U.S.C.A. §§ 9616(a), 9605(d) ] are delegated to the heads of Executive departments and agencies with respect to facilities under the jurisdiction, custody or control of those departments and agencies.

**(b)** Subject to subsection (a) of this Section, the functions vested in the President by Sections 116 and 105(d) [42 U.S.C.A. §§ 9616, 9605(d) ] are delegated to the Administrator.

**Sec. 4. Enforcement. (a)** The functions vested in the President by Sections 109(d) and 122(e)(3)(A) of the Act [42 U.S.C.A. §§ 9609(d), 9622(e)(3)(A) ], relating to development of regulations and guidelines, are delegated to the Administrator, to be exercised in consultation with the Attorney General.

**(b)(1)** Subject to subsection (a) of this Section, the functions vested in the President by Section 122 [42 U.S.C.A. § 9622] (except subsection (b)(1)) are delegated to the heads of Executive departments and agencies, with respect to releases or threatened releases not on the NPL where either the release is on or the sole source of the release is from any facility under the jurisdiction, custody or control of those Executive departments and agencies. These functions may be exercised only with the concurrence of the Attorney General.

ADD104

**(2)** Subject to subsection (a) of this Section, the functions vested in the President by Section 109 of the Act [42 U.S.C.A. § 9609], relating to violations of Section 122 of the Act [42 U.S.C.A. § 9622], are delegated to the heads of Executive departments and agencies, with respect to releases or threatened releases not on the NPL where either the release is on or the sole source of the release is from any facility under the jurisdiction, custody or control of those Executive departments and agencies. These functions may be exercised only with the concurrence of the Attorney General.

**(c)(1)** Subject to subsection[s] (a) and (b)(1) of this Section, the functions vested in the President by Sections 106(a) and 122 of the Act [42 U.S.C.A. §§ 9606(a), 9622] are delegated to the Coast Guard with respect to any release or threatened release involving the coastal zone, Great Lakes waters, ports, and harbors.

**(2)** Subject to subsection[s] (a) and (b)(2) of this Section, the functions vested in the President by Section 109 of the Act [42 U.S.C.A. § 9609], relating to violations of Sections 103(a) and (b), and 122 of the Act [42 U.S.C.A. §§ 9603(a), (b), 9622], are delegated to the Coast Guard with respect to any release or threatened release involving the coastal zone, Great Lakes waters, ports, and harbors.

**(3)** Subject to subsections (a) and (b)(1) of this section, the functions vested in the President by sections 106(a) and 122 (except subsection (b)(1)) [sections 9606(a) and 9622 (except subsec. (b)(1) thereof) of this title] of the Act are delegated to the Secretary of the Interior, the Secretary of Commerce, the Secretary of Agriculture, the Secretary of Defense, and the Secretary of Energy, to be exercised only with the concurrence of the Coast Guard, with respect to any release or threatened release in the coastal zone, Great Lakes waters, ports, and harbors, affecting (1) natural resources under their trusteeship, or (2) a vessel or facility subject to their custody, jurisdiction, or control. Such authority shall not be exercised at any vessel or facility at which the Coast Guard is the lead Federal agency for the conduct or oversight of a response action. Such authority shall not be construed to authorize or permit use of the Hazardous Substance Superfund to implement section 106 or to fund performance of any response action in lieu of the payment by a person who receives but does not comply with an order pursuant to section 106(a), where such order has been issued by the Secretary of the Interior, the Secretary of Commerce, the Secretary of Agriculture, the Secretary of Defense, or the Secretary of Energy. This subsection shall not be construed to limit any authority delegated by any other section of this order. Authority granted under this subsection shall be exercised in a manner to ensure interagency coordination that enhances efficiency and effectiveness.

**(d)(1)** Subject to subsections (a), (b)(1), and (c)(1) of this Section, the functions vested in the President by Sections 106 and 122 of the Act [42 U.S.C.A. §§ 9606, 9622] are delegated to the Administrator.

**(2)** Subject to subsections (a), (b)(2), and (c)(2) of this Section, the functions vested in the President by Section 109 of the Act [42 U.S.C.A. § 9609], relating to violations of Sections 103 and 122 of the Act [42 U.S.C.A. §§ 9603, 9622], are delegated to the Administrator.

**(3)** Subject to subsections (a), (b)(1), and (c)(1) of this section, the functions vested in the President by sections 106(a) and 122 (except subsection (b)(1)) [sections 9606(a) and 9622 (except subsec. (b) thereof)] of the Act are delegated to the Secretary of the Interior, the Secretary of Commerce, the Secretary of Agriculture, the Secretary of Defense, and the Department of Energy, to be exercised only with the concurrence of the Administrator, with respect to any release or threatened release affecting (1) natural resources under their trusteeship, or (2) a vessel or facility subject to their custody, jurisdiction, or control. Such authority shall not be exercised at any vessel or facility at which the Administrator is the lead Federal official for the conduct or oversight of a response action. Such authority shall not be construed to authorize or permit use of the Hazardous Substance Superfund to implement section 106 or to fund performance of any response action in lieu of the payment by a person who receives but does not comply with an order pursuant to section 106(a), where such order has been issued by the Secretary of the Interior, the Secretary of Commerce, the Secretary of Agriculture, the Secretary of Defense, or the Secretary of Energy. This subsection shall not be construed to limit any authority delegated by any other section of this order. Authority granted under this subsection shall be exercised in a manner to ensure interagency coordination that enhances efficiency and effectiveness.

ADD105

**(e)** Notwithstanding any other provision of this Order, the authority under Sections 104(e)(5)(A) and 106(a) of the Act [42 U.S.C.A. §§ 9604(e)(5)(A), 9606(a) ] to seek information, entry, inspection, samples, or response actions from Executive departments and agencies may be exercised only with the concurrence of the Attorney General.

**Sec. 5. Liability. (a)** The function vested in the President by Section 107(c)(1)(C) of the Act [42 U.S.C.A. § 9607(c)(1)(C) ] is delegated to the Secretary of Transportation.

**(b)** The functions vested in the President by Section 107(c)(3) of the Act [42 U.S.C.A. § 9607(c)(3) ] are delegated to the Coast Guard with respect to any release or threatened release involving the coastal zone, Great Lakes waters, ports, and harbors.

**(c)** Subject to subsection (b) of this Section, the functions vested in the President by Section 107(c)(3) of the Act [42 U.S.C.A. § 9607(c)(3) ] are delegated to the Administrator.

**(d)** The functions vested in the President by Section 107(f)(1) of the Act [42 U.S.C.A. § 9607(f)(1) ] are delegated to each of the Federal trustees for natural resources designated in the NCP for resources under their trusteeship.

**(e)** The functions vested in the President by Section 107(f)(2)(B) of the Act [42 U.S.C.A. § 9607(f)(2)(B) ], to receive notification of the state natural resource trustee designations, are delegated to the Administrator.

**(f)** The functions vested in the President by Section 107(o) and (p) of the Act [42 U.S.C.A. § 9607(o) and (o)] are delegated to the heads of the Executive departments and agencies, to be exercised in consultation with the Administrator, with respect to releases or threatened releases where either the release is on or the sole source of the release is from any facility under the jurisdiction, custody, or control of those departments and agencies.

**(g)** Subject to subsection (f) of this Section, the functions vested in the President by Section 107(o) and (p) of the Act [42 U.S.C.A. § 9607(o) and (p)] are delegated to the Administrator except that, with respect to determinations regarding natural resource restoration, the Administrator shall make such determinations in consultation with the appropriate Federal natural resource trustee.

**Sec. 6. Litigation. (a)** Notwithstanding any other provision of this Order, any representation pursuant to or under this Order in any judicial proceedings shall be by or through the Attorney General. The conduct and control of all litigation arising under the Act shall be the responsibility of the Attorney General.

**(b)** Notwithstanding any other provision of this Order, the authority under the Act to require the Attorney General to commence litigation is retained by the President.

**(c)** The functions vested in the President by Section 113(g) of the Act [42 U.S.C.A. § 9613(g) ], to receive notification of a natural resource trustee's intent to file suit, are delegated to the heads of Executive departments and agencies with respect to response actions for which they have been delegated authority under Section 2 of this Order. The Administrator shall promulgate procedural regulations for providing such notification.

**(d)** The functions vested in the President by Sections 310(d) and (e) of the Act [42 U.S.C.A. § 9659(d), (e) ], relating to promulgation of regulations, are delegated to the Administrator.

**Sec. 7. Financial Responsibility. (a)** The functions vested in the President by Section 107(k)(4)(B) of the Act [42 U.S.C.A. § 9607(k)(4)(B) ] are delegated to the Secretary of the Treasury.The Administrator will provide the Secretary with such technical information and assistance as the Administrator may have available.

ADD106

**(b)(1)** The functions vested in the President by Section 108(a)(1) of the Act [42 U.S.C.A. § 9608(a)(1) ] are delegated to the Coast Guard.

**(2)** Subject to Section 4(a) of this Order, the functions vested in the President by Section 109 of the Act [42 U.S.C.A. § 9609], relating to violations of Section 108(a)(1) of the Act [42 U.S.C.A. § 9608(a)(1) ], are delegated to the Coast Guard.

**(c)(1)** The functions vested in the President by Section 108(b) of the Act [42 U.S.C.A. § 9608(b) ] are delegated to the Secretary of Transportation with respect to all transportation related facilities, including any pipeline, motor vehicle, rolling stock, or aircraft.

**(2)** Subject to Section 4(a) of this Order, the functions vested in the President by Section 109 of the Act [42 U.S.C.A. § 9609], relating to violations of Section 108(a)(3) of the Act [42 U.S.C.A. § 9608(a)(3) ], are delegated to the Secretary of Transportation.

**(3)** Subject to Section 4(a) of this Order, the functions vested in the President by Section 109 of the Act [42 U.S.C.A. § 9609], relating to violations of Section 108(b) of the Act [42 U.S.C.A. § 9608(b) ], are delegated to the Secretary of Transportation with respect to all transportation related facilities, including any pipeline, motor vehicle, rolling stock, or aircraft.

**(d)(1)** Subject to subsection (c)(1) of this Section, the functions vested in the President by Section 108(a)(4) and (b) of the Act [42 U.S.C.A. § 9608(a)(4), (b) ] are delegated to the Administrator.

**(2)** Subject to Section 4(a) of this Order and subsection (c)(3) of this Section, the functions vested in the President by Section 109 of the Act [42 U.S.C.A. § 9609], relating to violations of Section 108(a)(4) and (b) of the Act [42 U.S.C.A. § 9608(a)(4), (b) ], are delegated to the Administrator.

**Sec. 8. Employee Protection and Notice to Injured. (a)** The functions vested in the President by Section 110(e) of the Act [42 U.S.C.A. § 9610(e) ] are delegated to the Administrator.

**(b)** The functions vested in the President by Section 111(g) of the Act [42 U.S.C.A. § 9611(g) ] are delegated to the Secretaries of Defense and Energy with respect to releases from facilities or vessels under the jurisdiction, custody or control of their departments, respectively, including vessels bare-boat chartered and operated.

**(c)** Subject to subsection (b) of this Section, the functions vested in the President by Section 111(g) of the Act [42 U.S.C.A. § 9611(g) ] are delegated to the Administrator.

**Sec. 9. Management of the Hazardous Substance Superfund and Claims. (a)** The functions vested in the President by Section 111(a) of the Act [42 U.S.C.A. § 9611(a) ] are delegated to the Administrator, subject to the provisions of this Section and other applicable provisions of this Order.

**(b)** The Administrator shall transfer to other agencies, from the Hazardous Substance Superfund out of sums appropriated, such amounts as the Administrator may determine necessary to carry out the purposes of the Act. These amounts shall be consistent with the President's Budget, within the total approved by the Congress, unless a revised amount is approved by OMB. Funds appropriated specifically for the Agency for Toxic Substances and Disease Registry ("ATSDR"), shall be directly transferred to ATSDR, consistent with fiscally responsible investment of trust fund money.

**(c)** The Administrator shall chair a budget task force composed of representatives of Executive departments and agencies having responsibilities under this Order or the Act. The Administrator shall also, as part of the budget request for the Environmental Protection Agency, submit to OMB a budget for the Hazardous Substance Superfund which is based on recommended levels developed by the budget task force. The Administrator may prescribe reporting and other forms, procedures, and guidelines to be used by the agencies of the Task Force in preparing the budget request, consistent with budgetary reporting requirements

ADD107

issued by OMB. The Administrator shall prescribe forms to agency task force members for reporting the expenditure of funds on a site specific basis.

**(d)** The Administrator and each department and agency head to whom funds are provided pursuant to this Section, with respect to funds provided to them, are authorized in accordance with Section 111(f) of the Act [42 U.S.C.A. § 9611(f) ] to designate Federal officials who may obligate such funds.

**(e)** The functions vested in the President by Section 112 of the Act [42 U.S.C.A. § 9612] are delegated to the Administrator for all claims presented pursuant to Section 111 of the Act [42 U.S.C.A. § 9611].

**(f)** The functions vested in the President by Section 111(o) of the Act [42 U.S.C.A. § 9611(o) ] are delegated to the Administrator.

**(g)** The functions vested in the President by Section 117(e) of the Act [42 U.S.C.A. § 9617(e) ] are delegated to the Administrator, to be exercised in consultation with the Attorney General.

**(h)** The functions vested in the President by Section 123 of the Act [42 U.S.C.A. § 9623] are delegated to the Administrator.

**(i)** Funds from the Hazardous Substance Superfund may be used, at the discretion of the Administrator or the Coast Guard, to pay for removal actions for releases or threatened releases from facilities or vessels under the jurisdiction, custody or control of Executive departments and agencies but must be reimbursed to the Hazardous Substance Superfund by such Executive department or agency.

**Sec. 10. Federal Facilities. (a)** When necessary, prior to selection of a remedial action by the Administrator under Section 120(e)(4)(A) of the Act [42 U.S.C.A. § 9620(e)(4)(A) ], Executive agencies shall have the opportunity to present their views to the Administrator after using the procedures under Section 1-6 of Executive Order No. 12088 of October 13, 1978 [42 U.S.C.A. § 4321 note], or any other mutually acceptable process. Notwithstanding subsection 1-602 of Executive Order No. 12088, the Director of the Office of Management and Budget shall facilitate resolution of any issues.

**(b)** Executive Order No. 12088 of October 13, 1978 [42 U.S.C.A. § 4321 note], is amended by renumbering the current Section 1-802 as Section 1-803 and inserting the following new Section 1-802:

**"1-802.** Nothing in this Order shall create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person."

**Sec. 11. General Provisions. (a)** The function vested in the President by Section 101(37) of the Act [42 U.S.C.A. § 9601(37) ] is delegated to the Administrator.

**(b)(1)** The function vested in the President by Section 105(f) of the Act [42 U.S.C.A. § 9605(f) ], relating to reporting on minority participation in contracts, is delegated to the Administrator.

**(2)** Subject to paragraph 1 of this subsection, the functions vested in the President by Section 105(f) of the Act [42 U.S.C.A. § 9605(f) ] are delegated to the heads of Executive departments and agencies in order to carry out the functions delegated to them by this Order. Each Executive department and agency shall provide to the Administrator any requested information on minority contracting for inclusion in the Section 105(f) [42 U.S.C.A. § 9605(f) ] annual report.

**(c)** The functions vested in the President by Section 126(c) of the Act [42 U.S.C.A. § 9626(c) ] are delegated to the Administrator, to be exercised in consultation with the Secretary of the Interior.

ADD108

**(d)** The functions vested in the President by Section 301(c) of the Act [42 U.S.C.A. § 9651(c) ] are delegated to the Secretary of the Interior.

**(e)** Each agency shall have authority to issue such regulations as may be necessary to carry out the functions delegated to them by this Order.

**(f)** The performance of any function under this Order shall be done in consultation with interested Federal departments and agencies represented on the NRT, as well as with any other interested Federal agency.

**(g)** The following functions vested in the President by the Act which have been delegated or assigned by this Order may be redelegated to the head of any Executive department or agency with his consent: functions set forth in Sections 2 (except subsection (b)), 3, 4(b), 4(c), 4(d), 5(b), 5(c), and 8(c) of this Order.

**(h)** Executive Order No. 12316 of August 14, 1981 [formerly set out as a note under this section], is revoked.

**Sec. 12. Brownfields. (a)** The functions vested in the President by Sections 101(39) and (41) [42 U.S.C.A. § 9601(39) and (41)] and 104(k) of the Act [42 U.S.C.A. § 9604(k)] are delegated to the Administrator.

(b) The functions vested in the President by Section 128(b)(1)(B)(ii) of the Act [42 U.S.C.A. § 9628(b)(1)(B)(iii)] are delegated to the heads of the Executive departments and agencies, to be exercised in consultation with the Administrator, with respect to property subject to their jurisdiction, custody, or control.

(c) The functions vested in the President by Section 128(b)(1)(E) of the Act [42 U.S.C.A. § 9628(b)(1)(E)] are delegated to the heads of Executive departments and agencies in cases where they have acted under subsection (b) of this Section.

(d) Subject to subsections (b) and (c) of this Section, the functions vested in the President by Section 128 of the Act [42 U.S.C.A. § 9628] are delegated to the Administrator.

**Sec. 13. Preservation of Authorities.** Nothing in this order shall be construed to impair or otherwise affect the functions of the Director of the Office of Management and Budget relating to budget, administrative, or legislative proposals.

**Sec. 14. General Provision.** This order is intended only to improve the internal management of the Federal Government and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

[For transfer of functions of the Federal Emergency Management Agency, including existing responsibilities for emergency alert systems and continuity of operations and continuity of government plans and programs as constituted on June 1, 2006, including all of its personnel, assets, components, authorities, grant programs, and liabilities, and including the functions of the Under Secretary for Federal Emergency Management relating thereto, see 6 U.S.C.A. § 315.]

Notes of Decisions (2)

42 U.S.C.A. § 9615, 42 USCA § 9615
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
      Subchapter I. Hazardous Substances Releases, Liability, Compensation (Refs & Annos)

42 U.S.C.A. § 9620

§ 9620. Federal facilities

Currentness

**(a) Application of chapter to Federal Government**

**(1) In general**

Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title. Nothing in this section shall be construed to affect the liability of any person or entity under sections 9606 and 9607 of this title.

**(2) Application of requirements to Federal facilities**

All guidelines, rules, regulations, and criteria which are applicable to preliminary assessments carried out under this chapter for facilities at which hazardous substances are located, applicable to evaluations of such facilities under the National Contingency Plan, applicable to inclusion on the National Priorities List, or applicable to remedial actions at such facilities shall also be applicable to facilities which are owned or operated by a department, agency, or instrumentality of the United States in the same manner and to the extent as such guidelines, rules, regulations, and criteria are applicable to other facilities. No department, agency, or instrumentality of the United States may adopt or utilize any such guidelines, rules, regulations, or criteria which are inconsistent with the guidelines, rules, regulations, and criteria established by the Administrator under this chapter.

**(3) Exceptions**

This subsection shall not apply to the extent otherwise provided in this section with respect to applicable time periods. This subsection shall also not apply to any requirements relating to bonding, insurance, or financial responsibility. Nothing in this chapter shall be construed to require a State to comply with section 9604(c)(3) of this title in the case of a facility which is owned or operated by any department, agency, or instrumentality of the United States.

**(4) State laws**

State laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at facilities owned or operated by a department, agency, or instrumentality of the United States or facilities that are the subject of a deferral under subsection (h)(3)(C) when such facilities are not included on the National Priorities List. The preceding sentence shall not apply to the extent a State law would apply any standard or requirement to such facilities

ADD110

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    1

which is more stringent than the standards and requirements applicable to facilities which are not owned or operated by any such department, agency, or instrumentality.

**(b) Notice**

Each department, agency, and instrumentality of the United States shall add to the inventory of Federal agency hazardous waste facilities required to be submitted under section 3016 of the Solid Waste Disposal Act (in addition to the information required under section 3016(a)(3) of such Act) information on contamination from each facility owned or operated by the department, agency, or instrumentality if such contamination affects contiguous or adjacent property owned by the department, agency, or instrumentality or by any other person, including a description of the monitoring data obtained.

**(c) Federal Agency Hazardous Waste Compliance Docket**

The Administrator shall establish a special Federal Agency Hazardous Waste Compliance Docket (hereinafter in this section referred to as the "docket") which shall contain each of the following:

**(1)** All information submitted under section 3016 of the Solid Waste Disposal Act and subsection (b) of this section regarding any Federal facility and notice of each subsequent action taken under this chapter with respect to the facility.

**(2)** Information submitted by each department, agency, or instrumentality of the United States under section 3005 or 3010 of such Act.

**(3)** Information submitted by the department, agency, or instrumentality under section 9603 of this title.

The docket shall be available for public inspection at reasonable times. Six months after establishment of the docket and every 6 months thereafter, the Administrator shall publish in the Federal Register a list of the Federal facilities which have been included in the docket during the immediately preceding 6-month period. Such publication shall also indicate where in the appropriate regional office of the Environmental Protection Agency additional information may be obtained with respect to any facility on the docket. The Administrator shall establish a program to provide information to the public with respect to facilities which are included in the docket under this subsection.

**(d) Assessment and evaluation**

**(1) In general**

The Administrator shall take steps to assure that a preliminary assessment is conducted for each facility on the docket. Following such preliminary assessment, the Administrator shall, where appropriate--

**(A)** evaluate such facilities in accordance with the criteria established in accordance with section 9605 of this title under the National Contingency Plan for determining priorities among releases; and

**(B)** include such facilities on the National Priorities List maintained under such plan if the facility meets such criteria.

ADD111

**(2) Application of criteria**

**(A) In general**

Subject to subparagraph (B), the criteria referred to in paragraph (1) shall be applied in the same manner as the criteria are applied to facilities that are owned or operated by persons other than the United States.

**(B) Response under other law**

It shall be an appropriate factor to be taken into consideration for the purposes of section 9605(a)(8)(A) of this title that the head of the department, agency, or instrumentality that owns or operates a facility has arranged with the Administrator or appropriate State authorities to respond appropriately, under authority of a law other than this chapter, to a release or threatened release of a hazardous substance.

**(3) Completion**

Evaluation and listing under this subsection shall be completed in accordance with a reasonable schedule established by the Administrator.

**(e) Required action by department**

**(1) RI/FS**

Not later than 6 months after the inclusion of any facility on the National Priorities List, the department, agency, or instrumentality which owns or operates such facility shall, in consultation with the Administrator and appropriate State authorities, commence a remedial investigation and feasibility study for such facility. In the case of any facility which is listed on such list before October 17, 1986, the department, agency, or instrumentality which owns or operates such facility shall, in consultation with the Administrator and appropriate State authorities, commence such an investigation and study for such facility within one year after October 17, 1986. The Administrator and appropriate State authorities shall publish a timetable and deadlines for expeditious completion of such investigation and study.

**(2) Commencement of remedial action; interagency agreement**

The Administrator shall review the results of each investigation and study conducted as provided in paragraph (1). Within 180 days thereafter, the head of the department, agency, or instrumentality concerned shall enter into an interagency agreement with the Administrator for the expeditious completion by such department, agency, or instrumentality of all necessary remedial action at such facility. Substantial continuous physical onsite remedial action shall be commenced at each facility not later than 15 months after completion of the investigation and study. All such interagency agreements, including review of alternative remedial action plans and selection of remedial action, shall comply with the public participation requirements of section 9617 of this title.

**(3) Completion of remedial actions**

ADD112

Remedial actions at facilities subject to interagency agreements under this section shall be completed as expeditiously as practicable. Each agency shall include in its annual budget submissions to the Congress a review of alternative agency funding which could be used to provide for the costs of remedial action. The budget submission shall also include a statement of the hazard posed by the facility to human health, welfare, and the environment and identify the specific consequences of failure to begin and complete remedial action.

**(4) Contents of agreement**

Each interagency agreement under this subsection shall include, but shall not be limited to, each of the following:

**(A)** A review of alternative remedial actions and selection of a remedial action by the head of the relevant department, agency, or instrumentality and the Administrator or, if unable to reach agreement on selection of a remedial action, selection by the Administrator.

**(B)** A schedule for the completion of each such remedial action.

**(C)** Arrangements for long-term operation and maintenance of the facility.

**(5) Annual report**

Each department, agency, or instrumentality responsible for compliance with this section shall furnish an annual report to the Congress concerning its progress in implementing the requirements of this section. Such reports shall include, but shall not be limited to, each of the following items:

**(A)** A report on the progress in reaching interagency agreements under this section.

**(B)** The specific cost estimates and budgetary proposals involved in each interagency agreement.

**(C)** A brief summary of the public comments regarding each proposed interagency agreement.

**(D)** A description of the instances in which no agreement was reached.

**(E)** A report on progress in conducting investigations and studies under paragraph (1).

**(F)** A report on progress in conducting remedial actions.

**(G)** A report on progress in conducting remedial action at facilities which are not listed on the National Priorities List.

With respect to instances in which no agreement was reached within the required time period, the department, agency, or instrumentality filing the report under this paragraph shall include in such report an explanation of the reasons why no agreement was reached. The annual report required by this paragraph shall also contain a detailed description on a State-

ADD113

by-State basis of the status of each facility subject to this section, including a description of the hazard presented by each facility, plans and schedules for initiating and completing response action, enforcement status (where appropriate), and an explanation of any postponements or failure to complete response action. Such reports shall also be submitted to the affected States.

**(6) Settlements with other parties**

If the Administrator, in consultation with the head of the relevant department, agency, or instrumentality of the United States, determines that remedial investigations and feasibility studies or remedial action will be done properly at the Federal facility by another potentially responsible party within the deadlines provided in paragraphs (1), (2), and (3) of this subsection, the Administrator may enter into an agreement with such party under section 9622 of this title (relating to settlements). Following approval by the Attorney General of any such agreement relating to a remedial action, the agreement shall be entered in the appropriate United States district court as a consent decree under section 9606 of this title.

**(f) State and local participation**

The Administrator and each department, agency, or instrumentality responsible for compliance with this section shall afford to relevant State and local officials the opportunity to participate in the planning and selection of the remedial action, including but not limited to the review of all applicable data as it becomes available and the development of studies, reports, and action plans. In the case of State officials, the opportunity to participate shall be provided in accordance with section 9621 of this title.

