**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., and NATIONAL WASTE & RECYCLING ASSOCIATION, | |
| *Petitioners,* | Case No. 24-1193 |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, in his official capacity as Administrator, United States Environmental Protection Agency, | |
| *Respondents.* | |

**UNOPPOSED MOTION TO INTERVENE IN SUPPORT OF
RESPONDENTS BY CLEAN CAPE FEAR, ENVIRONMENTAL JUSTICE
TASK FORCE, FIGHT FOR ZERO, MERRIMACK CITIZENS FOR CLEAN
WATER, AND NATURAL RESOURCES DEFENSE COUNCIL**

Pursuant to section 113(i) of the Comprehensive Environmental Response

Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9613(i); Federal Rule

of Appellate Procedure 15(d); and D.C. Circuit Rule 15(b), Clean Cape Fear,

Environmental Justice Task Force, Fight for Zero, Merrimack Citizens for Clean

1

Water, and Natural Resources Defense Council (collectively, the "Community and Environmental Groups") move to intervene in defense of Respondent U.S. Environmental Protection Agency's final rule designating perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS") as hazardous substances under CERCLA. EPA, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed. Reg. 39,124 (May 8, 2024) (the "Hazardous Substance Designations" or "the Designations").

Counsel for the Community and Environmental Groups conferred with counsel for Petitioners and Respondents regarding their respective positions on this motion. Petitioners Chamber of Commerce, Associated General Contractors of America, and National Waste & Recycling Association (collectively, the "Industry Petitioners") do not oppose the motion. Respondents EPA and EPA Administrator Michael Regan (collectively, "EPA") take no position on this motion.

## INTRODUCTION

For decades, the government allowed a class of long-lasting and highly toxic chemicals—known as per- and polyfluoroalkyl substances or "PFAS"—to spread throughout the environment, contaminating communities across the country. Upon learning of that contamination, often long after they were first exposed, several communities organized to fight for the remediation of PFAS in their drinking water

2

and soil and for increased access to information about ongoing PFAS releases. The Community and Environmental Groups represent four such communities, whose lives were upended and whose health remains threatened by PFAS contamination, as well as a national environmental organization with members who are exposed to unsafe levels of PFAS.

PFOA and PFOS are two of the oldest and most widespread PFAS. Despite their severe health effects—which include cancer, reduced response to vaccines, developmental harm, and impacts on the reproductive system—neither PFOA, PFOS, nor any other PFAS were previously listed as hazardous substances under CERCLA, the main federal law governing contaminated site remediation. As a result, the cleanup of PFOA and PFOS contamination has been haphazard, slow, and infrequent.

The Hazardous Substance Designations will help to change that. The designation of PFOA and PFOS as hazardous substances expands EPA's authority to conduct or order the remediation of contaminated sites. It also makes the parties that released those chemicals liable for the resulting cleanup costs and requires the reporting of PFOA and PFOS releases, so impacted communities have more information about their exposures and risks.

The Community and Environmental Groups are entitled to intervene in defense of the Designations. They have a clear interest in the Hazardous Substance

Designations, which, according to EPA, promote the timely remediation of chemicals that contaminate their communities and threaten their members' health. The Industry Petitioners' lawsuit threatens that interest by seeking to overturn the Designations. Further, while prospective intervenors do not have the burden of establishing the inadequacy of the existing parties' representation under CERCLA, the Community and Environmental Groups' interests are not adequately represented by any party and their arguments in support of the Hazardous Substance Designations have differed from EPA's. Alternatively, the Community and Environmental Groups also satisfy the requirements for permissive intervention.

## BACKGROUND

### A.     The PFAS Contamination Crisis

PFOA and PFOS are members of the large, widespread, and dangerous class of PFAS chemicals. PFAS are known as "forever chemicals" because "their strong carbon-fluorine bonds . . . cause them to be extremely resistant to degradation and to remain in the environment for long periods of time." 89 Fed. Reg. at 39,126. They do not occur naturally; PFAS were manufactured in the 1940s for use in cookware, clothing, furniture, and a range of other commercial and consumer products. *Id.* at 39,125–26, 39,139. People born when PFAS were first created now live in a world where they are virtually inescapable. Today, PFAS contaminate the

4

drinking water supplies for "millions of Americans" and the blood of "nearly all of the participants" in a nationwide study. *Id.* at 39,148, 39,163.

