**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA,
ASSOCIATED GENERAL
CONTRACTORS OF AMERICA, INC., and
NATIONAL WASTE & RECYCLING
ASSOCIATION,

                *Petitioners,*

          v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and MICHAEL S.
REGAN, in his official capacity as
Administrator, United States Environmental
Protection Agency,

                *Respondents.*

Case No. 24-1193

**DECLARATIONS ACCOMPANYING CLEAN CAPE FEAR,
ENVIRONMENTAL JUSTICE TASK FORCE, FIGHT FOR ZERO,
MERRIMACK CITIZENS FOR CLEAN WATER, AND NATURAL
RESOURCES DEFENSE COUNCIL'S UNOPPOSED MOTION TO
INTERVENE IN SUPPORT OF RESPONDENTS**

# TABLE OF CONTENTS

**DECLARATION**                                                                 **PDF PAGE**

DECLARATION OF LAURENE ALLEN
Merrimack Citizens for Clean Water.................................................................03

DECLARATION OF CHRISTEL BAILEY
Fight for Zero.............................................................................................12

DECLARATION OF EMILY DONOVAN
Clean Cape Fear..........................................................................................22

DECLARATION OF LINDA SHOSIE
Environmental Justice Task Force....................................................................31

DECLARATION OF PAUL AMES
Natural Resources Defense Council .................................................................39

DECLARATION OF ERIN STEPHENS
Natural Resources Defense Council .................................................................44

DECLARATION OF GINA TRUJILLO
Natural Resources Defense Council .................................................................48

DECLARATION OF JONATHAN KALMUSS-KATZ .................................52

## DECLARATION OF LAURENE ALLEN

I, Laurene Allen, state and declare as follows:

1.      I am a resident of Merrimack, New Hampshire. I have lived in Merrimack since 1985.  My husband and I raised our two daughters here.

2.      I am a clinical social worker with a full-time therapy practice. I am also the co-founder of Merrimack Citizens for Clean Water.

3.      When my husband and I moved to Merrimack from Massachusetts more than thirty-five years ago, we thought we would be able to raise our children in a safe and beautiful environment. I remember attending community Fourth of July parades where the local water department would hand out water bottles with a label saying, "Best Tasting Water in NH!" For decades, we believed we were getting clean water, and our community was environmentally sound.

4.      That belief was shattered in March 2016, when I learned that our drinking water is contaminated with high levels of toxic chemicals known as PFOA and PFOS.

5.      PFOA and PFOS are part of a class of chemicals known as per- and polyfluoroalkyl substances, or "PFAS." They are often referred to as "forever chemicals" because they persist for many years in the environment and build up in

1

the human body over time. They are associated with cancer, thyroid disorders, neurological disorders, and other serious health problems.

6.      Like most of Merrimack's residents, my household water comes from the Merrimack Village District Water Works (the "Water District"). The source of this public water supply is groundwater pumped from six public wells. Approximately 25,000 residents of Merrimack rely on these water sources with about 2,000 additional Merrimack residents relying on private wells.

7.      At a standing-room-only public meeting held at a local school in March 2016, I learned that the water I drank; cooked with; bathed in; and gave to my children, my husband, and our pets was contaminated with PFOA and PFOS, and that the levels of these toxic contaminants were so high that the New Hampshire Department of Environmental Services, our state environmental agency, was closing down two of the six public water wells because of the serious risks to human health.

8.      At that meeting, state officials disclosed that unbeknownst to me, my family, or my neighbors, we had been drinking PFOA- and PFOS-contaminated water for at least 15 years. I have since learned that, in addition to PFOA and PFOS, we have at least 21 other PFAS in our groundwater.

2

9.    State officials have identified emissions of PFAS from the nearby Saint-Gobain Performance Plastics Teflon manufacturing plant as the primary source of this pollution.

10.    While the revelations at that March 2016 meeting were astounding, I was really bothered by the way that the public officials skated around community members' questions about the implications of PFOA and PFOS contamination for our health. Despite their discomfort sharing personal medical information, many individuals came forward to disclose serious health concerns—including diagnoses with various cancers and thyroid problems—and raised questions about the connection between these diseases and our contaminated water. But the officials' responses were very vague. And we were told that only a few homes were affected by the contamination, though we would later learn that thousands of households using both public water and private wells have been affected.

11.    Subsequent but limited blood testing of Merrimack residents revealed that our bodies are contaminated with PFAS at more than double the average level nationwide. This places us at significantly higher risks for developing cancers including bladder, kidney, testicular, breast, esophageal, lymph and thyroid, as well as other life-altering and life-threatening diseases.

12.    In addition to our severe drinking water contamination, elevated levels of PFOA have been detected in the soil in Merrimack, potentially exposing

3

children who play in the dirt or people who garden in it. That soil contamination can also leach into and re-contaminate our drinking water supply. High levels of PFOA were also detected in largemouth bass and other fish in the Merrimack River. But the full extent of this ongoing PFAS contamination has not yet been determined, but less controlled.

13.    After the March 2016 meeting, it was clear that our community needed to take action to get accurate information and do what we can to protect ourselves. Many public officials were in denial and wrongly sought to minimize the problem and persuade us that the PFOA and PFOS contaminated water was safe.  I started to connect with other people in the community who were concerned and wanted to be better informed. I also started attending many meetings with public officials and worked to develop relationships across the political spectrum to try to push for accountability and justice for the community.

14.    In early 2017, I co-founded Merrimack Citizens for Clean Water. Merrimack Citizens for Clean Water is a volunteer-run membership advocacy and information organization founded by local residents. We advocate for and help implement the policies, solutions and guidance we need on a local, state and federal level to comprehensively address the needs of our PFAS-impacted community.

4

15.     I never signed on to do this work in my life. I am a clinical social worker with a full-time counseling practice. But for years, I cut back on my professional hours to work on addressing the contamination of my water and my community's water.

16.     Merrimack Citizens for Clean Water is steered by a 6-member leadership group. We have listened to, assessed needs and concerns of, and have connected many people with additional information. The leadership group is in communication on an ongoing basis and meets regularly.

17.     We also hold open meetings for community members. In addition to meetings, we regularly disseminate information to our members through our email list and social media.

18.     As part of our work, we have assisted our members in participating in multiple listening sessions with EPA officials and advocated tirelessly for state and federal support and enforcement to address the PFAS contamination in our community. We successfully urged the state to adopt what were at the time some of the nation's strongest PFAS drinking water standards. We also supported EPA's establishment of national PFAS drinking water standards and designation of PFOA and PFOS as hazardous substances.

19.     Over the years, Merrimack Citizens for Clean Water has become a critical source of trusted information in our community for people who are

5

grappling with the profound stress, anguish, and uncertainty caused by toxic contamination of their water and the lack of health guidance for impacted community members.

20.    From the beginning, we have been committed to gathering and sharing accurate information about the risks of exposure to PFOA, PFOS, and other PFAS in our environment as well as steps that people can and should take to reduce their exposure and health risks, including in-home water filtration options. There is an immense need for community support and information that we strive to fill, but the work is ongoing and it is tiring.

21.    We also work to empower community members with credible information that they can use to advocate effectively for remediation and regulation at the federal, state, and local levels.  Three members of our group have been elected to the state legislature.

22.    Following an intensive public education campaign, in March of 2019, 93% of Merrimack voters voted for all six of our public drinking water wells to be remediated for PFAS.  Unfortunately, the only funding available to support this critical effort consists of loans from the State, resulting in significant fee increases for consumers of Merrimack's dangerously contaminated water. Saint Gobain has not yet accepted responsibility for or agreed to fully remediate the contamination that it caused, passing those costs off on taxpayers and rate payers.

6

23.    Local taxpayers and ratepayers have funded more than $13 million in water treatment improvements to address PFAS contamination, and we continue to pay more than $100,000 per year to operate and maintain those systems. Individual residents have also paid substantial amounts to install water filtration systems in their homes to reduce PFAS exposures.

24.    Earlier this year, Saint Gobain closed its Merrimack facility. But the facility's legacy of contamination remains, and Saint Gobain continues to deny its responsibility to remediate the town's soil and groundwater.

25.    The PFOS and PFOS hazardous substance designations will advance Merrimack Citizens for Clean Water's mission and protect the health and safety of contaminated communities like mine. The designations will promote the investigation and remediation of PFOA and PFOS, including contaminated soil that presents a continued threat to the drinking water supplies. They will also make Saint Gobain and other polluters who release PFOA and PFOS financially responsible for the resulting clean-up costs, so I and other members of Merrimack Citizens for Clean Water do not have to fund that remediation with our tax dollars. It will also create a powerful incentive for companies that continue to use or release PFOA and PFOS, as well as companies that are currently remediating those chemicals, to exercise due care and avoid additional releases. And it will require the reporting of PFOA and PFOS spills and releases, providing critical information

7

that communities like mine can use to reduce our PFAS exposures and to ensure that any releases are contained and remediated as soon as possible.

26.    If the hazardous substance designations were invalidated by the Court, I would be harmed and so would the other members of my organization. We would lose a key incentive for PFOA and PFOS remediation, including permanent removal of PFAS that goes beyond existing drinking water treatment, prolonging our exposure to toxic chemicals. We would be more likely to have to fund the clean-up of industrial PFOA and PFOS contamination ourselves, as opposed to having those costs borne by the parties that released those chemicals. And we would have less information about PFOA and PFOS releases, making it more likely that we would be exposed to those chemicals without ever realizing it.

27.    Increasing drinking water treatment is an important but incomplete solution to the problems facing Merrimack and other PFAS-impacted communities. Permanent and health-protective protection requires the removal or remediation of the PFAS source material, including contaminated soil. And the parties that released PFAS and created the contamination must also be held responsible for cleaning it up. While more work remains to be done to protect all PFAS impacted communities, the PFOA and PFOS hazardous substance designations are an important step forward for communities like mine, and I

8

support Merrimack Citizens for Clean Water's motion to intervene in support of those designations.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed July 8, 2024, in Merrimack, New Hampshire.

