No. 24-1193
(consolidated with Nos. 24-1261, 24-1266, 24-1271, 24-1272)

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA**

---

**CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA, et al.,**
Petitioners,

v.

**ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL S. REGAN,
in his official capacity as Administrator,
United States Environmental Protection Agency**,
Respondents,

and

**CLEAN CAPE FEAR, et al.,**
Respondent-Intervenors

---

**MOTION FOR LEAVE TO FILE BRIEF IN SUPPORT OF REMAND BY
PASSIVE RECEIVERS AS *AMICI CURIAE***

---

Pursuant to Federal Rule of Appellate Procedure 29(b), the following passive

receivers respectfully move for leave to file a brief as *amici curiae* in support of no

party in full, but in support of remand: the National Association of Clean Water

Agencies ("NACWA"), the National Association of Water Companies ("NAWC"),

the National Rural Water Association ("NRWA"), the Water Environment

1

Federation ("WEF"), WateReuse Association ("WateReuse"), the American Farm Bureau Federation ("AFBF"), and the National Cattlemen's Beef Association ("NCBA").

1.      *Amici* represent providers of essential services to homes and businesses across the country. *Amici*'s members have never produced or purposefully used or profited from Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic Acid ("PFOS") in their operations. Instead, *amici*'s members are passive receivers of PFOA and PFOS because those substances are ubiquitous in the environment.

2.      *Amici* and their members have an interest in ensuring that the U.S. Environmental Protection Agency's ("EPA") designation of PFOA and PFOS as "hazardous substances" complies with the "Polluter Pays" principle required under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq*.

3.      *Amici*'s brief will assist the Court by presenting arguments and insights that have not been addressed by the Petitioners or other *amici*, including why EPA's designation of PFOA and PFOS must comply with the "Polluter Pays" principle. *Amici* are in a unique position to explain why the EPA's assessment of costs and benefits failed to take into account the real effects on passive receivers, such as *amici*. *Amici* can also explain why remand is the appropriate response to the deficiencies in EPA's rulemaking.

4.      Accordingly, *amici* request that the attached brief be filed with the Court.

Respectfully submitted,

/s/ *Erica M. Spitzig*
Erica M. Spitzig
Aaron M. Herzig
Annie M. McClellan
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Phone: (513) 381-2838
espitzig@taftlaw.com
aherzig@taftlaw.com
amcclellan@taftlaw.com

David C. Roper
Taft Stettinius & Hollister LLP
41 S High Street, Suite 1800
Columbus, OH 43215-4213
Phone: (614) 221-4000
droper@taftlaw.com

November 12, 2024          *Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(g), I certify that this motion:

(1) complies with the type-volume limitation of Rule 27(d)(2) because it contains 275 words; and

(2) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word and is typeset in Times New Roman in font size 14.

Dated: November 12, 2024

*/s/ Erica M. Spitzig*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 12, 2024, I electronically filed the foregoing motion with the Clerk of the Court using the appellate CM/ECF system, which served copies of the motion on all ECF-registered counsel.

Dated: November 12, 2024

*/s/ Erica M. Spitzig*

**[ORAL ARGUMENT NOT YET SCHEDULED]**

No. 24-1193
(consolidated with Nos. 24-1261, 24-1266, 24-1271, 24-1272)

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

## CHAMBER OF COMMERCE
## OF THE UNITED STATES OF AMERICA, et al.,
Petitioners,

v.

## ENVIRONMENTAL PROTECTION AGENCY and
## MICHAEL S. REGAN,
### in his official capacity as Administrator,
### United States Environmental Protection Agency,
Respondents,

and

## CLEAN CAPE FEAR, et al.,
Respondent-Intervenors.

---

On Petition for Review of Final Action by the
United States Environmental Protection Agency –
89 Fed Reg. 39,124 (May 8, 2024)

---

## BRIEF FOR PASSIVE RECEIVERS,
## AS *AMICI CURIAE* IN SUPPORT OF REMAND

---

(Names and addresses of counsel appear inside cover)

Erica M. Spitzig
Aaron M. Herzig
Annie M. McClellan
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Phone: (513) 381-2838
Fax: (513) 381-0205
espitzig@taftlaw.com
aherzig@taftlaw.com
amcclellan@taftlaw.com

David C. Roper
Taft Stettinius & Hollister LLP
41 S High Street, Suite 1800
Columbus, OH 43215-4213
Phone: (614) 221-4000
Fax: (614) 221-2007
droper@taftlaw.com

November 12, 2024                    *Counsel for Amici Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), counsel for *amici curiae* National Association of Clean Water Agencies, National Association of Water Companies, National Rural Water Association, Water Environmental Federation, WateReuse Association, American Farm Bureau Federation, National Cattlemen's Beef Association, and National Pork Producers Council certify that none of the *amici* have parent corporations and that no publicly traded companies own 10% or more of their stock.

## CERTIFICATE AS TO PARTIES,
## RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for *amici curiae* certify as follows:

**A.     Parties and Amici.**  All parties and intervenors appearing before this Court are listed in the Brief for Petitioners.  National Association of Manufacturers and PRINTING United Alliance have filed a brief as *amici curiae* as well.

**B.     Rulings Under Review.**  The ruling under review is EPA's Final Rule entitled "Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances," 89 Fed. Reg. 39,124 (May 8, 2024).

