No. 24-1193
(consolidated with Nos. 24-1261, 24-1266, 24-1271, 24-1272)

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA, et al.**,
Petitioners,

v.

**ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL S. REGAN,
in his official capacity as Administrator,
United States Environmental Protection Agency**,
Respondents,

and

**CLEAN CAPE FEAR, et al.**,
Respondent-Intervenors.

---

On Petition for Review of Final Action by the
United States Environmental Protection Agency –
89 Fed Reg. 39,124 (May 8, 2024)

---

**SUPPLEMENTAL APPENDIX**

---

(Names and addresses of counsel appear inside cover)

Erica M. Spitzig
Aaron M. Herzig
Annie M. McClellan
Taft Stettinius & Hollister LLP
301 East Fourth Street, Suite 2800
Cincinnati, OH 45202-3957
Phone: (513) 381-2838
Fax: (513) 381-0205
espitzig@taftlaw.com
aherzig@taftlaw.com
amcclellan@taftlaw.com

David C. Roper
Taft Stettinius & Hollister LLP
41 S High Street, Suite 1800
Columbus, OH 43215-4213
Phone: (614) 221-4000
Fax: (614) 221-2007
droper@taftlaw.com

December 5, 2025                   *Counsel for Amici Curiae*

# TABLE OF CONTENTS

## VOLUME 1 of 1

## INDEXED RECORD MATERIAL

EPA-HQ-OLEM-2019-0341-0407…………………………………………… SA01

EPA-HQ-OLEM-2019-0341-0538…………………………………………… SA08

 

 

Office of Superfund Remediation & Technology Innovation
U.S. Environmental Protection Agency
EPA Docket Center
OLEM Docket, Mail Code 28221T
1200 Pennsylvania Avenue, NW
Washington, DC 20460

**Re:     Public Comment on Proposed Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances; Docket ID No. EPA-HQ-OLEM-2019-0341**

The undersigned national water associations, together forming the "Water Coalition Against PFAS" (Coalition) respectfully submit the following comments on the "Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances" (Proposed Rule).

The Coalition recognizes the importance of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) in cleaning up uncontrolled or abandoned hazardous-waste sites, spills, and other emergency releases of hazardous substances into the environment. But the "polluter pays" principle on which CERCLA was established is vital for ensuring passive receivers of hazardous substances such as drinking water and clean water systems (hereinafter water systems) are not held liable for excessive costs. While the "polluter pays" principle has not always proven effective, given the uniqueness of PFAS in the context of CERCLA's scheme, ensuring this principle is appropriately applied is more vital than ever. To the extent water systems are held liable for CERCLA PFAS response costs, those costs will be directly passed down to ratepayers, effectively shifting the "polluter pays" principle to the "public pays" principle and resulting in a direct adverse impact to the public health services these water systems provide. The Coalition's comments will articulate some of the significant gaps in EPA's Proposed Rule the Environmental Protection Agency's (EPA) rule, supporting the fact that the proposal should not be finalized as written.

1

**I. EPA's decision to not extend the public comment period directly impacts the likelihood that the agency will have a robust and complete set of legal and scientific information from which a final rule could be established.**

The Coalition is disappointed with EPA's decision to not extend the public comment period for the Proposed Rule. Given this is the first time EPA has undergone a rulemaking to directly designate any substance, let alone two very complex substances, as hazardous under CERCLA, the Coalition is confused as to why the agency would not want to provide additional time beyond the 60-day initial public comment period. Such additional time could result in supplemental information that could affect the veracity of the legal and scientific basis on which the agency's hazardous substance designation has been made in the Proposed Rule.

The agency's desire to move quickly contradicts this Administration's commitment to follow the science and to adhere to a fully transparent public process. If there is additional scientific information that could be helpful, such as a robust external analysis of the Scientific Advisory Board's findings and evaluation of how those findings are or are not incorporated into EPA's Proposed Rule, it is unclear why EPA would not want to allow the opportunity for that information to be provided. If the only hinderance is the timeline EPA set for itself to have outside parties and the public provide an external analysis, it is an unfortunate disservice for EPA to not provide the time for that information to be fully analyzed and addressed. Further, EPA's decision not to release a full Regulatory Impact Analysis with sufficient time to review and comment during the 60-day public comment period calls into serious question the agency's commitments to transparency and leads to serious questions about the accuracy and confidence the public will have of any final rule.

**II. EPA's proposed rule, if finalized as written, will have a significant impact on water systems and the communities they serve.**

There are a host of costs that water systems will incur if the Proposed Rule is finalized as drafted. These include costs associated with becoming a "potentially responsible party" (PRP) under CERCLA or defending the water system against these claims, as well as those additional management and operations costs associated with the CERCLA construct. Unfortunately, water systems are not able to absorb these potentially staggering costs increases, meaning they will be passed directly to the ratepayer. In the most dire of situations, these types of costs could result in a water system not being able to sustain the costs of operation and maintenance, resulting in communities struggling to balance competing vital public services or facing the prospect of potential system closures. These scenarios, which have not been contemplated by EPA in the Proposed Rule, have the potential to significantly impact public health and to leave the public holding the bag on paying for cleanups for which they are not culpable.

Some of the additional costs water systems will incur (separate from those arising from a PRP designation) include disposal of PFOA- and PFOS-laden filtration media or destruction of this media. Currently, there is no destruction technology identified by the federal government as fully sufficient available. Additionally, water systems may incur costs associated with switching from

disposal methods which are currently legal, regulated, and even encouraged by EPA and other federal agencies, such as land-application to agricultural fields, forest revegetation, or other repurposing techniques. Further, should the proposed designations be finalized as proposed, water systems could become PRPs for any EPA-led or private cleanups taking place at those land application sites or repurposing locations. EPA's proposed rule fails to even consider these costs, let alone to offer remedies or alternative scenarios. EPA has therefore not appropriately evaluated the significant unintended consequences of the Proposed Rule.

When considering the operation, management, and liability costs facing water systems, it is important to note that in many cases, smaller rural water systems and those water systems serving disadvantaged communities (where the two do not overlap) with reduced economies of scale combined with a lower-income customer base, will likely experience the largest financial impact. EPA's Proposed Rule also fails to consider this fact, providing little to no discussion or analysis of these impacts.

At a time where access to, and affordability of, services provided by water systems is a prominent concern by Democrats and Republicans alike, as well as by the public at large, EPA's proposal and the "public pays" principle it will foster will further drastically reduce affordability and access. This will in turn result in a disproportionate impact to disadvantaged communities. EPA must consider all of these impacts in any final rule, lest water systems find themselves grasping at straws to continue maintenance and operation without drowning the communities they serve in unattainable rate payments. In the event EPA does not provide an analysis of these impacts in the final rule, the agency must explain why no evaluation was necessary and how the public ultimately incurring remediation and liability costs is consistent with the "polluter pays" model EPA has committed itself to in its PFAS Action Plan and more recently PFAS Strategic Roadmap.

**III. While the Coalition supports EPA's commitments to exercise enforcement discretion and to not seek response costs from water systems, such commitments do not abate the significant liability concerns for water systems caused by the Proposed Rule, particularly those stemming from private party and third-party suits.**

While the concept can be useful, enforcement discretion does not provide any actual legal shield from the liability water systems will face if the Proposed Rule is finalized as written. Enforcement discretion is, at best, formulated and memorialized through EPA guidance, and can be changed from administration to administration. This guidance, while informative and sometimes helpful, is not legally binding or legally enforceable. Further, while enforcement discretion could provide relief for water systems from government-imposed liability, enforcement discretion does not extend to those privately-brought recovery cases where water systems are identified by third parties as PRPs. Accordingly, the actual relief from exercised enforcement discretion only extends so far and only in a limited set of scenarios.

Additionally, enforcement discretion for water systems related to CERCLA has not historically proven fully effective or fruitful. In fact, 650 utilities have been sued for recovery thus far under CERCLA.[1] This number will likely significantly increase if the proposed PFOA and PFOS

---

[1] Salzman and Thompson. 2019. Environmental Law and Policy, 5th Ed. West Academic, St. Paul, MN.

designations are finalized given their ubiquity in the environment and the myriad of industrial, commercial, and domestic sources from which they enter water systems. Nor in many cases will either EPA or water systems be able to recover CERCLA costs from the very entities that created and profited from the PFAS pollution. Absent engaging in direct disposal, such entities are typically not PRPs under CERCLA under the U.S. Supreme Court's "useful products" exemption. As such, water systems may at times be the only identifiable PRPs, further increasing their – and the public's – liability exposure.

EPA must be transparent with respect to the true impact of enforcement discretion in any final rule. Holding enforcement discretion out as a tool which will shield water systems simply fails to paint the entire picture, promoting a false sense of security that water systems will not ultimately be brought in as PRPs. In the event EPA does not provide this type of meticulous analysis in the final rule, EPA should explain why the agency is so robustly and publicly holding out protections for water systems through enforcement discretion as a panacea for the public potentially incurring PFAS cleanup costs given these uncertainties.

## IV. The Economic Analysis in the Proposed Rule fails to accurately capture the proposal's true economic impacts on water systems and the disadvantaged communities or communities with environmental justice concerns they serve.

While EPA maintains the Proposed Rule is not "economically significant," this is solely because of EPA's grossly inadequate position that the costs stemming from the final rulemaking are limited to reporting. The reality is that the reporting costs, while themselves having the potential to become economically significant based on the cost of preparing a report as well as the frequency of doing so, will pale in comparison to the other quantitative impacts water systems, among others, will incur. These impacts will include new expectations for the disposal of PFOA- and PFOS-laden filtration media and biosolids.

