ORAL ARGUMENT SCHEDULED FOR JANUARY 20, 2026

No. 24-1193
(consolidated with Nos. 24-1261, 24-1266, 24-1271, 24-1272)

# In the United States Court of Appeals
# For the District of Columbia

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA et al.,
Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY AND LEE M. ZELDIN,
IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
Respondents, and

CLEAN CAPE FEAR, et al.,
Respondent-Intervenors

On Petition for Review of Final Action by the United
States Environmental Protection Agency –
89 Fed. Reg. 39,124 (May 8, 2024)

## OPENING BRIEF FOR PETITIONERS

(Names and addresses of counsel appear inside cover)

Andrew R. Varcoe
Stephanie A. Maloney
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
avarcoe@USChamber.com
smaloney@USChamber.com

*Counsel for Petitioner Chamber of
Commerce of the United States of
America*

Leah Pilconis
ASSOCIATED GENERAL CONTRACTORS
OF AMERICA, INC.
2111 Wilson Blvd., Suite 1000
Arlington, VA 22201
(703) 837-5332
Leah.pilconis@agc.org

*Counsel for Petitioner Associated
General Contractors of America, Inc.*

Aleacia Chinkhota
AMERICAN CHEMISTRY COUNCIL
Assistant General Counsel, Legal
Services
700 2nd Street, NE
Washington, DC 20002
202-249-6131
*Aleacia_Chinkhota@
americanchemsitry.com*

*Counsel for Petitioner American
Chemistry Council*

Elbert Lin
   *Counsel of Record*
Paul T. Nyffeler
David M. Parker
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
(804) 788-8200
elin@huntonAK.com
pnyffeler@huntonAK.com
dparker@huntonAK.com

Matthew Z. Leopold
HOLLAND & KNIGHT LLP
800 17th St. NW,
Washington, DC 20006
(202) 955-3000
mleopold@hklaw.com

*Counsel for Petitioners Chamber of
Commerce of the United States of
America, Associated General Contractors
of America, Inc., National Waste &
Recycling Association, and American
Chemistry Council*

Christopher L. Bell
D.C. Bar # 412857
GREENBERG TAURIG, LLP
1000 Louisiana Street, Suite 6700
Houston, TX 77002
(713) 374-3556
bellc@gtlaw.com

*Counsel for Petitioner Institute of Scrap
Recycling Industries, Inc., d/b/a Recycled
Materials Association*

Susan Parker Bodine
EARTH & WATER LAW LLC
1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004

*Counsel for Petitioner American
Forest & Paper Association*

Heather Lyons
  *General Counsel*
RECYCLED MATERIALS ASSOCIATION
1250 H Street NW, Suite 400
Washington, DC 20005
(202) 662-8500
hlyons@recycledmaterials.org
randrechak@recycledmaterials.org

*Counsel for Petitioner Institute of Scrap
Recycling Industries, Inc.*

Richard S. Moskowitz
Tyler Kubik
AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS
1800 M Street, NW
Suite 900 North
Washington, DC 20036
(202) 457-0480 (telephone)
(202) 457-0486 (facsimile)
rmoskowitz@afpm.org
tkubik@afpm.org

*Counsel for Petitioner American Fuel
& Petrochemical Manufacturers*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners Chamber of Commerce of the United States of America, Associated General Contractors of America, Inc., National Waste & Recycling Association, Institute of Scrap Recycling Industries, Inc., doing business as the Recycled Materials Association, American Forest & Paper Association, American Chemistry Council, and American Fuel & Petrochemical Manufacturers hereby certify the following as to the parties, rulings, and related proceedings in this case:

## I.    **Parties and amici**

Petitioners are the Chamber of Commerce of the United States of America (Chamber), Associated General Contractors of America, Inc. (AGC), National Waste & Recycling Association (NWRA), Institute of Scrap Recycling Industries, doing business as the Recycled Materials Association (ReMA), American Forest & Paper Association (AF&PA), American Chemistry Council (ACC), and American Fuel & Petrochemical Manufacturers (AFPM).

Respondents are the United States Environmental Protection Agency (EPA) and Lee M. Zeldin, in his official capacity as Administrator, United States Environmental Protection Agency.

i

Intervenors in support of Respondents are Clean Cape Fear, Environmental Justice Task Force, Fight for Zero, Merrimack Citizens for Clean Water, and Natural Resources Defense Council.

No other parties have appeared in this Court, and there were no proceedings in any district court. *See* Fed. R. Civ. P. 15(a), D.C. Cir. Rule 15(a).

## II.    Ruling under review

The ruling under review is EPA's Final Rule entitled "Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances," 89 Fed. Reg. 39,124 (May 8, 2024) (JA001–69).

## III.    Related cases

This case has not previously been before this Court or any other court.  There are no "other related cases" as defined by Local Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the Chamber of Commerce of the United States of America (Chamber) states that its general nature and purpose is to operate as the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.

The Chamber states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

The Associated General Contractors of America, Inc. (AGC) states that its general nature and purpose is to operate as the nation's largest and most diverse trade association in the commercial construction industry, now representing more than 28,000 member companies that include general contractors, specialty contractors, and service providers and suppliers to the industry through a nationwide network of chapters in all 50 states, the District of Columbia, and Puerto Rico. AGC members are engaged in building, heavy, civil, industrial, utility, and other construction for both public and private property owners and developers. AGC works to ensure the

iii

continued success of the commercial construction industry by advocating for federal, state, and local measures that support the industry; providing education and training for member firms; and connecting member firms with resources needed to be successful businesses and responsible corporate citizens. AGC represents the interest of its members in matters before Congress, the Executive Branch and the courts.

AGC states that it is registered as a 501(c)(6) organization. AGC has no parent corporation, but it does have two subsidiary corporations, Project Modeling, LLC and ConsensusDocs, LLC. No publicly traded company owns 10% or more of AGC or 10% or more of AGC's subsidiaries.

The National Waste & Recycling Association (NWRA) states that its general nature and purpose is to operate as a trade association representing the private sector recycling and waste industry. NWRA members operate in all fifty states and the District of Columbia. NWRA represents the interests of its members in matters before Congress, the Executive Branch, and the courts.

NWRA states that it is a non-profit, tax-exempt organization incorporated in the State of Illinois. NWRA has no parent corporation, and no publicly held company has 10% or greater ownership in the NWRA.

The Institute of Scrap Recycling Industries, Inc., doing business as the Recycled Materials Association, (ReMA) states that it is a trade association

iv

representing over 1,400 companies employing over 500,000 people engaged in the recycled industry in the United States (contributing over $117 billion annually to the U.S. economy), as well as around the globe, that process, broker, and consume over 130 million tons of recycled materials annually, including metals, vehicles (approximately 15 million annually), appliances, paper, plastics, glass, electronics, and textiles. ReMA advocates for environmentally responsible and economically sustainable recycling, which is a critical first link in the manufacturing value chain that decreases the need to deplete natural resources or rely on foreign sources for valuable raw materials necessary to a broad range of industrial and consumer economic sectors. ReMA states that it is a non-profit, tax-exempt organization incorporated in Delaware. ReMA has no parent corporation and no publicly held company has 10% or greater ownership in ReMA.

The American Forest and Paper Association (AF&PA) states that it serves to advance U.S. paper and wood products manufacturers through fact-based public policy and marketplace advocacy. The forest products industry is circular by nature. AF&PA member companies make essential products from renewable and recyclable resources, generate renewable bioenergy and are committed to continuous improvement through the industry's sustainability initiative — Better Practices, Better Planet 2030: Sustainable Products for a Sustainable Future. The forest products industry accounts for approximately 5% of the total U.S. manufacturing

GDP, manufactures about $350 billion in products annually and employs about 925,000 people. The industry meets a payroll of about $65 billion annually and is among the top 10 manufacturing sector employers in 43 states. No parent corporation or publicly held company has a 10% or greater ownership interest in AF&PA.

The American Chemistry Council (ACC) states that it represents the leading companies engaged in the business of chemistry. ACC members apply the science of chemistry to make innovative products and services that make people's lives better, healthier and safer. ACC is committed to improved environmental, health and safety performance through Responsible Care®; common sense advocacy designed to address major public policy issues; and health and environmental research and product testing. The business of chemistry is a $633 billion enterprise and a key element of the nation's economy. It is among the largest exporters in the nation, accounting for ten percent of all U.S. goods exported. ACC states that it is a "trade association" for purposes of Circuit Rule 26.1(b). ACC has no parent corporation, and no publicly held company has 10 percent or greater ownership in ACC.

The American Fuel & Petrochemical Manufacturers (AFPM) states that it is a national trade association whose members comprise most U.S. refining and petrochemical manufacturing capacity. AFPM has no parent companies, and no

publicly held company has a 10% or greater ownership interest in AFPM. AFPM is a "trade association" under Circuit Rule 26.1 and operates for the purpose of promoting the general commercial, professional, legislative, or other interests of its members.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF CONTENTS........................................................ viii

TABLE OF AUTHORITIES ................................................... xi

GLOSSARY OF ACRONYMS AND ABBREVIATIONS............................... xvii

INTRODUCTION ............................................................. 1

JURISDICTION............................................................... 4

STATEMENT OF ISSUES ..................................................... 4

STATUTES AND REGULATIONS................................................ 5

STATEMENT OF THE CASE.................................................... 5

    A.    Congress enacts CERCLA, imposing broad liability for hazardous substances.......................................... 5

        1.    CERCLA authorizes EPA to designate hazardous substances.................................................. 6

        2.    CERCLA grants EPA and others broad authority to clean up releases of hazardous substances. ....................... 6

        3.    Liability under CERCLA is harsh. ........................... 9

    B.    EPA discarded an interpretation that would have established defined criteria for designating hazardous substances and also considered costs.................................................. 10

    C.    EPA proposes to designate PFOA and PFOS as CERCLA hazardous substances........................................ 11

    D.    EPA publishes the Final Rule............................... 14

        1.    EPA adopts the proposed standard for "may present substantial danger."...................................... 14

2.   EPA declines to decide whether it needs to consider costs. ................................................................. 16

3.   EPA introduces a new totality of the circumstances analysis that includes costs. ........................... 17

SUMMARY OF THE ARGUMENT ...................................................... 20

STANDARD OF REVIEW ...................................................................... 23

STANDING ............................................................................................. 24

ARGUMENT ........................................................................................... 28

I.   EPA misinterprets the term "may present substantial danger." ......... 28

A.   EPA's interpretation has no fixed boundaries. ........................ 28

B.   EPA's interpretation is inconsistent with the statutory structure. ................................................................................. 32

C.   EPA's interpretation of Section 102 is inconsistent with prior agency interpretations. ................................................. 34

II.   EPA's evaluation of costs was fatally flawed. ................................... 37

A.   EPA was required to consider costs. ....................................... 38

B.   EPA violated the APA's notice-and-comment requirement by failing to disclose its cost-benefit analysis. ....................... 41

C.   The limited cost assessment that EPA did undertake was arbitrary and capricious. ........................................................ 48

1.   EPA's assessment of cleanup costs at NPL sites was arbitrary and capricious. ................................. 50

2.   EPA's assessment of costs at non-NPL sites was arbitrary and capricious. ................................. 53

3.   EPA's decision to ignore cleanup costs at federal sites was arbitrary and capricious. ................................. 56

ix

4.  EPA ignored significant categories of costs identified by commenters, and failed to adequately respond to these comments........................................ 59

5.  EPA's assessment of benefits was arbitrary and capricious too.................................................. 64

D.  EPA compounded these errors by violating the RFA.............. 65

III.  EPA's decision to designate PFOA and PFOS without assessing and understanding the widespread consequences was arbitrary and capricious.................................................... 67

IV.  The proper remedy is vacatur........................................... 73

CONCLUSION.......................................................................... 74

CERTIFICATE OF COMPLIANCE..................................................... 82

CERTIFICATE OF SERVICE ......................................................... 82

ADDENDUM A ......................................................................

ADDENDUM B.......................................................................

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Cmty. Voice v. EPA*,
   997 F.3d 983 (9th Cir. 2021) ................................................................. 68

*ACA Int'l v. Fed. Commc'ns Comm'n*,
   885 F.3d 687 (D.C. Cir. 2018) ............................................................ 29

*Alon Ref. Krotz Springs, Inc. v. EPA*,
   936 F.3d 628 (D.C. Cir. 2019) ............................................................ 40

*Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.*,
   939 F.2d 975 (D.C. Cir. 1991) ............................................................ 48

*Arizona v. EPA*,
   77 F.4th 1126 (D.C. Cir. 2023) .......................................................... 25

*Banner Health v. Price*,
   867 F.3d 1323 (D.C. Cir. 2017) .......................................................... 43

*Burlington N. & Santa Fe Ry. Co. v. United States*,
   556 U.S. 599 (2009) ............................................................................ 9

*Business Roundtable v. SEC*,
   647 F. 3d 1144 (D.C. Cir. 2011) ............................................ 53, 59, 61

*Comm. for Effective Cellular Rules v. FCC*,
   53 F.3d 1309 (D.C. Cir. 1995) ............................................................ 25

*Connecticut Light & Power Co. v. Nuclear Regul. Comm'n*,
   673 F.2d 525 (D.C. Cir. 1982) ..................................................... 42, 43

*Ctr. for Auto Safety v. Fed. Highway Admin.*,
   956 F.2d 309 (D.C. Cir. 1992) ............................................................ 59

*Ctr. for Biological Diversity v. EPA*,
    749 F.3d 1079 (D.C. Cir. 2014) ................................................................. 68

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*,
    No. 22-5295, 2024 WL 3083338 (D.C. Cir. June 21, 2024) .............................. 41

*FCC v. Fox TV Stations, Inc.*,
    566 U.S. 502 (2009) ................................................................................. 35

*Gen. Elec. Co. v. Jackson*,
    610 F.3d 110 (D.C. Cir. 2010) .............................................................. 7, 8

*GPA Midstream Ass'n v. United States Dep't of Transp.*,
    67 F.4th 1188 (D.C. Cir. 2023) ......................................................... 45, 47

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ................................................................................. 32

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
    448 U.S. 607 (1980) ............................................................................ 30, 32

*Int'l Fabricare Inst. v. U.S. EPA*,
    972 F.2d 384 (D.C. Cir. 1992) ................................................................. 26

*J.D. v. Azar*,
    925 F.3d 1291 (D.C. Cir. 2019) ............................................................... 24

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394 (1928) ................................................................................. 32

*Lake Carriers' Ass'n v. EPA*,
    652 F.3d 1 (D.C. Cir. 2011) ..................................................................... 65

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024)...................................................... 20, 28, 29, 30, 35

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................. 25

xii

*Maine Lobstermen's Ass'n, et al. v. Nat'l Marine Fisheries Service, et al.*,
   70 F.4th 582 (D.C. Cir. 2023) ............................................................. 31

*Mead Corp. v. Browner*,
   100 F.3d 152 (D.C. Cir. 1996) ............................................................. 26

*Michigan v. EPA*,
   576 U.S. 743 (2015) ............................................................. 21, 37, 39, 40

*Mid-Tex Elec. Co-op., Inc. v. FERC*,
   773 F.2d 327 (D.C. Cir. 1985) ............................................................. 65, 66

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................. 24

*Nat. Res. Def. Council, Inc. v. Herrington*,
   768 F.2d 1355 (D.C. Cir. 1985) ............................................................. 68

*Nat. Res. Def. Council v. Wheeler*,
   955 F.3d 68 (D.C. Cir. 2020) ............................................................. 47

*Nat'l Ass'n of Home Builders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012) ............................................................. 43

*New Jersey Conservation Found. v. FERC*,
   111 F.4th 42 (D.C. Cir. 2024) ............................................................. 73

*Ohio v. EPA*,
   603 U.S. 279 (2024) ............................................................. 24, 59, 64

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
   494 F.3d 188 (D.C. Cir. 2007) ............................................................. 42, 44, 45, 47

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) ............................................................. 24

*Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A.*,
   705 F.2d 506 (D.C. Cir. 1983) ............................................................. 48

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ............................................................... 32

*Thompson v. Clark*,
    741 F.2d 401 (D.C. Cir. 1984) ............................................ 49

*U.S. Sugar Corp. v. EPA*,
    113 F.4th 984 (D.C. Cir. 2024) ...................................... 23, 28

*United States v. Alcan Alum. Corp.*,
    990 F.2d 711 (2d Cir. 1993) .................................................. 9

*United States v. Monsanto Co.*,
    858 F.2d 160 (4th Cir. 1988) ................................................ 9

*United States v. Ne. Pharm. & Chem Co.*,
    810 F.2d 726 (8th Cir. 1986) ................................................ 5

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) ............................................................ 39

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
    82 F.4th 1273 (D.C. Cir. 2023) .......................................... 49

## **Statutes**

5 U.S.C. § 553(b) ..................................................................... 24
5 U.S.C. § 553(b)(3) ................................................................ 42
5 U.S.C. § 604(a)(1) ................................................................ 65
5 U.S.C. § 605(b) ..................................................................... 65
5 U.S.C. § 611(a)(1) ................................................................ 65
5 U.S.C. § 706 ......................................................................... 23
15 U.S.C. § 2606(f) ................................................................... 6
42 U.S.C. § 9601 ................................................................... 5, 6
42 U.S.C. § 9601(14) ............................................................ 5, 6
42 U.S.C. § 9601(23) ............................................................ 7, 33
42 U.S.C. § 9601(25) ................................................................ 7
42 U.S.C. § 9601(33) ........................................................... 5, 34
42 U.S.C. § 9601(40)(B)(ii)(I) ................................................ 72

42 U.S.C. § 9602(a) ................................................ 2, 6, 39, 40, 41
42 U.S.C. § 9604 ................................................................ 5
42 U.S.C. § 9604(a) ........................................................ 7, 8
42 U.S.C. § 9604(a)(1) ...................................................... 51
42 U.S.C. § 9604(a)(1)(B) .................................................. 33
42 U.S.C. § 9605(a)(8) ....................................................... 7
42 U.S.C. § 9606(a) .......................................................... 8
42 U.S.C. § 9607 ............................................................. 7
42 U.S.C. § 9607(a) ...................................................... 8, 33
42 U.S.C. § 9607(a)(1) ..................................................... 72
42 U.S.C. § 9607(a)(4)(A) ............................................... 8, 57
42 U.S.C. § 9607(a)(4)(B) ................................................... 8
42 U.S.C. § 9613(a) ..................................................... 4, 27
42 U.S.C. § 9620 ........................................................... 58
42 U.S.C. § 9620(e)(2) ..................................................... 58
42 U.S.C. § 9621(a) ........................................................ 51
42 U.S.C. § 9622 ............................................................ 8

## **Rules**

D.C. Cir. R. 29(a)(7) ....................................................... 25

## **Regulations**

40 C.F.R. § 300.430(e)(2)(i) ............................................... 35
40 C.F.R. § 312.21 ......................................................... 72

## **Administrative Materials**

Exec. Order No. 12,866 (1994) ............................................. 13
48 Fed. Reg. 23,602 (May 25, 1983) ...................................... 10
66 Fed. Reg. 58,258 (Nov. 20, 2001) ..................................... 36
87 Fed. Reg. 54,415 (Sept. 6, 2022) .................... 11, 13, 36, 40, 46
89 Fed. Reg. 32,532 (Apr. 26, 2024) ...................................... 74
89 Fed. Reg. 39,124 (May 8, 2024)......7, 8, 12, 14, 18, 19, 26, 29, 31, 33, 34, 36,
    37, 38, 40, 43, 44, 49, 51, 53, 56, 61, 62, 66, 69, 70, 72

## Other Authorities

Office of the Assistant Secretary of Defense for Energy, Installations, and
Environment, U.S. Department of Defense, *Appendix B: Per- and
Polyfluoroalkyl Substances Task Force Activities During the Fourth Quarter of
Fiscal Year 2022*, "Report on Department of Defense's Per- and Polyfluoroalkyl
Substances Task Force Activities," January 2023 ............................................... 65

Salvatore et al., "Presumptive Contamination: A New Approach to PFAS
Contamination Based on Likely Sources," Environ. Sci. Technol. Lett. Vol. 9,
Issue 11 (November 8, 2022) ................................................................. 12, 19, 55

EPA, Draft National Recycling Strategy (Oct. 5, 2020), *available at*
https://www.epa.gov/sites/default/files/2020-
10/documents/draft_national_recycling_strategy.pdf (last visited Nov. 30, 2025)
........................................................................................................................ 63

US EPA, Key EPA Actions to Address PFAS, *available at*
https://www.epa.gov/pfas/key-epa-actions-address-pfas (last
visited Nov. 30, 2025).............................................................................74

US EPA, List 8R Active Site Inventory, *available at*
https://www.epa.gov/superfund/list-8r-active-site-
inventory#:~:text=The%20Active%20Site%20Inventory%20Repor
t,include%20latitude%20and%20longitude%20information (last
visited Nov. 30, 2025).............................................................................55

US EPA, Number of NPL Sites of Each Status at the End of Each Fiscal Year,
*available at* https://www.epa.gov/superfund/number-npl-sites-each-status-end-
each-fiscal-year (last visited Nov. 30, 2025). ....................................... 71

US EPA, PFAS Enforcement Discretion and Settlement Policy Under
CERCLA (Apr. 19, 2024), *available at*
https://www.epa.gov/enforcement/pfas-enforcement-discretion-
and-settlement-policy-under-cercla (last visited Nov. 30, 2025) .......................26

US EPA, PFAS Strategic Roadmap: EPA's Commitments to Action
2021–2024 (Oct. 2021), *available at*
https://www.epa.gov/pfas/pfas-strategic-roadmap-epas-
commitments-action-2021-2024 (last visited Nov. 30, 2025)...........................26

## <u>GLOSSARY OF ACRONYMS AND ABBREVIATIONS</u>

| | |
|---|---|
| **CERCLA** | Comprehensive Environmental Response, Compensation and Liability Act |
| **EA** | Economic Assessment |
| **NCP** | National Contingency Plan |
| **NDAA** | National Defense Authorization Act |
| **NPL** | National Priorities List |
| **PFAS** | Per- and polyfluoroalkyl substances |
| **PFOA** | Perfluorooctanoic acid |
| **PFOS** | Perfluorooctane sulfonic acid |
| **PRPs** | Potentially Responsible Parties |
| **RCRA** | Resource Conservation and Recovery Act |
| **RFA** | Regulatory Flexibility Act |
| **RIA** | Regulatory Impact Analysis |

# **INTRODUCTION**

This lawsuit challenges a first-of-its-kind rule from the Environmental Protection Agency meant to address the potential environmental impact of per- and polyfluoroalkyl substances (PFAS).  In promulgating it, EPA has dusted off a provision of one of the most onerous environmental statutes—the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA)—that has never been used in the 40 years since the statute was enacted.

CERCLA allows EPA, State governments, and even private parties to hold others liable for environmental contamination caused by "hazardous substances." Cleaning up this contamination often costs tens of millions of dollars and takes decades.  Liability is strict, and generally joint and several.  Many courts have concluded that liability is retroactive.  And liability can attach to anyone who owns (or has owned) contaminated land, or anyone who arranged for the disposal of the hazardous substances, even if they didn't know these substances were present.

The specific substances at issue are perfluorooctanoic acid (PFOA) and perfluorooctanesulfonic acid (PFOS), two members of the broader class of PFAS. These man-made chemicals repel water, oils, and other substances, which resulted in their widespread use in both industry and consumer products starting in the 1940s, including in life-saving fire-fighting foams, medical devices, and semiconductors.

1

PFOA and PFOS are no longer domestically manufactured in large quantities, but their heavy production for more than half a century, combined with their ability to resist degradation in the environment, means that, according to EPA, they can now be found almost anywhere.

In this first-of-its-kind rule, EPA designates PFOA and PFOS as "hazardous substances" under CERCLA, unleashing the statute's full suite of authorities to require costly cleanups wherever those substances are found, even at extremely low levels.    In the past, EPA has added to CERCLA's coverage through different statutes—designating substances as hazardous or toxic under other environmental laws, which designations CERCLA then incorporates by reference.    But now, for the first time, EPA exercises its authority under CERCLA Section 102:

> The Administrator shall promulgate and revise as may be appropriate, regulations designating as hazardous substances … substances which, when released into the environment, may present substantial danger to the public health or welfare or the environment ….

42 U.S.C. § 9602(a).

EPA committed several errors when designating these substances.    For example, EPA misinterprets the standard for deeming a substance "hazardous"— whether it "may present substantial danger."    EPA concludes that *any* "possibility" of "substantial danger" is sufficient to satisfy the standard.    And EPA will decide

2

whether this possibility exists by weighing a non-exhaustive list of factors in an unknown manner. This allows EPA unbridled discretion to designate substances without manageable, predictable, or reviewable criteria. And the way EPA applies that standard to PFOA and PFOS—concluding that a mere "association" between these substances and "adverse health effects" can suffice—only confirms as much.

Even worse, EPA failed to adequately consider the enormous costs of its novel rule. In fact, EPA originally said it was *prohibited* from considering these costs. Instead, EPA said it could consider only the hazardous nature of a substance, without regard to the costs. But after many commenters objected, EPA backtracked in the Final Rule. It conceded that it might need to consider costs, though refused to decide for sure. Then, in an attempt to cover its bases, EPA ran two analyses—one that didn't consider cost, and an entirely new alternative one that did—and concluded that designation was warranted either way.

To support its new alternative analysis (claiming designation was warranted even when considering costs), EPA released a new 300-page cost-benefit analysis the public had never seen. Of course, EPA had given no notice of this analysis, and commenters had no opportunity to raise any concerns. Perhaps unsurprisingly, that cost analysis is fundamentally flawed. It ignores some categories of cost, drastically underestimates others, and mistakes significant costs as *benefits*.