**(g) Transfer of authorities**

Except for authorities which are delegated by the Administrator to an officer or employee of the Environmental Protection Agency, no authority vested in the Administrator under this section may be transferred, by executive order of the President or otherwise, to any other officer or employee of the United States or to any other person.

**(h) Property transferred by Federal agencies**

**(1) Notice**

After the last day of the 6-month period beginning on the effective date of regulations under paragraph (2) of this subsection, whenever any department, agency, or instrumentality of the United States enters into any contract for the sale or other transfer of real property which is owned by the United States and on which any hazardous substance was stored for one year or more, known to have been released, or disposed of, the head of such department, agency, or instrumentality shall include in such contract notice of the type and quantity of such hazardous substance and notice of the time at which such storage, release, or disposal took place, to the extent such information is available on the basis of a complete search of agency files.

**(2) Form of notice; regulations**

Notice under this subsection shall be provided in such form and manner as may be provided in regulations promulgated by the Administrator. As promptly as practicable after October 17, 1986, but not later than 18 months after October 17, 1986, and after consultation with the Administrator of the General Services Administration, the Administrator shall promulgate regulations regarding the notice required to be provided under this subsection.

ADD114

**(3) Contents of certain deeds**

**(A) In general**

After the last day of the 6-month period beginning on the effective date of regulations under paragraph (2) of this subsection, in the case of any real property owned by the United States on which any hazardous substance was stored for one year or more, known to have been released, or disposed of, each deed entered into for the transfer of such property by the United States to any other person or entity shall contain--

**(i)** to the extent such information is available on the basis of a complete search of agency files--

**(I)** a notice of the type and quantity of such hazardous substances,

**(II)** notice of the time at which such storage, release, or disposal took place, and

**(III)** a description of the remedial action taken, if any;

**(ii)** a covenant warranting that--

**(I)** all remedial action necessary to protect human health and the environment with respect to any such substance remaining on the property has been taken before the date of such transfer, and

**(II)** any additional remedial action found to be necessary after the date of such transfer shall be conducted by the United States; and

**(iii)** a clause granting the United States access to the property in any case in which remedial action or corrective action is found to be necessary after the date of such transfer.

**(B) Covenant requirements**

For purposes of subparagraphs (A)(ii)(I) and (C)(iii), all remedial action described in such subparagraph has been taken if the construction and installation of an approved remedial design has been completed, and the remedy has been demonstrated to the Administrator to be operating properly and successfully. The carrying out of long-term pumping and treating, or operation and maintenance, after the remedy has been demonstrated to the Administrator to be operating properly and successfully does not preclude the transfer of the property. The requirements of subparagraph (A)(ii) shall not apply in any case in which the person or entity to whom the real property is transferred is a potentially responsible party with respect to such property. The requirements of subparagraph (A)(ii) shall not apply in any case in which the transfer of the property occurs or has occurred by means of a lease, without regard to whether the lessee has agreed to purchase the property or whether the duration of the lease is longer than 55 years. In the case of a lease entered into after September 30, 1995, with respect to real property located at an installation approved for closure or realignment under a base closure law, the agency leasing the property, in consultation with the Administrator, shall determine before leasing the property that the

ADD115

property is suitable for lease, that the uses contemplated for the lease are consistent with protection of human health and the environment, and that there are adequate assurances that the United States will take all remedial action referred to in subparagraph (A)(ii) that has not been taken on the date of the lease.

**(C) Deferral**

**(i) In general**

The Administrator, with the concurrence of the Governor of the State in which the facility is located (in the case of real property at a Federal facility that is listed on the National Priorities List), or the Governor of the State in which the facility is located (in the case of real property at a Federal facility not listed on the National Priorities List) may defer the requirement of subparagraph (A)(ii)(I) with respect to the property if the Administrator or the Governor, as the case may be, determines that the property is suitable for transfer, based on a finding that--

**(I)** the property is suitable for transfer for the use intended by the transferee, and the intended use is consistent with protection of human health and the environment;

**(II)** the deed or other agreement proposed to govern the transfer between the United States and the transferee of the property contains the assurances set forth in clause (ii);

**(III)** the Federal agency requesting deferral has provided notice, by publication in a newspaper of general circulation in the vicinity of the property, of the proposed transfer and of the opportunity for the public to submit, within a period of not less than 30 days after the date of the notice, written comments on the suitability of the property for transfer; and

**(IV)** the deferral and the transfer of the property will not substantially delay any necessary response action at the property.

**(ii) Response action assurances**

With regard to a release or threatened release of a hazardous substance for which a Federal agency is potentially responsible under this section, the deed or other agreement proposed to govern the transfer shall contain assurances that--

**(I)** provide for any necessary restrictions on the use of the property to ensure the protection of human health and the environment;

**(II)** provide that there will be restrictions on use necessary to ensure that required remedial investigations, response action, and oversight activities will not be disrupted;

**(III)** provide that all necessary response action will be taken and identify the schedules for investigation and completion of all necessary response action as approved by the appropriate regulatory agency; and

ADD116

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(IV)** provide that the Federal agency responsible for the property subject to transfer will submit a budget request to the Director of the Office of Management and Budget that adequately addresses schedules for investigation and completion of all necessary response action, subject to congressional authorizations and appropriations.

**(iii) Warranty**

When all response action necessary to protect human health and the environment with respect to any substance remaining on the property on the date of transfer has been taken, the United States shall execute and deliver to the transferee an appropriate document containing a warranty that all such response action has been taken, and the making of the warranty shall be considered to satisfy the requirement of subparagraph (A)(ii)(I).

**(iv) Federal responsibility**

A deferral under this subparagraph shall not increase, diminish, or affect in any manner any rights or obligations of a Federal agency (including any rights or obligations under this section and sections 9606 and 9607 of this title existing prior to transfer) with respect to a property transferred under this subparagraph.

**(4) Identification of uncontaminated property**

**(A)** In the case of real property to which this paragraph applies (as set forth in subparagraph (E)), the head of the department, agency, or instrumentality of the United States with jurisdiction over the property shall identify the real property on which no hazardous substances and no petroleum products or their derivatives were known to have been released or disposed of. Such identification shall be based on an investigation of the real property to determine or discover the obviousness of the presence or likely presence of a release or threatened release of any hazardous substance or any petroleum product or its derivatives, including aviation fuel and motor oil, on the real property. The identification shall consist, at a minimum, of a review of each of the following sources of information concerning the current and previous uses of the real property:

**(i)** A detailed search of Federal Government records pertaining to the property.

**(ii)** Recorded chain of title documents regarding the real property.

**(iii)** Aerial photographs that may reflect prior uses of the real property and that are reasonably obtainable through State or local government agencies.

**(iv)** A visual inspection of the real property and any buildings, structures, equipment, pipe, pipeline, or other improvements on the real property, and a visual inspection of properties immediately adjacent to the real property.

**(v)** A physical inspection of property adjacent to the real property, to the extent permitted by owners or operators of such property.

ADD117

**(vi)** Reasonably obtainable Federal, State, and local government records of each adjacent facility where there has been a release of any hazardous substance or any petroleum product or its derivatives, including aviation fuel and motor oil, and which is likely to cause or contribute to a release or threatened release of any hazardous substance or any petroleum product or its derivatives, including aviation fuel and motor oil, on the real property.

**(vii)** Interviews with current or former employees involved in operations on the real property.

Such identification shall also be based on sampling, if appropriate under the circumstances. The results of the identification shall be provided immediately to the Administrator and State and local government officials and made available to the public.

**(B)** The identification required under subparagraph (A) is not complete until concurrence in the results of the identification is obtained, in the case of real property that is part of a facility on the National Priorities List, from the Administrator, or, in the case of real property that is not part of a facility on the National Priorities List, from the appropriate State official. In the case of a concurrence which is required from a State official, the concurrence is deemed to be obtained if, within 90 days after receiving a request for the concurrence, the State official has not acted (by either concurring or declining to concur) on the request for concurrence.

**(C)(i)** Except as provided in clauses (ii), (iii), and (iv), the identification and concurrence required under subparagraphs (A) and (B), respectively, shall be made at least 6 months before the termination of operations on the real property.

**(ii)** In the case of real property described in subparagraph (E)(i)(II) on which operations have been closed or realigned or scheduled for closure or realignment pursuant to a base closure law described in subparagraph (E)(ii)(I) or (E)(ii)(II) by October 19, 1992, the identification and concurrence required under subparagraphs (A) and (B), respectively, shall be made not later than 18 months after October 19, 1992.

**(iii)** In the case of real property described in subparagraph (E)(i)(II) on which operations are closed or realigned or become scheduled for closure or realignment pursuant to the base closure law described in subparagraph (E)(ii)(II) after October 19, 1992, the identification and concurrence required under subparagraphs (A) and (B), respectively, shall be made not later than 18 months after the date by which a joint resolution disapproving the closure or realignment of the real property under section 2904(b) of such base closure law must be enacted, and such a joint resolution has not been enacted.

**(iv)** In the case of real property described in subparagraphs (E)(i)(II) on which operations are closed or realigned pursuant to a base closure law described in subparagraph (E)(ii)(III) or (E)(ii)(IV), the identification and concurrence required under subparagraphs (A) and (B), respectively, shall be made not later than 18 months after the date on which the real property is selected for closure or realignment pursuant to such a base closure law.

**(D)** In the case of the sale or other transfer of any parcel of real property identified under subparagraph (A), the deed entered into for the sale or transfer of such property by the United States to any other person or entity shall contain--

**(i)** a covenant warranting that any response action or corrective action found to be necessary after the date of such sale or transfer shall be conducted by the United States; and

ADD118

(ii) a clause granting the United States access to the property in any case in which a response action or corrective action is found to be necessary after such date at such property, or such access is necessary to carry out a response action or corrective action on adjoining property.

**(E)(i)** This paragraph applies to--

**(I)** real property owned by the United States and on which the United States plans to terminate Federal Government operations, other than real property described in subclause (II); and

**(II)** real property that is or has been used as a military installation and on which the United States plans to close or realign military operations pursuant to a base closure law.

**(ii)** For purposes of this paragraph, the term "base closure law" includes the following:

**(I)** Title II of the Defense Authorization Amendments and Base Closure and Realignment Act (Public Law 100-526; 10 U.S.C. 2687 note).

**(II)** The Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of Public Law 101-510; 10 U.S.C. 2687 note).

**(III)** Section 2687 of Title 10.

**(IV)** Any provision of law authorizing the closure or realignment of a military installation enacted on or after October 19, 1992.

**(F)** Nothing in this paragraph shall affect, preclude, or otherwise impair the termination of Federal Government operations on real property owned by the United States.

**(5) Notification of States regarding certain leases**

In the case of real property owned by the United States, on which any hazardous substance or any petroleum product or its derivatives (including aviation fuel and motor oil) was stored for one year or more, known to have been released, or disposed of, and on which the United States plans to terminate Federal Government operations, the head of the department, agency, or instrumentality of the United States with jurisdiction over the property shall notify the State in which the property is located of any lease entered into by the United States that will encumber the property beyond the date of termination of operations on the property. Such notification shall be made before entering into the lease and shall include the length of the lease, the name of person to whom the property is leased, and a description of the uses that will be allowed under the lease of the property and buildings and other structures on the property.

**(i) Obligations under Solid Waste Disposal Act**

ADD119

Nothing in this section shall affect or impair the obligation of any department, agency, or instrumentality of the United States to comply with any requirement of the Solid Waste Disposal Act (including corrective action requirements).

## (j) National security

### (1) Site specific Presidential orders

The President may issue such orders regarding response actions at any specified site or facility of the Department of Energy or the Department of Defense as may be necessary to protect the national security interests of the United States at that site or facility. Such orders may include, where necessary to protect such interests, an exemption from any requirement contained in this subchapter or under title III of the Superfund Amendments and Reauthorization Act of 1986 with respect to the site or facility concerned. The President shall notify the Congress within 30 days of the issuance of an order under this paragraph providing for any such exemption. Such notification shall include a statement of the reasons for the granting of the exemption. An exemption under this paragraph shall be for a specified period which may not exceed one year. Additional exemptions may be granted, each upon the President's issuance of a new order under this paragraph for the site or facility concerned. Each such additional exemption shall be for a specified period which may not exceed one year. It is the intention of the Congress that whenever an exemption is issued under this paragraph the response action shall proceed as expeditiously as practicable. The Congress shall be notified periodically of the progress of any response action with respect to which an exemption has been issued under this paragraph. No exemption shall be granted under this paragraph due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation.

### (2) Classified information

Notwithstanding any other provision of law, all requirements of the Atomic Energy Act and all Executive orders concerning the handling of restricted data and national security information, including "need to know" requirements, shall be applicable to any grant of access to classified information under the provisions of this chapter or under title III of the Superfund Amendments and Reauthorization Act of 1986.

## CREDIT(S)

(Pub.L. 96-510, Title I, § 120, as added Pub.L. 99-499, Title I, § 120(a), Oct. 17, 1986, 100 Stat. 1666; amended Pub.L. 102-426, §§ 3 to 5, Oct. 19, 1992, 106 Stat. 2175 to 2177; Pub.L. 104-106, Div. B, Title XXVIII, § 2834, Feb. 10, 1996, 110 Stat. 559; Pub.L. 104-201, Div. A, Title III, §§ 330, 331, 334, Sept. 23, 1996, 110 Stat. 2484, 2486.)

Notes of Decisions (41)

42 U.S.C.A. § 9620, 42 USCA § 9620
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD120

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
      Subchapter I. Hazardous Substances Releases, Liability, Compensation (Refs & Annos)

42 U.S.C.A. § 9622

§ 9622. Settlements

Currentness

**(a) Authority to enter into agreements**

The President, in his discretion, may enter into an agreement with any person (including the owner or operator of the facility from which a release or substantial threat of release emanates, or any other potentially responsible person), to perform any response action (including any action described in section 9604(b) of this title) if the President determines that such action will be done properly by such person. Whenever practicable and in the public interest, as determined by the President, the President shall act to facilitate agreements under this section that are in the public interest and consistent with the National Contingency Plan in order to expedite effective remedial actions and minimize litigation. If the President decides not to use the procedures in this section, the President shall notify in writing potentially responsible parties at the facility of such decision and the reasons why use of the procedures is inappropriate. A decision of the President to use or not to use the procedures in this section is not subject to judicial review.

**(b) Agreements with potentially responsible parties**

**(1) Mixed funding**

An agreement under this section may provide that the President will reimburse the parties to the agreement from the Fund, with interest, for certain costs of actions under the agreement that the parties have agreed to perform but which the President has agreed to finance. In any case in which the President provides such reimbursement, the President shall make all reasonable efforts to recover the amount of such reimbursement under section 9607 of this title or under other relevant authorities.

**(2) Reviewability**

The President's decisions regarding the availability of fund financing under this subsection shall not be subject to judicial review under subsection (d).

**(3) Retention of funds**

If, as part of any agreement, the President will be carrying out any action and the parties will be paying amounts to the President, the President may, notwithstanding any other provision of law, retain and use such amounts for purposes of carrying out the agreement.

**(4) Future obligation of Fund**

ADD121

In the case of a completed remedial action pursuant to an agreement described in paragraph (1), the Fund shall be subject to an obligation for subsequent remedial actions at the same facility but only to the extent that such subsequent actions are necessary by reason of the failure of the original remedial action. Such obligation shall be in a proportion equal to, but not exceeding, the proportion contributed by the Fund for the original remedial action. The Fund's obligation for such future remedial action may be met through Fund expenditures or through payment, following settlement or enforcement action, by parties who were not signatories to the original agreement.

## (c) Effect of agreement

### (1) Liability

Whenever the President has entered into an agreement under this section, the liability to the United States under this chapter of each party to the agreement, including any future liability to the United States, arising from the release or threatened release that is the subject of the agreement shall be limited as provided in the agreement pursuant to a covenant not to sue in accordance with subsection (f). A covenant not to sue may provide that future liability to the United States of a settling potentially responsible party under the agreement may be limited to the same proportion as that established in the original settlement agreement. Nothing in this section shall limit or otherwise affect the authority of any court to review in the consent decree process under subsection (d) any covenant not to sue contained in an agreement under this section. In determining the extent to which the liability of parties to an agreement shall be limited pursuant to a covenant not to sue, the President shall be guided by the principle that a more complete covenant not to sue shall be provided for a more permanent remedy undertaken by such parties.

### (2) Actions against other persons

If an agreement has been entered into under this section, the President may take any action under section 9606 of this title against any person who is not a party to the agreement, once the period for submitting a proposal under subsection (e)(2)(B) has expired. Nothing in this section shall be construed to affect either of the following:

**(A)** The liability of any person under section 9606 or 9607 of this title with respect to any costs or damages which are not included in the agreement.

**(B)** The authority of the President to maintain an action under this chapter against any person who is not a party to the agreement.

## (d) Enforcement

### (1) Cleanup agreements

#### (A) Consent decree

Whenever the President enters into an agreement under this section with any potentially responsible party with respect to remedial action under section 9606 of this title, following approval of the agreement by the Attorney General, except

ADD122

as otherwise provided in the case of certain administrative settlements referred to in subsection (g), the agreement shall be entered in the appropriate United States district court as a consent decree. The President need not make any finding regarding an imminent and substantial endangerment to the public health or the environment in connection with any such agreement or consent decree.

**(B) Effect**

The entry of any consent decree under this subsection shall not be construed to be an acknowledgment by the parties that the release or threatened release concerned constitutes an imminent and substantial endangerment to the public health or welfare or the environment. Except as otherwise provided in the Federal Rules of Evidence, the participation by any party in the process under this section shall not be considered an admission of liability for any purpose, and the fact of such participation shall not be admissible in any judicial or administrative proceeding, including a subsequent proceeding under this section.

**(C) Structure**

The President may fashion a consent decree so that the entering of such decree and compliance with such decree or with any determination or agreement made pursuant to this section shall not be considered an admission of liability for any purpose.

**(2) Public participation**

**(A) Filing of proposed judgment**

At least 30 days before a final judgment is entered under paragraph (1), the proposed judgment shall be filed with the court.

**(B) Opportunity for comment**

The Attorney General shall provide an opportunity to persons who are not named as parties to the action to comment on the proposed judgment before its entry by the court as a final judgment. The Attorney General shall consider, and file with the court, any written comments, views, or allegations relating to the proposed judgment. The Attorney General may withdraw or withhold its consent to the proposed judgment if the comments, views, and allegations concerning the judgment disclose facts or considerations which indicate that the proposed judgment is inappropriate, improper, or inadequate.

**(3) 9604(b) agreements**

Whenever the President enters into an agreement under this section with any potentially responsible party with respect to action under section 9604(b) of this title, the President shall issue an order or enter into a decree setting forth the obligations of such party. The United States district court for the district in which the release or threatened release occurs may enforce such order or decree.

**(e) Special notice procedures**

**(1) Notice**

ADD123

Whenever the President determines that a period of negotiation under this subsection would facilitate an agreement with potentially responsible parties for taking response action (including any action described in section 9604(b) of this title) and would expedite remedial action, the President shall so notify all such parties and shall provide them with information concerning each of the following:

(A) The names and addresses of potentially responsible parties (including owners and operators and other persons referred to in section 9607(a) of this title), to the extent such information is available.

(B) To the extent such information is available, the volume and nature of substances contributed by each potentially responsible party identified at the facility.

(C) A ranking by volume of the substances at the facility, to the extent such information is available.

The President shall make the information referred to in this paragraph available in advance of notice under this paragraph upon the request of a potentially responsible party in accordance with procedures provided by the President. The provisions of subsection (e) of section 9604 of this title regarding protection of confidential information apply to information provided under this paragraph. Disclosure of information generated by the President under this section to persons other than the Congress, or any duly authorized Committee thereof, is subject to other privileges or protections provided by law, including (but not limited to) those applicable to attorney work product. Nothing contained in this paragraph or in other provisions of this chapter shall be construed, interpreted, or applied to diminish the required disclosure of information under other provisions of this or other Federal or State laws.

**(2) Negotiation**

**(A) Moratorium**

Except as provided in this subsection, the President may not commence action under section 9604(a) of this title or take any action under section 9606 of this title for 120 days after providing notice and information under this subsection with respect to such action. Except as provided in this subsection, the President may not commence a remedial investigation and feasibility study under section 9604(b) of this title for 90 days after providing notice and information under this subsection with respect to such action. The President may commence any additional studies or investigations authorized under section 9604(b) of this title, including remedial design, during the negotiation period.

**(B) Proposals**

Persons receiving notice and information under paragraph (1) of this subsection with respect to action under section 9606 of this title shall have 60 days from the date of receipt of such notice to make a proposal to the President for undertaking or financing the action under section 9606 of this title. Persons receiving notice and information under paragraph (1) of this subsection with respect to action under section 9604(b) of this title shall have 60 days from the date of receipt of such notice to make a proposal to the President for undertaking or financing the action under section 9604(b) of this title.

**(C) Additional parties**

ADD124

If an additional potentially responsible party is identified during the negotiation period or after an agreement has been entered into under this subsection concerning a release or threatened release, the President may bring the additional party into the negotiation or enter into a separate agreement with such party.

**(3) Preliminary allocation of responsibility**

**(A) In general**

The President shall develop guidelines for preparing nonbinding preliminary allocations of responsibility. In developing these guidelines the President may include such factors as the President considers relevant, such as: volume, toxicity, mobility, strength of evidence, ability to pay, litigative risks, public interest considerations, precedential value, and inequities and aggravating factors. When it would expedite settlements under this section and remedial action, the President may, after completion of the remedial investigation and feasibility study, provide a nonbinding preliminary allocation of responsibility which allocates percentages of the total cost of response among potentially responsible parties at the facility.

**(B) Collection of information**

To collect information necessary or appropriate for performing the allocation under subparagraph (A) or for otherwise implementing this section, the President may by subpoena require the attendance and testimony of witnesses and the production of reports, papers, documents, answers to questions, and other information that the President deems necessary. Witnesses shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In the event of contumacy or failure or refusal of any person to obey any such subpoena, any district court of the United States in which venue is proper shall have jurisdiction to order any such person to comply with such subpoena. Any failure to obey such an order of the court is punishable by the court as a contempt thereof.

**(C) Effect**

The nonbinding preliminary allocation of responsibility shall not be admissible as evidence in any proceeding, and no court shall have jurisdiction to review the nonbinding preliminary allocation of responsibility. The nonbinding preliminary allocation of responsibility shall not constitute an apportionment or other statement on the divisibility of harm or causation.

**(D) Costs**

The costs incurred by the President in producing the nonbinding preliminary allocation of responsibility shall be reimbursed by the potentially responsible parties whose offer is accepted by the President. Where an offer under this section is not accepted, such costs shall be considered costs of response.

**(E) Decision to reject offer**

Where the President, in his discretion, has provided a nonbinding preliminary allocation of responsibility and the potentially responsible parties have made a substantial offer providing for response to the President which he rejects, the reasons for the rejection shall be provided in a written explanation. The President's decision to reject such an offer shall not be subject to judicial review.

ADD125

**(4) Failure to propose**

If the President determines that a good faith proposal for undertaking or financing action under section 9606 of this title has not been submitted within 60 days of the provision of notice pursuant to this subsection, the President may thereafter commence action under section 9604(a) of this title or take an action against any person under section 9606 of this title. If the President determines that a good faith proposal for undertaking or financing action under section 9604(b) of this title has not been submitted within 60 days after the provision of notice pursuant to this subsection, the President may thereafter commence action under section 9604(b) of this title.

**(5) Significant threats**

Nothing in this subsection shall limit the President's authority to undertake response or enforcement action regarding a significant threat to public health or the environment within the negotiation period established by this subsection.

**(6) Inconsistent response action**

When either the President, or a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation and feasibility study for a particular facility under this chapter, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President.

**(f) Covenant not to sue**

**(1) Discretionary covenants**

The President may, in his discretion, provide any person with a covenant not to sue concerning any liability to the United States under this chapter, including future liability, resulting from a release or threatened release of a hazardous substance addressed by a remedial action, whether that action is onsite or offsite, if each of the following conditions is met:

**(A)** The covenant not to sue is in the public interest.

**(B)** The covenant not to sue would expedite response action consistent with the National Contingency Plan under section 9605 of this title.

**(C)** The person is in full compliance with a consent decree under section 9606 of this title (including a consent decree entered into in accordance with this section) for response to the release or threatened release concerned.

**(D)** The response action has been approved by the President.

**(2) Special covenants not to sue**

ADD126

In the case of any person to whom the President is authorized under paragraph (1) of this subsection to provide a covenant not to sue, for the portion of remedial action--

**(A)** which involves the transport and secure disposition offsite of hazardous substances in a facility meeting the requirements of sections 6924(c), (d), (e), (f), (g), (m), (o), (p), (u), and (v) and 6925(c) of this title, where the President has rejected a proposed remedial action that is consistent with the National Contingency Plan that does not include such offsite disposition and has thereafter required offsite disposition; or

**(B)** which involves the treatment of hazardous substances so as to destroy, eliminate, or permanently immobilize the hazardous constituents of such substances, such that, in the judgment of the President, the substances no longer present any current or currently foreseeable future significant risk to public health, welfare or the environment, no byproduct of the treatment or destruction process presents any significant hazard to public health, welfare or the environment, and all byproducts are themselves treated, destroyed, or contained in a manner which assures that such byproducts do not present any current or currently foreseeable future significant risk to public health, welfare or the environment,

the President shall provide such person with a covenant not to sue with respect to future liability to the United States under this chapter for a future release or threatened release of hazardous substances from such facility, and a person provided such covenant not to sue shall not be liable to the United States under section 9606 or 9607 of this title with respect to such release or threatened release at a future time.

**(3) Requirement that remedial action be completed**

A covenant not to sue concerning future liability to the United States shall not take effect until the President certifies that remedial action has been completed in accordance with the requirements of this chapter at the facility that is the subject of such covenant.

**(4) Factors**

In assessing the appropriateness of a covenant not to sue under paragraph (1) and any condition to be included in a covenant not to sue under paragraph (1) or (2), the President shall consider whether the covenant or condition is in the public interest on the basis of such factors as the following:

**(A)** The effectiveness and reliability of the remedy, in light of the other alternative remedies considered for the facility concerned.