PFAS are linked to a broad range of serious harms. *Id.* at 39,125, 39,128. PFOA and PFOS in particular are associated with cancer, developmental harm, liver disease, and immune system toxicity, among other serious conditions. *Id.* They are toxic at the lowest measurable exposure levels, such that EPA has found that any exposures to PFOA or PFOS in drinking water present health risks. *See* EPA, *PFAS National Primary Drinking Water Regulation FAQs for Drinking Water Primacy Agencies* at 4 (Apr. 2024), https://www.epa.gov/system/files/documents/2024-04/pfas_npwdr_faqsstates_4.8.24.pdf. Those risks are "exacerbated by the fact that PFOA and PFOS are persistent in the environment, which can cause long-term exposure." 89 Fed. Reg. at 39,126.

Decades of unregulated PFOA and PFOS releases have left many sites highly contaminated. *Id.* Moreover, despite the voluntary phase-out of many PFOA and PFOS uses, historic and ongoing releases continue to contaminate soil, sediment, surface water, and groundwater. *See id.* at 39,126–27. The communities where PFAS were used and released often experience the greatest overall exposures and risks. *Id.* at 39,149. Communities of color and economically

insecure communities are "disproportionately exposed to PFAS" and suffer "disproportionate and adverse" health effects. *Id.* at 39,158.

### B.    The Community and Environmental Groups

The Community and Environmental Groups are non-profit organizations dedicated to protecting their members and communities from severe PFAS contamination and the devastating health consequences of that contamination. Several of their groups formed in response to the unfolding crises surrounding the contamination of their home communities. *See* Declaration of Laurene Allen ("Allen Decl.") ¶¶ 6–14; Declaration of Linda Shosie ("Shosie Decl.") ¶ 6; Declaration of Emily Donovan ("Donovan Decl.") ¶ 13–14; Declaration of Christel Bailey ("Bailey Decl.") ¶ 2. They work to provide accurate information to their members and communities about potential PFAS exposures and advocate for policies to stop and remediate PFOA and PFOS contamination. Allen Decl. ¶¶ 17–21; Shosie Decl. ¶ 6–7; Donovan Decl. ¶¶ 14, 16; Bailey Decl. ¶¶ 6–8.

**Merrimack Citizens for Clean Water** ("Citizens for Clean Water") is a non-profit organization based in Merrimack, New Hampshire, that formed following revelations of severe contamination of local public water supplies with PFOA, PFOS, and other PFAS from a local manufacturing facility. Allen Decl. ¶¶ 7–14. While that facility closed earlier this year, its legacy of contamination remains in Merrimack's groundwater, soil, and its residents' bodies. *Id.* ¶ 24.

6

Citizens for Clean Water provides information and resources to its members and the Merrimack community concerning the status of local PFAS contamination and remediation efforts, and it advocates for water treatment and other PFAS remediation to address existing contamination and protect citizens' health. *Id.* ¶¶ 17–21.

**Environmental Justice Task Force** is a non-profit organization based in Tucson, Arizona, that uses education and advocacy to protect its members and the Tucson community from harm caused by toxic chemicals, including PFOA, PFOS, and other PFAS. Shosie Decl. ¶¶ ¶ 6–7, 9. Members of Environmental Justice Task Force are exposed to dangerous levels of PFOA and PFOS from the Tucson International Airport Area ("TIAA") Superfund Site and other contaminated sites on the southside of Tucson. *Id.* ¶¶ 8, 13–14. Many of these individuals live in primarily Hispanic, economically insecure neighborhoods that have also grappled with additional toxic contaminants in their drinking water. *Id.* ¶¶ 6, 8.