_____
Laurene Allen

9

## DECLARATION OF CHRISTEL BAILEY

I, Christel Bailey, state and declare as follows:

1.      I am the Executive Director of Fight for Zero, a non-profit organization based in Brevard County, Florida. I also serve as a member of the Leadership Team for the National PFAS Contamination Coalition.

2.      I was motivated to start Fight for Zero after I was diagnosed with cancer in 2013—along with my brother, my father, my uncle, and our family dog. My doctors advised that my cancer was likely caused by environmental contamination. Through extensive research, I learned that the community where I was raised in Brevard County, on the eastern coast of Florida, had been exposed to dangerous levels of toxic chemicals from Department of Defense and space industry facilities in our area. Fight for Zero developed from a group of cancer survivors and caregivers with a shared bond from disease, loss, and awareness that we and our loved ones had been exposed to toxic chemicals in our water.

3.      Today, Fight for Zero is a 501(c)(3) membership organization fighting for zero toxic pollution and pollution-related disease in Florida. The incidence of significant health problems among our members continues to be devastating. Our vice president's father who grew up in Satellite Beach, Florida, was recently diagnosed with lymphoma. His neighbor from across the street has the same diagnosis. His friend who lived with him, a non-smoker, is battling pre-cancerous

1

tumors in their throat. Other members and supporters suffer from an array of other ailments, including gastrological issues, Crohn's disease, breast cancer, liver issues, kidney disease, and loss of intestines. One of our members testified before Congress about losing his daughter to brain cancer and many of our other members lost children to, or have children who are currently fighting, cancer.

4.    I along with our vice president and an environmental scientist lead Fight for Zero and constitute its Board of Directors. The organization has regional directors throughout the State and approximately 5,000 members who have joined Fight for Zero and agreed to our community guidelines. We also communicate regularly with more than 60,000 supporters who subscribe to our newsletter.

5.    Our members and supporters are involved in Fight for Zero in various ways. They are our eyes and ears—they report contamination to us. They also attend meetings and write blog posts for the organization and update our website. We also provide advocacy training to our supporters who are interested in that aspect of our work.

6.    A main component of our work at Fight for Zero is advocacy at the local, state, and federal levels for regulatory action to restrict the use and release of per- and polyfluoroalkyl compounds ("PFAS") and other harmful chemicals and to require the remediation of PFAS contamination. We have drafted and signed comments and letters demanding PFAS regulation and remediation. We partnered

2

with the University of Florida to gather data to support such advocacy. I and other members have visited individual congressional offices multiple times to push for better PFAS regulation. I have also spoken at many protests demanding that the government act to protect the public from PFAS.

7.    Education is another core component of our organization's mission and activities. We work to educate our members and supporters about exposure to chemicals in the environment that pose health threats as well as measures to reduce exposure and detect disease early to increase survival. We also engage in physician outreach to educate the local medical community about chemicals that are present in the local environment and linked to disease to promote necessary screening, early detection, and treatment for our community members.

8.    Fight for Zero members also engage in an array of data-gathering and advocacy work to understand the chemical threats affecting our members and their environment and to fight for pollution reduction and remediation. For example, we organize citizen science initiatives in partnership with academic institutions and professional laboratories to develop data on the presence and levels of PFAS, including PFOA and PFOS, and other harmful chemicals in drinking water and other water bodies. We conduct health surveys and advocate for investigations of potential cancer clusters and other concerning disease patterns.

9.      In 2018, I became aware of severe PFAS contamination in the Brevard County—where I live and work—from nearby military and NASA facilities through reporting in the *Military Times.* Testing revealed combined levels of PFOA and PFOS up to 4.3 million parts per trillion (ppt) in groundwater at Patrick Air Force Base, 53,000 ppt at Cape Canaveral Air Force Station, 485,000 ppt in groundwater at Kennedy Space Center, and 493.8 ppt in residential areas in the Satellite Beach community. At that time, EPA's health advisory level for PFOA and PFOS in drinking water was 70 ppt. It is now less than 1 ppt.

10.      Growing up near the Kennedy Space Center had been such a special part of my childhood. Attending space launches was so unique. I was obsessed with stars, the moon, and space as a kid and felt lucky that I lived somewhere that people came to visit from around the world. It was devastating and heartbreaking when I learned that the space industry had polluted our community. It felt like betrayal.

11.      In response to the terrifying revelations of high PFAS contamination in 2018, Fight for Zero took several actions. We started putting public pressure on local governments to start testing their water for PFAS. Those that agreed to do so were willing to test only groundwater because they did not think they would find PFAS in the wells off base. But they did. Those results prompted successful

4

advocacy for more comprehensive testing in the wells outside of the base, particularly in places where children congregate.

12.    That comprehensive testing throughout the county uncovered PFOA, PFOS, and other PFAS in numerous schools and other locations. Those results prompted successful advocacy for more comprehensive testing throughout the county, particularly in places where children congregate. That testing uncovered PFBA in numerous school's drinking water and PFOA and PFOS in shallow wells, including PFOA and PFOS detections far above EPA's current health advisory levels for those chemicals.

13.    In addition to drinking water contamination, PFOA and PFOS have also been detected in soil and sediment throughout Brevard County, including in locations near schools and parks where children play. That soil contamination can leach into the groundwater and contaminate local drinking water sources. PFAS have also been found in the sediment in the Indian River Lagoon, where they can contaminate fish and work their way up the food chain. To this day, Brevard County residents remain exposed to multiple PFAS, including PFOA and PFOS, from multiple exposure pathways.

14.    Fight for Zero convened numerous public meetings—which drew more than 500 attendees—to educate our members and the broader community

5

about PFAS, how the chemicals get into our groundwater, and the most current scientific understanding of the health risks from exposure.

15. We also did outreach to the local fishing community after testing revealed high levels of PFAS in marine mammals and wildlife in our area. We trained community members to collect water samples and engage in citizen science initiatives to expand the body of data documenting PFAS in the environment so we could better understand, and share information about, the levels of these chemicals and potential pathways of exposure through drinking water, fish consumption, and other sources.

16. Fight for Zero also commissioned independent testing for PFOA and PFOS in local water sources, including drinking fountains at public parks. This testing revealed PFOA, PFOS and other PFAS in this public water supply at levels ranging from 10 ppt to 22 ppt based on analytical methods available at that time. We also collected water samples from community members' homes and found PFAS levels at 176 ppt using a Total Organofluoride test.

17. At the time we launched this effort in 2018, very few people in our membership and local community knew what PFAS were, what the levels of PFOA and PFOS in their environment were, and what the implications were for their health and the health of their families. Water systems in our area were conducting monitoring, but they were not monitoring adequately. Fight for Zero

6

engaged with an environmental science firm that drafted a memo outlining how water systems should properly monitor for PFAS.

18.    And while some local municipalities released monitoring results, they were not forthcoming with residents about the risks associated with the chemicals generally and more specifically with the levels of them found in the water. Rather, officials tried to reassure residents, asserting that the water was safe, the levels were low, and there was no reason to worry about their presence because PFAS can be found in so many products and places. People in the community were extremely distressed, confused, and overwhelmed.

19.    We worked—and continue to work—to fill this critical knowledge gap so that people can understand the risks based on the most up-to-date exposure data and research on health risks and so they can determine what steps they need to take to reduce their exposure through water filtration and other strategies. We provided, and continue to provide, information to our members and the public regarding water filtration options and effectiveness. We have also continued to emphasize education around early detection of associated diseases. As a cancer survivor, I know the importance of early detection to prolong your life.

20.    While there is now greater awareness of the risks associated with local PFAS contamination, there has been too little PFAS remediation in Brevard County. Local drinking water supplies and soil remain dangerously contaminated

7

with PFOA and PFOS, yet the Department of Defense and NASA have not remediated the contamination at and around Patrick Space Force Base, the Kennedy Space Center, and other PFAS contaminated sites.

21.    EPA's designations of PFOA and PFOS as hazardous substances under the federal Superfund law are important for the health and wellbeing of Fight for Zero's members. The designations will promote PFOA and PFAS remediation and give EPA additional tools to compel responsible parties to clean up existing PFAS contamination. The designations thus increase the likelihood of long overdue PFAS investigation and remediation in communities like mine.

22.    The hazardous substance designations also make the polluters who released PFOA and PFOS financially liable for the resulting clean-up costs, so I and other members of Fight for Zero do not need to fund that remediation with our tax dollars or water bills. The possibility of Superfund liability also creates an incentive for parties that continue to use or release PFOA and PFOS, as well as companies that are currently undertaking PFAS remediation, to exercise due care and avoid additional releases.

23.    And the designations will require the reporting of PFOA and PFOS spills and releases, providing information that impacted communities like mine can use to reduce our PFAS exposures and to ensure that any releases are contained and remediated as soon as possible.

8

24.     If the hazardous substance designations were to be vacated, I and other members of Fight for Zero would be harmed. We would lose a key incentive for PFOA and PFOS remediation, including permanent removal of PFAS that have the potential to re-contaminate local drinking water supplies. Without those designations, PFAS remediation would be more likely to be funded by local taxpayers and ratepayers. And without the designations' mandatory reporting requirements we would have less information about PFOA and PFOS releases, making it more likely that we would be exposed to those chemicals without ever realizing it.

25.     For decades, the government allowed PFOA, PFOS and other PFAS to spread through communities like mine, despite knowing of their severe health risks. The failure to remediate that contamination has caused, and continues to cause, severe harm to Fight for Zero's members and other residents of impacted communities nationwide. The hazardous substance designations challenged in this proceeding will provide much needed and long overdue relief of those communities by promoting the remediation of PFOA and PFOS, as well as generating additional information about ongoing PFOA and PFOS releases. Fight for Zero should be permitted to intervene in defense of those designations.