**C.     Related Cases.**  This case has not previously been before this Court or any other court.  There are no "other related cases" as defined by Circuit Rule 28(a)(1)(C).

i

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ……………………….. i

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ……………………………………………………………  i

TABLE OF CONTENTS ……………………………………………..……  ii

TABLE OF AUTHORITIES ……………………………………………  iv

INTRODUCTION ………………………………………………………... 1

IDENTITIES AND INTERESTS OF *AMICI CURIAE* …………………………... 3

    I.      National Association of Clean Water Agencies ("NACWA") ……… 4

    II.    The National Association of Water Companies ("NAWC") ………... 4

    III.   The National Rural Water Association ("NRWA") ………………… 5

    IV.   The Water Environment Federation ("WEF") ……………………… 5

    V.    WateReuse Association ("WateReuse") ……………………………… 6

    VI.   The American Farm Bureau Federation ("AFBF") ………………… 8

    VII.  National Cattlemen's Beef Association ("NCBA") ………………… 9

    VIII. National Pork Producers Council ("NPPC") ………………………... 9

SUMMARY OF THE ARGUMENT …………………………………………..10

ARGUMENT ………………………………………………………………  12

  I.    The Final Rule is Arbitrary and Capricious for Failing to Properly Consider the Costs Imposed on Passive Receivers, in Violation of the "Polluter Pays" Principle …………………………………………………………13

      a.  CERCLA's Regime Allocates Joint and Several Liability, to *Amici's* Detriment ……………..………………………………... 13

      b.  EPA's Designation of PFOA and PFOS Ignores Comments Regarding the Costs That Passive Receivers Will Bear ………………………. 16

II.   The Final Rule is Arbitrary and Capricious Because the Cost-Benefit Analysis Mischaracterizes Cleanup Liability as an "Indirect" Cost …………………..22

CONCLUSION ………………………………………………………………..… 25

CERTIFICATE OF COMPLIANCE ………………………………………….. 28

CERTIFICATE OF SERVICE ………………………………………………29

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*AEP Tex. N. Co. v. Surface Transp. Bd.*,
   609 F.3d 432 (D.C. Cir. 2010)................................................................21

*Bloomberg L.P. v. SEC*,
   45 F.4th 462 (D.C. Cir. 2022)...............................................................16

*Burlington N. & Santa Fe Ry. Co. v. United States*,
   556 U.S. 599 (2009)...............................................................................15

*Bus. Roundtable v. SEC*,
   647 F.3d 1144 (D.C. Cir. 2011).............................................................22

*City of Portland v. EPA*,
   507 F.3d 706 (D.C. Cir. 2007)..............................................................18

*Ctr. for Auto Safety v. Peck*,
   751 F.2d 1336 (D.C. Cir. 1985).............................................................22

*In re Du Pont de Nemours & Co. Personal Injury Litig.*,
   87 F.4th 315 (6th Cir. 2023) .................................................................17

*GPA Midstream Ass'n v. Dep't of Transp.*,
   67 F.4th 1188 (D.C. Cir. 2023).............................................................22

*Heartland Reg'l Med. Ctr. v. Sebelius*,
   566 F.3d 193 (D.C. Cir. 2009)..............................................................26

*Humane Soc. of U.S. v. Zinke*,
   865 F.3d 585 (D.C. Cir. 2017)..............................................................21

*Idaho Conservation League v. Wheeler*,
   930 F.3d 494 (D.C. Cir. 2019)..............................................................13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.*, 463 U.S. 29 (1983)............................................................................12, 21

*Nat'l Ass'n of Home Builders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012)............................................................13

iv

*NLRB v. Fed. Labor Rels. Auth.*,
   834 F.2d 191 (D.C. Cir. 1987)................................................................21

*Nurad, Inc. v. William E. Hooper & Sons Co.*,
   966 F.2d 837 (4th Cir. 1992) ..............................................................16

*O'Neil v. Picillo*,
   883 F.2d 176 (1st Cir. 1989) ...............................................................17

*Ohio v. Dep't of Interior*,
   880 F.2d 432 (D.C. Cir. 1989)........................................................11, 13

*Petroleum Commc'ns, Inc. v. FCC*,
   22 F.3d 1164 (D.C. Cir. 1994)............................................................16

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
   82 F.4th 1273 (D.C. Cir. 2023).......................................................13, 18

## Statutes

2 U.S.C. § 1532(a)(2).............................................................................24

5 U.S.C. § 706(2)(A)..............................................................................12

26 U.S.C. § 9507(C)(1)(A) .....................................................................19

42 U.S.C. § 9601, *et seq*..................................................................*passim*

42 U.S.C. § 9607(a)(1)–(4) ....................................................................14

42 U.S.C. § 9607(a)(4)(B) ......................................................................14

42 U.S.C. § 9613(g)(2)...........................................................................14

Fed.R.App.P. 29(a)(4)(E)..........................................................................3

## Other Authorities

58 Fed. Reg. 51735 ................................................................................24

87 Fed. Reg. 54415 ..................................................................................2

87 Fed. Reg. 54421 .............................................................................2, 12

87 Fed. Reg. 54423 ................................................................................12

89 Fed. Reg. 39124 ...............................................................................*passim*

89 Fed. Reg. 39132 .........................................................................................23

89 Fed. Reg. 39143 ......................................................................................3, 12

89 Fed. Reg. 39149 .........................................................................11, 13, 22, 24

89 Fed. Reg. 39150 .........................................................................................23

89 Fed. Reg. 39159 .........................................................................................12

89 Fed. Reg. 39163 .........................................................................................12

89 Fed. Reg. 39169 ....................................................................................17, 21

89 Fed. Reg. 39183 ....................................................................................21, 24

*Biosolids*, Environmental Protection Agency (Sept. 2000),
    https://www.epa.gov/sites/default/files/2018-11/documents/land-
    application-biosolids-factsheet.pdf ......................................................6

Mid Atlantic Biosolids Association, *Biosolids Facts*, available at
    https://maba.memberclicks.net/assets/docs/MABA%2BGeneral%2
    BQA%2BSheet%2B9.pdf (last accessed Oct. 2, 2024) ......................6

Salvatore, et al., *Presumptive Contamination: A New Approach to
    PFAS Contamination Based on Likely Sources,* EVN'T SCI. &
    TECH. LETTERS 983 (2022) ..................................................................18

# INTRODUCTION

This appeal involves the U.S. Environmental Protection Agency's ("EPA") attempt to address the environmental impacts of a class of widely used, humanmade chemicals known as per- and polyfluoroalkyl substances ("PFAS"). EPA's rulemaking is well-intentioned, but its rationale is seriously flawed. Remand is warranted to avoid the transfer of costs from polluters onto innocent passive receivers.