Biosolids beneficial reuse programs are likely to be immediately impacted by the Proposed Rule, potentially spurring a shift toward greater landfilling, and increasing the cost of biosolids management by orders of magnitude. This also includes the economic impacts arising from implication as a PRP. Unfortunately, EPA's analysis in the Proposed Rule does nothing to even acknowledge these types of costs – costs that will ultimately be incurred by water systems and the public at large. This lack of analysis further demonstrates EPA's failure to ensure that the "polluter pays" principle will not be replaced with the "public pays" principle.

Importantly, EPA's analysis in the Proposed Rule seems to go directly against the agency's own guidance for providing an economic analysis, failing to even mention or consider the "social costs" which would occur to the extent a "public pays" model becomes the norm, an accounting of true "private sector and public sector costs," and "indirect costs," all of which have significant implications on the public and likely will "ripple through the rest of the economy, causing prices in other sectors to rise or fall and ultimately affecting the incomes of consumers."[2] Indeed, this is an exact scenario where, as EPA puts it, "the indirect costs of a regulation may be considerably

---

[2] "Guidelines for Preparing Economic Analyses: Analyzing Costs." 2010, *Guidelines for Preparing Economic Analyses*, Chapter 8, EPA, https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses.

greater than the direct costs."[3] These "indirect costs" must be accounted for in any final rule or EPA must explain why this scenario merits abdicating evaluations accounted for in the agency's own guidance.

While EPA asserts that it is unclear whether the Proposed Rule will have a significant impact on disadvantaged populations or communities with environmental justice concerns relative to other communities, this assessment is also grossly inadequate. To the extent water systems are subject to any additional costs from anything ranging from new disposal techniques to liability from remedial actions under CERCLA, as previously discussed, these costs will be passed onto the communities they serve. The majority of water systems nationwide are public entities which do not generate profits and must raise rates or seek federal or state financing to cover new costs.

Additionally, the fact that this is the first time EPA is undergoing a rulemaking to designate a substance as a hazardous substance is no excuse for providing a slim analysis of economic impacts, considering reporting as the only actual potential cost. CERCLA has been utilized, and therefore a matrix of associated costs has been available, since 1981, when 4,000 drums were removed from the "Valley of Drums" site in Kentucky.[4] Thus, there are over four decades of cost information available that EPA seemingly has chosen to ignore, apparently deciding that actual costs accrued – costs that have been well documented for almost half a century – do not merit incorporation or even recognition in the Proposed Rule. It is the case that EPA will have a very difficult time estimating the costs specific to potential cleanups associated with PFOA and PFOS given the fact that EPA does not yet know how to remediate PFAS substances or to what levels they need to be remediated to protect public health and the environment. But that fact does not remove EPA's responsibility to assess the true impacts of its action; rather, it speaks to the potential rashness of the current proposal.

EPA must consider more than reporting costs in determining whether any final rule is economically significant and should be transparent in the costs that will result if the rule is finalized as proposed. In the event EPA does not analyze these costs in determining economic significance in the final rule, EPA must explain why these costs are not necessary for evaluation, given the functional certainty of their occurrence.

**V. EPA should focus on actions that will reduce the amount of PFOA and PFOS entering the environment prior to designating them has hazardous substances under CERCLA.**

Prior to, or consistent with, taking remedial actions pursuant to the authority CERCLA affords, EPA should be focusing on instituting those actions that will reduce the amount of PFOA and PFOS entering the environment before turning to cleanup. These actions should include, but are not limited to, those related to the elimination of non-essential uses of PFAS, greater source control of PFAS constituents already in commerce, and development of a viable, sustainable and cost-efficient destruction technology.

Because of the ubiquity and persistence of PFAS in everyday commercial products, without first ensuring that PFOA and PFOS are no longer entering the environment there is a significant

---

[3] Id.
[4]"Superfund History." *Superfund*, EPA, https://www.epa.gov/superfund/superfund-history#8.

backsliding risk with any remedial activity performed. In other words, ongoing and unmitigated releases could result in a contaminated site having to be cleaned up multiple times. EPA should at least account for this potential and speak to how the agency will avoid this outcome in a final rule or face a situation where any environmental remedial progress afforded by the CERCLA statutory and regulatory matrix is negated and must be undertaken again. In the event EPA does not account for this in the final rule, EPA must at least account for the potential additional costs from multiple rounds of remedial activity in the agency's evaluation of economic significance.

**VI. EPA should clearly identify whether the agency has relied on any science, scientific process, or scientific findings for which the Science Advisory Board has previously provided a review and recommendations, and if the agency has, should also address those comments, concerns, and recommendations provided by the Science Advisory Board in a final rule.**

It is not clear whether or to what extent EPA relied on the science, scientific process, or scientific findings of the five documents the Science Advisory Board (SAB) reviewed in issuing its final report titled "Review of EPA's Analyses to Support EPA's National Primary Drinking Water Rulemaking for PFAS," issued August 22, 2022, in determining that PFOA and PFOS "may present substantial danger . . . to the public health or welfare or the environment," or if they did, to what extent.[5] EPA should be fully transparent about whether and to what extent this reliance occurred. Further, to the extent EPA relied on the contents of those five documents, EPA should make publicly available the information demonstrating how the agency addressed the SAB's comments and recommendations (or why the comments and recommendations did not merit modification) prior to issuing the final rule.

Failure to provide this information seriously calls into question EPA's basis for proposing the hazardous substance designation given the many questions swirling around the science related to PFAS. EPA should be transparent about the use of this information in making a "substantial danger" finding. In the event EPA does not provide this information in the final rule, EPA must provide an explanation about why that type of transparent analysis is not necessary.

**VII. Conclusion.**

The Coalition again appreciates the opportunity to submit public comments on the Proposed Rule, even though EPA's denial of the requests for an extension of the public comment period raise serious concerns about how the Proposed Rule will be finalized and truncated the Coalition's ability to provide a robust set of public comments on such an impactful action.

EPA must address a series of shortcomings prior to finalizing the proposal. First, with respect to economic impacts, EPA must fully evaluate all of the economic impacts the water sector will be

---

[5] The documents are: (1) Analysis of Cardiovascular Disease Risk Reduction as a Result of Reduced PFOA and PFOS Exposure in Drinking Water; (2) Proposed Approaches to the Derivation of a Draft Maximum Contaminant Level Goal for Perfluorooctanoic Acid (PFOA) (CASRN 335-67-1) in Drinking Water; (3) Draft Framework for Estimating Noncancer Health Risks Associated with Mixtures of Per- and Polyfluoroalkyl Substances (PFAS); (4) Proposed Approaches to the Derivation of a Draft Maximum Contaminant Level Goal for Perfluorooctanoic Sulfonic Acid (PFOS) (CASRN 1763-23-1) in Drinking Water; and (5) Appendices for Analysis of Cardiovascular Diseases Risk Reduction as a Result of Reduced PFOA and PFOS Exposure in Drinking Water.

faced with, not simply reporting. There are over four decades of costs associated with CERCLA implementation available for evaluation, which it appears EPA has chosen to ignore, leaving a significant gap in those true costs that will be incurred from any final rule. Nor does a lack of understanding of the science behind PFAS excuse EPA's basic rulemaking requirements. In the case of the water sector, these are costs that will land squarely on the shoulders of the public, so it is critical that the agency undergo a robust analysis of all economic impacts that a final rule will bring, both directly and indirectly.

EPA must also be fully open and transparent with respect to the true impact its exercise of enforcement discretion could have on water systems should the proposed designations be finalized. In particular, EPA must analyze what, if any, ability the agency has to impact liability associated with the substantial number of private cleanup actions the designations would likely lead to.

Additionally, EPA should either take measures to ensure that PFOA and PFOS are no longer entering the environment prior to any final rulemaking, or it should at the very least account for the potential of significant remedial backsliding in the final rule and speak to how the agency will ensure backsliding does not occur. In the event EPA does not provide either of these analysis, potential economic impacts must have a multiplier applied, accounting for redundant, perpetual remedial activities as PFOA and PFOS potentially continue to enter the environment or move from one environmental media to another after remedial actions are taken.

It is vital EPA addresses these substantial shortcomings in the Proposed Rule. Without doing so, the "polluter pays" principle will undoubtably be shifted to the "public pays" principle and will result in significant issues related to the availability and affordability of drinking water and clean water services across the country.

Finally, given the significant concerns raised in these comments, the Coalition will continue to urge Congress to provide water systems with a tailored legislative exemption from CERCLA liability for PFAS-related cleanups. The Coalition respectfully requests the Administration, in whatever ways possible and appropriate but not limited to within a Statement of Administrative Position, support the Coalition's efforts to pursue this exemption from liability. Doing so would clearly and unambiguously demonstrate the Administration's professed commitment to ensuring water systems, as passive receivers, are not held liable for contamination they in no way contributed to.