3

This Court must vacate the Final Rule for multiple, independent reasons. First, as a threshold matter, EPA misinterprets the term "may present substantial danger" to contain no meaningful limits. Second, EPA *was* required to consider costs, and that analysis was improper in multiple respects. For one thing, EPA failed to provide notice and comment for most of its cost-benefit analysis. For another, that cost-benefit analysis contained serious errors, rendering it arbitrary and capricious. Third, EPA's decision to unleash CERCLA wherever PFOA and PFOS are present, while understanding so little about the consequences of doing so, was the definition of arbitrary-and-capricious decision-making.

For these reasons, this Court should vacate the Final Rule.

## JURISDICTION

This Court has jurisdiction pursuant to 42 U.S.C. § 9613(a). Venue is also appropriate pursuant to 42 U.S.C. § 9613(a). Petitioners timely filed petitions for review on June 10, 2024 (Chamber, AGC, NWRA), July 30, 2024 (ReMa), August 2, 2024 (AF&PA), and August 5 (ACC, AFPM).

## STATEMENT OF ISSUES

1.     Did EPA misinterpret the term "may present substantial danger"?

2.     Did EPA fail to provide adequate notice and comment on a new cost-benefit analysis it introduced for the first time in the Final Rule?

4

3.      Did EPA fail to adequately consider the costs of the Final Rule?

4.      Did EPA act arbitrarily and capriciously in promulgating the Final Rule

without sufficiently understanding the consequences?

## STATUTES AND REGULATIONS

Relevant statutes and regulations appear in the Addendum.

## STATEMENT OF THE CASE

**A.    Congress enacts CERCLA, imposing broad liability for hazardous substances.**

In 1980, Congress enacted the Comprehensive Environmental Response,

Compensation, and Liability Act (CERCLA), colloquially known as "Superfund."[1]

42 U.S.C. § 9601 et. seq.  CERCLA allows EPA to address "releases" of certain

substances, 42 U.S.C. § 9604, including "any spilling," "leaking," "leaching," or

"disposing" of that substance "into the environment," *id.* § 9601.  CERCLA divides

covered substances into two categories:  "hazardous substances" and "pollutants or

contaminants."  42 U.S.C. §§ 9601(14); 9601(33).

---

[1] CERCLA established the "Superfund," or Hazardous Substances Response Trust, which EPA uses to clean up environmental contamination.  The Superfund is funded by general appropriations and special taxes on the petroleum and chemical industries.  *See United States v. Ne. Pharm. & Chem Co.*, 810 F.2d 726, 731 n.2 (8th Cir. 1986).

5

### 1.    CERCLA authorizes EPA to designate hazardous substances.

Substances can be designated "hazardous" under CERCLA in several ways. First, Congress or EPA can designate substances as toxic or hazardous pursuant to other environmental statutes, provided they satisfy those other statutes' requirements. 42 U.S.C. § 9601(14).[2]  These substances then become "hazardous" under CERCLA. *Id.*

Second, EPA can designate a substance under CERCLA directly. 42 U.S.C. § 9602(a).  Under Section 102, EPA may designate, "as may be appropriate," substances that "when released into the environment may present substantial danger to the public health or welfare or the environment." 42 U.S.C. § 9602(a).

### 2.    CERCLA grants EPA and others broad authority to clean up releases of hazardous substances.

Once a substance is designated as "hazardous" (either through other statutes or Section 102), CERCLA grants EPA, other federal agencies, and private parties broad authority to clean up releases of that substance, or order others to do so. That authority can be exercised in several ways.

---

[2] *Compare, e.g.,* 15 U.S.C. § 2606(f) (Section 7 of the Toxic Substances Control Act, requiring "an imminent and unreasonable risk of serious or widespread injury to health or the environment") *with* 42 U.S.C. § 9601(14) (incorporating 15 U.S.C. § 2606(f) by reference).

6

First, EPA can clean up such releases itself with money from the "Superfund." 42 U.S.C. § 9604(a). These "response actions" include both "short-term" or emergency "removal" actions, and more expensive, longer-term "remedial" actions. Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed. Reg. 39,124, 39,137 (May 8, 2024) (JA001–69); 42 U.S.C. §§ 9601(23), 9601(25). To fund a longer-term "remedial" action, EPA must first add the site to the National Priorities List (NPL). JA015 (Final Rule).[3]

EPA can then seek reimbursement of response costs from "several classes" of potentially responsible parties (PRPs). *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 114 (D.C. Cir. 2010) (citing 42 U.S.C. § 9607). These include anyone who currently owns a contaminated site (or owned that site at the time of release), and—even more broadly—"parties that 'arrange[] for' the transport, treatment, or disposal of hazardous substances." *Id.* (quoting 42 U.S.C. § 9607).

---

[3] CERCLA requires EPA to identify on the NPL those contaminated sites that most urgently require remediation. *See* 42 U.S.C. § 9605(a)(8).

7

Second, EPA can force PRPs to clean up a hazardous substance themselves.[4] EPA can issue unilateral administrative orders or obtain orders from a federal court. 42 U.S.C. § 9606(a). Alternatively, EPA can pressure PRPs to enter settlement agreements that require PRPs to conduct cleanups. *Id.* § 9622.

Finally, other parties—including private parties, States, and local governments—can voluntarily clean up a hazardous substance and seek reimbursement from PRPs. 42 U.S.C. §§ 9607(a)(4)(A), 9607(a)(4)(B). This can occur without any involvement from EPA.

In contrast to "hazardous substances," EPA's authority to address "pollutants or contaminants" is more limited. EPA can clean up these substances itself only if they present an "imminent and substantial danger." 42 U.S.C. § 9604(a). EPA generally cannot recover costs from PRPs, or order PRPs to clean up "pollutants and contaminants." *See* 42 U.S.C. §§ 9606(a), 9607(a). And if third parties clean up such substances, they cannot seek reimbursement from others. *See* 42 U.S.C. § 9607(a)(4)(B).

---

[4] "Although a court is the final arbiter of whether a party is liable under CERCLA section 107," JA045 n.64 (Final Rule), CERCLA authorizes EPA to require parties whose liability has yet to be judicially determined (i.e., "potentially responsible parties" or PRPs) to engage in cleanup activities, *see Gen. Elec.*, 610 F.3d at 115.

8

### 3.    Liability under CERCLA is harsh.

CERCLA imposes "strict liability" on PRPs.  *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 608 (2009).  No showing of fault is necessary.  PRPs need not contribute to the contamination or even know it occurred.

Liability can also be joint and several.  A PRP may be liable for the entire cost of a contaminated site, regardless of how little that PRP has contributed in comparison to others (unless it can somehow "apportion[]" the harm from its own contribution).  *Burlington*, 556 U.S. at 613–14.  For that reason, significant liability can attach "for even minimal amounts of pollution."  *United States v. Alcan Alum. Corp.*, 990 F.2d 711, 720 (2d Cir. 1993).

Finally, "many courts" have held that CERCLA imposes retroactive liability.  *United States v. Monsanto Co.*, 858 F.2d 160, 174 (4th Cir. 1988) (collecting cases).  That means PRPs can be liable for conduct that occurred prior to a substance being designated "hazardous."

Liability for cleanup costs can be enormous.  Remedial actions can last decades.  JA213 (U.S. Chamber of Commerce, PFOS and PFOS Cleanup Costs at Non-Federal Superfund Sites (June 2022), EPA-HQ-OLEM-2019-341-405 (Nov. 9, 2022) (Chamber Cost Study)).  In one study cited by EPA, costs averaged between $35.2 and $48.2 million per NPL site (as of 2019).  JA149 (Economic Assessment

(EA)).  For PFOA and PFOS, EPA assumes that cleanups will continue for at least the next 77 years.  *See* JA534–35 (Regulatory Impact Analysis (RIA)).

**B.    EPA discarded an interpretation that would have established defined criteria for designating hazardous substances and also considered costs.**

Shortly after CERCLA was enacted, EPA issued an Advance Notice of Proposed Rulemaking seeking comment on how to designate "hazardous substances" under Section 102.  *Designation of Additional Hazardous Substances*, 48 Fed. Reg. 23,602-05 (May 25, 1983) (1983 Notice).  EPA proposed "four alternative sets of criteria" for satisfying the statutory standard "may present substantial danger."  *Id.* at 23,604.

All four tests would have established specific quantitative thresholds.  Three would have "establish[ed] a critical value" for specified factors, such as "aquatic toxicity" and "carcinogenicity."  *Id.*  If a substance exceeded the "critical value" for any factor, then it "may present substantial danger."  *Id.*  The fourth test would have applied a "scoring system" to enumerated "rating factors," used an "equation … to combine these several factors into a single number," and established a "cutoff point."  *Id.*

EPA also proposed to carefully consider costs.  It acknowledged that "[t]he consequences of designation can be substantial," *id.* at 23,602–03, including because

10

"any person responsible for a release of hazardous substances may be liable for:  (A) All costs of removal … ; (B) Any other necessary costs of response … ; and (C) Damages for injury to … natural resources."  *Id.*  Accordingly, EPA proposed "to carefully consider these economic impacts."  *Id.*

But EPA did not move forward with this rulemaking.  And Section 102 lay dormant for the next 40 years.  EPA never offered any other construction of "hazardous substance," nor did it designate any "hazardous substance" under Section 102.

## C.    EPA proposes to designate PFOA and PFOS as CERCLA hazardous substances.

In September 2022, EPA proposed to exercise its authority under Section 102 for the first time.  *Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances*, 87 Fed. Reg. 54,415 (Sept. 6, 2022) (JA070–97) (Proposed Rule).

The Proposed Rule targeted PFOA and PFOS:  man-made chemicals used in "industry and in consumer products since the 1940's."  JA073.[5]  These chemicals have "useful properties, including their resistance, to water, grease, and stains," and

_____

[5] When used in this brief, "PFOA and PFOS" also refers to the chemicals' "salts and structural isomers," which are also covered by the Final Rule.  JA002 & n.1.

11

therefore were used in "a variety of manufactured goods" and "industrial applications," including food packaging, firefighting foam, and electronics. JA073–74.

According to EPA, PFOA and PFOS "remain in the environment for long periods of time." JA024 (Final Rule). EPA states that they are "prevalent in the environment," including "surface water, groundwater, soil, and air." JA003 (Final Rule). According to one study cited by EPA, there are "57,412 sites of presumptive [PFOA/PFOS] contamination" in the United States. JA314 (Salvatore et al., "Presumptive Contamination: A New Approach to PFAS Contamination Based on Likely Sources," Environ. Sci. Technol. Lett. Vol. 9, Issue 11 (November 8, 2022) (Salvatore)) (cited at JA395–96 (RIA)).

EPA claims that while this contamination is "widespread," it is also "generally declining." JA003 (Final Rule). EPA admits that since PFOA and PFOS were "largely phased out of domestic production after 2002," JA104 (EA), blood levels of these substances have declined by 70–85%, JA003 (Final Rule).

In proposing to designate PFOA and PFOS as hazardous substances under CERCLA, EPA proposed to interpret the term "may present substantial danger" in Section 102. EPA did not mention the 1983 Notice or propose any similar quantitative thresholds. Rather, EPA proposed to "consider" a non-exhaustive set

12

of factors and "weigh" this information in a manner it did not explain. JA076 (Proposed Rule).

EPA also proposed to ignore the costs of designation. In contrast to its 1983 Notice, EPA asserted it could consider only whether a substance "may present substantial danger"—not any other factors, including costs. *Id.* Nevertheless, EPA requested comment on whether it should consider costs, which costs it should consider, and how it should weigh those costs in deciding whether to designate a substance. JA0078.

While EPA proposed to ignore costs, it also prepared a limited "Economic Assessment" (EA) of the Proposed Rule to comply with executive orders. *See, e.g.,* Exec. Order No. 12,866 (1994). There, EPA estimated only what it considered the "direct" costs of the regulation, comprising primarily the costs of reporting releases ($0–$370,000). JA141 (EA). EPA then included a "qualitative discussion" of the "indirect costs" of the rule, including all future cleanup costs. JA144–45 (EA). But EPA claimed these cleanup costs were "unknown due to a lack of data," and therefore "not feasible to quantify." *Id.*

The Proposed Rule prompted hundreds of comments. *See* Certified Index (Doc. No. 2067217) at 14–45. Among other things, commenters warned that EPA's standard for "may present substantial danger" was limitless and impossible to apply

13

(or predict) with any certainty; that EPA was required to consider the enormous costs of the designation; and that EPA failed to understand the consequences of the proposed rule. *See, e.g.,* JA342–46 Chamber Comments, EPA-HQ-OLEM-2019-341-569 (Nov. 10, 2022) (Chamber Comments), (unintended consequences); JA347–352 (substantial danger); JA353–366 (costs); JA327–28 (AWWA Comments Legal Appendix at JA327–328, EPA-HQ-OLEM-2019-341-544 (Nov. 10, 2022) (AWWA Comments)) (substantial danger).

### D.    EPA publishes the Final Rule.

Despite these concerns, EPA published the Final Rule in May 2024. *Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances*, 89 Fed. Reg. 39,124 (May 8, 2024) (JA001–69).

### 1.    EPA adopts the proposed standard for "may present substantial danger."

In explaining the Final Rule, EPA first interpreted the term "may present substantial danger" in Section 102. In EPA's view, this requires a "possibility" that the substance "may present substantial danger," as determined by what appears to be a purely discretionary weighing of a non-exhaustive set of factors. JA018.

Specifically, EPA considers the "two primary factors" of "hazard" (i.e., "the potential harm to humans or the environment from exposure") and "environmental

14

fate and transport" (i.e., how the substance moves and changes in the environment).

*Id.* In assessing these "primary factors," EPA identifies various information it "may

consider" in an unspecified manner:

> In deciding whether a substance presents potential harm to humans or the environment from exposure to the substance (hazard), EPA *may consider such information as* human health toxicity, including carcinogenicity, neurotoxicity, developmental toxicity, reproductive toxicity, and other adverse health effects. EPA *may also consider* toxicity or adverse impacts to non-human organisms or ecosystems, such as adverse effects to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas. Additionally, EPA *may consider* chemical properties such as combustibility, flammability, reactivity, or corrosiveness. Regarding the environmental fate and transport of a substance, EPA *may consider* whether a substance moves readily through the environment, and whether it persists and/or changes in the environment.

*Id.* (emphases added).

Beyond these two "primary factors," EPA explained that it "may also consider

additional information" that "includes, but is not limited to" the prevalence of

releases and the "likelihood of human exposure." *Id.* "Together with hazard and

environmental fate and transport, this additional information will inform EPA's

conclusion" on whether to designate a substance. *Id.*

EPA then asserted that "[i]n weighing this information, EPA will consider the

degree or magnitude of the danger posed based on the substance's hazard and

15

environmental fate and transport characteristics." *Id.* As in the Proposed Rule, EPA did not explain how the supposed "weighing" would occur or how EPA would choose which information to "consider." It instead gave itself carte blanche.

Finally, EPA applied this interpretation to PFOA and PFOS. It explained that PFOA and PFOS qualified as "hazardous" because they were purportedly "linked to adverse human health effects." JA020. EPA similarly relied on scientific studies purportedly showing "associations" between PFOA/PFOS and various levels of "adverse" effects. JA020–23. EPA then declared that "PFOA and PFOS each may present a substantial danger when released." JA025.

### 2.    EPA declines to decide whether it needs to consider costs.

As for costs, EPA retracted its prior conclusion that it was prohibited from considering costs when designating a hazardous substance. JA020. EPA instead claimed it "need not resolve" the question because "designation is appropriate" whether costs could be considered or not. *Id.*

To support that conclusion, EPA conducted two analyses in the alternative. First, it asserted that PFOA and PFOS could be designated without considering costs. *See* JA020–25. Second, it claimed that a previously undisclosed "totality of the circumstances" test, which weighed costs and benefits, "confirms that designation of PFOA and PFOS as hazardous substances is warranted." JA026.

16

### 3.   EPA introduces a new totality of the circumstances analysis that includes costs.

To support EPA's newly disclosed "totality of the circumstances" test, EPA relied heavily on a newly disclosed 300-page regulatory impact analysis (RIA) that weighed various costs and benefits. JA368–659 (RIA). EPA "considered the … costs and benefits evaluated in the RIA as part of its totality of the circumstances analysis." JA005.

EPA first considered what it deemed the "direct" costs of the Final Rule, which included EPA's assessment of the costs of reporting releases of PFOA and PFOS. JA007. EPA calculated those "direct" reporting costs to be no more than $1.6 million per year. *Id.*

EPA then considered what it deemed the "indirect" costs of the Final Rule, which included costs of actually removing PFOA and PFOS from the environment. EPA discussed potential "indirect" cleanup costs at (1) NPL sites, (2) non-NPL sites, and (3) federal sites (the last of which EPA merely acknowledged, only to exclude them from consideration).

First, EPA considered cleanup costs at NPL sites, which EPA actually characterized as benefits. *See* JA030–31. Without evidence, EPA asserted that it had planned to clean up PFOA and PFOS at NPL sites itself, absent the Final Rule, "under EPA's authority to address PFOA and PFOS as 'pollutants or

17

contaminants.'" JA030.  Accordingly, in EPA's view, the Final Rule did not create any new costs at NPL sites, but merely allowed EPA to "transfer these costs to PRPs." *Id.*[6]  EPA deemed this purported transfer "a critical and essential advantage of designation."  JA029.

EPA then estimated the value of this purported benefit at $10.3 million to $51.7 million per year.  JA030.  EPA conceded that the "magnitude of such costs" was "highly uncertain" because, among other things, "remedial technologies to address contamination" were "evolving."  JA553 (RIA).  But EPA nevertheless tried to quantify them by adding a 2–10% "cost premium" to the costs of prior NPL site cleanups of other substances.  *Id.*  It did not explain the basis for these cost premiums, other than stating that "some of the same treatment technologies" for other hazardous substances "may" be used to address PFOA and PFOS.  JA554 (RIA).  Nor did it address new NPL sites where PFOA or PFOS were the only hazardous substances present—i.e., where 100% of the cleanup costs were attributable to the Final Rule.

Second, EPA considered cleanup costs at non-NPL sites, which EPA also deemed not actual costs, but rather an "advantage of designation."  JA037 (Final

_____

[6] *See also* JA030 n.47 (Final Rule) ("As detailed in the RIA accompanying this rule, these 'cost transfers' from EPA to the PRP do not result in a net increase in economic costs—rather, they just change 'who pays' for these cleanup costs.")

18

Rule).  EPA acknowledged that these were new costs and a "burden" for PRPs, JA041, but reasoned that "the cleanup monies spent" by PRPs were an "advantage," *id.*, because they "ensure[] that parties that contributed to releases of PFOA and PFOS are responsible," JA037.

EPA then calculated the potential value of these cleanup costs at non-NPL sites to be $327,000 to $18.1 million per year.  *Id. See also* JA545 (RIA).  In doing so, EPA limited the universe of potential non-NPL cleanups to 133 sites, JA541 (RIA), despite elsewhere relying on a study that found "57,412 sites of presumptive [PFOA/PFOS] contamination," JA314 (Salvatore) (cited at JA395–96 (RIA)).  EPA then assumed it would act at only half of the sites, and further reduced this universe to 67 sites.  JA541 (RIA).  EPA did not discuss any cleanup that could occur outside of EPA-initiated enforcement actions, such as cleanups initiated by States or private parties.

Third, EPA expressly excluded from either of these calculations any cleanup costs incurred on property owned by the federal government.  EPA reasoned that "federal sites are generally expected to address PFOA and PFOS in the absence of designation."  JA054 n.71 (Final Rule).

19

## SUMMARY OF THE ARGUMENT

I.      As a threshold matter, EPA misinterpreted the term "may present substantial danger" in Section 102(a) of CERCLA.  Given EPA's misinterpretation of this foundational statutory term, this Court need not even reach the grave errors EPA made in its analysis of costs.

A.      EPA's misinterpretation of "may present substantial danger" places no fixed boundaries on EPA's discretion to designate "hazardous substances" under CERCLA.  Rather, it requires EPA merely to consider a non-exclusive list of factors, in an unknown manner, and decide for itself there is even a remote possibility of harm.  That interpretation is wrong and would raise serious constitutional questions. An agency's interpretation of a statutory term, even one that "delegates discretionary authority," must have "fix[ed] boundaries."  *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

B.      EPA's interpretation also disregards the broader structure of CERCLA. CERCLA grants significantly more authority to address "hazardous substances" than "pollutants and contaminants," and therefore makes "hazardous substances a smaller and more difficult-to-meet category.  But under EPA's interpretation, any "pollutant or contaminant" would also qualify for designation as a "hazardous substance."  That flips CERCLA's hierarchy on its head.

20

C.    EPA's interpretation of "may present substantial danger" is also inconsistent with EPA's own prior interpretations of the same or similar terms. EPA previously proposed to interpret the same provision in question to impose concrete quantitative thresholds. And EPA construed similar terms in CERCLA and other statutes to impose fixed boundaries as well. But EPA imposed no similar limits in the Final Rule.

II.    EPA's newly disclosed cost analysis is also unlawful.

A.    At the outset, EPA was required to consider costs. Section 102(a) allows EPA to regulate hazardous substances only "as may be appropriate." That requires EPA to consider costs, as *Michigan v. EPA* squarely held. EPA no longer disputes this point, arguing instead that it "need not reach" the issue because designation is warranted whether costs are considered or not.

B.    EPA's retreat from its prior position on costs violated the APA's notice-and-comment requirement. In the Final Rule, EPA presented a new cost-benefit analysis, relying on a new 300-page Regulatory Impact Analysis the public had never seen. This Court has invalidated rules for failure to disclose just one *component* of a cost-benefit analysis. Here, EPA failed to disclose the entire analysis. That includes EPA's calculations of both costs and benefits, as well as the data, methodology, and assumptions on which those calculations were based.

21

C.    Given that EPA never subjected its cost-benefit analysis to public scrutiny, it's no surprise that EPA also made serious substantive errors.  These included (1) assuming there would be no new cleanup costs at NPL sites; (2) assuming that cleanups would occur at only 67 non-NPL sites in the entire country; (3) ignoring all cleanup costs at federal sites; (4) ignoring costs to particular sectors raised by petitioners; and (5) miscalculating the allegedly offsetting benefits.  Each one of these errors establishes prejudice from EPA's notice-and-comment violation, and also independently invalidates the Final Rule as arbitrary and capricious.

D.    EPA compounded these errors by violating the RFA—a statute that separately requires federal agencies to consider the cost of their actions on small entities.  In certifying that the Final Rule would have no impact on small entities, EPA unreasonably ignored *all* of these entities' cleanup costs.

III.    In addition to all its other errors, EPA acted arbitrarily and capriciously by promulgating its rule despite enormous uncertainty about the consequences. EPA's rule applies a particularly harsh environmental statute to two substances that, according to EPA, are ubiquitous in the United States.  And EPA opened this pandora's box despite lacking any real understanding of what's inside.  EPA doesn't understand where PFOA and PFOS are located; how to clean them up; how much this will cost; or the broader ripple effects of its decision, including on real estate

22

transactions. EPA's decision to move forward anyway is paradigmatic arbitrary-and-capricious decision-making.

IV.    Finally, these violations warrant the "normal remedy" of vacatur. Each of these violations was serious, and vacatur would not have disruptive consequences. Exposure to PFOA and PFOS has already declined drastically without the Final Rule, and EPA is already using other more targeted tools to address what remains.

## STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), this Court must set aside agency regulations that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706. This Court reviews an agency's statutory interpretation de novo. *Loper Bright*, 144 S. Ct. 2244. It must apply "the statute's 'best' reading," "without deference" to the agency's interpretation. *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 & n.7 (D.C. Cir. 2024) (citing *Loper Bright*, 144 S. Ct. at 2266).

The APA also requires this Court to set aside agency regulations that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. A regulation is "arbitrary and capricious" if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

23

agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *see also Ohio v. EPA*, 603 U.S. 279, 280 (2024) ("An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" (citation omitted)).   The agency must also offer "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (citation omitted).

Finally, this Court must set aside a rule if the agency failed to provided adequate notice and comment under the APA.  5 U.S.C. § 553(b).

## STANDING

Petitioners have associational standing.   To demonstrate standing, an association must show that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).[7]

---

[7] Because all petitioners bring the same claim and seek the same remedy, this Court need only be satisfied that one petitioner has standing. *J.D. v. Azar*, 925 F.3d 1291, 1323 (D.C. Cir. 2019) (per curiam).

24

Here, Petitioners plainly satisfy the second and third requirements above. By challenging the Final Rule, Petitioners serve their purposes of securing the economic stability of the various industries and businesses they represent. *See, e.g.,* Addendum Add. B002–03 (Chamber Decl. ¶¶ 4–5); Add. B035–36 (AGC Decl. ¶¶ 4–5). And because Petitioners advance only legal arguments and seek vacatur of the Final Rule, the participation of individual members is not necessary. *Comm. for Effective Cellular Rules v. FCC*, 53 F.3d 1309, 1315 (D.C. Cir. 1995) (broad facial challenge to agency action seeking vacatur does not require individual participation).

The first requirement is also easily shown here. To have standing, a member must show (1) injury-in-fact, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). There is "ordinarily little question" of standing when the "plaintiff is himself an object of the [government] action." *Id.* at 561. Indeed, "standing is 'usually' self-evident" in that case. *Arizona v. EPA*, 77 F.4th 1126, 1131 (D.C. Cir. 2023).