**(B)** The nature of the risks remaining at the facility.

**(C)** The extent to which performance standards are included in the order or decree.

**(D)** The extent to which the response action provides a complete remedy for the facility, including a reduction in the hazardous nature of the substances at the facility.

**(E)** The extent to which the technology used in the response action is demonstrated to be effective.

ADD127

**(F)** Whether the Fund or other sources of funding would be available for any additional remedial actions that might eventually be necessary at the facility.

**(G)** Whether the remedial action will be carried out, in whole or in significant part, by the responsible parties themselves.

**(5) Satisfactory performance**

Any covenant not to sue under this subsection shall be subject to the satisfactory performance by such party of its obligations under the agreement concerned.

**(6) Additional condition for future liability**

**(A)** Except for the portion of the remedial action which is subject to a covenant not to sue under paragraph (2) or under subsection (g) (relating to de minimis settlements), a covenant not to sue a person concerning future liability to the United States shall include an exception to the covenant that allows the President to sue such person concerning future liability resulting from the release or threatened release that is the subject of the covenant where such liability arises out of conditions which are unknown at the time the President certifies under paragraph (3) that remedial action has been completed at the facility concerned.

**(B)** In extraordinary circumstances, the President may determine, after assessment of relevant factors such as those referred to in paragraph (4) and volume, toxicity, mobility, strength of evidence, ability to pay, litigative risks, public interest considerations, precedential value, and inequities and aggravating factors, not to include the exception referred to in subparagraph (A) if other terms, conditions, or requirements of the agreement containing the covenant not to sue are sufficient to provide all reasonable assurances that public health and the environment will be protected from any future releases at or from the facility.

**(C)** The President is authorized to include any provisions allowing future enforcement action under section 9606 or 9607 of this title that in the discretion of the President are necessary and appropriate to assure protection of public health, welfare, and the environment.

**(g) De minimis settlements**

**(1) Expedited final settlement**

Whenever practicable and in the public interest, as determined by the President, the President shall as promptly as possible reach a final settlement with a potentially responsible party in an administrative or civil action under section 9606 or 9607 of this title if such settlement involves only a minor portion of the response costs at the facility concerned and, in the judgment of the President, the conditions in either of the following subparagraph (A) or (B) are met:

**(A)** Both of the following are minimal in comparison to other hazardous substances at the facility:

ADD128

**(i)** The amount of the hazardous substances contributed by that party to the facility.

**(ii)** The toxic or other hazardous effects of the substances contributed by that party to the facility.

**(B)** The potentially responsible party--

**(i)** is the owner of the real property on or in which the facility is located;

**(ii)** did not conduct or permit the generation, transportation, storage, treatment, or disposal of any hazardous substance at the facility; and

**(iii)** did not contribute to the release or threat of release of a hazardous substance at the facility through any action or omission.

This subparagraph (B) does not apply if the potentially responsible party purchased the real property with actual or constructive knowledge that the property was used for the generation, transportation, storage, treatment, or disposal of any hazardous substance.

**(2) Covenant not to sue**

The President may provide a covenant not to sue with respect to the facility concerned to any party who has entered into a settlement under this subsection unless such a covenant would be inconsistent with the public interest as determined under subsection (f).

**(3) Expedited agreement**

The President shall reach any such settlement or grant any such covenant not to sue as soon as possible after the President has available the information necessary to reach such a settlement or grant such a covenant.

**(4) Consent decree or administrative order**

A settlement under this subsection shall be entered as a consent decree or embodied in an administrative order setting forth the terms of the settlement. In the case of any facility where the total response costs exceed $500,000 (excluding interest), if the settlement is embodied as an administrative order, the order may be issued only with the prior written approval of the Attorney General. If the Attorney General or his designee has not approved or disapproved the order within 30 days of this referral, the order shall be deemed to be approved unless the Attorney General and the Administrator have agreed to extend the time. The district court for the district in which the release or threatened release occurs may enforce any such administrative order.

**(5) Effect of agreement**

ADD129

A party who has resolved its liability to the United States under this subsection shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially responsible parties unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

**(6) Settlements with other potentially responsible parties**

Nothing in this subsection shall be construed to affect the authority of the President to reach settlements with other potentially responsible parties under this chapter.

**(7) Reduction in settlement amount based on limited ability to pay**

**(A) In general**

The condition for settlement under this paragraph is that the potentially responsible party is a person who demonstrates to the President an inability or a limited ability to pay response costs.

**(B) Considerations**

In determining whether or not a demonstration is made under subparagraph (A) by a person, the President shall take into consideration the ability of the person to pay response costs and still maintain its basic business operations, including consideration of the overall financial condition of the person and demonstrable constraints on the ability of the person to raise revenues.

**(C) Information**

A person requesting settlement under this paragraph shall promptly provide the President with all relevant information needed to determine the ability of the person to pay response costs.

**(D) Alternative payment methods**

If the President determines that a person is unable to pay its total settlement amount at the time of settlement, the President shall consider such alternative payment methods as may be necessary or appropriate.

**(8) Additional conditions for expedited settlements**

**(A) Waiver of claims**

The President shall require, as a condition for settlement under this subsection, that a potentially responsible party waive all of the claims (including a claim for contribution under this chapter) that the party may have against other potentially responsible parties for response costs incurred with respect to the facility, unless the President determines that requiring a waiver would be unjust.

**(B) Failure to comply**

ADD130

The President may decline to offer a settlement to a potentially responsible party under this subsection if the President determines that the potentially responsible party has failed to comply with any request for access or information or an administrative subpoena issued by the President under this chapter or has impeded or is impeding, through action or inaction, the performance of a response action with respect to the facility.

**(C) Responsibility to provide information and access**

A potentially responsible party that enters into a settlement under this subsection shall not be relieved of the responsibility to provide any information or access requested in accordance with subsection (e)(3)(B) or section 9604(e) of this title.

**(9) Basis of determination**

If the President determines that a potentially responsible party is not eligible for settlement under this subsection, the President shall provide the reasons for the determination in writing to the potentially responsible party that requested a settlement under this subsection.

**(10) Notification**

As soon as practicable after receipt of sufficient information to make a determination, the President shall notify any person that the President determines is eligible under paragraph (1) of the person's eligibility for an expedited settlement.

**(11) No judicial review**

A determination by the President under paragraph (7), (8), (9), or (10) shall not be subject to judicial review.

**(12) Notice of settlement**

After a settlement under this subsection becomes final with respect to a facility, the President shall promptly notify potentially responsible parties at the facility that have not resolved their liability to the United States of the settlement.

**(h) Cost recovery settlement authority**

**(1) Authority to settle**

The head of any department or agency with authority to undertake a response action under this chapter pursuant to the national contingency plan may consider, compromise, and settle a claim under section 9607 of this title for costs incurred by the United States Government if the claim has not been referred to the Department of Justice for further action. In the case of any facility where the total response costs exceed $500,000 (excluding interest), any claim referred to in the preceding sentence may be compromised and settled only with the prior written approval of the Attorney General.

**(2) Use of arbitration**

ADD131

Arbitration in accordance with regulations promulgated under this subsection may be used as a method of settling claims of the United States where the total response costs for the facility concerned do not exceed $500,000 (excluding interest). After consultation with the Attorney General, the department or agency head may establish and publish regulations for the use of arbitration or settlement under this subsection.

**(3) Recovery of claims**

If any person fails to pay a claim that has been settled under this subsection, the department or agency head shall request the Attorney General to bring a civil action in an appropriate district court to recover the amount of such claim, plus costs, attorneys' fees, and interest from the date of the settlement. In such an action, the terms of the settlement shall not be subject to review.

**(4) Claims for contribution**

A person who has resolved its liability to the United States under this subsection shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement shall not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

**(i) Settlement procedures**

**(1) Publication in Federal Register**

At least 30 days before any settlement (including any settlement arrived at through arbitration) may become final under subsection (h), or under subsection (g) in the case of a settlement embodied in an administrative order, the head of the department or agency which has jurisdiction over the proposed settlement shall publish in the Federal Register notice of the proposed settlement. The notice shall identify the facility concerned and the parties to the proposed settlement.

**(2) Comment period**

For a 30-day period beginning on the date of publication of notice under paragraph (1) of a proposed settlement, the head of the department or agency which has jurisdiction over the proposed settlement shall provide an opportunity for persons who are not parties to the proposed settlement to file written comments relating to the proposed settlement.

**(3) Consideration of comments**

The head of the department or agency shall consider any comments filed under paragraph (2) in determining whether or not to consent to the proposed settlement and may withdraw or withhold consent to the proposed settlement if such comments disclose facts or considerations which indicate the proposed settlement is inappropriate, improper, or inadequate.

**(j) Natural resources**

**(1) Notification of trustee**

ADD132

Where a release or threatened release of any hazardous substance that is the subject of negotiations under this section may have resulted in damages to natural resources under the trusteeship of the United States, the President shall notify the Federal natural resource trustee of the negotiations and shall encourage the participation of such trustee in the negotiations.

**(2) Covenant not to sue**

An agreement under this section may contain a covenant not to sue under section 9607(a)(4)(C) of this title for damages to natural resources under the trusteeship of the United States resulting from the release or threatened release of hazardous substances that is the subject of the agreement, but only if the Federal natural resource trustee has agreed in writing to such covenant. The Federal natural resource trustee may agree to such covenant if the potentially responsible party agrees to undertake appropriate actions necessary to protect and restore the natural resources damaged by such release or threatened release of hazardous substances.

**(k) Section not applicable to vessels**

The provisions of this section shall not apply to releases from a vessel.

**(l) Civil penalties**

A potentially responsible party which is a party to an administrative order or consent decree entered pursuant to an agreement under this section or section 9620 of this title (relating to Federal facilities) or which is a party to an agreement under section 9620 of this title and which fails or refuses to comply with any term or condition of the order, decree or agreement shall be subject to a civil penalty in accordance with section 9609 of this title.

**(m) Applicability of general principles of law**

In the case of consent decrees and other settlements under this section (including covenants not to sue), no provision of this chapter shall be construed to preclude or otherwise affect the applicability of general principles of law regarding the setting aside or modification of consent decrees or other settlements.

## CREDIT(S)

(Pub.L. 96-510, Title I, § 122, as added Pub.L. 99-499, Title I, § 122(a), Oct. 17, 1986, 100 Stat. 1678; amended Pub.L. 107-118, Title I, § 102(b), Jan. 11, 2002, 115 Stat. 2359.)

Notes of Decisions (146)

42 U.S.C.A. § 9622, 42 USCA § 9622
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD133

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #24-1193      Document #2153240      Filed: 01/07/2026      Page 139 of 204

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 103. Comprehensive Environmental Response, Compensation, and Liability (Refs & Annos)
      Subchapter III. Miscellaneous Provisions

42 U.S.C.A. § 9656

§ 9656. Transportation of hazardous substances; listing as hazardous material; liability for release

Currentness

**(a)** Each hazardous substance which is listed or designated as provided in section 9601(14) of this title shall, within 30 days after October 17, 1986, or at the time of such listing or designation, whichever is later, be listed and regulated as a hazardous material under chapter 51 of Title 49.

**(b)** A common or contract carrier shall be liable under other law in lieu of section 9607 of this title for damages or remedial action resulting from the release of a hazardous substance during the course of transportation which commenced prior to the effective date of the listing and regulation of such substance as a hazardous material under chapter 51 of Title 49, or for substances listed pursuant to subsection (a) of this section, prior to the effective date of such listing: *Provided, however,* That this subsection shall not apply where such a carrier can demonstrate that he did not have actual knowledge of the identity or nature of the substance released.

**CREDIT(S)**

(Pub.L. 96-510, Title III, § 306(a), (b), Dec. 11, 1980, 94 Stat. 2810; Pub.L. 99-499, Title II, § 202, Oct. 17, 1986, 100 Stat. 1695.)

42 U.S.C.A. § 9656, 42 USCA § 9656
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

End of Document                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD134

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 116. Emergency Planning and Community Right-to-Know (Refs & Annos)
      Subchapter I. Emergency Planning and Notification

42 U.S.C.A. § 11004

§ 11004. Emergency notification

Currentness

## (a) Types of releases

### (1) 11002(a) substance which requires CERCLA notice

If a release of an extremely hazardous substance referred to in section 11002(a) of this title occurs from a facility at which a hazardous chemical is produced, used, or stored, and such release requires a notification under section 103(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (hereafter in this section referred to as "CERCLA") (42 U.S.C. 9601 et seq.), the owner or operator of the facility shall immediately provide notice as described in subsection (b).

### (2) Other 11002(a) substance

If a release of an extremely hazardous substance referred to in section 11002(a) of this title occurs from a facility at which a hazardous chemical is produced, used, or stored, and such release is not subject to the notification requirements under section 103(a) of CERCLA, the owner or operator of the facility shall immediately provide notice as described in subsection (b), but only if the release--

**(A)** is not a federally permitted release as defined in section 101(10) of CERCLA,

**(B)** is in an amount in excess of a quantity which the Administrator has determined (by regulation) requires notice, and

**(C)** occurs in a manner which would require notification under section 103(a) of CERCLA.

Unless and until superseded by regulations establishing a quantity for an extremely hazardous substance described in this paragraph, a quantity of 1 pound shall be deemed that quantity the release of which requires notice as described in subsection (b).

### (3) Non-11002(a) substance which requires CERCLA notice

ADD135

If a release of a substance which is not on the list referred to in section 11002(a) of this title occurs at a facility at which a hazardous chemical is produced, used, or stored, and such release requires notification under section 103(a) of CERCLA, the owner or operator shall provide notice as follows:

**(A)** If the substance is one for which a reportable quantity has been established under section 102(a) of CERCLA, the owner or operator shall provide notice as described in subsection (b).

**(B)** If the substance is one for which a reportable quantity has not been established under section 102(a) of CERCLA--

**(i)** Until April 30, 1988, the owner or operator shall provide, for releases of one pound or more of the substance, the same notice to the community emergency coordinator for the local emergency planning committee, at the same time and in the same form, as notice is provided to the National Response Center under section 103(a) of CERCLA.

**(ii)** On and after April 30, 1988, the owner or operator shall provide, for releases of one pound or more of the substance, the notice as described in subsection (b).

**(4) Exempted releases**

This section does not apply to any release which results in exposure to persons solely within the site or sites on which a facility is located.

**(b) Notification**

**(1) Recipients of notice**

Notice required under subsection (a) shall be given immediately after the release by the owner or operator of a facility (by such means as telephone, radio, or in person) to the community emergency coordinator for the local emergency planning committees, if established pursuant to section 11001(c) of this title, for any area likely to be affected by the release and to the State emergency response commission of any State likely to be affected by the release. With respect to transportation of a substance subject to the requirements of this section, or storage incident to such transportation, the notice requirements of this section with respect to a release shall be satisfied by dialing 911 or, in the absence of a 911 emergency telephone number, calling the operator.

**(2) Contents**

Notice required under subsection (a) shall include each of the following (to the extent known at the time of the notice and so long as no delay in responding to the emergency results):

**(A)** The chemical name or identity of any substance involved in the release.

**(B)** An indication of whether the substance is on the list referred to in section 11002(a) of this title.

ADD136

**(C)** An estimate of the quantity of any such substance that was released into the environment.

**(D)** The time and duration of the release.

**(E)** The medium or media into which the release occurred.

**(F)** Any known or anticipated acute or chronic health risks associated with the emergency and, where appropriate, advice regarding medical attention necessary for exposed individuals.

**(G)** Proper precautions to take as a result of the release, including evacuation (unless such information is readily available to the community emergency coordinator pursuant to the emergency plan).

**(H)** The name and telephone number of the person or persons to be contacted for further information.

**(c) Followup emergency notice**

As soon as practicable after a release which requires notice under subsection (a), such owner or operator shall provide a written followup emergency notice (or notices, as more information becomes available) setting forth and updating the information required under subsection (b), and including additional information with respect to--

**(1)** actions taken to respond to and contain the release,

**(2)** any known or anticipated acute or chronic health risks associated with the release, and

**(3)** where appropriate, advice regarding medical attention necessary for exposed individuals.

**(d) Transportation exemption not applicable**

The exemption provided in section 11047 of this title (relating to transportation) does not apply to this section.

**(e) Addressing source water used for drinking water**

**(1) Applicable State agency notification**

A State emergency response commission shall--

**(A)** promptly notify the applicable State agency of any release that requires notice under subsection (a);

ADD137

**(B)** provide to the applicable State agency the information identified in subsection (b)(2); and

**(C)** provide to the applicable State agency a written followup emergency notice in accordance with subsection (c).

### (2) Community water system notification

#### (A) In general

An applicable State agency receiving notice of a release under paragraph (1) shall--

**(i)** promptly forward such notice to any community water system the source waters of which are affected by the release;

**(ii)** forward to the community water system the information provided under paragraph (1)(B); and

**(iii)** forward to the community water system the written followup emergency notice provided under paragraph (1)(C).

#### (B) Direct notification

In the case of a State that does not have an applicable State agency, the State emergency response commission shall provide the notices and information described in paragraph (1) directly to any community water system the source waters of which are affected by a release that requires notice under subsection (a).

### (3) Definitions

In this subsection:

#### (A) Community water system

The term "community water system" has the meaning given such term in section 1401(15) of the Safe Drinking Water Act.

#### (B) Applicable State agency

The term "applicable State agency" means the State agency that has primary responsibility to enforce the requirements of the Safe Drinking Water Act in the State.

**CREDIT(S)**

(Pub.L. 99-499, Title III, § 304, Oct. 17, 1986, 100 Stat. 1733; Pub.L. 115-270, Title II, § 2018(a), Oct. 23, 2018, 132 Stat. 3857.)

ADD138

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter J. Superfund, Emergency Planning, and Community Right–to–Know Programs
        Part 300. National Oil and Hazardous Substances Pollution Contingency Plan (Refs & Annos)
          Subpart E. Hazardous Substance Response (Refs & Annos)

40 C.F.R. § 300.400

§ 300.400 General.

Currentness

(a) This subpart establishes methods and criteria for determining the appropriate extent of response authorized by CERCLA and CWA section 311(c):

(1) When there is a release of a hazardous substance into the environment; or

(2) When there is a release into the environment of any pollutant or contaminant that may present an imminent and substantial danger to the public health or welfare of the United States.

(b) Limitations on response. Unless the lead agency determines that a release constitutes a public health or environmental emergency and no other person with the authority and capability to respond will do so in a timely manner, a removal or remedial action under section 104 of CERCLA shall not be undertaken in response to a release:

(1) Of a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found;

(2) From products that are part of the structure of, and result in exposure within, residential buildings or business or community structures; or

(3) Into public or private drinking water supplies due to deterioration of the system through ordinary use.

(c) Fund-financed action. In determining the need for and in planning or undertaking Fund-financed action, the lead agency shall, to the extent practicable:

(1) Engage in prompt response;

(2) Provide for state participation in response actions, as described in subpart F of this part;

ADD139

USCA Case #24-1193    Document #2153240    Filed: 01/07/2026    Page 145 of 204

(3) Conserve Fund monies by encouraging private party response;

(4) Be sensitive to local community concerns;

(5) Consider using treatment technologies;

(6) Involve the Regional Response Team (RRT) in both removal and remedial response actions at appropriate decision-making stages;

(7) Encourage the involvement and sharing of technology by industry and other experts; and

(8) Encourage the involvement of organizations to coordinate responsible party actions, foster site response, and provide technical advice to the public, federal and state governments, and industry.

(d) Entry and access.

(1) For purposes of determining the need for response, or choosing or taking a response action, or otherwise enforcing the provisions of CERCLA, EPA, or the appropriate federal agency, and a state or political subdivision operating pursuant to a contract or cooperative agreement under CERCLA section 104(d)(1), has the authority to enter any vessel, facility, establishment or other place, property, or location described in paragraph (d)(2) of this section and conduct, complete, operate, and maintain any response actions authorized by CERCLA or these regulations.

(2)(i) Under the authorities described in paragraph (d)(1) of this section, EPA, or the appropriate federal agency, and a state or political subdivision operating pursuant to a contract or cooperative agreement under CERCLA section 104(d)(1), may enter:

(A) Any vessel, facility, establishment, or other place or property where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed of, or transported from;

(B) Any vessel, facility, establishment, or other place or property from which, or to which, a hazardous substance or pollutant or contaminant has been, or may have been, released or where such release is or may be threatened;

(C) Any vessel, facility, establishment, or other place or property where entry is necessary to determine the need for response or the appropriate response or to effectuate a response action; or

(D) Any vessel, facility, establishment, or other place, property, or location adjacent to those vessels, facilities, establishments, places, or properties described in paragraphs (d)(2)(i)(A), (B), or (C) of this section.

ADD140

(ii) Once a determination has been made that there is a reasonable basis to believe that there has been or may be a release, EPA, or the appropriate federal agency, and a state or political subdivision operating pursuant to a contract or cooperative agreement under CERCLA section 104(d)(1), is authorized to enter all vessels, facilities, establishments, places, properties, or locations specified in paragraph (d)(2)(i) of this section, at which the release is believed to be, and all other vessels, facilities, establishments, places, properties, or locations identified in paragraph (d)(2)(i) of this section that are related to the response or are necessary to enter in responding to that release.

(3) The lead agency may designate as its representative solely for the purpose of access, among others, one or more potentially responsible parties, including representatives, employees, agents, and contractors of such parties. EPA, or the appropriate federal agency, may exercise the authority contained in section 104(e) of CERCLA to obtain access for its designated representative. A potentially responsible party may only be designated as a representative of the lead agency where that potentially responsible party has agreed to conduct response activities pursuant to an administrative order or consent decree.

(4)(i) If consent is not granted under the authorities described in paragraph (d)(1) of this section, or if consent is conditioned in any manner, EPA, or the appropriate federal agency, may issue an order pursuant to section 104(e)(5) of CERCLA directing compliance with the request for access made under § 300.400(d)(1). EPA or the appropriate federal agency may ask the Attorney General to commence a civil action to compel compliance with either a request for access or an order directing compliance.

(ii) EPA reserves the right to proceed, where appropriate, under applicable authority other than CERCLA section 104(e).

(iii) The administrative order may direct compliance with a request to enter or inspect any vessel, facility, establishment, place, property, or location described in paragraph (d)(2) of this section.

(iv) Each order shall contain:

(A) A determination by EPA, or the appropriate federal agency, that it is reasonable to believe that there may be or has been a release or threat of a release of a hazardous substance or pollutant or contaminant and a statement of the facts upon which the determination is based;

(B) A description, in light of CERCLA response authorities, of the purpose and estimated scope and duration of the entry, including a description of the specific anticipated activities to be conducted pursuant to the order;

(C) A provision advising the person who failed to consent that an officer or employee of the agency that issued the order will be available to confer with respondent prior to effective date of the order; and

(D) A provision advising the person who failed to consent that a court may impose a penalty of up to $25,000 per day for unreasonable failure to comply with the order. The civil monetary penalty amount listed in this section may not reflect recent inflation adjustments EPA is required to make. The current maximum and minimum statutory civil penalty amounts are located in § 19.4.

ADD141

(v) Orders shall be served upon the person or responsible party who failed to consent prior to their effective date. Force shall not be used to compel compliance with an order.

(vi) Orders may not be issued for any criminal investigations.

(e) Permit requirements.

(1) No federal, state, or local permits are required for on-site response actions conducted pursuant to CERCLA sections 104, 106, 120, 121, or 122. The term on-site means the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action.

(2) Permits, if required, shall be obtained for all response activities conducted off-site.

(f) Health assessments. Health assessments shall be performed by ATSDR at facilities on or proposed to be listed on the NPL and may be performed at other releases or facilities in response to petitions made to ATSDR. Where available, these health assessments may be used by the lead agency to assist in determining whether response actions should be taken and/or to identify the need for additional studies to assist in the assessment of potential human health effects associated with releases or potential releases of hazardous substances.

(g) Identification of applicable or relevant and appropriate requirements.

(1) The lead and support agencies shall identify requirements applicable to the release or remedial action contemplated based upon an objective determination of whether the requirement specifically addresses a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site.

(2) If, based upon paragraph (g)(1) of this section, it is determined that a requirement is not applicable to a specific release, the requirement may still be relevant and appropriate to the circumstances of the release. In evaluating relevance and appropriateness, the factors in paragraphs (g)(2)(i) through (viii) of this section shall be examined, where pertinent, to determine whether a requirement addresses problems or situations sufficiently similar to the circumstances of the release or remedial action contemplated, and whether the requirement is well-suited to the site, and therefore is both relevant and appropriate. The pertinence of each of the following factors will depend, in part, on whether a requirement addresses a chemical, location, or action. The following comparisons shall be made, where pertinent, to determine relevance and appropriateness:

(i) The purpose of the requirement and the purpose of the CERCLA action;

(ii) The medium regulated or affected by the requirement and the medium contaminated or affected at the CERCLA site;

(iii) The substances regulated by the requirement and the substances found at the CERCLA site;

ADD142

(iv) The actions or activities regulated by the requirement and the remedial action contemplated at the CERCLA site;

(v) Any variances, waivers, or exemptions of the requirement and their availability for the circumstances at the CERCLA site;

(vi) The type of place regulated and the type of place affected by the release or CERCLA action;

(vii) The type and size of structure or facility regulated and the type and size of structure or facility affected by the release or contemplated by the CERCLA action;

(viii) Any consideration of use or potential use of affected resources in the requirement and the use or potential use of the affected resource at the CERCLA site.

(3) In addition to applicable or relevant and appropriate requirements, the lead and support agencies may, as appropriate, identify other advisories, criteria, or guidance to be considered for a particular release. The "to be considered" (TBC) category consists of advisories, criteria, or guidance that were developed by EPA, other federal agencies, or states that may be useful in developing CERCLA remedies.

(4) Only those state standards that are promulgated, are identified by the state in a timely manner, and are more stringent than federal requirements may be applicable or relevant and appropriate. For purposes of identification and notification of promulgated state standards, the term promulgated means that the standards are of general applicability and are legally enforceable.

(5) The lead agency and support agency shall identify their specific requirements that are applicable or relevant and appropriate for a particular site. These agencies shall notify each other, in a timely manner as described in § 300.515(d), of the requirements they have determined to be applicable or relevant and appropriate. When identifying a requirement as an ARAR, the lead agency and support agency shall include a citation to the statute or regulation from which the requirement is derived.