**Fight for Zero** is a non-profit organization based in Brevard County, Florida, that advocates for zero toxic pollution and pollution-related disease across Florida. Bailey Decl. ¶¶ 2–3. Following the detection of high PFOA and PFOS levels in the drinking water and soil in Brevard County, including areas around schools and parks, Fight for Zero engaged in public education, advocacy, and data collection to expand awareness and understanding of the severe contamination of

7

local communities and advocated for policies to eliminate this pollution and protect community health. *Id.* ¶¶ 6–8, 11–16.

**Clean Cape Fear** is an all-volunteer community group based in Wilmington, North Carolina, downstream from a Chemours PFAS manufacturing facility that has contaminated the Cape Fear River with numerous PFAS. Donovan Decl. ¶¶ 5–10. The group works to educate the community about PFAS contamination, hold Chemours and other polluters accountable for their PFAS contamination, and advocate for the treatment and cleanup of PFAS. *Id*. ¶¶ 14, 16. The Cape Fear River, which provides drinking water to approximately 500,000 people, remains contaminated with PFOA, PFOS, and other PFAS. *Id.* ¶¶ 1, 8, 20. In addition to the health burdens caused by that contamination, many of the communities that Clean Cape Fear serves have also borne substantial economic costs associated with upgrading drinking water treatment systems to remove PFAS. *Id.* ¶¶ 20.

**Natural Resources Defense Council** ("NRDC") is a national environmental organization dedicated to protecting public health, the environment, and the welfare of its members. Declaration of Gina Trujillo ("Trujillo Decl.") ¶ 4. Over many years, NRDC has called on EPA to regulate and remediate PFAS, including through restrictions on industrial wastewater discharges, Superfund cleanups of PFAS-contaminated sites, bans on new uses of PFAS, and mandatory data

8

collection and disclosures about PFAS releases. *Id.* ¶ 6. EPA cited NRDC's analysis of the disproportionate impacts of PFAS contamination in support of the Hazardous Substance Designations, 89 Fed. Reg. at 39,158, and NRDC has members who are at risk of PFOA and PFOS exposures in their environment. Declaration of Paul Ames ("Ames Decl.") ¶¶ 4, 10; Declaration of Erin Stephens ("Stephens Decl.") ¶¶ 5, 7.

C.    CERCLA

Congress enacted CERCLA in 1980 "to promote the timely cleanup" of contaminated sites and "to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *CTS Corp. v. Waldburger*, 573 U.S. 1, 4 (2014) (internal quotations and citations removed). The law provides multiple tools for EPA and impacted communities and individuals to pursue those goals.

First, CERCLA authorizes EPA "to protect the public health or welfare or the environment" by directly remediating contaminated sites. *See* 42 U.S.C. 9604(a)(1). Alternatively, "EPA can compel responsible parties themselves to clean up" contaminated sites through the issuance of unilateral administrative orders. *See Viacom, Inc. v. United States*, 404 F. Supp. 2d 3, 5 (D.D.C. 2005); 42 U.S.C. § 9606(a). CERCLA also "creates a cause of action through which entities that have incurred costs cleaning up contaminated sites may sue to recover cleanup costs from parties that may have played a role in causing the pollution, whom CERCLA

9

refers to as potentially responsible parties (PRPs)." *Lockheed Martin Corp. v. United States*, 833 F.3d 225, 227 (D.C. Cir. 2016); 42 U.S.C. § 9607(a). Finally, CERCLA requires the timely reporting of hazardous substance spills and releases, 42 U.S.C. § 9603(a), "allow[ing] EPA and affected States and communities to immediately evaluate a release and quickly respond, as necessary." 89 Fed. Reg. at 39,127.

EPA's authority to conduct or compel remediation under CERCLA varies based on whether a contaminant has been designated as a hazardous substance. For instance, EPA may only issue clean-up orders for the removal or remediation of hazardous substances, 42 U.S.C. § 9606(a), and it has broader authority to directly remediate hazardous substances than other contaminants or pollutants. 42 U.S.C. § 9604(a)(1). The release or threatened release of a hazardous substance also can trigger third-party liability under CERCLA. 42 U.S.C. § 9607(a)(4); *see also Foster v. United States*, 922 F. Supp. 642, 650–51 (D.D.C. 1996). And CERCLA's release reporting requirements apply only to hazardous substances. 42 U.S.C. § 9603(a).