9

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed July ____7____, 2024, in ____Cocoa_____, Florida.

_____
Christel Bailey

10

## DECLARATION OF EMILY DONOVAN

I, Emily Donovan, state and declare as follows:

1.      I am a founding member of Clean Cape Fear, a grassroots organization working to restore and protect the water, air, soil, and food supply in the Cape Fear River Basin of North Carolina from per- and polyfluoroalkyl substances ("PFAS"). The Cape Fear River is the primary source of drinking water for nearly 500,000 people in southeastern North Carolina, including my family and me.

2.      I am also a member of the leadership team for the National PFAS Contamination Coalition, a network of community advocates from across the country who are working together to support local organizing for a clean, PFAS-free environment and for policies and other actions to protect people from PFAS exposure.

3.      I live in the town of Winnabow in Brunswick County, North Carolina, with my husband and two children. I have lived in the area since 2009.

4.      Brunswick County is a coastal community, known for its pristine beaches and beautiful waterways. We are the fastest growing county in one of the fastest growing states in the nation. The Cape Fear River traces the northern and eastern borders of the county before emptying into the Atlantic Ocean near Bald Head Island.

1

5.     Approximately 90 miles upstream in Fayetteville, NC, the chemical company Chemours manufactures PFAS along the Cape Fear River. For decades, Chemours and its predecessor, DuPont, discharged PFAS into the river, which provides drinking water for many downstream communities. The PFAS chemicals manufactured by Chemours in Fayetteville include PFOS and GenX.

6.     In addition to the PFAS pollution from Chemours, a massive textile manufacturer north of Pittsboro, 185 miles from me**,** discharges PFAS into the Cape Fear River**.**

7.     PFAS levels in the Cape Fear River basin are among the highest in the nation. In a 2019 study of PFAS levels in tap water taken from 34 different states, the highest reported level came from a Brunswick County elementary school, with more than 185 parts per trillion (ppt) total PFAS. The water in that school contained 9.3 ppt of PFOA and 14 ppt of PFOS, levels thousands of times higher than the levels that EPA has determined endanger health.

8.     In addition to contaminating our water supply, PFAS have been detected in the air, soil, and sediment within the Cape Fear River basin. A local sewage plant that discharges to a Cape Fear River tributary had 1,000 ppt of PFOA in its influent, and the state has warned residents to avoid eating striped bass from the River because of PFAS contamination. Local communities are exposed to a

2

range of PFAS, including PFOA and PFOS, from multiple sources and exposure pathways.

9.    After learning about the PFAS contamination in our community I bought bottled water for my family for a few years. Once I realized that enforceable drinking water regulations for PFAS would not be enacted quickly, we installed a reverse osmosis filter under our kitchen sink. That filters water for drinking and cooking, but my family still uses untreated water for brushing our teeth and taking showers. And, of course, my family, especially my children, drink water from other places in the community such as their friends' houses.

10.    The water in our region that is contaminated with PFAS is not just water used for drinking. The water in the rain gutters at my house contains PFAS, even though I live 80 miles from Chemours. I stopped gardening once I learned about PFAS in the area because I was worried about the soil and that any water that would feed the plants and crops would be contaminated with PFAS.

11.    I have witnessed the devastating effects of PFAS contamination firsthand. My husband survived a brain tumor shortly after we moved to North Carolina, and I worry about the effects of our drinking water on his health and the health of my children. I have known many children and young adults who have developed rare forms of kidney cancer, and research detected a cluster of thyroid cancers in Wilmington, North Carolina, just upstream from where I live.  My own

3

inner circle of friends and neighbors is filled with loved ones suffering from the trauma of cancer treatments, benign tumors, and terminal diagnoses.

12.    My children and other children in the local community are also experiencing the effects of pervasive illness in our community at school.  They have not had consistent instructors because teachers are regularly on leave for medical reasons, disrupting their learning.

13.    DuPont knew of the harms associated with PFAS more than fifty years ago, yet it never shared that information with downstream communities.  I first learned of the PFAS contamination in the Cape Fear River in 2017. Although our state environmental agency knew about the contamination, the public did not learn about it until a local investigative reporter wrote a story about it.

14.    Shortly after reading that story, five other local residents and I formed Clean Cape Fear. Clean Cape Fear advocates on the local, state, and federal levels for policies and regulations to protect people from the serious harms caused by PFAS, educates residents about the contamination of the Cape Fear River and the risks from PFAS, supports residents grappling with PFAS contamination and exposure, seeks accountability for and clean-up of PFAS contamination in our area, and advocates for health research and PFAS-related resources for the region.

15.    Our leadership structure is made up of a volunteer team which includes me and co-founder Jessica Cannon, as well as Harper Peterson, Rebecca

4

Trammel, Kirk deViere, and Kyle Horton. The team functions much like a board of directors and meets regularly to share information and discuss current and new initiatives. All the members of our leadership team live in the Cape Fear River basin, and all have been exposed to PFAS in their drinking water, and some continue to be.

16.    I have been advocating for regulation of PFAS continuously since the formation of Clean Cape Fear. I have testified before Congress several times, including at the first hearing it ever held on PFAS, urging them to act on PFAS. And just about every time I am in Washington, D.C., I set up a meeting with EPA urging it to regulate PFAS. Clean Cape Fear has signed on to numerous comment letters advocating for EPA to regulate PFAS not only in drinking water, but in other respects, like with respect to new chemical approvals, disposal, and clean up.

17.    Clean Cape Fear has often been at odds with EPA. I have tirelessly advocated for EPA to regulate PFAS as a class, which it has not done. Clean Cape Fear petitioned EPA to conduct comprehensive health studies on PFAS our community has been exposed to. EPA granted only three percent of the petition yet argued that it had granted it in its entirety and succeeded in having litigation over this issue dismissed in court. Part of that petition asked EPA to conduct the studies for purposes of clinical care, something EPA admitted it had authority to do, but

5

refused to do. And EPA has determined that the PFAS with the highest concentration in my blood should not even be considered and regulated as PFAS!

18.     Clean Cape Fear has also urged the State of North Carolina to regulate PFAS, which it has not done. Recently, my advocacy with Clean Cape Fear has also included working with the United Nations to highlight how a handful of companies have caused PFAS contamination throughout the world and seek remedies for decades of human rights abuses. This work involves collaborating with United Nations human rights experts to investigate where abuses occurred and then to use that information to engage in international legal pathways to address such abuses.

19.     Public outreach and education are also a core part of Clean Cape Fear's mission. We regularly communicate with and educate the community by hosting public meetings, posting on social media, and sending action alerts to our email database. We have more than 5,000 followers on Facebook, 1,200 followers on Twitter, and a database of more than 5,000 email addresses.

20.     In recent years, improvements to drinking water treatment systems have significantly reduced, and in some instances eliminated, PFAS levels in local drinking water supplies. However, many of those improvements have been funded by local taxpayers and ratepayers, since Chemours and other polluters have not assumed responsibility for the full cost of PFAS treatment and remediation. The

6

Cape Fear Public Utility Authority has repeatedly raised drinking water rates to account for the costs of PFAS treatment, placing a significant financial burden on the very residents who are already disproportionately harmed by PFAS exposures.

21.    Moreover, many of the communities served by Clean Cape Fear remain exposed to unsafe levels of PFOA and PFOS in their drinking water or soil. Because PFAS in soil and sediment can re-contaminate drinking water supplies, a permanent solution to the PFAS crisis requires not only drinking water treatment but also remediation of the PFAS source material.

22.    The PFOA and PFOS hazardous substance designations will advance Clean Cape Fear's mission and protect the health and safety of contaminated communities like mine. The designations will promote the investigation and remediation of PFOA and PFOS, including contaminated soil that presents a continuing threat to the drinking water supplies. They will also make Chemours and other polluters who release PFOA and PFOS financially responsible for the resulting clean-up costs, so I and other members of Clean Cape Fear do not have to fund that remediation with our tax dollars. It will also create a powerful incentive for companies that continue to use or release PFOA and PFOS, as well as companies that are currently remediating those chemicals, to exercise due care and avoid additional releases.

7

23.     In addition to promoting PFAS remediation, the designations' release reporting requirements are critical to me, the other members of Clean Cape Fear, and others in our community. Currently there is no real-time reporting of PFOA and PFOS releases, and people often do not learn of such releases until long after they have already been exposed.

24.     I think of transparency with respect to PFAS releases and monitoring results as akin to medical informed consent provisions. Our community members were so frustrated that our leaders had known about the PFAS contamination much earlier than we did, and we had to learn about it elsewhere. It is a fundamental human right to have access not only to a safe environment, but also to information about your potential chemical exposures, so you can take steps to reduce or prevent them. Cancer patients, new mothers, and people with autoimmune conditions, for example, have a right to be fully informed and decide for themselves whether to drink contaminated water, but that right was originally taken away from us. Fortunately, the hazardous substance designations will require reporting of PFOA and PFOS releases within 24 hours, so the public can assess the associated risks and advocate for remediation and other health protections.

25.     If the hazardous substance designations were invalidated by the Court, I and the other residents of the Cape Fear River basin would be harmed. We would lose a key incentive for PFOA and PFOS remediation, including permanent

8

removal of PFAS that goes beyond existing drinking water treatment. We would be more likely to have to fund the clean-up of industrial PFOA and PFOS contamination ourselves, as opposed to having those costs borne by Chemours and other responsible parties. And we would have less information about PFOA and PFOS releases, making it more likely that people would be exposed to those chemicals without ever realizing it.

26.    The hazardous substance designations are an important step towards in the direction of increased PFAS remediation and long overdue relief for contaminated communities like mine. But there is still more to be done. The Cape Fear River is contaminated with dozens of PFAS, and the broader PFAS class presents a serious threat to public health and the environment. Any and all PFAS that present risk to public health should also be regulated.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed July 10, 2024, in Winnabow, North Carolina.