*Amici* represent passive receivers of PFAS chemicals that, under EPA's new rule, could be subject to crippling liability merely because they are in the business of providing essential services, such as drinking water and sewerage services, food, and sustainable fuel to the public. The providers of these vital services are victims of PFAS contamination. Many are engaged in the work of mitigating that contamination so that less of it reaches the public, and will already have to bear considerable costs going forward to test for, treat, and dispose of PFAS chemicals in accordance with state and federal environmental permitting regimes. At a minimum, EPA should have accurately accounted for the costs to these passive receivers in adopting the PFAS rule. Ultimately, these passive receivers should be exempt from paying for PFAS cleanups. Farmers and communities nationwide should not be forced to pay for the misfortune of having had their lands and waters contaminated by PFAS chemicals.

1

PFAS chemicals have been used for decades in a wide variety of industrial, commercial, and consumer/household products because of properties like resistance to heat, fire, stains, and water. Prolonged exposure to high levels of these chemicals has been linked to serious health problems in humans, including cancer, liver effects, and birth defects. PFAS chemicals have been nicknamed "forever chemicals" because they are ubiquitous and persistent—meaning that they do not break down as the result of natural processes—in the environment and human bodies.

The two most common PFAS compounds, Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic Acid ("PFOS"), have been used in a wide range of products since the 1940s. PFOA and PFOS are no longer manufactured in the United States but decades of widespread use have entrenched PFOA and PFOS as ubiquitous and persistent in the environment. Because PFOA and PFOS have been so widely used in everyday products, and because they are so persistent in the environment, the number and type of parties that may be subject to liability as a result of EPA's new rule is staggering.

On September 6, 2022, EPA proposed a rule that would designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*; Designation of PFOA and PFOS as CERCLA Hazardous Substances, 87 Fed. Reg. 54415, 54421 (proposed Sept. 6, 2022) ("Proposed Rule"). In its notice of proposed

rulemaking, EPA theorized that it could not consider costs when designating hazardous substances.  Nevertheless, EPA invited comments on the costs of designating PFOA and PFOS.  In response, thousands of stakeholders weighed in on the cost-related implications of the Proposed Rule.

When EPA issued the final rule on May 8, 2024, it claimed it wasn't deciding whether cost considerations are precluded or required in hazardous substances designations.  Designation of PFOA and PFOS as CERCLA Hazardous Substances, 89 Fed. Reg. 39124, 39143 (May 8, 2024) ("Final Rule").  Even so, EPA studied the costs and benefits and concluded that they weighed in favor of designation.  *Amici* take issue with EPA's economic analysis and therefore request remand for EPA to properly account for costs to passive receivers.

## IDENTITIES AND INTERESTS OF *AMICI CURIAE*[1]

*Amici* have a compelling interest in ensuring that hazardous substance designations under CERCLA remain consistent with the requirements of the Administrative Procedure Act ("APA").  *Amici* represent providers of essential services to homes and businesses across the country.  Clean water utilities provide water conservation and recycling, stormwater management, and wastewater

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no counsel for a party authored this brief in whole or in part, and neither such counsel or any party made a monetary contribution intended to fund the preparation or submission of the brief.  *Amici* also state that no person, other than *amici*, their members, or their counsel have contributed money to fund this brief's preparation.

treatment services to the public. Drinking water utilities deliver clean water to homes and businesses nationwide. Farmers and ranchers rely on healthy soil and groundwater to support their livelihood, while the nation and the world depend on them to provide a sustainable future of safe and abundant food, fiber, and renewable fuel. *Amici*'s members have never produced or purposefully used or profited from PFOA or PFOS in their operations. Instead, because PFOS and PFOA are ubiquitous, *amici*'s members are passive receivers of those substances—not the polluters CERCLA was intended to target.

## I.    National Association of Clean Water Agencies ("NACWA")

NACWA is a nonprofit trade association representing the interests of over 350 publicly owned wastewater and stormwater utilities across the United States. These clean water utilities provide ratepayer-funded essential services. They own, operate, and manage publicly-owned wastewater collection and treatment systems, stormwater sewer systems, water reclamation districts, and all aspects of wastewater collection, treatment, and discharge.

## II.    The National Association of Water Companies ("NAWC")

NAWC represents regulated water and wastewater companies, as well as those engaging in partnerships with municipal utilities. NAWC clean water utilities provide 73 million Americans with safe and reliable water service. Its members have an exceptional record of compliance with federal and state health and

environmental regulations and make consistent capital investments that protect the public health.

## III.    The National Rural Water Association ("NRWA")

The National Rural Water Association is the largest public drinking water and sanitation utility organization representing the interests of more than 31,000 water and wastewater utilities nationwide. NRWA provides training and technical assistance through 49 affiliated State Rural Water Associations dedicated to supporting and promoting the water and wastewater professionals that serve small communities predominantly with populations of 10,000 or less across the United States. NRWA and the State Affiliates provide training on operator certification, financial sustainability, environmental compliance, utility management and governance to over 80,000 water professionals annually in all 50 states. NRWA's focus on safe drinking water and clean wastewater treatment is vital to the health and safety of Americans.