Sincerely,

Water Coalition Against PFAS

American Water Works Association
National Association of Clean Water Agencies
National Rural Water Association
Water Environment Federation



PRESIDENT
**Thomas W. Sigmund**
*Executive Director*
*NEW Water*
*Green Bay, WI*

VICE PRESIDENT
**Oluwole A. "OJ" McFoy**
*General Manager*
*Buffalo Sewer Authority*
*Buffalo, NY*

TREASURER
**Diane S. Taniguchi-Dennis**
*Chief Executive Officer*
*Clean Water Services*
*Hillsboro, OR*

SECRETARY
**William J. "Mickey" Conway**
*Chief Executive Officer*
*Metro Water Recovery*
*Denver, CO*

CHIEF EXECUTIVE OFFICER
**Adam Krantz**

1130 Connecticut Ave NW
Suite 1050
Washington DC 20036

**T** (202) 833-2672
**F** (888) 267-9505

**www.nacwa.org**

November 7, 2022

Mr. Michael S. Regan, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, DC 20460

Submitted via the Federal eRulemaking Portal:
https://www.regulations.gov/

***Re: NACWA Comments on the U.S. Environmental Protection Agency's Proposed Comprehensive Environmental Response, Compensation, and Liability Act Hazardous Substances: Designation of Perfluorooctanoic Acid and Perfluorooctanesulfonic Act*** **(Docket ID EPA-HQ-OLEM-2019-0341-0001)**

Dear Administrator Regan:

The National Association of Clean Water Agencies (NACWA) appreciates the opportunity to comment on the U.S. Environmental Protection Agency's (EPA) proposed designations of Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS) as hazardous substances under the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). NACWA represents the interests of 350 publicly owned wastewater and stormwater agencies of all sizes across the country. Each day, these public clean water agencies provide the essential service of protecting public health and the environment by managing and treating billions of gallons of our nation's wastewater and stormwater, as well as the millions of tons of biosolids generated as a byproduct of the wastewater treatment process.

NACWA is encouraged to see EPA working to address per- and polyfluoroalkyl (PFAS) substances. NACWA members share the concerns of their communities regarding the presence of these chemicals in the environment.

EPA's proposed designations, however, fall short of the Agency's aims by failing to advance the "polluter pays" approach the Agency has repeatedly espoused. The proposal instead threatens to push significant costs and liabilities onto local communities; increase affordability concerns, particularly for disadvantaged communities; and untenably put cleanup actions ahead of critical source control and risk assessment processes.

Public clean water agencies have never, and do not, produce or profit from PFAS chemicals. Rather, PFAS substances enter public sewer and

stormwater systems and the environment through industrial releases and, crucially, commercial and domestic sources as they wash off from household and commercial goods, clothing, and even our own bodies. Public clean water agencies have limited control over the amount of these substances they receive and must handle.

Yet, due to CERCLA's expansive definitions and lack of focus on culpability and simply by virtue of the critical public services they provide, clean water agencies will be exposed to extensive liability under CERCLA as potentially responsible parties for PFAS contamination. A truly unprecedented amount of the nation's water and land area will fall under CERCLA's contamination purview if EPA categorically designates PFOA and PFOS as CERCLA hazardous substances which, in turn, will expose clean water utilities to unprecedented liability for their wastewater, stormwater, and biosolids management activities. This is *in spite of the fact* that public clean water agencies undertake these practices in accordance with strict state and federal environmental regulations.

The inevitable result will be that the communities served by public clean water agencies will be paying through their utility bills for litigation and remediation efforts for environmental impacts they did not cause, in direct contradiction to the "polluter pays" approach EPA is purporting to advance through the proposed CERCLA designations. While EPA has indicated that it does not intend to seek cleanup costs from clean water agencies, EPA has done so in certain circumstances in the past. And the simple reality is that private entities – including those responsible for PFAS pollution – can and will attempt to pass significant costs on to public clean water agencies using certain CERCLA provisions discussed in more detail below.

NACWA strongly supports a true polluter pays model where those who produced and profited from pollution bear the necessary costs of its remediation. The public should not – and often cannot afford to – bear these costs in their utility bills. But as proposed, the blanket designation of PFOA and PFOS as hazardous substances under CERCLA would accomplish just the opposite of what the Administration intends, creating a "community pays" outcome that will have a disproportionate impact on historically disadvantaged communities.

EPA has yet to leverage the tools available to help stem the flow of PFAS into public wastewater and stormwater systems. EPA has not set technology-based limits to control industrial PFAS discharges, implemented source control measures to limit the ongoing introduction of these substances into the environment, or promulgated reliable and repeatable analytical methods to quantify PFAS compounds in media other than drinking water.

The federal government must take steps to address PFAS pollution that protect the public from bearing the costs associated with PFAS cleanups. EPA should support the Congressional enactment of a clear, narrowly tailored CERCLA PFAS exemption for public clean water agencies acting in accordance with all applicable laws to avoid a "community pays" outcome.

EPA must also take other actions before moving forward with the proposed designations, including:

- Utilize its authority, including that found under the Toxic Substances Control Act (TSCA), to focus on source control. Reducing the introduction of PFAS substances into the environment by industrial, commercial and domestic sources is an essential precursor to nationwide remediation efforts;
- Undertake a comprehensive accounting of the potential costs of the proposal, including cleanup costs stemming from the proposed designations. The Agency must not shirk its responsibility to consider the true ramifications of the proposal while passing the buck to local communities;
- Advance understanding of the risks from PFAS to human health and the environment to inform and advance standard setting under the Clean Water Act (CWA) and other bedrock environmental statutes;
- Work with the clean water community, states, and across its internal offices to develop PFAS strategies that achieve environmental objectives without putting local clean water agencies in untenable positions for managing and treating wastewater, stormwater and municipal biosolids;
- Promulgate a regulation formalizing its stated position that the land application of municipal biosolids constitutes the "normal application of fertilizer" and is therefore not a "release" subject to CERCLA liability;
- Modify its regulations at 40 CFR 117.12 to ensure that CERCLA's "federally permitted release" exemption applies to discharges from public clean water agencies at least on par with those from industrial dischargers; and
- Invest in advancing PFAS destruction technologies, particularly at scale for wastewater matrices.

In short, EPA must take a holistic, whole-of-Agency approach that first focuses on source control to strategically respond to PFAS-related public health and environmental concerns in a way that does not unduly burden local communities with unprecedented legal liability and affordability challenges. Unfortunately, if finalized, the proposed hazardous substance designations would do just the opposite, as described in detail below.

## I.     As Proposed, the Designations Will Lead to a Public – Not Polluter – Pays Model for PFAS Cleanups

Congress has stated that "CERCLA has two goals: (1) to provide for clean-up if a hazardous substance is released into the environment…and (2) to hold responsible parties liable for the costs of these clean-ups."[1] However, somewhat incongruously with its second stated aim, Congress set up a liability scheme in CERCLA whereby parties "face liability without regard to fault, without

---

[1] *See, e.g.*, H.R. Rep. No. 99-253 (1985), *reprinted in* 1986 U.S.C.C.A.N. 3038, 3038.

regard to the fact that the disposal activity now giving rise to such liability occurred decades ago, and without regard to the fact that such past practices were not only lawful but also often directed, permitted, or at least known by state officials."[2]

The ubiquitous nature of PFOA and PFOS (and thousands of other PFAS substances), their past and ongoing introduction into the environment through multiple industrial, commercial, and domestic pathways, and the fact that trace or even undetectable levels may ultimately be found to trigger health concerns,[3] suggest that a truly unprecedented amount of the nation's water and land area will fall under CERCLA's contamination purview if EPA categorically designates PFOA and PFOS as CERCLA hazardous substances. As a result, the number of parties that will become subject to potential legal liability and cleanup costs despite their lack of culpability for PFAS contamination will grow exponentially. These parties include local clean water utilities, which are funded by public ratepayers, i.e., local communities.

EPA has unquestionably achieved significant environmental progress in its implementation of CERCLA's hazardous substance removal and remediation provisions. However, the concerns expressed by multiple stakeholders over the years about CERCLA's strict liability provisions – and the categories of faultless parties potentially subjected to them – will become much more acute with finalized PFOA and PFOS hazardous substance designations unless both Congress and EPA take action to exclude public clean water agencies, including publicly owned treatment works (POTWs), municipal separate storm sewer systems (MS4s) and other passive receivers of PFAS, from potential liability.

<u>CERCLA's Liability Scheme</u>

CERCLA assigns strict, retroactive, joint and several liability to four categories of "potentially responsible parties" (PRPs): (1) the current owner or operator of a facility from which there is a release of a hazardous substance; (2) the former owner or operator of a facility at the time of disposal of a hazardous substance; (3) any person who "arranged for disposal or treatment" of hazardous substances at the facility (i.e., "generators" and "brokers"); and (4) any person who accepts hazardous substances for transport to a facility that the person selected.[4]

"Disposal," in turn, is broadly defined as "the discharge, deposit, injection, dumping, spilling, leaking, pouring or placing of solid waste or hazardous waste into or onto any land or water so that

---

[2] Gray, Peter L., The Superfund Manual: A Practitioner's Guide to CERCLA Litigation (2019), pg. xii.

[3] *See, e.g.,* EPA's 2022 Interim Updated PFOA and PFOS Health Advisories, available at https://www.epa.gov/sdwa/drinking-water-health-advisories-pfoa-and-pfos#:~:text=On%20June%2015%2C%202022%2C%20EPA,and%20polyfluoroalkyl%20substances%20(PFAS) (last visited Oct. 5, 2022).