Here, the administrative record alone, *see* D.C. Cir. R. 29(a)(7), confirms that Petitioners' members are the objects of the regulation.[8]  Members of some

---

[8] *See also, e.g.,* Addendum B004–B011 ¶¶ 10–17, 22–23 (Chamber Decl.); B014–19 ¶¶ 8–18 (Waste Connections Decl.); B024–29 ¶¶ 7–19, 24 (NWRA Decl.);

Petitioners belong to the "relatively narrow set of industries" that EPA has stated it plans to target for enforcement of CERCLA, based on EPA's assessment that they "directly discharge PFAS … in large quantities."  US EPA, PFAS Strategic Roadmap:  EPA's Commitments to Action 2021–2024, at 7 (Oct. 2021), *available at* https://www.epa.gov/pfas/pfas-strategic-roadmap-epas-commitments-action-2021-2024 (last visited Nov. 30, 2025).[9]  Some petitioners' members also belong to sectors and industry groups that EPA claims may be affected by the Final Rule.  *See* JA010 (Final Rule).  These members have "met the standing requirements by showing that [they] will likely face greater liability under [CERCLA]."  *Int'l Fabricare Inst. v. U.S. EPA*, 972 F.2d 384, 390 (D.C. Cir. 1992).  *See also Mead Corp. v. Browner*, 100 F.3d 152, 155 (D.C. Cir. 1996) (finding "ample" grounds for standing where agency's action "drastically increases the chances of costly activity"

_____

B031–33 ¶¶ 4, 7–12 (Republic Decl.); B036–44, 46–47 ¶¶ 5–24, 30 (AGC Decl.); B053–56 ¶¶ 7–11 (Kokosing Decl.); B061–63 ¶¶ 7–13 (Foundation Service Corporation Decl.); B065–B074 ¶¶ 7–17 (ACC Decl.); B075–B079 ¶¶ 7–12 (AF&PA Decl.); B083–B084 ¶¶ 8–11 (ReMA Decl.).

[9] *See also* US EPA, PFAS Enforcement Discretion and Settlement Policy Under CERCLA, at 1 (Apr. 19, 2024), *available at* https://www.epa.gov/enforcement/pfas-enforcement-discretion-and-settlement-policy-under-cercla (last visited Nov. 30, 2025); JA007 (Final Rule) ("[T]he Agency expects to 'focus on implementing EPA's PFAS Strategic Roadmap and holding responsible those who significantly contribute to the release of PFAS ….'").

26

by bringing petitioner "within the web of [CERCLA's] cleanup and enforcement scheme").

Even setting aside that petitioners' members are the objects of the regulation, they can independently establish standing based on specific costs they are already incurring, or imminently will incur, as a result of the Final Rule.[10]  For example, EPA has requested that multiple members of Petitioners' associations incur costs testing for PFOA or PFOS as a result of the Final Rule.  *See, e.g.,* Addendum B025 (NWRA Decl. ¶ 10); B027 (NWRA Decl. ¶ 16).  Other members have incurred increased costs disposing of waste as a result of the Final Rule.  *See, e.g.,* Addendum B029 (NWRA Decl. ¶ 24), B045–46 (AGC Decl. ¶ 29), B056 (Kokosing Decl. ¶ 11), B075 (AF&PA Decl. ¶ 11).

Finally, these injuries are made more immediate by CERCLA's requirement that any rule challenged "be made within ninety days from the date of promulgation."  42 U.S.C. § 9613(a).  If Petitioners cannot challenge the validity of

---

[10] *See, e.g.,* Addendum B008, B010–11 ¶¶ 16, 20–23 (Chamber Decl.); B019–20 ¶¶ 19–20 (Waste Connections Decl.); B025, B027–29 ¶¶ 10, 16, 20–24 (NWRA Decl.); B033 ¶¶ 12–14 (Republic Decl.); B042–49 ¶¶ 18, 20, 23–29, 31–37 (AGC Decl.); B054–57 ¶¶ 9–12 (Kokosing Decl.); B063 ¶¶ 12–13 (Foundation Service Corporation Decl.); B065–B074 ¶¶ 15–20 (ACC Decl.); B075–B079 ¶¶ 8–12 (AF&PA Decl.); B084 ¶ 11 (ReMA Decl.).

27

the Final Rule now, the statute purports to prohibit any later effort to obtain "judicial review in any civil or criminal proceeding for enforcement or to obtain damages or recovery of response costs." *Id.*

## ARGUMENT

### I.    EPA misinterprets the term "may present substantial danger."

Section 102(a) requires EPA to promulgate regulations "as may be appropriate" to designate hazardous substances.  As explained below, this language clearly requires EPA to consider costs, and EPA's cost analysis is both procedurally and substantively flawed.  But before conducting that cost analysis, EPA must first find that the substances "may present substantial danger."  EPA failed to properly interpret this threshold term.

EPA's interpretation of "may present substantial danger" is entitled to no deference.  *Loper Bright*, 144 S. Ct. 2244.  This Court must instead "apply what [it] regard[s] as the statute's 'best' reading."  *U.S. Sugar Corp*, 113 F.4th at 991 (citing *Loper Bright*, 144 S. Ct. at 2266).  For multiple reasons, EPA's interpretation in the Final Rule is far from the "best reading."

### A.    EPA's interpretation has no fixed boundaries.

An agency's interpretation of a statutory term, even one that "delegates discretionary authority," must have "fix[ed] boundaries."  *Loper Bright*, 144 S. Ct.

28

at 2263.   Accordingly, this Court must reject agency interpretations that are "unreasonable in [their] breadth." *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 699 (D.C. Cir. 2018).  Interpretations that "assume an eye-popping sweep" are "incompatible with congressional intent." *Id.* at 697, 699.

Here, EPA's interpretation of "may present substantial danger" has no real boundaries and is therefore unreasonably broad.  To begin, EPA interprets "may" to require only a "*possibility* [that] the substance, when released into the environment, presents substantial danger." JA018 (Final Rule) (emphasis added).  That does nothing to limit the breadth of "may present substantial danger."

EPA then interprets the subject of this "possibility" in equally broad terms.  With respect to "substantial danger," EPA merely identifies a non-exclusive set of factors that might be relevant, including "hazard" and "environmental fate and transport." *See* Statement of the Case Section D.1, *supra*.  EPA then lists examples of information it "may consider," like "human health toxicity," "adverse impacts to non-human organisms," and "chemical properties." *Id.*  EPA "may also consider additional information" that "includes, but is not limited to," "prevalence" and "likelihood of human exposure." *Id.*  That describes, to a limited extent, *what* EPA might or might not consider.  But it doesn't explain *how* EPA will choose what to consider or *how* EPA will consider it.  Instead, the Final Rule merely asserts that

29

EPA will "weigh this information in deciding whether the substance, when released, may present a substantial danger." *Id.*

That interpretation provides no "fix[ed] boundaries" on EPA's discretion. *Loper Bright*, 144 S. Ct. at 2263. *See also Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 641 n.45 (1980) (plurality opinion of Stevens, J. for four Justices) ("[I]t is unrealistic to assume that [Congress] intended to give no direction whatsoever to [EPA] in promulgating [the Final Rule]."). In EPA's view, any substance can be deemed "hazardous" under CERCLA if there's any "possibility" it could harm humans, animals, or the environment. And EPA will decide for itself whether that "possibility" exists after reviewing all information EPA, in its exclusive and apparently unbounded discretion, deems relevant. That isn't a standard; it's a blank check.

Indeed, almost any substance could clear this minimal bar. Salt (sodium chloride), for example, has the "possibility" of harming humans, animals, or the environment if released in sufficient amounts. Under EPA's interpretation, given the potential hazard and the common presence of salt, EPA could therefore designate it as a "hazardous substance" under CERCLA. And so long as EPA "considered" the risk information it deemed appropriate (such as "human health toxicity" and "chemical properties"), "weighed" it in some unknown manner, and then determined

30

there was some remote possibility of harm, EPA will have satisfied the standard it announced in the Final Rule.

EPA's application of this interpretation to PFOA and PFOS confirms the problem. In EPA's view, PFOA and PFOS "may present a substantial danger" because they are "associated" with "adverse health effects." JA025 (Final Rule).[11] EPA relies on scientific studies purportedly showing "associations" between PFOA/PFOS and various levels of "adverse" effects. JA020–23 (Final Rule). But EPA never explains why "associated" is equivalent to "present" or why "adverse health effects" are equivalent to "substantial danger." In failing to apply the terms of the statute, EPA impermissibly lowers the bar set by Congress. *Cf. Maine Lobstermen's Ass'n, et al. v. Nat'l Marine Fisheries Service, et al.*, 70 F.4th 582, 599–602 (D.C. Cir. 2023) (vacating a biological opinion that failed to evaluate whether jeopardy is likely, the standard set forth in the Endangered Species Act).

EPA's construction isn't correct—but if it were, Section 102(a) would present serious constitutional questions. As an initial matter, it would provide no

---

[11] *See also, e.g.,* JA020 (Final Rule) ("linked to adverse human health effects"); JA044 (Final Rule) ("That conclusion is supported by … evidence of adverse effects to human health and the environment from PFOA and PFOS exposure ….").

31

"intelligible principle" to guide the exercise of EPA's discretion. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). Further, Section 102 would also violate Due Process by failing to "give the person of ordinary intelligence a reasonable opportunity to know" what EPA might designate next. *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972). That is particularly problematic here, where liability has been applied retroactively. Parties not only must be concerned about whether *future* actions might come within CERCLA, but also whether substances they are lawfully handling now might expose them to liability.

These constitutional concerns further confirm that EPA's approach is incorrect, as "Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs,* 531 U.S. 159, 172–73 (2001). *See also See Indus. Union,* 448 U.S. at 646 (plurality opinion of Stevens, J., for four Justices) ("A construction of the statute that avoids this kind of open-ended grant [and thus avoids a constitutional nondelegation problem] is certainly favored.").

**B.    EPA's interpretation is inconsistent with the statutory structure.**

Aside from being standardless, EPA's expansive interpretation for "hazardous substance" would also be easier to satisfy than the statutory standard for "pollutants

32

or contaminants," destroying Congress's deliberate statutory hierarchy between these two types of substances.

As explained above, CERCLA confers significantly more authority to address "hazardous substances" than "pollutants or contaminants." *See* Statement of the Case Section A.2, *supra*. Congress provided EPA with only limited authority to respond to releases of "pollutant[s] or contaminant[s] which may present an imminent and substantial danger to the public health or welfare," *id.* § 9604(a)(1)(B), and limited the response costs which EPA could recover from PRPs to only "hazardous substances," *see id.* §§ 9601(23) ("removal" definition limited to "hazardous substances" only), 9601(24) ("remedial action" definition limited to "hazardous substances" only), 9607(a) (liability for response costs limited to "all costs of removal or remedial action"). *See also* JA004 (Final Rule). Accordingly, CERCLA establishes a hierarchy between these two types—requiring a higher bar for "hazardous substances," and making it a smaller category, than "pollutants or contaminants."

Yet, EPA's interpretation would effectively flip the hierarchy that Congress imposed on its head, paving the way for EPA to designate *every* "pollutant or contaminant" as a "hazardous substance." A "pollutant or contaminant" is any substance that "will or may reasonably be anticipated to cause death, disease,

33

behavioral abnormalities, cancer, genetic mutation, physiological malfunctions …

or physical deformations."  42 U.S.C. § 9601(33).  That's supposed to be an *easier*

standard to satisfy than the standard for "hazardous substance."  But because EPA

has set virtually *no* bar for "hazardous substance," any substance that "will" or "may

reasonably be anticipated to cause" any of the health problems above could also

present the "possibility" of a substantial danger, as interpreted by EPA in the Final

Rule.  Put another way, any "pollutant or contaminant" could also be deemed by

EPA a "hazardous substance."    Accordingly, the standard for "pollutant or

contaminant" is now the *harder* standard to satisfy.  That is plainly not what

Congress intended.

### C.    EPA's interpretation of Section 102 is inconsistent with prior agency interpretations.

While EPA claims it couldn't have provided a more definite standard, *see*

JA043 (Final Rule), EPA itself has recognized several alternatives that would

provide at least some limits on EPA's authority.

First, EPA previously proposed fixed standards for interpreting this very same

statutory term.  In its 1983 Notice, EPA proposed four different interpretations of

"may present substantial danger," all of which would have imposed concrete,

quantitative thresholds.  *See* Statement of the Case Section B, *supra*.  These

standards would have provided predictable and reviewable limits on EPA's ability

34

to designate "hazardous substances" that could be understood by the regulated community and the courts.  Notably, the Final Rule did not discuss these standards or even mention the 1983 Notice.[12]

Second, EPA has established limits when construing the term "substantial danger" elsewhere in CERCLA.  Section 105 required EPA to include methods for "remedying any releases … which pose substantial danger" in its Superfund regulations (the National Contingency Plan or NCP).  *Id.* § 9605(a)(2) (emphasis added).  In 1990, EPA promulgated a regulation within the NCP requiring remedial actions to, among other things, "[e]stablish… remediation goals" based on "acceptable exposure levels that are protective of human health and the environment," 40 C.F.R. § 300.430(e)(2)(i), such as reducing cancer risk for known or suspected carcinogens to between 1:10,000 and 1:1,000,000, *id.* § (e)(2)(i)(A)(2).  That interpretation, too, provides real boundaries on the term "substantial danger."

---

[12] This prior interpretation (which was roughly contemporaneous with the passage of CERCLA) undermines any argument that EPA's current, inconsistent interpretation is entitled to respect. *See Loper Bright*, 144 S. Ct. at 2258.  Further, reasoned decision-making requires EPA to explain why it no longer believes that a hazardous substance designation under Section 102 requires an identifiable risk threshold. *FCC v. Fox TV Stations, Inc.*, 566 U.S. 502, 515 (2009).

EPA concedes that its current interpretation of "substantial danger" is "different." JA076 n.15 (Proposed Rule). *See also* JA043 (Final Rule). To justify the discrepancy, EPA claims "substantial danger" carries a different meaning in the remedial context, because remedies are "site-specific," while Section 102 has "broader applicability." JA076 n.15 (Proposed Rule). *See also* JA043 (Final Rule). But EPA doesn't explain why the distinction it draws matters—i.e., why a quantitative threshold can be used in a "site-specific" context, but not one of "broader applicability." Indeed, EPA itself has used such thresholds in applying a broadly applicable provision of the Resource Conservation and Recovery Act (RCRA), another statute similarly addressing human health and environmental risks. *See, e.g.,* 66 Fed. Reg. 58,258, 58,262 (Nov. 20, 2001) (relying on a "hazard quotient of 9.4" to determine that certain inorganic chemical manufacturing wastes showed a significant risk).[13]

*  *  *

---

[13] Petitioners do not concede that any of the alternative constructions above would have been appropriate in all respects—they simply demonstrate that EPA is wrong that it is either impossible or inappropriate to give "substantial danger" a more definite meaning than EPA has attempted in the Final Rule.

For all these reasons, EPA's interpretation of "may present substantial danger" is incorrect. And because that misinterpretation is antecedent to both alternative analyses in the Final Rule (i.e., considering costs and not), this Court need look no further to invalidate the Final Rule.

## II.    EPA's evaluation of costs was fatally flawed.

Beyond EPA's flawed interpretation of "may present substantial danger," the Final Rule is also invalid due to EPA's treatment of costs. This is true for four reasons.

First, EPA was obligated to consider the costs of the Final Rule. Section 102 requires EPA to decide whether designation of a hazardous substance would be "appropriate"—a term well understood to require consideration of costs. *Michigan v. EPA*, 576 U.S. 743, 752 (2015). Accordingly, EPA's alternative analysis that excludes consideration of costs is contrary to law and irrelevant.

Second, EPA failed to disclose its analysis of costs until promulgating the Final Rule, violating the APA's notice-and-comment requirement. To support this previously undisclosed analysis, EPA relied on a new 300-page "Regulatory Impact Analysis" (RIA). *See, e.g.,* JA026 (Final Rule) ("This [totality of the circumstances] analysis included consideration of the formal benefit-cost analysis … provided in

37

the Regulatory Impact Analysis ….").[14]  None of that analysis was made available for public scrutiny or comment.

Third, EPA's substantive assessment of costs was fatally flawed.  It ignored some categories of cost, drastically underestimated others, and mistook some costs for *benefits*.  EPA also ignored categories of costs specifically raised by commenters and miscalculated the purported health benefits of the Final Rule.  That entire analysis was arbitrary and capricious.

Fourth, EPA's cost analysis also violated the Regulatory Flexibility Act—which, separate and apart from CERCLA itself, requires federal agencies to consider the cost of their actions on small entities.  In conducting this analysis, EPA mischaracterized certain costs as "indirect," and thus erroneously excluded them from the reach of the RFA.  That too was arbitrary and capricious.

## A.    EPA was required to consider costs.

EPA was required to consider the costs of designating new hazardous substances under Section 102.  Section 102 requires EPA to "promulgate and revise *as may be appropriate*, regulations designating as hazardous substances." 42 U.S.C.

_____

[14] *See also, e.g.,* JA003 (Final Rule) ("In conducting the [totality-of-the-circumstances] analysis as to PFOA and PFOS, EPA identified and weighed the advantages and disadvantages of designation … alongside the formal benefit-cost analysis … provided in the Regulatory Impact Analysis.").

38

§ 9602(a) (emphasis added).  Whether designation is "appropriate" depends on whether the resulting benefits are outweighed by the costs.

This issue is squarely governed by *Michigan*, 576 U.S. 743.  There, the Supreme Court addressed a provision in the Clean Air Act requiring EPA to regulate hazardous air pollutants from power plants if EPA first "finds … regulation is appropriate and necessary." *Id.* at 748.  EPA argued (*id.* at 755) that it was prohibited from considering costs in making that threshold determination, citing *Whitman v. American Trucking Associations*, 531 U.S. 457, 465 (2001)—just as EPA did here in the Proposed Rule.  But the Supreme Court disagreed.

The Court held that EPA was required to consider costs, relying heavily on the term "appropriate."  It explained that, "[i]n particular, 'appropriate' is the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *Id.* at 752.  And cost, the Court explained, was "a centrally relevant factor." *Id.* at 752–53.  Accordingly, "the phrase 'appropriate and necessary' requires at least some attention to cost" when used "to determine whether '*regulation* is appropriate and necessary.'" *Id.* at 752 (citation omitted).  *See also id.* at 753 ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.").

39

Applied here, *Michigan* requires EPA to consider costs. Section 102(a) requires EPA to "promulgate and revise *as may be appropriate*, regulations designating … hazardous substances." 42 U.S.C. § 9602(a) (emphasis added). As in *Michigan*, the word "appropriate" refers directly to EPA's decision whether to regulate. Accordingly, EPA must "treat[] cost as a centrally relevant factor" when making that decision. *Id.* at 752–53. *See also, e.g.*, *Alon Ref. Krotz Springs, Inc. v. EPA,* 936 F.3d 628, 654 (D.C. Cir. 2019) (agency required to consider cost when determining whether renewable fuel obligation would "be applicable to refineries, blenders, and importers, as appropriate").

EPA doesn't dispute this conclusion in the Final Rule, claiming instead that it "need not resolve" whether it is required to consider costs. JA042–43 (Final Rule). But it did dispute this conclusion in the Proposed Rule, claiming the term "as may be appropriate" did *not* require consideration of costs. JA077–78 (Proposed Rule). That reasoning is not persuasive.

In the Proposed Rule, EPA argued that in *Michigan*, the term "appropriate and necessary" was the *only* standard for deciding whether to regulate. JA077 (Proposed Rule). In contrast, EPA claimed, CERCLA provides additional "guidance" by defining the term "hazardous substance" in a manner that doesn't relate to costs. *Id.*

40

EPA further claimed that "the word 'appropriate' is not used in the context of what EPA should consider when assessing whether a substance is hazardous." *Id.*

That argument conflates two separate components of Section 102(a). In considering whether a substance *is* hazardous, EPA must decide whether it "may present substantial danger." 42 U.S.C. § 9602(a). Arguably, that does not require EPA to consider costs. But in deciding whether to *regulate* that substance under CERCLA, EPA must consider whether designating it under Section 102(a) would be "appropriate." *Id.* And as in *Michigan*, that *does* require EPA to consider costs. EPA cannot designate substances as hazardous without checking *both* boxes. *See, e.g., Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.,* No. 22-5295, 2024 WL 3083338, at *1 (D.C. Cir. June 21, 2024) ("The government does not consider economic impacts when it lists an animal as endangered. But the government does consider economic impacts when it decides on 'appropriate' regulations to guard … a listed species.").

## B. EPA violated the APA's notice-and-comment requirement by failing to disclose its cost-benefit analysis.

After commenters explained that EPA *was* required to consider costs, EPA did so (in the alternative) in the Final Rule. But this pivot unsurprisingly led to a notice-and-comment violation. In considering costs for the first time, EPA relied on

41

a previously undisclosed 300-page "Regulatory Impact Analysis" (RIA). *See* Statement of the Case Section D.3, *supra*.

"The APA requires that an agency publish notice of proposed rulemaking, including 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007) (quoting 5 U.S.C. § 553(b)(3)). This provides "interested persons an opportunity to participate." *Id.* (quoting same). And it yields "useful criticism," preventing the agency from seeing only "a one-sided or mistaken picture of the issues at stake." *Connecticut Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982).

The agency must disclose not just the proposal, but also the reasoning behind its proposal. "If the notice of proposed rule-making fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully." *Id.* at 530. Failure to disclose this reasoning is a "serious procedural error" that converts "what should be a genuine interchange" into a "mere bureaucratic sport." *Id.*

When disclosing this reasoning, it is "especially important for the agency to identify and make available technical studies and data that it has employed." *Id.* To allow otherwise would encourage a game of "hunt the peanut," with the agency

42

"hiding or disguising the information." *Id.  See also Banner Health v. Price*, 867 F.3d 1323, 1336 (D.C. Cir. 2017) ("Under APA notice and comment requirements, 'among the information that must be revealed for public evaluation are the technical studies and data upon which the agency relies in its rulemaking.'").

Here, EPA failed to disclose any of the RIA, which EPA used to justify the Final Rule.[15]   When initially proposing the rule, EPA offered only a limited Economic Assessment that bore no resemblance to the 300‑page RIA used to support the Final Rule.  *See* Statement of the Case Section C, *supra*.  The Economic Assessment estimated only the relatively trivial reporting costs imposed by the designation, and declined to estimate any compliance or liability costs at all—i.e., the vast majority of the actual costs of the Final Rule.  *See id*.

By contrast, the Final Rule relied on new estimates of costs.  *See* Statement of the Case Section D.3, *supra*.  For example, EPA calculated that cleanup costs at NPL sites would increase by approximately $10 million to $51.7 million per year, and

_____

[15] Such analyses are judicially reviewable when an agency relies on them to issue a rule.  *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) ("[W]hen an agency decides to rely on a cost‑benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable.").  EPA did so here.  As EPA said, "it considered the quantitative and qualitative direct and indirect costs and benefits evaluated in the RIA as part of its totality of the circumstances analysis."  JA005 (Final Rule).

43

costs at non-NPL sites would be $327,000 to $18.1 million per year.  *See id.*  Those estimates were never previously disclosed to the public, and the methodologies, data, and assumptions that went into them were never disclosed either.

The Final Rule also relied on estimated benefits that were not disclosed.  For example, the Economic Assessment from the Proposed Rule did not attempt to estimate any quantifiable health benefits.  *See* JA145–46 (EA).  Instead, it merely asserted that designation could lead to an unknown decrease in certain "adverse health effects."  JA146.  In comparison, the Final Rule included several new estimations of purported annual health benefits, valued at up to $25,800,000 at NPL sites, JA033 (Final Rule), and between $8,990 and $539,000 at non-NPL sites, JA033–34.  EPA claims these calculations are merely "illustrative," *id.*, but in fact they are crucial to quantitatively weighing costs and benefits.

This Court has vacated rules for far less.  In *Owner-Operator*, for example, the agency changed just *one component* of the cost-benefit methodology used to justify a rule limiting operating hours for truck drivers.  494 F.3d at 188, 193.  Specifically, the agency predicted the benefits of stricter hours restrictions, measured by accidents avoided, through an "operator-fatigue model."  *Id.* at 199.  Between the agency's proposal and its final rule, "[m]any of the details of the model[] were unchanged."  *Id.* at 200.  But in the final rule the agency did "modif[y]" the model

44

by introducing a new "time-on-task multiplier," which increased crash risk the longer a driver was on duty. *Id.* This was a "key component of the cost-benefit analysis." *Id.* at 198.

This Court held that this belated change in the agency's cost-benefit methodology "unquestionably" violated the APA:

> Because the time-on-task multipliers were an integral part of the operator-fatigue model, and because the output of that model was central to [the agency's] decision to adopt the [Final Rule] . . ., the model and its methodology were unquestionably among the 'most critical factual material that was used to support the agency's position.'

*Id.* (citation omitted). Accordingly, "[t]he failure to provide an opportunity for comment on the model's methodology" was "a violation of the APA's notice-and-comment requirements," *id.*, leading this Court to vacate the rule, *id.* at 206. *Cf. GPA Midstream Ass'n v. United States Dep't of Transp.,* 67 F.4th 1188, 1196 (D.C. Cir. 2023) (vacating rule in relevant part where agency failed to disclose the cost-benefit analysis of applying a pipeline safety rule to a particular type of pipeline until publishing the final rule).

EPA's violation was far worse here than in *Owner-Operator*. While the agency there changed one component of its analysis, EPA here introduced entirely new calculations of the lion's share of costs, and all of EPA's quantitative calculation

45

of benefits, for the first time in the Final Rule.  Commenters had no chance to address any number of errors in this analysis, including the following:

- EPA's calculation of increased costs at NPL sites;

- EPA's calculation of increased costs at non-NPL sites;

- EPA's calculation of quantified benefits at NPL sites, JA576–85 (RIA);

- EPA's assessment of benefits (but not costs) from inducing (through the reporting obligation) better waste management, JA387 (RIA).