(6) Notification of ARARs shall be according to procedures and timeframes specified in § 300.515 (d)(2) and (h)(2).

(h) Oversight. The lead agency may provide oversight for actions taken by potentially responsible parties to ensure that a response is conducted consistent with this part. The lead agency may also monitor the actions of third parties preauthorized under subpart H of this part. EPA will provide oversight when the response is pursuant to an EPA order or federal consent decree.

(i) Other.

(1) This subpart does not establish any preconditions to enforcement action by either the federal or state governments to compel response actions by potentially responsible parties.

ADD143

(2) While much of this subpart is oriented toward federally funded response actions, this subpart may be used as guidance concerning methods and criteria for response actions by other parties under other funding mechanisms. Except as provided in subpart H of this part, nothing in this part is intended to limit the rights of any person to seek recovery of response costs from responsible parties pursuant to CERCLA section 107.

(3) Activities by the federal and state governments in implementing this subpart are discretionary governmental functions. This subpart does not create in any private party a right to federal response or enforcement action. This subpart does not create any duty of the federal government to take any response action at any particular time.

**Credits**

[59 FR 47447, Sept. 15, 1994; 89 FR 88656, Nov. 8, 2024]

SOURCE: 47 FR 31202, July 16, 1982; 51 FR 41581, Nov. 17, 1986; 52 FR 13395, April 22, 1987; 54 FR 10517, March 13, 1989; 55 FR 8813, March 8, 1990; 55 FR 8839, March 8, 1990; 56 FR 5605, Feb. 11, 1991; 57 FR 47187, Oct. 14, 1992; 59 FR 47416, Sept. 15, 1994; 60 FR 16054, March 29, 1995; 60 FR 17004, April 4, 1995; 60 FR 19525, April 19, 1995; 60 FR 33362, June 28, 1995; 60 FR 58239, Nov. 27, 1995; 79 FR 36431, June 27, 2014; 80 FR 17705, April 2, 2015; 80 FR 37119, June 29, 2015; 81 FR 20257, April 7, 2016; 82 FR 14153, March 17, 2017; 82 FR 31267, July 6, 2017; 82 FR 36100, Aug. 3, 2017; 84 FR 56670, Oct. 22, 2019; 85 FR 22342, April 21, 2020; 85 FR 50787, Aug. 18, 2020; 85 FR 54935, Sept. 3, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.; 42 U.S.C. 9601–9657; E.O. 13626, 77 FR 56749, 3 CFR, 2013 Comp., p. 306; E.O. 12777, 56 FR 54757, 3 CFR, 1991 Comp., p. 351; E.O. 12580, 52 FR 2923, 3 CFR, 1987 Comp., p. 193.

Notes of Decisions (57)

Current through January 13, 2025, 90 FR 2871. Some sections may be more current. See credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter J. Superfund, Emergency Planning, and Community Right–to–Know Programs
        Part 300. National Oil and Hazardous Substances Pollution Contingency Plan (Refs & Annos)
          Subpart E. Hazardous Substance Response (Refs & Annos)

40 C.F.R. § 300.405

§ 300.405 Discovery or notification.

Currentness

(a) A release may be discovered through:

(1) A report submitted in accordance with section 103(a) of CERCLA, i.e., reportable quantities codified at 40 CFR part 302;

(2) A report submitted to EPA in accordance with section 103(c) of CERCLA;

(3) Investigation by government authorities conducted in accordance with section 104(e) of CERCLA or other statutory authority;

(4) Notification of a release by a federal or state permit holder when required by its permit;

(5) Inventory or survey efforts or random or incidental observation reported by government agencies or the public;

(6) Submission of a citizen petition to EPA or the appropriate federal facility requesting a preliminary assessment, in accordance with section 105(d) of CERCLA;

(7) A report submitted in accordance with section 311(b)(5) of the CWA; and

(8) Other sources.

(b) Any person in charge of a vessel or a facility shall report releases as described in paragraph (a)(1) of this section to the National Response Center (NRC). If direct reporting to the NRC is not practicable, reports may be made to the United States Coast Guard (USCG) on-scene coordinator (OSC) for the geographic area where the release occurs. The EPA predesignated OSC may also be contacted through the regional 24–hour emergency response telephone number. All such reports shall be promptly relayed to the NRC. If it is not possible to notify the NRC or predesignated OSC immediately, reports may be made immediately to the nearest USCG unit. In any event, such person in charge of the vessel or facility shall notify the NRC as soon as possible.

ADD145

(c) All other reports of releases described under paragraph (a) of this section, except releases reported under paragraphs (a) (2) and (6) of this section, shall, as appropriate, be made to the NRC.

(d) The NRC will generally need information that will help to characterize the release. This will include, but not be limited to: Location of the release; type(s) of material(s) released; an estimate of the quantity of material released; possible source of the release; and date and time of the release. Reporting under paragraphs (b) and (c) of this section shall not be delayed due to incomplete notification information.

(e) Upon receipt of a notification of a release, the NRC shall promptly notify the appropriate OSC. The OSC shall notify the Governor, or designee, of the state affected by the release.

(f)(1) When the OSC is notified of a release that may require response pursuant to § 300.415(b), a removal site evaluation shall, as appropriate, be promptly undertaken pursuant to § 300.410.

(2) When notification indicates that removal action pursuant to § 300.415(b) is not required, a remedial site evaluation shall, if appropriate, be undertaken by the lead agency pursuant to § 300.420, if one has not already been performed.

(3) If radioactive substances are present in a release, the EPA Radiological Response Coordinator should be notified for evaluation and assistance either directly or via the NRC, consistent with §§ 300.130(e) and 300.145(f).

(g) Release notification made to the NRC under this section does not relieve the owner/operator of a facility from any obligations to which it is subject under SARA Title III or state law. In particular, it does not relieve the owner/operator from the requirements of section 304 of SARA Title III and 40 CFR part 355 and § 300.215(f) of this part for notifying the community emergency coordinator for the appropriate local emergency planning committee of all affected areas and the state emergency response commission of any state affected that there has been a release. Federal agencies are not legally obligated to comply with the requirements of Title III of SARA.

**Credits**

[59 FR 47447, Sept. 15, 1994]

SOURCE: 47 FR 31202, July 16, 1982; 51 FR 41581, Nov. 17, 1986; 52 FR 13395, April 22, 1987; 54 FR 10517, March 13, 1989; 55 FR 8813, March 8, 1990; 55 FR 8839, March 8, 1990; 56 FR 5605, Feb. 11, 1991; 57 FR 47187, Oct. 14, 1992; 59 FR 47416, Sept. 15, 1994; 60 FR 16054, March 29, 1995; 60 FR 17004, April 4, 1995; 60 FR 19525, April 19, 1995; 60 FR 33362, June 28, 1995; 60 FR 58239, Nov. 27, 1995; 79 FR 36431, June 27, 2014; 80 FR 17705, April 2, 2015; 80 FR 37119, June 29, 2015; 81 FR 20257, April 7, 2016; 82 FR 14153, March 17, 2017; 82 FR 31267, July 6, 2017; 82 FR 36100, Aug. 3, 2017; 84 FR 56670, Oct. 22, 2019; 85 FR 22342, April 21, 2020; 85 FR 50787, Aug. 18, 2020; 85 FR 54935, Sept. 3, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.; 42 U.S.C. 9601–9657; E.O. 13626, 77 FR 56749, 3 CFR, 2013 Comp., p. 306; E.O. 12777, 56 FR 54757, 3 CFR, 1991 Comp., p. 351; E.O. 12580, 52 FR 2923, 3 CFR, 1987 Comp., p. 193.

ADD146

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter J. Superfund, Emergency Planning, and Community Right–to–Know Programs
        Part 300. National Oil and Hazardous Substances Pollution Contingency Plan (Refs & Annos)
          Subpart E. Hazardous Substance Response (Refs & Annos)

40 C.F.R. § 300.410

§ 300.410 Removal site evaluation.

Currentness

(a) A removal site evaluation includes a removal preliminary assessment and, if warranted, a removal site inspection.

(b) A removal site evaluation of a release identified for possible CERCLA response pursuant to § 300.415 shall, as appropriate, be undertaken by the lead agency as promptly as possible. The lead agency may perform a removal preliminary assessment in response to petitions submitted by a person who is, or may be, affected by a release of a hazardous substance, pollutant, or contaminant pursuant to § 300.420(b)(5).

(c)(1) The lead agency shall, as appropriate, base the removal preliminary assessment on readily available information. A removal preliminary assessment may include, but is not limited to:

(i) Identification of the source and nature of the release or threat of release;

(ii) Evaluation by ATSDR or by other sources, for example, state public health agencies, of the threat to public health;

(iii) Evaluation of the magnitude of the threat;

(iv) Evaluation of factors necessary to make the determination of whether a removal is necessary; and

(v) Determination of whether a nonfederal party is undertaking proper response.

(2) A removal preliminary assessment of releases from hazardous waste management facilities may include collection or review of data such as site management practices, information from generators, photographs, analysis of historical photographs, literature searches, and personal interviews conducted, as appropriate.

(d) A removal site inspection may be performed if more information is needed. Such inspection may include a perimeter (i.e., off-site) or on-site inspection, taking into consideration whether such inspection can be performed safely.

ADD147

(e)(1) As part of the evaluation under this section, the OSC shall determine whether a release governed by CWA section 311(c) (1), as amended by OPA section 4201(a), has occurred.

(2) If such a release of a CWA hazardous substance has occurred, the OSC shall determine whether the release results in a substantial threat to the public health or welfare of the United States. Factors to be considered by the OSC in making this determination include, but are not limited to, the size of the release, the character of the release, and the nature of the threat to public health or welfare of the United States. Upon obtaining relevant elements of such information, the OSC shall conduct an evaluation of the threat posed, based on the OSC's experience in assessing other releases, and consultation with senior lead agency officials and readily available authorities on issues outside the OSC's technical expertise.

(f) A removal site evaluation shall be terminated when the OSC or lead agency determines:

(1) There is no release;

(2) The source is neither a vessel nor a facility as defined in § 300.5 of the NCP;

(3) The release involves neither a hazardous substance, nor a pollutant or contaminant that may present an imminent and substantial danger to public health or welfare of the United States;

(4) The release consists of a situation specified in § 300.400(b) (1) through (3) subject to limitations on response;

(5) The amount, quantity, or concentration released does not warrant federal response;

(6) A party responsible for the release, or any other person, is providing appropriate response, and on-scene monitoring by the government is not required; or

(7) The removal site evaluation is completed.

(g) The results of the removal site evaluation shall be documented.

(h) The OSC or lead agency shall ensure that natural resource trustees are promptly notified in order that they may initiate appropriate actions, including those identified in subpart G of this part. The OSC or lead agency shall coordinate all response activities with such affected trustees.

(i) If the removal site evaluation indicates that removal action under § 300.415 is not required, but that remedial action under § 300.430 may be necessary, the lead agency shall, as appropriate, initiate a remedial site evaluation pursuant to § 300.420.

**Credits**

[59 FR 47448, Sept. 15, 1994]

ADD148

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter J. Superfund, Emergency Planning, and Community Right–to–Know Programs
        Part 300. National Oil and Hazardous Substances Pollution Contingency Plan (Refs & Annos)
          Subpart E. Hazardous Substance Response (Refs & Annos)

40 C.F.R. § 300.415

§ 300.415 Removal action.

Currentness

(a)(1) In determining the appropriate extent of action to be taken in response to a given release, the lead agency shall first review the removal site evaluation, any information produced through a remedial site evaluation, if any has been done previously, and the current site conditions, to determine if removal action is appropriate.

(2) Where the responsible parties are known, an effort initially shall be made, to the extent practicable, to determine whether they can and will perform the necessary removal action promptly and properly.

(3) This section does not apply to removal actions taken pursuant to section 104(b) of CERCLA. The criteria for such actions are set forth in section 104(b) of CERCLA.

(b)(1) At any release, regardless of whether the site is included on the National Priorities List (NPL), where the lead agency makes the determination, based on the factors in paragraph (b)(2) of this section, that there is a threat to public health or welfare of the United States or the environment, the lead agency may take any appropriate removal action to abate, prevent, minimize, stabilize, mitigate, or eliminate the release or the threat of release.

(2) The following factors shall be considered in determining the appropriateness of a removal action pursuant to this section:

(i) Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

ADD149

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate federal or state response mechanisms to respond to the release; and

(viii) Other situations or factors that may pose threats to public health or welfare of the United States or the environment.

(3) If the lead agency determines that a removal action is appropriate, actions shall, as appropriate, begin as soon as possible to abate, prevent, minimize, stabilize, mitigate, or eliminate the threat to public health or welfare of the United States or the environment. The lead agency shall, at the earliest possible time, also make any necessary determinations pursuant to paragraph (b)(4) of this section.

(4) Whenever a planning period of at least six months exists before on-site activities must be initiated, and the lead agency determines, based on a site evaluation, that a removal action is appropriate:

(i) The lead agency shall conduct an engineering evaluation/cost analysis (EE/CA) or its equivalent. The EE/CA is an analysis of removal alternatives for a site.

(ii) If environmental samples are to be collected, the lead agency shall develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs. Sampling and analysis plans shall be reviewed and approved by EPA. The sampling and analysis plans shall consist of two parts:

(A) The field sampling plan, which describes the number, type, and location of samples and the type of analyses; and

(B) The quality assurance project plan, which describes policy, organization, and functional activities and the data quality objectives and measures necessary to achieve adequate data for use in planning and documenting the removal action.

(5) CERCLA fund-financed removal actions, other than those authorized under section 104(b) of CERCLA, shall be terminated after $2 million has been obligated for the action or 12 months have elapsed from the date that removal activities begin on-site, unless the lead agency determines that:

(i) There is an immediate risk to public health or welfare of the United States or the environment; continued response actions are immediately required to prevent, limit, or mitigate an emergency; and such assistance will not otherwise be provided on a timely basis; or

(ii) Continued response action is otherwise appropriate and consistent with the remedial action to be taken.

ADD150

(c)(1) In carrying out a response to a release of a CWA hazardous substance, as described in CWA section 311(c)(1), as amended by OPA section 4201(a), the OSC may:

(i) Remove or arrange for the removal of a release, and mitigate or prevent a substantial threat of a release, at any time;

(ii) Direct or monitor all federal, state, and private actions to remove a release; and

(iii) Remove and, if necessary, destroy a vessel releasing or threatening to release CWA hazardous substances, by whatever means are available.

(2) If the investigation by the OSC under § 300.410 shows that the release of a CWA hazardous substance results in a substantial threat to public health or welfare of the United States, the OSC shall direct all federal, state, or private actions to remove the release or to mitigate or prevent the threat of such a release, as appropriate. In directing the response, the OSC may act without regard to any other provision of law governing contracting procedures or employment of personnel by the federal government to:

(i) Remove or arrange for the removal of the release;

(ii) Mitigate or prevent the substantial threat of the release; and

(iii) Remove and, if necessary, destroy a vessel releasing, or threatening to release, by whatever means are available.

(3) In the case of a release of a CWA hazardous substance posing a substantial threat to public health or welfare of the United States, the OSC shall:

(i) Assess opportunities for the use of various special teams and other assistance described in § 300.145, as appropriate;

(ii) Request immediate activation of the RRT; and

(iii) Take whatever additional response actions are deemed appropriate. When requested by the OSC, the lead agency or RRT shall dispatch appropriate personnel to the scene of the release to assist the OSC. This assistance may include technical support in the agency's areas of expertise and disseminating information to the public in accordance with § 300.155. The lead agency shall ensure that a contracting officer is available on-scene, at the request of the OSC.

(d) Removal actions shall, to the extent practicable, contribute to the efficient performance of any anticipated long-term remedial action with respect to the release concerned.

(e) The following removal actions are, as a general rule, appropriate in the types of situations shown; however, this list is not exhaustive and is not intended to prevent the lead agency from taking any other actions deemed necessary under CERCLA,

ADD151

CWA section 311, or other appropriate federal or state enforcement or response authorities, and the list does not create a duty on the lead agency to take action at any particular time:

(1) Fences, warning signs, or other security or site control precautions—where humans or animals have access to the release;

(2) Drainage controls, for example, run-off or run-on diversion—where needed to reduce migration of hazardous substances or pollutants or contaminants off-site or to prevent precipitation or run-off from other sources, for example, flooding, from entering the release area from other areas;

(3) Stabilization of berms, dikes, or impoundments or drainage or closing of lagoons—where needed to maintain the integrity of the structures;

(4) Capping of contaminated soils or sludges—where needed to reduce migration of hazardous substances or pollutants or contaminants into soil, ground or surface water, or air;

(5) Using chemicals and other materials to retard the spread of the release or to mitigate its effects—where the use of such chemicals will reduce the spread of the release;

(6) Excavation, consolidation, or removal of highly contaminated soils from drainage or other areas—where such actions will reduce the spread of, or direct contact with, the contamination;

(7) Removal of drums, barrels, tanks, or other bulk containers that contain or may contain hazardous substances or pollutants or contaminants—where it will reduce the likelihood of spillage; leakage; exposure to humans, animals, or food chain; or fire or explosion;

(8) Containment, treatment, disposal, or incineration of hazardous materials—where needed to reduce the likelihood of human, animal, or food chain exposure; or

(9) Provision of alternative water supply—where necessary immediately to reduce exposure to contaminated household water and continuing until such time as local authorities can satisfy the need for a permanent remedy.

(f) Where necessary to protect public health or welfare, the lead agency shall request that FEMA conduct a temporary relocation or that state/local officials conduct an evacuation.

(g) If the lead agency determines that the removal action will not fully address the threat posed by the release and the release may require remedial action, the lead agency shall ensure an orderly transition from removal to remedial response activities.

(h) CERCLA removal actions conducted by states under cooperative agreements, described in subpart F of this part, shall comply with all requirements of this section.

ADD152

(i) Facilities operated by a state or political subdivision at the time of disposal require a state cost share of at least 50 percent of Fund-financed response costs if a Fund-financed remedial action is conducted.

(j) Fund-financed removal actions under CERCLA section 104 and removal actions pursuant to CERCLA section 106 shall, to the extent practicable considering the exigencies of the situation, attain applicable or relevant and appropriate requirements (ARARs) under federal environmental or state environmental or facility siting laws. Waivers described in § 300.430(f)(1)(ii)(C) may be used for removal actions. Other federal and state advisories, criteria, or guidance may, as appropriate, be considered in formulating the removal action (see § 300.400(g)(3)). In determining whether compliance with ARARs is practicable, the lead agency may consider appropriate factors, including:

(1) The urgency of the situation; and

(2) The scope of the removal action to be conducted.

(k) Removal actions pursuant to section 106 or 122 of CERCLA are not subject to the following requirements of this section:

(1) Section 300.415(a)(2) requirement to locate responsible parties and have them undertake the response;

(2) Section 300.415(b)(2)(vii) requirement to consider the availability of other appropriate federal or state response and enforcement mechanisms to respond to the release;

(3) Section 300.415(b)(5) requirement to terminate response after $2 million has been obligated or 12 months have elapsed from the date of the initial response; and

(4) Section 300.415(g) requirement to assure an orderly transition from removal to remedial action.

(l) To the extent practicable, provision for post-removal site control following a CERCLA Fund-financed removal action at both NPL and non-NPL sites is encouraged to be made prior to the initiation of the removal action. Such post-removal site control includes actions necessary to ensure the effectiveness and integrity of the removal action after the completion of the on-site removal action or after the $2 million or 12–month statutory limits are reached for sites that do not meet the exemption criteria in paragraph (b)(5) of this section. Post-removal site control may be conducted by:

(1) The affected state or political subdivision thereof or local units of government for any removal;

(2) Potentially responsible parties; or

(3) EPA's remedial program for some federal-lead Fund-financed responses at NPL sites.

(m) OSCs/RPMs conducting removal actions shall submit OSC reports to the RRT as required by § 300.165.

ADD153

(n) Community relations in removal actions.

(1) In the case of all CERCLA removal actions taken pursuant to § 300.415 or CERCLA enforcement actions to compel removal response, a spokesperson shall be designated by the lead agency. The spokesperson shall inform the community of actions taken, respond to inquiries, and provide information concerning the release. All news releases or statements made by participating agencies shall be coordinated with the OSC/RPM. The spokesperson shall notify, at a minimum, immediately affected citizens, state and local officials, and, when appropriate, civil defense or emergency management agencies.

(2) For CERCLA actions where, based on the site evaluation, the lead agency determines that a removal is appropriate, and that less than six months exists before on-site removal activity must begin, the lead agency shall:

(i) Publish a notice of availability of the administrative record file established pursuant to § 300.820 in a major local newspaper of general circulation or use one or more other mechanisms to give adequate notice to a community within 60 days of initiation of on-site removal activity;

(ii) Provide a public comment period, as appropriate, of not less than 30 days from the time the administrative record file is made available for public inspection, pursuant to § 300.820(b)(2); and

(iii) Prepare a written response to significant comments pursuant to § 300.820(b)(3).

(3) For CERCLA removal actions where on-site action is expected to extend beyond 120 days from the initiation of on-site removal activities, the lead agency shall by the end of the 120–day period:

(i) Conduct interviews with local officials, community residents, public interest groups, or other interested or affected parties, as appropriate, to solicit their concerns, information needs, and how or when citizens would like to be involved in the Superfund process;

(ii) Prepare a formal community relations plan (CRP) based on the community interviews and other relevant information, specifying the community relations activities that the lead agency expects to undertake during the response; and

(iii) Establish at least one local information repository at or near the location of the response action. The information repository should contain items made available for public information. Further, an administrative record file established pursuant to subpart I for all removal actions shall be available for public inspection in at least one of the repositories. The lead agency shall inform the public of the establishment of the information repository and provide notice of availability of the administrative record file for public review. All items in the repository shall be available for public inspection and copying.

ADD154

USCA Case #24-1193      Document #2153240      Filed: 01/07/2026      Page 160 of 204

(4) Where, based on the site evaluation, the lead agency determines that a CERCLA removal action is appropriate and that a planning period of at least six months exists prior to initiation of the on-site removal activities, the lead agency shall at a minimum:

(i) Comply with the requirements set forth in paragraphs (n)(3) (i), (ii), and (iii) of this section, prior to the completion of the EE/CA, or its equivalent, except that the information repository and the administrative record file will be established no later than when the EE/CA approval memorandum is signed;

(ii) Publish a notice of availability and brief description of the EE/CA in a major local newspaper of general circulation or use one or more other mechanisms to give adequate notice to a community pursuant to § 300.820;

(iii) Provide a reasonable opportunity, not less than 30 calendar days, for submission of written and oral comments after completion of the EE/CA pursuant to § 300.820(a). Upon timely request, the lead agency will extend the public comment period by a minimum of 15 days; and

(iv) Prepare a written response to significant comments pursuant to § 300.820(a).

**Credits**

[59 FR 47448, Sept. 15, 1994; 80 FR 17706, April 2, 2015]

SOURCE: 47 FR 31202, July 16, 1982; 51 FR 41581, Nov. 17, 1986; 52 FR 13395, April 22, 1987; 54 FR 10517, March 13, 1989; 55 FR 8813, March 8, 1990; 55 FR 8839, March 8, 1990; 56 FR 5605, Feb. 11, 1991; 57 FR 47187, Oct. 14, 1992; 59 FR 47416, Sept. 15, 1994; 60 FR 16054, March 29, 1995; 60 FR 17004, April 4, 1995; 60 FR 19525, April 19, 1995; 60 FR 33362, June 28, 1995; 60 FR 58239, Nov. 27, 1995; 79 FR 36431, June 27, 2014; 80 FR 17705, April 2, 2015; 80 FR 37119, June 29, 2015; 81 FR 20257, April 7, 2016; 82 FR 14153, March 17, 2017; 82 FR 31267, July 6, 2017; 82 FR 36100, Aug. 3, 2017; 84 FR 56670, Oct. 22, 2019; 85 FR 22342, April 21, 2020; 85 FR 50787, Aug. 18, 2020; 85 FR 54935, Sept. 3, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.; 42 U.S.C. 9601–9657; E.O. 13626, 77 FR 56749, 3 CFR, 2013 Comp., p. 306; E.O. 12777, 56 FR 54757, 3 CFR, 1991 Comp., p. 351; E.O. 12580, 52 FR 2923, 3 CFR, 1987 Comp., p. 193.

Notes of Decisions (60)

Current through January 13, 2025, 90 FR 2871. Some sections may be more current. See credits for details.

ADD155

USCA Case #24-1193     Document #2153240        Filed: 01/07/2026      Page 161 of 204

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter J. Superfund, Emergency Planning, and Community Right–to–Know Programs
        Part 300. National Oil and Hazardous Substances Pollution Contingency Plan (Refs & Annos)
          Subpart E. Hazardous Substance Response (Refs & Annos)

40 C.F.R. § 300.420

§ 300.420 Remedial site evaluation.

Currentness

(a) General. The purpose of this section is to describe the methods, procedures, and criteria the lead agency shall use to collect data, as required, and evaluates releases of hazardous substances, pollutants, or contaminants. The evaluation may consist of two steps: a remedial preliminary assessment (PA) and a remedial site inspection (SI).

(b) Remedial preliminary assessment.

(1) The lead agency shall perform a remedial PA on all sites entered into the SEMS remedial assessment active inventory as defined in § 300.5 to:

(i) Eliminate from further consideration those sites that pose no threat to public health or the environment;

(ii) Determine if there is any potential need for removal action;

(iii) Set priorities for site inspections; and

(iv) Gather existing data to facilitate later evaluation of the release pursuant to the Hazard Ranking System (HRS) if warranted.

(2) A remedial PA shall consist of a review of existing information about a release such as information on the pathways of exposure, exposure targets, and source and nature of release. A remedial PA shall also include an off-site reconnaissance as appropriate. A remedial PA may include an on-site reconnaissance where appropriate.

(3) If the remedial PA indicates that a removal action may be warranted, the lead agency shall initiate removal evaluation pursuant to § 300.410.