Chemicals can be listed as hazardous substances in one of two ways. First, if a chemical is designated for regulation under certain other environmental laws— such as a hazardous air pollutants under the Clean Air Act or a toxic pollutant under the Clean Water Act—then it is automatically defined as a hazardous

10

substance under CERCLA. 42 U.S.C. § 9601(14) (defining "hazardous substance"). Second, CERCLA section 102 states that EPA "shall promulgate" regulations "designating as hazardous substances . . . such elements, compounds, mixtures, solutions, and substances which, when released into the environment may present substantial danger to the public health or welfare or the environment." 42 U.S.C. § 9602(a).

**D.     The Hazardous Substance Designations**

In September 2022, EPA proposed to designate PFOA and PFOS as hazardous substances under CERCLA section 102. EPA, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 54,415 (proposed Sept. 6, 2022). Based on those chemicals' severe health effects and widespread exposures, EPA found that "PFOA and PFOS . . . can pose substantial danger to public health or welfare or the environment." *Id.* at 54,417. Several of the Community and Environmental Groups submitted public comments in support of those designations. *See* Declaration of Jonathan Kalmuss-Katz ("Kalmuss-Katz Decl.") Ex. A.

On May 8, 2024, EPA finalized the Hazardous Substance Designations. According to EPA, the Designations "eliminate[] barriers to timely cleanup of contaminated sites, enable[] EPA to shift responsibility for cleaning up certain sites

11

. . . to [potentially responsible parties], and allow[] EPA to compel [potentially responsible parties] to address additional contaminated sites." 89 Fed. Reg. at 39,150; *see also id.* ("Absent designation, the cleanup of PFOA and PFOS contamination would be significantly hampered."). The remediation of PFOA and PFOS "translates to lower risk of adverse health effects for the most exposed communities." 89 Fed. Reg. at 39,151.

On June 10, 2024, the Industry Petitioners filed a petition for review of the Hazardous Substance Designations under CERCLA section 113, which grants this Court exclusive jurisdiction to review "any regulation promulgated under" CERCLA. 42 U.S.C. § 9613(a); *see also* Doc. No. 2059395.

## ARGUMENT

### I.   THE COMMUNITY AND ENVIRONMENTAL GROUPS ARE ENTITLED TO INTERVENE AS OF RIGHT

CERCLA section 113(i) sets forth the standard for intervention in CERCLA proceedings:

> [I]n any action commenced under this chapter . . . any person may intervene as a matter of right when such person claims an interest relating to the subject of the action and is so situated that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest, unless the President or the State shows that the person's interest is adequately represented by existing parties.

42 U.S.C. § 9613(i). That standard is "virtually identical" to the requirements for as-of-right intervention under Federal Rule of Civil Procedure 24(a)(2), *United*

12

*States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994) (citation omitted), which this Court looks to for guidance when considering motions to intervene in the Court of Appeals. *Bldg. and Const. Trades Dept. v. Reich*, 40 F.3d 1275, 1283 (D.C. Cir. 1994). The standards "differ only with respect to who bears the burden of proof of showing that the [movant's] interest is or is not adequately represented . . . [U]nder CERCLA § 113(i), the government bears that burden." *Pitney Bowes*, 25 F.3d at 70. The Community and Environmental Groups satisfy CERCLA's standard for as-of-right intervention.

### A.    The Community and Environmental Groups' Motion is Timely

While CERCLA section 113 does not impose a deadline for motions to intervene, the Community and Environmental Groups moved within 30 days of the Industry Petitioners' July 10, 2024, petition for review, consistent with Federal Rule of Appellate Procedure 15(d). Doc. No. 2059395. Their intervention will not delay this proceeding, which does not yet have a briefing schedule, or prejudice any party.