_s/ Emily Donovan_
Emily Donovan

9

## DECLARATION OF LINDA SHOSIE

I, Linda Shosie, state and declare as follows:

1.      I am the founding member of the Environmental Justice Task Force in Tucson, Arizona, also known as Mothers for Safe Air, Safe Water Force. The Environmental Justice Task Force is dedicated to protecting its members and others in the Tucson community from the harms caused by toxic chemicals, including per- and polyfluoroalkyl substances ("PFAS") such as PFOA and PFOS.

2.      I was born, raised, and have lived my entire life in the Tucson area. I currently live in the southern part of Tucson, near the Tucson International Airport. I love Tucson, which is a vibrant community surrounded by a beautiful desert environment.

3.      However, our community has suffered severe harm because of PFOA, PFOS, and other toxic chemicals in our drinking water and environment, which increase our risk of cancer and other serious diseases.

4.      PFAS discharges from the Tucson International Airport and several Air Force installations in and around Tucson have severely contaminated drinking water sources utilized by Tucson Water, our water provider. This and other contamination has turned the area around my home into a federal Superfund site and has threatened my health and the health of countless Tucson residents. PFOA, PFOS, and other PFAS have all been detected in my water.

1

5.      My family has suffered from multiple diseases that are associated with exposure to toxic chemicals such as PFAS. I lost my nineteen-year-old daughter to a rare form of cancer, and another of my daughters is a cancer survivor. My son has kidney disease, my grandson was born with birth defects, and in 2017 my five-year-old niece died of childhood brain cancer. Many of my friends and neighbors have experienced disease and loss as well. I believe that the high rates of disease in my own family and neighborhood are connected to the contamination of our drinking water.

6.      I formed the Environmental Justice Task Force in 2014 to educate people in my community about the chemicals in our water supply and to advocate for stronger public health protections so no one else would have to live through the pain that I have experienced. The organization has approximately 30 core members who vote on organizational decisions, as well as a mailing list of more than 1,000 people and an active social media presence. Many of our members, including myself, live in primarily Hispanic, lower income neighborhoods in Tucson.

7.      The Environmental Justice Task Force has organized meetings to inform people about the chemicals in their drinking water; met with local, state and federal policy makers; and partnered with scientists who are researching PFAS and other chemicals that are present in Tucson. I have personally gone door-to-door to talk to community members who have been exposed to contaminated drinking

2

water, and I have purchased and handed out hundreds of cases of bottled water, along with a flyer for people to learn more about the contaminants in our water supply.

8.    When I founded the Environmental Justice Task Force, our primary focus was on another chemical, trichloroethylene ("TCE"), that also was released at the Tucson International Airport Area Superfund Site. In addition to advocating for the cleanup and regulation of TCE, I began to look into what other chemicals had contaminated our water supplies. That information was hard to come by, but after multiple requests, in 2018 Tucson Water disclosed that there were also very high levels of PFOA and PFOS in our water supply.

9.    As alarming as it was to discover that contamination, I was equally distressed to learn that Tucson Water knew of elevated PFAS levels in the water supply for years before that information was made public. The public needs access to information about the levels of PFAS in their water supplies, as well information about what those levels mean and when they can present risk, so people can make informed decisions about the water that they and their families drink. The Environmental Justice Task Force is committed to disseminating that information.

10.    In one location, Tucson Water detected 13,000 parts per trillion ("ppt") of PFOS in the groundwater.

3

11.    Tucson Water has sent drinking water to thousands of customers containing up to 30 ppt of PFAS.

12.    Tucson Water removed several drinking water wells from service following the detection of extremely high levels of PFAS, but elevated levels of PFAS remain in the groundwater in Tucson.

13.    The City of Tucson runs a groundwater remediation project called the Tucson Airport Remediation Project ("TARP"), which is designed to treat contaminated groundwater so that it can be used as drinking water. In June 2021, Arizona forced Tucson Water to temporarily shut down the whole TARP area water field due to PFAS contamination. In November 2021, Tucson Water resumed operation of TARP, but is not serving drinking water from the TARP area water field.

14.    However, groundwater from the TARP field remains a critical part of Tucson Water's supply portfolio and the goal is to resume sending treated water from the TARP to our community. Other wells and water sources within Tucson Water's system remain contaminated with PFAS, including multiple drinking water wells that Tucson Water classifies as on "standby."

15.    In addition to the contamination of our local drinking water, PFOA and PFOS have also been detected in the soil at the Tucson International Airport Area Superfund Site, which covers not only the airport grounds but also nearby

4

residential neighborhoods and surrounding parcels that were previously operated by industrial and governmental entities. The full extent of that contamination has not yet been determined, and the PFAS contamination that has been detected has not been fully remediated.

16.     PFAS sampling from the last several years has revealed that unsafe levels of PFOA and PFOS remain in the groundwater underlying the Superfund site and the TARP. PFOA was detected at concentrations up to 2,400 ppt, and PFOS was detected at concentrations up to 3,000 ppt. Last April EPA issued an emergency order to the Air Force under the Safe Drinking Water Act "to abate the actual and potential imminent and substantial threat to the health of persons presented by the presence …. [PFAS] in groundwater underlying the Tucson Area Remediation Project ("TARP") water well field."

17.     Much of the PFAS treatment that has occurred to date has been funded by taxpayers and local ratepayers, as opposed to the parties responsible for that contamination. Tucson has received more than $60,000,000 in public funding for PFAS water treatment, and Tucson Water recently increased its rates in part due to the improvements needed to address PFAS contamination, forcing some of the same communities who are suffering the health consequences of PFAS contamination to also pay for its cleanup. According to EPA, Tucson Water has reported that the costs associated with PFAS treatment "have become a burden for

5

the Tucson Water rate payer."

18.    EPA's designations of PFOA and PFOS as hazardous substances under the federal Superfund law are important for the health and wellbeing of the Environmental Justice Task Force's members. The designations will promote PFOA and PFAS remediation and give EPA additional tools to compel responsible parties to clean up existing PFAS contamination.

19.    The hazardous substance designations also make the polluters like the Air Force and others who released PFOA and PFOS financially liable for the resulting clean-up costs, so I and other members of the Environmental Justice Task Force do not need to fund that remediation with our tax dollars or water bills. The possibility of Superfund liability creates an incentive for parties that continue to use or dispose of PFOA and PFOS to exercise due care and avoid additional releases.

20.    And the designations will require the reporting of PFOA and PFOS spills and releases, providing information that communities like mine can use to reduce our PFAS exposures and to ensure that any releases are contained and remediated as soon as possible.

21.    If the hazardous substance designations were to be vacated, I and other members of the Environmental Justice Task Force would be harmed. We would lose a key incentive for PFOA and PFOS remediation, including permanent

6

removal of PFAS that have the potential to re-contaminate drinking water supplies. Without those designations, PFAS remediation would be more likely to be funded by local taxpayers and ratepayers. And without the designations' mandatory reporting requirements we would have less information about PFOA and PFOS releases, making it more likely that people in Tucson and beyond would continue to be exposed to those chemicals without ever realizing it.

22.    The hazardous substance designations, combined with EPA's recent PFAS drinking water standards, deliver on EPA's longstanding promise to protect overburdened, environmental justice communities. Unfortunately, a lot of us in my community have lost children, and have lost other loved ones, neighbors, and friends. PFAS have been devastating for us, particularly given the preexisting contamination of Tucson's water with trichloroethylene, 1,4-dioxane, and other toxic chemicals.

23.    Now that we have the PFOA and PFOS hazardous substance designations we can start moving forward to address the problem and protect people who are suffering, especially children. If those designations were vacated, it would be devastating. That would be another injustice, and all the work we have done would go out the door. We have suffered enough, and we have had to deal enough with PFAS unregulated for years before EPA took action. On behalf of the Environmental Justice Task Force, I strongly support those designations and I urge

7

the Court to grant the Environmental Justice Task Force's motion to intervene.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed June 9, 2024, in Tucson, Arizona.

*s/ Linda Shosie*
Linda Shosie

8

## DECLARATION OF PAUL AMES

I, Paul Ames, declare as follows:

1.      I am a member of the Natural Resources Defense Council (NRDC). I have supported NRDC since the 1980s. I participated in the first Earth Day in 1970 and became interested in environmental issues not because of one specific concern, but rather because of the growing understanding that pollution is rampant. To protect ourselves, we have to be proactive and persistent about addressing bioaccumulative toxins in the environment. I have long been concerned about and continue to be concerned about drinking water contamination.

2.      I live in Bellport, New York, on Long Island. I have lived in my current home since 1980. I receive water from the Suffolk County Water Authority.

3.      Before I retired six years ago, I spent 45 years working for the Public & Environmental Health Laboratory of Suffolk County's Division of Environmental Quality. I first spent 20 years as a chemist there, then switched to information management at the lab. We analyzed seawater and drinking water samples and worked with the Water Authority to trace the origin of pollutants.

4.      The Water Authority has previously detected PFAS in various wells within their network and in the drinking water supply. They found the PFAS came from several airports in the area including at Westhampton and Islip, as well as the Firematics Training Center, where the firefighting foam they used for practice had

1

PFAS in it. Land on Long Island is very sandy, so the chemicals flow right down into the aquifer. Additionally, since PFAS are in so many things—pizza boxes, storage containers, and more—much of it ends up in the waste stream. Because landfill leaching is a chronic problem, many of these PFAS in the waste stream percolate into the surface water and groundwater.

5.     I live about 10 miles from the Brookhaven National Laboratory, a U.S. Department of Energy research and development facility, where environmental contamination has resulted from accidental spills and historical storage and disposal of chemical and radiological materials. EPA has listed the lab as a Superfund site, identified PFAS contamination as an area of concern, and is undergoing "remedial investigation" there.