## IV.    The Water Environment Federation ("WEF")

WEF has provided technical education and training for water quality professionals since 1928. It has over 30,000 individual members and 75 affiliated member associations who support its mission to preserve and enhance the global water environment. WEF is in favor of regulations that are science-based, achievable, and protective of human health and the environment.

5

## V.    WateReuse Association ("WateReuse")

WateReuse is a not-for-profit trade association for water and wastewater utilities, businesses, non-profit organizations, and research entities that engage in and on water reuse. WateReuse and its state and regional sections represent more than 200 utilities serving over 60 million American ratepayers, and over 300 businesses and organizations across the country engaged in water recycling to help build resilient and sustainable water supplies for our communities.

The drinking water and sewer systems that are affiliates and members of NACWA, NAWC, NRWA, WEF, and WateReuse encounter PFOA and PFOS at various points during the water treatment process. PFOA and PFOS can be present in the surface water and groundwater used by drinking water utilities to supply water to their communities.  Clean water utilities receive PFOA and PFOS from the homes and businesses they serve and also generate millions of tons of biosolids as part of performing highly regulated wastewater treatment processes.[2] Biosolids remain as

---

[2] When liquid is separated from solid materials during the wastewater treatment process, the resulting solids are mostly organic materials known as biosolids.  In order to be land applied, these biosolids undergo additional treatment to kill pathogens and must be approved by EPA for use as a fertilizer and soil amendment. "Biosolids are rich in such nutrients as nitrogen and phosphorous and contain other micronutrients for plant growth."  Mid Atlantic Biosolids Association, *Biosolids Facts*, available at https://maba.memberclicks.net/assets/docs/MABA%2BGeneral%2BQA%2BSheet%2B9.pdf (last accessed Oct. 2, 2024); *Biosolids Technology Fact Sheet: Land Application of Biosolids*, Environmental Protection Agency (Sept. 2000),

residuals after wastewater systems collect, treat, recycle, reuse and discharge wastewater in accordance with existing water quality standards.

Drinking water and water recycling utilities are able to remove PFOA and PFOS from source waters through expensive and complicated treatment processes like granular activated carbon, anion exchange, reverse osmosis, and nanofiltration. However, these technologies generate PFAS-laden residuals that must be properly disposed of by the water system. As a result, each drinking water and water recycling system that disposes of water treatment residuals containing PFOA or PFOS may be held liable for all or some of the cost of a site's remediation in the event that the ultimate disposal location is ever subject to a CERCLA cleanup.

Wastewater treatment facilities were not designed to remove PFOS and PFOA, and there is currently no commercially viable treatment technology to destroy PFOS and PFOA in wastewater, water treatment residuals, or biosolids. This means that clean water utilities may be subject to CERCLA liability as a result of PFOA and PFOS present in their treated wastewater effluent, water treatment residuals, and biosolids managed via incineration, land application, and/or landfilling.

---

https://www.epa.gov/sites/default/files/2018-11/documents/land-application-biosolids-factsheet.pdf.

PFOA and PFOS are also present in stormwater runoff that is discharged through storm sewer systems.  PFOA and PFOS enter storm sewers by migrating from diffuse sources such as industrial and commercial stormwater runoff, domestic fertilizers, pesticides, home and auto care products, etc.  Because stormwater system operators cannot control the amount or frequency of pollutants that enter their systems, these utilities are also at risk of CERCLA liability associated with their stormwater discharges.

## VI.    The American Farm Bureau Federation ("AFBF")

The AFBF is the Voice of Agriculture®.  The AFBF is the nation's largest general farm organization, representing over 6.2 million members in all 50 states and Puerto Rico.  Since 1919, the AFBF has advocated for the business, economic, social, and educational interests of American farmers and ranchers.  They too are innocent passive receivers of PFOA and PFOS.

PFOA and PFOS come onto agricultural land in several different ways.  First, firefighting foam contains these chemicals.  Firefighting foam is used in and around airports and Department of Defense training facilities, so farmland in close proximity to those areas often has elevated levels of PFOA and PFOS.  Second, farmers often use biosolids from clean water utilities as a fertilizer.  For decades, EPA encouraged and supported farmers' use of biosolids for protection of public health and the environment.  But these biosolids contain PFOA and PFOS that

8

farmers and ranchers did not create. Finally, pesticides and pesticide holding containers are a potential source of PFOA and PFOS on farms. As a result, AFBF members face an expanded threat of litigation and cleanup liability because of the designation.

## VII.   National Cattlemen's Beef Association ("NCBA")

NCBA works to advance the economic, political, and social interests of the U.S. cattle business and to be an advocate for the cattle industry's policy positions and economic interests. NCBA is a vigilant advocate in the nation's courts. It frequently participates as a party litigant and *amicus curiae* to safeguard the constitutional rights, statutory rights, and business interests of cattle producers across the country, as it seeks to do in this case.

## VIII.  National Pork Producers Council ("NPPC")

NPPC is an association of 43 state pork producer organizations and is the global voice for the Nation's nearly 60,000 pork producers. NPPC conducts public policy outreach at both the state and federal level with a goal of meeting a growing worldwide demand for pork. NPPC and its members throughout the United States work to promote the social, environmental, and economic sustainability of U.S. pork producers and their partners, as it seeks to do in this case.