[4] CERCLA § 107(a)(1) - (4).

such a solid or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into the waters, including groundwaters."[5]

The term "release" has likewise been interpreted extremely broadly, and includes "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment" barring a few listed exclusions.[6]

<u>In Carrying Out their Responsibilities under the CWA, Public Clean Water Agencies Can Incur Substantial CERCLA Liability and Associated Costs</u>

Ironically, public clean water agencies can be exposed to extensive liability under CERCLA's "generator" PRP category by virtue of the essential public services they provide. NACWA's members own, operate and manage municipal stormwater systems; collect, treat, recycle, reuse and discharge wastewater in accordance with stringent water quality standards protective of both human health and the environment; and responsibly manage the residuals – called biosolids – that are naturally and necessarily produced as a result of the municipal wastewater treatment process in accordance with robust federal and state regulations through sustainable land application and composting, landfilling, and incineration.[7] Nationwide, more than 15,000 POTWs treat 34 billion gallons of wastewater daily.[8]

These wastewater and stormwater management and treatment activities are essential to protecting public health, enhancing water quality and sustainability, supporting local economies, and bolstering modern, vibrant communities. Nevertheless, under CERCLA, they fall under the wide umbrella of "releases" and "disposal," and therefore open public agencies up to multiple types of lawsuits and requirements discussed in further detail below.

Through their ordinary operation, clean water utilities passively receive PFAS through the wastewater effluent and stormwater flows entering their treatment plants and collection systems, which were not designed to remove these chemicals. As a result, PFAS are likely present in utility effluent and residuals. Due to CERCLA's structure, however, utilities do not have to know they were "disposing" of PFAS substances via their provision of clean water services to nevertheless be responsible for cleanups. Likewise, even if a utility was only responsible for a fraction of

---

[5] CERCLA § 101(29).

[6] CERCLA §101(22).

[7] The preamble of the proposed designations notes that wastewater treatment plants and waste management facilities are potentially impacted by the proposal.  EPA should also note that, unlike the other four categories of potentially affected parties EPA lists, wastewater treatment plants are potentially impacted because they passively receive PFOA, PFOS, and other PFAS substances via influent sources, not because they manufacture or produce PFAS substances.

[8] EPA, The Sources and Solutions: Wastewater, https://www.epa.gov/nutrientpollution/sources-and-solutions-wastewater (last visited June 1, 2022).

contamination as a result of these services, they could legally be required to pay for an entire cleanup site, particularly where other PRPs cannot be identified.[9]

Clean water utilities, whether independently or as part of a larger municipal organization, may also incur CERCLA liability by owning or operating property outside of their treatment and collection facilities. Often these properties are used as part of broader urban renewal or community redevelopment projects as well as for stormwater control and sewer overflow abatement. Considering the ubiquitous nature of PFOA and PFOS and the broad definitions of "release" and "disposal," ownership or operation of these properties alone could subject clean water utilities to CERCLA liability.[10] In other words, public clean water agencies can potentially be subject to CERCLA liability for nearly every public service they perform on behalf of their local communities.

<u>Recent Examples Demonstrate CERCLA's Costs to Utilities – and Public Ratepayers</u>

An illuminating example of the potential impacts CERCLA actions can have on clean water utilities is that of the Passaic River (NJ) CERCLA cleanup. That case, which has been ongoing for years and will likely result in billions of dollars in cleanup costs, involves dioxins – chemicals that, like PFAS, public clean water utilities do not produce or profit from, but are downstream passive receivers of. OxyChem – a chemical company that directly discharged dioxins into the water from its facilities – has brought multiple downstream public wastewater treatment plants into its own CERCLA lawsuit as PRPs, seeking to make them pay for part of the cleanup.

Despite EPA's attempts to limit their exposure, the utilities have already had to spend hundreds of thousands of public dollars each year on litigation costs alone and may well still have to cover a share of the CERCLA cleanup bill. In fact, the case led to the New Jersey state legislature writing a sewage exclusion into the New Jersey Spill Act to stop utilities from being exposed to this kind of liability under state law in the future. The U.S. Congress should take note and replicate this protection for public clean water agencies under CERCLA.

Even where courts do not hold utilities responsible for cleanup costs, the transactional costs alone of having to engage in such complex technical and legal proceedings can be staggering. Just proving that they caused *de minimis* contributions can cost local utilities hundreds of thousands of dollars,

---

[9] Utilities may also be found to have "released" or "disposed of" PFOA or PFOS from collection or treatment facilities through activities that were lawful and even required at the time.

[10] There are a number of statutory defenses against such potential liability, including those for bona fide prospective purchasers under CERCLA §§ 101(40) and 107(r)(1); certain innocent landowners meeting third-party defense requirements under CERCLA §§ 107(b)(3) and 101(35)(A); and certain local governments under specified circumstances pursuant to CERCLA § 101(20)(D). However, it is unclear how these defenses would apply to municipalities in the context of PFOA and PFOS contamination, and even where such defenses are successful, local agencies will still have to incur potentially significant litigation and consulting costs to assert them.

as was the case in the Fox River (WI) polychlorinated biphenyl (PCB) cleanup, in which local utilities were implicated despite their lack of culpability for the pollution.

If the PFOA and PFOS designations as CERCLA hazardous substances are finalized as proposed, almost every POTW and municipal stormwater system in the country could have some level of exposure to such cost recovery or contribution actions by other PRPs because, as discussed below, PFAS substances are everywhere. The money that public utilities will be forced to spend simply defending themselves in such litigation should be used for projects benefiting their local communities. CERCLA's failure to focus the imposition of costs on culpable parties could therefore cause significant harm to the public in the context of PFAS substances.

<u>Existing Statutory Exclusions Do Not Sufficiently Alleviate the Concerns of the Clean Water Community</u>

Two primary statutory exclusions exist under CERCLA that may provide some relief for clean water utilities: those for the "normal application of fertilizer" and "federally permitted releases." However, even if they are found to be applicable to municipal clean water operations, these exclusions fall far short of providing the type of relief necessary to ensure that local communities are not burdened with excessive PFOA and PFOS cleanup costs.

As noted above, one of the major sources of potential CERCLA liability for clean water agencies with respect to PFOA and PFOS is the sustainable practice of land application of biosolids, including composted biosolids.[11] By statute, "releases" triggering CERCLA cleanup liability do not include "the normal application of fertilizer."[12] In the preamble to its biosolids regulations found at 40 CFR Part 503, EPA took the position that this exclusion exempted the application of biosolids to farm fields from being considered a "release" under CERCLA even where the biosolids contain listed hazardous substances.[13]

---

[11] Biosolids land application has been consistently heralded as an incredible example of resource recovery, as well as a dynamic field of innovation and improvement related to the creation of new biosolids products and uses. Fifty-three percent of biosolids generated in the U.S. are land applied, with wastewater agencies choosing land application for the sustainability of the practice as well as its many co-benefits. Land applied biosolids are subject to stringent regulations. They can contain only limited concentrations of certain metals under the CWA Part 503 program, must meet either Class A or Class B requirements for pathogen reduction, and are subject to requirements for vector attraction reduction.

[12] CERCLA §101(22).

[13] *Standards for the Use or Disposal of Sewage Sludge*, 58 FR 9248-01 (Feb. 19, 1993) ("If the placement of sludge on land were considered to be 'the normal application of fertilizer,' that placement could not give rise to liability under CERCLA. Today's rule, as previously noted, establishes standards for sewage sludge when applied to the land for a beneficial purpose (i.e., as a fertilizer substitute or soil conditioner). Sludge placed on the land for such beneficial purpose and applied in compliance with the requirements for land application of sewage sludge provided in §§ 503.13(b) (2) and (4), § 503.14 and § 503.15 (where applicable) of the final rule today, and in accordance with accepted

However, EPA never formalized this preamble statement into a regulation, and several courts have held that the presence of hazardous substances precludes application of fertilizer from being considered "normal" under CERCLA,[14] creating a legal "gray area."

EPA can and should initiate a rulemaking prior to finalizing the proposed designations clarifying that land application of municipal biosolids constitutes "the normal application of fertilizer" under CERCLA if done in full compliance with EPA's Part 503 regulations. Such action is necessary to preserve this longstanding, well-regulated, environmentally beneficial and sustainable method of biosolids management which is vital for communities nationwide. Though even that would not shield public clean water agencies engaging in the two other primary methods of biosolids management – landfilling and incineration – from potentially significant liability borne solely out of the performance of a critical environmental and public health service.

Clean water agencies run into similar limitations with respect to the existing statutory protections for discharged effluent. Public utilities collect, manage, treat, recycle, and discharge wastewater and stormwater through POTWs and municipal stormwater systems. These discharges are governed by stringent CWA National Pollutant Discharge Elimination System (NPDES) permits.

At first blush, CERCLA appears to exclude such NPDES-permitted discharges from potential CERCLA liability and reporting requirements as "federally permitted releases."[15] However, pursuant to EPA's regulations, this exclusion only applies where (1) a permittee is in compliance with specific limits on the hazardous substance contained in the permit, or (2) the hazardous substance was identified in the permit application process and the discharges at issue are "caused by events occurring within the scope of relevant operating or treatment systems."[16]

EPA has not yet developed either technology- or water quality-based requirements for PFOA or PFOS, and NPDES permits therefore do not yet contain such limits. Likewise, while clean water agencies are beginning the process of understanding the potential presence of PFAS substances in

---

agricultural practices using appropriate application rates, which constitutes the normal application of fertilizer, does not constitute a 'release.'"). *See also*, EPA, *A Plain English Guide to the EPA Part 503 Biosolids Rule*, 52-53 (Sept. 1994).