- EPA's assessment of "indirect benefits," including "property value impacts," "agricultural benefits," "benefits for public drinking water systems," "ecological benefits," "benefits associated with natural resource damages," "benefits associated with R&D," benefits of improved management of materials containing PFOA/PFOS, and "increased land productivity after site cleanup," *e.g.,* JA388–87 (RIA); and

- EPA's failure to fully assess costs to particular industries.

*See* Section II.C, *infra*.  Under *Owner-Operator*, any *one* of these changes or omissions would constitute a notice-and-comment violation.  But here, EPA made *all* these changes at once, as part of a new 300-page analysis it had never previously disclosed.

The fact that EPA requested comment on the potential costs of designation does not mitigate the problem.  JA078 (Proposed Rule) (soliciting comment on whether costs should be considered "and, if costs should be considered, how they should be considered").  This invited commenters to address the issue of cost generally, but it didn't allow them to address the specific methodology, data, and

46

assumptions that EPA used to evaluate cost in the Final Rule. No commenter could have predicted how EPA would select its data, use those data to calculate costs, and then weigh those costs against the predicted benefits.

Finally, EPA's notice-and-comment violation was prejudicial. *See Owner-Operator*, 494 F.3d at 202 ("[W]e must take due account of the rule of prejudicial error."). At the outset, this Court has "not been hospitable to government claims of harmless error in cases in which the government failed to provide notice." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020). Among other things, "the entire premise of notice-and-comment requirements is that an agency's decision-making may be affected by concerns aired by interested parties through those procedures." *Id.* Accordingly, to show prejudice, challengers need only "raise a credible argument about the merits of the rule." *GPA Midstream*, 67 F.4th at 1198. That is, they need only "show they had something useful to say," not that "the agency, had it adhered to the procedural requirements of the law, would have reached a different result." *Id.*

47

Here, commenters would have had more than merely "something useful to say." They could have shown how the analysis was fundamentally flawed and, therefore, arbitrary and capricious. *See* Section II.C, *infra*.[16]

### C. The limited cost assessment that EPA did undertake was arbitrary and capricious.

Due in part to this procedural violation, EPA's cost-benefit analysis contains significant substantive errors. The analysis focuses mainly on "direct" costs of the rule related to reporting releases of PFOA and PFOS. JA037 (Final Rule). But those costs are trivial compared to the costs of *cleaning up* PFOA and PFOS, which EPA characterized as "indirect" and "contingent" and refrained from considering with any rigor. *Id.* And when calculating these "indirect" cleanup costs for the first time in the Final Rule, EPA made numerous "serious errors," including:

---

[16] Further, this analysis was also critical to justifying the Final Rule, because EPA was required to consider costs when deciding whether regulation was "appropriate." *See* Section II.A, *supra*. Accordingly, the Final Rule cannot stand without it. *See Owner-Operator*, 494 F.3d at 206 (finding prejudice where "the basis for the [agency's] cost-benefit analysis" was not disclosed); *Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A.,* 705 F.2d 506, 541 (D.C. Cir. 1983) ("[W]e should not, we think, consider any [late-disclosed evidence] in determining whether there is enough evidence in the record to support the final rule."); *Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.,* 939 F.2d 975, 1010 (D.C. Cir. 1991) ("[R]eliance on such [late-disclosed] evidence normally is improper.") (citing *Small Refiner*).

48

1. Treating cleanup costs incurred by PRPs as benefits rather than costs, and assuming it would cost roughly the same to clean up PFOA and PFOS as other substances, despite previously rejecting this comparison;

2. Assuming that cleanups would occur at only 67 non-NPL sites, despite also relying on a study finding over 57,000 sites of presumptive PFOA/PFOS contamination;

3. Ignoring all cleanup costs at federal sites;

4. Ignoring costs to particular sectors raised by petitioners; and

5. Miscalculating the allegedly offsetting benefits.

These errors not only establish that EPA's procedural violation was prejudicial, as noted above, but also independently warrant vacatur of the Final Rule. As this Court has said, "a serious flaw in [an agency's] cost-benefit analysis can render the resulting rule … arbitrary and capricious." *Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1288 (D.C. Cir. 2023). So while this Court does "review cost-benefit analyses deferentially," *id.*, if "the rule constitutes such an unreasonable assessment of social costs and benefits as to be arbitrary and capricious, the rule cannot stand," *Thompson v. Clark*, 741 F.2d 401, 405 (D.C. Cir. 1984).

49

1.    **EPA's assessment of cleanup costs at NPL sites was arbitrary and capricious.**

To begin, EPA made several important errors in considering the costs of cleaning up PFOA and PFOS at sites on the NPL.  (These are sites that EPA can either clean up using the Superfund or force PRPs to clean up instead.)

First, EPA improperly assumed the Final Rule would impose no new cleanup costs at NPL sites.  EPA asserted that were it not for the Final Rule, EPA itself would clean up all the PFOA and PFOS at these NPL sites as "pollutants or contaminants." *See* Statement of the Case Section D.3, *supra*.  So, in EPA's view, the Final Rule did not create any new costs at all at NPL sites, but merely transferred preexisting costs from the Superfund to PRPs, which EPA considered a *benefit*.  *Id.*

That argument is baseless.  EPA nowhere establishes that it was already cleaning up PFOA and PFOS as "pollutants or contaminants" at NPL sites prior to the Final Rule.  Indeed, as one commenter pointed out, EPA has *not* expended significant Superfund dollars to clean up PFOA and PFOS, and the expenditure of costs for PFOA and PFOS response actions are far more likely to be driven by third party claims, not EPA.  JA325 (AWWA Comments).

Nor does EPA establish that it *could* clean up PFOA and PFOS as "pollutants or contaminants."  EPA can only clean up pollutants or contaminants that "may

present an *imminent* and substantial danger."   42 U.S.C. § 9604(a)(1) (emphasis added).  EPA never makes this showing with respect to PFOA or PFOS.

Finally, even if EPA could clean up PFOA and PFOS as "pollutants or contaminants," the Final Rule warps EPA's incentives.  It encourages EPA to clean up sites it might deem too expensive to clean up itself by allowing EPA to recover those costs from others.  For all these reasons, the entire foundation of EPA's baseline analysis is unsupported.

More important, EPA's premise assumes the conclusion.  For it to be true that EPA would nevertheless clean up PFOA and PFOS at NPL sites absent the Final Rule, EPA would need to show it would be *cost-effective* to do so.  As EPA elsewhere acknowledges, "costs are considered when determining the remedy" at any particular site, particularly given EPA's "resource constraints."  JA005 (Final Rule).  *See also* 42 U.S.C. § 9621(a) (remedial actions must provide for "cost-effective response").  By asserting (without evidence) that EPA would clean up PFOA and PFOS absent the Final Rule, EPA is assuming that the benefits of doing so would justify the costs.  EPA may not avoid the issue of costs and benefits by simply begging the question.

In addition to this fundamental flaw, EPA also miscalculated the value of these purported "transfer costs."  JA030 (Final Rule).  In calculating these costs,

51

EPA assumed that PFOA and PFOS would add only an incremental cost at NPL sites—i.e., that EPA would be cleaning up other substances at these NPL sites anyway, and that cleaning up PFOA and PFOS alongside these substances would only marginally increase costs. JA563 (RIA). EPA assumed that this added "cost premium" would be 2–10%, *id.*, yielding a total "transfer cost" of $10.3 million to $51.7 million per year, JA565.

This analysis contains multiple errors. First, EPA ignores that it can now designate NPL sites that *only* contain PFOA or PFOS, and do not contain any other hazardous substances. If EPA is correct that PFOA and PFOS can be found almost anywhere, then many sites will contain PFOA or PFOS but no other hazardous substances. And for any such site added to the NPL, the Final Rule wouldn't just add a "cost premium"—it would add an entirely new site, with 100% of the costs incurred at that site (not just 2–10%) attributable to the Final Rule. EPA entirely ignores these sites.

Further, even for sites that contain more than just PFOA or PFOS, EPA provides no basis for assuming a "cost premium" of only 2–10%. In fact, one Petitioner estimated this cost premium to be as high as 50% or 100%. Chamber Cost Study at JA216 Table 2. Further, EPA previously warned against this very methodology, saying that cleanup costs for PFOA and PFOS should *not* be

52

calculated using cleanup costs for other substances. JA149 (EA) ("[I]t is unknown how [historical NPL costs] would relate or compare to costs associated with response actions addressing PFOA and PFOS at a contaminated site."). In short, even accepting EPA's flawed premise of "transfer costs," EPA had "insufficient empirical data" to make the calculation, rendering it arbitrary and capricious. *Business Roundtable v. SEC*, 647 F. 3d 1144, 1150 (D.C. Cir. 2011).

    **2.**    **EPA's assessment of costs at non-NPL sites was arbitrary and capricious.**

EPA's assessment was also arbitrary and capricious with respect to cleanup costs at non-NPL sites. And those errors are even more consequential, because the Final Rule will affect far more non-NPL sites.

As with costs incurred at NPL sites, EPA erroneously deemed most costs incurred at non-NPL sites to be *benefits* of the rule. The Final Rule "acknowledges that the costs parties expend to clean up PFOA and PFOS is a burden for them." JA041 (Final Rule). But "[n]otwithstanding this, EPA views the cleanup monies spent by PRPs as an *advantage* of the rule." *Id.* (emphasis added).

That conclusion makes even less sense with respect to non-NPL sites. Unlike with NPL sites, EPA does not claim that cleanup costs at non-NPL sites would be incurred absent the Final Rule, and are therefore merely *transferred* from the public to PRPs. Rather, EPA seems to acknowledge it is imposing *new* cleanup costs on

53

PRPs, but views those new costs as a benefit—because "ensur[ing] that parties that contributed to releases of PFOA and PFOS are responsible for response costs" is an "advantage of designation." JA037. *See also id.* ("For PRPs that have significantly contributed to PFOA and PFOS contamination, imposing liability is appropriate and necessary.").

That doesn't follow. Under that logic, if cleaning up a particular non-NPL site would cost a PRP $1 million, while also producing $100,000 in health benefits, then the cleanup would yield $1.1 million in net benefits (as opposed to $900,000 in net costs). And that can't be right—the $1 million in costs are new costs regardless of who ultimately pays the tab. EPA cannot transform what are obviously costs into benefits simply by declaring them so.

Further, even if EPA had properly recognized these costs, EPA's estimate is arbitrarily low. EPA estimated that these aggregate costs could be $327,000 to $18.1 million per year—much *lower* than the $10.3 million to $51.7 million it estimated at NPL sites. But costs incurred at non-NPL sites should be much *higher*. There are far more non-NPL sites than NPL sites, as EPA itself concedes. JA054 ("[O]nly about *four percent* of all contaminated sites added to EPA's Active Site Inventory were placed on the NPL.") (emphasis added); JA041 n.59. ("[R]eleases that contain PFOA or PFOS are more likely to be addressed through non-NPL mechanisms than

54

through the NPL.").[17]  That's because at non-NPL sites, liability can be imposed not only by EPA, but also by other federal agencies, States, and private parties.  *Id.*  This alone shows that EPA's cost estimate is off, according to EPA's own reasoning.

It isn't hard to see where EPA went wrong.  In its analysis, EPA assumed a total universe of only 133 potential non-NPL sites for the entire United States.  JA541 (RIA).  But even EPA's own sources find this estimate is far too low.  Indeed, EPA cites one study estimating "*57,412 sites* of presumptive [PFOA/PFOS] contamination" in the United States, including "49,145 industrial facilities, 4,255 wastewater treatment plants, 3,493 current or former military sites, and 519 major airports."  JA314 (Salvatore) (cited at JA395–96 (RIA)) (emphasis added).  EPA's 133 sites represent approximately 0.2% of the universe of potential sites identified by the study that EPA itself cites.

The magnitude of this error is enormous.  Extrapolating EPA's own estimate of $327,000 to $18.1 million to the full universe of 57,412 presumptively contaminated sites yields a projected annual cost of $141 million to $7.8 billion.

---

[17] EPA's "Active Site Inventory" lists sites where a cleanup action is either being contemplated or is underway.  US EPA, List 8R Active Site Inventory, *available       at*         https://www.epa.gov/superfund/list-8r-active-site-inventory#:~:text=The%20Active%20Site%20Inventory%20Report,include%20latitude%20and%20longitude%20information (last visited Nov. 30, 2025).

Limiting that extrapolation to industrial facilities (49,145) would still yield a projected annual cost of $121 million to $6.7 billion.

Other aspects of EPA's non-NPL site analysis were arbitrary and capricious. For example, EPA baselessly assumed cleanup would occur only where EPA takes enforcement action. But only about one third of Superfund cost recovery cases are filed by the federal government. JA324 (AWWA Comments). Further, EPA also assumed that the cleanup costs at these sites would be equivalent to costs previously incurred at NPL sites for other substances.[18] But that assumption doesn't hold, as EPA itself has previously conceded. JA149 (EA) ("[I]t is unknown how [historical NPL costs] would relate or compare to costs associated with response actions addressing PFOA and PFOS at a contaminated site.").

### 3. EPA's decision to ignore cleanup costs at federal sites was arbitrary and capricious.

Finally, EPA unreasonably ignored cleanup costs at federal sites. JA054 n.71 (Final Rule) ("EPA determined that it was appropriate to assess the designations' impact with respect to non-federal NPL sites only ...."). EPA itself expects the "size

---

[18] *See* JA543 (RIA) ("In the absence of historical cost data for non-NPL site response actions ... the low-end value ... is the sum of the costs associated with a preliminary investigation and site inspection for sites under consideration for listing in the NPL."); *id.* ("The high-end value is the cost of the average remedial investigation/feasibility study for sites on the NPL.").

and scope" of "Federal PFOA and PFOS cleanup sites to be substantially larger than non-federal sites." JA060. For example, the Department of Defense (DoD) alone has identified 687 of its own sites "with a known or suspected release" of PFOA or PFOS. JA153 (EA). These costs will impact not only taxpayers, but also any private-sector PRPs implicated at DoD sites. 42 U.S.C. § 9607(a)(4)(A).

To justify ignoring these costs, EPA asserted that "federal sites are generally expected to address PFOA and PFOS in the absence of designation." *Id.* It explained that federal sites were "largely already addressing PFAS … as required by the NDAA [National Defense Authorization Act], federal facilities agreements, and in some instances voluntarily." JA503 (RIA). That rationale cannot withstand scrutiny.

First, none of the NDAAs discussed by EPA require federal agencies to actually *clean up* PFOA or PFOS. *See, e.g.,* JA464, JA466 (RIA) (requiring the DoD to "transition away from" firefighting foams containing PFOA/PFOS, "propos[e]" a "schedule for completion of remediation for PFAS," and "estimat[e] the associated costs").[19] But the Final Rule has the effect of granting EPA and other

---

[19] EPA discusses NDAAs enacted in 2020, 2022, and 2023. JA464, JA466, JA468 (RIA).

parties that power.  By designating PFOA and PFAS as hazardous substances, EPA and other parties can now require federal agencies to clean up PFOA and PFOS.  *See* 42 U.S.C. § 9620.

Second, the argument that some federal agencies are cleaning up PFOA and PFOS "voluntarily" suffers the same basic fallacy.  JA503 (RIA).  In the absence of any requirement that these agencies do so, EPA cannot assume this would occur absent the Final Rule.  In fact, the day the Final Rule went into effect, the State of New Mexico asserted a CERCLA claim against DoD for allegedly failing to voluntarily act.  Am. Compl. ¶¶ 235–45, *New Mexico v. United States*, No. 18-mn-02873-RMB (D.S.C. July 8, 2024).

Third, "federal facilities agreements" do not justify ignoring costs at federal sites.  These agreements are between EPA and other federal agencies governing the cleanup of federal sites listed on the NPL.  42 U.S.C. § 9620(e)(2).  According to EPA, "under federal facility agreements regarding pollutants or contaminants, federal agencies may be required to address PFOA and PFOS releases at certain federal sites."  JA453 (RIA).

EPA's reasoning here is flawed in several respects.  At the outset, EPA failed to include any federal facilities agreements in the administrative record, and an "agency action is arbitrary and capricious if it rests upon a factual premise that is

58

unsupported by substantial evidence." *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992).  But even accepting EPA's characterization of these agreements, they only "may" result in some cleanup at "certain federal sites." JA453 (RIA).  That is not a basis for ignoring *all* costs at *all* federal sites, as EPA does in the Final Rule.

> **4.    EPA ignored significant categories of costs identified by commenters, and failed to adequately respond to these comments.**

Aside from mischaracterizing and underestimating cleanup costs, EPA also failed to consider costs to specific industries.  Commenters specifically identified these costs, but EPA failed to provide a "reasoned response." *Ohio v. EPA*, 603 U.S. at 280.  This further confirms that the Final Rule was "not reasonably explained, that [EPA] failed to supply a satisfactory explanation for its action, and that it instead ignore[s] an important aspect of the problem." *Id.* at 294.  *See also Business Roundtable*, 647 F.3d at 1149 (agency acted "arbitrarily and capriciously" by "fail[ing] to respond to substantial problems raised by commenters").

Multiple organizations raised concerns about costs to the waste management sector.  Petitioners NWRA and the Chamber, for example, both warned that removing PFOA and PFOS from landfill leachate could increase costs by 400% to 800%, or $966 million and $8.2 billion per year—for municipal solid waste landfills

alone. JA285 (NWRA Comments, EPA-HQ-OLEM-2019-341-480 (Nov. 10, 2022)), JA340–41 (Chamber Comments). Similarly, the American Water Works Association warned that the Final Rule could force water treatment plants to incinerate liquid sludges at a cost of $1,700 per ton, or $3.5 billion per year. JA313 (AWWA Comments).

Petitioner AF&PA warned that the Final Rule would increase the cost of managing residual materials from paper mills because liability concerns would limit the beneficial reuse of these materials. AF&PA provided data showing it would cost the paper industry between $573 and $766 million per year to adopt a waste management method recommended by EPA in its PFAS Destruction and Disposal Guidance. JA247–70 (AF&PA Comments, EPA-HQ-OLEM-2019-341-423 (Nov. 10, 2022)). Further, AF&PA warned that this consequence of the Final Rule could overburden landfills, increase greenhouse gas emissions, and disrupt supply chains. JA265–266.

In the Final Rule, EPA unreasonably dismissed these concerns. It acknowledged that changing waste management practices "may, but will not necessarily, involve additional costs." JA531 n.226 (RIA). But it then baldly asserted that "[i]ssues pertaining to wastewater treatment, irrigation and farming practices, general waste management and the like, are outside the scope of this

60

rulemaking and require no response." JA683 (EPA, Response to Comments at 148, EPA-HQ-OLEM-2019-341-839 (May 8, 2024)). At the same time, EPA did rely on the purported *benefit* of "incentiviz[ing] better waste management practices" of products that may contain PFOA or PFOS. JA047 (Final Rule). EPA's failure to consider the corresponding costs of these practices, even-handedly assess costs and benefits, and provide a "reasoned response" to commenters' concerns, was arbitrary and capricious. *Ohio*, 603 U.S at 305. *See also Business Roundtable*, 647 F.3d at 1154 (arbitrary and capricious for agency to consider benefits of an activity without considering corresponding costs).

EPA also ignored costs to the construction industry. Petitioner AGC expressed concern that the presence of PFOA and PFOS in soil, groundwater, and building materials could impact all sectors of construction and demolition. JA232 (AGC Comments, EPA-HQ-OLEM-2019-341-418 (Nov. 10, 2022)). AGC also cited increased costs for training and certifications, project delays, testing of materials before demolition, construction, and/or disposal, as well as limited treatment and disposal options. JA236–37. Given these impacts, AGC questioned "why EPA [did] not include contractors/construction among the list of industry sectors that may be impacted by this economically significant proposal." JA231. In

61

response, EPA continued to ignore contractors' costs and to omit contractors from the list of entities that may be affected by the Final Rule. *See* JA010–13 (Final Rule).

Finally, Petitioner ReMA raised concerns about impacts and costs to the recycled materials industry. Recyclers do not add PFOA and PFOS to recycled materials or otherwise introduce them into commerce, and any residual presence in recycled materials (that would have been added only in the original manufacturing process) provide no value to the recycling process. JA330 (ISRI Comments, EPA-HQ-OLEM-2019-341-556 (Nov. 10, 2022) (ISRI Comments)). But EPA's designation of PFOA and PFOS as a CERCLA hazardous substance can open recyclers and some other participants in the recycling materials chain to potential CERCLA liability as a result of the normal mechanical recycling process, either directly or indirectly as "arrangers" for disposal. This significant liability exposure will discourage participants from (or possibly make it financially infeasible for) offering or accepting for recycling materials that could contain even miniscule concentrations of PFOA and PFOS (particularly since in the vast majority of situations it will not be possible to know whether the substances are present).

This threatens to significantly disrupt the national recycling system. Recycling provides many benefits to the environment, the economy, and our communities. As EPA has itself acknowledged, "[r]ecycling has been a critical

62

component of [its] decades-long efforts to implement the Resource Conservation and Recovery Act (RCRA) and its more recent efforts to pursue a Sustainable Materials Management (SMM) approach, which aims to reduce the environmental impacts of materials across their lifecycle." EPA, Draft National Recycling Strategy at 6 (Oct. 5, 2020), *available at* https://www.epa.gov/sites/default/files/2020-10/documents/draft_national_recycling_strategy.pdf (last visited Nov. 30, 2025). Successful recycling requires cooperation among multiple participants: individuals and companies must separate and make available recyclable materials, which are then collected and transported to facilities that sort or process the recyclable materials, to produce a high-quality product for sale to manufacturers for the production of the everyday products and infrastructure used throughout our economy. A disruption to the national recycling system can thus cause significant economic costs and adverse environmental consequences, such as the increased depletion of natural resources, energy use, greenhouse gas emissions, and waste disposal, none of which were taken into account by EPA.

Petitioner ReMA raised these concerns in comments, arguing that "EPA must address this potential economic harm," JA334 (ISRI Comments), and EPA's failure to make its RIA and "totality of the circumstances" analysis available for public comment further aggravated EPA's failures. But EPA ignored these concerns too in

63

the Final Rule. Indeed, EPA didn't even mention the impact on recycled materials. Again, the complete failure to even acknowledge a significant concern raised by commenters is arbitrary and capricious. *Ohio*, 603 U.S. at 299.

### 5. EPA's assessment of benefits was arbitrary and capricious too.

EPA's arbitrary analysis of costs is itself sufficient to invalidate the Final Rule. But EPA's assessment of benefits was arbitrary and capricious too.

First, as discussed above, EPA arbitrarily and capriciously by sleight of hand transformed costs into benefits, and in other places claimed benefits (e.g., enhanced waste management practices) while affirmatively ignoring the costs associated with those alleged benefits. *See* Section C.1–2, 4, *supra*. This artificially inflated EPA's claimed benefits.

Second, EPA failed to consider whether the purported health benefits of cleaning up PFOA and PFOS could be obtained through less costly means. For example, the same health benefits could be obtained by providing alternative water to those populations, as DoD has done when communities surrounding installations have elevated PFOA and PFOS levels in their drinking water, without assuming that PFOA and PFOS removal would be economically appropriate in all instances. *See* Office of the Assistant Secretary of Defense for Energy, Installations, and Environment, U.S. Department of Defense, *Appendix B: Per- and Polyfluoroalkyl*

64

*Substances Task Force Activities During the Fourth Quarter of Fiscal Year 2022*,
"Report on Department of Defense's Per- and Polyfluoroalkyl Substances Task
Force Activities," at B-2 January 2023 (cited at JA467 n. 142 (RIA)).

### D.    EPA compounded these errors by violating the RFA.

Compounding these errors, EPA's cost analysis also violated the Regulatory
Flexibility Act (RFA).  The RFA requires executive agencies to analyze the impact
of proposed actions on small entities.  In doing so, it requires agencies to prepare a
"regulatory flexibility analysis" that, among other things, estimates the number of
small entities impacted, and details steps taken to minimize that impact.  5 U.S.C. §
604(a)(1).  Agencies can avoid preparing a regulatory flexibility analysis only by
properly certifying that "the rule will not, if promulgated, have a significant
economic impact on a substantial number of small entities" ("no-impact
certification").  5 U.S.C. § 605(b).  Such certifications are subject to arbitrary and
capricious review.  *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 5 (D.C. Cir. 2011).  *See
also* 5 U.S.C. § 611(a)(1) (authorizing judicial review of no-impact certifications).

In determining whether there is a significant economic impact, agencies must
consider "the direct impact of a regulation on regulated small entities."  *Mid-Tex
Elec. Co-op., Inc. v. FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985) (quotation marks
removed).  A "direct impact" is felt by small entities that are "subject to the proposed

65

regulation." *Id.* By contrast, agencies should not consider the "indirect impact" on small entities that are *not* regulated by the relevant rule. *Id.*

Here, in purporting to comply with the RFA, EPA certified that the Final Rule "will not have a significant economic impact on a substantial number of small entities." JA061 (Final Rule). But in reaching that conclusion, EPA erroneously excluded the lion's share of costs to these entities as "indirect." This error independently warrants relief.