(4) In performing a remedial PA, the lead agency may complete the EPA Preliminary Assessment form, available from EPA regional offices, or its equivalent, and shall prepare a PA report, which shall include:

ADD156

(i) A description of the release;

(ii) A description of the probable nature of the release; and

(iii) A recommendation on whether further action is warranted, which lead agency should conduct further action, and whether an SI or removal action or both should be undertaken.

(5) Any person may petition the lead federal agency (EPA or the appropriate federal agency in the case of a release or suspected release from a federal facility), to perform a PA of a release when such person is, or may be, affected by a release of a hazardous substance, pollutant, or contaminant. Such petitions shall be addressed to the EPA Regional Administrator for the region in which the release is located, except that petitions for PAs involving federal facilities should be addressed to the head of the appropriate federal agency.

(i) Petitions shall be signed by the petitioner and shall contain the following:

(A) The full name, address, and phone number of petitioner;

(B) A description, as precisely as possible, of the location of the release; and

(C) How the petitioner is or may be affected by the release.

(ii) Petitions should also contain the following information to the extent available:

(A) What type of substances were or may be released;

(B) The nature of activities that have occurred where the release is located; and

(C) Whether local and state authorities have been contacted about the release.

(iii) The lead federal agency shall complete a remedial or removal PA within one year of the date of receipt of a complete petition pursuant to paragraph (b)(5) of this section, if one has not been performed previously, unless the lead federal agency determines that a PA is not appropriate. Where such a determination is made, the lead federal agency shall notify the petitioner and will provide a reason for the determination.

(iv) When determining if performance of a PA is appropriate, the lead federal agency shall take into consideration:

(A) Whether there is information indicating that a release has occurred or there is a threat of a release of a hazardous substance, pollutant, or contaminant; and

ADD157

(B) Whether the release is eligible for response under CERCLA.

(c) Remedial site inspection.

(1) The lead agency shall perform a remedial SI as appropriate to:

(i) Eliminate from further consideration those releases that pose no significant threat to public health or the environment;

(ii) Determine the potential need for removal action;

(iii) Collect or develop additional data, as appropriate, to evaluate the release pursuant to the HRS; and

(iv) Collect data in addition to that required to score the release pursuant to the HRS, as appropriate, to better characterize the release for more effective and rapid initiation of the RI/FS or response under other authorities.

(2) The remedial SI shall build upon the information collected in the remedial PA. The remedial SI shall involve, as appropriate, both on- and off-site field investigatory efforts, and sampling.

(3) If the remedial SI indicates that removal action may be appropriate, the lead agency shall initiate removal site evaluation pursuant to § 300.410.

(4) Prior to conducting field sampling as part of site inspections, the lead agency shall develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs. The sampling and analysis plans shall consist of two parts:

(i) The field sampling plan, which describes the number, type, and location of samples, and the type of analyses, and

(ii) The quality assurance project plan (QAPP), which describes policy, organization, and functional activities, and the data quality objectives and measures necessary to achieve adequate data for use in site evaluation and hazard ranking system activities.

(5) Upon completion of a remedial SI, the lead agency shall prepare a report that includes the following:

(i) A description/history/nature of waste handling;

(ii) A description of known contaminants;

ADD158

(iii) A description of pathways of migration of contaminants;

(iv) An identification and description of human and environmental targets; and

(v) A recommendation on whether further action is warranted.

**Credits**

[79 FR 65592, Nov. 5, 2014]

SOURCE: 47 FR 31202, July 16, 1982; 51 FR 41581, Nov. 17, 1986; 52 FR 13395, April 22, 1987; 54 FR 10517, March 13, 1989; 55 FR 8813, March 8, 1990; 55 FR 8839, March 8, 1990; 56 FR 5605, Feb. 11, 1991; 57 FR 47187, Oct. 14, 1992; 59 FR 47416, Sept. 15, 1994; 60 FR 16054, March 29, 1995; 60 FR 17004, April 4, 1995; 60 FR 19525, April 19, 1995; 60 FR 33362, June 28, 1995; 60 FR 58239, Nov. 27, 1995; 79 FR 36431, June 27, 2014; 80 FR 17705, April 2, 2015; 80 FR 37119, June 29, 2015; 81 FR 20257, April 7, 2016; 82 FR 14153, March 17, 2017; 82 FR 31267, July 6, 2017; 82 FR 36100, Aug. 3, 2017; 84 FR 56670, Oct. 22, 2019; 85 FR 22342, April 21, 2020; 85 FR 50787, Aug. 18, 2020; 85 FR 54935, Sept. 3, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.; 42 U.S.C. 9601–9657; E.O. 13626, 77 FR 56749, 3 CFR, 2013 Comp., p. 306; E.O. 12777, 56 FR 54757, 3 CFR, 1991 Comp., p. 351; E.O. 12580, 52 FR 2923, 3 CFR, 1987 Comp., p. 193.

Notes of Decisions (28)

Current through January 13, 2025, 90 FR 2871. Some sections may be more current. See credits for details.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ADD159

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter J. Superfund, Emergency Planning, and Community Right–to–Know Programs
                Part 300. National Oil and Hazardous Substances Pollution Contingency Plan (Refs & Annos)
                    Subpart E. Hazardous Substance Response (Refs & Annos)

40 C.F.R. § 300.425

§ 300.425 Establishing remedial priorities.

Currentness

(a) General. The purpose of this section is to identify the criteria as well as the methods and procedures EPA uses to establish its priorities for remedial actions.

(b) National Priorities List. The NPL is the list of priority releases for long-term remedial evaluation and response.

(1) Only those releases included on the NPL shall be considered eligible for Fund-financed remedial action. Removal actions (including remedial planning activities, RI/FSs, and other actions taken pursuant to CERCLA section 104(b)) are not limited to NPL sites.

(2) Inclusion of a release on the NPL does not imply that monies will be expended, nor does the rank of a release on the NPL establish the precise priorities for the allocation of Fund resources. EPA may also pursue other appropriate authorities to remedy the release, including enforcement actions under CERCLA and other laws. A site's rank on the NPL serves, along with other factors, including enforcement actions, as a basis to guide the allocation of Fund resources among releases.

(3) Federal facilities that meet the criteria identified in paragraph (c) of this section are eligible for inclusion on the NPL. Except as provided by CERCLA sections 111(e)(3) and 111(c), federal facilities are not eligible for Fund-financed remedial actions.

(4) Inclusion on the NPL is not a precondition to action by the lead agency under CERCLA sections 106 or 122 or to action under CERCLA section 107 for recovery of non-Fund-financed costs or Fund-financed costs other than Fund-financed remedial construction costs.

(c) Methods for determining eligibility for NPL. A release may be included on the NPL if the release meets one of the following criteria:

(1) The release scores sufficiently high pursuant to the Hazard Ranking System described in appendix A to this part.

ADD160

(2) A state (not including Indian tribes) has designated a release as its highest priority. States may make only one such designation; or

(3) The release satisfies all of the following criteria:

(i) The Agency for Toxic Substances and Disease Registry has issued a health advisory that recommends dissociation of individuals from the release;

(ii) EPA determines that the release poses a significant threat to public health; and

(iii) EPA anticipates that it will be more cost-effective to use its remedial authority than to use removal authority to respond to the release.

(d) Procedures for placing sites on the NPL. Lead agencies may submit candidates to EPA by scoring the release using the HRS and providing the appropriate backup documentation.

(1) Lead agencies may submit HRS scoring packages to EPA anytime throughout the year.

(2) EPA shall review lead agencies' HRS scoring packages and revise them as appropriate. EPA shall develop any additional HRS scoring packages on releases known to EPA.

(3) EPA shall compile the NPL based on the methods identified in paragraph (c) of this section.

(4) EPA shall update the NPL at least once a year.

(5) To ensure public involvement during the proposal to add a release to the NPL, EPA shall:

(i) Publish the proposed rule in the Federal Register and solicit comments through a public comment period; and

(ii) Publish the final rule in the Federal Register, and make available a response to each significant comment and any significant new data submitted during the comment period.

(6) Releases may be categorized on the NPL when deemed appropriate by EPA.

(e) Deletion from the NPL. Releases may be deleted from or recategorized on the NPL where no further response is appropriate.

ADD161

(1) EPA shall consult with the state on proposed deletions from the NPL prior to developing the notice of intent to delete. In making a determination to delete a release from the NPL, EPA shall consider, in consultation with the state, whether any of the following criteria has been met:

(i) Responsible parties or other persons have implemented all appropriate response actions required;

(ii) All appropriate Fund-financed response under CERCLA has been implemented, and no further response action by responsible parties is appropriate; or

(iii) The remedial investigation has shown that the release poses no significant threat to public health or the environment and, therefore, taking of remedial measures is not appropriate.

(2) Releases shall not be deleted from the NPL until the state in which the release was located has concurred on the proposed deletion. EPA shall provide the state 30 working days for review of the deletion notice prior to its publication in the Federal Register.

(3) All releases deleted from the NPL are eligible for further Fund-financed remedial actions should future conditions warrant such action. Whenever there is a significant release from a site deleted from the NPL, the site shall be restored to the NPL without application of the HRS.

(4) To ensure public involvement during the proposal to delete a release from the NPL, EPA shall:

(i) Publish a notice of intent to delete in the Federal Register and solicit comment through a public comment period of a minimum of 30 calendar days;

(ii) In a major local newspaper of general circulation at or near the release that is proposed for deletion, publish a notice of availability or use one or more other mechanisms to give adequate notice to a community of the intent to delete;

(iii) Place copies of information supporting the proposed deletion in the information repository, described in § 300.430(c)(2)(iii), at or near the release proposed for deletion. These items shall be available for public inspection and copying; and

(iv) Respond to each significant comment and any significant new data submitted during the comment period and include this response document in the final deletion package.

(5) EPA shall place the final deletion package in the local information repository once the notice of final deletion has been published in the Federal Register.

**Credits**

[80 FR 17706, April 2, 2015]

ADD162

Code of Federal Regulations

Title 40. Protection of Environment

Chapter I. Environmental Protection Agency (Refs & Annos)

Subchapter J. Superfund, Emergency Planning, and Community Right–to–Know Programs

Part 300. National Oil and Hazardous Substances Pollution Contingency Plan (Refs & Annos)

Subpart E. Hazardous Substance Response (Refs & Annos)

40 C.F.R. § 300.430

§ 300.430 Remedial investigation/feasibility study and selection of remedy.

Currentness

(a) General—

(1) Introduction. The purpose of the remedy selection process is to implement remedies that eliminate, reduce, or control risks to human health and the environment. Remedial actions are to be implemented as soon as site data and information make it possible to do so. Accordingly, EPA has established the following program goal, expectations, and program management principles to assist in the identification and implementation of appropriate remedial actions.

(i) Program goal. The national goal of the remedy selection process is to select remedies that are protective of human health and the environment, that maintain protection over time, and that minimize untreated waste.

(ii) Program management principles. EPA generally shall consider the following general principles of program management during the remedial process:

(A) Sites should generally be remediated in operable units when early actions are necessary or appropriate to achieve significant risk reduction quickly, when phased analysis and response is necessary or appropriate given the size or complexity of the site, or to expedite the completion of total site cleanup.

(B) Operable units, including interim action operable units, should not be inconsistent with nor preclude implementation of the expected final remedy.

(C) Site-specific data needs, the evaluation of alternatives, and the documentation of the selected remedy should reflect the scope and complexity of the site problems being addressed.

(iii) Expectations. EPA generally shall consider the following expectations in developing appropriate remedial alternatives:

(A) EPA expects to use treatment to address the principal threats posed by a site, wherever practicable. Principal threats for which treatment is most likely to be appropriate include liquids, areas contaminated with high concentrations of toxic compounds, and highly mobile materials.

ADD163

(B) EPA expects to use engineering controls, such as containment, for waste that poses a relatively low long-term threat or where treatment is impracticable.

(C) EPA expects to use a combination of methods, as appropriate, to achieve protection of human health and the environment. In appropriate site situations, treatment of the principal threats posed by a site, with priority placed on treating waste that is liquid, highly toxic or highly mobile, will be combined with engineering controls (such as containment) and institutional controls, as appropriate, for treatment residuals and untreated waste.

(D) EPA expects to use institutional controls such as water use and deed restrictions to supplement engineering controls as appropriate for short- and long-term management to prevent or limit exposure to hazardous substances, pollutants, or contaminants. Institutional controls may be used during the conduct of the remedial investigation/ feasibility study (RI/FS) and implementation of the remedial action and, where necessary, as a component of the completed remedy. The use of institutional controls shall not substitute for active response measures (e.g., treatment and/or containment of source material, restoration of ground waters to their beneficial uses) as the sole remedy unless such active measures are determined not to be practicable, based on the balancing of trade-offs among alternatives that is conducted during the selection of remedy.

(E) EPA expects to consider using innovative technology when such technology offers the potential for comparable or superior treatment performance or implementability, fewer or lesser adverse impacts than other available approaches, or lower costs for similar levels of performance than demonstrated technologies.

(F) EPA expects to return usable ground waters to their beneficial uses wherever practicable, within a timeframe that is reasonable given the particular circumstances of the site. When restoration of ground water to beneficial uses is not practicable, EPA expects to prevent further migration of the plume, prevent exposure to the contaminated ground water, and evaluate further risk reduction.

(2) Remedial investigation/feasibility study. The purpose of the remedial investigation/feasibility study (RI/FS) is to assess site conditions and evaluate alternatives to the extent necessary to select a remedy. Developing and conducting an RI/ FS generally includes the following activities: project scoping, data collection, risk assessment, treatability studies, and analysis of alternatives. The scope and timing of these activities should be tailored to the nature and complexity of the problem and the response alternatives being considered.

(b) Scoping. In implementing this section, the lead agency should consider the program goal, program management principles, and expectations contained in this rule. The investigative and analytical studies should be tailored to site circumstances so that the scope and detail of the analysis is appropriate to the complexity of site problems being addressed. During scoping, the lead and support agencies shall confer to identify the optimal set and sequence of actions necessary to address site problems. Specifically, the lead agency shall:

(1) Assemble and evaluate existing data on the site, including the results of any removal actions, remedial preliminary assessment and site inspections, and the NPL listing process.

ADD164

(2) Develop a conceptual understanding of the site based on the evaluation of existing data described in paragraph (b)(1) of this section.

(3) Identify likely response scenarios and potentially applicable technologies and operable units that may address site problems.

(4) Undertake limited data collection efforts or studies where this information will assist in scoping the RI/FS or accelerate response actions, and begin to identify the need for treatability studies, as appropriate.

(5) Identify the type, quality, and quantity of the data that will be collected during the RI/FS to support decisions regarding remedial response activities.

(6) Prepare site-specific health and safety plans that shall specify, at a minimum, employee training and protective equipment, medical surveillance requirements, standard operating procedures, and a contingency plan that conforms with 29 CFR 1910.120(l)(1) and (l)(2).

(7) If natural resources are or may be injured by the release, ensure that state and federal trustees of the affected natural resources have been notified in order that the trustees may initiate appropriate actions, including those identified in subpart G of this part. The lead agency shall seek to coordinate necessary assessments, evaluations, investigations, and planning with such state and federal trustees.

(8) Develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs. Sampling and analysis plans shall be reviewed and approved by EPA. The sampling and analysis plans shall consist of two parts:

(i) The field sampling plan, which describes the number, type, and location of samples and the type of analyses; and

(ii) The quality assurance project plan, which describes policy, organization, and functional activities and the data quality objectives and measures necessary to achieve adequate data for use in selecting the appropriate remedy.

(9) Initiate the identification of potential federal and state ARARs and, as appropriate, other criteria, advisories, or guidance to be considered.

(c) Community relations.

(1) The community relations requirements described in this section apply to all remedial activities undertaken pursuant to CERCLA section 104 and to section 106 or section 122 consent orders or decrees, or section 106 administrative orders.

(2) The lead agency shall provide for the conduct of the following community relations activities, to the extent practicable, prior to commencing field work for the remedial investigation:

ADD165

(i) Conducting interviews with local officials, community residents, public interest groups, or other interested or affected parties, as appropriate, to solicit their concerns and information needs, and to learn how and when citizens would like to be involved in the Superfund process.

(ii) Preparing a formal community relations plan (CRP), based on the community interviews and other relevant information, specifying the community relations activities that the lead agency expects to undertake during the remedial response. The purpose of the CRP is to:

(A) Ensure the public appropriate opportunities for involvement in a wide variety of site-related decisions, including site analysis and characterization, alternatives analysis, and selection of remedy;

(B) Determine, based on community interviews, appropriate activities to ensure such public involvement, and

(C) Provide appropriate opportunities for the community to learn about the site.

(iii) Establishing at least one local information repository at or near the location of the response action. Each information repository should contain a copy of items made available to the public, including information that describes the technical assistance grants application process. The lead agency shall inform interested parties of the establishment of the information repository.

(iv) Informing the community of the availability of technical assistance grants.

(3) For PRP actions, the lead agency shall plan and implement the community relations program at a site. PRPs may participate in aspects of the community relations program at the discretion of and with oversight by the lead agency.

(4) The lead agency may conduct technical discussions involving PRPs and the public. These technical discussions may be held separately from, but contemporaneously with, the negotiations/settlement discussions.

(5) In addition, the following provisions specifically apply to enforcement actions:

(i) Lead agencies entering into an enforcement agreement with de minimis parties under CERCLA section 122(g) or cost recovery settlements under section 122(h) shall publish a notice of the proposed agreement in the Federal Register at least 30 days before the agreement becomes final, as required by section 122(i). The notice must identify the name of the facility and the parties to the proposed agreement and must allow an opportunity for comment and consideration of comments; and

(ii) Where the enforcement agreement is embodied in a consent decree, public notice and opportunity for public comment shall be provided in accordance with 28 CFR 50.7.

(d) Remedial investigation.

ADD166

(1) The purpose of the remedial investigation (RI) is to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives. To characterize the site, the lead agency shall, as appropriate, conduct field investigations, including treatability studies, and conduct a baseline risk assessment. The RI provides information to assess the risks to human health and the environment and to support the development, evaluation, and selection of appropriate response alternatives. Site characterization may be conducted in one or more phases to focus sampling efforts and increase the efficiency of the investigation. Because estimates of actual or potential exposures and associated impacts on human and environmental receptors may be refined throughout the phases of the RI as new information is obtained, site characterization activities should be fully integrated with the development and evaluation of alternatives in the feasibility study. Bench- or pilot-scale treatability studies shall be conducted, when appropriate and practicable, to provide additional data for the detailed analysis and to support engineering design of remedial alternatives.

(2) The lead agency shall characterize the nature of and threat posed by the hazardous substances and hazardous materials and gather data necessary to assess the extent to which the release poses a threat to human health or the environment or to support the analysis and design of potential response actions by conducting, as appropriate, field investigations to assess the following factors:

(i) Physical characteristics of the site, including important surface features, soils, geology, hydrogeology, meteorology, and ecology;

(ii) Characteristics or classifications of air, surface water, and ground water;

(iii) The general characteristics of the waste, including quantities, state, concentration, toxicity, propensity to bioaccumulate, persistence, and mobility;

(iv) The extent to which the source can be adequately identified and characterized;

(v) Actual and potential exposure pathways through environmental media;

(vi) Actual and potential exposure routes, for example, inhalation and ingestion; and

(vii) Other factors, such as sensitive populations, that pertain to the characterization of the site or support the analysis of potential remedial action alternatives.

(3) The lead and support agency shall identify their respective potential ARARs related to the location of and contaminants at the site in a timely manner. The lead and support agencies may also, as appropriate, identify other pertinent advisories, criteria, or guidance in a timely manner (see § 300.400(g)(3)).

(4) Using the data developed under paragraphs (d)(1) and (2) of this section, the lead agency shall conduct a site-specific baseline risk assessment to characterize the current and potential threats to human health and the environment that may be posed by contaminants migrating to ground water or surface water, releasing to air, leaching through soil, remaining in

ADD167

USCA Case #24-1193    Document #2153240    Filed: 01/07/2026    Page 173 of 204

the soil, and bioaccumulating in the food chain. The results of the baseline risk assessment will help establish acceptable exposure levels for use in developing remedial alternatives in the FS, as described in paragraph (e) of this section.

(e) Feasibility study.

(1) The primary objective of the feasibility study (FS) is to ensure that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected. The lead agency may develop a feasibility study to address a specific site problem or the entire site. The development and evaluation of alternatives shall reflect the scope and complexity of the remedial action under consideration and the site problems being addressed. Development of alternatives shall be fully integrated with the site characterization activities of the remedial investigation described in paragraph (d) of this section. The lead agency shall include an alternatives screening step, when needed, to select a reasonable number of alternatives for detailed analysis.

(2) Alternatives shall be developed that protect human health and the environment by recycling waste or by eliminating, reducing, and/or controlling risks posed through each pathway by a site. The number and type of alternatives to be analyzed shall be determined at each site, taking into account the scope, characteristics, and complexity of the site problem that is being addressed. In developing and, as appropriate, screening the alternatives, the lead agency shall:

(i) Establish remedial action objectives specifying contaminants and media of concern, potential exposure pathways, and remediation goals. Initially, preliminary remediation goals are developed based on readily available information, such as chemical-specific ARARs or other reliable information. Preliminary remediation goals should be modified, as necessary, as more information becomes available during the RI/FS. Final remediation goals will be determined when the remedy is selected. Remediation goals shall establish acceptable exposure levels that are protective of human health and the environment and shall be developed by considering the following:

(A) Applicable or relevant and appropriate requirements under federal environmental or state environmental or facility siting laws, if available, and the following factors:

(1) For systemic toxicants, acceptable exposure levels shall represent concentration levels to which the human population, including sensitive subgroups, may be exposed without adverse effect during a lifetime or part of a lifetime, incorporating an adequate margin of safety;

(2) For known or suspected carcinogens, acceptable exposure levels are generally concentration levels that represent an excess upper bound lifetime cancer risk to an individual of between $10^{-4}$ and $10^{-6}$ using information on the relationship between dose and response. The $10^{-6}$ risk level shall be used as the point of departure for determining remediation goals for alternatives when ARARs are not available or are not sufficiently protective because of the presence of multiple contaminants at a site or multiple pathways of exposure;

(3) Factors related to technical limitations such as detection/quantification limits for contaminants;

(4) Factors related to uncertainty; and

ADD168

USCA Case #24-1193    Document #2153240    Filed: 01/07/2026    Page 174 of 204

(5) Other pertinent information.

(B) Maximum contaminant level goals (MCLGs), established under the Safe Drinking Water Act, that are set at levels above zero, shall be attained by remedial actions for ground or surface waters that are current or potential sources of drinking water, where the MCLGs are relevant and appropriate under the circumstances of the release based on the factors in § 300.400(g)(2). If an MCLG is determined not to be relevant and appropriate, the corresponding maximum contaminant level (MCL) shall be attained where relevant and appropriate to the circumstances of the release.

(C) Where the MCLG for a contaminant has been set at a level of zero, the MCL promulgated for that contaminant under the Safe Drinking Water Act shall be attained by remedial actions for ground or surface waters that are current or potential sources of drinking water, where the MCL is relevant and appropriate under the circumstances of the release based on the factors in § 300.400(g)(2).

(D) In cases involving multiple contaminants or pathways where attainment of chemical-specific ARARs will result in cumulative risk in excess of $10^{-4}$, criteria in paragraph (e)(2)(i)(A) of this section may also be considered when determining the cleanup level to be attained.

(E) Water quality criteria established under sections 303 or 304 of the Clean Water Act shall be attained where relevant and appropriate under the circumstances of the release.

(F) An alternate concentration limit (ACL) may be established in accordance with CERCLA section 121(d)(2)(B)(ii).

(G) Environmental evaluations shall be performed to assess threats to the environment, especially sensitive habitats and critical habitats of species protected under the Endangered Species Act.

(ii) Identify and evaluate potentially suitable technologies, including innovative technologies;

(iii) Assemble suitable technologies into alternative remedial actions.

(3) For source control actions, the lead agency shall develop, as appropriate:

(i) A range of alternatives in which treatment that reduces the toxicity, mobility, or volume of the hazardous substances, pollutants, or contaminants is a principal element. As appropriate, this range shall include an alternative that removes or destroys hazardous substances, pollutants, or contaminants to the maximum extent feasible, eliminating or minimizing, to the degree possible, the need for long-term management. The lead agency also shall develop, as appropriate, other alternatives which, at a minimum, treat the principal threats posed by the site but vary in the degree of treatment employed and the quantities and characteristics of the treatment residuals and untreated waste that must be managed; and

(ii) One or more alternatives that involve little or no treatment, but provide protection of human health and the environment primarily by preventing or controlling exposure to hazardous substances, pollutants, or contaminants, through engineering

ADD169

controls, for example, containment, and, as necessary, institutional controls to protect human health and the environment and to assure continued effectiveness of the response action.

(4) For ground-water response actions, the lead agency shall develop a limited number of remedial alternatives that attain site-specific remediation levels within different restoration time periods utilizing one or more different technologies.

(5) The lead agency shall develop one or more innovative treatment technologies for further consideration if those technologies offer the potential for comparable or superior performance or implementability; fewer or lesser adverse impacts than other available approaches; or lower costs for similar levels of performance than demonstrated treatment technologies.

(6) The no-action alternative, which may be no further action if some removal or remedial action has already occurred at the site, shall be developed.

(7) As appropriate, and to the extent sufficient information is available, the short- and long-term aspects of the following three criteria shall be used to guide the development and screening of remedial alternatives:

(i) Effectiveness. This criterion focuses on the degree to which an alternative reduces toxicity, mobility, or volume through treatment, minimizes residual risks and affords long-term protection, complies with ARARs, minimizes short-term impacts, and how quickly it achieves protection. Alternatives providing significantly less effectiveness than other, more promising alternatives may be eliminated. Alternatives that do not provide adequate protection of human health and the environment shall be eliminated from further consideration.

(ii) Implementability. This criterion focuses on the technical feasibility and availability of the technologies each alternative would employ and the administrative feasibility of implementing the alternative. Alternatives that are technically or administratively infeasible or that would require equipment, specialists, or facilities that are not available within a reasonable period of time may be eliminated from further consideration.