### B.    The Community and Environmental Groups Have a Protected Interest in the Hazardous Substance Designations

The Community and Environmental Groups, whose members are exposed to and harmed by PFOA and PFOS contamination, have a protected interest in the Hazardous Substance Designations. This Court has recognized that regulatory beneficiaries have an interest in maintaining the rules that protect them and are

13

entitled to intervene in defense of those rules. *See Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 317 (D.C. Cir. 2015) (holding interest prong is met "where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit").

The Designations benefit the Community and Environmental Groups in multiple ways. First, they "will help protect communities near [PFAS] contaminated sites from potential health risks" by "eliminat[ing] barriers to timely cleanup" and "allow[ing] EPA to compel PRPs to address . . . contaminated sites." 89 Fed. Reg. at 39,131, 39,150. For years, the Community and Environmental Groups' members have been exposed to PFOA and PFOS in their water, soil, and air. Allen Decl. ¶ 4, 12; Donovan Decl. ¶¶ 7–12; Shosie Decl. ¶¶ 9–11, 15; Bailey Decl. ¶¶ 9, 12–13; Ames Decl. ¶¶ 4, 10; Stephens Decl. ¶¶ 5, 7.

. Those members and their families and neighbors have suffered from cancer and other diseases associated with PFAS exposure; some have lost children and other loved ones to those diseases. Shosie Decl. ¶ 5; Bailey Decl. ¶ 3; Donovan Decl. ¶ 11; Ames Decl. ¶ 8. By "promot[ing] cleanups that might otherwise be delayed or not occur," 89 Fed. Reg. at 39,149, the Hazardous Substance Designations advance those groups' core interest of protecting their members and communities from harmful PFAS exposures. *Sierra Club v. Perry*, 373 F. Supp. 3d 128, 139 (D.D.C. 2019) (recognizing non-profit's interest in reducing members'

14

exposures to "harmful pollutants") (*citing Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 183 (2000)).

Second, the Hazardous Substance Designations will make the "parties responsible for significant [PFAS] contamination bear the costs of cleaning it up," as opposed to taxpayers and ratepayers in contaminated communities. 89 Fed. Reg. at 39,126–27. Historically, the communities most burdened by PFAS contamination have often borne the costs of PFAS remediation as well, resulting in increased water rates and depleted local and state government budgets. Donovan Decl. ¶ 20; Allen Decl. ¶ 22–23; *see also* 89 Fed. Reg. at 39,127. By "provid[ing] a mechanism for parties to recover response costs from [potentially responsible parties]," the Hazardous Substance Designations will reduce that economic burden on contaminated communities. *Id.* at 39,131.

Third, by mandating the reporting of PFAS spills and releases within a 24-hour period, the Hazardous Substance Designations enable the Community and Environmental Groups to identify and inform their members of potential PFAS exposures. Those reporting requirements "ensure[] transparency about new releases of PFOA and PFOS" and "allow[] . . . communities to immediately evaluate a release and quickly respond, as necessary, to address risks to human health or the environment." *Id.* at 39,127.

### C.    The Disposition of This Proceeding May Impair the Community and Environmental Groups' Interests

15

A ruling in favor of the Industry Petitioners "may, as a practical matter, impair or impede" the Community and Environmental Group's interests. 42 U.S.C. § 9613(i); Fed. R. Civ. Proc. 24(b). The practical impairment inquiry "is not a rigid one," *Cayuga Nation v. Zinke*, 324 F.R.D. 277, 280 (D.D.C. 2018), and it is "satisfied whenever disposition of the present action would put the movant at a practical disadvantage in protecting its interest." Charles Wright & Arthur Miller, 7C Federal Practice & Procedure § 1908.2 (3d ed. 2024 update).

As described above, the Hazardous Substance Designations will advance the Community and Environmental Groups' interests by promoting PFAS remediation and requiring the reporting of PFOA and PFOS releases. *See* pp. 14–15 *supra*. The Industry Petitioners seek to vacate those Designations. A decision granting their petition would create "barriers to timely cleanup of contaminated sites" and deprive impacted communities of "key information" about PFAS releases, impairing the Community and Environmental Groups' interest in protecting their members from PFAS contamination. 89 Fed. Reg. 39,127–28.