6.     For people on Long Island, the sole source of drinking water is the aquifers. When contaminants are detected in their wells, the Water Authority can either stop using those wells or dilute the water with other, less contaminated water until it meets the applicable maximum contaminant levels (MCLs). Addressing the contamination in the aquifers can require extensive remediation, using granulated activated carbon filters, or other measures.

7.     When we first moved to our home in Bellport in 1980, we used water from our own private well. We had to switch in the mid-80s because the well was contaminated with chemicals including trichloroethylene by a neighboring

2

laundromat. At one point we had bottled water delivery, but after some research I concluded that our tap water was likely safer, given the microplastics that bottled water can contain.

8.     Just as with microplastics, I am concerned about PFAS contamination in drinking water. I believe that the many toxic chemicals out there—chlorinated compounds, brominated compounds, now PFAS—have synergistic effects on human health. For example, my wife was recently diagnosed with cancer of the blood and had to go through chemotherapy; while we can't pinpoint the cause of her cancer, how can you rule out any one thing?

9.     I am aware that PFAS are bioaccumulative toxins, meaning that once they are in your system, they don't go away. In general, I try to be careful about what I eat and drink, and I opt for organic and unprocessed foods in order to reduce the amounts of pesticides in my food and in the environment. I have considered home filtration of my drinking water, but opted not to because it is expensive, time consuming, and reverse osmosis wastes a lot of water. I am aware that the Water Authority conducts testing for PFAS and rely on them to safeguard the water supply on our behalf.

10.     The 2024 Water Quality Report for the Suffolk County Water Authority, available at http://s1091480.instanturl.net/dwqr2024/AWQR%202024%20FINAL.pdf, is the most recent publicly available Consumer

3

Confidence Report for the water system that serves me. The report on page 12

shows that the water system on average did not detect PFOA or PFOS in the water

being delivered to my home in Distribution Area 1. However, the maximum

reported PFOA and PFOS concentrations detected in my Distribution Area were 6

parts per trillion and 35 parts per trillion, respectively.

     11.    I think it is beneficial that the U.S. Environmental Protection Agency

(EPA) recently designated PFOA and PFOS as "hazardous substances" under

CERCLA, the Superfund law. The hazardous substance designations will expand

EPA's ability to require responsible parties to clean up PFOA or PFOS

contamination. I understand that PFAS are a ubiquitous problem, with many

sources and the need for a comprehensive approach to prevent and address the

resulting drinking water contamination.

     12.    I support NRDC helping to defend EPA's new hazardous substance

designations. We should support more stringent regulation that EPA puts out, and

we need advocacy organizations to help coordinate efforts to protect the

environment. I'd have more peace of mind knowing EPA is prioritizing testing for

and remediation of PFAS contamination, which will lessen the potential for

adverse health effects from PFAS exposure in communities near Superfund sites. I

understand that the hazardous substance designations will require the responsible

parties to pay for clean up costs, which could minimize how much my water

4

system has to spend to treat water, and potentially allow me to spend less on water bills.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 8, 2024.

_____

Paul Ames

## DECLARATION OF ERIN STEPHENS

I, Erin Stephens, declare as follows:

1.      I am a member of the Natural Resources Defense Council (NRDC). I knew that more environmental advocacy had to be done after the administration change in 2016. I became a member of NRDC around two years ago.

2.      I live in Pensacola, Florida and have lived there since 2007. Around five years ago, I moved into the home I am currently living.

3.      My awareness of PFAS became heightened around six years ago. I learned about it by reading the local news, such as InWeekly and the Pensacola News Journal, national publications such as Politico, and from environmental groups. However, even before the term PFAS came to my knowledge, I had been concerned for many years about the notoriously bad water supply in Pensacola. I know that there is significant residential, commercial and industrial runoff into Carpenter Creek nearby, plus a high amount of fecal coliform bacteria and E. coli detected in the watershed.

4.      Pensacola frequently experiences storms, heavy rainfall and flooding which disperses contaminants. The contaminants can then seep through the soil and pollute the groundwater. Also, nearby Pensacola Beach and Pensacola Bay were among the most severely impacted areas by the Deepwater Horizon oil spill in 2010. Water, wildlife and the white beaches were coated with oil. The long-term

1

effects from the toxic Corexit dispersants, used to break down the oil, possibly made the environmental impact worse.

5.     There are many military and aviation facilities in the Pensacola area. I personally do not live right next to a military facility, however, there are many a few miles away to the west, northeast and east of me. For example, I live approximately eleven miles away from Pensacola Naval Air Station, an active U.S. Navy installation that is also a Superfund site undergoing remedial investigation for PFAS contamination. I also live close to a busy commercial airport. I understand that military bases and airports use aqueous film forming foams (AFFF), used for firefighting testing and training exercises, that contain PFAS. These are among the reasons I am concerned about PFAS in my water. I have read news articles and scientific studies that found military bases and airports leaking forever chemicals into neighboring communities and the environment.

6.     Emerald Coast Utilities Authority (ECUA) handles water and sewer services in Pensacola. ECUA draws its water from sand and gravel aquifers, and I am worried that this source water is contaminated from residential, commercial or industrial runoff. In 2018, ECUA sued the manufacturers and suppliers of AFFF in response to contamination found in four of the area's water wells due to the usage of these highly toxic chemicals at a defunct naval air station and the city's airport.

2

7.    The most recent publicly available water report for ECUA, available at https://assets.ecua.fl.gov/2023-CCR-Web.pdf?mtime=20240508095353, shows that the water system detected various PFAS in 2023. Page 2 of the report shows that on average, the water system has detected concentrations of PFOS at 6.0 parts per trillion and PFOA at 4.9 parts per trillion. The maximum reported concentrations were as high as 35.7 parts per trillion for PFOS and 25.8 parts per trillion for PFOA.

8.    Before I moved to Pensacola, the city was always on lists of areas with poor water quality, so I knew that water filtration was something I needed to consider. I use a PUR pitcher filter daily to proactively take care of my health.

9.    I started filtering my drinking water before I became aware of PFAS. Still, I am worried about PFAS exposure and associated health effects. I don't know if the PUR pitcher can filter out all PFAS and I don't know how much PFAS is in the unfiltered water I use, including at the bathroom tap and shower. I do know PFAS chemicals do not break down, accumulate in the body, and that all PFAS are linked to negative health impacts including asthma, birth defects, cardiovascular risk, higher cholesterol, liver and kidney damage, lower antibody response to vaccines, lower fertility, preeclampsia, thyroid disease and several forms of cancer.

10.     I am aware that the U.S. Environmental Protection Agency (EPA) recently designated PFOA and PFOS as "hazardous substances" under the Superfund law. When I first heard about the designations from NRDC, my initial reaction was that it felt like progress that was long overdue. I understand that EPA's hazardous substance designations will expand EPA's ability to require responsible parties to clean up PFOA or PFOS contamination. I think this will lessen the potential for health effects of PFAS exposure from the nearby military and aviation facilities. I am also aware that the designations will require the responsible parties to pay for clean up costs, which could minimize how much my water system has to spend to treat water, and ultimately may lead to lower water bills on my end.

11.     I understand that EPA expects the required remediation of PFOA and PFOS will provide significant health benefits by lowering the risk of adverse health effects from exposure to forever chemicals. I support NRDC helping to defend EPA's new hazardous substance designations, and my community and I will benefit from it being upheld and implemented without delay.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July __9__, 2024.

Erin Stephens

4

## DECLARATION OF GINA TRUJILLO

I, Gina Trujillo, declare as follows:

1.      I am the Director of Membership at the Natural Resources Defense Council, Inc. (NRDC). I have been in that position since January 1, 2015, and I have worked at NRDC in the membership department for more than 30 years.

2.      My duties include supervising the preparation of materials that NRDC distributes to members and prospective members. Those materials describe NRDC and identify its mission.

3.      NRDC is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under section 50l(c)(3) of the United States Internal Revenue Code. NRDC's headquarters are located at 40 West 20th Street, New York, NY 10011.

4.      NRDC's mission statement declares that "The Natural Resources Defense Council's purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends." NRDC works to ensure the rights of all people to clean air, clean water, and healthy communities. NRDC's mission includes protecting the health and safety of NRDC's members by reducing and preventing exposure to toxic chemicals, including PFAS "forever chemicals."

1

5.     NRDC is committed to ensuring that all communities are protected from dangerous PFAS exposure. NRDC has analyzed the disproportionate impacts of PFAS contamination and encouraged federal agencies to adopt strict regulation relating to PFAS chemicals.

6.     Over many years, NRDC has called on EPA to regulate PFAS in industrial water discharges, ensure Superfund cleanups and management of hazardous wastes with PFAS, ban new uses of PFAS, and require data collection and disclosures about PFAS in drinking water.[1] NRDC has extensively researched the prevalence of and advocated for limits on PFAS in drinking water. For instance, NRDC has delivered testimony to Congress several times about the dangers of PFAS contamination in drinking water.[2] NRDC has also produced multiple reports on PFAS contamination in several states, along with policy recommendations.

---

[1] *See* Erik D. Olson, Presentation at EPA PFAS National Leadership Summit (May 22, 2018), https://epa.gov/sites/default/files/2018-05/documents/nrdc-olson-pfass-final.pdf.

[2] Perfluorinated Chemicals in the Environment: An Update on the Response to Contamination and Challenges Presented: Hearing Before the Subcomm. on Energy, 115th Cong. 103 (2018) (Statement of Erik D. Olson, Senior Strategic Director for Health and Food, NRDC); Protecting Americans at Risk of PFAS Contamination & Exposure: Hearing Before the Subcomm. on Env't and Climate Change, 116th Cong. 66 (2019) (Statement of Erik D. Olson, Health Program Director, NRDC); Trusting the Tap: Upgrading America's Drinking Water Infrastructure: Hearing Before the Subcomm. on Env't and Climate Change, 117th Cong. (March 29, 2022) (Statement of Erik D. Olson, Senior Strategic Director for Health and Food, NRDC).