## SUMMARY OF THE ARGUMENT

EPA used a flawed economic analysis to designate PFOA and PFOS as hazardous substances under CERCLA. CERCLA's strict liability regime threatens farmers and entities funded by public ratepayer dollars,[3] many of which service small and rural communities,[4] with a deluge of litigation and potentially boundless cleanup costs—despite the fact that they are blameless victims of PFOA and PFOS contamination. Imposing limitless CERCLA liability on innocent passive receivers will do nothing to hold polluters responsible.

The administrative record is replete with comments explaining that EPA should not shift costs away from polluters and onto passive receivers. Unfortunately, the Final Rule failed to address these unintended consequences of the Proposed Rule. *Amici*'s members are now vulnerable to CERCLA actions initiated by states and private parties, even if EPA uses its enforcement discretion to focus on those responsible for PFOA and PFOS contamination. Worse yet, *amici*'s members could be responsible for all cleanup costs when PFOA and PFOS polluters are unavailable for judgment. It was arbitrary and capricious of EPA to mischaracterize passive

---

[3] Public clean water and drinking water agencies are primarily funded through water and sewer rates billed to their customers. These entities typically do not rely on taxpayer funding.

[4] Approximately 90% of the nearly 50,000 community drinking water systems throughout the country and 80% of the over 16,000 wastewater systems serve small communities.

receiver liability as an "indirect" cost with an unknown price tag and move forward with finalizing the rule.

One of the basic purposes of CERCLA is ensuring that the "Polluter Pays" to clean up hazardous substances. This principle means that "polluters bear the cost of their polluting activities," *i.e.*, "those who caused chemical contamination bear the costs of that harm." *Ohio v. Dep't of Interior*, 880 F.2d 432, 445 & n.10 (D.C. Cir. 1989); Final Rule, 89 Fed. Reg. at 39149. By failing to adequately consider the costs to passive receivers, EPA violated this principle, such that passive receivers, like *amici*'s members, will be forced to bear the costs for polluters' PFOA and PFOS in the end.

*Amici* request that the Court remand the Final Rule for two independent reasons:

1. The Final Rule is arbitrary and capricious because the economic analysis supporting EPA's designation of PFOA and PFOS as hazardous substances abandons the "Polluter Pays" principle underpinning CERCLA.

2. The Final Rule is arbitrary and capricious because EPA avoided its obligation to quantify litigation expenses and cleanup liability by labeling them as "indirect" costs.

# ARGUMENT

*Amici* object to EPA's designation decision as arbitrary and capricious, in violation of the APA. *See* 5 U.S.C. § 706(2)(A). An agency rule is arbitrary and capricious if it relied on impermissible factors, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that was contrary to the evidence, or is so implausible that it was not the result of accounting for differing views or agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

EPA failed this standard because it did not properly consider a major consequence of the designations—imposition of considerable costs on passive receivers. In its notice of proposed rulemaking, EPA "interpret[ed] the language of CERCLA section 102(a) as precluding the Agency from taking cost into account in designating hazardous substances." Proposed Rule, 87 Fed. Reg. at 54421. Even still, EPA solicited comments on costs upon finalizing of the Proposed Rule. *Id.* at 54423. In the Final Rule, EPA changed course and claimed that it was not resolving whether cost may factor into hazardous substance designations. Final Rule, 89 Fed. Reg. at 39143. Yet EPA performed a perfunctory economic analysis and concluded that the benefits of designating PFOA and PFOS would outweigh the costs, and that finalizing the rule was justified. *Id.* at 39159, 39163.

12

An agency cannot rely on an economic analysis marred by "a serious flaw" to justify its rulemaking—even if the authorizing statute does not require one. *Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1288 (D.C. Cir. 2023) (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)); *Idaho Conservation League v. Wheeler*, 930 F.3d 494, 507 (D.C. Cir. 2019). Remand is warranted here, first because EPA failed to properly account for CERCLA's "Polluter Pays" principle. Second, EPA improperly deemed the passive receivers' costs as "indirect" rather than directly quantifying their cleanup liability.

## I.    The Final Rule is Arbitrary and Capricious for Failing to Properly Consider the Costs Imposed on Passive Receivers, in Violation of the "Polluter Pays" Principle.

One of CERCLA's express purposes is to ensure that the "Polluter Pays" to clean up hazardous substances. *Ohio*, 880 F.2d at 445; Final Rule, 89 Fed. Reg. at 39149. But because of CERCLA's strict liability scheme and the ubiquity of PFOA and PFOS in the environment, the Final Rule threatens to impose substantial liability on passive receivers for pollution they did not cause. EPA's failure to consider the costs imposed on these passive receivers by the Final Rule was arbitrary and capricious.

### a.    CERCLA's Regime Allocates Joint and Several Liability, to *Amici*'s Detriment.

CERCLA imposes cleanup costs for "releases" of hazardous substances on four categories of potentially responsible parties ("PRPs"): (1) the current owner or

operator of a facility; (2) the former owner or operator of a facility at the time of disposal of a hazardous substance; (3) any person who "arranged for disposal or treatment" of hazardous substances at a facility; and (4) any person who accepts hazardous substances for transport to a facility that the person selected. 42 U.S.C. § 9607(a)(1)–(4). Any of these four categories of PRPs may be liable to the United States, a State or Indian Tribe, or *any other person* who incurs remediation costs as the result of a release of hazardous substances. *Id.* CERCLA allows private parties to initiate cost recovery against PRPs as soon as any response cost to a hazardous substance is incurred, and a party does not have to release any threshold amount of a hazardous substance in order to incur liability. 42 U.S.C. §§ 9607(a)(4)(B), 9613(g)(2). CERCLA liability is also strict and joint and several, such that a PRP that released only a *de minimis* amount of a hazardous substance can be responsible for cleaning up the entire site. What's more, EPA action is not a prerequisite for actions by States, Indian Tribes, or any private party who seeks to recover CERCLA costs. *Id.*

*Amici*'s members may fit into any one of the categories of PRPs in the context of PFOA and PFOS. *See* 42 U.S.C. § 9607(a)(4). The terms "release" and "facility" have been interpreted broadly, such that nearly any location where hazardous substances are found may be a target for a CERCLA cleanup and cost recovery action. *Id.* §§ 9601(9), (22). Under this liability scheme, because of the ubiquity of

14

PFAS compounds, *amici*'s members face a risk of liability for releases of PFOA and PFOS in their drinking water treatment byproducts, wastewater effluent, at biosolids management sites, at properties they currently or formerly own or operate, in emissions from their incinerators, and a variety of other potential locations.