[14] *See Sheridan v. D&D Grading, Inc.*, No. 16-CV-5085(JS)(ARL), 2019 WL 1433086, at *5 (E.D.N.Y. Mar. 29, 2019) ("Plaintiffs argue that 'the normal application of fertilizer' permits only that, and appear to argue that 'fertilizer' such as this, containing numerous hazardous substances, does not fall within the exception. The Court agrees."); *Fallowfield Dev. Corp v. Strunk*, No. CIV. A. 89-8644, 1994 WL 498316, at *1 (E.D. Pa. Sept. 2, 1994), *aff'd sub nom. Fallowfield Dev. Corp. v. Strunk*, 96 F.3d 1432 (3d Cir. 1996) (holding application of "sludge" fertilizer on cornfields "not 'normal' because it was contaminated" with lead and chlorinated solvents). *See also*, *United States v. Morrison-Quirk Grain Corp.*, No. CV88-L-720, 1990 WL 482139, at *4 (D. Neb. May 4, 1990) (application of pesticide according to manufacturer's instructions and industry practice not "normal application" where pesticide leached down into grain elevator); *City of Tulsa v. Tyson Foods, Inc.*, 258 F. Supp. 2d 1263, 1288 (N.D. Okla. 2003), *vacated pursuant to settlement* (July 16, 2003) (denying summary judgment and holding that interpretation of "normal application of fertilizer" is a fact based inquiry).

[15] CERCLA §101(10).

[16] 40 CFR 117.12.

their collection systems and influent to treatment plants, past permit applications typically did not address potential PFAS discharges from treatment processes. Moreover, although EPA's regulations clearly point to manufacturing and cooling water discharges as being "caused by events occurring within the scope of relevant operating and treatment systems," they are less clear about which municipal wastewater and stormwater discharges may qualify for such a categorization, and thus for exclusion as "federally permitted releases."[17]

The "federally permitted release" exclusion under CERCLA will therefore likely provide, at most, extremely limited coverage against CERCLA liability for discharges that are properly permitted under the NPDES program for public clean water agencies in the context of PFOA or PFOS.[18] In light of CERCLA's retroactive liability, this could leave these public clean water agencies with significant legal exposure in spite of doing all that was asked of them to protect water quality standards pursuant to the stringent NPDES program.

It is clear that under CERCLA's strict liability scheme, the public clean water community could be legally liable for the total cost of cleaning up waters and lands contaminated by PFAS simply because they perform vital public health and environmental services that put them into contact with PFAS substances already in the environment. For this reason, in addition to the clarifications noted above, EPA should support the enactment by Congress of an exclusion from CERCLA liability for PFAS releases from public clean water, stormwater, and drinking water agencies.

<u>CERCLA's Potential Disconnect Between Liability for PFAS Cleanups and Culpability for PFAS Contamination</u>

The troubling reality that local communities could be held responsible for PFAS cleanups is exacerbated by the fact that, due to CERCLA's emphasis on "releases" and "disposal" as opposed to culpability, chemical and products manufacturers that profited from the production and use of PFAS substances *could well escape any liability for cleanups under CERCLA in instances of domestic sources of contamination.*

In *Burlington Northern and Santa Fe Ry. Co. v. U.S.* (2009), the U.S. Supreme Court held that if a company makes a "useful product" but is not engaged in its ultimate "disposal," the company is not responsible for CERCLA cleanups necessitated by contamination from that product. As noted by EPA, PFAS substances such as PFOA and PFOS often enter the environment – and, in particular, public sewer systems – through the use of certain domestic products such as laundry detergents, non-stick cookware, waterproof gear, and food packaging.[19] Under the reasoning in *Burlington*

---

[17] 40 CFR 117.12(d) (clarifying application to noncontact cooling water or storm water and manufacturing).

[18] The same can also be said of the exclusion's coverage of air emissions from incinerators owned and operated by public wastewater utilities.

[19] Similar to how PFAS substances enter the public sewer system from homes through the use of PFAS-containing domestic products, they enter municipal stormwater systems by migrating into the environment from diffuse sources such as domestic fertilizers, pesticides, home and auto care products, etc.

*Northern*, while the local agencies collecting and cleaning that water could be held liable under CERCLA, the manufacturers of those products would not be unless it could be shown that they took "intentional steps to dispose"[20] of them (rather than merely profiting from their sale).

<u>Publicly Owned Treatment Works and Municipal Stormwater Systems Have Limited Control Over Significant PFAS Loadings to their Systems</u>

Importantly, the ability of clean water agencies to limit such domestic and commercial inputs into POTWs and MS4s is highly limited. The CWA's pretreatment program provides utilities with the authority to limit the introduction of substances into the public sewer system from industrial sources, but not from domestic and commercial sources. Public stormwater system operators likewise cannot control the amount or frequency of pollutants that enter their systems. This issue is exacerbated by the fact that public clean water agencies may receive PFAS compounds from multiple sources that are at or below the detection limit of the analytical methods used.

Public agencies may therefore be placed in the position of not being able to limit PFOA, PFOS, and other PFAS substances from entering their systems from myriad sources, while at the same time being the only major entities ultimately liable for cleanups necessitated by those substances. This is why, as discussed below, the clean water community strongly supports EPA undertaking robust source control measures to limit production and use of PFAS substances in commercial products, including through the utilization of its authority under statutes such as TSCA, which is consistent with the Agency's Strategic PFAS Roadmap. EPA should also work with other agencies such as the U.S. Food and Drug Administration to restrict imported goods containing PFAS substances and to address the use of PFAS in products that may be within their regulatory jurisdiction.

Clean water agencies recognize and are fully committed to the critical role they will play in mitigating PFAS contamination in the environment despite not causing it. Public utilities will be instrumental in helping to control industrial discharges and deploy management approaches, including pollutant minimization, to meet any PFAS-related water quality standards necessary to ensure the protection of human health and the environment. Through their pretreatment and stormwater management programs, clean water agencies will help shield local waterways from PFAS pollution. The public clean water community will also continue to work with EPA and state partners to implement safe, environmentally sound, and sustainable biosolids management practices.

Still, two critical facts remain. First, science and technology have not advanced to the point where we know what PFAS standards are necessary to protect human health and the environment, or how to achieve enough PFAS reduction to meet such standards. This remains a significantly limiting factor in contamination abatement, which will be hindered by the ubiquity and ongoing use of PFAS

---

[20] 556 U.S. 559 at 600.

substances in products throughout society. Comprehensive, science-based approaches to safe PFAS management and destruction are vital.

Second, CERCLA is about requiring cleanups and imposing costs for those cleanups on specified entities, and the simple truth is that, in the case of EPA's present proposal, that imposition will likely fall disproportionately on local communities served by clean water utilities rather than the parties that have benefited from the production and sale of products containing PFOA and PFOS.

## II.     The Proposed PFOA and PFOS CERCLA Hazardous Substance Designations Present Unique Challenges

Because clean water utilities have safely managed wastewater flows, stormwater runoff and biosolids for years despite the presence of small quantities of CERCLA hazardous substances, the question has been raised as to why the proposed PFOA and PFOS designations necessitate regulatory actions and liability protections for public clean water agencies that other hazardous substance designations have not. The answer is simple: the addition of PFAS substances to CERCLA's hazardous substances list is transformative.

As EPA notes, the proposed listing of PFOA and PFOS as CERCLA hazardous substances under CERCLA Section 102 is EPA's first exercise of this authority. This action by itself presents unique challenges that have not been an issue in the past with the other substances that were designated as hazardous under CERCLA by virtue of their designations as toxic or hazardous under other environmental statutes. Unlike substances designated under the primary federal air, water, and toxics statutes, very little is known about PFOA and PFOS remediation and appropriate cleanup thresholds – critical information for ensuring actions taken under CERCLA will protect public health and the environment.

Adding to that challenge is the reality that PFOA and PFOS are wholly ubiquitous, found in background levels throughout the environment and in over 99% of humans tested.[21] Moreover, PFAS substances, including PFOA and PFOS, are still being placed into commerce and are found in everyday products in homes throughout the U.S. There continues to be widespread migration of these chemicals from consumer products, households, and industries into waste streams and into the environment. These multiple points of entry and the persistent quality of PFAS substances have established ambient levels of PFAS widely present in the environment – a fact acknowledged by EPA.

Furthermore, the persistence of PFOA and PFOS, chemicals once lauded for their indestructibility, means that the chemicals will continue to wash off, wear off, disperse in air, and otherwise be

---

[21] EPA, Our Current Understanding of the Human Health and Environmental Risks of PFAS, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited June 27, 2022). In addition to PFAS in the environment, nearly all (97-99%) Americans have some quantity of PFAS in their blood—although most below levels of concern based on current public health research. See U.S. Centers for Diseases Control and Prevention, National Report on Human Exposure to Environmental Chemicals (2018); CDC, PFAS in the U.S. Population (2017).

released from household and industrial products and processes into the environment, and public wastewater and stormwater systems, for the foreseeable future. Their solubility, persistence, and multiple environmental release mechanisms from countless disparate sources make PFAS contamination a unique problem not well-suited to CERCLA's discrete cleanup actions.

Importantly, the U.S., as well as to a degree the international community, have phased out the use of PFOA and PFOS over the past two decades with notable success. Domestic production of PFOA and PFOS is now highly limited, with some exceptions for critical uses. The federal government must continue to support these phase-outs and work to reduce PFOA and PFOS entry into the U.S. marketplace. As these examples show, it is clear that source control measures can have critical benefits to human health and the environment. PFOA and PFOS have been declining in humans, attributed to these important steps. However, imports of these PFAS substances and products containing them from countries and industries not participating in such controls remain a significant concern for purposes of potential CERCLA liability, as does the liability stemming from their past use in the U.S.