In making the no-impact certification, EPA concluded that "direct effects to small entities are limited to potential reporting costs," which it "expected to be infrequent and relatively minor." JA442 (RIA). EPA then concluded that the impact on small entities of "[p]otential liability for response costs" was "an *indirect* effect of designation," and therefore did not count as significantly impacting regulated small entities. JA443 (RIA) (emphasis added). EPA deemed an impact "indirect"— even if felt by small entities that are regulated by the rule—if it is "contingent" on further agency action. *Id.*

That was incorrect. As explained above, an impact is "direct" for RFA purposes when felt by small entities that are directly regulated by the Final Rule. That is all. Those same impacts do not somehow become "indirect" because they are contingent on further action—*Mid-Tex* makes clear that effects are "indirect"

66

only if felt by small entities that are *not* directly regulated by the rule. Accordingly, EPA abused its discretion by categorically excluding substantial costs borne by regulated small entities.

### III. EPA's decision to designate PFOA and PFOS without assessing and understanding the widespread consequences was arbitrary and capricious.

The Final Rule is arbitrary and capricious for one final, fundamental reason: it will have severe consequences that EPA has not carefully assessed and does not understand.

Designation of new "hazardous substances" should not be taken lightly. Liability under CERCLA is both broad and harsh, with remedial actions lasting decades and costing tens of millions of dollars. *See* Statement of the Case Section A.3, *supra*. Accordingly, CERCLA is a cudgel that must be wielded with care. Congress itself recognized when requiring EPA to consider costs before designating any new substance under Section 102(a). *See* Argument Section II.A, *supra*. And particular care was warranted here, where EPA designated two substances that are purportedly present at over 57,000 sites nationwide. *See* Argument Section II.C.2, *supra*.

Yet EPA designated PFOA and PFOS despite acknowledging significant uncertainty as to the consequences of that action. These uncertainties included (1)

67

where PFOA and PFOS are located, and in what quantities; (2) what economic costs the Final Rule will impose, and how parties will address contamination; and (3) unintended consequences of designation, including on real estate transactions. That was arbitrary and capricious.

Plowing forward despite too much uncertainty about the effects of a rule is arbitrary and capricious. It is true that "[r]easoned judgment may at times permit … action in the face of uncertainty." *Ctr. for Biological Diversity v. EPA*, 749 F.3d 1079, 1090 (D.C. Cir. 2014). "But at some point, action infected by enough uncertainty cannot be called reasoned." *Id.* That this Court has "rejected *certainty* as an appropriate goal, does not mean that regulation is required (or permitted) no matter how much *uncertainty* the agency faces." *Id.* at 1090 n.18.

Further, agencies "may not tolerate needless uncertainties … when the evidence fairly allows investigation and solution of those uncertainties." *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1391 (D.C. Cir. 1985). Indeed, "[a] key element of rulemaking is the collecting of relevant information." *A Cmty. Voice v. EPA*, 997 F.3d 983, 993 (9th Cir. 2021).

Here, EPA unleashed CERCLA onto substances it claims are everywhere, despite admitting serious uncertainties about the resulting impacts. These

68

uncertainties, combined with the harshness of CERCLA, render the Final Rule arbitrary and capricious.

First, EPA admits uncertainty as to where PFOA and PFOS are located, and in what quantities. EPA acknowledges "numerous uncertainties" concerning "how many sites have PFOA or PFOS contamination at a level that warrants a cleanup action," "the extent and type of PFOA and PFOS contamination at/near sites," and "the extent and type of other contamination at/near sites." JA037 (Final Rule). *See also* JA592 (RIA) (admitting that EPA "lacks information on the number of sites that may require response actions"). Accordingly, EPA doesn't know where, and to what extent, new liability under CERCLA will be imposed—and made no serious effort to resolve that uncertainty before promulgating the Final Rule.

Based on what little EPA does claim to understand, the magnitude of these unknown effects is huge. If PFOA and PFOS are everywhere, as EPA supposes, then potential liability under CERCLA is everywhere too. As one Petitioner explained in comments, the Final Rule subjects millions of landowners to potential liability. JA367 (Chamber Comments). Yet, EPA lowballs the cost to PRPs for cleanup of contaminated sites through, among other things, using arbitrary cost premiums and drastically underestimating the number of potential sites. *See* Argument Section II.C.1–2, *supra*.

69

Second, EPA admits uncertainty about the economic costs the Final Rule will impose. EPA concedes that "[p]otential costs associated with CERCLA enforcement actions that may occur after designation are difficult to assess." JA029 (Final Rule). *See also, e.g.,* JA595 (RIA) ("[T]here is scarce information on the magnitude of costs and benefits associated with response actions."); JA036–37 (Final Rule) ("[T]here is uncertainty associated with … response costs, costs that may arise from a judgment of liability, and litigation costs."); *id.* ("[F]uture response costs are uncertain."). And as discussed above, EPA's limited attempt to assess these costs was woefully inadequate. *See* Section II.C.1–4, *supra.* EPA ignores crucial categories of these costs. *Id.* And the costs EPA does attempt to quantify are dramatically underestimated. *Id.*

Compounding this problem, EPA lacks certainty as to *how* parties should address contamination. EPA concedes that "[t]he science on treating, destroying, and disposing of PFAS is evolving." JA056 (Final Rule). And until that science further develops, there remain "uncertainties regarding assessment and cleanup methods and associated costs." JA594 (RIA). *See also id.* (explaining that "[t]reatment and disposal methods for PFOA and PFOS are changing," and this introduces "further uncertainty regarding the cost of response actions"). In addition, "the incremental cost of addressing PFOA/PFOS" at "existing contaminated sites"

70

is also "uncertain." *Id.* *See also* JA595 (RIA) (noting "[l]imited data …
documenting the incremental costs of PFOA/PFOS cleanup"); *id.* ("The extent to
which PFOA/PFOS contamination co-occur with other substances is uncertain and
complicates costs estimates in several ways …."). Without knowing *how* parties
should address PFOA and PFOS contamination, it is impossible to understand the
costs that designation will impose.

Third, EPA cannot foresee the unintended consequences of its actions. For
starters, designation could easily slow down, rather than speed up, cleanup sites.
Remedial actions take years, if not decades, to complete, and often lead to protracted
litigation. *See* JA149 (EA). And EPA is already substantially backlogged. Of the
approximately 1,800 sites EPA has added to the NPL since 1980, fewer than 500
have been fully remediated.[20] Designating PFOA/PFOS would complicate ongoing
cleanup efforts, divert resources from more urgent cleanup sites, and potentially
reopen sites that have already been deemed remediated.

_____

[20] *See* US EPA, Number of NPL Sites of Each Status at the End of Each Fiscal
Year, *available at* https://www.epa.gov/superfund/number-npl-sites-each-status-
end-each-fiscal-year (showing 1,340 active NPL sites and 458 deleted NPL sites as
of 2024) (last visited Nov. 30, 2025).

71

Designation could also severely hamper real estate transactions. As discussed, current property owners can be held liable for contamination that occurred under prior ownership. *See* 42 U.S.C. § 9607(a)(1). And while CERCLA provides "bona fide prospective purchaser" liability protection, that requires the prospective purchaser, prior to acquiring the property, to make "all appropriate inquiries into the previous ownership and uses of the facility." *Id.* § 9601(40)(B)(ii)(I). Accordingly, designation will force prospective purchasers to engage "an environmental professional" to conduct inquiries into potential PFOA or PFOS contamination before closing. *See* 40 C.F.R. § 312.21. This will complicate real estate transactions across the country even for residential properties. *See* JA038 (Final Rule) (EPA recommending "[r]esidential landowners" to "avail themselves of protections … available to Bona Fide Prospective Purchasers … or 'innocent land owners'").

EPA claims that some of these concerns can be ameliorated through proper use of EPA's "enforcement discretion." *See, e.g.,* JA007 (Final Rule) ("Enforcement discretion policies historically have given EPA the needed flexibility to offer liability comfort or protections when circumstances warrant."). But "[e]nforcement discretion policies are not exclusions from liability." JA045 n.64 (Final Rule). *See also* JA006 n.16 (Final Rule) ("… EPA's policies are not regulations and do not create new legal obligations."). Instead, they are exercised at the sole option of EPA.

72

How EPA chooses to exercise that discretion could vary greatly with changing administrations.

Further, even if these policies were binding, they "apply only to EPA." *Id.* Accordingly, they do nothing to prevent State governments or private parties from suing PRPs for clean-up costs, either for contribution under Section 113 or cost-recovery claims under Section 107. For these reasons, regulated entities cannot rely on EPA's enforcement discretion for protection.

In sum, the Final Rule designated purportedly ubiquitous substances under a particularly harsh environmental statute in the face of monumental uncertainty, without taking reasonable steps to understand the consequences. That was arbitrary and capricious.

## IV.    The proper remedy is vacatur.

Each of EPA's legal violations independently warrants vacatur of the Final Rule, which "is the normal remedy when [this Court] is faced with unsustainable agency action." *New Jersey Conservation Found. v. FERC*, 111 F.4th 42, 63 (D.C. Cir. 2024). Remand *without* vacatur is appropriate only "[i]n rare cases," depending on "two factors: (1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the

disruptive consequences of vacatur." *Id.* Here, both factors confirm that the normal remedy of vacatur is appropriate.

First, all the deficiencies identified above were serious. EPA misinterpreted a critical statutory term, failed to subject almost all its cost-benefit analysis to notice and comment, made serious substantive errors as a result, and ultimately stormed ahead in the face of enormous uncertainty. None of those errors are likely to be corrected on remand.

Second, vacatur would not trigger disruptive consequences. Exposure to PFOA and PFOS has already been declining drastically for decades. *See* Statement of the Case Section C, *supra*. And EPA and other regulators are already addressing what remains through other, more targeted means. *See, e.g., PFAS National Primary Drinking Water Regulation*, 89 Fed. Reg. 32,532 (April 26, 2024); US EPA, Key EPA Actions to Address PFAS, *available at* https://www.epa.gov/pfas/key-epa-actions-address-pfas (last visited Nov. 30, 2025). It would be far more disruptive to leave the Final Rule in place, given the costs that affected entities are already incurring and the threat of liability that they face. *See* pp. 27–29, *supra*; Argument Section II.C, *supra*.

## **CONCLUSION**

For the foregoing reasons, this Court should vacate the Final Rule.

Dated: December 5, 2025          Respectfully submitted,


/s/  *Elbert Lin*___


Andrew R. Varcoe                      Elbert Lin
Stephanie A. Maloney                    *Counsel of Record*
U.S. CHAMBER LITIGATION CENTER      Paul T. Nyffeler
1615 H Street, NW                   David M. Parker
Washington, DC 20062                HUNTON ANDREWS KURTH LLP
(202) 463-5337                      Riverfront Plaza, East Tower
avarcoe@USChamber.com               951 East Byrd Street
smaloney@USChamber.com              Richmond, VA 23219-4074
                                    (804) 788-8200
*Counsel for Petitioner Chamber of*   elin@huntonAK.com
*Commerce of the United States of*    pnyffeler@huntonAK.com
*America*                             dparker@huntonAK.com

Leah Pilconis                       Matthew Z. Leopold
ASSOCIATED GENERAL CONTRACTORS      HOLLAND & KNIGHT LLP
OF AMERICA, INC.                    800 17th St. NW,
2111 Wilson Blvd., Suite 1000       Washington, DC 20006
Arlington, VA 22201                 (202) 955-3000
(703) 837-5332                      mleopold@hklaw.com
Leah.pilconis@agc.org
                                    *Counsel for Petitioners Chamber of*
*Counsel for Petitioner Associated*   *Commerce of the United States of*
*General Contractors of America, Inc.* *America, Associated General Contractors*
                                    *of America, Inc., National Waste &*
                                    *Recycling Association, and American*
                                    *Chemistry Council*

Aleacia Chinkhota
AMERICAN CHEMISTRY COUNCIL
Assistant General Counsel, Legal
Services
700 2nd Street, NE
Washington, DC 20002
202-249-6131
*Aleacia_Chinkhota@
americanchemsitry.com*

*Counsel for Petitioner American
Chemistry Council*

Susan Parker Bodine
EARTH & WATER LAW LLC
1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004

*Counsel for Petitioner American
Forest & Paper Association*

Richard S. Moskowitz
Tyler Kubik
AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS
1800 M Street, NW
Suite 900 North
Washington, DC 20036
(202) 457-0480 (telephone)
(202) 457-0486 (facsimile)
rmoskowitz@afpm.org
tkubik@afpm.org

*Counsel for Petitioner American Fuel
& Petrochemical Manufacturers*

Christopher L. Bell
D.C. Bar # 412857
GREENBERG TAURIG, LLP
1000 Louisiana Street, Suite 6700
Houston, TX 77002
(713) 374-3556
bellc@gtlaw.com

Counsel for Petitioner Institute of Scrap
Recycling Industries, Inc., d/b/a Recycled
Materials Association

Heather Lyons
  *General Counsel*
RECYCLED MATERIALS ASSOCIATION
1250 H Street NW, Suite 400
Washington, DC 20005
(202) 662-8500
hlyons@recycledmaterials.org
randrechak@recycledmaterials.org

*Counsel for Petitioner Institute of Scrap
Recycling Industries, Inc.*

76

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7) because it contains 15,743 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(e)(1); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is typeset in Times New Roman in font size 14.

Dated: December 5, 2025                           */s/ Elbert Lin*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 5, 2025, I electronically filed the foregoing brief with the Clerk of the Court using the appellate CM/ECF system, which served copies of the brief on all ECF-registered counsel.

Dated: December 5, 2025                           */s/ Elbert Lin*

**<u>ADDENDUM A</u>**

# ADDENDUM A

# TABLE OF CONTENTS

42 U.S.C. § 9602(a)

Designation of additional hazardous substances and establishment of reportable released quantities; regulations ..................................... Add. A2

42 U.S.C. § 9602(a) provides:

**Designation of additional hazardous substances and establishment of reportable released quantities; regulations**

(a) The Administrator shall promulgate and revise as may be appropriate, regulations designating as hazardous substances, in addition to those referred to in section 9601(14) of this title, such elements, compounds, mixtures, solutions, and substances which, when released into the environment may present substantial danger to the public health or welfare or the environment, and shall promulgate regulations establishing that quantity of any hazardous substance the release of which shall be reported pursuant to Section 9603 of this title.

The Administrator may determine that one single quantity shall be the reportable quantity for any hazardous substance, regardless of the medium into which the hazardous substance is released. For all hazardous substances for which proposed regulations establishing reportable quantities were published in the Federal Register under this subsection on or before March 1, 1986, the Administrator shall promulgate under this subsection final regulations establishing reportable quantities not later than December 31, 1986. For all hazardous substances for which proposed regulations establishing reportable quantities were not published in the Federal Register under this subsection on or before March 1, 1986, the Administrator shall publish under this subsection proposed regulations establishing reportable quantities not later than December 31, 1986, and promulgate final regulations under this subsection establishing reportable quantities not later than April 30, 1988.

Add. A2

**ADDENDUM B**

# ADDENDUM B
# TABLE OF CONTENTS

**Declaration of Martin Durbin**

Declaration for the Chamber of Commerce of the United States of America ................................................................................... Add. B001

**Declaration of John M. Perkey**

Declaration for Waste Connections, Inc.................................... Add. B012

**Declaration of Anne Germain**

Declaration for the National Waste & Recycling Association... Add. B022

**Declaration of Joseph Benco**

Declaration of Republic Services, Inc........................................ Add. B030

**Declaration of Leah Pilconis**

Declaration of the Associated General Contractors of America, Inc........... ................................................................................... Add. B034

**Declaration of Charles Mull**

Declaration for Kokosing, Inc. .................................................. Add. B051

**Declaration of Dale Schwager**

Declaration for Foundation Service Corporation ...................... Add. B059

**Declaration of Robert J. Simon**

Declaration of the American Chemistry Council ....................... Add. B065

**Declaration of Paul Noe**

Declaration of the American Forest & Paper Association ......... Add. B075

**Declaration of Robin K. Weiner**

Declaration of the Institute of Scrap Recycling Industries, Inc. Add. B080

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, ET AL.,

     *Petitioners*,

v.                                    Case Nos. 24-1193 et al.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and
MICHAEL S. REGAN, in his official
capacity as Administrator, United States
Environmental Protection Agency,

     *Respondents*.

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency

---

**DECLARATION OF MARTIN DURBIN**

---

I, Martin Durbin, declare based on personal knowledge as follows:

1.     I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.     I am the Senior Vice President for Policy for the Chamber of Commerce of the United States of America (Chamber), overseeing the U.S. Chamber's Policy Division, and serve as the President of the Chamber's Global Energy Institute.  I

1

oversee a portfolio of policy and advocacy issues in the energy and environment space, including on issues related to per- and polyfluoroalkyl substances (PFAS), including Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS). I lead the strategic development and implementation of the Chamber's climate, energy, and sustainability policy, highlighting the role of the business community.

3.      My business address is 1615 H Street, N.W., Washington, D.C. 20062.

4.      The Chamber is a non-profit organization created and existing under the laws of the District of Columbia that promotes trade and commerce across the U.S. and worldwide.  The Chamber is the world's largest business federation. The Chamber represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  The Chamber brings this action on behalf of its members.

5.      On behalf of its members, the U.S. Chamber supports reasonable, effective environmental regulations that promote important sustainability values while providing businesses with a stable and predictable regulatory regime.  The U.S. Chamber pursues these efforts through advocacy directed to federal legislative

2

and regulatory processes, as well as advocacy in litigation and the public square. The Chamber is also dedicated to ensuring the safety of our member companies' employees and the communities where they live and operate.

6.　　The Chamber recognizes that the United States must maintain access to essential fluorochemistries in key sectors across the economy in products that Americans rely on every day (e.g., aircraft, automobiles, cell phones, medical devices, and the technologies needed for the energy transition). To this end, the Chamber regularly engages with, and plays a leadership role in, a coalition of diverse companies, associations, and other stakeholders that have a strong interest in appropriately addressing challenges associated with PFAS, including PFOA and PFOS. As part of its engagement with these issues, the Chamber also supports the responsible cleanup of PFOA and PFOS in the environment based on the best science and risk management.

7.　　On September 6, 2022, the U.S. Environmental Protection Agency (EPA) issued the proposed rule that led to the final rule at issue here. The Proposed Rule was entitled "Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances," 87 Fed. Reg. 54,415-01 (Sept. 6, 2022) ("Proposed Rule"). On November 9, 2022, the

3

Chamber, along with several other associations, submitted detailed comments on the proposed rule.[1]

8.      On May 8, 2024, the U.S. Environmental Protection Agency published the final rule entitled Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances (Final Rule), which is the subject of the above-referenced case.

9.      The Chamber's members include companies across the economy from every sector in the chemicals value chain (including chemical manufacturing itself, as well as aircraft, automobiles, cell phones, medical devices, and various technologies needed for the energy transition).  Many of the Chamber's members "will likely face greater liability" as a result of the Final Rule, *Int'l Fabricare Inst. v. U.S. E.P.A.*, 972 F.2d 384, 390 (D.C. Cir. 1992), or are otherwise directly affected by the Final Rule.

10.      **Liability for clean-up/remediation**.  The Chamber's members include entities that, as a result of the Final Rule, are newly subject to liability risk as "potentially responsible parties" (PRPs) under CERCLA.  For these members, the

---

[1] See *Comments of the U.S. Chamber of Commerce Coalition of Companies and Trade Associations on Proposed Rule, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances*, 87 Fed. Reg. 54,415 (Sept. 6, 2022), Dkt. Nos. 404 and 405 EPA-HQ-OLEM-2019-0341 (Nov. 9, 2022) and Dkt. No. 569 EPA-HQ-OLEM-2019-0341 (posted Nov. 10, 2022).

Final Rule "drastically increases the chances of costly activity." *Mead Corp. v. Browner*, 100 F.3d 152, 155 (D.C. Cir. 1996).

11.    There are four categories of PRPs under CERCLA: "(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance." 42 U.S.C. § 9607(a).

12.    PRPs can be liable for a broad range of "response" costs, including costs of removal or remedial actions and natural resource damages. The Chamber conducted research finding that private sector cleanup costs related to PFOA or PFOS at Superfund sites alone (i.e., sites included on EPA's National Priorities List) could be between $700 million and $800 million annually. U.S. Chamber of Commerce, *PFOS and PFOA Private Cleanup Costs at Non-Federal Superfund*

5

*Sites*, at 3-4 (June 2022).  This estimate is based on economic modeling and analysis of the potential aggregate financial liabilities associated with private party cleanups of PFOS and PFOA sites. In addition, EPA can issue an administrative order or obtain a court order that requires PRPs to take actions to address "imminent and substantial endangerment to the public health or welfare or the environment" resulting from a release or threatened release of a hazardous substance.  42 U.S.C. § 9606(a).

13.     Various members of the Chamber are already PRPs at Superfund sites, or are at high risk of qualifying as PRPs at potential sites, and therefore the Rule "drastically increases the chance of costly activity" for these members, *Mead Corp.*, 100 F.3d at 155, and the chance that they will suffer at least some of the harms described above.  Among other things, numerous members of the Chamber are likely to incur PRP-related costs as a result of the release or disposal of PFOA and PFOS from their facilities in the United States.  These include members with historical evidence of PFOA and PFOS being present on or having been released from their property; examples include private airports and landfills.  Further, particularly in instances where this historical PFOA and PFOS evidence is public, the Rule impedes members' ability to transact with third parties, such as insurers or potential purchasers of their property or business.

6

14.     Other members at high risk of qualifying as PRPs include those that have previously completed remedial activities for contaminated sites under CERCLA.  These members may be required by EPA to expend additional funds to conduct additional testing for PFOA and PFOS and, if PFOA or PFOS is present, to reopen the site for additional and likely expensive remediation.

15.     Other members that face greater liability as a result of the Rule belong to industries that have been specifically targeted by EPA for enforcement of the Final Rule.  These include "PFAS production and processing, metal finishing, airports, pulp and paper, landfills, and textile and carpet manufacturing," which EPA included in "a relatively narrow set of industries [that] directly discharge PFAS into water or soil or generate air emissions in large quantities."  U.S. EPA, *PFAS Strategic Roadmap: EPA's Commitments to Action, 2021-2024*, at 7, 23 n.iii. (Oct. 2021), available at https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf (Strategic Roadmap).[2]  The Chamber has many members from these various industries.

---

[2] EPA's Office of Enforcement and Compliance Assurance (OECA) declared in a 2023 memo that the focus of the National Enforcement and Compliance Initiative (NECI) for Fiscal Years 2024–2027 to address exposure to PFAS, once "EPA designates PFOA and PFOS as hazardous substances under" CERCLA, would be to "focus on implementing EPA's PFAS Strategic Roadmap. . . ."  EPA, *FY 2024-2027 National Enforcement and Compliance Initiatives*, at 3 (Aug. 17, 2023), available at https://www.epa.gov/enforcement/national-enforcement-and-compliance-initiatives.

16.    The Chamber has many members that have already been directly affected by the rule, including 3M Company (3M) and The Chemours Company (Chemours).  For example, I understand from publicly available information that in August 2024, 3M received a request for information from EPA under CERCLA seeking information and documents, including regarding the use and disposal of PFAS (including PFOA and/or PFOS) at its Greystone facility and its downtown Wausau facility. 3M is in the process of responding to the request. As another example, I understand from publicly available information that in its permitted water discharges from 2020 to 2023, Chemours' Washington Works complex, where PFOA had previously been used, discharges ammonium perfluorooctanoate, a salt form of PFOA that is subject to the Rule.  Thus, in addition to CERCLA remediation assertions under the Final Rule, should the Washington Works complex release reportable quantities of ammonium perfluorooctanoate in the future, Chemours will incur costs reporting any such release(s) to EPA, as further noted below.

17.    Waste Connections, Inc., another Chamber member, has wholly owned subsidiaries that own and/or operate landfills, and as a result, is newly subject to liability risk as a PRP under CERCLA.  Perkey Decl. ¶¶ 10–18.  For example, Rochelle Waste Disposal, operates a landfill and transports landfill leachate for treatment and disposal. *Id.* ¶¶ 16–17.  The Final Rule directly harms Rochelle Waste Disposal by newly subjecting it to liability risk as a PRP under CERCLA, including

8

by targeting transporters of CERCLA hazardous substances as PRPs.  *Id.* ¶ 18.

EPA's public statements make clear that it intends to target enforcement of the Rule

against landfills.  89 Fed. Reg. 39,124, 39,136 (May 8, 2024); PFAS Strategic

Roadmap at 7, 23 n.iii; 89 Fed. Reg. at 39,125 n.1 ("PFOA and PFOS are part of a

group of humanmade chemicals known as per- and polyfluoroalkyl substances

(PFAS)."  The Rule also directly harms Waste Connection, Inc. by deterring third

parties from transacting with it.  Perkey Decl. ¶ 19.

18.    **Real estate transactions.**  Other members of the Chamber are being

and will be affected by the Final Rule because it affects real estate transactions in

which they are engaging and seeking to engage.  Members who plan to purchase

property that may contain PFOA or PFOS will likely incur new environmental

assessment costs.  To protect themselves from CERCLA liability, these members

are required to investigate, including through a qualified environmental professional,

the property they are considering purchasing for CERCLA hazardous substances.

19.    In enacting CERCLA, Congress included several statutory landowner

liability protections that private parties can implement without involving EPA.  A

condition common to these statutory landowner liability protections is the need to

conduct "all appropriate inquiries" into the previous ownership and uses of a

property before the party becomes its owner.

20.    EPA's regulations defining "all appropriate inquiries" require potential property purchasers to engage the services of a qualified environmental professional before closing to investigate the property and identify conditions indicative of releases and threatened releases of substances designated as "hazardous" under CERCLA on, at, in, or to the property.  40 C.F.R. §§ 312.1 to 312.31.

21.    As a result of the Final Rule, site investigations will need to be expanded to include searching for PFOA and PFOS, and these expanded site investigations will result in immediate, additional costs to any member that wishes to purchase property, in the form of higher fees assessed by qualified environmental professionals.