(iii) Cost. The costs of construction and any long-term costs to operate and maintain the alternatives shall be considered. Costs that are grossly excessive compared to the overall effectiveness of alternatives may be considered as one of several factors used to eliminate alternatives. Alternatives providing effectiveness and implementability similar to that of another alternative by employing a similar method of treatment or engineering control, but at greater cost, may be eliminated.

(8) The lead agency shall notify the support agency of the alternatives that will be evaluated in detail to facilitate the identification of ARARs and, as appropriate, pertinent advisories, criteria, or guidance to be considered.

(9) Detailed analysis of alternatives.

(i) A detailed analysis shall be conducted on the limited number of alternatives that represent viable approaches to remedial action after evaluation in the screening stage. The lead and support agencies must identify their ARARs related to specific actions in a timely manner and no later than the early stages of the comparative analysis. The lead and support agencies may also, as appropriate, identify other pertinent advisories, criteria, or guidance in a timely manner.

ADD170

(ii) The detailed analysis consists of an assessment of individual alternatives against each of nine evaluation criteria and a comparative analysis that focuses upon the relative performance of each alternative against those criteria.

(iii) Nine criteria for evaluation. The analysis of alternatives under review shall reflect the scope and complexity of site problems and alternatives being evaluated and consider the relative significance of the factors within each criteria. The nine evaluation criteria are as follows:

(A) Overall protection of human health and the environment. Alternatives shall be assessed to determine whether they can adequately protect human health and the environment, in both the short- and long-term, from unacceptable risks posed by hazardous substances, pollutants, or contaminants present at the site by eliminating, reducing, or controlling exposures to levels established during development of remediation goals consistent with § 300.430(e)(2)(i). Overall protection of human health and the environment draws on the assessments of other evaluation criteria, especially long-term effectiveness and permanence, short-term effectiveness, and compliance with ARARs.

(B) Compliance with ARARs. The alternatives shall be assessed to determine whether they attain applicable or relevant and appropriate requirements under federal environmental laws and state environmental or facility siting laws or provide grounds for invoking one of the waivers under paragraph (f)(1)(ii)(C) of this section.

(C) Long-term effectiveness and permanence. Alternatives shall be assessed for the long-term effectiveness and permanence they afford, along with the degree of certainty that the alternative will prove successful. Factors that shall be considered, as appropriate, include the following:

(1) Magnitude of residual risk remaining from untreated waste or treatment residuals remaining at the conclusion of the remedial activities. The characteristics of the residuals should be considered to the degree that they remain hazardous, taking into account their volume, toxicity, mobility, and propensity to bioaccumulate.

(2) Adequacy and reliability of controls such as containment systems and institutional controls that are necessary to manage treatment residuals and untreated waste. This factor addresses in particular the uncertainties associated with land disposal for providing long-term protection from residuals; the assessment of the potential need to replace technical components of the alternative, such as a cap, a slurry wall, or a treatment system; and the potential exposure pathways and risks posed should the remedial action need replacement.

(D) Reduction of toxicity, mobility, or volume through treatment. The degree to which alternatives employ recycling or treatment that reduces toxicity, mobility, or volume shall be assessed, including how treatment is used to address the principal threats posed by the site. Factors that shall be considered, as appropriate, include the following:

(1) The treatment or recycling processes the alternatives employ and materials they will treat;

(2) The amount of hazardous substances, pollutants, or contaminants that will be destroyed, treated, or recycled;

ADD171

(3) The degree of expected reduction in toxicity, mobility, or volume of the waste due to treatment or recycling and the specification of which reduction(s) are occurring;

(4) The degree to which the treatment is irreversible;

(5) The type and quantity of residuals that will remain following treatment, considering the persistence, toxicity, mobility, and propensity to bioaccumulate of such hazardous substances and their constituents; and

(6) The degree to which treatment reduces the inherent hazards posed by principal threats at the site.

(E) Short-term effectiveness. The short-term impacts of alternatives shall be assessed considering the following:

(1) Short-term risks that might be posed to the community during implementation of an alternative;

(2) Potential impacts on workers during remedial action and the effectiveness and reliability of protective measures;

(3) Potential environmental impacts of the remedial action and the effectiveness and reliability of mitigative measures during implementation; and

(4) Time until protection is achieved.

(F) Implementability. The ease or difficulty of implementing the alternatives shall be assessed by considering the following types of factors as appropriate:

(1) Technical feasibility, including technical difficulties and unknowns associated with the construction and operation of a technology, the reliability of the technology, ease of undertaking additional remedial actions, and the ability to monitor the effectiveness of the remedy.

(2) Administrative feasibility, including activities needed to coordinate with other offices and agencies and the ability and time required to obtain any necessary approvals and permits from other agencies (for off-site actions);

(3) Availability of services and materials, including the availability of adequate off-site treatment, storage capacity, and disposal capacity and services; the availability of necessary equipment and specialists, and provisions to ensure any necessary additional resources; the availability of services and materials; and availability of prospective technologies.

(G) Cost. The types of costs that shall be assessed include the following:

ADD172

(1) Capital costs, including both direct and indirect costs;

(2) Annual operation and maintenance costs; and

(3) Net present value of capital and O&M costs.

(H) State acceptance. Assessment of state concerns may not be completed until comments on the RI/FS are received but may be discussed, to the extent possible, in the proposed plan issued for public comment. The state concerns that shall be assessed include the following:

(1) The state's position and key concerns related to the preferred alternative and other alternatives; and

(2) State comments on ARARs or the proposed use of waivers.

(I) Community acceptance. This assessment includes determining which components of the alternatives interested persons in the community support, have reservations about, or oppose. This assessment may not be completed until comments on the proposed plan are received.

(f) Selection of remedy—

(1) Remedies selected shall reflect the scope and purpose of the actions being undertaken and how the action relates to long-term, comprehensive response at the site.

(i) The criteria noted in paragraph (e)(9)(iii) of this section are used to select a remedy. These criteria are categorized into three groups.

(A) Threshold criteria. Overall protection of human health and the environment and compliance with ARARs (unless a specific ARAR is waived) are threshold requirements that each alternative must meet in order to be eligible for selection.

(B) Primary balancing criteria. The five primary balancing criteria are long-term effectiveness and permanence; reduction of toxicity, mobility, or volume through treatment; short-term effectiveness; implementability; and cost.

(C) Modifying criteria. State and community acceptance are modifying criteria that shall be considered in remedy selection.

(ii) The selection of a remedial action is a two-step process and shall proceed in accordance with § 300.515(e). First, the lead agency, in conjunction with the support agency, identifies a preferred alternative and presents it to the public in a proposed plan, for review and comment. Second, the lead agency shall review the public comments and consult with the

ADD173

state (or support agency) in order to determine if the alternative remains the most appropriate remedial action for the site or site problem. The lead agency, as specified in § 300.515(e), makes the final remedy selection decision, which shall be documented in the ROD. Each remedial alternative selected as a Superfund remedy will employ the criteria as indicated in paragraph (f)(1)(i) of this section to make the following determination:

(A) Each remedial action selected shall be protective of human health and the environment.

(B) On-site remedial actions selected in a ROD must attain those ARARs that are identified at the time of ROD signature or provide grounds for invoking a waiver under § 300.430(f)(1)(ii)(C).

(1) Requirements that are promulgated or modified after ROD signature must be attained (or waived) only when determined to be applicable or relevant and appropriate and necessary to ensure that the remedy is protective of human health and the environment.

(2) Components of the remedy not described in the ROD must attain (or waive) requirements that are identified as applicable or relevant and appropriate at the time the amendment to the ROD or the explanation of significant difference describing the component is signed.

(C) An alternative that does not meet an ARAR under federal environmental or state environmental or facility siting laws may be selected under the following circumstances:

(1) The alternative is an interim measure and will become part of a total remedial action that will attain the applicable or relevant and appropriate federal or state requirement;

(2) Compliance with the requirement will result in greater risk to human health and the environment than other alternatives;

(3) Compliance with the requirement is technically impracticable from an engineering perspective;

(4) The alternative will attain a standard of performance that is equivalent to that required under the otherwise applicable standard, requirement, or limitation through use of another method or approach;

(5) With respect to a state requirement, the state has not consistently applied, or demonstrated the intention to consistently apply, the promulgated requirement in similar circumstances at other remedial actions within the state; or

(6) For Fund-financed response actions only, an alternative that attains the ARAR will not provide a balance between the need for protection of human health and the environment at the site and the availability of Fund monies to respond to other sites that may present a threat to human health and the environment.

ADD174

(D) Each remedial action selected shall be cost-effective, provided that it first satisfies the threshold criteria set forth in § 300.430(f)(1)(ii)(A) and (B). Cost-effectiveness is determined by evaluating the following three of the five balancing criteria noted in § 300.430(f)(1)(i)(B) to determine overall effectiveness: long-term effectiveness and permanence, reduction of toxicity, mobility, or volume through treatment, and short-term effectiveness. Overall effectiveness is then compared to cost to ensure that the remedy is cost-effective. A remedy shall be cost-effective if its costs are proportional to its overall effectiveness.

(E) Each remedial action shall utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable. This requirement shall be fulfilled by selecting the alternative that satisfies paragraph (f)(1)(ii)(A) and (B) of this section and provides the best balance of trade-offs among alternatives in terms of the five primary balancing criteria noted in paragraph (f)(1)(i)(B) of this section. The balancing shall emphasize long-term effectiveness and reduction of toxicity, mobility, or volume through treatment. The balancing shall also consider the preference for treatment as a principal element and the bias against off-site land disposal of untreated waste. In making the determination under this paragraph, the modifying criteria of state acceptance and community acceptance described in paragraph (f)(1)(i)(C) of this section shall also be considered.

(2) The proposed plan. In the first step in the remedy selection process, the lead agency shall identify the alternative that best meets the requirements in § 300.430(f)(1), above, and shall present that alternative to the public in a proposed plan. The lead agency, in conjunction with the support agency and consistent with § 300.515(e), shall prepare a proposed plan that briefly describes the remedial alternatives analyzed by the lead agency, proposes a preferred remedial action alternative, and summarizes the information relied upon to select the preferred alternative. The selection of remedy process for an operable unit may be initiated at any time during the remedial action process. The purpose of the proposed plan is to supplement the RI/FS and provide the public with a reasonable opportunity to comment on the preferred alternative for remedial action, as well as alternative plans under consideration, and to participate in the selection of remedial action at a site. At a minimum, the proposed plan shall:

(i) Provide a brief summary description of the remedial alternatives evaluated in the detailed analysis established under paragraph (e)(9) of this section;

(ii) Identify and provide a discussion of the rationale that supports the preferred alternative;

(iii) Provide a summary of any formal comments received from the support agency; and

(iv) Provide a summary explanation of any proposed waiver identified under paragraph (f)(1)(ii)(C) of this section from an ARAR.

(3) Community relations to support the selection of remedy.

(i) The lead agency, after preparation of the proposed plan and review by the support agency, shall conduct the following activities:

ADD175

(A) Publish a notice of availability and brief analysis of the proposed plan in a major local newspaper of general circulation;

(B) Make the proposed plan and supporting analysis and information available in the administrative record required under subpart I of this part;

(C) Provide a reasonable opportunity, not less than 30 calendar days, for submission of written and oral comments on the proposed plan and the supporting analysis and information located in the information repository, including the RI/FS. Upon timely request, the lead agency will extend the public comment period by a minimum of 30 additional days;

(D) Provide the opportunity for a public meeting to be held during the public comment period at or near the site at issue regarding the proposed plan and the supporting analysis and information;

(E) Keep a transcript of the public meeting held during the public comment period pursuant to CERCLA section 117(a) and make such transcript available to the public; and

(F) Prepare a written summary of significant comments, criticisms, and new relevant information submitted during the public comment period and the lead agency response to each issue. This responsiveness summary shall be made available with the record of decision.

(ii) After publication of the proposed plan and prior to adoption of the selected remedy in the record of decision, if new information is made available that significantly changes the basic features of the remedy with respect to scope, performance, or cost, such that the remedy significantly differs from the original proposal in the proposed plan and the supporting analysis and information, the lead agency shall:

(A) Include a discussion in the record of decision of the significant changes and reasons for such changes, if the lead agency determines such changes could be reasonably anticipated by the public based on the alternatives and other information available in the proposed plan or the supporting analysis and information in the administrative record; or

(B) Seek additional public comment on a revised proposed plan, when the lead agency determines the change could not have been reasonably anticipated by the public based on the information available in the proposed plan or the supporting analysis and information in the administrative record. The lead agency shall, prior to adoption of the selected remedy in the ROD, issue a revised proposed plan, which shall include a discussion of the significant changes and the reasons for such changes, in accordance with the public participation requirements described in paragraph (f)(3)(i) of this section.

(4) Final remedy selection.

(i) In the second and final step in the remedy selection process, the lead agency shall reassess its initial determination that the preferred alternative provides the best balance of trade-offs, now factoring in any new information or points of view expressed by the state (or support agency) and community during the public comment period. The lead agency shall

ADD176

consider state (or support agency) and community comments regarding the lead agency's evaluation of alternatives with respect to the other criteria. These comments may prompt the lead agency to modify aspects of the preferred alternative or decide that another alternative provides a more appropriate balance. The lead agency, as specified in § 300.515(e), shall make the final remedy selection decision and document that decision in the ROD.

(ii) If a remedial action is selected that results in hazardous substances, pollutants, or contaminants remaining at the site above levels that allow for unlimited use and unrestricted exposure, the lead agency shall review such action no less often than every five years after initiation of the selected remedial action.

(iii) The process for selection of a remedial action at a federal facility on the NPL, pursuant to CERCLA section 120, shall entail:

(A) Joint selection of remedial action by the head of the relevant department, agency, or instrumentality and EPA; or

(B) If mutual agreement on the remedy is not reached, selection of the remedy is made by EPA.

(5) Documenting the decision.

(i) To support the selection of a remedial action, all facts, analyses of facts, and site-specific policy determinations considered in the course of carrying out activities in this section shall be documented, as appropriate, in a record of decision, in a level of detail appropriate to the site situation, for inclusion in the administrative record required under subpart I of this part. Documentation shall explain how the evaluation criteria in paragraph (e)(9)(iii) of this section were used to select the remedy.

(ii) The ROD shall describe the following statutory requirements as they relate to the scope and objectives of the action:

(A) How the selected remedy is protective of human health and the environment, explaining how the remedy eliminates, reduces, or controls exposures to human and environmental receptors;

(B) The federal and state requirements that are applicable or relevant and appropriate to the site that the remedy will attain;

(C) The applicable or relevant and appropriate requirements of other federal and state laws that the remedy will not meet, the waiver invoked, and the justification for invoking the waiver;

(D) How the remedy is cost-effective, i.e., explaining how the remedy provides overall effectiveness proportional to its costs;

(E) How the remedy utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable; and

ADD177

(F) Whether the preference for remedies employing treatment which permanently and significantly reduces the toxicity, mobility, or volume of the hazardous substances, pollutants, or contaminants as a principal element is or is not satisfied by the selected remedy. If this preference is not satisfied, the record of decision must explain why a remedial action involving such reductions in toxicity, mobility, or volume was not selected.

(iii) The ROD also shall:

(A) Indicate, as appropriate, the remediation goals, discussed in paragraph (e)(2)(i) of this section, that the remedy is expected to achieve. Performance shall be measured at appropriate locations in the ground water, surface water, soils, air, and other affected environmental media. Measurement relating to the performance of the treatment processes and the engineering controls may also be identified, as appropriate;

(B) Discuss significant changes and the response to comments described in paragraph (f)(3)(i)(F) of this section;

(C) Describe whether hazardous substances, pollutants, or contaminants will remain at the site such that a review of the remedial action under paragraph (f)(4)(ii) of this section no less often than every five years shall be required; and

(D) When appropriate, provide a commitment for further analysis and selection of long-term response measures within an appropriate time-frame.

(6) Community relations when the record of decision is signed. After the ROD is signed, the lead agency shall:

(i) Publish a notice of the availability of the ROD in a major local newspaper of general circulation; and

(ii) Make the record of decision available for public inspection and copying at or near the facility at issue prior to the commencement of any remedial action.

SOURCE: 47 FR 31202, July 16, 1982; 51 FR 41581, Nov. 17, 1986; 52 FR 13395, April 22, 1987; 54 FR 10517, March 13, 1989; 55 FR 8813, March 8, 1990; 55 FR 8839, March 8, 1990; 56 FR 5605, Feb. 11, 1991; 57 FR 47187, Oct. 14, 1992; 59 FR 47416, Sept. 15, 1994; 60 FR 16054, March 29, 1995; 60 FR 17004, April 4, 1995; 60 FR 19525, April 19, 1995; 60 FR 33362, June 28, 1995; 60 FR 58239, Nov. 27, 1995; 79 FR 36431, June 27, 2014; 80 FR 17705, April 2, 2015; 80 FR 37119, June 29, 2015; 81 FR 20257, April 7, 2016; 82 FR 14153, March 17, 2017; 82 FR 31267, July 6, 2017; 82 FR 36100, Aug. 3, 2017; 84 FR 56670, Oct. 22, 2019; 85 FR 22342, April 21, 2020; 85 FR 50787, Aug. 18, 2020; 85 FR 54935, Sept. 3, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.; 42 U.S.C. 9601–9657; E.O. 13626, 77 FR 56749, 3 CFR, 2013 Comp., p. 306; E.O. 12777, 56 FR 54757, 3 CFR, 1991 Comp., p. 351; E.O. 12580, 52 FR 2923, 3 CFR, 1987 Comp., p. 193.

Notes of Decisions (244)

ADD178

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter J. Superfund, Emergency Planning, and Community Right–to–Know Programs
Part 300. National Oil and Hazardous Substances Pollution Contingency Plan (Refs & Annos)
Subpart E. Hazardous Substance Response (Refs & Annos)

40 C.F.R. § 300.435

§ 300.435 Remedial design/remedial action, operation and maintenance.

Currentness

(a) General. The remedial design/remedial action (RD/RA) stage includes the development of the actual design of the selected remedy and implementation of the remedy through construction. A period of operation and maintenance may follow the RA activities.

(b) RD/RA activities.

(1) All RD/RA activities shall be in conformance with the remedy selected and set forth in the ROD or other decision document for that site. Those portions of RD/RA sampling and analysis plans describing the QA/QC requirements for chemical and analytical testing and sampling procedures of samples taken for the purpose of determining whether cleanup action levels specified in the ROD are achieved, generally will be consistent with the requirements of § 300.430(b)(8).

(2) During the course of the RD/RA, the lead agency shall be responsible for ensuring that all federal and state requirements that are identified in the ROD as applicable or relevant and appropriate requirements for the action are met. If waivers from any ARARs are involved, the lead agency shall be responsible for ensuring that the conditions of the waivers are met.

(c) Community relations.

(1) Prior to the initiation of RD, the lead agency shall review the CRP to determine whether it should be revised to describe further public involvement activities during RD/RA that are not already addressed or provided for in the CRP.

(2) After the adoption of the ROD, if the remedial action or enforcement action taken, or the settlement or consent decree entered into, differs significantly from the remedy selected in the ROD with respect to scope, performance, or cost, the lead agency shall consult with the support agency, as appropriate, and shall either:

(i) Publish an explanation of significant differences when the differences in the remedial or enforcement action, settlement, or consent decree significantly change but do not fundamentally alter the remedy selected in the ROD with respect to scope, performance, or cost. To issue an explanation of significant differences, the lead agency shall:

ADD179

(A) Make the explanation of significant differences and supporting information available to the public in the administrative record established under § 300.815 and the information repository; and

(B) Publish a notice that briefly summarizes the explanation of significant differences, including the reasons for such differences, in a major local newspaper of general circulation; or

(ii) Propose an amendment to the ROD if the differences in the remedial or enforcement action, settlement, or consent decree fundamentally alter the basic features of the selected remedy with respect to scope, performance, or cost. To amend the ROD, the lead agency, in conjunction with the support agency, as provided in § 300.515(e), shall:

(A) Issue a notice of availability and brief description of the proposed amendment to the ROD in a major local newspaper of general circulation;

(B) Make the proposed amendment to the ROD and information supporting the decision available for public comment;

(C) Provide a reasonable opportunity, not less than 30 calendar days, for submission of written or oral comments on the amendment to the ROD. Upon timely request, the lead agency will extend the public comment period by a minimum of 30 additional days;

(D) Provide the opportunity for a public meeting to be held during the public comment period at or near the facility at issue;

(E) Keep a transcript of comments received at the public meeting held during the public comment period;

(F) Include in the amended ROD a brief explanation of the amendment and the response to each of the significant comments, criticisms, and new relevant information submitted during the public comment period;

(G) Publish a notice of the availability of the amended ROD in a major local newspaper of general circulation; and

(H) Make the amended ROD and supporting information available to the public in the administrative record and information repository prior to the commencement of the remedial action affected by the amendment.

(3) After the completion of the final engineering design, the lead agency shall issue a fact sheet and provide, as appropriate, a public briefing prior to the initiation of the remedial action.

(d) Contractor conflict of interest.

(1) For Fund-financed RD/RA and O&M activities, the lead agency shall:

ADD180

USCA Case #24-1193      Document #2153240          Filed: 01/07/2026      Page 186 of 204

(i) Include appropriate language in the solicitation requiring potential prime contractors to submit information on their status, as well as the status of their subcontractors, parent companies, and affiliates, as potentially responsible parties at the site.

(ii) Require potential prime contractors to certify that, to the best of their knowledge, they and their potential subcontractors, parent companies, and affiliates have disclosed all information described in § 300.435(d)(1)(i) or that no such information exists, and that any such information discovered after submission of their bid or proposal or contract award will be disclosed immediately.

(2) Prior to contract award, the lead agency shall evaluate the information provided by the potential prime contractors and:

(i) Determine whether they have conflicts of interest that could significantly impact the performance of the contract or the liability of potential prime contractors or subcontractors.

(ii) If a potential prime contractor or subcontractor has a conflict of interest that cannot be avoided or otherwise resolved, and using that potential prime contractor or subcontractor to conduct RD/RA or O&M work under a Fund-financed action would not be in the best interests of the state or federal government, an offeror or bidder contemplating use of that prime contractor or subcontractor may be declared nonresponsible or ineligible for award in accordance with appropriate acquisition regulations, and the contract may be awarded to the next eligible offeror or bidder.

(e) Recontracting.

(1) If a Fund-financed contract must be terminated because additional work outside the scope of the contract is needed, EPA is authorized to take appropriate steps to continue interim RAs as necessary to reduce risks to public health and the environment. Appropriate steps may include extending an existing contract for a federal-lead RA or amending a cooperative agreement for a state-lead RA. Until the lead agency can reopen the bidding process and recontract to complete the RA, EPA may take such appropriate steps as described above to cover interim work to reduce such risks, where:

(i) Additional work is found to be needed as a result of such unforeseen situations as newly discovered sources, types, or quantities of hazardous substances at a facility; and

(ii) Performance of the complete RA requires the lead agency to rebid the contract because the existing contract does not encompass this newly discovered work.

(2) The cost of such interim actions shall not exceed $2 million.

(f) Operation and maintenance.

(1) Operation and maintenance (O&M) measures are initiated after the remedy has achieved the remedial action objectives and remediation goals in the ROD, and is determined to be operational and functional, except for ground- or surface-water

ADD181

USCA Case #24-1193    Document #2153240    Filed: 01/07/2026    Page 187 of 204

restoration actions covered under § 300.435(f)(4). A state must provide its assurance to assume responsibility for O&M, including, where appropriate, requirements for maintaining institutional controls, under § 300.510(c).

(2) A remedy becomes "operational and functional" either one year after construction is complete, or when the remedy is determined concurrently by EPA and the state to be functioning properly and is performing as designed, whichever is earlier. EPA may grant extensions to the one-year period, as appropriate.

(3) For Fund-financed remedial actions involving treatment or other measures to restore ground- or surface-water quality to a level that assures protection of human health and the environment, the operation of such treatment or other measures for a period of up to 10 years after the remedy becomes operational and functional will be considered part of the remedial action. Activities required to maintain the effectiveness of such treatment or measures following the 10–year period, or after remedial action is complete, whichever is earlier, shall be considered O&M. For the purposes of federal funding provided under CERCLA section 104(c)(6), a restoration activity will be considered administratively "complete" when:

(i) Measures restore ground- or surface-water quality to a level that assures protection of human health and the environment;

(ii) Measures restore ground or surface water to such a point that reductions in contaminant concentrations are no longer significant; or

(iii) Ten years have elapsed, whichever is earliest.

(4) The following shall not be deemed to constitute treatment or other measures to restore contaminated ground or surface water under § 300.435(f)(3):

(i) Source control maintenance measures; and

(ii) Ground- or surface-water measures initiated for the primary purpose of providing a drinking-water supply, not for the purpose of restoring ground water.

SOURCE: 47 FR 31202, July 16, 1982; 51 FR 41581, Nov. 17, 1986; 52 FR 13395, April 22, 1987; 54 FR 10517, March 13, 1989; 55 FR 8813, March 8, 1990; 55 FR 8839, March 8, 1990; 56 FR 5605, Feb. 11, 1991; 57 FR 47187, Oct. 14, 1992; 59 FR 47416, Sept. 15, 1994; 60 FR 16054, March 29, 1995; 60 FR 17004, April 4, 1995; 60 FR 19525, April 19, 1995; 60 FR 33362, June 28, 1995; 60 FR 58239, Nov. 27, 1995; 79 FR 36431, June 27, 2014; 80 FR 17705, April 2, 2015; 80 FR 37119, June 29, 2015; 81 FR 20257, April 7, 2016; 82 FR 14153, March 17, 2017; 82 FR 31267, July 6, 2017; 82 FR 36100, Aug. 3, 2017; 84 FR 56670, Oct. 22, 2019; 85 FR 22342, April 21, 2020; 85 FR 50787, Aug. 18, 2020; 85 FR 54935, Sept. 3, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.; 42 U.S.C. 9601–9657; E.O. 13626, 77 FR 56749, 3 CFR, 2013 Comp., p. 306; E.O. 12777, 56 FR 54757, 3 CFR, 1991 Comp., p. 351; E.O. 12580, 52 FR 2923, 3 CFR, 1987 Comp., p. 193.

Notes of Decisions (66)

ADD182

## § 302.5 Determination of reportable quantities.

(a) *Listed Hazardous Substances.* The quantity in the column "Proposed RQ" for each substance in Table 302.4 is the reportable quantity for that substance.