## D. The Community and Environmental Groups' Interests May Not be Adequately Represented by the Existing Parties

Under CERCLA section 113, a party whose interests may be impaired by the disposition of a proceeding is entitled to intervene "unless *the President or the State* shows that the [movant's] interest is adequately represented by existing

16

parties." 42 U.S.C. § 9613(i) (emphasis added); *see also Pitney Bowes*, 25 F.3d at 70 (holding that "the government" bears the burden of establishing the adequacy of existing representation under CERCLA). Because the sole governmental party in this proceeding, EPA, takes no position on the Community and Environmental Groups' motion, it cannot carry the burden of establishing adequate representation. On that basis alone, this factor is satisfied.

In the event the Court looks beyond the government's silence, the disparities between the movants' and the existing parties' interests and potential litigation positions readily establishes that the existing parties' representation "'may be' inadequate." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n. 10 (1972)). This standard is "not onerous," *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986), and a party "ordinarily should be allowed to intervene unless it is clear that [an existing] party will provide adequate representation for the absentee." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980).

The Industry Petitioners cannot represent the Community and Environmental Groups' interests because they challenge the Hazardous Substance Designations that those groups seek to defend. And while EPA is defending the Designations, "a shared general agreement . . . that the regulations should be lawful

17

does not necessarily ensure" adequacy of representation. *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977).

This Court has "often concluded that governmental entities," which must balance a broad range of perspectives and interests, "do not adequately represent the interests of aspiring intervenors" with narrower or more particularized interests. *Fund for Animals*, 322 F.3d at 736; *see also Crossroads Grassroots Pol'y Strategies*, 788 F.3d 312 at 321. "Because the EPA represents the broad public interest, it must consider not only the interests of . . . public interest groups, but also the possibly conflicting interests" of regulated entities and other stakeholders. *Am. Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98, 111 (M.D. Pa. 2011); 89 Fed. Reg. at 31,126–31 (weighing the benefits of the Hazardous Substance Designations against the costs to companies that use and release PFAS). In contrast, the Community and Environmental Groups' interests in the health and safety of their members are "more narrow and focused than EPA's." *Costle*, 561 F.2d at 912.

Those disparate interests have resulted in differing positions concerning the Hazardous Substances Designations, such that the Community and Environmental Groups "may well have honest disagreements with EPA" on matters related to this proceeding. *Costle*, 561 F.2d at 912. For instance, given the risks posed by PFOA and PFOS at immeasurably low exposure levels, in their comments on the proposed designations, several of the Community and Environmental Groups

18

urged EPA to lower the reportable quantity that triggers the reporting of PFOA and
PFOS releases. *See* Kalmuss-Katz Decl. Ex. A at 6–8. EPA declined to do so,
maintaining its default reportable quantity of one pound. 89 Fed. Reg. at 39,174.
The Community and Environmental Groups also argued that CERCLA section 102
requires EPA to designate hazardous substances based solely on the substances'
"danger to public health or welfare," without consideration of costs or other factors
beyond those referenced in the statute. Kalmuss-Katz Decl. Ex. A at 4–6. EPA
declined to address that issue in its final rule, claiming that it "need not resolve"
the legal question concerning the role of costs under section 102 because the
Designations are warranted even if costs are considered. 89 Fed. Reg. at 39,143.
Where proposed intervenors have disagreed with an agency in the past and "there
is no guarantee that the [agency] will make all of the [movants'] arguments in
litigation," intervention is justified. *New Mexico Off-Highway Vehicle All. U.S.
Forest Serv.*, 540 F. App'x 877, 881–82 (10th Cir. 2013); *Costle*, 561 F.2d at 912.