7.     NRDC uses scientific and technical information concerning toxic chemicals to further its mission. NRDC does this by informing its members about health risks so that they can take action to protect themselves and their families and by advocating for states and the federal government to issue and enforce strong limits on drinking water contaminants to protect public health, including the health of NRDC's members.

8.     Ensuring that the hazardous substance designations of PFOA and PFOS go into effect without delay is a paradigmatic example of NRDC's efforts to safeguard public health and the environment.

9.     When an individual becomes a member of NRDC, his or her current residential address is recorded in NRDC's membership database. When a member renews his or her membership or otherwise makes a contribution to NRDC, the database entry reflecting the member's residential address is verified or updated.

10.     NRDC currently has approximately 483,972 members. There are NRDC members residing in each of the fifty United States and in the District of Columbia and Puerto Rico.

11.     When an individual becomes a member of NRDC, he or she authorizes NRDC to take legal action on his or her behalf to protect the environment and public health.

3

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 8, 2024.

Gina Trujillo

4

## DECLARATION OF JONATHAN KALMUSS-KATZ

I, Jonathan Kalmuss-Katz, declare and state as follows:

1.     I am counsel of record for Proposed Intervenors Clean Cape Fear,
Environmental Justice Task Force, Fight for Zero, Merrimack Citizens for Clean
Water, and Natural Resources Defense Council in this matter. I submit this
declaration to provide the court with a copy of document referenced in the
accompanying motion to intervene.

2.     Attached to this declaration as **Exhibit A** is a true and correct copy of
public comments submitted by several of the Proposed Intervenors and other
organizations on the U.S. Environmental Protection Agency's ("EPA") proposed
designation of perfluoroctanoic acid ("PFOA") and perfluorooctanesulfonic acid
("PFOS") as CERCLA hazardous substances. The attached comments were
submitted to EPA on November 7, 2023.

I declare under penalty of perjury that, to the best of my knowledge, the
foregoing is true and correct. Executed July 9, 2023, in Brooklyn, New York.

/s/ *Jonathan Kalmuss-Katz*
Jonathan Kalmuss-Katz

# Exhibit A

November 7, 2022

*Via Regulations.gov*

Mr. Barry Breen
Acting Assistant Administrator, Office of Land and Emergency Management
U.S. Environmental Protection Agency
1200 Pennsylvania Ave. NW
Washington, DC 20460–0001

    **Re:**    **Comprehensive Environmental Response, Compensation, and Liability Act Hazardous Substances: Designation of Perfluorooctanoic Acid and Perfluorooctanesulfonic Acid, Docket No. EPA–HQ–OLEM–2019–0341**

Dear Mr. Breen:

    The undersigned organizations submit these comments in strong support of the U.S. Environmental Protection Agency's ("EPA") proposed designations of perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS") as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").[1] Our organizations include communities contaminated by PFOA and PFOS; scientists who study the harms associated with PFOA, PFOS, and other per- and polyfluoroalkyl substances ("PFAS"); and advocates for strengthened federal, state, and local protections against PFAS.

    PFOA and PFOS are two of the most pervasive members of the PFAS class, which comprises thousands of chemicals that have contaminated drinking water supplies for nearly two out of every three people in the United States. While EPA has known of the risks posed by PFOA and PFOS for decades—including multiple types of cancer, liver disease, autoimmune disorders, and other serious harms—these chemicals remain unregulated under CERCLA and most other federal environmental laws. The absence of CERCLA hazardous substance designations has impeded the treatment and remediation of PFAS by making it harder for impacted communities to identify releases and to recover their clean-up costs from responsible parties. When releases are not timely reported and remediated, PFAS contamination spreads faster than it can be detected, leaving more communities exposed to these toxic chemicals and placed at greater risk.

    We support the proposed hazardous substance designations, which would notify the government of PFOA and PFOS releases and facilitate the remediation of contaminated soil, sediment, surface water, and groundwater. We urge EPA to promptly finalize those designations with certain modifications, set forth below, that promote "the timely cleanup of [contaminated] sites," which is a "fundamental purpose and objective of CERCLA."[2]

---

[1] Proposed Rule, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 54,415 (Sept. 6, 2022).
[2] *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 947 (9th Cir. 2002).

A.        **PFOA and PFOS Satisfy the Standard for Designation as Hazardous Substances**

CERCLA authorizes EPA to "designat[e] as hazardous substances . . . such . . . substances which, when released into the environment may present substantial danger to the public health or welfare or the environment."[3] As EPA correctly found in its proposed hazardous substance designations, PFOA and PFOS meet that listing standard.[4]

PFAS, including PFOA and PFOS, "are an urgent public health and environmental issue facing communities across the United States."[5] PFAS are highly persistent chemicals that have contaminated the water supplies for more than 200 million Americans and the air, soil, and food supplies of countless others.[6] A century ago, PFAS did not exist; today, they are present in the blood of more than 98% of the U.S. population.[7] Many PFAS, including PFOA and PFOS, bioaccumulate in animals and people, meaning even low exposures build up into higher concentrations in people's bodies. Exposure to PFOA, PFOS, and many other PFAS are associated with a range of serious harms, including cancer, developmental and reproductive harm, liver disease, and other health effects.[8]

---

[3] 42 U.S.C. § 9602(a).

[4] 87 Fed. Reg. at 54,424–29.

[5] EPA, *PFAS Strategic Roadmap: EPA's Commitments to Action 2021–2024*, at 5 (2021), https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf ("PFAS Roadmap"); *see also id.* at 1 (describing EPA's plans to "to restrict these dangerous chemicals from getting into the environment").

[6] *See* Annie Sneed, *Forever Chemicals Are Widespread in U.S. Drinking Water*, Sci. Am. (Jan 22, 2021), https://www.scientificamerican.com/article/forever-chemicals-are-widespread-in-u-s-drinking-water/.

[7] Antonia M. Calafat et al., *Polyfluoroalkyl Chemicals in the U.S. Population: Data from the National Health and Nutrition Examination Survey (NHANES) 2003-2004 and Comparisons with NHANES 1999-2000*, 115 Env't Health Perspectives 1596 (2007), http://doi.org/10.1289/ehp.10598.

[8] *What Are the Health Effects of PFAS?*, Agency for Toxic Substances and Disease Registry, https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last updated Sept. 9, 2022).

The risks from PFOA and PFOS are well established and broadly recognized by international organizations,[9] federal and state regulatory agencies,[10] and leading scientific bodies.[11] EPA recently conducted updated toxicity assessments for both of those chemicals, which found that they harm children's immune systems and reduce vaccine effectiveness at extremely low exposure levels, in the parts-per-quadrillion range.[12] Those assessments were based on EPA's review of hundreds of studies that were published since 2013. Because those studies identified health risks below most laboratories' detection limits for PFOA and PFOS, EPA warned that "any detectable level of PFOA [and] PFOS" places children's health at risk.[13] Therefore, particularly when the chemicals' persistence, mobility, and capacity for bioaccumulation are taken into account, any release of PFOA and PFOS "may present substantial danger to the public health or welfare or the environment."[14]

As EPA noted, a finding that a substance "may present" substantial danger "d[oes] not require certainty that the substance presents a substantial danger or require proof of actual harm."[15] Here, however, the dangers associated with PFOA and PFOS are not merely predicted or hypothetical; they are being experienced in communities across the country. For example,

---

[9] *See* United Nations Env't Programme, UNEP/POPS/POPRC.2/17/Add.5, *Report of the Persistent Organic Pollutants Review Committee on the Work of Its Second Meeting* add. 25–26 (Nov. 2006) (Risk Profile on Perfluorooctane Sulfonate), http://chm.pops.int/Portals/0/download.aspx?d=UNEP-POPS-POPRC.2-17-Add.5.English.PDF; United Nations Env't Programme, UNEP/POPS/POPRC.12/11/Add.2, *Report of the Persistent Organic Pollutants Review Committee on the Work of Its Twelfth Meeting* add. 24–26 (Oct. 2016) (Risk Profile on Pentadecafluorooctanoic Acid (PFOA, Perfluorooctanoic Acid), Its Salts and PFOA-related Compounds), http://chm.pops.int/Portals/0/download.aspx?d=UNEP-POPS-POPRC.12-11-Add.2.English.PDF.

[10] Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Perfluoroalkyls* 7–21 (May 2021), https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf; Cal. Env't Protection Agency, First Public Review Draft, *Public Health Goals*: *Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid in Drinking Water* (July 2021) https://oehha.ca.gov/sites/default/files/media/downloads/crnr/pfoapfosphgdraft061021.pdf.

[11] Nat'l Acads. of Scis., Eng'g, & Med., *Guidance on PFAS Exposure, Testing, and Clinical Follow-Up* 7–8 (2022), https://nap.nationalacademies.org/catalog/26156/guidance-on-pfas-exposure-testing-and-clinical-follow-up.

[12] EPA, EPA/822/R-22/003, *Interim Drinking Water Health Advisory: Perfluorooctanoic Acid (PFOA) CASRN 335-67-1*, at 10 (June 2022), https://www.epa.gov/system/files/documents/2022-06/interim-pfoa-2022.pdf; EPA, EPA/822/R-22/004, *Interim Drinking Water Health Advisory: Perfluorooctane Sulfonic Acid (PFOS) CASRN 1763-23-1*, at 11 (June 2022), https://www.epa.gov/system/files/documents/2022-06/interim-pfos-2022.pdf.

[13] EPA, EPA/822/F-22/002, *Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX Chemicals, and PFBS)* 5 (June 2022), https://www.epa.gov/system/files/documents/2022-06/technical-factsheet-four-PFAS.pdf.

[14] 42 U.S.C. § 9602(a).