And passive receivers (and ultimately their customers and local governments) could be left holding the entire bag if they cannot identify a source of PFOA or PFOS that is also a PRP subject to CERCLA liability. For example, companies that manufacture a "useful product" that was ultimately disposed of by the end user may be exempted from liability under CERCLA. *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 612–13 (2009). PFOA and PFOS are present in countless everyday products, such as cookware, clothing, carpet, pizza boxes, and laundry detergent. The useful product exemption could prevent passive receivers from recovering CERCLA costs from the chemical manufacturers whose PFOA and PFOS was washed down the drain by consumers doing dishes and laundry or steam cleaning their carpets. J.A. ___ [AR 0240]. In short, public water and wastewater utilities and farmers—who have no culpability for the proliferation of those substances in the environment—could be easy targets for CERCLA litigation, and they may be left with no recourse against the actual polluters.

Even worse, polluters can—and do—bring contribution actions against passive receivers in an attempt to reduce their portion of the cleanup bill. As of

December 2022, at least 650 municipalities and counties that operate clean water utilities have been pulled into CERCLA litigation by other PRPs.  J.A. ___ [AR 0240].  A regime that lets polluters escape liability by transferring not only their hazardous substances but also their cleanup costs to passive receivers is not what Congress had in mind when enacting CERCLA.  *See Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845–46 (4th Cir. 1992).

> **b.    EPA's Designation of PFOA and PFOS Ignores Comments Regarding the Costs That Passive Receivers Will Bear.**

When EPA receives public comments, a reasoned response is required when the "public comments raise relevant and significant concerns about the costs associated with a proposed rule." *Bloomberg L.P. v. SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022).  An agency must also "justify its failure to take into account of circumstances that appear to warrant different treatment for different parties." *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994).  Given the significant comments received on shifting costs and the distinctions between passive receivers and polluters, EPA had to explain how the Final Rule advances the "Polluter Pays" principle.

During the notice-and-comment period, NACWA warned that passive receivers "could be legally liable for the total cost of cleaning up waters and lands contaminated by [PFOA and PFOS] simply because they perform vital public health and environmental services that put them into contact with [PFOA and PFOS]

16

already in the environment." J.A. ___ [AR 0240]. WateReuse argued in its comments that water recycling services "could be undermined if water and wastewater utilities are held liable for the costs of remediation under CERCLA, or if scarce public dollars are diverted to defend against litigation from other parties seeking to make local agencies financially responsible for cleanup costs." J.A. ___ [AR 0511]. Likewise, the AFBF cautioned that EPA could not "support its claim that it will hold PFOA/PFOS manufacturers liable." J.A. ___ [AR 0243]. EPA did not address these concerns. Instead, it tried to explain them away using CERCLA's "liability framework" that apportions cleanup costs among multiple PRPs. Final Rule, 89 Fed. Reg. at 39169. But this "liability framework" does not adequately insulate innocent passive receivers from unwarranted PFOA and PFOS liability.

As *amici* explained in their comments, EPA's obligation to protect the "Polluter Pays" principle becomes even more important when CERCLA is applied to PFOA and PFOS. That's because passive receivers cannot escape joint and several liability when the true polluters are impossible to identify or cannot be held liable. *See O'Neil v. Picillo*, 883 F.2d 176, 178–79 (1st Cir. 1989). What's more, at least one court has found that it can be impossible to trace thousands of comingled PFOA and PFOS compounds back to each original polluter. *See In re Du Pont de Nemours & Co. Personal Injury Litig.*, 87 F.4th 315, 321 (6th Cir. 2023). This

17

traceability problem may leave passive receivers of PFOA and PFOS functionally defenseless against CERCLA actions.

EPA's economic analysis gravely underestimates the exposure passive receivers will face under its designation decision. *See Window Covering Mfrs. Ass'n*, 82 F.4th at 1288. One study identified 57,412 locations across the country that are presumptive PFAS contamination sites. Salvatore, et al., *Presumptive Contamination: A New Approach to PFAS Contamination Based on Likely Sources*, EVN'T SCI. & TECH. LETTERS 983 (2022). A significant portion of those locations are "sites related to PFAS-containing waste," which the study defines to include agricultural fields to which PFAS-containing biosolids have been land applied, and 4,255 of them are wastewater treatment plants. *Id.* And water and wastewater services already account for 30–40% of the energy costs of a typical municipality *without* considering efforts to address PFOA or PFOS. J.A. ___ [AR 0508]. Requiring ratepayers nationwide to shoulder the burden of CERCLA response costs at these sites would have dire economic consequences on utilities and the communities they serve. Such outcomes would also contradict the stated purpose of EPA's designation decision, which is to minimize the use of the taxpayer-supported Superfund for cleanup costs. *See City of Portland v. EPA*, 507 F.3d 706, 713 (D.C.