### III. The Proposal Fails to Adequately Consider the Significant Potential Impacts on Public Clean Water Utilities PFOA and PFOS CERCLA Hazardous Substance Designations Could Have

In addition to the concerns outlined above, the proposed rule does not evaluate other significant impacts that the proposed hazardous substance designations will have on POTW and MS4 operations, including municipal biosolids management, water recycling, reporting, and legal considerations. These will each have direct impacts on day-to-day utility management and operational costs that cannot be ignored by the Agency.

Biosolids Management Considerations

As noted above, the work of POTWs includes responsibly managing wastewater treatment residuals – municipal biosolids – in accordance with robust federal and state regulations through land application, landfilling, and incineration. These are the only three management options currently available for the more than 7 million dry tons of municipal biosolids generated by U.S. treatment plants each year.[22]

Under CERCLA, biosolids management and disposal would likely fall under the wide umbrella of "releases" and "disposal" and therefore expose public clean water agencies to liability. Each of the

---

[22] It is estimated that ~ 7.2 m dry tons of biosolids are generated in the US annually and approximately 55% (~ 3.9 m dry tons) are applied to soil for agronomic, sylviculture or land restoration purposes; the remaining 45% are disposed of in municipal solid waste landfills, surface disposal units, or incineration facilities (USEPA, 2010), available at https://www.wef.org/globalassets/assets-wef/3---resources/topics/a-n/biosolids/technical-resources/wef-fact-sheet-microconstituents-v25-aug-2017.pdf.

three management options could therefore be significantly impacted by the proposed rule, in ways that EPA has failed to address.

Biosolids are nutrient-rich and high in organic matter, making them valuable to improve physical, chemical, and biological properties of soils. In addition to being sustainable, land application is often considered the most economical of biosolids management methods and can supplement or replace the need for commercial fertilizer. PFOA and PFOS CERCLA hazardous substance designations could severely curtail this sustainable biosolids management approach, however.

Absent more data on the levels necessary to protect human health and the environment, any amount of PFOA and PFOS in biosolids could potentially lead to liability for utilities, farmers, landowners, and any other party that could fall into one of CERCLA's PRP categories based on their land application of municipal biosolids. This chilling effect is unwarranted. Even though the levels of PFOA and PFOS found in biosolids may ultimately not be found to create health or environmental risks, the mere perception of risk and the threat of future liability as a PRP will reduce acceptance of and demand for municipal biosolids use. In the absence of risk-based information, municipal biosolids users could easily assume that the only safe level of PFAS substances in land-applied municipal biosolids is zero, thereby placing the most sustainable method of biosolids management available to municipalities across the country in serious jeopardy.

Land application of biosolids containing low levels of existing CERCLA hazardous substances has occurred safely under federal and state regulations for decades. However, the widespread presence and persistence of PFAS substances coupled with the lack of known standards for exposure, cleanup thresholds, and remediation strategies puts this vital longstanding public health practice at risk. NACWA urges EPA to move expeditiously to complete its PFAS biosolids risk assessment, which can provide clarity and guide ongoing land application where appropriate. NACWA likewise encourages EPA to develop effluent limitations guidelines and pretreatment standards as appropriate so that POTWs can leverage their CWA industrial pretreatment programs for targeted reductions in industrial loading to their systems and, ultimately, municipal biosolids. Until these assessment and control steps are completed, the designations as proposed could have unacceptable impacts on this critical biosolids management practice.

Moreover, a reduction in land application will undoubtedly lead to greater demand for landfills. This is already the outcome seen in Maine, where a ban on the land application of municipal biosolids – prior to the completion of any PFAS risk assessments and without any efforts to understand the scope of the issue (e.g., presence or concentration) or landfill capacity – is increasing disposal costs significantly. Municipalities will increasingly be left searching for alternative biosolids management options. Often this means hauling biosolids daily great distances to the few landfills that will accept them. The proposed CERCLA designations would exacerbate these issues nationwide, as well as lead to increased truck traffic and greenhouse gas emissions. [23]

---

[23] In addition to decreasing vehicle emissions from hauling practices, organic waste composting can also significantly reduce methane emissions resulting from decomposing organic waste in landfills, thereby helping to achieve critical greenhouse gas goals.

There is also no guarantee that landfills will continue to accept materials containing PFAS substances considering the proposed designations. [24]

A swing toward increased landfilling may also lead to other environmental harms and injustices. Landfills are often located in areas that are relatively socioeconomically disadvantaged. By necessitating increased landfilling, the proposed designations would likely increase disposal in these communities.

Nor is landfilling a panacea; it unfortunately does not eliminate PFAS substances permanently from the environment. Many landfills in fact send their leachate, which can contain PFAS, back to POTWs for treatment, thereby perpetuating the persistence of PFAS substances in the environment and in the systems of public clean water agencies.

The final alternative which some communities use to manage biosolids, sewage sludge incinerators (SSIs), will likewise be impacted by the proposed designations. Extensive regulation of SSIs has led many communities to move away from incineration in recent decades, resulting in a steep decline in incineration capacity. While incineration could provide an alternative biosolids management option should land application and landfilling become less available to communities – and is in fact being studied for its potential to destroy PFAS chemicals – ramping up incineration would not be quick, inexpensive, or easy to permit.

And, importantly, regardless of which biosolids management methods may remain available to municipalities in light of the proposed designations, the simple fact is that communities cannot easily shift from one method to another. Clean water utilities have invested in local and regional facilities and infrastructure to support biosolids management, and entered into contracts with haulers, farmers, and other recipients for their use and transport. Biosolids are generated 24 hours a day, 365 days of the year, by all communities – there is no way to stop the flow into the system. Communities must be given the time and tools to address the challenge without being faced with unprecedented and patently unfair CERCLA liability in the interim.

Reporting Considerations

NACWA does not expect that clean water agencies will commonly exceed the statutory default 1 pound over a 24-hour period Reportable Quantity (RQ), given the low levels of PFAS typically being found by the monitoring efforts for influent, effluent, and biosolids currently underway. However, this situation will be highly site-specific. Further, while the proposed RQ appears straightforward, EPA must clarify how reporting for PFAS releases will apply to POTWs and MS4s.

---

[24] Because the proposal likewise creates legal risks for landfills, it may also lead to Subtitle D landfills refusing to accept materials known or suspected to contain PFAS compounds. Such an outcome would not only increase the distances biosolids may have to be transported, but also further tax the limited number of Subtitle C landfills throughout the country. As such, the proposal could create situations where public clean water agencies cannot find places to bring their biosolids, or are faced with limits on tonnage that landfills can accept.

As noted throughout these comments, while clean water utilities are passive receivers of PFAS substances, they can nevertheless "release" or "dispose" of them for purposes of CERCLA through their stormwater, wastewater, and biosolids management operations. Should EPA finalize the proposed designations, it must provide POTWs and MS4s with clear guidance on how these potential releases will be evaluated and reported under CERCLA and the Emergency Planning and Community Right-to-Know Act (EPCRA).

EPA must provide information on how a public clean water agency should consider simultaneous releases from a number of different points in its treatment plants and across collection systems that might span miles. Should these releases be combined and evaluated against the reportable quantity, or should each release point be considered separately? For MS4s, should each outfall be considered separately, or is the RQ cumulative over the entire stormwater management system? Wastewater and stormwater collection and treatment systems are constructed and managed in a wide variety of ways, and EPA will need to construct clear guidance for all types of systems, including both combined sewer systems and separate sewer systems.

Additionally, because public clean water agencies do not control how much PFAS is released into their sewer and stormwater systems, determining quantities of PFAS in any given discharge from those systems is not easy. Nor can a public clean water agency anticipate "immediate" analytical results necessary to support what EPA has previously determined is timely reporting under CERCLA if a release occurs. Because of the delay in receiving analytical results necessary to determine whether an RQ release has occurred, EPA must also acknowledge that timely reporting of a PFAS-containing release under CERCLA may be separated in time from the actual release triggering the report.

EPA must also provide information for POTWs and MS4s on how to determine or estimate PFOA and PFOS quantities in discharges. Will monitoring and testing be required for every discharge, or can quantities be estimated based on previous, representative samples? How will more consistent discharges over time, such as the effluent discharge at a treatment plant, be considered compared to one-time or periodic discharges, such as a separate or combined sewer overflow? Should each biosolids land application event be considered separately, and how should PFAS quantities in biosolids be monitored and calculated? These are key considerations for public clean water agencies that will impact their compliance capabilities and the investments needed for monitoring and analysis.

EPA must also specify if and how reporting requirements for continuous releases may apply to effluent discharges from POTWs and MS4s. Although the effluent discharge at a treatment plant is likely to be stable in rate over time, the amount of PFAS in the effluent may fluctuate depending on the influent to the sewer system. Likewise, effluent discharges from MS4s can be highly variable depending on precipitation, further complicating the notion of continuous release reporting.

<u>Legal Considerations if the Proposed Listings Are Finalized</u>

The proposed listings will subject clean water agencies – and therefore the community at large – to unprecedented legal liability and costs that EPA must better assess before moving forward. EPA

acknowledges in the proposal that its "indirect impacts" include legal liability and costs stemming from cleanup actions undertaken or mandated by EPA, as well as those undertaken voluntarily by other parties. However, in addition to providing at best a cursory analysis of what such costs could entail, the proposal also blatantly mischaracterizes their application to clean water utilities.