22.    **Reporting Costs**.  The Final Rule harms members who have either already borne or are at dramatically increased risk of bearing the costs of reporting releases of PFOA and PFOS.  For example, certain members possess sufficient quantities of PFOA and PFOS in firefighting foams that, despite full compliance with all state and federal regulatory obligations, could result in an unavoidable release of a reportable quantity of PFOA and PFOS under the Final Rule.

23.    Contrary to EPA's assertions, the costs incurred by these members would include paying personnel to report such releases to the National Response Center, the community emergency coordinator for local emergency planning committee (LEPC) for any area likely to be affected by the release, and the State

10

Emergency Response Commission (SERC) of any State likely to be affected by the release of these substances.  In addition, these costs also would include paying personnel to draft and submit follow-up reports to the SERC.

24.    I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of November 2024.


_____

Martin Durbin

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, ET AL.,

    *Petitioners,*

v.

Case Nos. 24-1193 et al.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and
MICHAEL S. REGAN, in his official
capacity as Administrator, United States
Environmental Protection Agency,

    *Respondents.*

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency

### DECLARATION OF JOHN M. PERKEY

I, John M. Perkey, declare based on personal knowledge as follows:

1.    I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.    I am Vice President, Deputy General Counsel—Compliance and Government Affairs of Waste Connections, Inc. ("WCI").

3.    I have been employed by Waste Connections US, Inc. ("WCUS"), a subsidiary of WCI, for 13 years and have held my current title for two years. Prior

1

to my current position, I served as Associate General Counsel—Director of Compliance from 2017 to 2022 and as Operations Counsel from 2011 to 2017. I have extensive experience in environmental regulation, environmental compliance, litigation, and corporate law, including the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and similar federal and state laws involving alleged hazardous substances.

4.    In my current role, among other responsibilities, I manage the compliance program for WCI and its wholly owned subsidiaries (collectively "Waste Connections"). This role includes working with and advising our operations and engineering teams on obtaining, renewing, and complying with all environmental permits and applicable laws, rules and regulations. I also oversee the defense of Waste Connections in litigation involving alleged hazardous substances.

5.    Waste Connections is an integrated solid waste services company that provides non-hazardous waste collection, transfer and disposal services, including by rail, along with resource recovery primarily through recycling, composting and renewable fuels generation. Waste Connections collects waste from its customers' locations, safely transports that waste to recycling or disposal locations, and, for waste that cannot be recycled, operates landfills that isolate that waste from the environment. Waste Connections serves the daily waste collection and disposal

needs of approximately nine million residential, commercial, and industrial customers across 46 states in the United States and six provinces in Canada.

6.    WCI is a member of the Chamber of Commerce of the United States of America and the National Waste & Recycling Association.

7.    I submit this declaration to attest to the harm suffered by Waste Connections as a direct result of the final rule entitled "Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances," published by the Environmental Protection Agency on May 8, 2024 ("Rule").

8.    Waste Connections, as a result of the Rule, is newly subject to liability risk as a "potentially responsible party" (PRP) for PFOA and PFOS under CERCLA. For Waste Connections, the Rule provides a new avenue for bringing Waste Connections into "the web of Superfund's cleanup and enforcement scheme," which "drastically increases the chances of costly activity." *Mead Corp. v. Browner*, 100 F.3d 152, 155 (D.C. Cir. 1996).

9.    CERCLA establishes financial liability for four categories of PRPs: (i) current owners or operators of a contaminated site ("facility"); (ii) persons who owned or operated the facility at the time hazardous substances were released or disposed of there; (iii) persons who arranged for the disposal or treatment of hazardous substances at a facility or incineration vessels or arranged for transport

for disposal or treatment of hazardous substances; and (iv) persons who transported hazardous substances for disposal or treatment at facilities, incineration vessels, or sites selected by such persons. *See* 42 U.S.C. § 9607(a).

10.    A significant number of WCI's wholly owned subsidiaries own and/or operate over 90 landfills throughout the United States that provide vital solid waste management services. When rain falls on a landfill, the water infiltrates the contents of the landfill and becomes a liquid called leachate, which can be contaminated with any number of chemicals or constituents found in the waste disposed of in the landfill. In modern landfills, leachate is collected at an impermeable bottom liner of the landfill, which prevents the leachate from entering soil and groundwater below. The vast majority of leachate generated by landfills owned and/or operated by WCI's wholly owned subsidiaries is conveyed for treatment and disposal to local Publicly Owned Treatment Works ("POTWs"), which typically discharge treated effluent to surface waters via outfalls that are subject to National Pollution Discharge Elimination System permits that are governed by the federal Clean Water Act.

11.    Each of WCI's wholly owned subsidiaries that own and/or operate landfills faces greater potential liability as a result of the Rule because as an owner or operator of a landfill, it belongs to an industry that has been specifically targeted by EPA for enforcement of the Rule. The Rule identifies by North American Industrial Classification System (NAICS) codes entities that may be affected by the

4
Add. B015

Rule. That list includes NAICS code 562212 (solid waste landfills), which is one of the primary industries in which Waste Connections operates. *See* 89 Fed. Reg. 39,124, 39,136 (May 8, 2024).

12.    In October 2021, EPA released its "Strategic Roadmap: EPA's Commitments to Action, 2021-2024," which asserted that "a relatively narrow set of industries," including "landfills," had "discharge[d] PFAS into water or soil or generate air emissions in large quantities." U.S. EPA, PFAS Strategic Roadmap: EPA's Commitments to Action ("PFAS Strategic Roadmap"), 2021-2024, at 7, 23 n.iii. (Oct. 2021); *see* 89 Fed. Reg. at 39,125 n.1 ("PFOA and PFOS are part of a group of humanmade chemicals known as per- and polyfluoroalkyl substances (PFAS).").[1] The PFAS Strategic Roadmap also described EPA's plans to leverage the National Pollutant Discharge Elimination System (NPDES) permitting program to "seek proactively to use existing NPDES authorities to . . . obtain more comprehensive information through monitoring on the sources of PFAS and the quantity of PFAS discharges by these sources," including by "recommending that state-issued [NPDES] permits that do not already include monitoring requirements for PFAS use EPA's recently published analytical method 1633 . . . at facilities

---

[1] Available at https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf.

where PFAS is expected or suspected to be present in wastewater and stormwater discharges." PFAS Strategic Roadmap at 14.

13.    EPA's Office of Enforcement and Compliance Assurance (OECA) also declared in a 2023 memo that the focus of the National Enforcement and Compliance Initiative (NECI) for Fiscal Years 2024–2027 to address exposure to PFAS, once "EPA designates PFOA and PFOS as hazardous substances under" CERCLA, would be to "focus on implementing EPA's PFAS Strategic Roadmap. . . ." EPA, *FY 2024-2027 National Enforcement and Compliance Initiatives*, at 3 (Aug. 17, 2023).[2]

14.    In addition to these public statements that EPA intends to target its enforcement of the Rule against landfills, EPA held a regional information session on June 22, 2023, for POTWs in which Justin Pimpare, Regional Industrial Pretreatment Program Coordinator for EPA's New England office, urged POTWs that are attempting to map potentially known dischargers of PFAS to scrutinize leachate received from landfills because it is "low hanging fruit" for EPA enforcement.[3] These public statements, coordination with the Illinois Environmental Protection Agency ("IEPA"), and other developments demonstrate that EPA has

---

[2] Available at https://www.epa.gov/enforcement/national-enforcement-and-compliance-initiatives

[3] Recording of June 22, 2023, presentation at 50:55, available at https://www.epa.gov/compliance/developing-and-implementing-pfas-monitoring-strategies-npdes-pretreatment-programs-and#materials.

made clear that owners and operators of landfills are its top priority in enforcing the Rule.

15.    In May 2024, IEPA issued a draft National Pollutant Discharge Elimination System (NPDES) permit for the City of Rochelle Water Reclamation Facility. Draft Reissued NPDES Permit No. IL0030741 (May 14, 2024).[4] The draft NPDES permit includes a Special Condition requiring the POTW to "develop an inventory of those facilities which may have the potential to contribute or discharge PFAS into the sanitary sewer system" and required consideration for inclusion in the inventory of all facilities with several NAICS Codes, including 562212. *Id.* at 13. Additionally, the Special Condition required "landfill leachate" to be included in the inventory list, even if it may not be associated with an NAICS code, because it has "the potential to contribute or discharge PFAS into the sewer system. . . ." *Id.*

16.    To cite one specific example of impacts to Waste Connections of EPA's hazardous substance designation, Rochelle Waste Disposal, L.L.C. ("Rochelle Waste Disposal"), an Illinois limited liability company and wholly owned subsidiary of WCI, operates a landfill and transports landfill leachate for treatment and disposal

---

[4] Available at
https://webapps.illinois.gov/EPA/WebSiteApi/api/PublicNotices/GetDocument/27 723.

at the City of Rochelle Water Reclamation Facility. Rochelle Waste Disposal is identified by NAICS code 562212.

17.    Rochelle Waste Disposal is a member of the Chamber of Commerce of the United States of America.

18.    Based on the facts above, the Rule directly harms WCI's wholly owned subsidiaries, including Rochelle Waste Disposal, which own and/or operate landfills or transport solid waste by newly subjecting each of them to liability risk as a PRP under CERCLA. Transporters of CERCLA hazardous substances can become PRPs, and Waste Connections owns and operates thousands of vehicles transporting solid waste. Waste Connections cannot wait to seek relief because CERCLA prevents PRPs from raising any matter for judicial review in a civil or criminal proceeding for enforcement or to obtain damages or recovery of response costs if that matter could have been raised in a petition for review of a CERCLA regulation. 42 U.S.C. § 9613(a).

19.    In addition, the Rule directly harms WCI's wholly owned subsidiaries that own and/or operate landfills or transport solid waste by deterring third parties from transacting with those subsidiaries. There are several markets throughout the country in which Waste Connections has concerns about whether POTWs will continue to accept leachate from its facilities because of the Rule. Since the Rule was promulgated, a number of WCI's wholly owned subsidiaries have received

letters from POTWs indicating that the POTWs may no longer accept landfill leachate out of concerns for the potential presence of PFOA and PFOS. Where WCI's wholly owned subsidiaries cannot send leachate to a POTW for treatment and disposal, they will have to pay to have the leachate hauled to more distant POTWs that will accept it.

20.    EPA's action will have other harmful consequences, including undermining productive public-private relationships. First, as noted above, WCI's subsidiaries that own and/or operate landfills will face increased difficulty locating POTWs willing to accept leachate produced at their landfills. Relatedly, many POTWs need to manage off-site solid residuals produced during the wastewater treatment process (sludge or biosolids), and they often manage sludge or biosolids though disposal in landfills. Landfills may be unable to continue to accept POTW sludge or biosolids as they are a likely source of PFOA and PFOS. This long-standing synergistic public-private cooperation is therefore threatened by EPA's designation action. Second, a significant number of the landfills WCI's subsidiaries operate in the United States are municipally owned, and typically are subject to long-term operating agreements. EPA's designation of PFOA and PFOS as CERCLA hazardous substances would materially impact the parties' assumptions that existed at the time these contracts were formed, and potentially require the agreements to be unwound at great cost and to the detriment of both parties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of November 2024.

John M. Perkey

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES CHAMBER OF
COMMERCE, *et al.*,

     *Petitioners*,

v.                                                              Case No. 24-1193

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and
MICHAEL S. REGAN, in his official
capacity as Administrator, United States
Environmental Protection Agency,

     *Respondents*.

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency

———————————

## DECLARATION OF ANNE GERMAIN

———————————

I, Anne Germain, declare based on personal knowledge as follows:

1.    I am over eighteen years of age, suffer from no disability that would

preclude me from giving this declaration, and make this declaration upon personal

knowledge.

2.    I am the Chief of Technical & Regulatory Affairs with the National

Waste & Recycling Association ("NWRA"), where I oversee a portfolio of policy

and advocacy issues in the waste and recycling space. In that role, I am responsible

1

for communicating with members, regulators, and legislators on the potential impacts of designating PFOA/PFOS as CERCLA hazardous substances.

3.    NWRA is the trade association representing the private sector recycling and waste industry with members operating in all fifty states and the District of Columbia. NWRA is a non-profit, tax-exempt organization incorporated in the State of Illinois. NWRA has no parent corporation, and no publicly held company has 10% or greater ownership in the NWRA. An important function of NWRA is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  NWRA brings this action on behalf of its members.

4.    NWRA members are modifying their waste acceptance policies to proactively include PFAS testing to screen waste that should be addressed in a different manner as a result of EPA's final Rule.

5.    On September 6, 2022, the U.S. Environmental Protection Agency ("EPA") issued the proposed rule that led to the final rule at issue here. The Proposed Rule was entitled "Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances," 87 Fed. Reg. 54,415-01 (Sept. 6, 2022) ("Proposed Rule"). On November 7, 2022, NWRA submitted comments on the proposal.[1]

---

[1] *Comments of the U.S. Chamber of Commerce Coalition of Companies and Trade Associations on Proposed Rule, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous*

2

6.    On May 8, 2024, the U.S. Environmental Protection Agency published the final rule entitled Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances ("Rule"), which is the subject of the above-referenced case.

7.    EPA identified "Waste Management and Remediation Services" as a sector that "may be directly or indirectly affected" by the Rule.  These include entities with the following NAICS codes: 562112 – Hazardous Waste Collection, 562211 – Hazardous Waste Treatment and Disposal, 562212 – Solid Waste Landfill, 562213 – Solid Waste Combustors and Incinerators, and 562219 – Other Nonhazardous Waste Disposal. The codes are used by NWRA members. Other NAICS codes serviced by our members could also be impacted as EPA acknowledges the NAICS codes listed in the Rule was not intended to be exhaustive.

8.    NWRA has members that are small businesses that are anticipated to be impacted by this rule. For example, one of our members doing business as a medical waste treatment facility in Idaho using NAICS code of 562219 had an annual revenue of $2.8 million in 2023 and is expected to have $3.2 million this year.

---

*Substances*, *87 Fed. Reg. 54,415 (Sept. 6, 2022)*, Dkt. No. 405 EPA-HQ-OLEM-2019-0341 (Nov. 9, 2022)).

3

9.    NWRA's members include collection and transportation operations; and transfer, recycling, and disposal facilities that are directly regulated by the Rule.

10.    For example, in late April 2024, one member received a letter from EPA Region 5 regarding a landfill they own in Wisconsin.  Both the letter and email transmittal cite the Rule as grounds for requesting the member to conduct PFAS sampling at the site.  (While the Rule had not yet been published in the Federal Register, EPA had released a pre-publication version to the public on April 19, 2024, which it cited in the letter to this member).

11.    NWRA's members include entities that, as a result of the Rule, are newly subject to liability risk as "potentially responsible parties" (PRPs) under CERCLA.  For these members, the Rule "drastically increases the chances of costly activity."  *Mead Corp. v. Browner*, 100 F.3d 152, 155 (D.C. Cir. 1996).

12.    CERCLA establishes financial liability for four categories of PRPs: current owners or operators of a contaminated site ("facility"); persons who owned or operated the facility at the time hazardous substances were released or disposed of there; persons who arranged for the disposal or treatment of hazardous substances at a facility or incineration vessels or arranged for transport for disposal or treatment of hazardous substances; and persons who transported hazardous substances for disposal or treatment at facilities, incineration vessels, or sites selected by such persons.  *See* 42 U.S.C. § 9607(a).

4

13.     PRPs can be liable for a broad range of costs, including costs of removal or remedial actions, natural resource damages, or health assessment or health effects studies associated with the release PFOA, PFOS, or their salts, acids, or structural isomers (hereinafter "PFOA/PFOS") incurred by the United States,  individual States, Indian tribes, and other parties.  In addition, EPA can issue an administrative order or obtain a court order that requires PRPs to take actions to address "imminent and substantial endangerment to the public health or welfare or the environment" resulting from a release or threatened release of a hazardous substance.  42 U.S.C. § 9606(a).

14.     CERCLA makes all of these harms more immediate through its provision that allows for judicial review of regulations under CERCLA within ninety days of their promulgation.  42 U.S.C. § 9613(a).  This provision prevents PRPs from raising any matter for judicial review in a civil or criminal proceeding for enforcement or to obtain damages or recovery of response costs if that matter could have been raised in a petition for review of a CERCLA regulation.  Accordingly, if PRPs do not challenge the Rule now, they could forfeit valid defenses that could have been used as a defense against enforcement, damages, and response cost recovery.

15.     Certain members of NWRA are at high risk of qualifying as PRPs, and therefore the Rule drastically increases the chance that they will suffer the harms

described above. These include members with historical evidence of PFOA/PFOS being present on or having been released from their property. Examples include composting, transfer, and disposal facilities.

16.    For example, one member who was identified as a PRP for a particular Superfund site received a letter in September 2024 from EPA Region 5 requesting that this member and others begin PFAS sampling at that site.

17.    EPA has stated in its Enforcement Discretion and Settlement Policy that it does "not intend to pursue" publicly owned or operated municipal solid waste landfills. But many of NWRA's members are private owners and operators of solid waste landfills, or service solid waste landfills that are privately owned and operated. And even for members that do service municipal solid waste landfills that are publicly owned or operated, EPA's enforcement discretion will not protect them from third party suits from other PRPs.

18.    Other members at high risk of qualifying as PRPs include those that have completed remedial activities for contaminated sites under CERCLA. These members may be required by EPA to expend additional funds to conduct testing for PFOA/PFOS and, if present, reopen the site for additional and likely expensive remediation. Examples of these members include owners and operators of municipal solid waste landfills.

6

19.    All members at high risk of qualifying as PRPs will be encumbered by a new cloud of potential liability by virtue of that historical PFOA/PFOS evidence as of the effective date of the Rule.  Further, in instances where this historical PFOA/PFOS evidence is public, the Rule impedes members' ability to transact with third parties, such as insurers or potential purchasers of their property or business.

20.    Other members of NWRA will immediately incur costs needed to protect themselves from CERCLA liability as a result of the Rule.  These include all members who plan to purchase property that may contain PFOA or PFOS.  To protect themselves from potential CERCLA liability, these landowners are required to investigate, including through a qualified environmental professional, the property they are considering to purchase for CERCLA hazardous substances.

21.    In enacting CERCLA, Congress included several statutory landowner liability protections that private parties can implement without involving EPA.  A condition common to these statutory landowner liability protections is the need to conduct "all appropriate inquiries" into the previous ownership and uses of a property before the party becomes its owner.

22.    EPA's regulations defining "all appropriate inquiries" require potential property purchasers to engage the services of a qualified environmental professional before closing to investigate the property and identify conditions indicative of

7

releases and threatened releases of substances designated as "hazardous" under CERCLA on, at, in, or to the property.

23.    As a result of the Rule, site investigations will need to be expanded to include searching for PFOA/PFOS, and these expanded site investigations will result in immediate, additional costs to any member that wishes to purchase property, in the form of higher fees assessed by qualified environmental professionals.

24.    The Rule harms members who have either already borne or are at dramatically increased risk of bearing the costs of reporting PFOA/PFOS test results from groundwater and surface water monitoring. In addition, to avoid liability under the Rule, wastewater treatment plants have already begun requiring NWRA's members to conduct additional testing for PFOA and PFOS on any landfill leachate the members send to these plants for treatment.  That also imposes additional costs on NWRA's members.

25.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of October 2024.

Anne Germain

8

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES CHAMBER OF
COMMERCE, et al.,

      *Petitioners*,

v.                                      Case No. 24-1193

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and
MICHAELS. REGAN, in his official
capacity as Administrator, United States
Environmental Protection Agency,

      *Respondents*.

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency

**<u>DECLARATION OF JOSEPH BENCO</u>**

I, Joseph Benco, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.      I am the Director of Engineering – Engineering and Environmental Compliance, for Republic Services, Inc. ("Republic").

3.      I have been employed by Republic for twenty-six (26) years and held the title of Director of Engineering – Engineering and Environmental Compliance for five (5) years. I am a licensed Professional Engineer in multiple states and have spent over 30 years involved in the design, permitting, construction, operation, monitoring and remediation of landfills. In my current role, I oversee the budgeting and performance of environmental remediation at the company's

CERCLA and RCRA facilities. I also lead the environmental diligence inquiry process for all property acquisitions at the company.

4.      Republic, through its numerous subsidiaries, offers comprehensive environmental services including the collection, transfer, treatment and disposal of wastes, recycling, field and industrial services, emergency response and energy services including, but not limited to the following:

| Sector | Industry Group | 6-Digit NAICS | 6-Digit NAICS Description | Approximate Number of Facilities |
|---|---|---|---|---|
| Waste Management and Remediation Services | Waste Collection | 562111 | Solid Waste Collection | 364 collection operations and 246 transfer stations |
| | | 562112 | Hazardous Waste Collection | |
| | Waste Treatment and Disposal | 562211 | Hazardous Waste Treatment and Disposal | 3 treatment, recovery and disposal facilities, 22 treatment, storage and disposal facilities (TSDF), 6 saltwater disposal wells and 12 deep injection wells |
| | | 562212 | Solid Waste Landfill | 207 active landfills, 126 closed landfills and 76 landfill gas-to-energy and other renewable energy projects |
| | | 562219 | Other Nonhazardous Waste Treatment and Disposal | 74 recycling centers, 1 polymer center |

5.      Republic is a member of the National Waste and Recycling Association.

6.      I submit this declaration to attest to the harm suffered by Republic's subsidiaries as a direct result of the final rule entitled "Designation of Perfluorooctanoic Acid (PFOA) and

2

Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances," published by the Environmental Protection Agency on May 8, 2024 ("Rule").

7.      Publicly available evidence suggests that PFOA/PFOS have been found at a number of CERCLA remediation sites throughout the country.  As a result, USEPA is requiring the investigation of PFOA/PFOS related impacts at many Superfund sites at which certain Republic subsidiaries are identified as potentially responsible parties but deny liability, regardless of the stage of remediation, but most notably during Five-Year Reviews of remedy effectiveness.

8.      Republic's subsidiaries have incurred and will continue to incur response costs, remediation costs, and consultant and legal fees associated with the investigation and remediation of PFOA and PFOS at sites owned and/or operated by these companies as well as those operated by others.

9.      Based on the facts above, the Rule directly harms Republic's subsidiaries by newly subjecting them to liability risk as a "potentially responsible party," or "PRP", under CERCLA.

10.      CERCLA establishes financial liability for four categories of PRPs: current owners or operators of a contaminated site ("facility"); persons who owned or operated the facility at the time hazardous substances were released or disposed of there; persons who arranged for the disposal or treatment of hazardous substances at a facility or incineration vessels or arranged for transport for disposal or treatment of hazardous substances; and persons who transported hazardous substances for disposal or treatment at facilities, incineration vessels, or sites selected by such persons.  *See* 42 U.S.C. § 9607(a).

11.      CERCLA also prevents PRPs from raising any matter for judicial review in a civil or criminal proceeding for enforcement or to obtain damages or recovery of response costs if that

matter could have been raised in a petition for review of a CERCLA regulation.  42 U.S.C. § 9613(a).

12.    Republic's subsidiaries have been and will be further harmed by incurring additional costs and fees associated with conducting due diligence on property, or entities owning property, they seek to acquire in addition to the potential liabilities associated with taking ownership of those properties if PFOA/PFOS are discovered including, but not limited to broader groundwater, soil and leachate sampling and analysis of historic and current inbound and outbound waste stream analysis.

13.    In order to receive certain liability protections under CERCLA, companies are required to investigate properties for potential contamination by CERCLA hazardous substances, which now include PFOA and PFOS.  This includes an investigation of the properties by a qualified environmental professional.

14.    This due diligence investigation is now more costly as a result of the Rule.

15.    I declare under penalty of perjury that the foregoing is true and correct.


Executed this 31 day of October 2024.


_____

Joseph Benco

4

Add. B033

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES CHAMBER OF
COMMERCE, *et al.*,

     *Petitioners*,

v.                                                                  Case No. 24-1193

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and
MICHAEL S. REGAN, in his official
capacity as Administrator, United States
Environmental Protection Agency,

     *Respondents*.

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency

————————————

## DECLARATION OF LEAH PILCONIS

————————————

I, Leah Pilconis, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would

preclude me from giving this declaration, and make this declaration upon personal

knowledge and in support of the Associated General Contractors of America, Inc.

("AGC") in the above-referenced case.

2.      I have been employed by AGC for more than 20 years. Throughout

that time, I have served as the association's subject-matter expert on environmental

1

law and policy. Currently, I am the General Counsel for AGC. In that capacity, I oversee AGC's programs and services that help contractors mitigate business and operational risks in an evolving construction landscape in the domains of safety, health, and environmental regulations; contract administration; and insurance coverage. I am a key person in AGC's strategy and responses to regulatory and legislative challenges affecting the construction landscape. I oversee AGC's litigation in federal and state courts.

3.     On the subject of environmental law, I have a central role with AGC in liaising with federal agencies that interpret, apply, and enforce federal environmental laws, including the U.S. Environmental Protection Agency ("EPA"). In a proactive effort to help construction contractors meet environmental requirements, I also oversee the development and dissemination of practical "compliance tools" for the construction industry and help organize and hold environmental seminars, forums, and other programs for contractors – covering planning and permitting requirements and other complex compliance issues that impact the industry.