(b) *Unlisted Hazardous Substances.* Unlisted hazardous wastes designated by 40 CFR § 302.4(b) have the reportable quantity of 100 pounds, except for those unlisted hazardous wastes exhibiting the characteristic of EP toxicity identified in 40 CFR § 261.24. Unlisted hazardous wastes which exhibit EP toxicity have the reportable quantities listed in Table 302.4 for the contaminant on which the characteristic of EP toxicity is based. If an unlisted hazardous waste exhibits EP toxicity on the basis of more than one contaminant, the reportable quantity for that waste shall be the lowest of the reportable quantities listed in Table 302.4 for those contaminants. If an unlisted hazardous waste exhibits the characteristic of EP toxicity and one or more of the other characterstics referenced in 40 CFR § 302.4(b), the reportable quantity for that waste shall be the lowest of the applicable reportable quantities.

## § 302.6 Notification requirements.

Any person in charge of a vessel or an offshore or an onshore facility shall, as soon as he has knowledge of any release (other than a federally permitted release or normal application of a pesticide) of a hazardous substance from such vessel or facility in a quantity equal to or exceeding the reportable quantity determined by this part in any 24-hour period, immediately notify the National Response Center ((800) 424–8802; in Hawaii, Alaska, and the Washington, D.C. metropolitan areas (202) 426–2675).

## § 302.7 Penalties.

(a) Any person

(1) In charge of a vessel from which a hazardous substance is released, other than a federally permitted release, into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of a contiguous zone,

(2) In charge of a vessel from which a hazardous substance is released, other than a federally permitted release, which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Fishery Conservation and Management Act of 1976), and who is otherwise subject to the jurisdiction of the United States at the time of the release, or

(3) In charge of a facility from which a hazardous substance is released, other than a federally permitted release, in a quantity equal to or greater than that reportable quantity determined under this part who fails to notify immediately the National Response Center as soon as he has knowledge of such release shall, upon conviction, be fined not more than $10,000 or imprisoned for not than one year, or both.

(b) Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

(c) This section shall not apply to the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act or to the handling and storage of such a pesticide product by an agricultural producer.

2. It is proposed to revise 40 CFR 117.3 as follows:

## § 117.3 Determination of reportable quantities.

The quantity listed with each substance in Table 302.4, in 40 CFR 302.4 is determined to be reportable quantity for that substance.

Dated: April 26, 1983.

**Lee L. Verstandig,**
*Administrator.*

[FR Doc. 83-13985 Filed 5-24-83; 8:45 am]
BILLING CODE 6560-50-M

---

## 40 CFR Part 302

[SWH-FRL 2207-5a ]

## Designation of Additional Hazardous Substances

**AGENCY:** Environmental Protection Agency.

**ACTION:** Advance Notice of Proposed Rulemaking.

**SUMMARY:** Under Section 102(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA" or "Superfund"), the Environmental Protection Agency ("EPA" or "the Agency") is considering proposal of regulations to designate hazardous substances in addition to those already designated under Section 101(14) of CERCLA. Section 102(a) requires the Administrator to promulgate regulations designating as hazardous substances those substances that, when released into the environment, may present substantial danger to public health or welfare or the environment. This Advance Notice of

Proposed Rulemaking ("ANPRM") discusses and solicits comments on various approaches that the Agency may use to determine what additional substances, if any, should be proposed for designation as hazardous.

**DATES:** To be considered, written comments must be submitted in triplicate on or before July 25, 1983.

**ADDRESS:** Send written comments to: Emergency Response Division, Docket Clerk, Attn: Docket No. 102 ADD, U.S. Environmental Protection Agency, 401 M Street, S.W., WH-548B, Washington, D.C. 20460.

**FOR FURTHER INFORMATION CONTACT:**

*For general information contact:* RCRA/Superfund Hotline, (800) 424–9346 ([(202) 382–3000 in Washington, D.C.).

*For specific information contact:* Dr. K. Jack Kooyoomjiam, Chief, Regulation Development Section, Emergency Response Division (WH-548B), U.S. Environmental Protection Agency, 401 M Street, S.W., Washington, D.C. 20460, or the RCRA/Superfund Hotline (800) 424–9346, in Washington, D.C. (202) 382–3000.

**SUPPLEMENTARY INFORMATION:**

1. Background Information

Substances are designated as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, CERCLA (Pub. L. 96–510), 42 U.S.C. Section 9601 *et seq.,* in two ways. Section 101(14) defines "hazardous substance" to include substances designated under certain provisions of other environmental statutes: Sections 307(a) and 311(b)(2)(A) of the Federal Water Pollution Control Act (Clean Water Act), Section 112 of the Clean Air Act, Section 3001 of the Solid Waste Disposal Act (commonly known as the Resource Conservation and Recovery Act, "RCRA"), and Section 7 of the Toxic Substances Control Act. In addition, Section 102(a) requires the EPA Administrator to promulgate regulations to designate as hazardous substances other elements, compounds, mixtures, solutions, and substances that may present substantial danger to public health or welfare or the environment when released into the environment.

The consequences of designation can be substantial. First, Section 103(a) of CERCLA requires that releases of designated hazardous substances that equal or exceed reportable quantities ("RQs") be reported to the National Response Center unless the release is federally permitted or otherwise exempted. (For a further discussion of reportable quantities and release

ADD183

notification see the Notice of Proposed Rulemaking ("NPRM") on Superfund Notification Requirements and Reportable Quantity Adjustments, published elsewere in today's **Federal Register.**) This notification allows the federal government to determine whether a response is necessary. In addition, Section 103(b) establishes penalties, including criminal sanctions, for persons in charge of vessels or facilities who fail to report releases of hazardous substances which equal or exceed reportable quantities. Any such person who, as soon as he has knowledge of a reportable release, fails to report the release pursuant to Section 103 (a) or (b) shall, upon conviction, be fined no more than $10,000 or imprisoned for not more than one year, or both.

Regardless of whether a reportable quantity of the hazardous substance is released and proper notification is given, any person responsible for a release of hazardous substances may be liable for:

(A) All costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) Any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natual resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release (see Section 107 of CERCLA).

Finally, substances designated as hazardous under CERCLA must also be listed as hazardous materials under the Hazardous Materials Transportation Act (see Section 306(a) of CERCLA).

EPA intends to consider carefully these economic impacts in developing its designation strategy.

## II. Major Alternatives Under Consideration and Requests for Public Comment

EPA contemplates that the designation process will involve two distinct steps. First, the Agency will identify a candidate list or lists of substances to be considered for designation. Second, the Agency will identify the criteria to be applied to determine which substances on the candidate list or lists will be designated as hazardous substances. EPA is considering several alternatives for both of these steps. The first section below discusses the potential candidate lists and the second section discusses possible criteria for designating substances from these candidate lists.

The Agency has conducted several preliminary economic and technical analyses in support of this ANPRM. These analyses are part of the rulemaking record: "Analysis of the Economic Effects of Regulatory Strategies for Sections 102 and 103 of the Comprehensive Environmental Response, Compensation, and Liability Act," November 2, 1981; and "Strategies for Designation of Additional Hazardous Substances pursuant to CERCLA Section 102(a)," September 17, 1982.

Public comment is solicited on the alternatives discussed below and on other alternatives that commentors may want the Agency to consider.

### A. Candidate Lists

EPA has identified a number of candidate lists that might be considered for designating hazardous substances. These lists are briefly described below. They are divided into two groups: specific lists developed under other environmental statutes or programs, and general data bases which include broader lists of potential hazardous substances. EPA is soliciting comments on which lists are appropriate for EPA to review in designating hazardous substances, particularly information on the scope of coverage of these candidate lists and the availability of data for substances on these lists. EPA may also decide to designate hazardous substances in several phases, rather than complete the designation process in one rulemaking. EPA solicits comments on which of the candidate lists should be given highest priority and solicits information concerning other candidate lists not mentioned below that should be considered.

The presence of a substance on a candidate list does not in itself determine whether the substance will be designated as a hazardous substance under CERCLA. Part II(B) of this notice discusses the types of criteria that might be applied to determine whether substances on these candidate lists are sufficiently hazardous to warrant designation. The Agency anticipates that substances on the candidate lists will be ranked on the basis of factors such as production volume, potential for release, and the availability of data in conjunction with the application of the criteria discussed in part II(B).

### Specific Lists:

(1) Certain pesticide or pesticide active ingredients identified under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). One potential candidate list is the list of about 600 pesticide active ingredients identified by EPA after a review of

about 40,000 pesticide formulations ("Pesticide Active Ingredients Standards Ranking Scheme Results" produced by the EPA Office of Pesticide Programs; see 47 FR 3770–3771, January 27, 1982). These ingredients will be evaluated by EPA to determine their possible effects on man and the environment. It may not be possible for EPA to analyze all of these pesticides and pesticide active ingredients to determine whether they should be designated as hazardous substances under CERCLA. EPA solicits comments on methods for setting priorities for analysis of these substances.

(2) Chemicals listed under RCRA, 40 CFR Part 261, Appendix VIII, excluding those already listed under Section 101(14). These substances are hazardous constituents of RCRA wastes (45 FR 33132–33133, May 19, 1980).

(3) Materials listed under the Department of Transportation ("DOT") regulations issued under the Hazardous Materials Transportation Act, excluding those already listed under Section 101(14). These lists designate materials considered hazardous for the purpose of transportation (49 CFR 172.101, 172.102).

(4) Substances determined by the International Agency for Research on Cancer ("IARC") to demonstrate carcinogenic characteristics, excluding those already listed under Section 101(14). IARC has assessed the evidence for carcinogenicity of substances from experimental animal studies and classified these substances into five groups according to the extent of evidence of carcinogenicity: (1) sufficient evidence, (2) limited evidence, (3) inadequate evidence, (4) negative evidence, and (5) no data. Substances might be included on the candidate list if the IARC has determined that there is sufficient or limited evidence of carcinogenicity. Sufficient evidence indicates a causal association between exposure and human cancer, while limited evidence indicates a possible carcinogenic effect in humans, although the data are not sufficient to demonstrate a causal association (Table 1, International Agency for Research on Cancer, monograph supplement, September 1979).

(5) The 1982 list of explosive materials subject to regulation under 18 USC Chapter 40, 47 FR 40974–40976 (September 16, 1982). This list of explosive materials is designated by the Director of the Bureau of Alcohol, Tobacco and Firearms.

(6) The Toxic Substances Control Act (TSCA) Section 4(e) list. This is the list of chemical substances and mixtures recommended for priority consideration

in regard to testing requirements under TSCA Section 4(a) (see the TSCA Chemicals in Progress Bulletin, Volume 3, Number 1, April 1982).

*General Lists*

(1) *Chemical Activities Status Report ("CASR").*This data base identifies substances that the Agency has already regulated, that it is proposing for regulation, or that it otherwise is considering. CASR covers other substances in addition to those already regulated or proposed for rulemaking; it also includes those substances for which the Agency has demonstrated some concern, even if no rulemaking has begun. CASR is limited to EPA activities and does not reflect the activities of other agencies or departments (e.g., DOT, Coast Guard ). CASR has been issued as a two-volume Agency report, EPA 560/13–80–040a&b, but the candidate list would be the actual CASR data base, which is constantly updated and may differ slightly from this report.

(2) *The Suspect Chemicals Sourcebook.* This list already includes chemical substances derived from regulatory lists or other publications that have been issued not only by EPA but also by DOT, the Department of Health and Human Services, the Occupational Safety and Health Administration, and IARC. It does not go beyond substances that have already been regulated, considered for regulation, or listed for testing. This list was prepared by Executive Enterprise Publications Company, Inc., in cooperation with the Synthetic Organic Chemical Manufacturers Association.

(3) *Toxic Substances Control Act Chemical Substance Inventory.* This list includes approximately 55,000 chemicals. It is likely that most known potentially hazardous chemicals would be included and considered for designation if this list is used. The Agency, however, could have difficulty in establishing priorities and applying designation criteria in a timely fashion to this list, and data on these substances may be insufficient.

*B. Criteria for Designation*

The Agency has identified four alternative sets of criteria for designating candidate substances as hazardous for purposes of CERCLA. Comment is specifically solicited on these alternatives, and on combinations of them.

*Designation Alternative 1: Critical Value Strategy.* This approach resembles the primary and secondary criteria used to adjust RQs. [See today's NPRM on Superfund Notification Requirements and Reportable Quantity Adjustments, published elsewhere in todays **Federal Register**, for a more detailed explanation of this process.] To assign RQs to designated hazardous substances, the Agency would evaluate whether substances exhibit any of the following characteristics: aquatic toxicity, mammalian (oral, dermal, or inhalation) toxicity, ignitability, reactivity, other toxic effects, carcinogenicity, and a tendency to dissipate into the environment. These characteristics or criteria are used to adjust reportable quantities in the accompanying NPRM. In applying this approach to designation, the Agency would establish a critical value for each of the above criteria. Substances would be designated if the rating of the substances were above the critical value for any criterion. If there were insufficient evidence to judge, the substance could be retained as a candidate pending the collection of further data. The data gathered in the designation process would also be used to establish RQs for substances once they have been designated.

EPA specifically solicits comments on the following issues:

(1) Are the critical values developed to adjust reportable quantities also appropriate for designation of hazardous substances? (These critical values are discussed in the accompanying Notice of Proposed Rulemaking on Superfund Reportable Quantity Adjustments, Part IV.)

(2) Are other critical values more appropriate for designation of hazardous substances?

*Designation Alternative 2: A Combination of Production Level and Critical Value Strategy.* This alternative would identify substances on the candidate list for further analysis if their annual production level exceeded some specified amount. The critical value methodology would then be applied to these substances to determine whether they should actually be designated. This method treats production volume as an indication of release potential. It assumes that there is less chance of a release if a substance is produced in relatively small quantities. For imported substances, the amount imported would be added to the domestic production level.

Section 311 of the Clean Water Act screened substances by production level. The Clean Water Act's final promulgated list of hazardous substances includes those hazardous substances produced at a level of 10 million pounds per year or more. The Agency has found that the materials most commonly encountered (i.e., spilled most frequently) in Section 311 spill situations are those produced in high volumes. Screening by production levels results in fewer candidate substances than Alternative 1, which means that the Agency may be able to analyze for possible designation the substances most likely to be released. If this approach is taken, however, certain potentially hazardous substances that may be released will not be considered for possible designation because thay are no longer produced or they are produced in low volumes.

The Agency specifically requests comments on the following points: (1) if production level is used to screen substances for analysis, what production level should be selected as the cutoff point, and (2) what problems could occur when substances with low production volumes that might otherwise be considered hazardous are not designated.

*Designation Alternative 3: Hazard Index.* This approach involves a scoring system to evaluate the relative potential threat posed to public health or welfare or the environment when candidate substances are released to the air, ground water, surface water, or soil. A variety of rating factors (e.g., toxicity, reactivity, bioaccumulation, persistence, carcinogenicity) would be used to determine the kinds of hazards that would result and, insofar as possible, the degree of hazard posed. EPA solicits comments concerning the appropriate rating factors. An equation would be used to combine these several factors into a single number. A substance's hazard index value derived in this fashion could be compared to the values determined for other substances, and a ranking of substances would be possible. A cutoff point for designation could then be determined.

A hazard index approach provides a quantative ranking of hazard that facilitates setting a cutoff point, and it uses all available data. It is possible, however, that (1) data gaps may make a substance appear less hazardous than it is and may make relative ranking difficult to develop, (2) a cutoff point could not be easily determined, (3) there would be no general agreement in the scientific community on how rating factors are to be combined to form an acceptable hazard index for a broad listing of chemicals, and (4) different but equally defensible equations would result in different rankings for the same subtance.

*Designation Alternative 4: Combination of Release History and Critical Value Strategy.* This approach would identify all candidate substances with a history of release problems. For

example, substances would be considered for designation if their release had required frequent or extraordinary response (e. g., rapid evacuation) in the past, or if they had frequently been identified at sites undergoing remedial action under CERCLA. The critical value strategy would then be applied to determine which substances pose a threat to public health or welfare or the environment.

This approach identifies for CERCLA designation those substances that pose a threat to public health or welfare or the environment and that have a proven history of release problems. Designation of substances that have not historically been a problem is avoided. It may be appropriate, however, to designate substances that are rarely, if ever, released because of the potential hazard they pose. In addition, non-regulated substances are not usually monitored when releases of hazardous substances occur, so that there may be no release record of a substance that is released in potentially significant amounts.

### 111. Other Issues

Several issues will arise regardless of the alternatives selected. The issues include designation under other statutes and the use of categorical designation.

#### A. Effects of Designation Under Other Statutes

Substances may be added to or deleted from the lists identified under Section 101(14) of CERCLA: Sections 307(a) and 311(b)(2)(A) of the Clean Water Act, Section 112 of the Clean Air Act, Section 3001 of RCRA, and Section 7 of TSCA. Substances added to these lists will be added to the CERCLA list and substances deleted from these lists will be deleted from the CERCLA list (unless they are also designated under some other provisions). In proposing any additions to these other lists, EPA will reference the fact that these substances will automatically be designated under CERCLA. EPA anticipates proposing RQs for these substances at that time. EPA solicits comments on any other arrangements that might be helpful to inform the public concerning additions to or deletions from these lists.

#### B. Categorical Versus Individual Designation

Hazardous substances could be designated as categories of substances (e.g., acids) or as individual substances (e.g., sulfuric acid). If designation is by category, however, the designation may be too broad. Although such an approach guarantees that all truly hazardous substances in that category are designated, it could impose an unnecessary burden on the regulated community and might prevent EPA from focusing on the most serious releases. In addition, RQ assignment might be complicated if individual substances covered by a single categorical designation required different RQs. Individual designation, on the other hand, is a time-consuming process, and designation of particular substances as hazardous under CERCLA may take longer than if the categorical designation approach had been used. A delay or a failure to designate substances as hazardous may adversely affect public health or welfare or the environment.

The Agency requests public comment on the relative merits of categorical versus individual designation.

### IV. Public Comment

To summarize the previous discussion, public comment is specifically requested on the following:

(1) The alternatives presented for developing a list of candidate substances;

(2) The alternatives presented for selecting substances from the candidate list for designation as hazardous for purposes of CERCLA;

(3) The option of designating no new hazardous substances;

(4) The relative merits of designating substances categorically or individually;

(5) Data bases or techniques that could be used by the Agency to fill data gaps about substances being considered for designation.

### List of Subjects in 40 CFR Part 302

Administrative practice and procedure, Air pollution control, Chemicals, Hazardous materials, Hazardous materials transportation, Hazardous substances, Hazardous wastes, Intergovernmental relations, Liabilities, Natural resources, Nuclear materials, Penalties, Pesticides and pests, Radioactive materials, Reporting and recordkeeping requirements, Superfund, Waste treatment and disposal, Water pollution control, Water supply.

Dated: April 26, 1983.

**Lee L. Verstandig,**

*Acting Administrator.*

[FR Doc. 83–13986 Filed 5–24–83; 8:45 am]

**BILLING CODE 6560-50-M**

# Presidential Documents

Executive Order 12580 of January 23, 1987

## Superfund Implementation

By the authority vested in me as President of the United States of America by Section 115 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. 9615 *et seq.*) ("the Act"), and by Section 301 of Title 3 of the United States Code, it is hereby ordered as follows:

**Section 1.** *National Contingency Plan.* (a)(1) The National Contingency Plan ("the NCP"), shall provide for a National Response Team ("the NRT") composed of representatives of appropriate Federal departments and agencies for national planning and coordination of preparedness and response actions, and regional response teams as the regional counterpart to the NRT for planning and coordination of regional preparedness and response actions.

(2) The following agencies (in addition to other appropriate agencies) shall provide representatives to the National and Regional Response Teams to carry out their responsibilities under the NCP: Department of State, Department of Defense, Department of Justice, Department of the Interior, Department of Agriculture, Department of Commerce, Department of Labor, Department of Health and Human Services, Department of Transportation, Department of Energy, Environmental Protection Agency, Federal Emergency Management Agency, United States Coast Guard, and the Nuclear Regulatory Commission.

(3) Except for periods of activation because of a response action, the representative of the Environmental Protection Agency ("EPA") shall be the chairman and the representative of the United States Coast Guard shall be the vice chairman of the NRT and these agencies' representatives shall be co-chairs of the Regional Response Teams ("the RRTs"). When the NRT or an RRT is activated for a response action, the chairman shall be the EPA or United States Coast Guard representative, based on whether the release or threatened release occurs in the inland or coastal zone, unless otherwise agreed upon by the EPA and United States Coast Guard representatives.

(4) The RRTs may include representatives from State governments, local governments (as agreed upon by the States), and Indian tribal governments. Subject to the functions and authorities delegated to Executive departments and agencies in other sections of this Order, the NRT shall provide policy and program direction to the RRTs.

(b)(1) The responsibility for the revision of the NCP and all of the other functions vested in the President by Sections 105(a), (b), (c), and (g), 125, and 301(f) of the Act is delegated to the Administrator of the Environmental Protection Agency ("the Administrator").

(2) The function vested in the President by Section 118(p) of the Superfund Amendments and Reauthorization Act of 1986 (Public Law 99–499) ("SARA") is delegated to the Administrator.

(c) In accord with Section 107(f)(2)(A) of the Act and Section 311(f)(5) of the Federal Water Pollution Control Act, as amended (33 U.S.C. 1321(f)(5)), the following shall be among those designated in the NCP as Federal trustees for natural resources:

(1) Secretary of Defense;

ADD187

(2) Secretary of the Interior;

(3) Secretary of Agriculture;

(4) Secretary of Commerce;

(5) Secretary of Energy.

(d) Revisions to the NCP shall be made in consultation with members of the NRT prior to publication for notice and comment. Revisions shall also be made in consultation with the Director of the Federal Emergency Management Agency and the Nuclear Regulatory Commission in order to avoid inconsistent or duplicative requirements in the emergency planning responsibilities of those agencies.

(e) All revisions to the NCP, whether in proposed or final form, shall be subject to review and approval by the Director of the Office of Management and Budget ("OMB").

**Sec. 2.** *Response and Related Authorities.* (a) The functions vested in the President by the first sentence of Section 104(b)(1) of the Act relating to "illness, disease, or complaints thereof" are delegated to the Secretary of Health and Human Services who shall, in accord with Section 104(i) of the Act, perform those functions through the Public Health Service.

(b) The functions vested in the President by Sections 104(e)(7)(C), 113(k)(2), 119(c)(7), and 121(f)(1) of the Act, relating to promulgation of regulations and guidelines, are delegated to the Administrator, to be exercised in consultation with the NRT.

(c)(1) The functions vested in the President by Sections 104(a) and the second sentence of 126(b) of the Act, to the extent they require permanent relocation of residents, businesses, and community facilities or temporary evacuation and housing of threatened individuals not otherwise provided for, are delegated to the Director of the Federal Emergency Management Agency.

(2) Subject to subsection (b) of this Section, the functions vested in the President by Sections 117(a) and (c), and 119 of the Act, to the extent such authority is needed to carry out the functions delegated under paragraph (1) of this subsection, are delegated to the Director of the Federal Emergency Management Agency.

(d) Subject to subsections (a), (b) and (c) of this Section, the functions vested in the President by Sections 104(a), (b) and (c)(4), 113(k), 117(a) and (c), 119, and 121 of the Act are delegated to the Secretaries of Defense and Energy, with respect to releases or threatened releases where either the release is on or the sole source of the release is from any facility or vessel under the jurisdiction, custody or control of their departments, respectively, including vessels bare-boat chartered and operated. These functions must be exercised consistent with the requirements of Section 120 of the Act.

(e)(1) Subject to subsections (a), (b), (c), and (d) of this Section, the functions vested in the President by Sections 104(a), (b), and (c)(4), and 121 of the Act are delegated to the heads of Executive departments and agencies, with respect to remedial actions for releases or threatened releases which are not on the National Priorities List ("the NPL") and removal actions other than emergencies, where either the release is on or the sole source of the release is from any facility or vessel under the jurisdiction, custody or control of those departments and agencies, including vessels bare-boat chartered and operated. The Administrator shall define the term "emergency", solely for the purposes of this subsection, either by regulation or by a memorandum of understanding with the head of an Executive department or agency.

(2) Subject to subsections (b), (c), and (d) of this Section, the functions vested in the President by Sections 104(b)(2), 113(k), 117(a) and (c), and 119 of the Act are delegated to the heads of Executive departments and agencies, with respect to releases or threatened releases where either the release is on or the sole source of the release is from any facility or vessel under the jurisdiction,

custody or control of those departments and agencies, including vessels bare-boat chartered and operated.

(f) Subject to subsections (a), (b), (c), (d), and (e) of this Section, the functions vested in the President by Sections 104(a), (b) and (c)(4), 113(k), 117(a) and (c), 119, and 121 of the Act are delegated to the Secretary of the Department in which the Coast Guard is operating ("the Coast Guard"), with respect to any release or threatened release involving the coastal zone, Great Lakes waters, ports, and harbors.

(g) Subject to subsections (a), (b), (c), (d), (e), and (f) of this Section, the functions vested in the President by Sections 101(24), 104(a), (b), (c)(4) and (c)(9), 113(k), 117(a) and (c), 119, 121, and 126(b) of the Act are delegated to the Administrator. The Administrator's authority under Section 119 of the Act is retroactive to the date of enactment of SARA.

(h) The functions vested in the President by Section 104(c)(3) of the Act are delegated to the Administrator, with respect to providing assurances for Indian tribes, to be exercised in consultation with the Secretary of the Interior.

(i) Subject to subsections (d), (e), (f), (g) and (h) of this Section, the functions vested in the President by Section 104(c) and (d) of the Act are delegated to the Coast Guard, the Secretary of Health and Human Services, the Director of the Federal Emergency Management Agency, and the Administrator in order to carry out the functions delegated to them by this Section.

(j)(1) The functions vested in the President by Section 104(e)(5)(A) are delegated to the heads of Executive departments and agencies, with respect to releases or threatened releases where either the release is on or the sole source of the release is from any facility or vessel under the jurisdiction, custody or control of those departments and agencies, to be exercised with the concurrence of the Attorney General.