Finally, even if their interests were aligned with EPA's, the Community and
Environmental Groups can still aid the Court by "serv[ing] as a vigorous and
helpful supplement to EPA's defense," *Costle*, 561 F.2d at 912–13, and "focus[ing]
on points not made or adequately elaborated upon in the [EPA's] brief," as
required by this Court's rules. D.C. Cir. R. 28(d)(2). Because they have substantial
interests in the Hazardous Substance Designations that may be impaired by the

19

relief Petitioners seek, the Community and Environmental Groups are entitled to
intervene.

## II.    IN THE ALTERNATIVE, THE COMMUNITY AND ENVIRONMENTAL GROUPS SATISFY THE STANDARD FOR PERMISSIVE INTERVENTION

For the foregoing reasons, the Community and Environmental Groups
satisfy CERCLA's standard for intervention as-of-right. Should this Court find
otherwise, they also satisfy this Court's standard for permissive intervention.

Permissive intervention is proper where a motion is timely, the claim or
defense shares a common question of law or fact with the underlying litigation, and
the intervention will not unduly delay or prejudice the adjudication of the rights of
the original parties. Fed. R. Civ. P. 24(b); *see also Bldg. and Constr. Trades Dep't*,
40 F.3d at 1282–83 (applying Federal Rule of Civil Procedure 24's permissive
intervention standard in an original proceeding in this Court.) To establish a
common claim or defense in a challenge to agency action, it is sufficient that
"movants seek to defend the [agency's] decision." *Sault Ste. Marie Tribe of
Chippewa Indians v. Bernhardt*, 331 F.R.D. 5, 14 (D.D.C. 2019) (citing *Nuesse v.
Camp*, 385 F.2d 694, 704–05 (D.C. Cir. 1967)).

The Community and Environmental Groups seek to defend the Hazardous
Substance Designations against the Industry Petitioners' challenge, and thus
necessarily shares questions in common with the underlying action and EPA's

20

defense. *Id.* They moved to intervene at the earliest stages of this proceeding, which does not yet have a briefing scheduled, and their intervention would not unduly delay or prejudice the resolution of the Petitioners' claims. Accordingly, permissive intervention is justified.

## III.   THOUGH IT IS NOT NECESSARY TO DEMONSTRATE STANDING, THE COMMUNITY AND ENVIRONMENTAL GROUPS HAVE STANDING

While this Court previously has inquired into intervenor-respondents' standing, *see Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 316, recent Supreme Court decisions have clarified that, when an intervenor does not seek broader or different relief than an existing party, it need not demonstrate Article III standing. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) (holding that it was error for court to "inquir[e] into [proposed intervenor's] . . . standing" where intervenor sought the same relief as an existing party)); *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019) (explaining that, where entity participated as an intervenor in support of defendants, a role that did not "entail[] invoking a court's jurisdiction, it was not . . . incumbent on the [entity] to demonstrate its standing"). As then-Judge Jackson observed, this Court's prior decisions requiring standing for defensive intervenors "predate, and are plainly inconsistent with, the Supreme Court's recent opinions." *Env't Integrity Project v. Wheeler*, No. 20-CV-1734 (KBJ), 2021 WL 6844257, at

21

*2 (D.D.C. Jan. 27, 2021) (declining to require intervenor-defendants to demonstrate Article III standing in light of recent Supreme Court precedent); *Twing v. United States*, No. 19-CV-00902 (KBJ), 2021 WL 7908121, at *1 (D.D.C. Mar. 30, 2021) (same). However, should the Court consider it, the interests set forth above and documented in the accompanying declarations establish the Community and Environmental Groups' standing. *See Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 317 (upholding intervenors' standing when the intervenor and its members "benefit[] from [the] agency action . . . and an unfavorable decision would remove th[at] benefit."

First, by "increase[ing] the likelihood that [Community and Environmental Groups'] members will experience [PFAS]-related injuries," vacatur of the Hazardous Substance Designations would inflict a concrete injury on those members that supports the Groups' standing. *Clean Wis. v. EPA*, 964 F.3d 1145, 1157 (D.C. Cir. 2020); *see also* 89 Fed. Reg. at 39,164 (explaining that the Hazardous Substance Designations "provide meaningful health benefits to the communities near [contaminated] sites by reducing the risk of exposure and the potential adverse health and environmental effects . . ."). In addition, vacatur of the Designations would deprive the Community and Environmental Groups' members of information about PFAS releases to which CERCLA entitles them, and that will allow them to take responsive, health protective action, which constitutes an

22

independent injury supporting their standing. *Waterkeeper All. v. EPA*, 853 F.3d 527, 533–34 (D.C. Cir. 2017).