[15] 87 Fed. Reg. at 54,421.

epidemiological studies of nearly 70,000 people in and around Parkersburg, WV, where DuPont manufactured and released PFOA, found that people who were exposed to PFOA had higher rates of thyroid disease, autoimmune disease, high cholesterol, testicular and kidney cancer, and pregnancy-induced hypertension.[16] Other studies of people who were exposed to PFOS detected similar results.[17] EPA was thus correct to conclude that the evidence that PFOA and PFOS pose substantial dangers to public health and the environment is "more than sufficient to satisfy the CERCLA section 102(a) standard."[18]

### B.  EPA Correctly Interpreted CERCLA to Preclude the Consideration of Costs in Hazardous Substance Designations

In its proposed rule, EPA correctly "interpret[ed] the language of CERCLA section 102(a) as precluding the Agency from taking cost into account in designating hazardous substances."[19] EPA also solicited comment on that interpretation.[20] We support EPA's construction and application of CERCLA section 102(a), which accords with CERCLA's unambiguous text, statutory structure, and judicial interpretations of comparable provisions of other environmental laws.

"Statutory interpretation starts—and often ends—with the text of the statute," which is "generally deemed to carry [its] plain and ordinary meaning."[21] CERLA's text contains a single criterion for the designation of a hazardous substance: whether the substance, "when released into the environment[,] may present substantial danger to the public health or welfare or the environment."[22] That provision requires EPA to make listing determinations based solely on the "danger" that the release of a substance poses to public health, welfare, or the environment—not on the economic value of the substance or the costs that may flow from such a designation. The ordinary meaning of "danger," in the context of a hazardous substance release, is "the possibility of harm or death."[23] Compliance costs do not constitute "substantial danger to the public health

---

[16] *C8 Probable Link Reports*, C8 Sci. Panel, http://www.c8sciencepanel.org/prob_link.html (last visited Nov. 1, 2022).

[17] Bos. Child.'s Hosp. Pediatric Env't Health, *Poly- and Perfluoroalkyl Substances (PFAS) – Emerging Pollutants in New England: A White Paper* 3 (2020), https://www.hsph.harvard.edu/niehs-dev/wp-content/uploads/sites/2603/2021/04/PEPH-version-2020-New-England-PEHSU-PFAS-guide1-27-21-2-22-21-4-2-21.pdf.

[18] 87 Fed. Reg. at 54,417.

[19] *Id.* at 54,421.

[20] *Id.* at 54,423.

[21] *In re Shamus Holdings, LLC*, 642 F.3d 263, 265 (1st Cir. 2011); *see also Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409 (1993) ("The starting point in interpreting a statute is its language, for [i]f the intent of Congress is clear, that is the end of the matter." (alteration in original) (quotation omitted)); *Wilson v. United States*, 6 F.4th 432, 435 (2d Cir. 2021) ("In interpreting any statute, we start with the plain meaning of the text, and absent any ambiguity, we end there too.").

[22] 42 U.S.C. § 9602(a).

[23] *Danger*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/danger (last visited Nov. 1, 2022).

4

or welfare or the environment," and they are not attributable to the "release[]" of a hazardous substance into the environment,[24] but rather to EPA's separate act of designating the substance as hazardous. EPA thus properly concluded that "Congress did not list cost as a required or permissible factor, and none of the Congressionally-listed statutory factors encompass a consideration of cleanup costs."[25]

In contrast to the provision governing hazardous substance designations, other parts of CERCLA authorize or require the consideration of costs when making remedial decisions. For instance, when "establish[ing] procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants," Congress directed EPA to consider, among other factors, whether the "remedial action measures are cost-effective over the period of potential exposure to the hazardous substances."[26] Similarly, when evaluating proposed remedial options for a given site, CERCLA authorizes EPA to "take into account the total short- and long-term costs of such actions, including the costs of operation and maintenance for the entire period during which such activities will be required."[27] The express authorization to consider costs in other CERCLA provisions further supports EPA's interpretation of section 102(a), since "when Congress includes particular language in one section of a statute but omits it in another," an agency must "'presume' that Congress intended a difference in meaning."[28]

EPA's position also is supported by judicial interpretations of health-focused provisions of other environmental laws, which have also been interpreted to exclude the consideration of costs. For instance, the Clean Air Act requires EPA to set national ambient air quality standards at levels "requisite to protect the public health" with "an adequate margin of safety."[29] Construing this "absolute" language, the Supreme Court found it "fairly clear that this text does not permit the EPA to consider costs in setting the standards."[30] Similarly, under the Resource Conservation and Recovery Act ("RCRA"), EPA may classify a disposal facility as a "sanitary landfill," which is subject to less stringent regulatory requirements than an "open dump," only if "there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility."[31] Under that statute as well, the D.C. Circuit Court of Appeals held that EPA was not required to consider costs in its analysis of "adverse effects on health or

---

[24] 42 U.S.C. § 9602(a).

[25] 87 Fed. Reg. at 54,421.

[26] 42 U.S.C. § 9605(a), (a)(7).

[27] *Id.* § 9621(a); *see also id.* § 9621(b) ("The President shall select a remedial action that is protective of human health and the environment [and] that is cost effective . . . .").

[28] *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quotation and alteration omitted); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

[29] 42 U.S.C. § 7409(b)(1).

[30] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465 (2001) (quotation omitted).

[31] 42 U.S.C. § 6944(a).

5

the environment" and that it was "far from clear that the EPA could consider costs even if it wanted to."[32] Finally, the Toxic Substances Control Act ("TSCA") requires EPA to "identify . . . lead-based paint hazards,"[33] which are defined as "any condition that causes exposure to lead . . . that would result in adverse human health effects."[34] The Ninth Circuit Court of Appeals held that EPA could not consider costs when establishing such hazard levels, noting that "Congress made no mention of economic or market factors in any of" the provisions governing the identification of lead-based paint hazards.[35] Nor did Congress mention costs or economic factors in CERCLA section 102(a).

Similar to the Clean Air Act, RCRA, and TSCA, CERCLA establishes separate processes for the designation of a hazardous substance (in which costs cannot be considered) and for decisions about how to remediate the substance (in which costs can be considered along with other relevant factors).[36] EPA's interpretation of CERCLA section 102(a) preserves that "identification versus implementation dichotomy"[37] and appropriately limits cost considerations to the development of remedial plans for a particular site, when EPA will also be able to assess the public health benefits associated with such remediation. Any consideration of costs to avoid the designation of hazardous substances would violate CERCLA's text and erase the distinction that Congress established between the criteria for hazardous substance designations and for remedy selection. We urge EPA to maintain its interpretation of section 102(a) in its final PFOA and PFOS rule and in any future hazardous substance designations.

## C. EPA Should Lower the Reportable Quantity for PFOA and PFOS to Cover All Releases

When designating hazardous substances under CERCLA, EPA "shall" establish a "reportable quantity" ("RQ") above which releases of the substance must be reported to the National Response Center.[38] Upon receiving a report, "[t]he National Response Center shall convey the notification expeditiously to all appropriate Government agencies, including the Governor of any affected State," allowing those agencies to assess the threat posed by the release and take appropriate responsive action.[39] The National Response Center also publishes all reported release information online, informing impacted communities of their potential exposures to hazardous substances.

---

[32] *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 448–49 (D.C. Cir. 2018) (quotation omitted).

[33] 15 U.S.C. § 2683.

[34] *Id.* § 2681(10).

[35] *A Cmty. Voice v. EPA*, 997 F.3d 983, 990–92 (9th Cir. 2021).

[36] *See id.* at 990 (explaining that TSCA "deals separately" with the identification of lead paint hazards and implementation of plans to abate those hazards).

[37] *Id.*

[38] 42 U.S.C. § 9602(a).

[39] *Id.* § 9603(a).

6

Congress gave EPA broad discretion to determine the appropriate RQ for each hazardous substance, while setting a default threshold of one pound per 24 hours that applies "[u]nless and until superseded by [EPA] regulations."[40] EPA has modified that RQ for many hazardous substances, increasing the default reporting level for some and establishing a wholly different scale for radionuclides because "releases of much less than one pound . . . may present a substantial threat to public health or welfare or the environment."[41] In its proposed PFOA and PFOS hazardous substance designations, EPA left the default RQ of one pound in place even though releases of far less than one pound of PFOA and PFOS also present a substantial threat to public health and the environment.[42]

EPA should lower the RQ and require reporting of all known PFOA and PFOS releases, which would slow the spread of PFAS contamination by enabling prompt remediation following an environmental release. EPA stated that "[o]nce EPA has collected more data on the size of releases and the resulting risks to human health and the environment, the Agency may consider issuing a regulation adjusting the reportable quantities for these substances."[43] But there is no need for additional data or a separate rulemaking process, since EPA already has the information required to establish a lower RQ for both PFOA and PFOS.

As EPA has acknowledged, multiple studies have found that PFOA and PFOS pose health risks below their respective limits of detection, meaning "*any detectable level* of PFOA or PFOS will result in" potential harm to children and others.[44] All environmental releases of PFOA and PFOS are thus of potential public health concern, and they should be promptly reported so regulatory officials can assess the threat and take action to contain or remediate the release before it spreads through surface water, groundwater, or other environmental pathways. In contrast, EPA's proposed RQ would allow companies to release massive amounts of PFAS-containing waste before triggering any CERCLA requirements. For a firefighting foam product containing one part-per-million of PFOA or PFOS, EPA's proposed RQ would permit the release of up to 1,000,000 pounds of the foam without any CERCLA reporting, equivalent to approximately 120,000 gallons of the concentrate that is used to create the foam or approximately 4,000,000 gallons of the foam after it is mixed with water for use.[45] If PFOA and

---

[40] *Id.* § 9602(b); 40 C.F.R. § 302.6(a).