Cir. 2007) ("[W]e will [not] tolerate rules based on arbitrary and capricious cost-benefit analyses.").[5]

The Final Rule also puts drinking water utilities in a Catch-22. National Primary Drinking Water Regulations separately finalized by EPA will set limits on the amount of PFOA and PFOS in drinking water. But the treatment process to remove PFOA and PFOS from source waters eventually requires drinking water utilities to dispose of water treatment residuals containing these contaminants, which the Final Rule has designated as hazardous substances. Drinking water utilities could face substantial cleanup costs if the ultimate disposal location of the PFOA and PFOS is subject to a CERCLA cleanup at any point in the future. Local water system ratepayers should not have to pay to remove PFOA and PFOS from their drinking water *and* pay to remediate that same PFOA and PFOS from the environment years or decades later. It is arbitrary and capricious for EPA to impose a rule that allows this "double jeopardy" situation. EPA should allocate CERCLA site remediation costs to polluters instead of water system ratepayers.

Farmers and ranchers wouldn't fare any better under the current regulatory scheme. Consider the story of AFBF member Jason Grostic. J.A. ___ [AR 0243]. Mr. Grostic unwittingly fertilized his land using PFAS-contaminated biosolids. The

---

[5] The purpose of the Superfund is to address injuries and damages caused by the presence of hazardous substances in the environment. 26 U.S.C. § 9507(C)(1)(A).

contamination seeped into the surface water, crops, and soil on the farm. Mr. Grostic does not know who produced the contaminants and it is unlikely that those entities will face any consequences. EPA failed to consider that farmers like Mr. Grostic could face significant expenses for PFOA and PFOS on their property. The threat of CERCLA liability will also follow Mr. Grostic forever, even if he decides to sell his farm. And the Final Rule threatens Mr. Grostic's ability to sell his farm at fair market value. The State of Michigan publicly identified Mr. Grostic's farm as contaminated. Subsequent purchasers may be leery of paying top dollar for a property known to be contaminated with PFOS.

Mr. Grostic did nothing wrong when he applied biosolids to his land. Indeed, land application of biosolids is generally accepted to be the most sustainable option for managing an unavoidable byproduct of human life. Among the primary methods for managing biosolids—land application, landfilling, and incineration—land application is considered the most sustainable and environmentally beneficial method. J.A. ___ [AR 0538]. As a result, EPA encourages farmers to accept these biosolids from clean water utilities for use as a fertilizer. J.A. ___ [AR 0243]; J.A. ___ [AR 0508]. PFOA and PFOS enter clean water utilities and end up on farm fields because of polluters. Imposing liability on clean water utilities and farmers for accepting PFOA and PFOS would punish them for their efforts to pursue sustainable options for providing vital sanitation and food production services.

20

EPA should have recognized that shifting costs onto passive receivers and away from polluters was an "important aspect" of the PFOA and PFOS problem. *AEP Tex. N. Co. v. Surface Transp. Bd.*, 609 F.3d 432 (D.C. Cir. 2010) (quoting *State Farm*, 463 U.S. at 43). That's because EPA cannot issue regulations that contravene the "Polluter Pays" principle. *See NLRB v. Fed. Labor Rels. Auth.*, 834 F.2d 191, 172–73 (D.C. Cir. 1987). Instead of addressing the specifics of that problem, however, EPA fell back on CERCLA's "liability framework . . . to equitably resolve who should pay." Final Rule, 89 Fed. Reg. at 39169. More specifically, the Agency claimed that passive receivers can rely on "CERCLA's liability limitations, coupled with EPA enforcement discretion policies" to "minimize hardship." *Id.* at 39183. But EPA cannot rely on a "generalized conclusion" to address the "unique circumstances" of designating PFOA and PFOS as hazardous substances. *AEP Tex. N. Co.*, 609 F.3d at 441. A proper economic analysis should examine cost allocation in light of the "Polluter Pays" principle, the widespread proliferation of PFOA and PFOS, and the challenge of tracing each chemical compound back to the original polluter. *See Humane Soc. of U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017).

Cursory attention to *amici*'s comments proves the point. As currently formulated, CERCLA's liability scheme will not provide any recourse to a passive receiver that finds itself as the only potentially responsible party in a cleanup action.

21

Nor will it allow a farmer like Mr. Grostic to recover the costs of cleaning up his farmland. Moreover, malapportionment of CERCLA liability is a nationwide concern. J.A. ___ [AR 0493]. EPA failed in its statutory obligation to protect passive receivers from a "public pays" model. On remand, EPA should develop a rule that complies with the "Polluter Pays" principle.

## II.    The Final Rule is Arbitrary and Capricious Because the Cost-Benefit Analysis Mischaracterizes Cleanup Liability as an "Indirect" Cost.

EPA characterized the potential costs of litigation and liability as "qualitative costs" that it "could not quantify with reasonable certainty." Final Rule, 89 Fed. Reg. at 39149. Absent an attempt to project the liabilities that passive receivers will face under the Final Rule, however, EPA's cost-benefit analysis is inherently unreliable.

A regulatory decision is arbitrary and capricious when it fails to account for all relevant costs and benefits. *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1343 (D.C. Cir. 1985). An agency is also prohibited from framing the costs and benefits in an inconsistent or opportunistic manner. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148–49 (D.C. Cir. 2011). Relevant here, an agency decision is not well-reasoned if its economic analysis contains quantifiable factors that went uncalculated. *GPA Midstream Ass'n v. Dep't of Transp.*, 67 F.4th 1188, 1200 (D.C. Cir. 2023).

To begin, EPA framed the costs of designation in an arbitrary manner by characterizing reporting requirements as the only direct costs of designation.