Specifically, the proposal states that "EPA and delegated agencies could recover PFOA and PFOS cleanup costs from potentially responsible parties, to facilitate having polluters and other potentially responsible parties, <u>rather than taxpayers</u>,[25] pay for these cleanups."[26] As explained in detail in other sections of these comments, however, by virtue of their activities related to protecting human health and the environment through the management and treatment of stormwater and wastewater, local clean water agencies fall under CERCLA's definition of "potentially responsible parties." As their name would suggest, these public clean water agencies are owned and funded by the public – the very taxpayers the proposal states will <u>not</u> be responsible for such cleanup costs.[27]

Any imposition of legal liability and cleanup costs on public clean water agencies could therefore cause significant affordability challenges for communities throughout the country. It is imperative that EPA transparently and comprehensively assess the potential legal implications of the proposed listings on public wastewater and stormwater utilities. Unfortunately, those implications could be staggering.

## IV. The Economic Analysis Fails to Consider the Significant Costs the Proposed Designations Will Impose on Public Clean Water Agencies

The proposal fails to include an assessment of the potential remediation costs for PFOA and PFOS cleanups which, as discussed above, could be passed on to local communities and public clean water utility ratepayers. EPA acknowledges that any costs stemming from eventual PFOA and PFOS cleanups are impossible to quantify due to "numerous, significant uncertainties" surrounding issues such as "how many sites have PFOA or PFOS contamination at a level that warrants a cleanup action; the extent and type of PFOA and PFOS contamination; the incremental cost of assessing and

---

[25] NACWA notes that, on its face, this statement is simply untrue. While EPA may have a policy against bringing CERCLA actions against residential property owners, they can certainly be PRPs under CERCLA. *See* the U.S. Supreme Court's 2020 decision in *Atlantic Richfield v. Christian*, 140 S. Ct. 1335 (2020), in which the Court held that homeowners whose properties were impacted by contamination from a nearby Superfund site were PRPs. While the Court indicated that the homeowners were likely eligible for either an innocent landowner or third-party defense, they nevertheless did meet the statutory definitions for PRPs. There is nothing to say that a homeowner could not be liable for releases of PFOA or PFOS they cause on their own property (or that they send to a landfill, public sewer system, etc.).

[26] 87 *Fed. Reg.* 54415 at 54418 (emphasis added).

[27] The public itself funds the budget for clean water agencies through rates and fees charged to them as utility customers, and in some instances clean water agencies receive funding through local governments, which in turn generate that revenue through activities such as the collection of local property taxes.

remediating the PFOA and/or PFOS contamination; and the cleanup level required for these substances."[28]

Put another way, EPA is essentially admitting that it is very difficult to estimate the costs of remediating substances that may be found in trace quantities nearly everywhere but that, at present, no one knows how to remediate, or even to what levels they should be remediated in order to protect human health in the environment. While this is undeniably true, should EPA nevertheless determine that it is appropriate to finalize the designations, it must fill in these sizable data gaps. EPA cannot excuse itself of its duty to assess what the impacts of its actions will be; local public clean water agencies will have no such luxury.

Importantly, without an assessment of potential removal and remediation costs, it is impossible for the regulated community to determine the scope of its potential legal liabilities stemming from the proposed designations. CERCLA Section 121(a) generally requires that removal and remediation actions necessitated under CERCLA achieve acceptable levels of exposure that would be protective of human health and the environment. While cleanup requirements can vary widely from site to site, CERCLA Section 121(d) broadly requires that cleanups comply with applicable, relevant, and appropriate requirements (ARARs), which typically include federal and state standards, requirements, or other criteria related to the hazardous substances present at the site.

If EPA moves to finalize the proposed hazardous substance designations for PFOA and PFOS despite the current absence of such standards, requirements, and criteria, it should, at a minimum, acknowledge the significant and unpredictable legal risks those designations will expose municipalities to.

<u>The Agency's Cursory Examination of the Legal Liability the Proposal Could Impose on Public Agencies Is Inadequate</u>

CERCLA imposes potential strict, joint and several, and retroactive legal liability on parties responsible for releases of hazardous substances. While EPA's proposal acknowledges this scheme in passing, a closer examination of its potential ramifications for clean water agencies is warranted.

As the proposal notes, EPA may list sites on the National Priorities List (NPL) and seek to have PRPs, including public clean water utilities, reimburse the government for the cleanup activities at those sites. Pursuant to CERCLA Section 106, EPA may also exercise its "abatement" authority to compel responsible parties to themselves respond to hazardous substance releases that may endanger public health and welfare or the environment. Section 106 allows EPA to avoid depleting its Superfund resources to finance cleanups and instead require PRPs to pay for the cleanups from the beginning.

The proposal fails to acknowledge, however, that the designations would very likely lead to the reopening of existing NPL site cleanup plans for purposes of adding PFOS and PFOA remediation or removal responses. Considering the ubiquity of PFAS chemicals, as well as the lack of knowledge

---

[28] 87 *Fed. Reg.* at 54423.

concerning how or to what levels they may need to be remediated, the costs resulting from such reopeners alone could be staggering, to say nothing of the costs associated with new NPL listings based on PFOA or PFOS contamination.

EPA has indicated that, as a general matter, it does not intend to seek significant costs from public clean water agencies related to PFOA and PFOS response actions. NACWA appreciates and encourages EPA's efforts aimed at limiting the CERCLA-related costs imposed on public utilities due solely to their provision of clean water services. However, it is important for EPA to acknowledge that, should the proposed designations of PFOA and PFOS as CERCLA hazardous substances be finalized, the Agency will have limited authority to shield local agencies from the potentially massive amounts of liability stemming from those designations.

In the case of NPL-listed sites, it is true that EPA has the authority to enter into settlement agreements with clean water utilities (which must be approved by a court) limiting their financial responsibility for a cleanup and precluding other PRPs from bringing contribution claims against them for that cleanup.[29] But even in such instances, utilities could – and often do – still spend significant amounts of public dollars during the years (if not decades) it can take to litigate such suits, including costs related to proving their own *de minimis* contributions or other defenses against liability. Such costs will be difficult for any utility to bear, but for smaller utilities or those serving disadvantaged communities, they can preclude spending on vital infrastructure improvements or community revitalization efforts. EPA's economic analysis for the rule does not take into consideration these potentially significant costs on local governments.

Moreover, while the proposal focuses on NPL sites, another major source of liability clean water utilities throughout the country will face should PFOA, PFOS, or any other PFAS substance be listed as a CERCLA hazardous substance are cost recovery actions for cleanups not compelled by EPA. CERCLA Section 107(a) enables private parties to recover the costs of cleaning up a contaminated site from liable parties if the costs are "necessary" and the cleanup is "consistent with the national contingency plan." Notably, the liability imposed on PRPs under Section 107(a) is joint and several, meaning that any party (including one that is itself a PRP) voluntarily undertaking a cleanup effort can seek to recover all the expenses incurred from any single other PRP. And *any* person who incurs qualifying cleanup costs can avail themselves of this remedy.

Given the negative public perception surrounding lands that are contaminated with designated hazardous substances, as well as the sheer volume of land that may be found to contain PFOA and PFOS, it is very likely that any final designations will spur private cleanup actions. However, because such cleanups must be in substantial compliance with potentially applicable requirements and of "CERCLA quality," as with potential liability for NPL cleanups, it is impossible for municipalities to predict with any accuracy the potential scope of liability Section 107(a) could impose in the context

---

[29] Under CERCLA Section 113, parties that are settling or have settled their own liability with the government can bring contribution claims against other PRPs. Clean water utilities can, and often do, get brought into such contribution actions by other PRPs. Unless and until a successful settlement agreement is entered into between EPA and a clean water utility that precludes other contribution claims, a clean water utility will have the same potential liability in such suits as all other PRPs.

of PFAS cleanups absent a much more robust analysis on the part of EPA concerning remediation and removal measures.

It should also be noted that CERCLA Section 114(a) clarifies that CERCLA does not "preempt any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." Many states have their own CERCLA-equivalent laws, and some of those state laws contain provisions that will be automatically triggered if PFOA or PFOS become designated as hazardous substances under CERCLA. Likewise, many state programs include voluntary cleanup programs. A hazardous designation for PFOA and PFOS would likely also result in the reopening of many of these previously voluntarily remediated sites which, in light of the designations, may no longer meet the state program requirements for approval and liability releases. While the proposal fails to discuss these impacts of the proposed designations, clean water utilities in states with such laws can face compounded liability.

<u>EPA's Position that it is Statutorily Precluded from Considering Costs is Flawed; the Agency Must Consider the Costs of the Proposed Designations</u>

The proposal states that CERCLA Section 102(a) precludes EPA from taking costs into account in designating hazardous substances. According to EPA, by establishing the standard for a "hazardous substance" designation as a finding by EPA that a substance "may present substantial danger to the public health or welfare or the environment," Congress omitted consideration of cost as either a required or a permissible factor. The Agency also claims that "as a matter of common sense" a hazardous determination "does not naturally lend itself to considerations of cost," but rather only "scientific and technical considerations." Both assertions lack merit.

Section 706(2)(A) of the Administrative Procedure Act (APA) instructs courts reviewing regulations, including those promulgated by EPA, to invalidate actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." The proposed designations could lead to huge swaths of the American landscape being legally designated as "contaminated" and subject to remediation standards no one yet knows how to determine, measure or achieve. To use the Agency's parlance, "as a matter of common sense," EPA's failure to consider the costs and associated impacts to the public of such an action is both arbitrary and capricious.[30] EPA's position is not grounded in the tenets of statutory construction or other well-established legal doctrines; to the contrary, the Agency's decision to bury its head in the sand and cherry-pick the data it considers while ignoring the true ramifications of its actions is the very definition of arbitrary and capricious action.