4.     AGC is a tax-exempt entity that is organized under Internal Revenue Code section 501(c)(6) that exists to promote a better industry for the professionals who build America's future. Founded in 1918, AGC is the nation's largest and most diverse trade association in the commercial construction industry, now

2

representing more than 28,000 member companies, including approximately 7,000 general contractors, 9,000 specialty contractors, and 12,000 service providers and suppliers to the industry through a nationwide network of chapters in all 50 states, the District of Columbia, and Puerto Rico. AGC represents both union- and open-shop employers engaged in building, heavy, civil, industrial, utility, and other construction for both public and private property owners and developers. AGC's mission is to serve our nation's construction professionals and, therefore, the public interest by promoting the skill, integrity, and responsibility of those who build America.

5.      AGC has hundreds of members that fall under NAICS codes 236220, 237110, 237310, and 237990 and that had annual revenues in 2024 under $45 million, based on the results of AGC's 2024 workforce survey, meaning they would qualify as "small entities" under the Regulatory Flexibility Act. The survey was conducted in July and August 2024. Of the 990 respondents who answered the question, "Estimate the total dollar amount of work your firm performed during the past 12 months," 24% reported revenue of $10 million or less, while 33% reported revenue between $10.1 million and $50 million.  Looking more broadly, according to the latest available Census Bureau data (2017 Census of Construction), out of 547,496 construction firms that operated for the entire year, 519,442, or 94.9%,

had revenue of less than $10 million, while 537,273 or 98.1%, had revenue of less than $25 million.[1]

6.    On September 6, 2022, the EPA issued the proposed rule that led to the final rule that is the subject of the above-referenced case. The Proposed Rule was entitled "Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA [Comprehensive Environmental Response, Compensation, and Liability Act] Hazardous Substances," 87 *Fed. Reg.* 54,415-01 (Sept. 6, 2022) ("Proposed Rule"). AGC submitted extensive legal, policy, and economic comments on the proposed rule.[2] AGC also joined the U.S. Chamber of Commerce, which submitted comments on behalf of a coalition of industry groups.[3]

7.    The purpose of this declaration is to lay out the effects of the final rule published by EPA on May 8, 2024, entitled Designation of Perfluorooctanoic Acid

---

[1] *See* https://data.census.gov/table/ECNSIZE2017.EC1700SIZEREVFIRM?t=Receipt%20Size&y=2017&n=23.

[2] *See Comments of the Associated General Contractors of America (AGC) on Proposed Rule, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances*, 87 *Fed. Reg.* 54,415 (Sept. 6, 2022), Dkt. No. 418 EPA-HQ-OLEM-2019-0341 (posted Nov. 10, 2022)); *Comments of the U.S. Chamber of Commerce Coalition of Companies and Trade Associations*, Dkt. No. 404 EPA-HQ-OLEM-2019-0341 (posted Nov. 9, 2022) and Dkt. No. 569 EPA-HQ-OLEM-2019-0341 (posted Nov. 10, 2022).

[3] *Id.*

4

(PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances ("Rule"), on AGC members.

8.    AGC has allocated resources to educate its members about the Rule's complexities and uncertainties, as well as their potential legal risks and liabilities directly resulting therefrom. Allocating scarce resources for these endeavors has harmed AGC because it has correspondingly needed to draw staff time and monetary resources from other functions as a result.

9.    AGC's members include entities that, as a result of the Rule, are newly subject to liability risk for clean-up/remediation as "potentially responsible parties" (PRPs) under CERCLA.  For these members, the Rule drastically increases the chances of costly activity." *Mead Corp. v. Browner*, 100 F.3d 152, 155 (D.C. Cir. 1996).

10.    CERCLA establishes financial liability for four categories of PRPs: current owners or operators of a contaminated site ("facility"); persons who owned or operated the facility at the time hazardous substances were released or disposed of there; persons who arranged for the disposal or treatment of hazardous substances at a facility or incineration vessels or arranged for transport for disposal or treatment of hazardous substances; and persons who transported hazardous substances for disposal or treatment at facilities, incineration vessels, or sites selected by such persons.  *See* 42 U.S.C. § 9607(a).

5

11.    Construction project participants clearly fall within CERCLA's categories of PRPs. For example, in *Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp.*, 976 F.2d 1338 (9th Cir. 1992), an excavation contractor removed soil that had been contaminated by prior use by someone else. The contractor placed the excavated soil on-site and commingled it with uncontaminated soil. Because of its own activities, the contractor was held to be an operator and transporter with regard to the release of hazardous substances.[4] A "release" is broadly defined under CERCLA to include any ". . . spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment. . . ." 42 U.S.C. § 9601(22).

12.    While building our nation's infrastructure, AGC member companies routinely excavate and move soil, crushed concrete, and other paving materials onsite. They often move these materials to store them temporarily in laydown yards, arrange for offsite landfill disposal, and transport materials with company-owned fleets. In addition, AGC member companies practice beneficial reuse and recycling of materials, incorporating these materials into other projects, which provides economic advantages. AGC members also routinely engage in dewatering activities on projects.

---

[4] *Id.*; *see also K.C.1986 Ltd. Partnership v. Reade Mfg.*, 33 F. Supp.2d 1143 (W.D. Mo. 1998) (environmental engineers who drilled groundwater wells through contaminated land can be liable for response costs as site operator).

6

13.    The preamble text to EPA's final rule refers to PFOA and PFOS as "ubiquitous." 89 *Fed. Reg.* 39161 (May 8, 2024). AGC contractors that have handled materials with PFOA or PFOS, disposed of materials with PFOA or PFOS, or transported materials with PFOA or PFOS will be potentially liable for CERCLA cleanup costs, leading to prolonged and costly litigation.

14.    PRPs can be liable for a broad range of costs, including costs of removal or remedial actions, natural resource damages, or health assessment or health effects studies associated with the release of PFOA, PFOS, or their salts, acids, or structural isomers (hereinafter "PFOA/PFOS") incurred by the U.S., States, Indian tribes, and other parties. In addition, EPA can issue an administrative order or obtain a court order that requires PRPs to take actions to address "imminent and substantial endangerment to the public health or welfare or the environment" resulting from a release or threatened release of a hazardous substance. 42 U.S.C. § 9606(a). These costs can be staggering, running easily into the millions of dollars.

15.    CERCLA makes all of these harms more immediate through its provision that allows for judicial review of regulations under CERCLA within ninety days of their promulgation.  42 U.S.C. § 9613(a). This provision prevents PRPs from raising any matter for judicial review in a civil or criminal proceeding for enforcement or to obtain damages or recovery of response costs if that matter

7

could have been raised in a petition for review of a CERCLA regulation. Accordingly, if PRPs do not challenge the Rule now, they could forfeit valid defenses that could have been used as a defense against enforcement, damages, and response cost recovery.

16.    Certain members of AGC are at high risk of qualifying as PRPs, and therefore, the Rule drastically increases the chance that they will suffer the harms described above. CERCLA imposes strict liability, where intent does not matter. It also imposes joint and several liability in which multiple parties can share in liability and any party found responsible can be held liable for the entire judgment, even if it is only nominally at fault. AGC members have standing to challenge the rule even if they do not actually know that they have released PFOA/PFOS in a way that could provide a plausible basis for being named a PRP, given the well-documented PFOA/PFOS contamination on airport construction and military construction (MILCON) projects. AGC-member firms perform airport runway and taxiway construction and military construction projects for the U.S. Department of Defense ("DoD"), including buildings, roads, airfields, training ranges, and other structures at airports, military bases, and private airfields.

17.    It is widely documented by EPA and DoD that aviation operations and military facilities that have historically used Aqueous Film-Forming Foam ("AFFF") firefighting foams containing PFOS and PFOA—and where large

8

volumes have been released to combat oil and chemical fires in aircraft accidents and hangars, to perform live-fire training exercises, and to test equipment—are at high risk of contamination in soil, surface water, and groundwater.[5]

18.     Due to the Rule, AGC members have experienced a delay and/or decline in business and/or operating expenses, as airport and federal DoD work is a significant component of many contractors' operations. For example, to comply with the rule and avoid liability, AGC member Kokosing, Inc. now faces delays in contract negotiations to assess potential contamination risks, sometimes resulting in a decision not to bid on projects due to liability concerns. Mull Decl. ¶ 9.

19.     Other AGC members have reported experiences with demolishing, restoring, and constructing airport hangars equipped with AFFF fire suppression systems. Many existing hangars, built in the past 70 years, have "charged" systems that require testing (the AFFF is discharged through devices such as sprinklers, nozzles, hoses and chambers), cleaning, dismantling, and disposal. Modern designs include containment systems to collect the AFFF effluent, but older hangars do not have functioning containment systems. When demolishing or renovating an existing hangar, the contractor must address the existing AFFF system (drain the

---

[5] *See e.g.* EPA study that characterizes the nature of PFAS chemicals in AFFF, Reconstructing the Composition of Per- and Polyfluoroalkyl Substances in Contemporary Aqueous Film-Forming Foams | Science Inventory | US EPA; *see also* multidistrict litigation *In Re: Aqueous Film-Forming Foam (AFFF) Products Liability Litigation*, No. 2873 (MDL).

9

system before work and test/charge the new fire suppression system components) as well as surrounding areas. In general, the construction process requires demolishing asphalt/concrete pavement, digging soil out two to ten feet below the surface, and disposing of the asphalt/concrete and soil waste in a landfill.

20.     As demonstrated above, EPA's final rule designating PFOS and PFOA as CERCLA hazardous substances imposes significant cost, risk, and legal liability—both retroactively and prospectively—on AGC-member contractors who have performed or will perform work at airports and DoD locations. AGC contractors that have handled materials with PFOA or PFOS, disposed of materials with PFOA or PFOS, or transported materials with PFOA or PFOS will be potentially liable for CERCLA cleanup costs, leading to prolonged and costly litigation.

21.     Other AGC members at high risk of qualifying as PRPs include those that have completed remedial activities for contaminated sites under CERCLA. EPA may require these members to expend additional funds to conduct testing for PFOA/PFOS and, if present, reopen the site for additional and likely expensive remediation.

22.     All members at high risk of qualifying as PRPs will be encumbered by a new cloud of potential liability by virtue of that historical PFOA/PFOS evidence as of the effective date of the Rule.  Further, in instances where this historical

10

PFOA/PFOS evidence is public, the Rule impedes members' ability to transact with third parties, such as insurers or potential purchasers of their property or business, as further described below.

23.    In addition, EPA's designation of PFOA and PFOS as CERCLA hazardous substances directly impacts beneficial reuse and recycling practices and has substantial economic implications for contractors like AGC member Kokosing, Inc. that incorporate reclaimed asphalt pavement ("RAP") into projects. Mull Decl. ¶¶ 10-11. This practice is a financial revenue stream that is no longer available for many contractors.

24.    RAP potentially containing PFOA/PFOS can no longer be reused as before due to potential CERCLA liability for cleanup. This has complicated project bidding, raised disposal costs, limited recycling options, and led to increased materials costs. Indeed, contractors must now divert potentially contaminated RAP to landfills and purchase new, more costly materials, causing project delays and significantly increasing operational expenses. Mull Decl. ¶¶ 10-11.

25.    Numerous AGC members also report that the PFAS rule has led to increased consulting, transportation, and disposal costs for contractors handling PFOA- and PFOS-containing hazardous substances. But for the Rule and its impending implementation, Foundation Service Corporation would have spent at minimum $88,300 less to remediate a hydraulic spill. Schwager Decl. ¶ 12.

11

26.     In another instance, landfill costs for an AGC member increased tenfold, causing months-long project delays and adding to operational expenses. Mull Decl. ¶ 11.

27.     Due to the Rule, the U.S. Department of Transportation ("DOT") must list and regulate PFOA and PFOS as hazardous materials under the Hazardous Materials Transportation Act, and this process is already in the final rulemaking stage. As a result, contractors will need to comply with DOT's stringent hazardous materials transport regulations, which require specialized packaging, marking, and labeling, as well as HAZMAT-certified drivers with appropriate Commercial Driver's Licenses (CDL), endorsements, and training. Mull Decl. ¶ 12.

28.     Contractors will also face additional costs related to on-site HAZWOPER training and compliance for employees handling these materials. Although the EPA estimated the "indirect incremental costs to shippers to be zero or negligible," 89 *Fed. Reg.* 39160 (May 8, 2024), AGC contractors expect significant costs associated with meeting DOT standards and are already seeing impacts on their overall project expenses. Mull Decl. ¶ 12 and Schwager Decl. ¶¶ 11-12.

29.     What is more, the Rule has led some landfills to outright deny inbound wastes with elevated levels of PFOA or PFOS. As a result, AGC members

Add. B045

are incurring significantly higher disposal (tipping) fees and trucking costs to transport the waste materials to other facilities, and sometimes even out of state, which creates additional time delays, increased transportation fuel consumption, and increased vehicular emissions. Mull Decl. ¶ 11 and Schwager Decl. ¶¶ 11-13. To further illustrate this point, an AGC member was recently turned away by a California landfill that had previously accepted DoD waste but now is declining to accept waste from DoD facilities. This has forced the AGC member to pay significantly more to haul the waste materials to other facilities, and sometimes out of state.  This AGC member anticipates that as a direct result of the Rule, disposal options for the soil and effluent waste from the above-referenced projects will be limited to hazardous landfills.  On one particular project, a member company that is dealing with the export of 10,000 to 20,000 yards of soil waste shared that under this same scenario, the company's disposal costs increased from $40/yard to $200-300-$400/yard.

30.     EPA has identified landfills as PFOA and PFOS hotspots, and disposing of these substances in any amount at a non-hazardous waste landfill may expose the contractor to CERCLA arranger liability and liability to public owners through the broad indemnity clauses that protect public owners in certain public works contracts. Those clauses require the contractor to defend the owner in CERCLA as well as civil litigation. EPA's Enforcement Discretion Settlement

13

Policy implies CERCLA relief to publicly owned landfills. This relief would not extend to privately owned landfills, nor would it protect contractors against third-party civil suits.

31.    Other AGC members face immediate costs during real estate transactions to protect themselves from CERCLA liability under EPA's Rule. The Rule directly increases liability for construction firms that own property, complicates real estate transactions, and increases environmental due diligence time and expense.

32.    Construction firms frequently acquire property for essential needs such as equipment storage, laydown yards, temporary offices, staging areas, and materials sourcing. To avoid potential CERCLA liability, before purchasing or leasing land, AGC members routinely investigate—including through a qualified environmental professional—the property they are considering purchasing for CERCLA hazardous substances. In enacting CERCLA, Congress included several statutory landowner liability protections that private parties can implement without involving the EPA. A condition common to these protections is the need to conduct "all appropriate inquiries" into the previous ownership and uses of a property before the party becomes its owner.

33.    EPA's regulations defining "all appropriate inquiries" require potential property purchasers to engage the services of a qualified environmental

14

professional before closing, to investigate the property and identify conditions indicative of releases and threatened releases of substances designated as "hazardous" under CERCLA on, at, in, or to the property.

34.    As a result of the Rule, site investigations will need to be expanded to include searching for PFOA/PFOS, and these expanded site investigations will result in immediate, additional costs to any member that wishes to purchase or lease property, in the form of higher fees assessed by qualified environmental professionals.

35.    AGC members report this is resulting in longer turnaround times for testing, increased due diligence pricing, and a heightened level of scrutiny to evaluate current and potential environmental risks at a given property.

36.    Additional testing may also be required if PFAS is suspected or detected, even in trace amounts. These assessments are particularly costly and time-consuming, as PFAS field sampling requires additional measures to prevent cross-contamination, and PFAS lab tests are costly and require longer analysis time. The Interstate Technology and Regulatory Council (ITRC) has developed a series of fact sheets that summarize recent science and emerging technologies regarding PFAS, see Sampling_and_Lab_PFAS_Fact Sheet_Sept2023_final (itrcweb.org). Testing timeframes can take several weeks, compared to one week

15

or less for most testing – and costs can be significantly higher. *See* Schwager Decl. ¶ 13.

37.    AGC members and recent industry journal articles report that as regulation increases around PFAS chemicals, insurance underwriting is tightening across lines. Insurance professionals who specialize in PFAS say insurers are mandating coverage exclusions and, in some cases, declining to write liability policies at all in PFAS-exposed industries.[6]  AGC members and recent industry journal articles also report that lenders are showing more hesitance to finance PFAS-impacted properties, affecting property values and the financial viability of deals.[7]

38.    Overall, the lack of comprehensive regulatory standards regarding the level of PFAS contamination requiring remediation at a property, and the scope of remediation required, is creating additional uncertainty for construction companies.

39.    Vacatur of the Final Rule would remedy these ongoing costs and uncertainties.

---

[6] *See Insurance Journal*, "Underwriters Wary of PFAS Amid 'Superstorm' of Litigation, Regulation" by Allen Laman (Oct. 7, 2024).
[7] *See Outsourced Risk Management Solutions*, "EPA Takes Action on PFAS. Here's What Lenders Need to Know | ORMS" by Derek Ezovski (July 10, 2024); *Sentry Commercial Broker & Advisory*, "Understanding the EPA's New PFAS Regulations: What Property Owners and Buyers Need to Know," (May 31, 2024).

16

40.     I declare under penalty of perjury that the foregoing is true and

correct.

Executed this 1st day of November 2024.

_Leah Pilconis_
_____
Leah Pilconis
General Counsel
Associated General Contractors of America Inc.

17

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES CHAMBER OF
COMMERCE, ASSOCIATED GENERAL
CONTRACTORS OF AMERICA, INC.,
and NATIONAL WASTE & RECYCLING
ASSOCIATION,

      *Petitioners*,

v.                                                                     Case No. 24-1193

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and
MICHAEL S. REGAN, in his official
capacity as Administrator, United States
Environmental Protection Agency,

      *Respondents*.

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency

**<u>DECLARATION OF CHARLES MULL</u>**

I, Charles Mull, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would

preclude me from giving this declaration, and make this declaration upon personal

knowledge.

2.      I am the Corporate Environmental Director for the Kokosing, Inc.

("Kokosing").

1

3.      I have been employed by Kokosing for 20 years and held the position of Corporate Environmental Director for 3 years. In the beginning of my career with Kokosing, I was a Field Engineer. I then served as an Environmental, Health, and Safety director, and in other roles. For the past 16 years, I have served in roles focusing on environmental compliance and safety. As the Corporate Environmental Director, I oversee and manage the implementation and development of environmental policies, procedures, and practices.  I provide guidance, direction, and coaching in maintaining compliance by identifying, solving and alleviating environmental items with applicable environmental regulations.  In addition, I develop and implement sustainability strategies, policies, practices and action plans to ensure corporate or client sustainability goals.

4.      Kokosing is one of the largest family-owned construction companies in the Midwest and Mid-Atlantic. Known for unwavering integrity and exceptional safety and quality, Kokosing companies provide extensive resources for its customers. Kokosing's primary business lines include industrial, transportation, pipelines, water and wastewater, marine and renewable energy. Aggregates and asphalt material suppliers are part of the Kokosing family of companies. Kokosing's annual revenue is approximately $2,300,000,000. The company owns

2

approximately $500,000,000 in equipment assets. Its 4,000 or so employees provide value creation for the company's clients.

5.    Kokosing is a member of the Associated General Contractors of America, Inc., a tax-exempt entity that is organized under Internal Revenue Code section 501(c)(6) that exists to promote a better industry for the professionals who build America's future.

6.    I submit this declaration to attest to the harm, including economic harm, suffered by Kokosing as a direct result of the Environmental Protection Agency's final rule entitled Designation of Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic Acid ("PFOS") as CERCLA Hazardous Substances, that the agency published on May 8, 2024 ("Rule").

7.    These chemicals are sometimes present in soils and recycled asphalt from construction sites where Kokosing provides services, particularly airports. Since 1988, the Federal Aviation Administration has required commercial airports to use aqueous film-forming foams (AFFF) firefighting foam that contains PFOA and PFOS chemicals and to discharge this foam as part of routine, federally-mandated testing of their firefighting equipment. *See* 14 C.F.R. Part 139 (Airport Certification). The FAA is currently implementing a firefighting foam transition plan for Part 139-certificated airports for fluorine-free firefighting foam (F3) and has allowed the adoption of F3 foam for firefighting only since Nov. 27, 2023. *See*

3

Advisory Circular and ENVIRONMENTAL EVALUATIONS OF REPLACEMENT OF FLUORINATED AQUEOUS FIRE_FIGHTING FOAMS.PDF.

8.     CERCLA establishes financial liability for four categories of Potentially Responsible Parties: current owners or operators of a contaminated site ("facility"); persons who owned or operated the facility at the time hazardous substances were released or disposed of there; persons who arranged for the disposal or treatment of hazardous substances at a facility or incineration vessels or arranged for transport for disposal or treatment of hazardous substances; and persons who transported hazardous substances for disposal or treatment at facilities, incineration vessels, or sites selected by such persons.  *See* 42 U.S.C. § 9607(a).

9.     Consequently, as a measure of compliance with the Rule, Kokosing has integrated a series of pre-bid questions for several airport projects, for which it would otherwise bid, concerning the disposal or relocation by Kokosing of potentially contaminated PFOA or PFOS soils or recycled asphalt pavements ("RAP"). This process causes delays, sometimes lasting weeks, in the contract formation process. Depending on the responses Kokosing receives from the pre-bid questions, it evaluates the risk of bidding on projects with potential CERCLA impacts. On account of the Rule, Kokosing has experienced a diminution in

4

business as airport work plays a significant role in our heavy highway divisional work.

10.     Kokosing, like many contractors that incorporate RAP in their businesses, is adversely impacted by the Rule's CERCLA designation.  The economic savings and landfill diversion associated with RAP reuse are well documented.  SR-229_Barriers_to_Higher_RAP_Usage_NAPA_06-2024.pdf (asphaltpavement.org)  Current industry practice is for contractors to mill off the asphalt surface, transport the millings to a company owned asphalt plant site, and then reutilize the millings in the hot mix or warm mix asphalt either back to the airport and/or potentially other roadway projects. In addition, these millings could be sold as an aggregate source to third party customers or stored onsite by the owner for future use. Under the Rule, by receiving the PFOA- or PFOS-contaminated RAP at a company-owned facility, the contractor may be liable for costs or performance of a cleanup of a hazardous substance under CERCLA as "current owners and operators of a facility" where hazardous substances come to be located and or liable as "transporters of hazardous waste that selected the site where the hazardous substances were brought" under Superfund liability. Environmental Protection Agency, https://www.epa.gov/enforcement/superfund-liability (last accessed Oct. 10, 2024).

5

11.    To avoid liability under the Rule, Kokosing will not be able to reuse certain RAP that contains or likely contains PFOA or PFOS in future projects. Instead, that material will now potentially need to be removed to a landfill, instead of being recycled, and Kokosing will need to purchase newer and more expensive materials for these future projects. In addition to airport work and the use of RAP, Kokosing projects have been impacted by the Rule due to a significant decrease in disposal acceptance and an increase in fees associated with PFOA- and PFOS-contaminated materials at designated landfill sites.  One particular jobsite location had an initial disposal cost increase of nearly 10 times the initial estimate, and then a three-month delay in contract negotiation with the project owner and several different disposal sites.

12.    Additionally, "the direct effects of the rule require… [t]he U.S. Department of Transportation to list and regulate these substances [PFOA and PFOS] as hazardous materials under the Hazardous Materials Transportation Act," [Questions and Answers about Designation of PFOA and PFOS as Hazardous Substances under CERCLA | US EPA](#) (last accessed Oct. 14, 2024), and the U.S. Department of Transportation (DOT) is indeed executing on this requirement.[1] Under the DOT's rulemaking that is proximately necessitated by the Rule at bar in

---

[1] The Spring 2024 edition of the *Unified Agenda of Regulatory and Deregulatory Actions* lists DOT's "Hazardous Materials: Revisions to the List of Hazardous Substances and Reportable Quantities" in the final rulemaking stage – RIN 2137-AF66.

this case, there are certainly impending additional costs under that agency's hazardous materials regulatory requirements. "No person may offer or accept a hazardous material for transportation in commerce unless… the hazardous material is properly classed, described, packaged, marked, labeled, and in a condition for shipment"[2] and the "offeror" must use hazardous materials transport ("HAZMAT")-compliant drivers.[3] Hazmat compliant drivers would have to have the proper CDL, a Hazmat endorsement, and proper DOT training.  In addition, hazmat transport increase insurance rates and liability for the hauler.  Worksite employees must receive appropriate training and comply with strict Hazardous Waste Operations and Emergency Response ("HAZWOPER") guidelines from the Occupational Safety and Health Administration. In direct conflict with EPA's findings, HAZMAT transport and HAZWOPER worksite compliance is costly to Kokosing.[4]

13.    I declare under penalty of perjury that the foregoing is true and correct.

---

[2] 49 CFR Part 171.2(a); *see also* Parts 100-180.

[3] 49 CFR Parts 300-399.

[4] "EPA also considered direct costs that may be associated with DOT regulations under CERCLA section 306 and Federal property sales and transfers under CERCLA section 120(h). EPA has not estimated the cost to DOT to implement this requirement but expects it to be minimal; additionally, EPA estimates the subsequent indirect incremental costs to shippers as zero or negligible."  89 *Fed. Reg.* 39160 (May 8, 2024).

7

Executed this 18 day of October 2024.


_____
Charles Mull
Corporate Environmental Director
Kokosing, Inc.

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES CHAMBER OF
COMMERCE, ASSOCIATED GENERAL
CONTRACTORS OF AMERICA, INC.,
and NATIONAL WASTE & RECYCLING
ASSOCIATION,

     *Petitioners*,

v.                                                          Case No. 24-1193

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and
MICHAEL S. REGAN, in his official
capacity as Administrator, United States
Environmental Protection Agency,

     *Respondents*.

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency

## <u>DECLARATION OF DALE SCHWAGER</u>

I, Dale Schwager, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would

preclude me from giving this declaration, and make this declaration upon personal

knowledge.