(2) Subject to subsection (b) of this Section and paragraph (1) of this subsection, the functions vested in the President by Section 104(e) are delegated to the heads of Executive departments and agencies in order to carry out their functions under this Order or the Act.

(k) The functions vested in the President by Section 104(f), (g), (h), (i)(11), and (j) of the Act are delegated to the heads of Executive departments and agencies in order to carry out the functions delegated to them by this Section. The exercise of authority under Section 104(h) of the Act shall be subject to the approval of the Administrator of the Office of Federal Procurement Policy.

**Sec. 3.** *Cleanup Schedules.* (a) The functions vested in the President by Sections 116(a) and the first two sentences of 105(d) of the Act are delegated to the heads of Executive departments and agencies with respect to facilities under the jurisdiction, custody or control of those departments and agencies.

(b) Subject to subsection (a) of this Section, the functions vested in the President by Sections 116 and 105(d) are delegated to the Administrator.

**Sec. 4.** *Enforcement.* (a) The functions vested in the President by Sections 109(d) and 122(e)(3)(A) of the Act, relating to development of regulations and guidelines, are delegated to the Administrator, to be exercised in consultation with the Attorney General.

(b)(1) Subject to subsection (a) of this Section, the functions vested in the President by Section 122 (except subsection (b)(1)) are delegated to the heads of Executive departments and agencies, with respect to releases or threatened releases not on the NPL where either the release is on or the sole source of the release is from any facility under the jurisdiction, custody or control of those Executive departments and agencies. These functions may be exercised only with the concurrence of the Attorney General.

(2) Subject to subsection (a) of this Section, the functions vested in the President by Section 109 of the Act, relating to violations of Section 122 of the Act, are delegated to the heads of Executive departments and agencies, with

ADD189

respect to releases or threatened releases not on the NPL where either the release is on or the sole source of the release is from any facility under the jurisdiction, custody or control of those Executive departments and agencies. These functions may be exercised only with the concurrence of the Attorney General.

(c)(1) Subject to subsection (a) and (b)(1) of this Section, the functions vested in the President by Sections 106(a) and 122 of the Act are delegated to the Coast Guard with respect to any release or threatened release involving the coastal zone, Great Lakes waters, ports, and harbors.

(2) Subject to subsection (a) and (b)(2) of this Section, the functions vested in the President by Section 109 of the Act, relating to violations of Sections 103 (a) and (b), and 122 of the Act, are delegated to the Coast Guard with respect to any release or threatened release involving the coastal zone, Great Lakes waters, ports, and harbors.

(d)(1) Subject to subsections (a), (b)(1), and (c)(1) of this Section, the functions vested in the President by Sections 106 and 122 of the Act are delegated to the Administrator.

(2) Subject to subsections (a), (b)(2), and (c)(2) of this Section, the functions vested in the President by Section 109 of the Act, relating to violations of Sections 103 and 122 of the Act, are delegated to the Administrator.

(e) Notwithstanding any other provision of this Order, the authority under Sections 104(e)(5)(A) and 106(a) of the Act to seek information, entry, inspection, samples, or response actions from Executive departments and agencies may be exercised only with the concurrence of the Attorney General.

**Sec. 5.** *Liability.* (a) The function vested in the President by Section 107(c)(1)(C) of the Act is delegated to the Secretary of Transportation.

(b) The functions vested in the President by Section 107(c)(3) of the Act are delegated to the Coast Guard with respect to any release or threatened release involving the coastal zone, Great Lakes waters, ports, and harbors.

(c) Subject to subsection (b) of this Section, the functions vested in the President by Section 107(c)(3) of the Act are delegated to the Administrator.

(d) The functions vested in the President by Section 107(f)(1) of the Act are delegated to each of the Federal trustees for natural resources designated in the NCP for resources under their trusteeship.

(e) The functions vested in the President by Section 107(f)(2)(B) of the Act, to receive notification of the state natural resource trustee designations, are delegated to the Administrator.

**Sec. 6.** *Litigation.* (a) Notwithstanding any other provision of this Order, any representation pursuant to or under this Order in any judicial proceedings shall be by or through the Attorney General. The conduct and control of all litigation arising under the Act shall be the responsibility of the Attorney General.

(b) Notwithstanding any other provision of this Order, the authority under the Act to require the Attorney General to commence litigation is retained by the President.

(c) The functions vested in the President by Section 113(g) of the Act, to receive notification of a natural resource trustee's intent to file suit, are delegated to the heads of Executive departments and agencies with respect to response actions for which they have been delegated authority under Section 2 of this Order. The Administrator shall promulgate procedural regulations for providing such notification.

(d) The functions vested in the President by Sections 310 (d) and (e) of the Act, relating to promulgation of regulations, are delegated to the Administrator.

**Sec. 7.** *Financial Responsibility.* (a) The functions vested in the President by Section 107(k)(4)(B) of the Act are delegated to the Secretary of the Treasury.

The Administrator will provide the Secretary with such technical information and assistance as the Administrator may have available.

(b)(1) The functions vested in the President by Section 108(a)(1) of the Act are delegated to the Coast Guard.

(2) Subject to Section 4(a) of this Order, the functions vested in the President by Section 109 of the Act, relating to violations of Section 108(a)(1) of the Act, are delegated to the Coast Guard.

(c)(1) The functions vested in the President by Section 108(b) of the Act are delegated to the Secretary of Transportation with respect to all transportation related facilities, including any pipeline, motor vehicle, rolling stock, or air-craft.

(2) Subject to Section 4(a) of this Order, the functions vested in the President by Section 109 of the Act, relating to violations of Section 108(a)(3) of the Act, are delegated to the Secretary of Transportation.

(3) Subject to Section 4(a) of this Order, the functions vested in the President by Section 109 of the Act, relating to violations of Section 108(b) of the Act, are delegated to the Secretary of Transportation with respect to all transportation related facilities, including any pipeline, motor vehicle, rolling stock, or aircraft.

(d)(1) Subject to subsection (c)(1) of this Section, the functions vested in the President by Section 108 (a)(4) and (b) of the Act are delegated to the Administrator.

(2) Subject to Section 4(a) of this Order and subsection (c)(3) of this Section, the functions vested in the President by Section 109 of the Act, relating to violations of Section 108 (a)(4) and (b) of the Act, are delegated to the Administrator.

**Sec. 8.** *Employee Protection and Notice to Injured.* (a) The functions vested in the President by Section 110(e) of the Act are delegated to the Administrator.

(b) The functions vested in the President by Section 111(g) of the Act are delegated to the Secretaries of Defense and Energy with respect to releases from facilities or vessels under the jurisdiction, custody or control of their departments, respectively, including vessels bare-boat chartered and operated.

(c) Subject to subsection (b) of this Section, the functions vested in the President by Section 111(g) of the Act are delegated to the Administrator.

**Sec. 9.** *Management of the Hazardous Substance Superfund and Claims.* (a) The functions vested in the President by Section 111(a) of the Act are delegated to the Administrator, subject to the provisions of this Section and other applicable provisions of this Order.

(b) The Administrator shall transfer to other agencies, from the Hazardous Substance Superfund out of sums appropriated, such amounts as the Administrator may determine necessary to carry out the purposes of the Act. These amounts shall be consistent with the President's Budget, within the total approved by the Congress, unless a revised amount is approved by OMB. Funds appropriated specifically for the Agency for Toxic Substances and Disease Registry ("ATSDR"), shall be directly transferred to ATSDR, consistent with fiscally responsible investment of trust fund money.

(c) The Administrator shall chair a budget task force composed of representatives of Executive departments and agencies having responsibilities under this Order or the Act. The Administrator shall also, as part of the budget request for the Environmental Protection Agency, submit to OMB a budget for the Hazardous Substance Superfund which is based on recommended levels developed by the budget task force. The Administrator may prescribe reporting and other forms, procedures, and guidelines to be used by the agencies of the Task Force in preparing the budget request, consistent with budgetary reporting requirements issued by OMB. The Administrator shall prescribe

ADD191

forms to agency task force members for reporting the expenditure of funds on a site specific basis.

(d) The Administrator and each department and agency head to whom funds are provided pursuant to this Section, with respect to funds provided to them, are authorized in accordance with Section 111(f) of the Act to designate Federal officials who may obligate such funds.

(e) The functions vested in the President by Section 112 of the Act are delegated to the Administrator for all claims presented pursuant to Section 111 of the Act.

(f) The functions vested in the President by Section 111(o) of the Act are delegated to the Administrator.

(g) The functions vested in the President by Section 117(e) of the Act are delegated to the Administrator, to be exercised in consultation with the Attorney General.

(h) The functions vested in the President by Section 123 of the Act are delegated to the Administrator.

(i) Funds from the Hazardous Substance Superfund may be used, at the discretion of the Administrator or the Coast Guard, to pay for removal actions for releases or threatened releases from facilities or vessels under the jurisdiction, custody or control of Executive departments and agencies but must be reimbursed to the Hazardous Substance Superfund by such Executive department or agency.

**Sec. 10.** *Federal Facilities.* (a) When necessary, prior to selection of a remedial action by the Administrator under Section 120(e)(4)(A) of the Act, Executive agencies shall have the opportunity to present their views to the Administrator after using the procedures under Section 1–6 of Executive Order No. 12088 of October 13, 1978, or any other mutually acceptable process. Notwithstanding subsection 1–602 of Executive Order No. 12088, the Director of the Office of Management and Budget shall facilitate resolution of any issues.

(b) Executive Order No. 12088 of October 13, 1978, is amended by renumbering the current Section 1–802 as Section 1–803 and inserting the following new Section 1–802:

"1–802. Nothing in this Order shall create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person."

**Sec. 11.** *General Provisions.* (a) The function vested in the President by Section 101(37) of the Act is delegated to the Administrator.

(b)(1) The function vested in the President by Section 105(f) of the Act, relating to reporting on minority participation in contracts, is delegated to the Administrator.

(2) Subject to paragraph 1 of this subsection, the functions vested in the President by Section 105(f) of the Act are delegated to the heads of Executive departments and agencies in order to carry out the functions delegated to them by this Order. Each Executive department and agency shall provide to the Administrator any requested information on minority contracting for inclusion in the Section 105(f) annual report.

(c) The functions vested in the President by Section 126(c) of the Act are delegated to the Administrator, to be exercised in consultation with the Secretary of the Interior.

(d) The functions vested in the President by Section 301(c) of the Act are delegated to the Secretary of the Interior.

(e) Each agency shall have authority to issue such regulations as may be necessary to carry out the functions delegated to them by this Order.

USCA Case #24-1193    Document #2153340    Filed: 01/07/2026    Page 198 of 204

(f) The performance of any function under this Order shall be done in consultation with interested Federal departments and agencies represented on the NRT, as well as with any other interested Federal agency.

(g) The following functions vested in the President by the Act which have been delegated or assigned by this Order may be redelegated to the head of any Executive department or agency with his consent: functions set forth in Sections 2 (except subsection (b)), 3, 4(b), 4(c), 4(d), 5(b), 5(c), and 8(c) of this Order.

(h) Executive Order No. 12316 of August 14, 1981, is revoked.

THE WHITE HOUSE,
*January 23, 1987.*

[FR Doc. 87-1842
Filed 1-27-87; 2:35 pm]
Billing code 3195-01-N

ADD193

# Calendar No. 933

| 96TH CONGRESS<br>*2d Session* | SENATE | REPORT<br>No. 96–848 |
|---|---|---|

## ENVIRONMENTAL EMERGENCY RESPONSE ACT

JULY 11, 1980.—Ordered to be printed
Filed under authority of the order of the Senate of July 2 (legislative day, June 12), 1980

Mr. CULVER, from the Committee on Environment and Public Works, submitted the following

# REPORT

[To accompany S. 1480]

together with

## MINORITY, ADDITIONAL, AND SUPPLEMENTAL VIEWS

The Committee on Environment and Public Works, to which was referred the bill (S. 1480) to provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

### PREFACE

The Committee reported a bill on June 27, 1980, which actually has its roots in the liability and funding provisions provided in the Clean Water Act of 1972. The current legislation, S. 1480, was introduced on July 11, 1979, and creates a liability and compensation scheme to address spills and all other releases of hazardous substances into the environment.

The Committee held a total of 11 days of hearings from March 28, 1979, to September 7, 1979, including 8 hearing days in Washington, D.C., and one each in Niagara Falls, New York, Charles City, Iowa, and San Francisco, California. A total of 74 witnesses gave public testimony at these hearings, which along with submitted testimony comprised 1,723 pages of printed record.

This report shall include a general statement which will discuss the problems addressed in S. 1480 and the goals and basic elements of the new legislation; a general summary of the reported bill; and a more specific analysis of major provisions.                    ADD194

(1)

## DISCUSSION OF MAJOR PROVISIONS

### DEFINITION OF HAZARDOUS SUBSTANCES

The provisions of the bill apply to discharges, releases, and disposal of hazardous substances. Thus, the characterization of a substance as hazardous under section 2(b)(13) is important for several reasons: first, in most cases that is the key to government response and the use of the Fund; secondly, release of designated hazardous substances invokes the requirement for notice to the government under section 3(a)(3) and (4); and thirdly, discharge, release or disposal of designated hazardous substances applies the liability under section 4 of the bill for removal, remedial action, and damage costs.

There are two basic mechanisms for substances to be designated as hazardous for purposes of the bill. The first under section 2(b)(13) (A) through (E) is through the operation of the statute itself. By the terms of those provisions those substances listed as hazardous or toxic under certain other Federal laws are incorporated by reference and upon the date of enactment of this bill such substances become statutorily defined as hazardous substances for purposes of this bill. And the release of any of them or any constituent of them invokes the notice requirements and response provisions and any costs of removal or remedial action or any damages are subject to the liability provisions of the bill.

Section 2(b)(13) of S. 1480 defines as a hazardous substance all those substances which are listed under sections 311 and 307 of the Clean Water Act; section 112 of the Clean Air Act; subtitle C of the Solid Waste Disposal Act; and section 7 of the Toxic Substances Control Act. As substances are added to these lists they would be automatically designated as hazardous substances for purposes of S. 1480.

Following are lists of substances which will be hazardous substances under S. 1480 upon enactment.

At the present time 297 substances have been listed as hazardous substances under section 311 of the Clean Water Act, as follows:

| | |
|---|---|
| Acetaldehyde | Ammonium bifluoride |
| Acetic acid | Ammonium bisulfite |
| Acetic anhydride | Ammonium carbamate |
| Acetone cyanohydrin | Ammonium chloride |
| Acetyl bromide | Ammonium chromate |
| Acetyl chloride | Ammonium citrate |
| Acrolein | Ammonium fluoborate |
| Acrylonitrile | Ammonium fluoride |
| Adipic acid | Ammonium hydroxide |
| Aldrin | Ammonium oxalate |
| Allyl alcohol | Ammonium silicofluoride |
| Allyl chloride | Ammonium sulfamate |
| Aluminum sulfate | Ammonium sulfide |
| Ammonia | Ammonium sulfite |
| Ammonium acetate | Ammonium tartrate |
| Ammonium benzoate | Ammonium thiocyanate |
| Ammonium bicarbonate | Ammonium thiosulfate |
| Ammonium bichromate | Amyl acetate |

ADD195

Aniline
Antimony pentachloride
Antimony tribromide
Antimony trichloride
Antimony trifluoride
Antimony trioxide
Arsenic disulfide
Arsenic pentoxide
Arsenic trichloride
Arsenic trioxide
Arsenic trisulfide
Barium cyanide
Benzene
Benzoic acid
Benzonitrile
Benzoyl chloride
Benzyl chloride
Beryllium chloride
Beryllium fluoride
Beryllium nitrate
Butyl acetate
n-Butyl phthalate
Butylamine
Butyric acid
Cadmium acetate
Cadmium bromide
Cadmium chloride
Calcium arsenate
Calcium arsenite
Calcium carbide
Calcium chromate
Calcium cyanide
Calcium dodecylbenzenesulfonate
Calcium hypochlorite
Captan
Carbanyl
Carbofuran
Carbon disulfide
Carbon tetrachloride
Chlordane
Chlorine
Chlorobenzene
Chloroform
Chlopyrifos
Chlorosulfonic acid
Chromic acetate
Chromic acid
Chromic sulfate
Chromous chloride
Cobaltous bromide
Cobaltous formate
Cobaltous sulfamate
Coumaphos
Cresol
Crotonal dehyde
Cupric acetate
Cupric acetoarsenite
Cupic chloride
Cupric nitrate
Cupric oxalate
Cupric sulfate
Cupric sulfate ammoniated
Cupric tartrate
Cyanogen chloride
Cyclohexane
24–D Acid

24–D Esters
DDT
Diazinon
Dicamba
Dichiobenil
Dichlone
Dichlorobenzene
Dichloropropane
Dichloropropene
Dichloropropene-Dichloropropane
  Mixture
2.2–Dichloropropionic acid
Dichlorvos
Dielarin
Diethylamine
Dimethylamine
Dinitrobenzene
Dinitrophenol
Dinitrotoluene
Diquat
Disulfoton
Diuron
Dodecylbenzenesulfonic acid
Endosulfan
Endrin
Epichlorohydrin
Ethion
Ethylbenzene
Ethylenediamine
Ethylene dibromide
Ethylene dichloride
EDTA
Ferric ammonium citrate
Ferric ammonium oxalate
Ferric chloride
Ferric fluoride
Ferric nitrate
Ferric sulfate
Ferrous ammonium sulfate
Ferrous chloride
Ferrous sulfate
Formaldehyde
Formic acid
Fumaric acid
Furfural
Guthion
Heptachlor
Hexachlorocyclopentadiene
Hydrochloric acid
Hydrofluoric acid
Hydrogen cyanide
Hydrogen sulfide
Isoprene
Isopropanolamine
  dodecylbenzenesulfonate
Kelthane
Kepone
Lead acetate
Lead arsenate
Lead Chloride
Lead fluoborate
Lead fluoride
Lead iodide
Lead nitrate
Lead stearate
Lead sulfate

Lead sulfide
Lead triocyanate
Lindane
Lithium chromate
Malathion
Maleic acid
Maleic anhydride
Mercapatodimethur
Mercuric cyanide
Mercuric nitrate
Mercuric sulfate
Mercuric thiocyanate
Mercurous nitrate
Methoxychlor
Methyl mercaptan
Methyl methacrylate
Methyl parathion
Mevinphos
Mexacarbate
Monoethylamine
Monomethylamine
Naled
Naphthalene
Naphthenic acid
Nickel ammonium sulfate
Nickel chloride
Nickel hydroxide
Nickel nitrate
Nickel sulfate
Nitric acid
Nitrobenzene
Nitrogen dioxide
Nitrophenol
Nitrotoluene
Paraformaldehyde
Parathion
Pentachlorophenol
Phenol
Phospene
Phosphoric acid
Phosphorus
Phosphorus oxychloride
Phosphorus pentasulfide
Phosphorus trichloride
Polychlorinated biphenyls
Potassium arsenate
Potassium arsenite
Potassium bichromate
Potassium chromate
Potassium cyanide
Potassium hydroxide
Potassium permanganate
Propargite
Propionic acid
Propionic anhydride
Propylene oxide
Pyrethrins
Quinoline
Resorcinal
Selenium oxide
Silver nitrate
Sodium
Sodium arsenate
Sodium arsenite
Sodium bichromate
Sodium bifluoride

Sodium bisulfite
Sodium chromate
Sodium cyanide
Sodium dodecylbenzenesulfonate
Sodium fluoride
Sodium hydrosulfide
Sodium hydroxide
Sodium hypochlorite
Sodium methylate
Sodium nitrite
Sodium phosphate, dibasic
Sodium phosphate, tribasic
Sodium selenite
Strontium chromate
Strychnine
Styrene
Sulfuric acid
Sulfur monochloride
2,4,5–T acid
2,4,5–T amines
2,4,5–T esters
2,4,5–T salts
2,4,5–TP acid
2,4,5–TP acid esters
TDE
Tetraethyl lead
Tetraethyl pyrophosphate
Thallium sulfate
Toluene
Toxaphene
Trichorfon
Trichloroethylene
Trichlorophenol
Triethanolamine dodecylbenzenesulfonate
Triethylamine
Trimethylamine
Uranyl acetate
Uranyl nitrate
Vanadium pentoxide
Vanadyl sulfate
Vinyl acetate
Vinylidene chloride
Xylene
Xylenol
Zinc acetate
Zinc ammonium chloride
Zinc borate
Zinc bromide
Zinc carbonate
Zinc chloride
Zinc cyanide
Zinc fluoride
Zinc formate
Zinc hydrosulfite
Zinc nitrate
Zinc phenolsulfonate
Zinc phosphide
Zinc silicofluoride
Zinc sulfate
Zirconium nitrate
Zirconium potassium fluoride
Zirconium sulfate
Zirconium tetrachloride

At the present time 67 categories of chemicals have been designated as toxic pollutants under section 307 of the Clean Water Act, as follows:

Acenaphthene
Acrolein
Acrylonitrile
Aldrin/Dieldrin
Antimony and compounds*
Arsenic and compounds
Asbestos
Benzene
Benzidine
Beryllium and compounds
Cadmium and compounds
Carbon tetrachloride
Chlordane (technical mixture and metabolites)
Chlorinated benzenes (other than dichlorobenzenes)
Chlorinated ethanes (including 1,2-dichloroethane, 1,1,1-trichloroethane, and hexachloroethane)
Chloroalkyl ethers (chloromethyl, chloroethyl, and mixed ethers)
Chlorinated naphthalene
Chlorinated phenols (other than those listed elsewhere; includes trichlorophenols and chlorinated cresols)
Chloroform
2-chlorophenol
Chromium and compounds
Copper and compounds
Cyanides
DDT and metabolites
Dichlorobenzenes (1,2-,1,3-, and 1,4-dichlorobenzenes)
Dichloroethylenes (1,1- and 1,2-dichloroethylene)
2,4-dichlorophenol
Dichloropropane and dichloropropene
2,4-dimethylphenol
Dinitrotoluene
Diphenylhydrazine
Endosulfan and metabolites
Endrin and metabolites
Ethylbenzene
Fluoranthene

Haloethers (other than those listed elsewhere; includes chlorophenylphenyl ethers, bromophenylphenyl ether, bis(dischloroisopropyl) ether, bis(chloroethoxy) methane and polychlorinated diphenyl ethers)
Halomethanes (other than those listed elsewhere; includes methylene chlorid methylchloride, methylbromide, bromoform, dichlorobromomethane, trichlorofluoromethane, dichlorodifluoromethane)
Heptachlor and metabolites
Hexachlorobutadiene
Hexachlorocyclohexane (all isomers)
Hexachlorocyclopentadiene
Isophorone
Lead and compounds
Mercury and compounds
Naphthalene
Nickel and compounds
Nitrobenzene
Nitrophenols (including 2,4-dinitrophenol, dinitrocresol)
Nitrosamines
Pentachlorophenol
Phenol
Phthalate esters
Polychlorinated biphenyls (PCBs)
Polynuclear aromatic hydrocarbons (including benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenzaanthracenes, and indenopyrenes)
Selenium and compounds
Silver and compounds
2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD)
Tetrachloroethylene
Thallium and compounds
Toluene
Toxaphene
Trichloroethylene
Vinyl chloride
Zinc and compounds

At the present time six chemicals have been designated as hazardous air pollutants under section 112 of the Clean Air Act, as follows:

Asbestos
Beryllium
Mercury

Vinyl chloride
Benzene
Radionuclides

At the present time there are no chemicals which have been listed as toxic under section 7 of the Toxic Substances Control Act.

Under section 3001 of the Solid Waste Disposal Act a waste is listed as hazardous for any one of the following three reasons:

—First, the Administrator of the Environmental Protection Agency has determined that it meets one of the statutory characteristics

*The term "compounds" shall include organic and inorganic compounds.

of hazardous waste in the definition under section 1004(5) of the Solid Waste Disposal Act;

—Secondly, the Administrator has determined that the waste has been found to be fatal to humans in low doses (or has a low animal oral, inhalation or dermal LD/LC 50) or otherwise is capable of causing or significantly contributing to an increase in serious irreversible, or incapacitating reversible, illness.

—Finally, the Administrator has determined that the waste contains any of some 400 acutely hazardous chemicals, unless after considering such factors as the concentration of those chemicals in the waste, the amount of waste generated, and the potential of the chemicals to migrate from the waste, the Environmental Protection Agency concludes that the waste is not capable of posing a substantial present or potential hazard to human health or the environment when improperly managed.

Under section 2(b) (13) (C) of the reported bill, any material which is listed as a hazardous waste under section 3001 (including listed process wastes) or identified as a hazardous waste pursuant to the characteristics published under section 3001 is a hazardous substance under S. 1480.

At the present time the Environmental Protection Agency has promulgated rules providing for the identification and listing of hazardous waste at 40 CFR Part 261 (45 FR 33119, May 19, 1980). These regulations must be referred to to determine the hazardous wastes and their constituents which are hazardous substances for purposes of S. 1480. Any material listed as a hazardous waste or hazardous constituent is a hazardous substance for the purposes of S. 1480 regardless of whether it is a waste.

It should be noted that any substance or material for which regulation is specifically suspended by Act of Congress under the Solid Waste Disposal Act is excluded from designation as a hazardous substance for the purpose of S. 1480, notwithstanding the presence in such substance of any hazardous or toxic chemical.

Thus drilling muds and brines, which will have been excluded from regulation by the 1980 amendments to section 3001 of the Solid Waste Disposal Act, are not hazardous substances under S. 1480.

The second basic mechanism for designating hazardous substances under section 2(b) (13) (F), is the addition of substances just for the purposes of this bill under section 3(a) (2).

Section 3(a) (2) authorizes the President to designate as hazardous substances those compounds, elements, mixtures, and solutions which may present substantial danger to public health and welfare and the environment. This provision essentially authorizes the President to augment the existing lists of hazardous substances derived from existing statutes (see, section 2(b) (13) (A), (B), (C), (D), and (E)). The language of this provision has a lower threshold for designation than that currently in place in section 311(b) (2) of the Clean Water Act. This is intended to afford the President broad discretion in designating substances which may adversely affect public health or the environment.

Section 3(a) (2) also authorizes the President to establish for each additional hazardous substance so designated a single quantity which,