Because the Community and Environmental Groups' members would suffer injury-in-fact from vacatur of the Hazardous Substance Designations, they satisfy the elements of causation and redressability required for standing. *Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 316. Further, the interests of the Community and Environmental Groups' members in securing the health and informational benefits of the Final Rule are central to the Groups' purposes, and the participation of individual members in this lawsuit is not required, *see Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015). Accordingly, the Community and Environmental Groups have associational standing. *Pub. Emps. for Env't Resp. v. EPA*, 77 F. 4th 899, 912 (D.C. Cir. 2023).

## CONCLUSION

For the foregoing reasons, the Community and Environmental Groups respectfully request that this Court grant their unopposed motion to intervene.

Dated: July 10, 2024                          Respectfully submitted,

                                              */s/ Jonathan Kalmuss-Katz*
                                              Jonathan Kalmuss-Katz
                                              Earthjustice
                                              48 Wall Street Floor 15
                                              New York, New York 10005
                                              T: 212-823-4989
                                              jkalmusskatz@earthjustice.org

23

*Counsel for Clean Cape Fear,*
*Environmental Justice Task*
*Force, Fight for Zero,*
*Merrimack Citizens for Clean*
*Water, and Natural Resources*
*Defense Council*

24

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

I hereby certify, in accordance with Federal Rule of Appellate Procedure 32(g)(1), that the foregoing motion contains 4,841 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), as counted by counsel's word processing system, and thus complies with the 5,200-word limit. *See* Fed. R. App. P. 27(d)(2)(A).

Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 using size 14 Times New Roman font. *See* Fed. R. App. P. 27(d)(1)(E).

Dated: July 10, 2024                         */s/ Jonathan Kalmuss-Katz*
                                             Jonathan Kalmuss-Katz

25

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Clean Cape Fear, Environmental Justice Task Force, Fight for Zero, and Merrimack Citizens for Clean Water, and Natural Resources Defense Council state that they are non-governmental, non-profit advocacy organizations dedicated to the protection of public health and the environment. They have no parent corporations and no publicly held corporation owns a 10% or greater ownership interest in these organizations.

Dated: July 10, 2024                    */s/ Jonathan Kalmuss-Katz*
                                        Jonathan Kalmuss-Katz

26

## CERTIFICATE OF PARTIES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A), I certify that the

parties, intervenors, and amici in these consolidated cases are:

Petitioners: Chamber of Commerce, Associated General Contractors of

America, and National Waste & Recycling Association

Respondents: United States Environmental Protection Agency; Michael S.

Regan in his official capacity as Administrator, United States Environmental

Protection Agency.

Prospective Intervenors: Clean Cape Fear, Environmental Justice Task

Force, Fight for Zero, Merrimack Citizens for Clean Water and Natural Resources

Defense Council. Undersigned counsel is not aware of any other movant-

intervenors as of the time of this filing.

Amici: No parties have sought amici curiae status at the time of this filing.


Dated: July 10, 2024                              /s/ *Jonathan Kalmuss-Katz*
                                                  Jonathan Kalmuss-Katz

27

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2024, I served the foregoing motion, and all accompanying declarations, on Petitioners' counsel through the Court's electronic filing system. I further certify that on July 10, 2024, I served the foregoing motion, and all accompanying declarations, on Respondents' counsel by emailing a copy to Elizabeth Berg at the United States Department of Justice (Elizabeth.Berg@usdoj.gov), who consented to receive electronic service on behalf of the government Respondents.

Dated: July 10, 2024                          /s/ *Jonathan Kalmuss-Katz*
                                              Jonathan Kalmuss-Katz