[41] Proposed Rule, Administrative Reporting Exemptions for Certain Radionuclide Releases, 60 Fed. Reg. 40,042, 40,043 (Aug. 4, 1995) (codified at 40 C.F.R. § 302.4 app.B).

[42] 87 Fed. Reg. at 54,429 ("EPA is setting the RQ by operation of law at the statutory default of one pound pursuant to Section 102(b) of CERCLA.").

[43] 87 Fed. Reg. at 54,416.

[44] EPA, EPA/822/F-22/002, *Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX Chemicals, and PFBS)* 5 (June 2022) (emphasis added), https://www.epa.gov/system/files/documents/2022-06/technical-factsheet-four-PFAS.pdf.

[45] Williams Fire & Hazard Control, *New York State Rule Regulating PFOS and PFOA: Implications for Tyco Fire Protection/Williams Customers* 2 (June 23, 2016), https://www.williamsfire.com/uploads/media/NYSDEC_Response_Williams_letterhead_-_06-

7

PFOS releases of that magnitude are not reported to the National Response Center, then by the time federal, state, and local officials learn of the releases (if at all), it will often be too late to contain the spread of the PFAS or to prevent exposures to nearby communities.

When dealing with persistent, bioaccumulative, and toxic chemicals like PFOA and PFOS, it is particularly important to immediately respond to any spills or releases, since the longer that PFOA and PFOS remain in the environment, the farther they spread and the harder it is to contain their harms. CERCLA authorizes EPA to adjust the default RQ in order to "focus [EPA's] resources on those releases that are more likely to pose potential threats to public health or welfare or the environment, while relieving the regulated community and government emergency response personnel from the burden of making and responding to reports of releases that are less likely to pose such threats."[46] All PFOA and PFOS releases "pose potential threats to public health or . . . the environment," including at levels far below one pound per day. EPA should set RQs that reflect those chemicals' serious risks.

### D.  EPA Should Expeditiously Designate Additional PFAS as CERCLA Hazardous Substances

In addition to promptly finalizing its proposal to designate PFOA and PFOS as hazardous substances under CERCLA, EPA should expeditiously designate additional PFAS based on existing authoritative assessments for individual chemicals within the class, EPA's recognition that PFOA and PFOS precursors degrade into these hazardous substances in the environment, and substantial evidence that the broader class of PFAS satisfies the statutory definition of hazardous substances.

The proposed rule states that "in 2022, the EPA will be developing an advance notice of proposed rulemaking seeking comments and data to assist in the development of potential future regulations" to designate additional PFAS compounds as hazardous substances under CERCLA.[47] EPA initially expected to begin that process in the spring of 2022, yet to date it has not sent any notice or advance notice of proposed rulemaking ("ANPRM") to the Office of Management and Budget to review.[48] While we support EPA's pursuit of additional hazardous substance designations for PFAS, there is no need for EPA to publish an advance notice of proposed rulemaking before proposing to designate as hazardous those PFAS for which an EPA health advisory level, Agency for Toxic Substances and Disease Registry toxicological profile,

---

23-2016.pdf; Interstate Tech. Regul. Council, *Aqueous Film-Forming Foam* 5 (Oct. 2018), https://pfas-1.itrcweb.org/fact_sheets_page/pfas-fact-sheet-afff-10-3-18.pdf ("For legacy fluorotelomer AFFF, it would normally require a release of thousands of gallons of foam concentrate to result in release of 1 pound of PFOA.").

[46] EPA, EPA/540/R-94/005, *Questions and Answers on Release Notification Requirements and Reportable Quantity Adjustments* 36 (Jan. 1995), https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=600007A1.txt.

[47] 87 Fed. Reg. at 54,418.

[48] *See* PFAS Roadmap at 17 (2021).

EPA Integrated Research Information System assessment, or other authoritative assessment provides the requisite evidence that the chemical(s) "may present substantial danger to the public health or welfare or the environment" when released.[49] In these circumstances, publishing an ANPRM would unduly delay the CERCLA designation of substances that are already known to be hazardous. EPA can just as effectively, and more quickly, "engage robustly with communities near PFAS-contaminated sites to seek their input and learn about their lived experiences" by proceeding directly to a notice of proposed rulemaking.[50]

Likewise, EPA should expeditiously publish a proposed rule to list as hazardous substances all PFAS precursors that degrade to produce PFOA or PFOS. As EPA acknowledged in the proposed rule, in addition to direct environmental releases of PFOA and PFOS, these hazardous substances form in the environment "by chemical or biological degradation from a large group of related PFAS (i.e., precursor compounds)."[51] EPA correctly recognized that this phenomenon will contribute to continued "[e]nvironmental contamination and resulting human exposure to PFOA and PFOS . . . for the foreseeable future," despite steps to phase out intentional production of PFOA and PFOS.[52] And it is self-evident that PFOA and PFOS generated from environmental releases of precursor chemicals pose the same "substantial danger to the public health or welfare or the environment" that justifies the designation of PFOA and PFOS as hazardous substances.[53]

At the same time, EPA should pursue a class-based hazardous substance designation for a broader PFAS category. There is extensive precedent for adding chemical categories to the CERCLA hazardous substances list,[54] and there is an emerging consensus that PFAS should be evaluated and regulated on a class basis due to common toxicity, persistence, and mobility traits as well as evidence that PFAS precursors can transform into long- and short-chain PFAS in the

---

[49] 42 U.S.C. § 9602(a); *see*, *e.g.*, EPA, EPA/822/R-22/005, *Drinking Water Health Advisory: Hexafluoropropylene Oxide (HFPO) Dimer Acid (CASRN 13252-13-6) and HFPO Dimer Acid Ammonium Salt (CASRN 62037-80-3), Also Known as "GenX Chemicals"* (June 2022), https://www.epa.gov/system/files/documents/2022-06/drinking-water-genx-2022.pdf; EPA, EPA/822/R-22/006, *Drinking Water Health Advisory: Perfluorobutane Sulfonic Acid (CASRN 375-73-5) and Related Compound Potassium Perfluorobutane Sulfonate (CASRN 29420-49-3)* (June 2022), https://www.epa.gov/system/files/documents/2022-06/drinking-water-pfbs-2022.pdf; Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Perfluoroalkyls* (May 2021), https://www.atsdr.cdc.gov/ToxProfiles/tp200.pdf.
[50] PFAS Roadmap at 17.
[51] 87 Fed. Reg. at 54,418.
[52] *Id.* at 54,417.
[53] 42 U.S.C. § 9602(a).
[54] *See* EPA, EPA/550/B-21/001, *List of Lists: Consolidated List of Chemicals Subject to the Emergency Planning and Community Right-to-Know Act (EPCRA), Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), and Section 112(r) of the Clean Air Act (CAA)* app.G (Apr. 2022) (CERCLA Hazardous Substances – Chemical Categories), https://www.epa.gov/system/files/documents/2022-04/list_of_lists_compiled_april-2022.pdf.

9

environment.[55] We urge EPA to move quickly to develop a proposed hazardous substance designation for a PFAS category, which is essential to fulfill the Administration's commitments to "[b]roaden and accelerate the cleanup of PFAS contamination to protect human health and ecological systems,"[56] "[m]aximize responsible party performance and funding for investigations and cleanup of PFAS contamination," and ensure equitable access to remediation resources in affected communities.[57]

**Conclusion**

Thousands of communities across the country are contaminated by PFAS, and countless others are threatened by releases that were never reported and have yet to be detected.[58] For decades, the costs of investigating and remediating that contamination have fallen largely on those communities and their local water providers, as opposed to the parties that created the hazard. The designation of PFOA and PFOS will start to change that, expanding the reporting of releases and shifting clean-up costs from the public to the parties responsible for PFAS contamination. EPA should finalize that rule with a lower RQ that captures all detectable PFOA and PFOS releases, immediately propose hazardous substance designations for other PFAS with existing toxicity assessments, and pursue a class-based hazardous substance designation for all PFAS.

If you have any questions about these comments, please contact Jonathan Kalmuss-Katz (jkalmusskatz@earthjustice.org) or Katherine O'Brien (kobrien@earthjustice.org).

Respectfully submitted,

Alabama Rivers Alliance
Alaska Community Action on Toxics
Alliance for the Great Lakes
Breast Cancer Prevention Partners
Cahaba River Society
Center for Environmental Health
Chesapeake Bay Foundation
Children's Environmental Health Network
Clean+Healthy
Clean Cape Fear
Delaware Riverkeeper Network

---

[55] *See, e.g.*, Zhanyun Wang et al., *A Never-Ending Story of Per- and Polyfluoroalkyl Substances (PFASs)?*, 51 Env't. Sci. & Tech. 2508 (2017), https://doi.org/10.1021/acs.est.6b04806; Carol F. Kwiatkowski et al., *Scientific Basis for Managing PFAS as a Chemical Class*, 7 Env't Sci. & Tech. Letters 523 (2020), https://doi.org/10.1021/acs.estlett.0c00255.
[56] PFAS Roadmap at 5.
[57] *Id.* at 9.
[58] *See PFAS Contamination in the U.S.*, Env't Working Grp. (June 8, 2022), https://www.ewg.org/interactive-maps/pfas_contamination/.

Earthjustice
Ecology Center
Environmental Defense Fund
Food & Water Watch
Freshwater Future
GreenLatinos
Green Science Policy Institute
Harpeth Conservancy
Illinois Council of Trout Unlimited
League of Conservation Voters
Merrimack Citizens for Clean Water
Midwest Environmental Advocates
Missouri Confluence Waterkeeper
Moms for a Nontoxic New York
National PFAS Contamination Coalition
Natural Resources Defense Council
NC Conservation Network
Ohio Environmental Council
Oregon Environmental Council
PfoaProject NY
River Network
Sierra Club
Southern Environmental Law Center
Union of Concerned Scientists
U.S. PIRG Education Fund
Waterkeeper Alliance
Waterkeepers Chesapeake
Zero Waste Washington

11