Inexplicably, the Agency's economic analysis did not consider litigation risk and cleanup liability as direct costs—and it thereby exempted itself from quantifying those expenses.  Final Rule, 89 Fed. Reg. at 39132.  It goes without saying that designating PFOA and PFOS will cause CERCLA litigation.  If EPA did not intend for cleanup costs and liability to be a direct result of designation, what was the purpose of the Final Rule?  As one commenter pointed out, hazardous substance designations bring with them the full weight of CERCLA—reportable substances are also substances that give rise to cleanup liability.  J.A. ___ [AR 0493].  EPA cannot decouple PFOA and PFOS reporting obligations from litigation costs and cleanup liability.

EPA further concluded that passive receivers of PFOA and PFOS will not face the direct costs of CERCLA litigation.  Final Rule, 89 Fed. Reg. at 39150.  That notion is inconsistent with the law and common sense.  It is impossible, for example, to square that conclusion with the CERCLA's strict joint and several liability scheme and the uncertainties of litigation.  *Id.*  As discussed *supra*, those uncertainties include the distinct possibility that passive receivers will pick up the whole cleanup tab.  And it overlooks the fact that defending against CERCLA actions can involve crippling litigation costs—even in cases that do not result in liability for an innocent farmer or water or wastewater utility.  For that reason, the Agency acted arbitrarily

23

when it labeled the consequences of CERCLA litigation as indirect costs and dodged the cost misallocation problem.

By performing a Regulatory Impact Analysis (RIA), however perfunctory, EPA in fact implicitly revealed the enormity of the potential liability at stake with its designation decision.   RIAs are only required for "significant regulatory actions"—which, by definition, "[h]ave an annual effect on the economy of $100 million." Final Rule, 89 Fed. Reg. at 39149 (citing E.O. 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993)); *see also* 2 U.S.C. § 1532(a)(2) (requiring agencies to perform a cost-benefit analysis when regulations may result in expenditures of $100 million or more).   Under the Final Rule, passive receivers are not exempt from facing this massive liability.  Final Rule, 89 Fed. Reg. at 39183.

For many passive receivers, the expense of cleaning up PFOA and PFOS without a liable polluter could threaten their solvency.  The communities served by clean water and drinking water utilities will inevitably pay for litigation and remediation efforts through higher water and sewer rates, an outcome that many ratepayers cannot afford.  J.A. ___ [AR 0538].  Limited ratepayer funds should be reinvested in water and wastewater infrastructure and efforts to mitigate PFAS impacts, rather than diverted to expenses that polluters should have to pay.  And what if thousands of farmers are faced with Mr. Grostic's situation?  They would be left to clean up unmarketable land that was polluted by parties who may never be

24

held accountable. EPA must consider whether the benefits of designation are worth risking such massive ramifications to passive receivers.

Importantly, a reliable cost-benefit analysis cannot come before commercially viable cleanup methods for PFOA and PFOS exist. As one commenter aptly explained, "treatment and disposal technologies for PFOA and PFOS are still being developed and . . . . [t]he science and conclusive methods on destruction and/or disposal are not yet settled." J.A. ___ [AR 0493]. NACWA commented that current PFOA and PFOS management techniques are inefficient, risky, and do not destroy the chemical compounds. J.A. ___ [AR 0538]. Moreover, PFOA and PFOS destruction technologies are unproven and have only limited capacity. J.A. ___ [AR 0538]. The RIA acknowledges as much, noting that studies haven't proven that the PFOA and PFOS in biosolids can be destroyed at scale. J.A. ___ [AR 0835]. At the very least, EPA must wait until reliable PFOA and PFOS remediation technology is available. Otherwise, passive receivers will be faced with decades of litigation costs while effective treatments—and the corresponding ability of passive receivers to shield themselves from incurring ever-expanding future CERCLA liability—remain out of reach.

## CONCLUSION

As *amici* have demonstrated, the deficiencies in the Final Rule offend the foundational purpose of CERCLA. EPA should be required to develop a designation

rationale that protects the "Polluter Pays" principle and adequately accounts for and addresses potential harms to passive receivers.

For the foregoing reasons, *amici* respectfully request that the Court remand the Final Rule designating PFOA and PFOS as hazardous substances back to EPA for compliance with the APA and the "Polluter Pays" principle. *See Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) (supporting remand instead of vacatur "[w]hen an agency may be able to cure a defect in its explanation of a decision"). Without the necessary clarifications, the Final Rule threatens *amici*'s members with litigation costs and cleanup liability for PFOA and PFOS that they did not create or use. This would require diversion of limited ratepayer dollars to pay for private pollution and place farmers into financial distress, while arbitrarily and capriciously subverting CERCLA's Polluter Pays principle.

Respectfully submitted,

*/s/ Erica M. Spitzig*
Erica M. Spitzig
Aaron M. Herzig
Annie M. McClellan
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Phone: (513) 381-2838
espitzig@taftlaw.com
aherzig@taftlaw.com
amcclellan@taftlaw.com

26

David C. Roper
Taft Stettinius & Hollister LLP
41 S High Street, Suite 1800
Columbus, OH 43215-4213
Phone: (614) 221-4000
droper@taftlaw.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g), I certify that this brief:

(1) complies with the type-volume limitation of Rule 32(a)(7) because it contains 5,846 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(e)(1); and

(2) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word and is typeset in Times New Roman in font size 14.

Dated: November 12, 2024

*/s/ Erica M. Spitzig*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 12, 2024, I electronically filed the foregoing brief with the Clerk of the Court using the appellate CM/ECF system, which served copies of the brief on all ECF-registered counsel.

Dated: November 12, 2024

*/s/ Erica M. Spitzig*