Surely, absent an express mandate from Congress, an Agency cannot be legally precluded from considering whether its actions will turn every individual running a nonstick pan or waterproof jacket through the wash into a CERCLA PRP? Whether land values throughout the U.S. will be negatively impacted by a newfound "contaminated" label? Whether low-income communities will

---

[30] EPA's position also appears to be at odds with the Office of Management and Budget's determination that the rulemaking is economically significant.

have to pay higher water, sewer and stormwater rates because their local clean water utility will be forced to finance downstream cleanups it did not cause?[31]

Even assuming for the sake of argument that EPA were statutorily precluded from considering monetary costs when making a hazardous determination, why do the "scientific and technical" considerations the Agency acknowledges it can look to not include the current lack of validated methods for PFAS disposal and destruction, or the lack of scientific determinations concerning the levels of PFOA and PFOS in air, soils, and water protective of human health and the environment? Removal and remediation plans lie at the heart of CERCLA; it is unclear to NACWA how the Agency can deem their costs and feasibility irrelevant in the present action.

NACWA also cannot help but point out the irony of the position that the Agency cannot consider the costs to certain entities of a rulemaking being promulgated under CERCLA – a statute with the literal purpose of ensuring that environmental cleanup costs are borne by the appropriate parties.

EPA's arguments concerning relevant Supreme Court caselaw likewise fall flat. The Agency likens CERCLA Section 102(a) to Clean Air Act Section 109(b)(1), which governs EPA's setting of national ambient air quality standards (NAAQS). In *Whitman v. American Trucking*, the Court held that costs could not be considered where the statute instructs EPA to base NAAQS on health effects articulated in certain technical documents, "allowing an adequate margin of safety," and ensuring that the standards are "requisite to protect the public health."

By contrast, the Agency argues that the Supreme Court's decision in *Michigan v. EPA* actually requiring the Agency to consider costs when determining whether to regulate air toxic emissions from power plants where the statute mandates such regulation if EPA finds it is "appropriate and necessary" is *not* applicable to CERCLA 102(a)'s language. As EPA notes, in *Michigan v. EPA*, "the Supreme Court explained that 'appropriate' is a broad term that 'includes consideration of all the relevant factors' and when read in the context of CAA section 112(n)(1)(A) requires 'at least some attention to costs.'"

A closer inspection of the relevant text of CERCLA 102(a) reveals that the provision is, in fact, much more akin to that considered by the Court in *Michigan v. EPA,* where consideration of costs was deemed mandatory, rather than the one at issue in *Whitman v. American Trucking.*

In relevant part, CERCLA Section 102(a) states that EPA "shall promulgate and revise <u>as may be appropriate</u> regulations designating as hazardous…substances which, when released into the environment may present substantial danger to the public health <u>or welfare</u> or the environment…" (emphasis added). Just as the air toxics provision determined by the Court in *Michigan v. EPA* to require a consideration of costs, CERCLA Section 102(a) expressly instructs EPA to promulgate

---

[31] NACWA notes that Congress proactively addressed similar concerns when it enacted the exclusion of petroleum from CERCLA's hazardous substance definition.  Absent that exclusion, every home and tailpipe in America could come under CERCLA's purview, and administration would be impossible.  Rather than applying CERCLA, EPA instead addresses petroleum in ways that focus on the primary sources of the pollution, such as federal and state <u>requirements and cleanup programs</u> for petroleum underground storage tanks.

regulations where it finds doing so "appropriate." The broader statutory context of ensuring that responsible parties pay for environmental damages and Section 102(a)'s reference to broadly protecting "public welfare" likewise support consideration of costs.

EPA is proposing for the first time to designate a substance as "hazardous" under CERCLA 102(a) that is not a listed CWA hazardous substance or toxic pollutant, Clean Air Act hazardous air pollutant, Resource Conservation and Recovery Act hazardous waste, or TSCA imminently hazardous substance. As EPA itself notes, substances designated under the primary federal air, water, waste and toxics laws are automatically designated under CERCLA, which itself is a statute dedicated to funding cleanups based primarily on standards set by other environmental statutes. Congress' instruction to EPA to utilize CERCLA to make a substantive determination concerning the hazardous nature of a substance when it has not seen fit to do so under any of the other environmental statutes it implements *only* where it deems it "appropriate" to do so should, like the provision in *Michigan,* be read to entail consideration of all relevant factors including costs.

Additionally, as in *Michigan v. EPA*, the question posed to the Agency in CERCLA Section 102(a) is one of whether to regulate at all. By contrast, in *Whitman v. American Trucking*, the Court was not addressing a provision from Congress leaving discretion to the Agency on whether or not to regulate; rather, the provision at issue presumed Agency action and instead spoke to the "how" of setting NAAQS. Costs are inherently relevant to the question of the appropriateness of a regulation, even where they may not be to the issue of which requirements should be included in that regulation.

EPA must fully consider the ramifications – including costs – of the proposed hazardous substance designations on all stakeholders. As these comments point out, such potential implications for local public clean water agencies are, in a word, significant. It is incumbent upon EPA from a legal, policy, and public health standpoint to fully analyze and consider what the proposed listings will mean for the clean water community, and to utilize its full statutory authority to mitigate any potential negative impacts to the provision of safe, affordable clean water for communities across the country.

## V.    Actions Needed Prior to the Designation of PFOA and PFOS As CERCLA Hazardous Substances

Public clean water agencies stand ready to work with EPA and the states to address concerns related to PFAS substances, including PFOA and PFOS. However, given the existing significant gaps in the scientific record, lack of existing technology to safely manage or destroy PFAS, and constant and ubiquitous introduction of PFAS substances into the environment, the proposed designations of PFOA and PFOS as CERCLA hazardous substances could have significant negative ramifications for public clean water utilities and the communities they serve. *Prior to moving forward with the proposal, EPA must take several actions which would go far towards the desired "polluter pays" approach by mitigating these potential impacts and the affordability challenges they could lead to.*

First, EPA must utilize its existing authority, including that found under TSCA, to stem the introduction of PFAS substances, including PFOA and PFOS, into commerce and ultimately the

environment by both industrial and domestic sources. Any mitigation and remediation efforts undertaken pursuant to CERCLA would be substantially hampered if widespread use of domestic products and industrial processes continue to release PFAS substances into our air, water, and soils.

Clean water utilities share EPA's desire to ensure the appropriate cleanup of sites contaminated with PFAS substances, but the Agency must turn off the source of the pollution before downstream cleanups can have any real environmental impact. Robust source control measures, including those limiting the domestic production and use of PFAS substances in commercial products, are a necessary precursor to action under CERCLA. EPA must also continue to invest its resources in researching and developing safe and efficient methods for managing and destroying PFAS substances.

As noted above, EPA must also undertake a much more robust analysis of the potential costs – including cleanup costs – that will be incurred by public clean water agencies because of the proposed designations.  It is essential that EPA take a holistic and fully informed approach to PFAS regulation.

At present, initiatives from EPA's various offices have the potential to curtail every existing method of biosolids management available to wastewater utilities, including promising alternative technologies such as pyrolysis. EPA must work with the clean water community, states, and its own internal offices to develop PFAS strategies that achieve environmental objectives without putting local clean water agencies in untenable positions. EPA has talked about a "whole of Agency approach" to dealing with PFAS, but so far that has not been borne out in EPA's proposed regulations, as key program offices are not working with others to understand the potential unintended consequences of regulatory actions. The proverbial buck cannot simply be passed to local communities left with few if any acceptable options.

EPA must also update its regulations implementing CERCLA to provide as much relief as possible to clean water agencies prior to designating PFAS substances as hazardous. Specifically, EPA should promulgate a regulation formalizing the position it took in the preamble to the Part 503 biosolids regulations that the land application of municipal biosolids – including those containing CERCLA hazardous substances – constitutes the normal application of fertilizer and is therefore not a "release" subject to CERCLA liability. Such a regulation is necessary to preserve the critical, sustainable, and environmentally beneficial practice of biosolids land application. Should EPA determine as part of its ongoing biosolids evaluation process that PFOA and PFOS measures are necessary, EPA should implement them through changes to the Part 503 regulations.

EPA should also update its regulations at 40 CFR 117.12 to clarify that discharges made pursuant to an NPDES permit from POTWs and municipal stormwater systems are "caused by events occurring within the scope of relevant operating or treatment systems" for purposes of CERCLA. This language is necessary to ensure that CERCLA's "federally permitted release" exemption applies to discharges from public clean water agencies at least on par with those from industrial dischargers.

Public clean water agencies also support EPA's stated plan to develop technology-based limits for various PFAS substances under the CWA and, as necessary, recommended water quality criteria.

These time-tested, science-based approaches to pollution control have led to considerable environmental achievements over the last 50 years of CWA implementation and should be EPA's primary method of addressing potential impacts to surface water resources from PFAS substances.

Finally, EPA should actively support the adoption by Congress of an exclusion for clean water utilities from CERCLA's strict liability scheme for potential "releases" or "disposal" of PFAS substances. The statutory exclusion of public wastewater and stormwater utilities from CERCLA's categories of PRPs is necessary to protect the public, including low-income and overburdened communities, from having to foot the bill for PFAS cleanups. Clean water utilities will play an important role in addressing PFAS substances, but local communities should not have to bear the costs of cleaning up pollution they did not cause and were themselves harmed by.

NACWA appreciates the opportunity to provide input on the proposed PFOA and PFOS hazardous substance designations. Please contact NACWA's Chief Advocacy & Policy Officer, Nathan Gardner-Andrews, at ngardner-andrews@nacwa.org with any questions concerning these comments.

Sincerely,

Adam Krantz
Chief Executive Officer