2.      I am a Senior Project Manager and Estimator for Foundation Service Corporation ("FSC"). I have worked for the company for 17 years. In these positions, I oversee the planning, execution, and financial management of geotechnical construction projects. I also lead project estimating, bid preparation, and client negotiations, drawing on extensive industry experience.

3.      FSC is a small business specialty contractor that self-performs geotechnical construction projects, with project sizes ranging from $100,000 to $15,000,000.

4.      Foundation Service Corporation is a member of the Associated General Contractors of America, Inc., a tax-exempt entity that is organized under Internal Revenue Code section 501(c)(6) that exists to promote a better industry for the professionals who build America's future.

5.      I submit this declaration to attest to the harm, including economic harm, suffered by FSC as a direct result of the Environmental Protection Agency's final rule entitled Designation of Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic Acid ("PFOS") as Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") Hazardous Substances, that the agency published on May 8, 2024 ("Rule").

6.      CERCLA establishes financial liability for four categories of Potentially Responsible Parties: current owners or operators of a contaminated site

2

("facility"); persons who owned or operated the facility at the time hazardous substances were released or disposed of there; persons who arranged for the disposal or treatment of hazardous substances at a facility or incineration vessels or arranged for transport for disposal or treatment of hazardous substances; and persons who transported hazardous substances for disposal or treatment at facilities, incineration vessels, or sites selected by such persons. *See* 42 U.S.C. § 9607(a).

7.    In the spring of 2024, coinciding with the timeframe when the Environmental Protection Agency was finalizing its final Rule, I was overseeing a ground improvement project in Wisconsin for aviation fuel tanks. This project involved improving the existing soil conditions to increase bearing capacity to ensure the stability, support, and performance of the tanks. This process included the installation of rammed aggregate piers to reduce settlement risks.

8.    During the construction process, a hydraulic line on one of our machines broke, resulting in a spill of hydraulic fluid. As a result of the hydraulic line break, our rig could not be moved. After FSC addressed the cleanup by utilizing spill containment kits there was still some oil and oil residue on the ground that could not be cleaned up due to our rig being in the way. Then a bad weather front moved in that resulted in several days of rain. The area where the rig was parked and the oil spill happened was contained by an earth berm constructed

3

by the onsite General Contractor. After several rain events, FSC's rig was repaired, and the rig was moved out of the way.

9.    On account of the berm, a significant amount of rainwater and some oil residue was collected. The General Contractor on the project, through which FSC subcontracted, informed FSC about potential PFOA and PFOS contamination concerns due to historical uses of the property, prompting FSC to hire a consultant to perform testing and assist with the cleanup and disposal processes. FSC's consultant tested the accumulated water and hydraulic oil mixture before arranging for its disposal.

10.    The test results showed that PFOA and PFOS were present in the collected water. Based on further research of disposal options and input from the consultant, FSC learned that there were no final standards or regulations on the management or disposal of PFOA or PFOS indicating acceptable levels. However, FSC was made aware of the Environmental Protection Agency's PFOA and PFAS rulemaking effort under CERCLA.

11.    FSC's consultant pumped approximately 22,000 gallons of water from the containment area into temporary storage tanks while disposal options were reviewed. FSC's consultant identified a facility that could accept the water for disposal/treatment and arranged for its transport there with a U.S. Department of Transportation- (DOT) certified hazardous materials (hazmat) hauler. The

4

disposal/treatment facility was in Kentucky, several states away from the project location. The consultant informed FSC that a local facility would not consider taking water contaminated with PFOA and PFOS.

12.    As a direct result of a hydraulic leak on machinery, bad weather, the Environmental Protection Agency's final Rule designating PFOA and PFOS as hazardous substances under CERCLA, and regulatory uncertainty regarding the management and disposal of PFOA and PFOS, FSC invested significant time and resources to manage and dispose of the PFOA- and PFOS-contaminated water. The total costs FSC incurred ranged between $100,000 and $150,000, covering onsite clean-up, disposal at a regulated facility, transportation, testing, consulting fees, and project management. If the water that was accumulated by the earth berm did not have PFOA and PFOS, the approximate estimate to properly dispose of the water with oil residue would have been about $11,700.00.

13.    In addition, the testing of the water/oil residue for PFOS and PFOAS took about 3 weeks to complete.  Once it was determined that the water/oil residue contained PFOA and PFOS, it took our consultant about an additional five weeks to find a facility that would dispose of the PFOA and PFOS contaminated water. While it was determined how to dispose of the contaminated water FSC was paying to store the contaminated water onsite in storage tanks.

5

14.     I declare under penalty of perjury that the foregoing is true and

correct.


Executed this 29th day of October 2024.

*Dale Schwager*

‎‎_____

Dale Schwager
Senior Project Manager and Estimator
Foundation Service Corporation

6

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, ET AL.,

     *Petitioners*,

v.                                                    Case No. 24-1193 et al.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and
MICHAEL S. REGAN, in his official
capacity as Administrator, United States
Environmental Protection Agency,

     *Respondents*.

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency

———————————

**DECLARATION OF ROBERT J. SIMON**

———————————

I, Robert Simon, declare based on personal knowledge as follows:

1.     I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.     I am the Vice President, Chemical Products & Technology Division (CPTD), at the American Chemistry Council (ACC). I am authorized to make this declaration on the ACC's behalf. ACC's headquarters are located at 700 2nd Street

1

NE, Washington, DC 20002. In that role, I manage ACC's more than 100 chemical product and sector groups, which focus on research, health, environment and safety performance, advocacy, and public outreach and education on specific chemicals and technologies. CPTD provides strategic counsel, technical consulting, advocacy, and management services for manufacturers and downstream users.

3.     The ACC represents more than 190 companies engaged in the business of chemistry – an innovative, economic growth engine that is helping to solve the biggest challenges facing the nation and the world. Its members are the leading companies engaged in all aspects of the business of chemistry, from large corporations to small businesses. ACC's members' groundbreaking innovations improve the world around us by making it healthier, safer, more sustainable, and more productive. The industry's products make it possible to sustain a growing world population, including by protecting food, air, and water supply, supplying affordable energy sources, and delivering new medical treatments.

4.     ACC's core vision is to protect the chemistry industry's unique role in facilitating the growth and global leadership of American industry. Its member-driven philosophy makes ACC the leading, collective voice of the chemistry business. It advocates a science-based public policy agenda to create jobs, spur economic growth, and enhance public and environmental health and safety. This

work includes participating in litigation on its members' behalf to promote or address policies affecting their interests where warranted.

5.       On September 6, 2022, the U.S. Environmental Protection Agency ("EPA") issued the proposed rule that led to the final rule at issue here. The Proposed Rule was entitled "Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances," 87 Fed. Reg. 54,415-01 (Sept. 6, 2022) ("Proposed Rule"). On November 7, 2022, the ACC submitted comments on the proposal.[1]

6.       On May 8, 2024, the U.S. Environmental Protection Agency published the final rule entitled Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances ("Rule"), which is the subject of the above-referenced case.

7.       ACC's members have manufactured and used, and still manufacture and use a multitude of chemistries that may be defined as perfluoroalkyl and polyfluoroalkyl substances (PFAS) for use in their operations and as their products, as well as for use throughout industrial manufacturing and other value chains. PFAS have played a critical role in developing products that have sustained

---

[1] *Comments of the American Chemistry Council on Proposed Rule, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances*, 87 Fed. Reg. 54,415 (Sept. 6, 2022), EPA-HQ-OLEM-2019-0341-0421 (posted Nov. 7, 2022).

3

modern America, such as medical technologies, semiconductors, batteries, phones, cars, and airplanes. For ACC members developing products in, for example, the national security, aerospace, medical and renewable energy industries, the unique properties of product that are PFAS, contain them or are manufactured with them have been indispensable.  Although "PFOA and PFOS are part of a group of humanmade chemicals known as per- and polyfluoroalkyl substances (PFAS)," 89 Fed. Reg. at 39,125 n.1 (May 8, 2024), they are no longer manufactured as a product in the United States. *See* EPA's Fact Sheet: 2010/2015 PFOA Stewardship Program.[2]

8.    ACC's members include entities that, as a result of the Rule, are newly subject to liability risk as "potentially responsible parties" (PRPs) under CERCLA.  For these members, the Rule drastically increases the chances of costly activity."  *Mead Corp. v. Browner*, 100 F.3d 152, 155 (D.C. Cir. 1996).

9.    There are four categories of PRPs under CERCLA: "(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of

---

[2] See in particular the Answer to Q8, which states "PFOS was not reported as manufactured (including imported) into the U.S. as part of the 2012 Chemical Data Reporting (CDR) effort or the previous collection effect in 2006. CDR requires manufacturers (including importers) to report if they meet certain production volume thresholds, generally 25,000 lbs at a single site. The last time PFOS manufacture was reported to EPA as part of this collection effort in 2002….The manufacture and import of PFOA has also been phased out in United States as part of the PFOA Stewardship program."

4

any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment , or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned by possess by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance." 42 U.S.C. § 9607(a).

10.    PRPs can be liable for a broad range of "response" costs incurred by the United States, individual States, Indian tribes, and other parties, including costs of removal or remedial actions and natural resource damages  associated with a hazardous substance under CERCLA, including the release of PFOA, PFOS, or their salts, acids, or structural isomers (hereinafter "PFOA/PFOS") as a result of the Rule.  Also, EPA can issue an administrative order or obtain a court order requiring PRPs to attend to "imminent and substantial endangerment to the public health or welfare or the environment" resulting from a release or threatened release of a hazardous substance.  42 U.S.C. § 9606(a).

5

11.    Certain members of the ACC are at high risk of being identified  as PRPs, and therefore the Rule "drastically increases the chance of costly activity" for these members, *Mead Corp.*, 100 F.3d at 155, and the chances that they will suffer at least some of the harms described above.  Among other things, numerous members of ACC are likely to incur PRP-related costs as a result of the release or disposal of PFOA and PFOS from their facilities in the United States. These include members with historical evidence of PFOA/PFOS being present on or having been released from their property.  The Rule identifies by North American Industrial Classification System (NAICS) codes entities that may be affected by the Rule.  That list includes the following NAICS codes appliable to ACC members:

| Sector | Industry Group | 6-Digit NAICS | 6-Digit NAICS Description |
|---|---|---|---|
| | Basic Chemical Manufacturing | 325110 | Petrochemical Manufacturing |
| | | 325120 | Industrial Gas Manufacturing |
| | | 325130 | Synthetic Dye and Pigment Manufacturing |
| | | 325180 | Other Basic Inorganic Chemical Manufacturing |
| | | 325193 | Ethyl Alcohol Manufacturing |
| | | 325199 | All Other Basic Organic Chemical Manufacturing |
| | Resin, Synthetic Rubber, and Artificial and Synthetic Fibers and Filaments Manufacturing | 325211 | Plastics Material and Resin Manufacturing |
| | | 325212 | Synthetic Rubber Manufacturing |
| | | 325220 | Artificial and Synthetic Fibers and Filaments Manufacturing |

6

| Chemical Manufacturing | Pesticide, Fertilizer, and Other Agricultural Chemical Manufacturing | 325320 | Pesticide and Other Agricultural Chemical Manufacturing |
| | Pharmaceutical and Medicine Manufacturing | 325411 | Medicinal and Botanical Manufacturing |
| | Paint, Coating, and Adhesive Manufacturing | 325510 | Paint and Coating Manufacturing |
| | Soap, Cleaning Compound, and Toilet Preparation Manufacturing | 325611 | Soap and Other Detergent Manufacturing |
| | | 325612 | Polish and Other Sanitation Good Manufacturing |
| | | 325613 | Surface Active Agent Manufacturing |
| | Other Chemical Product and Preparation Manufacturing | 325910 | Printing Ink Manufacturing |
| | | 325992 | Photographic Film, Paper, Plate, and Chemical Manufacturing |
| | | 325998 | All Other Miscellaneous Chemical Product and Preparation Manufacturing |

89 Fed. Reg. 39,124, 39,134 (May 8, 2024).

12.    Further, EPA asserted that "a relatively narrow set of industries," including "PFAS production and processing," had "discharge[d] PFAS into water or soil or generate air emissions in large quantities." U.S. EPA, PFAS Strategic Roadmap: EPA's Commitments to Action, 2021-2024, at 7, 23 n.iii. (Oct. 2021).[3] EPA's Office of Enforcement and Compliance Assurance (OECA) also declared in

---

[3] Available at https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf.

a 2023 memo that the focus of the National Enforcement and Compliance Initiative (NECI) for Fiscal Years 2024–2027 to address exposure to PFAS, once "EPA designates PFOA and PFOS as hazardous substances under" CERCLA, would be to "focus on implementing EPA's PFAS Strategic Roadmap. . . ."  EPA, *FY 2024-2027 National Enforcement and Compliance Initiatives*, at 3 (Aug. 17, 2023) (OECA Memo).[4]

13.    Other members at high risk of being identified as PRPs include those that have completed remedial activities for contaminated sites under CERCLA. These members may be required by EPA to expend additional funds to conduct testing for PFOA/PFOS and, if present, reopen the site for additional and likely expensive remediation.

14.    Other members belong to industries that have been specifically targeted by EPA for enforcement of the Rule.  These include "PFAS production and processing, [and] metal finishing," which EPA included in "a relatively narrow set of industries [that] directly discharge PFAS into water or soil or generate air emissions in large quantities."  PFAS Strategic Roadmap at 7, 23 n.iii.[5]  ACC has many members from each of these particular industries.

---

[4] Available at https://www.epa.gov/enforcement/national-enforcement-and-compliance-initiatives

[5] EPA's Office of Enforcement and Compliance Assurance (OECA) declared in a 2023 memo that the focus of the National Enforcement and Compliance Initiative (NECI) for Fiscal Years 2024–2027 to address exposure to PFAS, once

8

15.     Two of ACC's members, 3M and The Chemours Company, have been directly impacted by the Rule as described more fully in the Chamber declaration. *See* Chamber declaration at ¶ 16.

16.     All members at high risk of being identified as PRPs will be encumbered by a new cloud of potential liability as of the effective date of the Rule.  Further, the Rule impedes members' ability to transact with third parties, such as insurers or potential purchasers of their property or business.

17.     Other members of ACC will immediately incur costs needed to protect themselves from CERCLA liability as a result of the Rule.  These include all members who plan to purchase property that may contain PFOA or PFOS.  To protect themselves from potential CERCLA liability under the "all appropriate inquiries" defense, these landowners are required to investigate, including through a qualified environmental professional, the property they are considering to purchase for CERCLA hazardous substances.

18.     In enacting CERCLA, Congress included several statutory landowner liability protections that private parties can implement without involving EPA.  A condition common to these statutory landowner liability protections is the need to

---

"EPA designates PFOA and PFOS as hazardous substances under" CERCLA, would be to "focus on implementing EPA's PFAS Strategic Roadmap. . . ." OECA Memo at 3.

conduct "all appropriate inquiries" into the previous ownership and uses of a property before the party becomes its owner.

19.    EPA's regulations defining "all appropriate inquiries" require potential property purchasers to engage the services of a qualified environmental professional before closing to investigate the property and identify conditions indicative of releases and threatened releases of substances designated as "hazardous" under CERCLA on, at, in, or to the property.

20.    As a result of the Rule, site investigations will need to be expanded to include searching for PFOA/PFOS, and these expanded site investigations will result in immediate, additional costs to any member that wishes to purchase property, in the form of higher fees assessed by qualified environmental professionals.

21.    I declare under penalty of perjury that the foregoing is true and correct.


Executed this 4th day of November 2024.

Robert J. Simon

No. 24-1193 (and consolidated cases)

═══════════════════════════════════════

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
─────────────

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, ET AL.,

*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, MICHAEL S. REGAN

*Respondents.*
─────────────

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency
─────────────

## DECLARATION OF PAUL R. NOE ON BEHALF OF AMERICAN FOREST & PAPER ASSOCIATION

I, Paul R. Noe, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration upon personal knowledge.

2.      I am Paul Noe, Vice President of Public Policy at the American Forest & Paper Association (AF&PA).

3.    I have been employed by AF&PA for 16 years and held the Vice President of Public Policy title for that time while working on AF&PA regulatory and public policy matters. I have extensive regulatory, technical and legislative experience, including in environmental regulation, regulatory reform, renewable energy, chemicals and product stewardship, workplace health and safety, and sustainability.

4.    AF&PA is a trade association headquartered in Washington, DC. AF&PA serves to advance U.S. pulp, paper, packaging and wood products manufacturers through fact-based public policy and marketplace advocacy. The forest products industry is circular by nature. AF&PA member companies make essential products from renewable and recyclable resources, generate renewable bioenergy and are committed to continuous improvement through the industry's sustainability initiative — *Better Practices, Better Planet 2030: Sustainable Products for a Sustainable Future.*  The forest products industry accounts for approximately 5% of the total U.S. manufacturing GDP, manufactures about $350 billion in products annually and employs about 925,000 people. The industry meets a payroll of about $65 billion annually and is among the top 10 manufacturing sector employers in 43 states. AF&PA informs member companies of regulations and policies that will affect their businesses, collects information, and conducts analyses that are the basis for public comments to regulatory agencies like EPA.

5. On November 7, 2022, AF&PA filed comments in the rulemaking docket for the EPA Final Rule: Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances: Docket ID No. EPA-HQ-OLEM-2019-0341. The AF&PA comments explained how paper mill residuals are safely and beneficially reused. The comments also explained the significant adverse economic impacts on paper mills if opportunities for beneficial reuse are reduced or eliminated as a result of the Final Rule. The comments argued that section 102 of CERCLA requires consideration of these and other costs to ensure reasoned decision-making.

6. The Final Rule will harm AF&PA members.

7. In the preamble and in the Regulatory Impact Analysis, EPA has correctly identified the Paper Manufacturing industry as a sector that is affected by the Final Rule.

8. AF&PA members will incur costs as a result of the rule's reporting obligations. In the past, some AF&PA members used PFOA and PFOS to coat certain specialty papers. However, that use was discontinued over a decade ago. Based on data collected from AF&PA members that is discussed in the September 2021 Multi-Industry Per- and Polyfluoroalkyl Substances (PFAS) study prepared by the Office of Water, EPA has determined that PFAS concentrations in paper mill effluent are too low to warrant setting Clean Water Act discharge standards for the industry. Despite these facts, AF&PA members will incur costs to estimate the

concentration, if any, of PFOA and PFOS in their effluent for the purposes of

determining their reporting obligations under the Final Rule. Absent performing such

an analysis, EPA's reporting regulations require a facility to report the entire volume

of a mixture. Accordingly, if there are even trace amounts of PFOA or PFOS in mill

effluent the entire volume of effluent would be counted when determining whether a

discharge exceeds the reportable quantities established in the Final Rule for PFOA

and PFOS, unless the fraction that consists of PFOA or PFOS is known.  Persons

failing to comply with the CERCLA release reporting requirements can be subject to

both civil and criminal penalties.

     9.   AF&PA members also will incur increased costs for managing

residuals. Paper mill residuals often are used beneficially, as fertilizer and soil

amendments. However, as noted in the AF&PA comments, some of those residuals

may contain very low levels of PFAS, including, in some cases, PFOA and PFOS.

As noted in the AF&PA comments, based on AF&PA's review of samples of paper

mill residuals, median levels of PFOA and PFOS measured in the mill residuals of

AF&PA members are below median levels of PFOA and PFOS found in household

dust. However, any amount of a hazardous substance can be a basis for imposing

liability under CERCLA. And, under the CERCLA liability regime, very small

contributors still incur significant transaction costs.

     10.  EPA recently updated its Interim Guidance on the Destruction and

Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing

Perfluoroalkyl and Polyfluoroalkyl Substances—Version 2 (2024). In this updated guidance, EPA identifies disposal in a hazardous waste landfill, deep well injection, and incineration as management methods more likely to reduce the chance of PFAS releases.

11.   In its comments on the Proposed Rule, AF&PA provided an estimate of the costs to the paper manufacturing industry of disposing of their mill residuals in off-site hazardous waste landfills (a management method now recommended by EPA) and of constructing such landfills on mill property to manage those materials. These costs are estimated to be from $573 million to $766 million a year amortized over nine years.

12.   When analyzing the benefits of the Final Rule, EPA assumed the rule will induce changes to waste management practices and considered those changes to be direct benefits. Accordingly, the costs of those waste management changes are direct costs of the Final Rule, costs that would be borne by AF&PA's members.

13.   I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of October 2024

_____        _____

Paul R. Noe

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF | ) | |
| THE UNITED STATES OF | ) | |
| AMERICA, et al., | ) | |
| | ) | |
| _Petitioner_, | ) | Case No. 24-1193 (Lead Case) |
| | ) | |
| v. | ) | Consolidated with 24-1261, |
| | ) | 24-1266, 24-1271, 24-1272 |
| ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, et al. | ) | |
| | ) | |
| _Respondents_. | ) | |
| _____ | ) | |

**DECLARATION OF ROBIN K. WIENER ON BEHALF OF INSTITUTE
OF SCRAP RECYCLING INDUSTRIES, INC., D/B/A RECYCLED
MATERIALS ASSOCIATION**

I, Robin K. Wiener, declare based on personal knowledge as follows:

1.      I am over eighteen years of age, suffer from no disability that would

preclude me from giving this declaration, and am competent and duly authorized to

make this declaration. The facts contained in this declaration are based on my

personal knowledge and are true and correct.

2.      I am the President of the Institute of Scrap Recycling Industries, Inc.,

doing business as the Recycled Materials Association ("ReMA"). I have been

1

employed by ReMA since 1989, initially to direct environmental compliance issues, and have been President since 2000. I have direct and extensive experience in environmental compliance, product stewardship, and sustainability, particularly in the context of recycled materials and the "circular economy."

3.      ReMA is a trade association representing over 1,400 companies engaged in the recycled materials industry in the United States, as well as well as around the globe, that process, broker, and consume recyclable materials, including metals, paper, plastics, glass, electronics, and textiles. ReMA provides advocacy, education, safety, and compliance training, and promotes public awareness of the vital role recycled materials play in the U.S. economy, global trade, the environment, and sustainable development. ReMA represents the interest of its members in matters before federal and state governments and courts. ReMA brought this action on behalf of its members.

4.      ReMA's members employ over 500,000 people and contribute over $117 billion annually to the U.S. economy, managing over 130 million tons of recyclable materials annually, including metals, vehicles (approximately 15 million annually), appliances, paper, plastics, glass, electronics, and textiles.

5.      Recycling is the backbone of the nation's "circular economy:" recycling and reusing products and materials advances many key sustainability goals, including decreasing the depletion of natural resources, lowering the volume

2

of waste destined for landfills, and decreasing energy use and combatting climate change. Successful recycling requires cooperation among multiple participants: individuals and companies must separate and make available recyclable materials, which are then collected and transported to facilities that sort or process the recyclable materials, to produce a high-quality product for sale to manufacturers to produce the everyday products and infrastructure used throughout our economy.

6.    On September 6, 2022, the U.S. Environmental Protection Agency ("EPA") issued the proposed rule that led to the final rule being challenged in this litigation. "*Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances*," 87 Fed. Reg. 54,415-01 (Sept. 6, 2022) ("Proposed Rule"). On November 7, 2022, ReMA submitted comments on the Proposed Rule, comments that included the impact of the Proposed Rule on the recycled materials industry.[1]

7.    On May 8, 2024, the U.S. Environmental Protection Agency published the final rule entitled *Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances* ("Rule"), 89 Fed. Reg. 39124 (May 8, 2024), which is the subject of this litigation.

---

[1] *Comments of the Institute of Scrap Recycling Industries, Inc. on the Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances*; EPA–HQ–OLEM–2019– 0341– 0556 (November 7, 2022).

3

8.      ReMA's members include many companies that, because of the Rule, are newly subject to significantly increased liability risk as "potentially responsible parties" (PRPs) under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA," also known as "Superfund").

9.      EPA states that the Rule will affect over one hundred industrial sectors and subsectors, and identifies many materials used in commercial and consumer applications, and products that will be affected by the designation of PFOA and PFOS as CERCLA hazardous substances, including metal finishing, pulp and paper, textiles of all sorts (including carpets), plastics, rubber, electronics and electrical equipment, motor vehicles, appliances, and home furnishings.  89 Fed. Reg. at 39,133-39,137. These materials and products, which according to EPA may contain PFOA/PFOS and will be affected by the Rule, are widely recycled by ReMA members.

10.      ReMA's members purchase or otherwise receive recyclable materials from virtually every segment of the U.S. economy. These materials are processed by recyclers to produce high-quality recycled materials used in the manufacture of new consumer products and infrastructure.  At no point in the process do. ReMA's members add PFOA/PFOS to recycled materials. Further, the miniscule residual concentrations of PFOA/PFOS do not serve any purpose in recycled materials, and

4

it is not feasible to test all recycled materials for the potential presence of PFOA/PFOS.

11.    EPA's Rule designating PFOA/PFOS as CERCLA hazardous substances will encumber the recycled materials sector, including ReMA's members, with a new cloud of potential liability that will significantly disrupt the national recycling system. ReMA's members are, by virtue of the Rule, subject to additional liability risks because PFOA/PFOS in recycled materials could contaminate facilities owned by ReMA members due to the regular mechanical recycling processes, and ReMA's members may be exposed to CERCLA "arranger" liability under 42 U.S.C. § 9607(a)(3), even if such ReMA members did not know PFOA or PFOS was present in the recycled materials.  Further, increased CERCLA liability risk will cause additional economic harm to ReMA's members by discouraging recycling and disrupting the recycling system.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of November 2024.

Robin K. Wiener
President
Recycled Materials Association

5

Add. B084